UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GERVIL ST. LOUIS, a/k/a ST. LOUIS GERVIL,<br><br>　　　　　　　　　Plaintiff,<br>　　　v.<br><br>DOUGLAS PERLITZ; FATHER PAUL E. CARRIER, S.J.; HOPE E. CARTER; HAITI FUND, INC.; FAIRFIELD UNIVERSITY; THE SOCIETY OF JESUS OF NEW ENGLAND; SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA, AMERICAN ASSOCIATION, U.S.A., a/k/a ORDER OF MALTA, AMERICAN ASSOCIATION, USA; JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; JOHN DOE FOUR; JOHN DOE FIVE; JOHN DOE SIX; and JOHN DOE SEVEN,<br><br>　　　　　　　　　Defendants. | Civil Action No.: 3:13-cv-01132 (RNC)<br><br>Consolidated with:<br>3:13-cv-1225-RNC; 3:13-cv-1269-RNC;<br>3:13-cv-1437-RNC; 3:13-cv-1480-RNC;<br>3:13-cv-1626-RNC; 3:13-cv-1627-RNC;<br>3:13-cv-1628-RNC; 3:13-cv-1629-RNC;<br>3:13-cv-1630-RNC; 3:13-cv-1631-RNC;<br>3:13-cv-1632-RNC; 3:13-cv-1633-RNC;<br>3:13-cv-1634-RNC; 3:13-cv-1635-RNC;<br>3:13-cv-1636-RNC; 3:13-cv-1637-RNC;<br>3:13-cv-1638-RNC; 3:13-cv-1639-RNC;<br>3:13-cv-1640-RNC; 3:13-cv-1641-RNC;<br>3:13-cv-1642-RNC; 3:13-cv-1644-RNC;<br>3:13-cv-1645-RNC; 3:13-cv-1647-RNC;<br>3:13-cv-1648-RNC; 3:13-cv-1701-RNC;<br>3:13-cv-1767-RNC; 3:13-cv-1768-RNC;<br>3:13-cv-1769-RNC |
| *This document applies to:*<br>*All consolidated cases* | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF DEFENDANT FATHER PAUL E. CARRIER TO DISMISS COUNTS 2 AND 7 AS TO ALL CASES AND TO DISMISS COUNT 5 AS TO SOME CASES**

March 27, 2014

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

SUMMARY OF FACTUAL ALLEGATIONS ................................................................... 3

APPLICABLE LEGAL STANDARD .................................................................................. 11

ARGUMENT ..................................................................................................................... 11

      I.      PLAINTIFFS SUFFICIENTLY ALLEGE THAT FATHER CARRIER IS LIABLE UNDER THE SEX TOURISM STATUTE ....................................................................... 11

            A.    Plaintiffs Allege that Father Carrier Facilitated Perlitz's Travel to Haiti ............................................................................................... 12

            B.    Plaintiffs Allege that Father Carrier Acted for the Purpose of Private Financial Gain ........................................................................ 16

     II.     THIS COURT SHOULD ADHERE TO ITS PRIOR RULINGS WITH RESPECT TO PLAINTIFFS' FIFTH AND SEVENTH CLAIMS FOR RELIEF...................................... 19

            A.    Plaintiffs State Claims Against Father Carrier under the Child Sex Trafficking Statute......................................................................... 19

            B.    Plaintiffs State Claims against Father Carrier for Breach of Fiduciary Duty ...................................................................................... 21

CONCLUSION ................................................................................................................... 23

CERTIFICATE OF SERVICE............................................................................................... 24

i

# TABLE OF AUTHORITIES

*Page*

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 11, 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................... 11, 15, 21

*Conley v. Gibson*, 355 U.S. 41 (1957) .................................................................. 11, 21

*Donohoe v. Arpaio*, 869 F.Supp.2d 1020 (D. Ariz. 2012), *aff'd on other grounds sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9ᵗʰ Cir. 2013) ................................. 16, 17

*G & G Closed Circuit Events, LLC v. DJT Fieldhouse, Inc.*, 11-3016, 2011 WL 4527341 (C.D. Ill. Sept. 28, 2011) ........................................................................................ 19

*J & J Sports Prods., Inc. v. Garcia*, CIV. A. H-08-1675, 2009 WL 2567891 (S.D. Tex. Aug. 14, 2009) ..................................................................................................... 19

*J & J Sports Productions, Inc. v. L & J Grp., LLC*, RWT 09CV3118, 2010 WL 816719 (D. Md. Mar. 4, 2010) .............................................................................................. 19

*J & J Sports Productions, Inc. v. Mayreal II, LLC*, 840 F.Supp. 2d 586 (D. Md. 2012) .......... 18

*J & J Sports Productions, Inc. v. Ribeiro*, 562 F.Supp.2d 498 (S.D.N.Y. 2008) ...................... 19

*Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276 (D. Conn. 2013) ...................................... 10, 19, 20

*Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565 (2d Cir. 2011) ................... 11, 16, 21

*Vega v. Sacred Heart University, Inc.*, 2011 WL 2971782 (D. Conn. July 20, 2011) .............. 11

## Statutes, Rules, and Regulations

18 U.S.C. § 2255 ........................................................................................................... 3

18 U.S.C. § 2423 ...................................................................................................... 3, 14

28 U.S.C. § 1595 ...................................................................................................... 3, 19

Fed. R. Civ. P. 12 ....................................................................................................... 11

Fed. R. Civ. P. 8 .......................................................................................................... 11

## INTRODUCTION

This is the second time the issues in this case have been before this Court. As the Court is aware, these cases arise from allegations that, for a decade, from 1998 until 2008, Defendant Douglas Perlitz sexually abused minor boys, including plaintiff Gervil St. Louis and the plaintiffs in the 29 other cases consolidated with this one (collectively, "Plaintiffs"), who were in his care at a residential school program for poor and destitute children in Haiti.[1]  Taking advantage of some of the most vulnerable children in the world – children who, in many instances, lacked basic food, clothing and shelter, and who were completely dependent on the program at Project Pierre Toussaint ("PPT") – Perlitz sexually abused dozens of boys under the age of eighteen (and in most instances much younger that that).  During this time, Defendant Father Paul E. Carrier ("Father Carrier") – a Jesuit priest who was Perlitz's mentor and sometime-lover – repeatedly visited Perlitz in Haiti to supervise the program at PPT on behalf of Defendants Fairfield University and the Haiti Fund, Inc. ("Haiti Fund"), both of which provided funding to PPT and both of which employed Father Carrier.  During these visits, Father Carrier was presented with overwhelming evidence that Perlitz was engaging in improper sexual relationships with the children in his care:  he saw minor boys in Perlitz's bedroom; saw Perlitz show pornography to minor boys in his bedroom; overheard Perlitz arranging a rendezvous to meet up with a boy at Perlitz's home late

---

[1] Five additional cases on behalf of plaintiffs abused by Perlitz have been filed in this Court, but have not yet been consolidated.  Father Carrier's motion purports to relate to 34 cases, *see* Carrier Br. at 1, without providing a list of case names or docket numbers. The motion was filed only the consolidated docket sheet, and not on the docket sheets of the unconsolidated cases.  Accordingly, Plaintiffs treat this motion as applicable only to the 30 consolidated cases and not to any of the unconsolidated cases in which the motion was not filed.

in the evening; was aware that boys spent the night in Perlitz's bedroom, indeed, were living with Perlitz in his house. Yet during this time, Father Carrier did nothing to stop Perlitz's abuse of the children in his care.

Indeed, Father Carrier did worse than nothing. He not only continued to raise money for PPT, so that Perlitz could continue his activities in Haiti; when word of Perlitz's misconduct reached the Haiti Fund, Father Carrier interfered with and manipulated the Haiti Fund's investigation to prevent the Haiti Fund from discovering that the allegations against Perlitz were true, and he falsely told donors to the Haiti Fund that the charges were groundless. In this way, Father Carrier helped defer Perlitz's day of reckoning and helped prolong the abuse suffered by many of Perlitz's victims.

Perlitz was eventually prosecuted by the U.S. government for his crimes; he pleaded guilty and was sentenced to more than 19 years in prison by this Court. A previous group of cases, the "*Jean-Charles* cases," brought on behalf of 24 of Perlitz's victims[2] was settled in 2013, after this Court denied in part defendants' motions to dismiss and permitted the cases to go forward. Since then, 35 additional victims, including the plaintiff in the lead case, Gervil St. Louis, have filed claims against the same defendants named in the *Jean-Charles* cases; thirty of their cases have been consolidated.

Father Carrier now seeks dismissal, under Rule 12(b)(6), of some, but not all, of the claims against him in the consolidated cases.[3] Recognizing that this Court has

---

[2] Only 23 of the cases had actually been filed as of the time of the settlement.

[3] The Second, Third, Fifth, and Seventh claims in the Complaint in *St. Louis v. Perlitz et al.*, 13-cv-01132 (the "Complaint") are asserted against Father Carrier. Father Carrier seeks to dismiss the Second and Seventh claims as to all plaintiffs, and the Fifth Claim with respect to some of the plaintiffs. The pleadings in the consolidated cases are

*(footnote continued on next page)*

2

already upheld essentially identical claims against him based on negligent hiring and, with respect to some of the plaintiffs, breach of fiduciary duty, Father Carrier does not seek dismissal of those claims.   Nonetheless, he does seek dismissal of Plaintiffs' Seventh Claim for Relief, under 28 U.S.C. § 1595 (the Child Sex Trafficking statute) even though *this Court previously upheld the identical claim against him* in the *Jean-Charles* cases. He also seeks dismissal of Plaintiffs' newly-pleaded claim under 18 U.S.C. §§ 2255 and 2324(b) (the Sex Tourism statute), even though this claim is no longer grounded in aiding and abetting liability (as was a similar claim asserted in the *Jean-Charles* cases), but rather now alleges direct liability.[4]   Finally, Father Carrier argues that some of the Plaintiffs have not properly pleaded their claim for breach of fiduciary duty, even though the language in the Complaint that defendant now claims to be inadequate *is identical to the language in the operative complaint in the* Jean-Charles *cases, and the breach of fiduciary duty claim was upheld as to all plaintiffs in those cases.*

Thus, with respect to two of the three claims at issue on this motion, this Court has already found identical pleadings sufficient and has already denied a motion by Father Carrier to dismiss those claims.   It should do the same here, and further should deny the motion with respect to Plaintiffs' claims under the Sex Tourism statute as well.

### SUMMARY OF FACTUAL ALLEGATIONS

The facts pertaining to Plaintiffs' claims are set forth in the Complaint and

---

substantially identical to the Complaint, except as relates to the specifics of the abuse each plaintiff suffered.  Unless otherwise indicated, all citations to paragraphs of the Complaints may also be read as citations to the corresponding paragraphs in each of the other complaints.

[4] Plaintiffs did not allege in any form the other three claims dismissed by the court in the *Jean-Charles* cases, claims grounded in (a) international law; (b) vicarious liability; and (c) aiding and abetting.

summarized here for the Court's convenience.

Father Carrier is a Catholic priest and a member of defendant The Society of Jesus of New England (the "Jesuit Order"); he was, during the time period at issue in this case, both the University Chaplain and the Director of Campus Ministry and Community Service at defendant Fairfield University. Complaint ¶ 19. In the late 1980's, when Perlitz was a student at Fairfield University and Father Carrier was its Chaplain, Father Carrier and Perlitz became lovers. Complaint ¶¶ 26. Less than ten years later, in 1997, Father Carrier assisted Perlitz in obtaining approval, support, and funding from the Order of Malta, in which Father Carrier held the title of Magistral Chaplain, to start and operate PPT, a program and school for minor boys in Haiti. *Id.* at ¶¶ 19, 29. PPT provided a variety of services, including meals, access to running water for baths or showers, basic classroom instruction, and sports activities. *Id.* at ¶ 30.

Although the original funding for PPT came from the Order of Malta, a group with which Father Carrier was associated, funding and personnel for the project were also provided by three other entities with which Father Carrier was also associated. First, the Haiti Fund was formed to raise money for, and operate, PPT; from its formation, Father Carrier served as a director of the Haiti Fund, and, within a year, he became an officer as well. *See* Complaint ¶¶ 31-32. Together, Perlitz and Father Carrier raised money for the Haiti Fund to support PPT. *Id.* at ¶¶ 53-54. Second, under Father Carrier's direction, Fairfield University supplied student volunteers to PPT through its Mission Volunteers program; the volunteers worked at PPT and were supervised in that work by Father Carrier in his capacity as Director of Campus Ministry and Community Service. Complaint ¶¶ 36-40. Fairfield University also raised over $600,000 for the Haiti Fund and/or PPT. *Id.* From 1997 through 2006, Fairfield University paid Father Carrier approximately $120,000, some or all of which was spent to support Father

Carrier's activities with PPT. *Id.* at ¶ 40.  Finally, Jesuits in training were sent to work at PPT, *see id.* at ¶ 52, and the "Jesuits in the Fairfield Community" co-hosted with Father Carrier a fundraiser to support the Haiti Fund  *Id.* at ¶ 43.  The Order of Malta also continued to support PPT, Complaint ¶¶ 45-50, and Father Carrier raised money for PPT under the auspices of the Order of Malta.  *Id.* at ¶ 49. Father Carrier was thus the link among all the players, bringing together Perlitz, with whom he had been involved since Perlitz's student days, with the Order of Malta, the Haiti Fund, Fairfield University, and the New England Jesuit Order to enable Perlitz to run PPT in Haiti.

Father Carrier and Perlitz started PPT in 1997, *see* Complaint ¶ 29; as alleged in the complaints in these cases and in the *Jean-Charles* cases, by 1998, Perlitz was sexually abusing minor boys who participated in the project.  *See, e.g., Legrand v. Perlitz*, 3:12-cv-15, Complaint ¶ 65 (sexual abuse began in 1998); *Alcime v. Perlitz*, 3:12-cv-9, Complaint ¶ 65 (sexual abuse began in 1999);[5]  *see also Pierre v. Perlitz,* 13-cv-1269 (D. Conn.), Complaint at ¶ 99 (sexual abuse began in 2000). The abuse continued, with Perlitz replacing some of the boys as they aged with younger ones, until Perlitz was removed as director in 2008.  *See, e.g.,* Complaint ¶ 99 (sexual abuse in 2007); *Ilguens v. Perlitz,* 13-cv-1225 (D. Conn.), Complaint at ¶ 99 (sexual abuse in 2008).  Much of the sexual abuse took place in Perlitz's home, in his bedroom.  *See* Complaint ¶¶ 66, 76-79, 83.  Perlitz would suggest that boys spend the night, then molest them while they slept, or were about to go to sleep.  *Id.* at ¶¶ 66-68.  Perlitz often provided intoxicating substances to the minor victims to cloud their judgment and weaken their resistance. *Id.* at ¶ 69. He also showed them pornography on the computer in his bedroom.  *Id.* at ¶¶ 74.

Perlitz's sexual advances to the minor boys in his charge were particularly

---

[5] The *Legrand* and *Alcime* cases were included within the *Jean-Charles* cases.

fiendish in the way they combined abuse of the trust and confidence that the boys naturally placed in one who had been presented to them as their benefactor and who had the endorsement of Father Carrier, Fairfield University, and the Jesuit Order, with outright coercion and commercialization of the sexual relationship. Many of the boys at PPT were completely dependent on Perlitz and the program for food, clothing and shelter. Complaint ¶¶ 30, 70-72, 75. Moreover, through his role at PPT, Perlitz was in a position that the boys at PPT believed they could trust him and have confidence that the conduct Perlitz engaged in was to further their best interests. *Id.* at ¶¶ 62-63. Perlitz was able to trade on this trust – created by the Haiti Fund, Fairfield University, and by Father Carrier, all of whom endorsed and supported him -- to convince impressionable and dependent children to allow him to sexually molest them. In addition, Perlitz demanded sexual favors in exchange for shoes, clothing, money or other necessities. Complaint ¶¶ 70-73. Boys who were willing to accede to Perlitz's demands were provided with new clothes and shoes, as well as cash, while boys who refused Perlitz's demands were forced to go without basic necessities. In many instances, Perlitz would tell the boys that for them to continue to live at PPT's facilities, they had to engage in sexual activity with Perlitz. They understood if they could not continue to live at PPT's facilities, they were faced with the stark reality that they would have to return to living on the streets. *Id.* Perlitz thus forced the boys to prostitute themselves, even as he continued to present himself as their benefactor looking after their welfare.

Perlitz made little effort to conceal the nature of his relationship with the boys at PPT. Boys frequently spent the night at Perlitz's home, which was the PPT staff residence, in Perlitz's bedroom, even while visitors or PPT staff members were staying in the house as well. Complaint ¶¶ 66, 82. Some of the boys lived outright with Perlitz. *Id.* at ¶ 66. The staff residence was extremely small, and the shape and design were

such that Perlitz's room was visible from other rooms in the house. As a result, there was little privacy and it was difficult to conceal from the rest of the house activities taking place in any part of it. *Id.* at ¶ 76. Moreover, the sexual abuse was widely known at PPT. Not only did it involve large numbers of children, but, on several occasions, some of those children told staff at PPT about the abuse. For example, several of the boys that Perlitz abused told a psychologist/social worker named Margaret Joseph, about the abuse. Complaint ¶ 84. At least one boy told one of the tutors. Other staff members, including teachers, drivers, and a cook were aware that Perlitz was sexually abusing some of the boys at PPT. *Id.* Staff volunteers and even a nun in Haiti with whom Father Carrier was acquainted all had concerns about Perlitz and about the situation at the staff residence. *Id.* at ¶ 80.

During the 11 years that PPT was operational, Father Carrier made numerous trips to Haiti in connection with the project. Complaint ¶¶ 34, 64, 85. As the Chairman and then President of the Haiti Fund, and as Director of Campus Ministry and Community Service at Fairfield University, Father Carrier was obliged to supervise and monitor the program at PPT, which was being supported with funds from the Haiti Fund and from Fairfield University, and which was being staffed, in part by volunteers from Fairfield University and by Jesuits in training. Complaint ¶¶ 19, 29-32, 36-49. During his trips to Haiti, Father Carrier was confronted on numerous occasions with evidence that Perlitz was engaging in improper relationships with the boys in his care. As alleged in the Complaint, Father Carrier was present at Perlitz's home boys from PPT were also there. Complaint ¶ 89. He saw minor boys from PPT in Perlitz's bedroom, where, because PPT had residential facilities, there was no legitimate reason for them to be. *Id.* Father Carrier also saw Perlitz show at least one PPT student a pornographic video on Perlitz's computer in Perlitz's bedroom. He was aware that at

7

least one of the boys was living in Perlitz's house. *Id.* On at least one occasion, Father Carrier was present when Perlitz arranged a rendezvous at his house with one of the boys for late in the evening. He was was present when Perlitz hugged one PPT minor student so that the front of Perlitz's body was pressed against the back of that minor's body. *Id.* And he spent an evening at Perlitz's house in an upstairs bedroom when one of the minor boys slept in Perlitz's bedroom downstairs and was sexually abused by Perlitz that evening. *Id.* He also knew that yet another minor boy was sleeping in Perlitz's bedroom. *Id.*

Moreover, these events occurred in a context where Father Carrier had every reason to be on the alert for precisely this kind of situation. Over the last four decades, the New England Jesuit Order has had several members who have sexually abused numerous children. Complaint ¶¶ 25. The Jesuit Order was not alone in this and the abuse of minors by Catholic clergy in the United States and around the world has become a major scandal. Complaint ¶¶ 60, 91-92 In 1995, before Father Carrier and Perlitz set up PPT, the National Conference of Catholic Bishops released a document entitled "Walk in the Light: a Pastoral Response to Child Sex Abuse." *Id.* The document recognized the problem of child sex abuse and the need for the Church to take steps to address it. In 2002, the United States Conference of Catholic Bishops at a widely publicized meeting issued a document entitled "Charter for the Protection of Children and Young People." This document recognized the need for clear and well-publicized "standards of ministerial behavior and appropriate boundaries for clergy and for any other church personnel in positions of trust who have regular contact with children and young people." The Jesuit Order states that it abides by the "Charter for the Protection of Children and Young People." In addition, the Jesuit Order in January 2006 promulgated "Ethics in Ministry Policies" which proscribed the conduct in which

8

Perlitz engaged. Complaint ¶¶ 60, 91. From 1998 through 2008, in his capacity as Chaplain and Director of Campus Ministry and Community Service at Fairfield University, Father Carrier was supervising Perlitz as he operated a program for young boys, precisely the kind of setting addressed in "Walk in the Light" and the Charter for the Protection of Children and Young People.

Yet Father Carrier did nothing to stop Perlitz. Despite all the evidence in front of him, he made no effort to investigate and never spoke to the boys at PPT in private about their experiences. Complaint ¶¶ 85-89. If any of the staff members who knew about Perlitz's abuse of the children told him about it, he ignored it. *Id.* at ¶ 86. He ceased to speak to a staff member who had confronted Perlitz, *see* Complaint ¶ 87, presumably at Perlitz's behest. He continued to raise money for PPT throughout this period, until sometime in 2008, *see* Complaint ¶ 54, thus enabling Perlitz to continue on at PPT and to continue molesting children.

Finally, in late 2007 or early 2008, the Haiti Fund, having learned of rumors of Perlitz's abuse of the minors in his care, launched an investigation. But that investigation was intended to discredit the charges and exonerate Perlitz. Complaint ¶ 97. Father Carrier manipulated the investigation, and/or allowed Perlitz to manipulate it, by preventing and precluding other Haiti Fund board members – or anyone else – from questioning potential independent witnesses or otherwise engaging in any serious investigation. As a result, the Haiti Fund's initial report declared there was no merit to claims Perlitz was sexually abusing boys at PPT. *Id.* In 2008, having failed to put to bed charges about Perlitz's conduct, the Haiti Fund launched a second investigation. Rather than assist that investigation with what he had seen in Haiti, Father Carrier instead wrote a letter to Haiti Fund donors stating that the accusations against Perlitz were groundless. *Id.*

9

Despite Father Carrier's best efforts to protect him, Perlitz was eventually convicted in this Court of violating the "Sex Tourism Statute. Complaint ¶ 1. The *Jean-Charles* cases followed. Defendants, including Father Carrier, moved to dismiss the claims against them in the *Jean-Charles* cases, arguing they could not be held liable for Perlitz's crimes, or for their own conduct in enabling him, failing properly to supervise him, and breaching their duties to the plaintiffs. After extensive briefing, the Court held oral argument on the motions, questioning the parties closely over the course of an entire afternoon. On March 31, 2013, this Court issued its detailed, 26-page opinion, carefully analyzing each claim in order to reach its conclusions. *See Jean-Charles v. Perlitz,* 937 F. Supp. 2d 276 (D. Conn. 2013). On the basis of this analysis, the Court granted dismissal of certain claims, but denied the motions to dismiss as to others. In particular, with respect to Father Carrier, this Court upheld Plaintiffs' pleadings with respect to their claims for negligent hiring and supervision, breach of fiduciary duty, and violation of the Child Sex Trafficking Statute. Following the Court's decision on the motions to dismiss, the parties to the *Jean-Charles* cases reached a settlement and the actions were dismissed.

Since then, additional victims have asserted the same claims against Father Carrier and the other defendants. (It is hardly surprising that additional victims have come forward, in light of the length of time that Perlitz was in Haiti with unfettered access to homeless and destitute boys). In the Complaint, Plaintiffs have pleaded, in identical language, the three claims against Father Carrier that were upheld by this Court in *Jean-Charles* (for negligent hiring and supervision, breach of fiduciary duty, and violation of the Child Sex Trafficking Statute) and one additional claim, under the Sex Tourism Statute. (Although the Court dismissed the claim against Father Carrier under the Sex Tourism Statute in the *Jean-Charles* cases, that claim was predicated on

"aiding and abetting" liability, which this Court held did not apply.  In the Complaint at issue now, Plaintiffs plead a claim for direct liability under the Sex Tourism Statute.)

## APPLICABLE LEGAL STANDARD

On a motion to dismiss under Fed. R. Civ. P 12(b)(6), the Court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565, 567 (2d Cir. 2011); *accord Vega v. Sacred Heart University, Inc.*, 2011 WL 2971782, *1 (D. Conn. July 20, 2011) (Hall, J.).  The complaint is judged under the general pleading standard of Fed. R. Civ. P. 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Rule 8(a)(2), the pleading must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). A complaint governed by Rule 8 need not contain detailed factual allegations; it need only allege enough factual matter to suggest that the pleader's conclusion is plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This does not impose a probability requirement at the pleading stage, but simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence to support the claim. A claim is facially plausible if it includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where legal conclusions are supported by factual allegations, a court must "assume their veracity." *Id.* 129 S. Ct. at 1950.

## ARGUMENT

### I.    PLAINTIFFS SUFFICIENTLY ALLEGE THAT FATHER CARRIER IS LIABLE UNDER THE SEX TOURISM STATUTE

Father Carrier claims he cannot be liable under the Sex Tourism Statute (Plaintiffs' Second Claim for Relief) because, he argues, Plaintiffs have not sufficiently

11

alleged that Father Carrier arranged, induced, procured, or facilitated Perlitz's travel to Haiti or that he did so "for the purpose of commercial advantage or private financial gain." Carrier is wrong: the Complaint adequately alleges both of these elements.

### A.    Plaintiffs Allege that Father Carrier Facilitated Perlitz's Travel to Haiti

Plaintiffs have alleged that Father Carrier facilitated Perlitz's travel to Haiti. Specifically, they allege:

> In approximately 1997, Perlitz, with the assistance of Father Carrier, Carter, Fairfield University, and John Doe One through John Doe Five obtained approval, support, and funding from the Order of Malta to start and operate PPT, a school for boys in Cap-Haitien, Haiti. Complaint ¶ 29.

> In November, 2005, Father Carrier and the "Jesuits in the Fairfield Community" held a fundraiser "to support the missions in Haiti and Bridgeport." Complaint ¶ 43.

> A letter signed by Father Carrier in the summer of 2002 to the "Friends of Project Pierre Toussaint" also described Perlitz and one of the PPT volunteers as "Malta lay missionaries." The letter asked recipients to make donations to support these Malta lay missionaries. . . . Complaint ¶ 49.

> The Haiti Fund, Father Carrier and Fairfield University facilitated Perlitz's travel to Haiti by providing funds for such travel and/or scheduling Perlitz's trips to Haiti. Complaint ¶ 53.

> From at least 1999 to sometime in 2008, Father Carrier and Carter participated in raising substantial funds for the Haiti Fund from residents of Connecticut, New York and other states to support activities of PPT in Haiti. Complaint ¶ 54.

> As the Chairman and then President of the Haiti Fund, and as Director of Campus Ministry and Community Service at Fairfield University, Father Carrier was obliged to supervise and monitor the program at PPT, which was being supported with funds from the Haiti Fund and from Fairfield University, and which was being staffed, in part by volunteers and missionaries from Fairfield University and by Jesuits in training. Father Carrier knew that Perlitz used substantial portions of funds from the Haiti Fund and from Fairfield University to finance Perlitz's frequent trips to, and extended stays in, Haiti. Complaint ¶ 55.

> Father Carrier, the Haiti Fund, and Fairfield University, in order to promote PPT and receive the financial benefits from their involvement

with PPT, arranged for, or facilitated, Perlitz's numerous trips to, and extended stays in, Haiti when Father Carrier, the Haiti Fund, and Fairfield University knew or should have known that Perlitz was traveling to Haiti to engage in illicit sexual conduct with minors in Haiti. Complaint ¶ 116.

Together, these allegations allege that Father Carrier personally raised money for the purpose of sending Perlitz to Haiti and maintaining him there, that Father Carrier was in a position to decide how the money he raised would be spent, that he was aware that substantial portions of the money that he raised were being used "to finance Perlitz's frequent trips to, and extended stays in, Haiti," and that he approved the use of the funds in this manner. This is sufficient to allege that Father Carrier "facilitated" Perlitz's travel to Haiti.

According to the Merriam-Webster online dictionary, the word "facilitate" means: "to make (something) easier: to help cause (something)" or "to help (something) run more smoothly and effectively." (The definition that Father Carrier uses is not at odds with this one. *See* Carrier Br. at 14.) Plaintiffs allege that Father Carrier made it easier for Perlitz to travel to Haiti and caused that travel to happen, by knowingly providing the funds for it. Plaintiffs specifically allege Father Carrier's *personal* involvement in providing these funds: they allege that he personally assisted Perlitz in obtaining the original funding from the Order of Malta to permit Perlitz to go to Haiti, Complaint ¶ 29; that he personally held a fundraiser and sent a solicitation letter to obtain funding that permitted Perlitz to continue to travel back and forth and to remain in Haiti, Complaint ¶¶ 43, 49, 53-43; and that he personally knew that Perlitz was using portions of the money raised to travel to, and remain in, Haiti. Complaint ¶ 55.

Father Carrier's argument that these allegations are insufficient begins by ignoring several of the relevant allegations, including the allegations in ¶¶ 29, 43, 49, 54, and 116, and focusing only ¶¶ 53 and 55. But, of course, in ruling on Father Carrier's

13

motion, this Court must consider all of the allegations, not merely those Father Carrier acknowledges.    Father Carrier then claims that the paragraphs he does acknowledge insufficiently allege a *mens rea* for the underlying criminal act.  *See* Carrier Br. at 14. In making this argument, however, Father Carrier ignores the language of the statute, which defines the requisite *mens rea* for the ancillary offense of facilitation.

> Section 2423(d) provides:

> Whoever, for the purpose of commercial advantage or private financial gain, arranges, induces, procures, or facilitates the travel of a person *knowing that such a person is traveling in interstate commerce or foreign commerce for the purpose of engaging in illicit sexual conduct* shall be fined under this title, imprisoned not more than 30 years, or both.

18 U.S.C.A. § 2423 (emphasis added).  The Complaint is replete with allegations from which it can be inferred that Father Carrier knew that Perlitz was travelling to Haiti for the purpose of, *inter alia*, engaging in illicit sexual conduct.  (That Perlitz may have had other purposes as well is beside the point, if Father Carrier knew that the illicit sexual conduct was one of the purposes of the travel to Haiti.)  For example, Plaintiffs allege:

> Father Carrier and Carter became aware that Perlitz was engaged in conduct that endangered minor boys participating in PPT. In spite of this information, Father Carrier and Carter assisted and facilitated Perlitz in Perlitz's efforts to sexually abuse minor boys participating in PPT and in Perlitz's efforts to conceal his sexual abuse of minors participating in PPT.

Complaint ¶ 64.  Plaintiffs also allege:

> Both Father Carrier and Carter saw minor boys from PPT in Perlitz's bedroom in the Bel Air house. Because PPT had residential facilities, there was no legitimate reason for the boys to be present at Perlitz's home, even less to be in his bedroom in the Bel Air house.

> Father Carrier saw Perlitz show at least one PPT student a pornographic video on Perlitz's computer in Perlitz's bedroom in the Bel Air staff residence.

> Both Father Carrier and Carter were aware that at least one of the boys was living in the Bel Air house.

> On at least one occasion, Father Carrier was present when Perlitz

14

arranged a rendezvous at the Bel Air house with one of the boys for late in the evening.

Father Carrier was present when Perlitz hugged one PPT minor student so that the front of Perlitz's body was pressed against the back of that minor's body.

Father Carrier spent an evening at the Bel Air staff residence in an upstairs bedroom when another minor slept in Perlitz's bedroom downstairs and was sexually abused by Perlitz that evening. Father Carrier knew that yet another minor was sleeping in Perlitz's bedroom in the Bel Air house.

Father Carrier was well aware that the Bel Air residence was several miles from PPT's residential facilities and that there was no transportation available to take boys back to PPT late at night. When Father Carrier saw boys there late at night, he knew they would be spending the entire night there

Complaint ¶ 89. Plaintiffs further allege that "The visits to PPT by Father Carrier . . . occurred at a time when those in leadership positions of organizations affiliated with the Catholic Church were well aware of the potential for sexual abuse of minor children by adults charged with looking after their well-being." *Id.* at ¶ 91. They also alleged that Father Carrier "facilitated Perlitz's crimes by continuing to provide him money and facilities to run PPT in the face of evidence that Perlitz was maintaining inappropriate relationships with boys in his care." *Id.* at 92. These allegations are sufficient to give rise to an inference that Carrier facilitated Perlitz's travel to Haiti knowing that Perlitz was traveling for the purpose of engaging in illicit sexual conduct. Moreover, Plaintiffs' allegations that Father Carrier continued to facilitate Perlitz's travel to Haiti over the entire time period in question, and that Father Carrier manipulated the Haiti Fund's investigation of Perlitz (and/or permitted Perlitz to manipulate it), *see* Complaint ¶ 97, further permits the inference that Father Carrier specifically intended to facilitate Perlitz's crimes in Haiti. These inferences are plausible, and accordingly, the Court is required to draw them for purposes of this motion to dismiss. *See Iqbal,* 556 U.S. 662, 679 (court to assume veracity of factual allegations); *Twombly,* 550 U.S. at 570 (plaintiff

15

need only allege enough factual matter to suggest that the pleader's conclusion is plausible); *Katzman*, 660 F.3d at 567 (court to draw all reasonable inferences in plaintiff's favor).

**B.     Plaintiffs Allege that Father Carrier Acted for the Purpose of Private Financial Gain**

Father Carrier also argues that Plaintiffs have not alleged the he acted for the purpose of financial gain. He argues that Plaintiffs do not allege that he "did anything to try to obtain for himself some of the money that the Haiti Fund raised."  *See* Carrier Br. at 11-12.  But again, in order to make this argument, Father Carrier ignores the actual allegations of the Complaint, at least two paragraphs of which allege facts that support the inference that Father Carrier acted for the purpose of financial gain.  First, Plaintiffs allege that "Father Carrier knowingly benefitted financially from PPT in that Father Carrier was an officer of the Haiti Fund, which received large sums of money, apparently with substantial sums not accounted for."  Complaint ¶ 114.  Thus, Plaintiffs allege both that some of the money that went to the Haiti Fund is not accounted for and also that Father Carrier had access to that money.  Second, Plaintiffs allege that "from 1997 through 2006, Fairfield University paid Father Carrier approximately $120,000, some or all of which was spent to support Father Carrier's activities with PPT."  Complaint ¶ 40.  Thus, Plaintiffs allege that some of the money that Father Carrier received may have been dependent on the continued operation of PPT, which in turn required Father Carrier to facilitate Perlitz's role, with knowledge of what Perlitz was doing in Haiti.  Accordingly, the Complaint alleges that Father Carrier acted for the purpose of financial gain.

Father Carrier makes much of two cases involving statutes with similar language, but neither is on point.  In *Donohoe v. Arpaio*, 869 F.Supp.2d 1020 (D. Ariz. 2012), *aff'd on other grounds sub nom. Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013), the

district court found that the plaintiffs had not sufficiently alleged that defendants had acted for financial gain[6], but the facts of that case are so different and distinctive that the case simply sheds no light here.  In *Donohoe,* plaintiffs alleged that the Maricopa County Sheriff's Office and the Maricopa County Attorney's Office engaged in a political vendetta against members of the Maricopa County Board of Supervisors and certain judges of the Maricopa County Superior Court, including bringing frivolous prosecutions and civil lawsuits against them.  Plaintiffs alleged that defendants used an investigative unit of the Sheriff's office, the Maricopa Anti-Corruption Enforcement ("MACE") team, to carry out some of the improper activities.  Plaintiffs' argued that the heightened appearance of public corruption that resulted from the MACE unit's involvement permitted the Sheriff to raise money for the Sheriff's office, as well as for the Sherriff's and the County Attorney's political campaigns, and also that one of the objectives of the improper activities was to divert funds from certain county projects to the Sheriff's office and the County Attorney's office.  869 F.2d at 1066.  The court found

---

[6] Father Carrier's citation of *Donohoe* suggests that the Ninth Circuit affirmed the district court's holding on this point, see Carrier Br. at 10, but that is not the case.  In *Donohoe,* the court granted certain defendants' motions to dismiss with respect to plaintiffs' claim under the Arizona racketeering statute, on the basis that plaintiffs had not pleaded that defendants acted for financial gain. The court also dismissed a handful of other claims on various grounds, but permitted the remainder of the claims to go forward, despite defendants' claim to absolute immunity from all claims.  Defendants appealed; their appeal from the denial of their motion to dismiss was permissible because the denial of absolute immunity constituted an immediately appealable final decision. On appeal, the Ninth Circuit affirmed the district court's refusal to dismiss the remaining claims on the ground of absolute immunity.  It does not appear that the plaintiffs appealed from the dismissal of the racketeering claim or any of the other dismissed claims (nor would it seem they could have, since fewer than all claims were dismissed, so the dismissal was not a final decision).  Accordingly, the Ninth Circuit had no occasion to consider the portion of the district court opinion on which Father Carrier relies here. In no sense can that portion of the opinion be deemed to have been affirmed.

that any indirect and incidental fund-raising benefit was insufficient to support allegations that defendants acted for financial gain. It is clear that, in *Donohoe,* the fund-raising benefits alleged were entirely distinct from the activities – malicious investigations and prosecutions – that gave rise to the racketeering claims. That is why the court referred to them as "indirect" and attenuated." *Id.* Here, by contrast, the fundraising activities at issue *were the means by which Father Carrier facilitated Perlitz's travel to Haiti*. Far from being separate from the activities that give rise to Plaintiffs' claim under § 2255, the money that was raised for PPT was at the heart of the improper conduct. The extent to which Father Carrier also made use of that money for himself remains to be seen, but, as shown above, Plaintiffs have alleged sufficient facts from which the Court can infer that Father Carrier raised money to send Perlitz to Haiti (and keep him there) in part to benefit himself financially.

The other authority cited by Defendant, *J & J Sports Productions, Inc. v. Mayreal II, LLC*, 840 F.Supp. 2d 586 (D. Md. 2012), similarly is of no help to Father Carrier. The issue in *Mayreal II* was whether a motive for commercial advantage or private financial gain could be imputed to an officer, director, shareholder, employee, agent, or other representative of an entity that acted for such purpose, merely on the basis of the relationship. The *Mayreal II* plaintiff asserted no allegations with respect to the individual defendants other than their relationship with the entity and sought to impose vicarious liability. The court found that the plaintiff had insufficiently pleaded a claim against the individuals. Here, by contrast, Plaintiffs do not seek to impose liability on Father Carrier merely by virtue of his position at the Haiti Fund. Rather, Plaintiffs allege that some of the Haiti Fund money is actually unaccounted for and also that some of the money Father Carrier was paid by Fairfield may have been dependent on his ongoing work at PPT. Complaint ¶¶ 40, 114. These allegations are sufficient to

18

support the claim that Father Carrier acted for financial gain.  The question whether the relationship alone is sufficient to impute the motive thus does not arise here.[7]

## II.    THIS COURT SHOULD ADHERE TO ITS PRIOR RULINGS WITH RESPECT TO PLAINTIFFS' FIFTH AND SEVENTH CLAIMS FOR RELIEF

Father Carrier raises two issues already disposed of by this court in its opinion in *Jean-Charles*, one pertaining to the Child Sex Trafficking Statute, and the other pertaining to the breach of fiduciary duty claim.  This Court should adhere to its prior rulings on these questions, and deny Father Carrier's motion to dismiss Plaintiffs' Fifth and Seventh Causes of action.

### A.    Plaintiffs State Claims Against Father Carrier under the Child Sex Trafficking Statute

Father Carrier argues that Plaintiffs have not pleaded a claim against him under the Child Sex Trafficking Statute, 28 U.S.C. § 1595, because, he claims, Plaintiffs have not alleged that he actually benefitted from any of Perlitz's activities.  This Court has already rejected this argument in *Jean-Charles*, where it upheld the Twelfth Claim for Relief against Father Carrier. *See* 937 F. Supp. 2d at 288-89.  The Seventh Claim for Relief here, under the Child Sex Trafficking Statute, is identical in every respect to the Twelfth Claim for Relief upheld in the *Jean-Charles* cases; the factual allegations applicable to all

---

[7] Even if it did, Plaintiffs note – and Father Carrier himself acknowledges -- that other district court cases have found mere ownership or control a sufficient basis to impute a motive for financial gain from an entity to the owner or controlling individual. *See, e.g., J & J Sports Productions, Inc. v. L & J Grp., LLC,* RWT 09CV3118, 2010 WL 816719 (D. Md. Mar. 4, 2010) (principals and co-owners may be vicariously liable where entity acted for financial gain); *see also G & G Closed Circuit Events, LLC v. DJT Fieldhouse, Inc.*, 11-3016, 2011 WL 4527341 (C.D. Ill. Sept. 28, 2011) (vicarious liability based on supervisory control and financial gain to the entity); *J & J Sports Prods., Inc. v. Garcia*, CIV. A. H-08-1675, 2009 WL 2567891 (S.D. Tex. Aug. 14, 2009) (imposing vicarious liability on owner of establishment); *J & J Sports Productions, Inc. v. Ribeiro*, 562 F.Supp.2d 498 (S.D.N.Y. 2008) (vicarious liability based on supervisory control and financial gain to the entity).

claims include all of the facts alleged in the *Jean-Charles* cases, plus additional facts available to Plaintiffs that were not included in the complaints in the prior cases, and the claim itself is taken *verbatim* from the claim that was previously upheld.  Moreover, in *Jean-Charles*, this Court specifically rejected the very same argument Father Carrier makes here, holding:  "To the extent Father Carrier argues that he did not benefit financially from participation in PPT, the complaint contains sufficient allegations to the contrary."  *Jean-Charles,* 937 F. Supp. 2d at 289 n.12.    Father Carrier nowhere acknowledges that this Court has already addressed this argument, and offers no reason for this Court to depart from its prior ruling.

Nor is there any basis for the Court to do so.  As was true with respect to the Sex Tourism claim, Father Carrier suggests that Plaintiffs seek to impose liability on Father Carrier vicariously, solely by virtue of his position at the Haiti Fund. But that is not the case.  Rather, as discussed above, Plaintiffs allege that Father Carrier received money from Fairfield University, some of which was on account of his work at PPT; Plaintiffs further allege that some of the money raised by the Haiti Fund remains unaccounted for.  These were the same allegations the Court found sufficient in the *Jean-Charles* cases.

Nonetheless, Father Carrier contends that the latter allegation is insufficient, because Plaintiffs do not actually allege that Father Carrier took the money that is unaccounted for.  But Plaintiffs *also* allege that Father Carrier was an officer of the Haiti Fund, indeed, that at various times, he was Chairman, President, or Vice-President of that entity.  If money is unaccounted for, it is a plausible inference that Father Carrier had something to do with it.  Of course, more would be required to *prove* Plaintiffs' claims; the issue is what Plaintiffs must *plead* to survive a motion to dismiss.  As discussed above, on a motion to dismiss, he Court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."

*Katzman*, 660 F.3d at 567.  Moreover, under Rule 8(a)(2), a  pleading need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47; it need not contain detailed factual allegations and need only allege enough factual matter to suggest that the pleader's conclusion is plausible. *Twombly*, 550 U.S. at 570.  The Complaint contains enough factual material for the Court to infer that Father Carrier actually benefitted from Perlitz's activities.  As this Court previously recognized, no more is required.

**B.    Plaintiffs State Claims against Father Carrier for Breach of Fiduciary Duty**

This Court previously denied Father Carrier's motion to dismiss the breach of fiduciary duty claim in the *Jean-Charles* cases.  Father Carrier now seeks dismissal of the identical claim with respect to 18 of the plaintiffs.  Inexplicably, Father Carrier contends that these 18 plaintiffs have not alleged that they were ever students at PPT.  This is simply not so. Each and every complaint in each and every one of the consolidated cases contains the following allegation:   "Perlitz used that trust and authority to sexually molest *Plaintiff and numerous other minor boys who attended PPT*. Complaint ¶ 3 (emphasis added).  The plain meaning of the sentence is that the referenced plaintiff and the other minor boys all attended PPT.   Indeed, Father Carrier apparently understood the allegation that way in the *Jean-Charles* cases, where the exact same allegation appeared *verbatim* in the operative complaints there.   *See Jean-Charles v. Perlitz*, 11-cv-614, Third Amended Complaint (Doc. #197) ("TAC") ¶ 3.  (For the Court's convenience in comparing the allegations in *Jean-Charles* and those at issue here, a copy of the TAC is annexed as Exhibit A.)   In case the allegation of paragraph 3 is not sufficiently clear, the Complaint also alleges that "Father Carrier . . . had a fiduciary obligation to the *Haitian minors participating in PPT, specifically including Plaintiff*." Complaint ¶ 139.  In light of this allegation, it is frivolous for Father Carrier to contend

that the 18 plaintiffs as to which Father Carrier seeks dismissal do not allege that they participated or attended PPT. This allegation, too, appeared *verbatim* in the *Jean-Charles* cases, *see* TAC ¶ 130, and clearly was understood to allege participation at PPT for each plaintiff.

Nonetheless, Father Carrier now argues that because some, but not all, of the plaintiffs also allege that Perlitz used threats about their continued participation at PPT to coerce them into performing sexual acts, the Court should infer that the plaintiffs who were not so threatened did not attend PPT at all. *See* Carrier Br. at 7-8. This is nonsense. The allegations about coercive threats are in addition to the overall allegation that Perlitz molested each plaintiff and others *who attended PPT* and that Father Carrier owed a duty to minors at PPT, *including specifically each plaintiff.* These additional allegations in no way alter or undermine the meaning of the ¶¶ 3 and 139, which were previously understood to allege attendance at PPT and should be understood in the same way now. This Court should deny Father Carrier's motion to dismiss the breach of fiduciary duty claim as to the 18 boys whose complaints do not include additional (and, for this purpose, irrelevant) allegations about PPT beyond the basic fact of attendance.[8]

---

[8] Although Plaintiffs believe the allegations are clear, they recognize that the grammar could be clearer. If the Court finds the allegations that each plaintiff attended PPT to be insufficiently clear in any way, Plaintiffs respectfully request leave to amend to clarify the matter.

## CONCLUSION

For the foregoing reasons, this Court should deny Father Carrier's motion to dismiss in its entirety.

Dated:  March 27, 2014                    LAW OFFICES OF MITCHELL GARABEDIAN

                                   By:    /s/    Mitchell Garabedian
                                          Mitchell Garabedian (phv04676)
                                          garabedianlaw@msn.com  (phv04677)
                                          William H. Gordon
                                          garabedianlaw@earthlink.net
                                          100 State Street, 6th Floor
                                          Boston, MA 02109
                                          Phone:  (617) 523-6250

                                          Paul J. Hanly, Jr. (phv04680)
                                          phanly@hanlyconroy.com
                                          Jayne Conroy (phv04679)
                                          jconroy@hanlyconroy.com
                                          Andrea Bierstein (phv04678)
                                          abierstein@hanlyconroy.com
                                          HANLY CONROY BIERSTEIN SHERIDAN FISHER &
                                          HAYES LLP
                                          112 Madison Ave., 7th floor
                                          New York, New York 10016
                                          Phone:  (212) 784-6400

                                          Steven J. Errante (ct04292)
                                          SErrante@ltke.com
                                          Marisa A. Bellair (ct23802)
                                          MBellair@ltke.com
                                          LYNCH, TRAUB, KEEFE, & ERRANTE, P.C.
                                          P.O. Box 1612
                                          52 Trumbull Street
                                          New Haven, CT 06510
                                          Phone:  (203) 787-0275
                                          Fax:  (203) 782-0278

                                          Attorneys for Plaintiffs

23

CERTIFICATE OF SERVICE

I certify that on March 27, 2014, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on March 27, 2014, the foregoing document was sent by first-class mail, postage prepaid, to:

        (1) Counsel for Defendant Douglas Perlitz at the below address:
            David T. Grudberg, Esq.
            Carmody & Torrance, LLP
            195 Church St.
            PO Box 1950
            New Haven, Conn. 06509-1950

        (2) Defendant Haiti Fund, Inc. at the below address:
            Haiti Fund, Inc.
            c/o Mr. Michael McCooey
            Chairman
            475 Polly Park Road
            Rye, NY 10580


        /s/    Mitchell Garabedian
            Mitchell Garabedian