```
 1                  UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF CONNECTICUT

 3

 4    - - - - - - - - - - - - - - - - x
                                      :
 5    GERVIL ST. LOUIS,               :   No. 3:13CV1132(RNC)
                      Plaintiff,      :
 6                                    :
                 vs                   :
 7                                    :
      DOUGLAS PERLITZ, ET AL,         :
 8                    Defendants.     :   FEBRUARY 17, 2015
      - - - - - - - - - - - - - - - - x
 9

10

11                     STATUS CONFERENCE

12

13

14        BEFORE:  HON. ROBERT N. CHATIGNY, U.S.D.J.

15

16

17

18

19                              Darlene A. Warner, RDR-CRR
                                Official Court Reporter
20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2          FOR GERVIL ST. LOUIS:

 3                  SIMMONS HANLY CONROY, LLP
                        112 Madison Avenue; 7th Floor
 4                      New York, New York 10016
                    BY:  PAUL J. HANLY, JR., ESQ.
 5                       ANDREA BIERSTEIN, ESQ.
                         ELLYN HURD, ESQ.
 6
                    LAW OFFICES OF MITCHELL GARABEDIAN
 7                      100 State Street
                        6th Floor
 8                      Boston, Massachusetts 02109
                    BY:  MITCHELL GARABEDIAN, ESQ.
 9                       WILLIAM H. GORDON, ESQ.
                         LU XIA, ESQ.
10
                    LYNCH, TRAUB, KEEFE & ERRANTE
11                      52 Trumbull Street
                        P.O. Box 1612
12                      New Haven, Connecticut 06506
                    BY:  MARISA A. BELLAIR, ESQ.
13
            FOR FAIRFIELD UNIVERSITY:
14
                    DAY PITNEY LLP
15                      One Canterbury Green
                        Stamford, Connecticut 06901
16                  BY:  THOMAS D. GOLDBERG, ESQ.
                         STANLEY A. TWARDY, JR., ESQ.
17
                    DAY PITNEY, LLP
18                      242 Trumbull Street
                        Hartford, Connecticut 06103
19                  BY:  JOHN W. CERRETA, ESQ.
                         PAUL D. WILLIAMS, ESQ.
20
            FOR HOPE E. CARTER:
21
                    MILANO & WANAT
22                      471 East Main Street
                        Branford, Connecticut 06405
23                  BY:  JEFFREY WILLIAM KENNEDY, ESQ.

24

25
```

```
 1        FOR PAUL E. CARRIER:

 2                MURPHY & KING, PC
                     One Beacon Street
 3                   21st Floor
                     Boston, Massachusetts 02108
 4              BY:  TIMOTHY P. O'NEILL, ESQ.

 5        FOR SOVEREIGN MILITARY HOSPITALLER ORDER OF
               ST. JOHN OF JERUSALEM OF RHODES AND OF
 6             MALTA, AMERICAN ASSOCIATION, U.S.A.:

 7                ROBINSON & COLE
                     280 Trumbull Street
 8                   Hartford, Connecticut 06103
               BY:  BRADFORD S. BABBITT, ESQ.
 9
          FOR SOCIETY OF JESUS OF NEW ENGLAND:
10
                  SLOANE & WALSH, LLP
11                   Three Center Plaza
                     Boston, Massachusetts 02108
12             BY:  MICHAEL J. KERRIGAN, ESQ.
                     WILLIAM J. DAILEY, JR., ESQ.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              11:37 A.M.

2

3            THE COURT:  Good morning.  This is a status

4    conference in the Perlitz cases.  I have received and read

5    your joint status report and I'm prepared to speak with

6    you about the topics that are covered by the report.

7            I see that both sides are agreeable to the

8    bellwether approach that we have talked about in the past

9    and that's okay with me.  I trust that there is no better

10   alternative.

11           I do have some questions regarding the

12   bellwether approach.

13           I take it that under this approach a number of

14   cases, perhaps four, would be selected for trial and

15   discovery would be done in those four cases so that they

16   would be trial ready, and we would then try those cases

17   more or less back to back until all four were done.

18           Is that what you have in mind, generally

19   speaking?

20           MR. HANLY:  Good morning, Your Honor, Paul Hanly

21   for the plaintiffs.  Yes.  Generally speaking, that's

22   correct.  The plaintiffs would propose perhaps as many as

23   six rather than four.

24           The other aspect which I would bring to the

25   Court's attention is that the defendants' proposal

1       contemplates discovering all 37 of the consolidated cases

2       before the bellwether selection.  That's contrary to the

3       so-called bellwether practice, at least in the MDL world,

4       Judge, because that would really defeat the whole purpose

5       of saving resources and time.

6                   Your Honor, instead in the usual MDL context, if

7       I may, the did defendants and the plaintiffs select the

8       bellwether candidates and discover those four, six,

9       whatever number of cases, not the entirety of the

10      consolidated group of cases before the district judge.

11                  So we would respectfully but vehemently disagree

12      with that aspect of the defendants' proposal.  Otherwise

13      we would be taking 37 plaintiff depositions, presumably

14      other witness depositions.  It would be years from now.

15                  So with those caveats, Your Honor, I think

16      pretty much the defendants and the plaintiffs are on the

17      same page.

18                  THE COURT:  Okay, thank you.

19                  So your suggestion would be to select perhaps

20      six cases using whatever criteria people might use without

21      first conducting discovery in all 37 of the St. Louis

22      cases, and at the conclusion of those six trials, the

23      parties would switch into settlement mode and attempt to

24      use the results of the trials to somehow conclude

25      settlements in the rest of the cases without discovery?

1           MR. HANLY:  Again, Your Honor, if I may, that is

2   the typical way it's done in the multi-district construct.

3   So, yes, Your Honor that would be the proposal.

4           And with respect to the Court's mentioning the

5   criteria to be used, again if I may, without being

6   presumptuous, in the MDL world, the way that is done is

7   the parties have regard either to what are called

8   plaintiff fact sheets, which are simply shortened versions

9   of full blown interrogatories, or they have the benefit of

10  full blown answers to interrogatories.

11          We are fortunate in this case that we don't even

12  need fact sheets because I believe all 37 of the

13  consolidated cases have already answered the defendants'

14  very extensive interrogatories.  So those answers would be

15  available to the defendants to review as they wish and to

16  make their selection in that fashion.

17          THE COURT:  In the meantime, what would happen

18  with regard to additional claimants?

19          You point out in the joint status report that

20  plaintiffs' counsel have been retained by 139 people and

21  counsel are investigating others.

22          MR. HANLY:  The others are probably a handful,

23  if that.  So at the present time there are -- including

24  the 37 filed cases, our firms collectively represent

25  approximately 139 individuals.

1            So in the context of, if the Court were amenable

2    to a bellwether process, we could do one of two things.

3    Either with the defendants' consent we could have a

4    tolling agreement with respect to the unfiled cases,

5    tolling of statute of limitations.  Alternatively, if the

6    defendants were not to agree to such a suggestion, then

7    the plaintiffs would undertake to, upon our Rule 11

8    investigations, to file as many of those 139 --

9    approximately 100 additional cases as we deemed viable

10   claims.  We would file them in this court and ask Your

11   Honor perhaps to put them on some sort of a suspense

12   calendar.

13            THE COURT:  The 139 figure encompasses which

14   cases?

15            MS. GORDON:  The first 37 that were filed, the

16   next ten, and then over that, the total -- so the 47 filed

17   cases are part of 139.  So the total universe is 139.  Of

18   those 47 cases have been filed.

19            THE COURT:  Does the 139 encompass the first set

20   that were settled?

21            MS. GORDON:  No, they're outside of that, Your

22   Honor.

23            THE COURT:  At one point, Mr. Hanly, I think you

24   mentioned that if we were attempting to gain control over

25   this process, in the broadest, largest sense of the word

1    process, it would behoove us to set a date after which it

2    would be difficult for a person to come forward with a

3    claim notwithstanding the potential timeliness of the

4    claim under any applicable statute of limitations, at

5    least that's what I understood you to be suggesting.

6            Let me ask you:  Is that something that you did

7    in fact mean to suggest at one point?

8            MR. HANLY:  In the sense, Your Honor, that -- I

9    don't believe, again with the utmost respect to the

10   authority of this Court -- I don't believe that outside of

11   the Rule 23 class action context Your Honor could -- would

12   have the authority to issue an order barring claims as to

13   which the statute of limitations had not run.

14           However, again, in the cases before Your Honor's

15   colleagues around the country in the MDL context, what has

16   typically happened is that once there has been a

17   resolution of the majority of the claims, district judges

18   have altered the timetables that would apply after filing

19   of an additional case, such that as a practical matter,

20   Judge, additionally filed cases become extremely difficult

21   to litigate.

22           That's what I can convey to Your Honor from ten

23   MDLs in which I've been involved.

24           But that is, if I may, that is the sort of case

25   control that the district judge has exercised after there

1    has been a resolution of what the district judge and the

2    parties believe is the vast majority of the universe of

3    the claims.

4                THE COURT:  Thank you.  Is there any point in

5    considering whether it would make sense for me to issue an

6    order that purports to set a bar date with an asterisk?

7    In other words, publish something that makes it clear to

8    people that if they are thinking about filing a claim

9    against one of these defendants, they need to act by a

10   certain time?

11               Granted what you just said is legally correct.

12   But I'm looking for a way to deal with the particular

13   problem we face here, and to put that in context:  Suppose

14   we have a number of bellwether trials, whether it's four

15   or six, and the results turn out to be very encouraging to

16   your side, what's to prevent another 200 people from

17   showing up?

18               I mean, Mr. Perlitz swore that he had eight

19   victims and the government wasn't sure about that, but

20   here we are with close to 175, something like that.  Far

21   from eight.  I don't imply anything from that, except that

22   this is a very unusual situation and the bellwether

23   approach, which is calculated to help bring about an end

24   to litigation, could have the effect of encouraging yet

25   many more claims.

1           So if we're going to pursue the bellwether

2    approach, and I think we probably are, why shouldn't I

3    issue an order that makes it difficult for people to come

4    forward after those bellwether trials are concluded and

5    publicized?

6           MR. HANLY:  Your Honor, I can say two things:

7           I understand fully the Court's concern about the

8    sort of never ending -- potentially never ending aspect to

9    this litigation, which frankly we don't think is going to

10   come to be.  Your Honor, I'm just not sure that the

11   Court's order would ultimately be enforceable in the

12   circuit if somebody, not us, but somebody perhaps

13   representing some 179th victim, came forward.  I don't

14   know about that.

15          An alternative, however, Your Honor, which would

16   be, we believe because we've taken a look at it, would

17   be -- would conform with circuit law -- would be a

18   settlement class action in which Your Honor could issue a

19   bar date which would be a binding bar date and would bar

20   any subsequent claims.  We actually proposed this at one

21   point to the defendants and they considered it and came

22   back to us and said no.  I'm not sure why.  At least I

23   don't recall if we were given a reason.

24          But I think we might be able to devise a

25   so-called bellwether approach, or maybe we would call it a

1    class representative trial approach, as part of a class

2    action, and then if there were settlement on that basis,

3    of course the bar date would be fully enforceable.

4              THE COURT:  This is something that you've

5    discussed among counsel?

6              MR. HANLY:  My partner, Ms. Bierstein, had a

7    conversation with one of defense counsel probably a year

8    ago and they said they'd consider it.

9              As I think about it, Judge, I think I was told

10   perhaps by Ms. Bierstein or someone else that the

11   defendants have looked at it and they didn't think the

12   circuit would uphold such an approach.  But we actually

13   think it would fly.  And of course if there are no

14   objectors to it, then there would be no issue.

15             THE COURT:  Well, at the moment if you could

16   pick the process that you think would be best from your

17   point of view, would it be the bellwether process or would

18   it be something else?

19             MR. HANLY:  Absolutely would be the bellwether

20   process, Your Honor.

21             Your Honor's colleagues in this district and

22   throughout the country I think would swear by the

23   bellwether process.  It is a way for the parties to come

24   to grips with the value, if any, of these cases.

25             THE COURT:  What is the alternative that you

1    just appeared to outline?

2         MR. HANLY:  Well, the alternative would be, as a

3    practical matter, I think both sides would have to agree,

4    stipulate, that the action could proceed as a class action

5    for purposes of attempting to create a settlement vehicle.

6    Then once such a stipulation were in effect, Your Honor

7    could try, just like in the bellwether construct, instead

8    of calling them bellwether, we call them class reps and

9    try the four cases seriatim or all at once to a jury and

10   we would then be informed as to what the values might be

11   and the actual dollar amount of the class settlement could

12   thereafter be agreed.

13        And then under Rule 23, of course Your Honor has

14   absolute authority to issue a bar date, and any claimants

15   who come forward after that bar date, as the Court well

16   knows, they're barred.

17        THE COURT:  I get the sense that you think

18   that's a better way to go.

19        MR. HANLY:  I think it might be a better way for

20   you, Your Honor, because Your Honor is concerned about

21   these -- the tail, if you will.

22        If my partner may address the Court?

23        MS. BIERSTEIN:  Just to elaborate on that a

24   little more, I think what Mr. Hanly says is the blueprint

25   we envision.  But I think just to be clear, I would think

1    the way to combine the bellwether with the class approach

2    would be to defer certifying the class, proceed with the

3    bellwethers, see if it gives the parties guidance for

4    settlement, and then with the idea that any settlement

5    that was reached could then be presented to Your Honor as

6    a settlement class for certification.  And of course at

7    that point the certification involves the procedural

8    safeguards of Rule 23, finding adequacy of representation

9    that give the due process protections that the absent

10   class members need.

11        But I think by deferring that until after the

12   trials we could do the bellwethers purely as bellwether to

13   get a sense of where the cases are and what they look

14   like, and then if the parties reach resolution, then

15   perhaps at that point, class cert would be something that

16   could be agreed on in the process of resolution, and at

17   that point it would kick in with Your Honor's ability to

18   set the bar date, because at that point you would find the

19   procedural protections.

20        And I think the bellwethers would help in the

21   class certification process.  I think in terms of

22   submitting a settlement class, once we had done a few

23   bellwethers, I think it would be easier to show Your Honor

24   that the elements for class certification are met.

25            I would think of it as a hybrid, bellwethers

1    today, and class cert on the tail end.  But I think it

2    would accomplish what Your Honor is looking for, which is

3    a streamline way to deal with a large group of cases now

4    without the fear that this stretches into an infinite

5    future.

6              THE COURT:  Anybody want to comment from the

7    defense side?

8              MR. GOLDBERG:  Thank you, Your Honor, Thomas

9    Goldberg from Day Pitney for defendant Fairfield

10   University.

11             Let me start with what Ms. Bierstein said

12   because I think we agree with a lot of that, so I'm going

13   to work backwards to the places where I think we have

14   issues.

15             In terms of a settlement class and the idea of a

16   certification here, our concern is we're pretty much

17   writing on a blank slate.  We have reviewed the authority

18   Ms. Bierstein cited.  Really we're operating here without

19   much of a template.  I think that there is an argument

20   that can be made for the certification process, but it's

21   untested.

22             What we do agree with is that what might work is

23   to go through the bellwether process, get to a mediation

24   or settlement conference, and then at that point if we can

25   reach an agreement, class certification may be a vehicle

1   to enforce the agreement, make sure these 200 claims don't

2   come out of the woodwork that Your Honor rightly expressed

3   a concern about.  And in the meantime we'll come back to

4   what kind of procedure should be in place for the 139 less

5   47.  I think it's 82 -- 92?  Thank you.  92 cases that may

6   or may not be there.  I think we can deal with those

7   separately.

8              But ultimately it may be that if we can resolve

9   this, that a settlement class that would come before Your

10  Honor might be workable and we're open to that and we

11  agree with Ms. Bierstein that the appropriate thing to do

12  is to leave that out there.  And then if we can get to

13  that point, consider that as a vehicle to bring it to

14  resolution.

15             THE COURT:  Picking up from there, if we adopt

16  the bellwether approach, would you want to do discovery in

17  all pending cases?

18             MR. GOLDBERG:  Not all pending cases, Your

19  Honor, the consolidated St. Louis cases.  And let me take

20  a minute and go through that.

21             Because I think from the discussion this

22  morning, that's one of the places where we're apart, and

23  let me explain the benefits of going through the 37, the

24  risk to us of not doing that and why this is different

25  than many of the typical MDL cases with thousands and

1    thousands of potential product claims out there that tend

2    to fall in the various categories.

3            The starting point is this:  From the

4    plaintiffs' perspective, they know what they need to try

5    all these cases.  The facts are pretty much the same.

6    They're going to depose the defendants, and

7    representatives of the defendants; they're deposing people

8    who were on the Haiti Fund board; they're deposing

9    volunteers and other witnesses.

10           From our perspective, in addition to some of the

11   people that -- where there's an overlap with the

12   plaintiffs -- it's the named plaintiffs.  And in the first

13   consolidated group there are 37 people, all of whom I

14   understand they are seeking to get passports to the

15   Dominican Republic.  Many of whom they already I believe

16   have passports for or they're in process.  It's been

17   represented to us that it is not that difficult a process.

18   We've started scheduling.  The first series of depositions

19   will be taking place the week of March 23.  And we have

20   been discussing dates for follow up depositions.

21           And right now I think there seems to be

22   agreement that there should be some extension to the fact

23   discovery deadline.  What we've suggested is with an

24   extension that's under four months, we should be able to

25   complete all 37.  If we can't complete all 37 and there

1    are a handful that for reasons beyond their control can't

2    get passports, for example, then there will be some number

3    close to that, some number between say 25 and 37.

4              So this isn't something where we're talking

5    about years of additional discovery and delay.  It pretty

6    much can fit within the existing framework.  And then once

7    the bellwether claims are identified, we agree they don't

8    need to get expert reports and evaluations done for each

9    of those, nor do we.  We'll pick the four or six cases.

10   And for those people there will be expert reports.  So it

11   will be on a truncated schedule and we'll be able to move

12   promptly toward dispositive motions and then possibly to

13   trial.

14             So this isn't something where -- I really think

15   the difference between deposing all or nearly all of the

16   first round of the 37 and deposing just a handful is going

17   to have an immaterial affect on the scheduling of the

18   case.  But from our perspective it's really important for

19   a couple of reasons.

20             As we've made clear to the Court, one of our

21   concerns and one of our challenges is trying to get a

22   sense of the extent to which these are real claims and the

23   extent to which perhaps these are people who have realized

24   that after a 12 million-dollar settlement was publicly

25   announced that there may be benefits in bringing claims.

1                And if there's one thing that we've learned --

2    and I know Your Honor's going to be dealing on a separate

3    day with the Emanuel Clervil issues, which is the

4    gentleman who moved to amend his complaint and there were

5    some issues about that, and now he's moved to voluntarily

6    dismiss the complaint.  And we filed an opposition to that

7    on Friday.  I believe other defendants may be filing this

8    week.

9                But while we have some disagreements about

10   Mr. Manville, he clearly lied at least once.  There were

11   three sworn statements.  He clearly lied at least one of

12   those three times where he said, I lied in the earlier

13   one, and gave a reason for it.

14               And in explaining why the case should be

15   voluntarily dismissed, the plaintiffs made the point that

16   this is a gentleman who was of limited education and

17   understanding of the legal procedures and the obligations

18   that accompany them.  And while we have different views of

19   how the Clervil complaint and motion to withdraw or

20   voluntarily dismiss should be treated, one thing I think

21   is pretty clear is that these people in Haiti have an

22   enormous incentive to claim that they were victims of

23   sexual abuse.  And for us to be able to get to a point

24   where we can get to a mediation, get to a settlement, we

25   have to have a better opportunity to test the extent to

1    which these 139 claims have merit or don't have merit or

2    some subset that have merit.  And also, hopefully, to

3    dissuade others from coming forward where we can show that

4    there are consequences to people who come forward with

5    false claims.

6            But that gets us back to the issue of the number

7    of depositions, and I'd like to make two points why we

8    should have the larger number.

9            The first is fairness.  Unlike a lot of cases

10   where you take a fact sheet and you can go through it and

11   you know there are going to be variations but you can come

12   up with certain patterns.  Here there was an enormous

13   imbalance of information.

14           Of the 37 cases, the plaintiffs have met

15   personally with these people.  They know within that 37

16   that some cases are stronger and some cases are weaker.

17   They know from having met the gentlemen, they can tell

18   you, they know that some of these may have corroboration,

19   others may not.  They know some of these are stronger and

20   they can readily -- I'll bet you today if you said pick

21   your best three cases, they could do it.

22           From our standpoint, we have none of that

23   information and, frankly, we cannot rely on either the

24   allegations of the complaint or the sworn interrogatory

25   responses.  They are helpful, they are necessary, but

1    there tend to be differences between them.  And as we've

2    seen from the Clervil situation, we don't know to the

3    extent to which we can rely on the sworn interrogatory

4    responses.

5            For us to be able to pick a fair selection of

6    two to three cases, we should be able to go and test some

7    of the plaintiffs and figure out where the strengths and

8    weaknesses are so that we are similarly situated and we

9    have the same opportunity as the plaintiffs.

10           The second aspect beyond that fairness is a

11    practical one.  We all want to get to a point where we can

12    try and get these matters resolved, again, if they survive

13    dispositive motions.  We want to get them resolved, and if

14    we are going into a mediation and we've taken four

15    depositions or six depositions, it's not going to give us

16    much additional information on the other 133 claims.

17           On the other hand, if we've taken a group of 25

18    or 37 depositions, at that point we'll have a better feel.

19    Now, one might say the first 37 are probably better than

20    the next 102, but we wonder about even the first 37.  And

21    that will give us enough of a view of those cases that

22    when we get to the mediation we'll be able to say, we

23    think X number or X percentage of these are stronger or

24    weaker.  Here are some of the variations we saw in the

25    discovery process.

```
1              So we think ultimately by allowing us to take

2      the first full group of plaintiffs, there's going to be

3      very, very little additional time and cost to the process

4      in terms of the scheduling, but it will get us to a point

5      that we can get to the resolution, that I know Your Honor

6      would appreciate as well.

7              THE COURT:  Apart from the depositions of the

8      named plaintiffs, what other discovery would you need to

9      do in advance of the bellwether trials?  Reference is made

10     to expert discovery.  What would that entail?

11             MR. GOLDBERG:  The expert discovery is -- here

12     is our proposal:  We have a date, we suggested

13     December 15.  That would be the fact discovery cutoff.

14     Within two to three weeks each side would pick their

15     bellwether cases.

16             So let's take Mr. Hanly's number of six, I don't

17     think it's a deal breaking issue whether it's four or six.

18     Four or six, let's say it's six.  They pick three and we

19     pick three.  And then expert reports are prepared for

20     those six.

21             So there's a period of time to just do those

22     six.  We take the depositions, they take the depositions

23     and that process is done with, let's say, three to four

24     months.

25             So we then have -- and for that we agree that it
```

1    would be wasteful to do the other 31 plaintiffs.

2         THE COURT:  What sorts of experts?

3         MR. GOLDBERG:  I am assuming that the plaintiffs

4    will call experts that will testify as to the

5    psychological harm, for example, that have occurred as a

6    result of the abuse, and we will be responding to that.

7         I don't mean to limit it to that, but that's

8    certainly one type of expert that I expect the plaintiffs

9    will designate and we would counter designate.

10        THE COURT:  So these experts would be testifying

11   concerning damages issues?  As distinct from liability

12   issues?

13        MR. GOLDBERG:  I think that's right, yes.

14        Now it's possible, I don't mean to preclude

15   designation of experts that may go to liability issues.

16   That's something that we haven't really focused on,

17   certainly haven't talked about with other defense counsel,

18   but I think what we're talking about where -- if there

19   were common experts on liabilities, if they're going to

20   have an expert say that the university is supposed to --

21   when you're a university and you hold a fundraiser on

22   campus -- if they're going to have that, it should apply

23   to all cases equally.  But the fact specific experts will

24   go to damages.

25        THE COURT:  Do you have any notion with regard

1    to how long each of these trials would take?

2            MR. GOLDBERG:  I would think normally a week,

3    maybe a week to two weeks.  I don't know whether --

4    although actually I don't think issues of translation

5    should be that big a deal because mostly there will be

6    just the one witness where there are issues of

7    translation, I think.  And I'll see what other counsel

8    would think how long a trial would take.

9            THE COURT:  You're in agreement that the cases

10   would be tried back to back?

11           MR. GOLDBERG:  Yes.  The whole idea is that

12   you'll get a sense of the variation and get the results.

13           Now, there is one point that I'd like to make

14   that they haven't commented on and I think we would have

15   to address, and that is the issue of estoppel.

16           If these are intended as cases that are to be

17   guidance so that we then could go into a mediation with

18   the idea that here are the bellwethers, this is a sense of

19   what's likely to happen, in bellwether cases it would not

20   be unusual to have inconsistent verdicts, but we would

21   want to make sure there was no estoppel effect so they

22   didn't have trial one, plaintiff wins and now you go into

23   trial two and the only issues is damages, for example.

24           So let me just get that point on the table.  The

25   idea would be you get the verdicts, you understand that

1    there might be some inconsistencies between them, but they

2    provide guidance so you can get to where you really need

3    to get, which is into the mediation to see how you can

4    come up with a resolution.

5            THE COURT:  Thank you.

6            Does anybody else on the defense side want to

7    add anything?

8            MR. DAILEY:  I would, Your Honor, if I might?

9    My name is William Dailey and I represent the New England

10   Province of the Jesuit Order.

11           I believe that I -- I agree with what

12   Mr. Goldberg has said.  I believe there are three

13   essentials here.

14           One that we know the number of cases, and when

15   we had the mediation involving the cases which would be

16   about two years ago now, that would have been about six

17   years after Mr. Perlitz had left PPT, six years in

18   between, we were under the impression as the Court

19   observed, that Mr. Perlitz had acknowledged abusing eight

20   children, eight young men.  The U.S. Attorney's Office had

21   indicated that they were quite confident that they could

22   have proven 16 instances of abuse.  And then Judge

23   Arterton, during the criminal proceedings had inquired

24   about what the total number might be, and the number of

25   between 22 and 25, that range, was mentioned.

1            We settled 24.  We had every reason to believe

2    that at that point we had resolved a global problem.  We

3    received an assurance that that was basically so, and it

4    made -- it was made known that certainly in the situation

5    involving our client, if we had basically exhausted our

6    insurance coverage, we did that with the belief that we

7    were at the end of the line.  We never would have done it

8    but for that.  But nevertheless that's where the situation

9    stands now.

10            We had a situation where some of the defendants

11    have insurance coverage, some of the defendants were

12    paying out of their own pockets, people who were trying to

13    be good in life but yet they were called upon in this

14    instance to come up with money out of their own pockets.

15    We had very experienced claims people there and we were

16    giving them assurances that while we only had

17    interrogatory answers -- and I might say that the

18    interrogatory answers are not of any great use.  You

19    really get no information.  There's no medicals, there's

20    no economic costs.  There is a pattern that you see as far

21    as the claim of damages, that there's a lack now of

22    ability to trust and things like that.  I'm not

23    diminishing that.  But the interrogatory answers, as far

24    as claims people are concerned, are basically useless.

25            So we're in a situation, Your Honor, where right

1    now we don't know how many plaintiffs there are out there.

2    And one of the things that we've asked for in the status

3    report is that the plaintiffs declare by, I think it's

4    July 1, how many of this group of 92, if that's the

5    number, are going to ripen into actual claimants?  And if

6    it's 92, then that's the answer.  And that these matters

7    be put into suit by the end of the year.  That way we can

8    have people who know, hopefully know, what the extent of

9    the problem may be.

10            We're now eight years removed from the time that

11   Mr. Perlitz was at PPT and you would certainly think

12   during that eight-year period, folks would come forward if

13   they were going to claim to be abused and that the

14   plaintiffs would have an opportunity to vet these

15   potential claims and be in a position to tell us by July

16   what number of the 92 there are and put those into suit so

17   that if we have a claims person he can set up a file.

18            The second essential, as I see it, is that the

19   dispositive motions be heard because there is a strong

20   feeling among the defendants that these motions are good

21   strong motions.  And I think that in many instances

22   defendants are going to be disabled from doing anything

23   until they have their motions heard.  We have been told

24   that by all of the defendants.  I think it's general

25   agreement.

1            The depositions are needed because we really

2    don't have a feel for the number -- we don't have a feel

3    for what the claims are really about.  And as Mr. Goldberg

4    said, we really are at a disadvantage, a significant

5    disadvantage, because we don't know what claims we would

6    want to designate.

7            So those are the three things that I think we

8    have to have.

9            And I think it's very, very important that we

10   know what cases are going to be in suit before any

11   bellwether cases are tried because the people who will

12   participate and if necessary fund any effort to resolve

13   the claims will have to have that information well before

14   the bellwether cases are tried.  Or the alternative will

15   be, after the bellwether cases are tried, this information

16   is going to have to be developed at that time and there's

17   going to be a tremendous delay between the trial of the

18   bellwether cases and the ability to go forward with any

19   effort towards resolution.

20           That's basically where we're coming from, Your

21   Honor.

22           THE COURT:  Thank you.

23           Anybody else on the defense side?

24           MR. O'NEILL:  Yes, Your Honor, Timothy O'Neill

25   for Father Carrier.

1          Your Honor, on the trial aspect, there really

2    hasn't been much discussion, at least that I've heard, as

3    to what kind of trials these should be if the bellwether

4    concept is accepted.  And I would suggest that they should

5    be advisory.  Not a verdict that means someone gets a

6    million dollars, somebody else gets nothing, and the

7    person that can buy a Land Rover and drive the main

8    streets of Cap-Haitien.  The trials should be advisory and

9    not to verdict in that sense.

10          It would give us needed information on damages

11    and on liability.  Some of the defendants may throughout

12    these bellwether trials, if that's what we do, will be

13    found not liable, maybe consistently.  So it would be

14    immensely helpful to try to come to resolution.

15          I don't know, I must apologize for not knowing

16    the local rules by heart here, but in the District Court

17    in Boston, the Local Rule 16.4C3 is used quite frequently

18    and that sets out summary jury trial processes.  The one

19    I'm going to call to the Court's attention, if there's

20    something similar here, was under C, capital C.

21          The judge may -- well, it can be done by

22    agreement or by order of the Court if there's no

23    agreement, that they shall set up a panel of six jurors,

24    unless the parties agree on a larger or smaller number,

25    that the panel then would issue after the trial an

1    advisory opinion on the subjects of liability or damages

2    or both, and the advisory opinion would not be appealable

3    and would be not binding.  So that if a person lost, a

4    plaintiff lost the advisory file, he would be part of the

5    settlement pool.

6                It would give the needed information.  It could

7    be done in a much more expeditious way by the Court

8    appointing a magistrate to conduct the arguments on the

9    motions or to certainly conduct a trial.  A six jury

10   trial.  It could even be less.  It could be truncated, it

11   could be streamlined so that it would fit well into

12   getting the information from the depositions, picking the

13   bellwether, doing advisory opinions, and then roping in

14   all of the cases that we know of and figuring out some

15   process, again perhaps with a magistrate at mediation kind

16   of teasing out what these other 92 cases are about.  And

17   it might be a way to think about the process, Your Honor,

18   and I thought I would mention that.

19               THE COURT:  Thank you.

20               Anybody else on the defense side wish to be

21   heard?

22               Okay, any response to the comments of defense

23   counsel?

24               MR. GARABEDIAN:  Your Honor, I'd like to address

25   the issue of the number of potential victims.

1          I have quite a bit of experience in this area.

2     I have cases that span -- well, let me just say that many

3     pedophiles abuse as many children as they can for as long

4     as they can until they're caught, stopped, incarcerated,

5     whatever.

6          Douglas Perlitz was in Haiti for 11 years and

7     for 11 years this sick man sexually abused children.

8     There is no telling how many children were sexually abused

9     by Douglas Perlitz.

10          Our allegations are that supervisors turned

11     their backs on these children.  There could be 500, 600

12     victims of Douglas Perlitz in Haiti.  Someone seems to

13     think the magic number is 139.  It's not 139.

14          A man called me earlier this year, he was 89

15     years old, he was abused by a Catholic priest in Boston.

16     He said I've been carrying this around for 82 years.

17     Everyone in my life that would be significantly adversely

18     affected by finding out I was sexually abused has died.

19     Now I want to report it.

20          Each victim comes forward when they're

21     emotionally able to.  Just because a child hasn't come

22     forward in the past six months or past two years doesn't

23     mean they're not going to come forward 40 years from now

24     or 30 years from now when they're emotionally able to.

25          This is -- you can ask any expert, any

1    psychiatrist, any psychologist, any licensed social worker

2    about victims of sexual abuse and when they're going to

3    come forward, and it's only when their coping mechanisms

4    allow them to come forward.

5            Douglas Perlitz, as I said earlier, was a sick

6    man and he wasn't being supervised properly.  There is no

7    telling how many children he's sexually abused.  There is

8    no telling that -- not every child can come forward

9    because we've set a July date.  And I think the Court

10   should expect victims of Douglas Perlitz to come forward

11   for years to come, and I think the defendants shouldn't be

12   surprised by them.  Many of the esteemed counsel here have

13   represented cases which I've been involved in representing

14   victims.  I've had 148 cases with Father John J. Geoghan

15   alone, and I'm one lawyer.  And there have probably been

16   cases brought by other lawyers over the years.  It's an

17   endless stream.

18           To the pedophile, it's not about sex, it's about

19   control, and they want to control a child.  And it's not

20   unusual for them to continue daily controlling children

21   through sex.

22           And I'd just like to stress that there are

23   probably in my experience hundreds of victims of Doug

24   Perlitz in Haiti and in the Dominican Republic.

25           THE COURT:  I have no reason to doubt your

1   statement.  Where does that leave us?

2          MR. GARABEDIAN:  It leaves us with a problem

3   of -- we shouldn't consider the fact that there are only

4   139 cases out there.  If we need some sort of bar date, we

5   need some sort of bar date that could be relied upon.  And

6   I defer to Attorney Hanly in terms of what he said earlier

7   about the MDL cases and having a bar date that counsel can

8   honor or find to be good law.

9          I mean, it's just going to -- it's just

10  exploding now.  Just because we settled cases doesn't mean

11  that fraudulent cases come forward.

12         As I stated in this court months ago, these

13  children who are coming forward now didn't come forward

14  earlier because of a cultural issue, and that issue was

15  they didn't understand, they didn't think they could bring

16  claims because claims had already been brought.  And once

17  they thought these 24 had -- or I think there were 22

18  cases -- were brought, they thought they were precluded

19  until it was explained to them that they could bring

20  claims too.

21         So my point is, it's a larger issue than I think

22  we're getting today.  There are hundreds of claims out

23  there, and I think the Court will be surprised,

24  respectfully, how many claims will be coming forward for

25  years to come.  And I think we have to take that into

1    consideration when we talk about, well, this date would be

2    a bar date or maybe we'll have an unofficial bar date or,

3    respectfully, a bar date with an asterisk.

4            What do you do when a child who was mentally ill

5    shows up with his parent and the parent says I saw Doug

6    Perlitz abuse my child.  I want to have my day in court.

7    This is not beyond the realm of possibility.

8            I just want to make the Court aware of that.

9    Thank you.

10           MS. BIERSTEIN:  Your Honor, if I could pick up

11   where Mr. Garabedian left off, although it is true and it

12   does make it difficult to get any hard, fast numbers or

13   certainty, I think there are some things that we do know.

14           For one thing there is a statute of limitations,

15   and the statute of limitations reflects the policies in

16   terms of how long people have to file their claims, and I

17   think there's no authority for this Court to shorten the

18   statute of limitations, which I think is what Mr. O'Neill

19   is proposing when he ask that we not only identify the

20   claimants but that we be forced to file all their cases,

21   because the statute of limitations is what determines when

22   we have to file the cases.  And I respectfully would

23   suggest that the Court would be without authority to

24   shorten it.

25           But to Your Honor's point of, as Mr. Garabedian

1    says, there may be hundreds, so what do we do, I think

2    what we do is what we've spoken about already, that there

3    are a number of ways that this can be made manageable,

4    whether it's through ultimately a class action settlement,

5    whether it's through procedures that at some later point

6    for cases that have not yet been filed have settled, the

7    procedures become -- make the cases more and more

8    difficult to litigate, which may discourage late comers

9    without absolutely barring them.

10           There are a number of things that can be done,

11   but Mr. O'Neill's cry for certainty, he wants to know now

12   how many victims there are.  It's unrealistic, it's

13   unworkable and there's no authority for it, but that

14   doesn't prevent us from having workable mechanisms to deal

15   with the group that we have, that we know about, to

16   resolve those cases, and to continue discussions with

17   defendants about how much peace going forward in terms of

18   certainty they need.

19           But I think everybody always wants to know how

20   big a problem is it, but that doesn't mean it's knowable,

21   and it doesn't give the Court the authority to shorten the

22   statute of limitations so that Mr. O'Neill can sleep

23   better at night when the legislators have determined

24   figuring out what the applicable statute is.  Some are

25   federal claims, federal statutes, some of state claims

1    with state statutes.  People have thought long and hard

2    about what the appropriate period is.  That doesn't

3    necessarily give people who are responsible for these, or

4    answerable, for these acts the certainty that they would

5    like.  The church doesn't have certainty that a priest who

6    abused someone 20 years ago, a victim isn't going to show

7    up today.  But that's the law.

8              THE COURT:  What's the statute of limitations in

9    Connecticut?

10             MS. BIERSTEIN:  My understanding is that for the

11   common law claims, the statute of limitations is until the

12   victims turn 48.

13             THE COURT:  So what are we talking about?

14             MS. BIERSTEIN:  I think the youngest of the

15   victims now that we know about -- I mean, if we think

16   about 2008, 2007 or 2008, which would be when Mr. Perlitz

17   left Haiti, if you imagine a child who was 14 in 2007 or

18   2008, you're talking about until that person is 48.

19             THE COURT:  So that's another 27 years?

20             MS. BIERSTEIN:  Something like that.

21             But that doesn't prevent us from resolving the

22   cases we have now, reaching a settlement, and if somebody

23   comes forward in 20 years, they'll have some hurdles to

24   deal with in terms of why they didn't come forward sooner.

25             But other than with a class action settlement

1    which would provide a bar, because it would have the

2    procedural safeguards.  But without those procedural

3    safeguards, other than a class order, there isn't a

4    realistic way to make sure that 20 years from now somebody

5    doesn't show up.

6         And even if Your Honor were to try it as

7    Mr. Hanly mentioned earlier, when that person shows up in

8    20 years, it wouldn't be enforceable.  Other than, again,

9    if you have a final class judgment binding on class

10   members, because only then do you have the due process.

11        THE COURT:  And picking up on that point, you

12   refer to procedural protections available through the

13   class action device, protecting the interests of these

14   absentees; basically notice, right?

15        MS. BIERSTEIN:  It isn't only notice, Your

16   Honor.

17        THE COURT:  It isn't only notice, but notice is

18   of prime importance.

19        MS. BIERSTEIN:  Well, I think notice is -- I'm

20   not sure I'd say it's prime importance.  I think the

21   findings Your Honor has to make that the representatives

22   are adequate representatives and that the cases are

23   sufficiently similar, is as important as notice.

24        Because giving people notice of something, if

25   it's not sufficiently similar, if the issues aren't

1    predominantly similar, they're being given notice of

2    something that may not apply to them.

3            So I think the Court's findings of adequacy and

4    typicality and predominance and commonality are just as

5    important.

6            THE COURT:  I don't disagree with you.  How

7    would you give notice in this case?

8            MS. BIERSTEIN:  I actually think notice in this

9    case might be simpler than notice in the U.S., because I

10   think the community in Cap-Haitien is -- I think there are

11   fewer media outlets and so it would be easier to hone in

12   on the ones that exist, the radio stations -- I'm going to

13   let Mr. Hanly speak, because I think he knows more about

14   this.

15           MR. HANLY:  Ms. Bierstein is absolutely correct,

16   Judge, having the benefit of -- the benefit or

17   detriment -- of ten or so trips to Cap-Haitien.  And to

18   Haiti generally, there are very few media outlets, couple

19   TV stations.  I think one newspaper in Cap-Haitien,

20   Port-au-Prince, few other newspapers throughout the

21   country.  So it would actually be, compared to the kind of

22   cases Your Honor has dealt with here in Connecticut for

23   example or anywhere in the United States, would be

24   extravagantly inexpensive.

25           THE COURT:  To your knowledge, how are the most

1    recent claimants learning about the process and coming

2    forward?  What is it that's reaching them?  How are they

3    getting involved?

4              MR. GARABEDIAN:  My experience has been that,

5    again, they knew about the original 24 claims, but they

6    thought they're out the door, it was too late.  There's a

7    great cultural divide, and that was their understanding

8    for most part.  They said, oh, it's too late, can't do it.

9    And until they were told otherwise.

10             THE COURT:  Apart from the individual who, like

11   the person you mention didn't feel comfortable coming

12   forward until everybody had passed away, apart from that

13   kind of situation, do we need to be concerned that

14   potential plaintiffs would not be aware of this litigation

15   and would not want to come forward and file a claim?

16             MR. HANLY:  No, Judge, I don't think there's a

17   serious risk of that.  Haiti is a relatively small

18   country.  Cap-Haitien, in particular, which is where the

19   vast majority of the victims still reside, is an extremely

20   small sort of close knit city with one radio station and I

21   think a single newspaper.  And the whole PPT Douglas

22   Perlitz situation, tragedy, if you will, is well-known in

23   the community.

24             So if there were, for example, a class action

25   vehicle and notice sent pursuant to Rule 23, I am quite

1    certain that the vast majority of people certainly in that

2    area would know about it.

3              THE COURT:  Thank you.

4              MR. GOLDBERG:  Your Honor, Tom Goldberg again.

5              First of all, on the class action concept, I

6    think ultimately we hope Ms. Bierstein is right, that that

7    would be a way to deal with this problem of potential

8    future claimants.  I suppose at some point if there were a

9    settlement, there would have to be some sort of reserve

10   for potential future claimants, but it would be binding

11   and people could not come forward and sue the defendants

12   if it goes that way, and the class certification process

13   works, so that may be the way to deal with what

14   Mr. Garabedian identified.

15             But putting aside all the people that may come

16   out of Cap-Haitien in the future, we know that there are

17   92 people who have already come forward who have already

18   overcome whatever constraints they had and have reached

19   out and gauged plaintiffs' counsel, and at least for those

20   92, we should be able to find out how many of those are

21   real claims.  There should be a Rule 11 investigation

22   done.  And if people have good claims, then those claims

23   should be brought and we should know that before we get

24   into any settlement discussions.  And the suggestion that

25   we've made is that any such claims be filed by the end of

1    the year.  That's another ten months from now.  So we

2    think that that's a reasonable way of getting a handle on

3    how many real cases there are.

4            If it turns out that of those 92, only 25 of

5    them are going to be filed, then that will be incredibly

6    informative for any settlement process.  If 89 are filed,

7    then it's a different matter, but that will also be very

8    informative for the settlement process.

9            So that's why we have suggested that there

10   should be some deadlines set.  And we think that Your

11   Honor does have authority where we have counsel that are

12   here before the Court who have these clients.

13           So we think that that process combined with --

14   once we get to mediation -- potential class settlement,

15   should be protection for both parties.

16           One other point, because I neglected to make it

17   the first time, it was in support of the 37 depositions.

18           We agree with plaintiffs' counsel that if there

19   is going to be a class settlement that everybody's going

20   to have to be really comfortable, particularly given how

21   novel this is, with not only the adequacy of notice, but

22   the adequacy of representation that these were truly

23   representative plaintiffs.  And we think in order to make

24   that showing, having the test cases selected out of a

25   larger pool of 37 cases will be far more valuable than

1    making an up front determination to just pick two or four

2    or six cases right now.

3              So that's further support for the idea that we

4    should go ahead and get these depositions taken.

5              MS. BIERSTEIN:  Your Honor, if I might respond

6    briefly to that?

7              The problem here is that Mr. Goldberg wants us

8    to do depositions of 37 plaintiffs and at the same time he

9    wants us to conduct due diligence investigations into the

10   claims of 92 other people, which on the one hand he places

11   a lot of confidence in because they're subject to the

12   Rule 11 obligations before we file, and yet on the other

13   hand he seems to completely disregard how time consuming

14   that is.

15             The effect of requiring all the cases, all the

16   people who have retained us, to file by the end of the

17   year despite the fact that their statute of limitations

18   won't have run, will be to deflect the time and resources

19   needed to work on the cases that have been filed.  It's

20   not as if time is infinitely expandable.  Ninety-two

21   claims, it's a very time consuming process to spend the

22   time you need to spend to develop a complaint.

23             As it is, we do it for people when one of their

24   claims may be running up against the statute of

25   limitations, but it's just unrealistic to imagine that we

1    can do the equivalent of discovery in 92 cases behind the

2    scenes while we all try to do discovery on the cases that

3    have been filed, which is not only the 37 plaintiff

4    depositions that Mr. Goldberg proposes, but all of the

5    defendant discovery that we all need to take in addition

6    to that.

7         So when Mr. Hanly mentioned earlier the problem

8    of delaying things for years, that's exactly what this

9    file every case you know about by the end of the year

10   would accomplish.  It would delay things for years.  On

11   top of which, even if the Court had the authority to bind

12   counsel, that would not bind the claimants who could hire

13   a different lawyer because the statute of limitations

14   hasn't run.  So that doesn't seem to be a way to deal with

15   this problem.

16        Now, what is a way to deal with this problem and

17   which has been used before, is if we've done discovery on

18   a subset of cases and if we've done a bellwether process

19   and if we have a negotiation that doesn't preclude having

20   some sort of claims verification process which would be

21   more streamlined than what we would have done in

22   litigation.  Presumably everyone would have learned a lot

23   from the litigation process.

24        But we're not suggesting we would go into a

25   negotiation and say, here's 92 people you've never heard

1    of, by the way, pay them also.

2              I mean, we understand there would need to be a

3    claims vetting process.  That would be true whether it was

4    a class or not.  There would be something more than

5    somebody sticking in a piece of paper saying claim form,

6    hi, pay me.

7              So we understand that there would need to be

8    some verification, but the deadline that Mr. Goldberg and

9    Mr. O'Neill are arguing for is not the way to accomplish

10   it.

11             MS. GORDON:  Your Honor, one other issue.

12             On trial time, there will be more than one --

13   probably in each trial, more than one Haitian witness.

14             I say that because if you've done examinations

15   or trials with somebody where there's a translation, it

16   almost doubles the time needed.  There would be some

17   corroboration witnesses we anticipate in each case.  So

18   that the trial is probably going to run longer than what

19   defendants expect.

20             We haven't sat down and figured out exactly, but

21   we do anticipate more than one witness who is going to not

22   be able to speak English for which we will need a

23   translator and which the question gets translated, the

24   answer gets translated, next question, next translation,

25   back and forth.  It's time consuming.

1          So I wanted to address that because we haven't

2     really responded to that.  The trials will probably be

3     longer than what they're thinking.

4          THE COURT:  More specifically are you saying you

5     think the trials would take not one to two weeks but two

6     to four?

7          MS. GORDON:  Two to three I think would be more

8     realistic.  We haven't sat down and done the analysis, but

9     I think definitely a minimum of two, at least three

10    probably.

11         THE COURT:  At least three.

12         MS. GORDON:  I think given the witnesses, we

13    could be looking at three-week trials, but nothing less

14    than two, nothing less than two.

15         When I heard one week anticipated, I just can't

16    see that as being workable.

17         THE COURT:  So just with regard to trial time,

18    realistically if you try these cases back to back with no

19    interruption, you think you're looking at, if we have six

20    cases, 18 weeks.

21         MS. GORDON:  Minimum.  Eighteen weeks.  I think

22    it's a reasonable estimate.  Eighteen weeks.  Leave it at

23    that.  There might be a few less than three, some might

24    run over.  But given how long we know it takes to talk to

25    people with a different culture and we have to -- we're

1     going to have to explain to every jury the actual layout

2     of what is in the building where this occurred, what was

3     going on at the school, because no jury -- every jury is

4     going to be different, they're not going to know the

5     basics, so we're going to need to explain to them where

6     this happened, what was their relationship to the school.

7     And a lot of this will come from Haitian witnesses.

8                  MS. BIERSTEIN:  Your Honor, the time would be

9     greatly shortened if Your Honor were to try groups of

10    cases together.  You could try two, three, four cases in a

11    single trial.  The time for the case specific facts would

12    not be shortened, but the rest of what Mr. Gordon was

13    describing would only need to be done once, and the

14    witnesses that deal with the defendants' conduct, which is

15    common to all the plaintiffs in most instances would only

16    have to be put up once, and that would greatly shorten the

17    amount of time needed for trial.

18                  And that as I said could be two, three, four, it

19    could even be as many as six.  But even if we discovered

20    six or eight for bellwether purposes, Your Honor could do

21    a trial of more than one without doing the full set.

22    There's a lot of flexibility in what you might do to get

23    the amount of trial weeks down to something more

24    manageable.

25                  THE COURT:  Mr. O'Neill suggested they be

1    non-binding summary trials?

2            MS. BIERSTEIN:  Your Honor, I've never heard of

3    that and I think -- I mean, the first reaction I have is,

4    well, you can't do that, but my second reaction when he

5    was citing what the local rule is, at least from my point

6    of view is I'd want to look into that, my sense is that

7    would be much less helpful than actual trials.  But it's

8    the first I've heard of it.  So unless someone else on our

9    side is prepared to speak at greater length about it, we

10   would appreciate the opportunity to look into it and maybe

11   let Your Honor know what our view on that is.

12           But my assumption had been that these were real

13   trials.  And when Mr. Goldberg raised the issue of

14   estoppel, what I was going to say about that if asked is

15   that I wanted to look at that as well.

16           I understand the issue and it's related

17   obviously to the notion that the trials be not binding.

18   Although they're somewhat different approaches.  But my

19   view was I want to look into that too, because it was not

20   something we heard from the defendants before.  These are

21   issues that are new to us today.

22           MR. HANLY:  Your Honor, if I may, just one last

23   point at least at this juncture, concerning the number of

24   so-called bellwether cases or the number of cases to be

25   discovered in the bellwether process that Mr. Goldberg's

1   suggests 37 cases.

2              First of all, Judge, I think that would be

3   enormously time consuming and would probably effectively

4   put a stop to the depositions of non-plaintiffs.  For

5   example, we still have a number of defendant-related

6   depositions to be done.

7              But more importantly, Judge, if we're going to

8   do a bellwether process, I suggest we do a bellwether

9   process.  The bellwether process, as the manual teaches,

10  is not perfect, it's simply a way to get to an end point,

11  and if we're going to do --

12             Well, for example, in a case I'm involved in the

13  Northern District of Texas, an MDL, there are 7,000

14  claims.  The judge has picked eight, eight bellwethers out

15  of 7,000 claims.  So eight cases will be discovered, not

16  7,000.

17             Mr. Goldberg is essentially suggesting that the

18  entire inventory of cases before Your Honor get deposed as

19  part of the bellwether process.  It's just not a

20  bellwether process.

21             So I just leave the Court with that, that's all.

22             THE COURT:  Okay.  Anything else?

23             MR. DAILEY:  If I could make an observation,

24  Your Honor?  William Dailey again.

25             We have a New England compounding case that's

1    going in Massachusetts that we're involved with.  Judge

2    Saylor has been guiding it, now Judge Zobel.  But in these

3    MDL cases very often there is no liability problem.  When

4    you get to the bellwether situation, the liability is kind

5    of resolved.

6              Liability here is very much an issue.  So as I

7    sit here and hear that we may well have any number of

8    additional cases coming over and above the 139 -- and as I

9    think about the bellwether approach and the fact that

10   liability is certainly going to be a major issue here --

11   it brings me to the point where, number one, I'm a little

12   bit uncomfortable on behalf of my client buying into the

13   bellwether approach because we could well have the

14   bellwether cases tried, we could eventually have the 929

15   cases winnowed down to whatever number, but I'm hearing

16   we're not at an end.  And that's a huge problem.

17             And we have not had a chance to confer at all,

18   but I know that at least two of the four defendants will

19   be paying out their own pockets without insurance, and the

20   incentive for very good people who are dedicated to doing

21   the common good and helping and then suddenly finding that

22   they're caught up in this, it's really going to chill

23   their enthusiasm to put much in when they hear that

24   there's no end in sight.

25             So I'm wondering whether or not, and I haven't

1     spoken to a soul, we shouldn't ask the Court to schedule

2     another status conference before any decisions are made so

3     that we could all go back and try to figure out and help

4     the Court based on what we have heard today to come up

5     with some process.  We can think about the class action,

6     we can think about how we would get to some closure.

7                    That's a thought on my part.

8                    THE COURT:  Thank you.

9                    MS. BIERSTEIN:  Your Honor, if I might note,

10    this is exactly what we talked about in December on the

11    phone.  We talked about the class mechanism, we talked

12    about the bellwether process.  Your Honor set this status

13    conference to give us time to discuss it with the

14    defendants to do exactly what Mr. O'Neill is suggesting.

15    And when we contacted the defendants and asked for their

16    position, it was very late in the game before we heard

17    anything back from them.

18                    So I think the idea of kicking this down the

19    road for another two months or another period of time, I

20    think that doesn't -- I don't think that's fair.  I think

21    we need to get the cases moving.  I think that's just

22    going to be more delay.

23                    We've had these options on the table already for

24    a good two months.  The parties have thrown -- I mean, I

25    understand the defendants have added some new wrinkles

1    today, but I don't think that's a reason to send us back

2    to the drawing board when we've had so much time to deal

3    with it.

4              I wanted to add one last point just because it's

5    gotten a little lost.

6              When Mr. Goldberg talked about the lopsided

7    information in selecting from among the 37, I should

8    mention that the first three depositions that are going

9    forward on the week of March 23, were selected by the

10   defendants, and if those cases were to be in the mix of

11   the bellwether cases, I think the concern that they were

12   cherry picked by the plaintiffs would be somewhat

13   alleviated.  And obviously that's something we'll have to

14   discuss at a later point, but I think there are ways to

15   deal with lopsided information.

16             But I think Your Honor has the issues, and I

17   think the issues have been laid out for the Court.  I

18   don't -- we would request that Your Honor not defer

19   addressing this at yet another status conference.

20             THE COURT:  You referred to a vetting process

21   that would be somewhat less time consuming and resource

22   intensive than the Rule 11 due diligence.  Can you outline

23   what that alternative would look like, please?

24             MS. BIERSTEIN:  Your Honor, I wasn't suggesting

25   it was less time consuming than the Rule 11 due diligence,

1    although it might be.  The comparison with Rule 11 is when

2    it would occur.  That is, by doing the verification at the

3    back end, it wouldn't delay the other cases.  I did say it

4    would be more streamline than a full trial, and I think it

5    would benefit from the experience we would have had with

6    the discovery in trial.  But I think it often in other

7    cases is some kind of mini trial where the claimant might

8    appear and answer some questions from the defendants so

9    that they would have a chance to look them in the eye and

10   we might have worked out what sort of questions it would

11   be so that the defendants wouldn't have to just pay claims

12   without confronting someone.

13           So it might or might not be less time consuming

14   than our due diligence.  I suspect it would be, but my

15   comment on the less time was really twofold:  One,

16   comparing it to full discovery at trial and the other

17   comparing when it would happen so that it wouldn't delay

18   us from what we were doing now.

19           But I think some kind of mini trial or process

20   in front of a mediator, in front of someone that -- where

21   the claimant would come in and be available to be spoken

22   to before they would have to agree that that was a claim

23   to be paid.

24           THE COURT:  Let me clarify the purpose of my

25   question.

1            You have explained that the defendants' desire

2    to do as many as 37 depositions of the plaintiffs is

3    simply not workable, and you point out that their interest

4    in having a date, perhaps the end of the year, by which

5    plaintiffs' counsel will be obliged to tell us how many of

6    the 92 potential cases are real cases is similarly

7    unworkable.

8            In that context, I'm wondering, is there a way

9    to accommodate the defendants' desire for information that

10   they would seek to obtain by way of depositions that would

11   serve their interest without requiring 37 depositions?

12           Similarly, I'm wondering whether there is

13   something that plaintiffs' counsel could do to identify

14   which of the 92 potential cases are likely to be real

15   cases without doing the full blown Rule 11 due diligence.

16           And my question to you was directed at the

17   latter.  Is there something short of Rule 11 due diligence

18   that could be done before the end of the year that would

19   enable plaintiffs' counsel to state which of the 92

20   potential cases are likely to be real cases?

21           MS. BIERSTEIN:  Your Honor, we've already done

22   that.  That is, every client that's actually signed a

23   retainer is a client that's been interviewed in person --

24   either in person or by the phone.  A client who has been

25   interviewed by a lawyer and the determination has been

1    made that we're willing to sign them as a client.

2          That's less of a process than what we would do

3    to write a complaint, but there are other people that

4    we've spoken to and have not taken on as clients, have

5    determined that there wasn't enough there or that they

6    weren't actually there, that they -- there were lots of

7    reasons that -- we have not signed everybody who's come

8    forward and said, hey, I'd like to bring a suit too.  The

9    signed clients have already all been vetted.  And so we've

10   already done what we -- so in terms of which of those are

11   likely to be good cases, most of those are cases that we

12   are likely to file.

13         THE COURT:  So on that note, it sounds like

14   you've done what you regard as due diligence and the

15   message is that those 92 cases are likely to be filed.

16         MS. BIERSTEIN:  They're likely to be filed but

17   that's short of what we would need to write and sign a

18   complaint.

19         And I want to say, Your Honor, discovery in this

20   case, it was very much slowed by the time it took us to do

21   the interrogatory answers for the 36 or the 37 that we've

22   done.  It's a very time consuming process.  Drafting a

23   complaint requires getting into more details and more

24   specifics and vetting and checking and looking to see

25   whether it conflicts with something another client has

1    said.  It's a much more time consuming process than even

2    the attorney interviews that have given us sufficient

3    reason on which to sign up the clients.

4         So we've done some of the work and that has been

5    time consuming, but the concern is that to convert those

6    to complaints and the number of additional interviews with

7    the clients necessary to do that would just overwhelm the

8    rest of the discovery in the same way that doing the

9    interrogatory answers overwhelmed the rest of the

10   discovery for a period of several months where no

11   depositions were happening because we were devoting all of

12   our resources to that.  I would think the same thing would

13   happen if we had to file complaints for 92 people.

14   Everything else would grind to a halt.

15        As to Your Honor's first question, the best I

16   could say about that is I suspect there's a number between

17   6 and 37 for the number of plaintiff depositions to go

18   forward that might make Mr. Goldberg more comfortable that

19   he was getting a broader range of information and might

20   make us more comfortable that it wouldn't totally

21   overwhelm the process.  And it may be possible to find a

22   number that both sides are comfortable with.

23        But I was happy to note that Mr. Goldberg's idea

24   of the bellwethers was that we would do individual case

25   specific expert work only after the trial cases were

1    selected, and I think that's something we're in agreement

2    with as well.  I think that's particularly important.

3                MR. GORDON:  One issue, Your Honor, we haven't

4    addressed is specific changes to the scheduling order.  I

5    know the Court said it would.

6                We have a deadline coming up of March 9 of

7    damages analysis, and defendants have indicated that with

8    the bellwether process they would be willing, at least for

9    the 37 plaintiffs, to go to February 15 of next year.

10   We've already given them answers to interrogatories for 36

11   of the 37.  They've got the detail as to what those

12   clients say happened to them, how it affected them.  We

13   really couldn't do much more analysis until we talk to the

14   experts.  We propose the damages analysis be extended out

15   also to coincide when we have the expert reports in front

16   of us.  So we think that date needs to be changed in the

17   schedule.

18               And we've also given them -- we recognize that

19   they don't know a lot about our clients and we recognize

20   we've had a terrible time getting medical records.  We

21   can't get records for these kids.  A few of them have some

22   records they've given us, whatever we have we will give

23   over.  We will give some more documents to them by the end

24   of this week.

25               There are 88 interrogatories that they proposed.

1    We agreed to answer.  We didn't object to quantity.  And

2    they've got 88 answers.  Nothing is perfect.  But they do

3    have, for 36 of the 37, 80 sets of answers to

4    interrogatories.  And if they really are concerned about a

5    vetting process, there are other ways to do this.

6            We've done thousands of cases we've settled for

7    sex abuse victims where the victims fill out

8    questionnaires.  They can sign them under pains and

9    penalties of perjury.  They are made sometimes to be

10   available for examination by defendants' counsel even if

11   it's outside of court.  We've agreed to that.

12           We've had mediators who then ultimately help

13   everybody get to a number.  Or we've had arbitrators issue

14   a decision.

15           There are other ways to do this if they really

16   want to get at those other 92 that can provide a vetting

17   process for that universe.  It doesn't necessarily mean

18   that the only way to get some confidence is to actually

19   have full blown cases filed and with the litigation that

20   then follows.  There are more efficient vehicles

21   available.  We use them daily in our work with sex abuse

22   victims.  And I know that some of the counsel on the other

23   side have worked with us in those cases.

24           So there are some vehicles to do that, but I

25   think as my co-counsel have said, the bellwether process,

1    if we are going to go to trial on these cases provides an

2    efficient way to get there.

3              THE COURT:  Okay.  Thank you.

4              Well, I see no alternative to the bellwether

5    approach.  I trust that both sides have thought long and

6    hard about alternatives and this is the best we can do.

7              With regard to the details, I don't think it's

8    necessary for me to make any final decisions this minute,

9    but I think that the concerns that have been raised on the

10   defense side are perfectly understandable and need to be

11   accommodated.

12             With regard to the number of depositions, if

13   indeed each deposition of a named plaintiff were to take

14   two days, you're looking at a couple of months of nothing

15   but those depositions.  I'm not sure that this would be

16   the best use of our time; and it may be, as counsel

17   suggests, that there is a lesser number than 37 that would

18   serve to provide the defense with needed information,

19   including sufficient information to be able to select the

20   cases that would be the subject of the bellwether trials.

21   So I would ask Mr. Goldberg and his colleagues to confer

22   and let me know what is the minimum number that the

23   defense requires.

24             With regard to the number of cases that need to

25   be addressed, it sounds like plaintiffs' counsel are

1    reasonably satisfied based on their interviews that these

2    92 individuals have a sufficient basis for bringing suit

3    and I think that we should assume that to be true unless

4    we hear differently from plaintiffs' counsel in the near

5    future.

6         With regard to vetting, I take it that there are

7    techniques that have been tried in other cases which could

8    be considered, but we don't need to be treating that as a

9    first priority right now.  I grant you the more we know

10   about those claims the better, and the sooner the better,

11   but I don't think that it's the first priority.  I think

12   that the first priority needs to be to establish an order

13   appropriate for the bellwether approach that provides for

14   completion of fact discovery including whatever

15   depositions of named plaintiffs need to be done leading to

16   the trials themselves.

17        With regard to that, I need to ask you to please

18   confer and let me know as soon as possible whether these

19   would be binding or non-binding, whether these would be

20   summary in nature and whether we would have consolidated

21   trials of bellwether cases.

22        As I'm sure you can appreciate, it would be

23   exceedingly difficult for me or anybody else to set aside

24   six months of trial time for these bellwether trials,

25   which is what we would be looking at if we did six cases

1    of about three weeks each leaving time for people to pick

2    juries and have a day off.  So I think that I need to ask

3    you to confer and let me know what is the minimum that you

4    realistically will need by way of these trials.  If it's

5    four, if it's five, if it's six, we need to do as many as

6    we need to do in order to facilitate another attempt at a

7    global resolution.

8              From what you've told me today, it sounds like a

9    settlement class is feasible and preferable to any of the

10   other alternatives and so I think that's what we should

11   bear in mind as we go about the bellwether process.  In

12   other words, if we think of the bellwether process as

13   phase one, then the settlement class, if it comes to that,

14   would be phase two, and in that way we would try to

15   achieve an end to this.

16             I haven't forgotten about dispositive motions

17   and we're going to have to include that in our new

18   tailored schedule.

19             So I think the next step would be for you to

20   submit a proposed scheduling order that implements the

21   bellwether approach, provides for a period of fact

22   discovery that accommodates the defendants' need for a

23   certain number of depositions of the named plaintiffs

24   followed by expert discovery and a dispositive motion

25   practice leading to a series of trials, and it would be

1     helpful to me if you could include in your proposal an

2     indication of whether these trials would be binding or

3     not, whether they would be summary in nature or not, and

4     whether they would be consolidated.  I guess we can leave

5     for another day any further discussion about the 92

6     potential cases that aren't going to go anywhere while we

7     pursue the bellwether approach.  Indeed it's my

8     understanding that there will be no attempt to prepare any

9     of the other cases that are already on file besides the

10    ones that will be selected for the bellwether trials.

11    Those will simply sit there and I see no alternative to

12    that.

13              So is it fair and reasonable for me to rely on

14    you to confer and put together this proposed tailored

15    scheduling order implementing the bellwether approach?

16              MR. GOLDBERG:  Your Honor, yes.  We will work

17    together.

18              May I suggest or request that the Court set a

19    date for another conference?  I was going to suggest say

20    the first week or two of April, and my guess is that there

21    are going to be some areas of disagreement and that will

22    give us an opportunity to fully identify them, and then we

23    could get them resolved and be prepared to find out one

24    way or the other what's going to happen.

25              THE COURT:  Are you saying you wouldn't be able

1    to do a proposed order until then?

2         MR. GOLDBERG:  No, we would endeavor to get a

3    proposed order, but it may be, for example, in terms of

4    the -- I'm going to be -- I'm optimistic we're going to

5    work out the deposition issue.  I'm optimistic we're going

6    to do that.  We may not be able to, in which case we'll

7    need the Court's guidance on that.

8         With respect to some of the issues regarding

9    trial, the numbers, whether they will be consolidated,

10   things like that, we may not be able to work that out, but

11   we should be able to identify the open issues and get that

12   to you sometime in advance of the conference.

13        THE COURT:  Okay.

14        MS. BIERSTEIN:  I mean, that's fine.

15        I think what we would propose is a deadline for

16   this joint status -- joint scheduling order to be

17   submitted.  And I think as Mr. Goldberg envisions, there

18   might be some sections of the scheduling order where there

19   were alternate proposals where we were not able to agree.

20   As to whether Your Honor needs a status conference to rule

21   them on, I leave that to Your Honor.  I have no objection

22   to scheduling the next conference as long as we've gotten

23   the scheduling order well in advance of that.

24        I do have an issue with the first two weeks of

25   April which actually segues into a housekeeping matter I

1   wanted to take up, but maybe we can finish this and then

2   I'll segue into that.

3           MR. GOLDBERG:  I was just throwing that out

4   obviously.  We can push it back.

5           We could even do it in the form that you do with

6   a Rule 26(f) report where if you got agreement you state

7   it and if you don't have agreement you state plaintiffs

8   would do this and defendants would prefer something else.

9           THE COURT:  I think that makes sense.

10          MS. BIERSTEIN:  Is there a deadline for that,

11   Your Honor?

12          THE COURT:  What would you suggest?

13          MS. BIERSTEIN:  Thirty days.

14               (Pause)

15          MS. BIERSTEIN:  Your Honor, if I might, the last

16   issue I wanted to take up is really a series of

17   housekeeping matters relating to the motion to compel

18   production of documents that we discussed on the phone in

19   December.  And Your Honor, may recall at that time Your

20   Honor directed us to discuss with the defendants and try

21   to reach agreement on the filing of certain parts of the

22   motion papers in redacted form.

23          So I wanted to report back first that we did

24   negotiate with the defendants and we were able to reach

25   agreement, and as a result of the agreement, we filed the

1    motion on the ECF docket this last week with the agreed

2    upon redactions as negotiated between the parties.

3            So I have here with me, which at the end I'd

4    like to hand up to Your Honor, a courtesy copy set of the

5    unredacted papers, which is not what went on to ECF.  I

6    also have a sealed envelope for the clerk's office with a

7    sealed copy with just the ones that are different, the

8    unredacted, which we need Your Honor's signature for the

9    clerk's office in order to file it under seal.

10           And then the last piece of that would be to

11   schedule oral argument on that motion, and I was hoping we

12   could get a date for that argument today.  And on that,

13   this is where the issue -- I have a conflict for the first

14   two weeks of April.  And in discussions with the

15   defendants, we were not able to ensure that we could get

16   the motion fully briefed, because although we filed our

17   papers and we have their opposition, we have not yet put

18   in our reply, there's a cross motion.  It didn't appear

19   that we could have it fully briefed in time to do argument

20   before I'm going to be away.  In fact even before they are

21   going to be in the Dominican Republic on that first week

22   of depositions.

23           So I was going to request that Your Honor set a

24   date for argument any time from April 16 on as soon as

25   Your Honor can hear us from April 16 on, and it may be

1    that to the extent we need to discuss the scheduling

2    order, we could do that at the same time if we're going to

3    be here for argument.

4              THE COURT:  Okay.  Thank you.

5              I'll ask Terri to speak with you about a date

6    that works for everybody after April 16.

7              MS. BIERSTEIN:  Your Honor, if I could have one

8    question about that?

9              I don't know how much time Your Honor needs

10    between the filing of the last brief and the argument.

11    Because we're going to work out the schedule for the

12    briefing based to some extent on the argument.

13              THE COURT:  Just a day.

14              Anything else?

15              April 30 looks like a good date for us.

16              MR. KERRIGAN:  Your Honor, for the defendants,

17    I'm scheduled to start a trial on April the 27th which is

18    expected to last that week and into the next week in

19    Massachusetts state court.  I would be the one arguing the

20    motion on behalf of the Society.  So that wouldn't work

21    for me unfortunately.

22              THE COURT:  I'll just ask the clerk's office to

23    come up with a date rather than try to set one this

24    minute.

25              As far as the deadline for submitting the new

1    proposed tailored scheduling order is concerned,

2    recognizing that it would be a Rule 26(f) type proposal,

3    did you come up with a time?

4                 MR. GOLDBERG:  We agreed on April 3, Your Honor.

5    I will say that if the hearing is going to be pushed back

6    to May -- why don't we stick with April 3, shoot for April

7    3.

8                 THE COURT:  All right.  Then I'll look forward

9    to receiving that on or about April 3, and I'll be happy

10   to take what you have.

11                MS. BIERSTEIN:  I was about to ask if I could

12   approach, Your Honor?

13                MR. GOLDBERG:  I assume, Your Honor, whenever

14   we're next before Court, Your Honor would hear the motion

15   in the Clervil case for voluntary dismissal.

16                THE COURT:  That's fine with me if that's

17   agreeable to everybody.  We can leave it until then.

18                So am I right that we're now thinking in terms

19   of a date sometime after mid April at which time we would

20   address the motion to compel, the Clervil motion, and any

21   disagreements concerning the tailored scheduling order

22   going forward, is that right?

23                MR. GOLDBERG:  That's my understanding.

24                MR. HANLY:  Yes.

25                THE COURT:  We would do it at one sitting?

```
 1              MR. HANLY:  Yes.

 2              MR. GOLDBERG:  Yes.

 3              THE COURT:  In the meantime, the depositions are

 4    going to take place in March and we're going to be

 5    implementing the bellwether approach.

 6              MR. GOLDBERG:  Yes.

 7              THE COURT:  All right.

 8              MR. O'NEILL:  Excuse me, Your Honor, there are

 9    motions to dismiss the Michele case that are pending and

10    probably will have to be argued at some point.

11              THE COURT:  Do you want to do those that day as

12    well, whatever that day turns out to be?

13              MR. O'NEILL:  Yeah, sure.

14              THE COURT:  Okay, then we'll add that to the

15    calendar for that date.

16              Is there anything else anybody needs to raise

17    while we're together?

18              Would it be helpful to you if I were to ask

19    someone to work with you as a special master?  Someone

20    that would be available to you to assist you with whatever

21    issues crop up in connection with depositions or

22    otherwise?

23              MR. GOLDBERG:  Your Honor, why don't we discuss

24    that in the context of talking about the scheduling order.

25              THE COURT:  Okay.  I think it is worth
```

1    considering.  Maybe in your experience you have learned

2    that it's helpful or not, but I would be happy to consider

3    that if you thought it would be helpful to you.

4            Okay, thank you.

5                  (Proceedings adjourned at 1:25 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3                In Re: ST. LOUIS vs. PERLITZ

4

5

6          I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15

16          /s/_____

17          DARLENE A. WARNER, RDR-CRR
             Official Court Reporter
             450 Main Street, Room #223
18          Hartford, Connecticut 06103
                (860) 547-0580
19

20

21

22

23

24

25