1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF CONNECTICUT

3

4      - - - - - - - - - - - - - - - x
                                     :
5      GERVIL ST. LOUIS,             :   No. 3:13CV1132(RNC)
                      Plaintiff,     :
6                                    :
                vs                   :
7                                    :
       DOUGLAS PERLITZ, ET AL,       :
8                     Defendants.    :   MAY 29, 2015
       - - - - - - - - - - - - - - - x
9

10

11             STATUS CONFERENCE AND MOTIONS HEARING

12

13

14        BEFORE:   HON. ROBERT N. CHATIGNY, U.S.D.J.

15

16

17

18

19                                   Darlene A. Warner, RDR–CRR
                                     Official Court Reporter
20

21

22

23

24

25

```
 1    APPEARANCES:

 2         FOR GERVIL ST. LOUIS:

 3              SIMMONS HANLY CONROY, LLP
                     112 Madison Avenue; 7th Floor
 4                   New York, New York 10016
                BY:  PAUL J. HANLY, JR., ESQ.
 5                   JAYNE CONROY, ESQ.
                     ANDREA BIERSTEIN, ESQ.
 6                   ELLYN HURD, ESQ.

 7              LAW OFFICES OF MITCHELL GARABEDIAN
                     100 State Street
 8                   6th Floor
                     Boston, Massachusetts 02109
 9              BY:  MITCHELL GARABEDIAN, ESQ.
                     WILLIAM H. GORDON, ESQ.
10                   LU XIA, ESQ.

11              LYNCH, TRAUB, KEEFE & ERRANTE
                     52 Trumbull Street
12                   P.O. Box 1612
                     New Haven, Connecticut 06506
13              BY:  MARISA A. BELLAIR, ESQ.

14         FOR FAIRFIELD UNIVERSITY:

15              DAY PITNEY LLP-STMFD
                     One Canterbury Green
16                   Stamford, Connecticut 06901
                BY:  THOMAS D. GOLDBERG, ESQ.
17                   PAUL D. WILLIAMS, ESQ.
                     STANLEY A. TWARDY, JR., ESQ.
18                   JOHN W. CERRETA, ESQ.

19         FOR HOPE E. CARTER:

20              MILANO & WANAT
                     471 East Main Street
21                   Branford, Connecticut 06405
                BY:  JEFFREY WILLIAM KENNEDY, ESQ.
22

23

24

25
```

```
 1

 2          FOR PAUL E. CARRIER:

 3               MURPHY & KING, PC
                      One Beacon Street
 4                    21st Floor
                      Boston, Massachusetts 02108
 5               BY:  THEODORE J. FOLKMAN, ESQ.
                      TIMOTHY P. O'NEILL, ESQ.
 6                    PETER C. OBERSHEIMER, ESQ.

 7          FOR SOVEREIGN MILITARY HOSPITALLER ORDER OF
               ST. JOHN OF JERUSALEM OF RHODES AND OF
 8             MALTA, AMERICAN ASSOCIATION, U.S.A.:

 9               ROBINSON & COLE
                      280 Trumbull Street
10                    Hartford, Connecticut 06103
                 BY:  BRADFORD S. BABBITT, ESQ.
11
            FOR SOCIETY OF JESUS OF NEW ENGLAND:
12
                 SLOANE & WALSH, LLP
13                    Three Center Plaza
                      Boston, Massachusetts 02108
14               BY:  MICHAEL J. KERRIGAN, ESQ.
                      WILLIAM J. DAILEY, JR., ESQ.
15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:07:25 | 1 | <u>10:05 A.M.</u> |
| 10:07:28 | 2 | |
| 10:07:30 | 3 | THE COURT:  Good morning.  This is a hearing and |
| | 4 | conference in the Perlitz cases.  I'm going to ask you to |
| | 5 | please identify yourselves for the record starting with |
| | 6 | plaintiffs' counsel. |
| 10:07:53 | 7 | MR. HANLY:  Good morning, Your Honor, Paul |
| | 8 | Hanly, Simmons Hanly Conroy for the plaintiffs. |
| 10:07:59 | 9 | MS. BIERSTEIN:  Good morning, Your Honor, Andrea |
| | 10 | Bierstein, Simmons Hanly Conroy for the plaintiffs. |
| 10:08:03 | 11 | MR. GARABEDIAN:  Richard Garabedian for the |
| | 12 | plaintiffs. |
| 10:08:06 | 13 | MR. GORDON:  Good morning, Your Honor, William |
| | 14 | Gordon Law Offices of Mitchell Garabedian for the |
| | 15 | plaintiffs. |
| 10:08:12 | 16 | MS. CONROY:  Jayne Conroy, Simmons Hanly Conroy, |
| | 17 | for the plaintiffs. |
| 10:08:17 | 18 | MS. HURD:  Ellen Hurd, Simmons Hanly Conroy, for |
| | 19 | plaintiffs. |
| 10:08:21 | 20 | MS. XIA:  Lu Xia for plaintiffs. |
| 10:08:24 | 21 | MS. BELLAIR:  Good morning, Your Honor, Marissa |
| | 22 | Bellair, Lynch, Traub, Keefe & Errante for the plaintiffs. |
| 10:08:29 | 23 | THE COURT:  Good morning. |
| 10:08:30 | 24 | MR. GOLDBERG:  Good morning, Your Honor, Tom |
| | 25 | Goldberg, together with John Cerreta, Paul Williams and |

1    Stan Twardy from Day Pitney on behalf of defendant

2    Fairfield University.

10:08:41  3            THE COURT:  Good morning.

10:08:42  4            MR. FOLKMAN:  Good morning, Your Honor, Ted

5    Folkman for Father Carrier.

10:08:48  6            MR. O'NEILL:  Mr. O'Neill for Father Carrier,

7    Your Honor.

10:08:50  8            MR. BABBITT:  Your Honor, I'm Bradford Babbitt.

9    I represent the Order of Malta America Association.

10:08:56  10            MR. KENNEDY:  I'M Jeff Kennedy, Your Honor, for

11   Hope Carter.

10:09:01  12            MR. KERRIGAN:  Good morning, Your Honor, Michael

13   Kerrigan with William J. Daily, Junior, on behalf of the

14   Society of Jesus of New England.

10:09:10  15            MR. OBERSHEIMER:  Good morning, Your Honor,

16   Peter Obersheimer, Murphy & King on behalf of Father

17   Carrier.

10:09:19  18            THE COURT:  Is that everybody?

10:09:23  19            Thank you.

10:09:29  20            There are a number of things that we want to

21   address today.  I have a list of them.  Let me read the

22   list to you to be sure that I haven't overlooked anything.

10:09:42  23            Counsel seek an opportunity to present argument

24   on the motion for voluntary dismissal submitted on behalf

25   of Mr. Clervil.  That's Document Number ECF 495.

10:10:06  1              Next counsel would like an opportunity to

          2     address the motion to dismiss Count Eight of the Bernard

          3     complaint.  This is Father Carrier's motion ECF Number

          4     484.

10:10:32  5              Next on my list is the plaintiffs' motion to

          6     compel ECF Number 501 of the defendant's cross motion for

          7     a protective order, ECF Numbers 512 and 513.

10:10:54  8              Beyond that, we have your bellwether proposals

          9     to discuss.

10:11:07 10              Are there any other matters that either side

         11     would like to address while we're together today?

10:11:15 12              MR. HANLY:  Your Honor, there's one additional

         13     matter.

10:11:19 14              The plaintiffs just wish to put on the record

         15     that one of the plaintiffs whom we represent is apparently

         16     now deceased.  We're seeking a death certificate in Haiti

         17     and at the appropriate time would file pursuant to the

         18     Federal Rules a suggestion of death on the record.  But

         19     until we have a death certificate, we don't feel

         20     comfortable doing so.

10:11:43 21              THE COURT:  Thank you.

10:11:46 22              Anything else on the defense side?

10:11:48 23              MR. GOLDBERG:  Nothing, Your Honor.

10:11:49 24              THE COURT:  Okay, then, why don't we start with

         25     the motion for voluntary dismissal.

10:12:08  1           MS. BIERSTEIN:  Good morning, Your Honor, this

        2    motion I think is very straightforward.  Mr. Clervil is

        3    seeking to dismiss the case.  He's prepared to dismiss the

        4    case with prejudice.  We think that he has an absolute

        5    right to do that, that he can't be compelled to proceed.

10:12:29  6           The issue here is that the defendants are

        7    seeking to condition the dismissal on a whole list of

        8    kinds of relief that they're seeking, some of which I

        9    think would never be available, and some of which might be

       10    available in the circumstance if Mr. Clervil were seeking

       11    a dismissal without prejudice.

10:12:53 12           But we believe that in the situation where he's

       13    prepared to take a dismissal with prejudice such that

       14    there would be a judgment in favor of defendants, that

       15    there's no basis to condition his dismissal in any way.

10:13:10 16           I'm prepared to answer questions about the

       17    specific conditions that the defendants have placed on it.

       18    I think in our brief we've covered why we think each is

       19    unavailable here.  I can review that if you'd like or, as

       20    I say, if there are particular ones you'd want to focus on

       21    or particular issues you have.

10:13:27 22           THE COURT:  After reading the parties'

       23    submissions, my view is that you're right, Mr. Clervil

       24    cannot be forced to prosecute this case against his

       25    wishes; however, in the unusual situation that we confront

1    here, it's not clear to me that he should be allowed to

2    essentially walk away without even being required to sit

3    for a deposition.

10:14:07  4        I think that the other conditions that have been

5    suggested are likely beyond what is needed to achieve a

6    fair resolution of this unusual situation.  So my view is

7    that Mr. Clervil should make himself available for a

8    deposition.

10:14:41  9        Ordinarily a Court wouldn't have to grapple with

10   this, but the difficulty of obtaining his testimony if he

11   is a non-party causes me to think that the fairest

12   resolution would be to condition his voluntary dismissal

13   on his appearance at a deposition.

10:15:08 14        Now, I grant you technically there may be

15   something about a dismissal with prejudice that can't

16   support a contemporaneous condition requiring Mr. Clervil

17   to appear for a deposition, but I think that the Court's

18   authority and its responsibility to deal with this matter

19   gives me whatever tool I need to require that Mr. Clervil

20   sit for a deposition.  Whether that means postponing the

21   dismissal until after he's been deposed or some other

22   means of getting at what I regard is the proper outcome, I

23   don't know, and I'm open to suggestions.

10:16:25 24        MS. BIERSTEIN:  Your Honor, I understand and I

25   respect Your Honor's views on this, but if Your Honor

1  would indulge me with a couple of minutes to try to

2  persuade you again otherwise.

10:16:35  3       THE COURT:  I don't think you can.  I've thought

4  about it a lot.

10:16:38  5       MS. BIERSTEIN:  Well, I'm concerned a little bit

6  about the enforceability of that.  Since we were

7  Mr. Clervil's lawyers, but since he doesn't want to

8  proceed and has no need for lawyers, I don't know that we

9  have the ability to procure the deposition.  He's beyond

10  the authority of the Court.

10:16:56  11       If Mr. Clervil were to refuse to appear for a

12  deposition -- if we had never made this motion, if he were

13  to refuse to appear for deposition, the sanction that the

14  Court would impose would be dismissal, which is what we're

15  seeking in any event.

10:17:12  16       I think there's some practical issues as well as

17  to where this deposition would take place.  I mean, is the

18  Court going to be ordering Mr. Clervil to obtain a

19  passport and visa at his own expense to travel to the

20  Dominican Republic or would this deposition take place in

21  Haiti?

10:17:29  22       I think as well what's curious to me, Your

23  Honor, is that there are any number of victims of

24  Mr. Perlitz who have not filed suit who are potential

25  witnesses because they have not -- but have not filed suit

1  for the various reasons, and I'm not sure I understand how

2  Mr. Clervil, because he stepped forward at one time and

3  now no longer wishes to, I don't know that his testimony,

4  that he's differently situated than any of the other

5  potential witnesses to this case.

10:18:01  6        THE COURT:  I think he's uniquely situated.  He

7  filed the lawsuit and he made representations that turned

8  out to be inaccurate and he now wants to walk away.

9  That's understandable, and I'm perfectly willing to have

10 him walk away, but not before he sits for a deposition.

10:18:19 11        If your point is that I don't have the power to

12 order it, then what you're really telling me is this

13 matter is moot.  I mean, if I don't have the power, I

14 don't have the power.  That's not an argument that I

15 recall you making before this morning.

10:18:40 16        MS. BIERSTEIN:  Well, I think we did make in the

17 brief --

10:18:42 18        THE COURT:  We have a lot to do today.  I don't

19 want to spend any more time on this.

10:18:46 20        MS. BIERSTEIN:  Okay, thank you, Your Honor.

10:18:48 21        THE COURT:  Does defense side have anything to

22 by way of a resolution that would allow you to obtain

23 Mr. Clervil's deposition testimony in conjunction with his

24 request for voluntary dismissal?

10:19:03 25        MR. GOLDBERG:  All we could suggest, Your Honor,

1    we do think you have authority and counsel should use best

2    efforts to try to effectuate this so that we could move

3    forward and get the case dismissed with prejudice and take

4    his deposition.

10:19:14  5    THE COURT:  I think that's right.  I don't think

6    it needs to be a ten-act play.

10:19:23  7    Mr. Clervil has decided he doesn't want to

8    prosecute his claim, that's fine.  We'd like to get his

9    deposition testimony.  I think he should understand that.

10    And if plaintiffs' counsel, his counsel of record, is

11    unable to help make that happen, then that's disappointing

12    to hear.

10:19:45  13    I would require you to make your best efforts to

14    make that happen.  If you can't, then let me know.

10:19:50  15    MS. BIERSTEIN:  Your Honor, we will make our

16    best efforts.  We will undertake to do that.

10:19:54  17    I would ask Your Honor, though, for example, if

18    Mr. Clervil has to sit for his deposition in any event, we

19    would ask the dismissal be as we originally requested,

20    which is without prejudice, because depending on his

21    testimony as it comes through in the deposition, there may

22    be a different view about his ability to proceed and his

23    willingness to proceed given that he does need to be

24    deposed.

10:20:15  25    So that was the original relief that we had

1   asked for was without prejudice.  It pertained to the with

2   prejudice when the defendants thought to condition it.

10:20:24  3        So I would ask Your Honor to consider once the

4   deposition has been taken to permit Mr. Clervil's

5   dismissal to be without prejudice.

10:20:32  6        THE COURT:  Any comment?

10:20:33  7        MR. GOLDBERG:  What we know is, and I say "know"

8   because he admitted it, this plaintiff committed perjury.

9   That supports a sanction of dismissal with prejudice.  So

10  we don't want to have to go through further efforts with

11  this particular plaintiff.  It should be dismissed.

10:20:51 12        And the reason we've asked for supplemental

13  relief is the egregious nature of this particular

14  individual's submissions.

10:20:58 15        THE COURT:  Okay.  I don't need to subscribe to

16  the comments of counsel on either side with regard to what

17  exactly happened, why it happened.  My point is simply

18  this:

10:21:17 19        On the record before me, I'm more than willing

20  to grant Mr. Clervil's request that his action be

21  dismissed, but in light of the unusual circumstances, I

22  think that he should be obliged to appear for a

23  deposition.  If you want to call that a sanction, okay.  I

24  don't necessarily view it that way.  I just see it as an

25  appropriate way of resolving what happened.

10:21:48    1        I don't think a person in Mr. Clervil's position

2        has a right to walk away without sitting for a deposition

3        in the unusual circumstances of this case where obtaining

4        his deposition testimony would otherwise be difficult.

10:22:10    5        These plaintiffs are more than welcome to use

6        the power of this Court to pursue justice, but they should

7        also be prepared to cooperate with the Court.  It's not a

8        one-way street, and Mr. Clervil should be available for

9        deposition.

10:22:29   10        He doesn't have to incur any expense.  The

11       defendants can pay for it.  It can be in Haiti or it can

12       be in the Dominican Republic.  But please don't ask me to

13       fine tune this.  I'm going to rely on the numerous counsel

14       that I see array before me to work this one out.

10:22:51   15        Next is the motion to dismiss Count Eight of the

16       Bernard complaint filed by Father Carrier.

10:23:03   17        MR. FOLKMAN:  Good morning, Your Honor.

10:23:04   18        I want to start by addressing what you could

19       call the subtext, maybe it's not even the subtext of the

20       plaintiffs' response, which is this is Father Carrier's

21       third motion to dismiss.  Why is it the third motion?  I

22       guess from our perspective, I would turn that around and

23       say, why is it that all the plaintiffs haven't been able

24       to bring their claims?  And for whatever reason they

25       haven't.  Why is it that we're just seeing new claims now?

10:23:29  1        These are new claims never before asserted.  We

2    have a right to test their sufficiency.  In fact, if you

3    add up the batting average on the motions to dismiss,

4    we're doing okay, we're batting about 500 by my

5    calculation.  So we have a right to seek it.

10:23:45  6        I think it helps to narrow the claims.  I think

7    it helps to manage the cases.  Because when you dismiss

8    these claims, issues vanish from the case, issues about in

9    this case the purpose of Father Carrier's travel, issues

10    about mandatory statutory minimum damages.  Those are the

11    kind of issues that by really digging in on these

12    statutory counts, we can help to get out of the case and

13    really simplify things to advance the ball.

10:24:13 14        The background to this issue, it's agreed by

15    everybody, I think that the six-year statute of

16    limitations is the right statute of limitations.  It's

17    agreed that we're not relying on the discovery rule for

18    any sort of delayed accrual and that we're not relying on

19    any tolling doctrine to save Mr. Michel's claim.

10:24:34 20        The issue is whether an active abuse that took

21    place more than six years before the suit was filed is

22    saved by this amendment to 2255 called Masha's Law that

23    provides that minors who are injured when they're minors

24    can sue regardless of whether the injury occurred while

25    the person was a minor.

10:24:55  1          And if I can refer Your Honor to the complaint,

          2    really the only paragraph in the complaint that makes this

          3    case anything other than a simple personal injury tort

          4    case is paragraph 108 where what's alleged is that

          5    Mr. Michel has suffered, is suffering and will suffer

          6    because of the abuse that Father Carrier allegedly

          7    committed.

10:25:15  8          That's something that anybody in any tort case

          9    could plead.  A victim of a car crash could say I have

         10    suffered, I am suffering and I will suffer in the future

         11    because of this injury that occurred to me at the time of

         12    the crash.  And that's really, I think, the key to this

         13    issue.

10:25:28 14          What we're talking about is not two wrongdoers,

         15    one wrongdoer at the time of the abuse and one wrongdoer

         16    later, but rather one wrongdoer, supposedly Father

         17    Carrier, and then suffering that manifests itself over

         18    time.  Perhaps that suffering is not fully known or

         19    knowable at the time of the injury.

10:25:46 20          But all that really means is that if you accept

         21    their theory, you're essentially saying there's a

         22    discovery rule under the statute.  When I discover that

         23    this thing that happened in the past to cause the injury,

         24    I can sue.

10:25:58 25          And we've shown in the main brief, and they

1    haven't disputed it, but there is no discovery rule under

2    2255.

10:26:08  3         I think the main point you have to grapple with

4    is what did Congress mean when it enacted Masha's Law.

5    Masha's Law of course it's part of, I think it's called,

6    The Internet Safety Act, which in turn was part of the

7    Adam Walsh Act in 2006.

10:26:22  8         And it's pretty clear from the legislative

9    history and I don't think there's any question that the

10   kind of case Congress had in mind was the classic child

11   pornography case, which is a sui generis sort of thing.

12   You are the victim of child pornography when the

13   pornography is created, the pornographer himself commits a

14   wrongful act when he films the child engaged in sexual

15   conduct, and then when the stuff is downloaded years later

16   by someone in his living room, the law is that's a

17   separate injury, and that's what Congress was trying to

18   address.  That's something that you see noted as a problem

19   in the Supreme Court cases going back to the New York

20   versus Ferber cases, and it's a sui generis kind of

21   injury.

10:27:09  22        Now, I think the plaintiffs' main point on this

23   is sort of a grammatical point, which is to say, if you

24   look at the statute there's all these predicates including

25   2423, the statute that Father Carrier is sued under, and

1    this new amendment applies to all of them.  And as a

2    grammatical issue, I guess I don't have a problem with it.

3    I think the problem is that as a logical matter if you

4    think about, is this the kind of injury where the accrual

5    of the cause of action is delayed, I think that the only

6    factual circumstance in which it's really conceivable that

7    that's so is child pornography, the kind of case that

8    Masha's Law was meant to address.

10:27:52  9             The key case that I think Your Honor should

10    focus on is the Clash case, this is the Elmo -- the actor

11    who played Elmo, he was accused of sexual abuse.  The

12    Court actually addressed -- although the plaintiffs I

13    think disagree with us on this -- the Court actually

14    addressed this issue about the purpose or the meaning of

15    this amendment in 2006.  And what it said was the

16    plaintiffs argue that Congress intended to allow

17    plaintiffs to bring claims that are more than six years

18    old because of what the Court called a delayed connection

19    to the injury theory, which as I understand it is more or

20    less what the plaintiffs are saying here.  There's one

21    wrongful act, but then the injury in some sense happened

22    later.

10:28:39 23             The Court rejected that.  The Court said no,

24    what the statute is aimed at getting at is a case where

25    there's one wrongful act, there's an injury that's

1    suffered and then there's another wrongful act later as in

2    the person downloading or viewing or possessing the child

3    pornography, and then the injury which wouldn't have

4    happened but for the initial wrongful act is in some way

5    recommitted, reperpetrated.

10:29:03  6         So I think the Court Singleton v. Clash is

7    really rejecting the theory that the plaintiffs are

8    proposing.  And I would add there are no cases that I know

9    of that have adopted the reading of Masha's Law that the

10   plaintiffs are suggesting.

10:29:21 11        The last point I want to address, Your Honor, is

12   retroactivities.  I just observe that this is not a point

13   we need to win in order to win the motion, however, I

14   would make a few points on it.

10:29:31 15        Point number one:  The plaintiffs say, you know,

16   this is a mere procedural lengthening of the statute of

17   limitations, and since it's merely procedural, we know

18   that if the claim hadn't expired at the time of the

19   amendments, the amendment doesn't cause -- isn't

20   impermissibly retroactive.

10:29:51 21        To that I say no, this isn't just a lengthening

22   of the statute of limitations.  I point to a few facts to

23   show that.

10:29:56 24        One is just look at the statute.  Section A

25   of -- paragraph A of Section 2255 lays out the liability

1   part of the statute.  Section B says the statute of

2   limitations is six years.

10:30:06   3        Congress didn't change the statute of

4   limitations of 2255.  And in fact we know from that

5   supplemental authority that I submitted a few days ago

6   that when Congress wants to lengthen the statute of

7   limitations to do what the plaintiffs say it is trying to

8   do in Masha's Law, which is to allow children who are

9   injured as children have a longer time to sue, Congress

10  knows how to do that.

10:30:40  11        In the Senate bill 178 which we submitted, when

12  Congress wants to do that, it says the statute of

13  limitations is X years or X years after the plaintiff

14  turns 18.  There's very straightforward ways to do what

15  the plaintiffs say Congress sub silentio in a very

16  convoluted way did.

10:30:58  17        I'd also point out that the question of whether

18  the law has an impermissible retroactive effect, which I

19  think is what the plaintiffs are getting at, is really

20  step two of the Landgraf analysis.  It lays out two steps

21  that you look at to see if a statute is being applied

22  impermissibly retroactively.  Step one is what has

23  Congress said about it.  And step two is if you don't get

24  an answer in step one, then you look to see is the statute

25  going to have some retroactive effect.

10:31:33    1          I think if we got to step two, I would agree

            2  with them, but the point we make in our brief is that, no,

            3  it's very clear from the statute itself, which is in other

            4  areas of the statute, does deal with retroactivity, that

            5  Congress did not intend for this bit of the statute to

            6  apply to conduct that happened prior to the amendment.

10:31:53    7          I'm happy to answer your questions that you

            8  have.  But that's the presentation.

10:31:55    9          THE COURT:  Thank you.

10:32:14   10          MR. GORDON:  Good morning, Your Honor.  I'm

           11  going to address the arguments in the main brief and Ms.

           12  Bierstein will address the issue in the reply brief with

           13  regard to retroactivity.

10:32:24   14          Let me point out, first of all, that statute of

           15  limitations is an affirmative offense.  The burden is on

           16  the defendant to show that on the face of the complaint,

           17  all the elements that show that the claim is time barred

           18  must be shown.  It is not our obligation to proceed around

           19  the statute of limitations affirmative defense.  Given

           20  that, we then look at the statute that we've claimed

           21  relief under, and it's Section 2255 of Title 18.

10:33:02   22          Now, that, as we've looked closer at the

           23  legislative history, in fact if you look at Masha's Law

           24  and then you try to see what the statute was then, we

           25  think it actually read, prior to the amendment in 2006,

1    any minor who is a victim of a violation of all those

2    actions and suffers personal injury could sue.  So the

3    statute was any minor who suffers any of these violations

4    can sue.  It was then substituted with any person who

5    while a minor was a victim of all of these actions,

6    including the internet violations, as well as sex tourism,

7    and who suffers a personal injury as a result of such

8    violation regardless of whether the injury occurred while

9    such person was a minor may sue.  Congress did not limit

10   the remedy for injury occurring after the act to simply

11   the internet problem.

10:34:05 12        What happened in Masha's case, it highlighted an

13   issue for Congress that there's a problem with applying

14   the statute of limitations.  We have a problem, and the

15   Adam Walsh Act really tried to get it, and it's something

16   we're all learning more about, which is child sex abuse.

10:34:22 17        And so what Congress did -- and that's what we

18   ultimately have to look at is the language of the

19   statute -- the statute clearly says that any person while

20   a minor suffers these injuries, suffers these violations,

21   but then has an injury regardless of when the injury

22   occurs, whether they're a minor or not, may sue.

10:34:39 23        So the question then is, since Mr. Michel has

24   alleged that he suffered injury then, he suffers injury

25   now and he will suffer injury in the future, the Court

1    cannot on this record at this stage decide that the case

2    must be dismissed.

10:34:58  3         We deal with sex abuse cases in our office all

4    the time and most of the time when people come forward,

5    they're well into adulthood and they have many problems

6    and injuries that result from this abuse that occurred

7    decades earlier when they were children.  They have

8    injuries that could not manifest themselves when they were

9    children.

10:35:20 10        For instance, we have people who come in and

11   tell us, I have children now, I'm extremely

12   overprotective.  I won't let them do things.  We see this

13   again and again.  How could that particular injury

14   materialize when a child's abused?  A child cannot have

15   children.

10:35:36 16        We have so many people with relationship

17   problems, divorces.  Those kinds of injuries do not

18   materialize when they're children.

10:35:44 19        The problem is Congress did what Congress did,

20   and the Supreme Court is clear, you really have to look at

21   the language of the statute.  You cannot change the terms

22   of the statute by looking at some congressional comments.

10:35:59 23        There was motivation from what happened in

24   Masha, but the remedy was broader than that, and what it

25   says clearly is, if you violate sex tourism and the victim

1   is a minor and later suffers an injury, that person can

2   sue.  And on the face of the pleading, he prevails.

10:36:21  3          THE COURT:  What is the time limit?

10:36:23  4          MR. GORDON:  I think the last abusive act

5   occurred in 2005 when he was a minor.  That's the abusive

6   act.  He has some of these adult injuries that we only see

7   when they come into adulthood.

10:36:37  8          So we would see a record developed with our

9   experts showing what the injuries are and when they

10  accrued, and defendants could then come in with their

11  experts, and then with the full record, the Court could

12  make a decision as to whether or not it's timely.  But not

13  at this point in the pleadings.

10:36:59 14          THE COURT:  You refer to adult injuries.  Is it

15  your claim on behalf of this plaintiff that he has

16  sustained some injury that is different from emotional

17  distress?

10:37:26 18          MR. GORDON:  It would be problems in his life as

19  to whether or not -- we would argue that not being able to

20  have stable relationships, there's no way to know that

21  until later on.  It does not necessarily translate as it's

22  just is an emotional distress problem, it's a life

23  problem.  They can't have stable relationships.  They

24  can't have healthy relationships with children.

10:37:55 25          In one way, it's emotional.  But in another way,

it's a life problem, an injury in their life that they

would not have incurred but for the wrongdoing of the

perpetrator.

10:38:06    And I don't think at this stage we could say

that his injuries are simply emotional damages.  There are

life problems that come about as a result of what happens

to children.  The trauma materializes in a number of ways,

sometimes physical, and we just don't fully know that

until our doctors do an evaluation.

10:38:29    THE COURT:  At what point in a person's life can

we safely say that whatever injuries might have been

caused by the abuse have materialized so that there

actually is finality?

10:38:50    MR. GORDON:  I think that depends on the

individual.  I think it depends on how it's affected their

lives.

10:38:57    There are some people, our doctors tell us, that

experience sex abuse and don't have later problems.  There

are some who do have all sorts of problems and injuries

materializing throughout their lives and have crippling

experiences in their lives because of the injuries that

occur.

10:39:15    THE COURT:  So a wrongdoer could be many decades

removed from the wrongdoing with no connection to the

victim in the interim and be subject to suit?

| | | |
|---|---|---|
| 10:39:34 | 1 | MR. GORDON:  I think we have to take the statute |
| | 2 | as it is.  This statute was amended -- |
| 10:39:37 | 3 | THE COURT:  Is that a yes? |
| 10:39:38 | 4 | MR. GORDON:  Yes, yes. |
| 10:39:43 | 5 | And what we pointed out in our brief was the |
| | 6 | Adam Walsh Act created this new definition and actually |
| | 7 | literally separated the act from the injury and the |
| | 8 | analysis.  It's not an appropriate test in this case with |
| | 9 | regard to the discovery rule. |
| 10:40:03 | 10 | I know defendant says, well, you didn't meet the |
| | 11 | discovery rule.  That's a totally different statute.  It's |
| | 12 | not what Congress decided to do. |
| 10:40:13 | 13 | THE COURT:  Did Congress -- I don't mean to |
| | 14 | interrupt you -- but did Congress consider the point that |
| | 15 | you're making to me about adult injuries that are latent |
| | 16 | and emerge only many, many years later?  Is that something |
| | 17 | that they -- |
| 10:40:38 | 18 | MR. GORDON:  I think the words of the statute |
| | 19 | say that.  The statute says, if you suffer this act, a |
| | 20 | violation of any of these statutes, including sex tourism, |
| | 21 | and suffer an injury even when you're not a minor, the |
| | 22 | words of the statute address that. |
| 10:40:54 | 23 | The Adam Walsh Act that made this change with a |
| | 24 | number of sex abuse crimes, as we pointed out in the |
| | 25 | brief, abolish statute of limitations.  Congress is |

1    troubled about how to get justice for child sex abuse

2    cases.  You have people who don't have the vocabulary.

3    Forget foreign.  In the United States, anywhere, children

4    don't have the vocabulary.  They don't know how to process

5    it.  So Congress created a vehicle to provide remedies.

6    With regard to some of the criminal statutes, there is no

7    statute of limitations anymore.

10:41:31  8          That issue I think Congress has dealt with.  And

9    in this case what they've done is placed the burden on the

10   plaintiff to show by evidence that you have an injury that

11   accrued later than the act.  They didn't abolish the

12   statute of limitations, they created a new standard.  The

13   standard is, the act had to occur and you have to show

14   that an injury occurred later than that within the time.

10:41:52 15          THE COURT:  And you're saying that if I were to

16   delve into the legislative history, I would find that

17   Congress was presented with the very problem that you're

18   describing.

10:42:02 19          MR. GORDON:  I think what we've seen with the

20   legislative history with regard to this very specific

21   amendment is discussion about Masha and discussion about

22   she should be able to sue even though that she's now an

23   adult every time it gets rebroadcast.

10:42:17 24          The problem is they did not create a remedy just

25   for video rebroadcasting internet, they applied it to all

                1    the violations that are predicate for Section 2255.

10:42:31   2            THE COURT:  It sounds like you're saying --

10:42:37   3            MR. GORDON:  That's just my analogy with regard

                4    to Masha.

10:42:42   5            THE COURT:  Okay.  Has any Court gone along with

                6    you on this?

10:42:47   7            MR. GORDON:  Doe v. Boland talked about the 2255

                8    requires a person be a minor when she's a victim of a sex

                9    crime but allows that person to recover when she incurs an

               10    injury regardless of whether the injury occurred while

               11    such person was a minor.

10:43:12  12            Now, I believe Boland was a case where an

               13    attorney expert in sex abuse cases created an image and

               14    put children's faces on people engaged in sex acts, and he

               15    used it only in court, but that was considered a

               16    violation, and so it's in that context.

10:43:35  17            But nobody has looked at -- nobody yet has said,

               18    well, the statute says this, and when the -- because as

               19    defendants are doing and as we're used to in our firm

               20    which only does sex abuse cases more times than not, it's

               21    a discovery rule standard.  That's not what Congress did

               22    here.

10:43:57  23            On the face of the statute, it says, if you've

               24    been harmed by virtue of violating any one of these

               25    statutes, you can sue regardless of whether the injury

1    occurs when you're an adult.

10:44:11  2         So what it did is shift the burden from the

3    pleading stage to either summary judgment or trial stage

4    where the plaintiff must come forward with evidence to

5    show an injury materialized after the act but within the

6    time, the statutory time, to bring the claim.

10:44:26  7         So it's a different mechanism, a different way

8    of proceeding with these actions, and it's just the

9    language of the statute.  It's a relatively new statute,

10    it's a new concept, and courts are just beginning to

11    grapple with it.  But I think Doe v. Boland says it

12    succinctly:  You're a minor, you suffered a violation

13    under the statute, you can seek a remedy regardless of

14    when the injury you suffer is when you're an adult.

10:44:57 15         THE COURT:  Suppose we have a plaintiff who

16    experienced emotional distress as a result of abuse but

17    did not sue, and 20 years later filed suit saying that, to

18    use your example, he's having difficulty maintaining

19    stable relationships, and he attributes this, or his

20    therapist, attributes this to the childhood sex abuse.

10:45:31 21         In that case, is the recovery limited to damages

22    for that adult harm, as you put it, or is he able to seek

23    at that point recovery for the emotional distress that he

24    experienced for decades without suing?

10:45:57 25         MR. GORDON:  In that scenario, if he's had

1    decades of emotional problems and he's been going to a

2    therapist, his psychiatric and psychological records are

3    discoverable.  There's no privilege.  Those records would

4    establish that his injury accrued much earlier and

5    therefore he would be out of time.  It would be with

6    somebody with a new injury that occurred.

10:46:19  7          Mr. Michel is not that old that it went on for

8    decades.  He's a young man and has some of these adult

9    injuries that we see.  And he's come fairly soon with

10   regard to when those adult injuries occur.

10:46:35  11         THE COURT:  So you're saying that a person who

12   has experienced harm and knows it is obliged to act.  He

13   can't wait decades and then assert some form of adult

14   injury that he claims not to have appreciated before?  Is

15   that what you're saying?

10:47:01  16         MR. GORDON:  If the injury was there and shows

17   in the records, he's out of time.

10:47:07  18         THE COURT:  Okay.

10:47:09  19         MR. GORDON:  So it would depend on what's in his

20   record.

10:47:11  21         And there are a number of cases in the discovery

22   rule cases that they're out of time because there's a

23   record of treatment and it shows that they understood this

24   problem years ago.  Those cases cannot go forward under

25   the law in those jurisdictions.

10:47:25  1              THE COURT:  Well, this plaintiff alleges abuse

          2    in 2005.

10:47:32  3              MR. GORDON:  Yes.  And he alleges that he

          4    suffered injuries then, he suffered injuries now and he

          5    anticipates suffering injuries in the future.

10:47:39  6              But on the face of the pleadings, he's alleged

          7    contemporaneous injuries, which means that it accrues from

          8    that point forward on the face of the pleadings.

10:47:51  9              THE COURT:  So on the face of his pleading, the

          10   abuse occurred in 2005 and he alleges that he was injured

          11   right then.

10:48:05  12             MR. GORDON:  Those injuries are out, but

          13   injuries that have accrued since then are in, that have

          14   occurred -- his injuries that he suffered after that point

          15   that are within that window are in.

10:48:21  16             THE COURT:  He --

10:48:27  17             MR. GORDON:  Mr. Michel.

10:48:29  18             THE COURT:  Right.  He was born in 1988 and

          19   turned 21 in 2009, and according to your position had

          20   three years from then in order to sue?

10:48:44  21             MR. GORDON:  We can't assume that the adult

          22   injuries materialized at 18 or 19 or 21.  They obviously

          23   appeared prior to filing suit, because he came forward so

          24   no later than that date, he was aware of injuries he

          25   suffered.

10:49:02  1          It will be up to the experts to say, well, what

       2     did you suffer when and for us to come in and show the

       3     Court, with evidence, that his injury accrued within six

       4     years from the date he filed.  If we can't do that at that

       5     point, his case is out.

10:49:22  6          THE COURT:  Thank you.

10:49:31  7          MS. BIERSTEIN:  Your Honor, if I might?  As

       8     Mr. Gordon said at the outset, he was going to address the

       9     main argument but on the retroactivity point which

      10     Mr. Goldberg touched on -- I'm sorry -- Mr. Folkman,

      11     touched on, I just wanted to say two very quick things.  I

      12     don't want to belabor this.

10:49:53 13          I think on the substance versus procedural point

      14     that Mr. Folkman mentioned, the actual test for

      15     impermissible retroactivity is not substance versus

      16     procedure, that was an example the Supreme Court gave that

      17     procedural rules are not viewed as improperly retroactive.

      18     The actual test, which is in our papers, has the Court

      19     look at the effect of the law, whether it impairs the

      20     rights of party possessed when he acted, whether it

      21     increases a party's liability for past conduct or imposes

      22     new duties with respect to transactions already completed.

10:50:36 23          And I think we covered in the papers, and I

      24     don't want to belabor it, why applying this law this way

      25     does not have an impermissible retroactive effect, but I

1    did want to note that it doesn't turn on whether we call

2    it substance or procedure, it turns on whether it meets

3    the test.

10:50:53  4            The second point that Mr. Folkman raised was he

5    says that we don't have to get to that test because he

6    thinks Congress made clear that there is no intended

7    retroactive effect.  I think the statute is anything but

8    clear on that.  But I think the one point I want to make

9    on that is if Mr. Folkman was correct and Congress

10   intended no retroactive effect, then Masha herself would

11   not have been able to sue the original perpetrator because

12   those acts had clearly happened earlier.

10:51:25  13           Masha did sue under this statute, the original

14   perpetrator, and although defendants discuss in their

15   briefs, that case, Doe versus Hesketh, the claims against

16   the original perpetrator were ultimately dismissed, but

17   not because they were too late.  They were ultimately

18   dismissed because it turned out the perpetrator as part of

19   his criminal prosecution paid restitution.  And the Court

20   found it would be double recovery to let Masha recover

21   from him a second time.

10:51:59  22           But if Mr. Folkman were correct that Congress

23   had never intended a retroactive effect, then the whole

24   law would have been -- it would have been dead the minute

25   it was passed because the point, at least in part, was to

1    give Masha a cause of action which required that it have

2    at least some retroactive effect.

10:52:17  3        We've also discussed in our paper, and I'm not

4    going to reiterate why we think the analogy of other parts

5    of the statute does not allow you to read Congress's

6    intent.

10:52:27  7        We think you do have to get to the second part

8    of the retroactive test.

10:52:34  9        THE COURT:  Thank you.

10:52:34 10        Anything further?

10:52:35 11        MR. FOLKMAN:  Yes, very briefly, Your Honor.  I

12   wanted to read to you, because it addresses a colloquy you

13   had with Mr. Gordon, what exactly they're alleging.  This

14   is paragraph 108.

10:52:45 15        They say, "Plaintiff has suffered deep emotional

16   physical pain, is suffering deep emotional and physical

17   pain and will suffer deep emotional and physical pain."

10:52:59 18        So I think it's clear they're claiming continued

19   suffering; and, number two, as Your Honor asked, they are

20   talking about emotional and physical pain which are

21   results of the abuse.

10:53:09 22        THE COURT:  Thank you.

10:53:14 23        Shall we go on to address the motion to compel

24   and cross motion for protective order?

10:53:24 25        MS. BIERSTEIN:  Yes, Your Honor.  I know there's

1    been a lot of briefing on this and so I think the issues

2    have been fully developed and I'm going to try in my

3    presentation to just focus on what I think the key issues

4    here are because I think the briefing has shed a lot of

5    light and maybe narrowed the issues to some extent.

10:54:02    6         But I want to start by pointing out that it's

7    the defendant's burden here to show either that they

8    shouldn't be compelled to produce the documents or that

9    they're entitled to a protective order.  So they need to

10    show good cause for the protective order.  And to the

11    extent they're claiming privilege, they need to

12    establish -- they have the burden of proof on that

13    privilege.

10:54:26    14         The defendants have offered what I think comes

15    down to three separate grounds to not produce these

16    documents.  The first is their contention that they're

17    subject to psychotherapist privilege; the second is their

18    contention that it's an impermissible burden on their free

19    exercise of religion; and their third is kind of a

20    relevance/confidentiality argument where they suggested

21    there's a heightened standard of relevance because of some

22    of the interests in confidentiality that they allege in

23    here in these documents.

10:55:03    24         And what I think we've shown in our briefs, but

25    what I'd like to distill down today is that I don't think

1    that the defendants have met their burden to establish any

2    of these, that they have not met their burden to show that

3    the documents are subject to privilege or that they burden

4    free exercise of religion or that they're not sufficiently

5    relevant to be produced.

10:55:26  6          On the issue of privilege, I would say at the

7    outset, it is our view -- and I know this is not the way

8    it was argued in the opening brief, but it is I think very

9    clear in our reply brief -- the defendants are correct

10    that the privilege law that applies here is the federal

11    law.  Because of the mixed nature of the claims, we were

12    looking at the state law aspect of the claims and looking

13    at the state law privilege law.  But the Second Circuit

14    has been quite clear that if you have both, the federal

15    court applies the federal law.

10:55:57 16          So we think it's federal law.  We agree with the

17    defendants on that.  It's nice that we can agree on

18    something.

10:56:03 19          THE COURT:  It's nice.

10:56:05 20          MS. BIERSTEIN:  Under federal law, the test for

21    the psychotherapist/patient privilege is the test in

22    Jaffee which gives a privilege for communications during

23    the course of treatment.  There's also an issue about

24    diagnosis, I'm going to deal with that separately.  But

25    the point is that Jaffee doesn't simply protect

1   communications with the psychotherapist, those

2   communications need to be in the course of treatment.

10:56:28   3        So I think the key issue here for the Court is

4   whether the communications between Father Carrier and

5   Doctors Midden and Smith were in the course of treatment.

6   And I think the evidence that we've put together clearly

7   shows they were not.

10:56:43   8        I do want to mention a little bit as an aside --

9   and I'm sure Your Honor is aware of this, but just to

10   mention it -- obviously Mr. Kerrigan has seen what's in

11   these documents because the society has withheld them.  My

12   understanding is Your Honor has seen what's in these

13   documents because they have been produced in camera, and I

14   think that's helpful in Your Honor making a decision, but

15   obviously I have not seen what's in the documents.  So to

16   the extent that my argument touches upon what may be in

17   the documents, it's based on the evidence that we have

18   from the documents that have been produced.

10:57:20   19        So there are some things that we do know based

20   on what's been produced, and I'll start with one I think

21   was mentioned in our brief but perhaps not really

22   emphasized, which is that the Society's own privilege law,

23   which we submitted as Exhibit B, describes what Doctors

24   Smith and Midden did as an evaluation.  That was not our

25   word or our characterization when we began to seek these

documents.  It was the defendant's choice in describing

what it was they were withholding, that these were

evaluations.

10:57:53    So I think we begin with their characterization

that what Dr. Smith and Dr. Midden did was not to treat

Father Carrier but to evaluate him.  I think the rest of

the evidence supports that very strongly.

10:58:13    We know from the evidence we submitted that

Father Carrier was sent by the Society to determine his

fitness for subsequent placement, and you see that in

exhibits D, E, and H.

10:58:24    We know that Father Carrier was not

enthusiastic.  He didn't wish to be seen by either Dr.

Midden or Dr. Smith, but he acceded because the Society

required it.

10:58:35    We know from the documents that we've seen that

the Society, after these evaluations, asked Father Carrier

to undergo treatment, and in particular offered him the

options of undergoing treatment with either Dr. Midden or

Dr. Smith, but Father Carrier refused to be treated by

either of them, and I think you'll see that in Exhibit K.

10:58:56    You'll see in Exhibit H that Father Carrier

offered instead to be treated by his own therapist.  He

also made reference to treatment with his own therapist in

Exhibit E.  So his idea was that if he needed to be

1   treated, he wanted to be treated by his own therapist, not

2   by these -- either of these doctors.

10:59:15   3        We also know that Father Carrier was fairly

4   hostile to both Dr.'s Midden and Dr. Smith.  We see in his

5   communication with Dr. Smith directly kind of a note of

6   hostility about it.  His description of his experience in

7   St. Louis as kind of traumatic and invasive I think

8   demonstrates he did not have or establish a therapeutic

9   relationship with either of them, a relationship that

10  would be the kind of treatment relationship that the

11  Jaffee privilege was meant to protect.

10:59:55  12        We know that Dr. Smith did not view himself as

13  having a therapeutic relationship with Father Carrier as

14  evidenced by his refusal to provide Father Carrier a copy

15  of his report.  If Dr. Smith were treating Father Carrier,

16  presumably he would have shared with him what was

17  happening in that treatment, but Dr. Smith specifically

18  stated that his report was intended for father Regan's use

19  alone.  That's Exhibit G.

11:00:27  20        So it's hard to see that his work with Father

21  Carrier could have involved treatment when it was intended

22  solely for Father Regan.  And as I mentioned before,

23  Father Carrier didn't even expect to receive the report.

24  He said, I knew you wouldn't give it to me.  And I think

25  that's because he knew he wasn't receiving treatment from

1   Dr. Smith so he didn't expect that it would be shared with

2   him.

11:00:52  3        And I would say that there is in fact no

4   evidence whatsoever that Father Carrier himself actually

5   received treatment at either the St. Louis Center or the

6   healthcare chaplaincy.  For example, there's been no

7   affidavit submitted from Father Carrier on this motion,

8   although he has submitted papers to say that, no, this was

9   a treatment exercise, no, I did receive treatment.  What

10  we see in the documents that Father Carrier wrote was a

11  clear demarcation that he was receiving treatment from a

12  therapist of his own and didn't want to be involved with

13  these other doctors.

11:01:29 14        So we think that the evidence clearly

15  establishes that these meetings in St. Louis with

16  Dr. Midden and in New York with Dr. Smith were not in the

17  course of treatment.  So the issue is not really the

18  purpose of it but what happened when he was there.  I

19  think the evidence is clear this was not treatment for

20  Father Carrier.

11:01:55 21        And I want to now turn to diagnosis because I

22  think that dovetails with this because the Society has

23  claimed this is too narrow a view because they say both

24  Dr. Midden and Dr. Smith provided diagnoses, and the

25  Society wants to say, well, because there were diagnoses,

1    they must have been part and parcel of treatment.  And I

2    think that's exactly backwards, Your Honor.

11:02:22  3        In order to treat someone, I think it is

4    necessary to have a diagnosis.  You need to know what it

5    is they have before you try a treatment.  But the converse

6    isn't true.  To do a diagnosis doesn't necessarily mean

7    there's going to be treatment and certainly doesn't

8    necessarily mean there will be treatment with that

9    therapist.

11:02:42 10        So when the issue is whether the communications

11    were in the course of treatment and what the Barmore court

12    has looked at, and I think correctly, is that the

13    diagnostic part of it does not stand alone.  It really has

14    to be diagnosis that's part and parcel of a treatment.

11:02:58 15        So, for example, I would say when Dr. Carrier

16    first -- when Father Carrier first went to his own

17    therapist, the person from whom we accept he was receiving

18    treatment, at that point I would expect, perhaps in the

19    early meetings, that psychotherapist engaged in diagnostic

20    activity.  We would not say, well, those aren't privileged

21    because they're diagnosis, not treatment.  We would

22    understand that diagnosis was part and parcel of the

23    treatment that Father Carrier received.

11:03:28 24        That's not true with Dr. Smith and Dr. Midden

25    because there never was treatment.  So if there is no

1    treatment, the diagnosis standing alone doesn't bootstrap

2    you into the Jaffee privilege.

11:03:40  3            And I think it's important, because we know from

4    the Supreme Court and from the Second Circuit that

5    evidentiary privileges are narrowly construed because of

6    the -- their derogation in the search for the truth.  So

7    the idea that this would be opened up in a more expansive

8    way I think is contrary to the teachings of the court.

11:04:01  9            So whether or not there was diagnosis here, I

10    think the touchstone for the Court is that there was not

11    treatment, and if there was not treatment, then the

12    communications are not privileged.

11:04:13  13            And I think for that reason in this discussion

14    and this disagreement we had in our papers about which of

15    the Barmore decisions, which of the four decisions in the

16    Barmore case provide the most apposite guidance for the

17    Court, I think it's clear if there was no treatment, the

18    applicable law is Barmore II, because Barmore II is the

19    one that looks at fitness evaluations.  Which is exactly

20    what we had here.

11:04:43  21            We had in Barmore police officers who needed to

22    be evaluated for their fitness to continue for what kind

23    of duty, could they go back on active duty or not.  That's

24    exactly what was happening here.  Father Carrier was being

25    evaluated for his fitness for a teaching position to

1    figure out:  Can he still teach?  Do we have to assign him

2    to another place?  So I think the analogy there is the

3    strongest.

11:05:08  4        The issue with Barmore IV has to do with the

5    interaction between the fitness evaluators on the one hand

6    and the personal therapists on the other.  And the holding

7    in Barmore IV is not that the communications with the

8    evaluators become privileged, it's that the fact that the

9    evaluators used privileged information from the personal

10   therapist doesn't waive the privilege on the personal

11   therapy side.  But it doesn't affect the holding in

12   Barmore II that the communications to the evaluators are

13   still not privileged.

11:05:47 14        So I think that it's Barmore II that provides

15   the requisite guidance here and not Barmore IV.

11:05:56 16        As I say, we believe that it is federal

17   privilege law here that governs, but there was a lot of

18   discussion back and forth in the papers about New York

19   privilege law, which if New York law applied would cover

20   only the healthcare chaplaincy report from Dr. Smith which

21   was performed in New York.

11:06:16 22        And I think that in that context, I think the

23   parties agree that if New York law were to apply, the

24   Court would need to predict how New York's highest court

25   would rule here, but I think that the cases cited by

1    defendants are not helpful on that.

11:06:35  2         We had already noted that the Friel decision

3    that they cited in their initial brief wasn't helpful

4    because it deals with, first of all, waiver, which is not

5    the issue here, and second of all, because the Court

6    decided the case under the adoptive patient medical

7    records privilege -- which is a different privilege in New

8    York.  There's been a lot of back and forth about which

9    privilege is strong and err and which is weaker in New

10   York.  I don't know if the Court needs to get into that,

11   because I don't think New York law applies.  I also don't

12   think the characterizations stronger or weaker or helpful.

13   I think they're different privileges.  They have different

14   requirements.

11:07:16  15        I think the psychotherapist/patient privilege is

16   very strong on the issue of waiver.  It's harder for it to

17   be waived.  But by the same token, it's harder for it to

18   attach in the first place.  It has more conditions on

19   attaching to begin with.  So we made the argument in

20   addition to the overt issues that are conditioned on an

21   expectation of confidentiality, which I think as we brief,

22   is clearly not there.  Father Carrier didn't expect

23   confidentiality.  He shared lots of this information.

11:07:50  24        But we think actually that the New York courts

25   would use a similar test in the course of treatment for

1     the same reason my analogy to attorney/client privilege.

2     So I think that the issue of what's stronger and weaker is

3     not the point, it's how does it operate.

11:08:06  4          I just wanted to touch on, there's one case they

5     cite in their reply brief, so we didn't have a chance to

6     address it.  That was the Crystal G. case.  It's a

7     trilevel case.  And more important, the issue here on the

8     psychotherapist/patient privilege was disposed in a single

9     sentence without analysis.  I don't think that case is

10    particularly helpful to the Court.

11:08:30  11         Unless the Court has questions on privilege, I'm

12    going to move on to free exercise of religion.

11:08:37  13         THE COURT:  It appears to me based on the case

14    law that in a situation like this, when a supervisor wants

15    a fitness evaluation, the confidentiality that people

16    might naturally want and expect can be gained by having

17    the fitness evaluator report yes or no with no

18    elaboration.  Is that your understanding of how this works

19    in the real world today?

11:09:24  20         MS. BIERSTEIN:  Your Honor, I actually don't

21    know.  I've seen in some of the cases discussions that in

22    some instances that is all that's provided.

11:09:36  23         My understanding is that at least in this case

24    that's not what was done.  That what was provided was a

25    much more detailed report.

11:09:46  1          It may depend on what the fitness is for and the

        2     intentions of the employer.  Because confidentiality is

        3     one thing.  The word means a lot of different things, the

        4     evidentiary privilege I think is limited to certain types

        5     of confidentiality.

11:10:05  6          For example, we're not disputing that these

        7     documents would be sufficiently confidential to be marked

        8     confidential, to be subject to a protective order as

        9     confidential.  We're not suggesting that because they

        10    should be produced to us, you know, they could be on the

        11    internet the next day.

11:10:24 12          So I think in terms of how employers actually

        13    deal with interesting confidentiality, to some extent it

        14    may be a reflection they're interested in confidentiality

        15    rather than evidentiary privilege, which is a different

        16    standard.

11:10:41 17          So I don't know whether they typically limit it

        18    to yes or no.

11:10:45 19          THE COURT:  Thank you.

11:10:50 20          MS. BIERSTEIN:  Moving on to the free exercise

        21    of religion issue, we don't believe the Society's

        22    established that production of the records would violate

        23    their free exercise of religion whether they're analyzed

        24    under the First Amendment or under the Religious Freedom

        25    Restoration Act or RFRA.

11:11:08  1          So to begin with the First Amendment, in

2      Employment Division v. Smith in 1990, the Supreme Court

3      announced a new test for analyzing laws that were claimed

4      to burden free exercise of religion and held that the

5      right of free exercise does not relieve an individual of

6      the obligation to comply with the valid and neutral law of

7      general applicability on the ground that the law

8      proscribes or prescribes conduct that his religion

9      prescribes or proscribes.

11:11:47 10          And the Court further made clear the scope of

11      its holding when -- this is the Supreme Court in Smith,

12      the Court said, respondents urge us to hold quite simply

13      that when otherwise prohibitable conduct is accompanied by

14      religious convictions, not only the convictions but the

15      conduct itself must be free from governmental regulation.

16      We have never held that and decline to do so now.

11:12:13 17          So the First Amendment itself, the protection is

18      quite a bit more limited, and what we're dealing with here

19      is production of documents under Federal Rules of Civil

20      Procedure, clearly a valid law of general applicability,

21      not a law targeted at religion.  And so the notion that

22      because even if they were to assert a religious objection

23      to doing so, I think that's what the Court rejected in the

24      Smith case.

11:12:44 25          Now, it's true that in the employment case -- in

1    the employment context, courts have recognized a

2    ministerial exception, but that exception doesn't apply

3    here, because I think the case law shows that the

4    exception is limited to claims that call for interference

5    in the selection, assignment and compensation of

6    ministers.

11:13:07  7         We understand it's not just the selection

8    because compensation and assignment fall within that.  The

9    question of what the minister's duties are and the scope

10   of that, we understand that that exception will cover all

11   of that.

11:13:22 12         But the cases that have interpreted this have

13   drawn a clear line between those claims that would cause

14   the Court to have to question or adjudicate the

15   correctness of a hiring decision, of a duty assignment,

16   even of compensation, and claims against a religious

17   authority that don't cause the Court to have to second

18   guess those kinds of decisions.

11:13:47 19         One of those is the Petruska case that we

20   discussed in our brief when the Court said that on the one

21   hand the decisions that challenged the restructuring that

22   deprived the plaintiff of her position to chaplain, you

23   couldn't challenge the propriety of the restructuring in

24   taking away her job because that was the religious schools

25   freedom to select its ministers.  But the fraud claims

1    arising from the same transactions could go forward

2    because they didn't infringe on the defendant's freedom to

3    select its ministers, they focused on whether the

4    defendant misrepresented, whether it had lied about

5    something, not whether it did the wrong thing.

11:14:29   6         You see a similar limitation in the Bollard case

7    we cited which was a case for sexual harassment, and the

8    Court said there's no danger that by allowing this suit to

9    proceed would thrust the secular courts into the

10   constitutionally untenable position of passing judgment of

11   questions of religious faith before a doctrine.

11:14:52  12         So it's clear this is limited to where the Court

13   is going to have to pass judgment on some aspect of the

14   hiring and the assignment and, you know, within the scope

15   of that relationship.  These cases don't deal with what

16   information can be discovered.  They're about claims where

17   the Court's adjudication threatens to interfere with

18   church decisions.  By the Court saying that was wrong, you

19   shouldn't have done that, you shouldn't have fired him,

20   all those things that the Court can't do.  But the Society

21   can't explain how requiring him to produce records

22   interferes with its autonomy to hire Father Carrier, to

23   assign him.  We're not challenging the decision it made of

24   when it decided how to assign it based on the records.  We

25   just want to see the records.

| | | |
|---|---|---|
| 11:15:39 | 1 | And so I think the ministerial exception doesn't |
| | 2 | apply. And I want to do a quick aside and then move on to |
| | 3 | RFRA. |
| 11:15:50 | 4 | In the RFRA context, the Society has suggested |
| | 5 | that the Court should follow the Society of Jesus case |
| | 6 | from Massachusetts from the Supreme Judicial Court in |
| | 7 | Massachusetts. And I'm going to discuss that under RFRA |
| | 8 | and why I think it's not helpful or court controlling on |
| | 9 | the RFRA analysis. But I want to note that in that same |
| | 10 | case, which defendants tout for RFRA, that same Court |
| | 11 | rejected the analysis of the ministerial exception that |
| | 12 | the defendants are urging here. |
| 11:16:22 | 13 | And I think consistent with our position on the |
| | 14 | RFRA argument, we understand that the case is not binding |
| | 15 | on this Court, although I will note that on the |
| | 16 | ministerial exception they were at least interpreting the |
| | 17 | same provision because they were interpreting the First |
| | 18 | Amendment, that is they were interpreting the same |
| | 19 | provision that Your Honor is looking at which is not the |
| | 20 | case when we move to RFRA. |
| 11:16:49 | 21 | But I think the language the Court used on the |
| | 22 | ministerial exception is nonetheless helpful because it's |
| | 23 | persuasive. I mean, somebody writes something that seems |
| | 24 | to get it right, whether it's in an authoritative decision |
| | 25 | or in an article, if the language seems to capture it, I |

1    think it's helpful.  And what the Society of Jesus court

2    said about the ministerial exception there -- that case

3    also involved a subpoena for records, it also involved

4    somebody accused of improper conduct, a priest -- and what

5    the Court said was the mere examination of the Jesuit's

6    documents concerning Talbot, which is all that the

7    subpoena entails, does not infringe on the Jesuit's

8    autonomous decision-making with respect to the fitness,

9    discipline, assignments or any other aspect of his

10   relationship with the Jesuits.  And I would suggest to

11   Your Honor that on that part of that decision, the

12   Massachusetts court got it exactly right.  That's our

13   position here as well.

11:17:58 14          Turning now to RFRA, which provides a search

15   test for protecting free exercise of religion from the

16   Smith case, because RFRA resurrected the old balancing

17   test that had been used at least in some contexts prior to

18   Smith.  Under that, the defendants have to show that

19   producing these documents places a substantial burden on

20   their free exercise of religion.  And I would suggest they

21   haven't made that showing.

11:18:31 22          And again what they have to show is that it's

23   the mere production of the documents that would interfere

24   the religious practice.  And I should note that the

25   Society has never claimed the confidentiality in its

1      evaluation of Father Carrier and its decision-making

2      process are religiously mandated.  This is not where the

3      confidentiality is sort of baked into the religious

4      belief.  What the Society is claiming is that the

5      decision-making process is more efficient if it's

6      confidential, and that's on page 29 of their first brief.

11:19:09   7      And I think that what we're really talking about

8      is administrative convenience, efficiency, arguments that

9      are equally applicable in any employment situation and

10     don't really have anything to do with religion.  And

11     again, we are not saying that there's no confidentiality

12     to these documents, what we're saying is that they don't

13     burden the free exercise of religion so that they need to

14     be produced under whatever appropriate safeguards are for

15     confidentiality we usually use in litigation for all kinds

16     of documents for which confidentiality is a useful and

17     efficient way for them to manage their affairs.

11:19:49  18      So I think there is no burden on their free

19     exercise of religion.  But even if the Court were to

20     characterize the loss of confidentiality as some burden --

21     and I don't think it is -- that burden is slight in terms

22     of its impact on the actual religious -- the exercise of

23     religion as opposed to these administrative aspects of it.

11:20:12  24      And I think coming back now to the Massachusetts

25     state court case, because I think the Society relies

1    rather heavily on it -- which putting aside that that case

2    construes the Massachusetts constitution and not RFRA,

3    because RFRA doesn't apply to the states -- the

4    fundamental problem with Society of Jesus is that the

5    Court never says what the defendants ask this Court to

6    infer it says.

11:20:41  7         It's a confusing decision, I have to say.  At

8    page 669 of the Society of Jesus case, the Court announces

9    the test it intends to use.  It says, we must determine

10   whether the state action complained of substantially

11   burdens the free exercise of religion.  That is

12   substantially burdens it.  Uses the word "substantially."

13   And if it does, then it goes on to talk about whether

14   there's a compelling interest.

11:21:10  15        So the Court acknowledges the test is

16   substantial burden, but on the very next page, the Court

17   says, we thus accept their argument that enforcement of

18   the subpoena would impose some burden, not a substantial

19   burden, only some burden.

11:21:24  20        So trying to make sense of this decision where

21   the Court says on the one hand the test is substantial, on

22   the other hand we find some, you know, what happened?  And

23   I do think there's limited value of trying to make sense

24   of the state law decision construing state law even when

25   the state law parallels to a large extent the federal

1    statute.

11:21:44    2         But to the extent the Court attempts to do so,

3    we submit that either the Court mistakenly applied its

4    open test and required only a showing of some burden even

5    though its precedence would have required substantial

6    burden and RFRA clearly requires substantial burden.  So

7    either they decided the wrong thing or, at least the thing

8    that's not before this Court, and found only some burden.

9    Or having found some burden, the Court decided that since

10   the governmental interest was sufficiently compelling to

11   outweigh even the more substantial burden, there was no

12   need to determine whether the burden involved was in fact

13   substantial.

11:22:22   14         I don't know which it was.  I think in either

15   case it doesn't really make a difference, because I think

16   that this case is not helpful.  And it's important to

17   remember in the end the Court made this side turn over the

18   records.

11:22:38   19         So exactly how they got there may not have been

20   as careful and neat as we would have liked them to be to

21   make sense of this.  So I don't think that this case is as

22   helpful -- is helpful to them at all in establishing this.

11:22:51   23         The last thing I want to say on this point has

24   to do with governmental interest, because the Society

25   argues that there's not a compelling governmental interest

1    here because Perlitz is in prison and PPT is closed.  And

2    I think that's wrong for a couple of reasons.  I think,

3    first of all, the government's interest in stopping

4    Perlitz is not the only interest involved.  There are

5    several other interests.

11:23:23    6         First, there's a strong governmental interest in

7    discovering the truth in the litigation process and it's

8    for this reason that testimonial exclusionary privileges

9    are narrowly construed and disfavored.  And the Second

10    Circuit has made clear that these privileges are in

11    derogation of the search for truth.  And I think that is a

12    compelling interest that the Society simply ignores.

11:23:44    13         But I think there are other interests that we

14    have to talk about here.  I think the fact that Perlitz is

15    in prison doesn't end the government interest in dealing

16    with child sex abuse.  Punishment after the fact is all

17    very well and good, but preventing sexual abuse of

18    children is more important.  And as alleged in the

19    complaint, defendants failed to prevent that abuse here

20    because they took no steps whatsoever to create or enforce

21    rules, to set boundaries, to pay attention.

11:24:16    22         What our allegations are about is the

23    carelessness with which this program was allowed to

24    operate, recklessness even beyond carelessness, because

25    they knew that you need boundary rules, you need to have

1    rules for people to function in an environment with

2    children precisely to avoid this.

11:24:35   3          If the sexual abuse of children is to be

4    prevented, those who set the conditions who allow it to

5    occur must be held accountable.  And the fact that the

6    government views itself as having a compelling interest to

7    doing that is reflective in the laws that give rise to the

8    plaintiffs' claims, including in the Adam Walsh Act, in

9    the very lengthy statute of limitations that Connecticut

10   has adopted for claims involving child sex abuse, in the

11   federal statutes that not only criminalizes this conduct

12   but creates federal private rights of action that cover,

13   you know, ancillary -- those who enable the conduct, not

14   merely those who were the initial perpetrator, in the

15   privilege laws of various states that find privileges

16   inapplicable in the context of allegations of childhood

17   abuse.

11:25:30  18          So Perlitz is in prison, but those who enabled

19   him, those who sent him to Haiti, funded him, all of them

20   have yet to answer for their roll and the government has a

21   strong interest in that and therefore a strong interest in

22   ensuring that the truth comes out and the evidence to

23   explain and understand what happens here is not hidden

24   from the Court and the ultimate fact finder.

11:25:51  25          I would add as well that in the Michel case and

          1     this is independent of the claim, the particular federal

          2     claim that was the subject of the earlier argument today,

          3     that in the Michel case, Michel also alleges that Father

          4     Carrier himself sexually abused him, and Father Carrier

          5     has not in any way been held accountable.  So I think the

          6     governmental interest in exploration of that claim is

          7     especially strong.

11:26:19  8              So I think even if there were any burden here, I

          9     think the governmental interests I think would outweigh

         10     it.  Especially given the very timely burden, if any, on

         11     giving merely us the documents subject to whatever

         12     confidential restrictions the Court thinks are

         13     appropriate.

11:26:38 14              I want to say something quickly about relevance,

         15     and then I'll be through, but I don't know if Your Honor

         16     has questions on the free exercise of religion before I

         17     move on?

11:26:50 18              THE COURT:  As you mentioned, I have had the

         19     benefit of reading the documents, you have not.  Suppose

         20     that the results of the evaluations to my eye do not offer

         21     much of value to you, recognizing I'm not responsible for

         22     prosecuting the case and you are and your view could

         23     conceivably be different, you might see things that I

         24     don't see.  But suppose that there's nothing in there that

         25     talks about what happened at PPT?  Suppose there's nothing

1    in there that talks about the relationship between Father

2    Carrier and Mr. Perlitz apart from a statement to the

3    effect that Father Carrier denies having any improper

4    relationship, period.  Suppose that's all that's there.

5    If you're doing the balancing, if you're weighing the

6    burden on the Society against the interest in production,

7    where does that leave you?

11:28:23  8         If a person looking at the documents would see

9    very little if anything there that would be of value to

10    the plaintiffs, it becomes almost gratuitous, does it not?

11:28:34  11         MS. BIERSTEIN:  I don't believe that the

12    relevance of the documents is part of the RFRA analysis.

13    I understand when we come to relevance, I mean, if the

14    Court having seen the documents thinks the documents are

15    irrelevant, you know, there's a more fundamental problem

16    because we're only entitled to the discovery.  But the

17    discovery of relevant evidence includes evidence likely to

18    lead to the discovery of admissible evidence.

11:29:02  19         So I think the test on that is fairly broad, but

20    I don't know that the religious exercise test incorporates

21    that, because I think the search for the truth, which is

22    part of the governmental interest here, the notion that we

23    get all the evidence so that when we litigate we have the

24    facts in front of us, may include, you know, what may at

25    first blush appear to be dead ends or blind alleys.

11:29:33  1          I also think that as Your Honor alluded to, I

        2    think the relevance of the documents may depend to some

        3    extent on the person looking at them, particularly because

        4    there's so much other evidence that we've looked at that

        5    may give meaning and context and substance to information

        6    that the Court looking at it without all the other

        7    documents that we've seen may see differently.

11:30:01  8          I think, with all due respect to Your Honor's

        9    view of the documents, there's a reason for the

       10    adversarial process, because we may see things in there

       11    and have the opportunity to point out that this is

       12    relevant and they may say, no, it's not, and that may come

       13    up in the context of admissibility or in the context of

       14    making these documents more public if they were to be used

       15    in the course of a trial.  But in this context where we

       16    can't even see them, the adversarial process is really

       17    hamstrung because I can't argue to that other than to say

       18    I think that comes in in a different place, not in the

       19    First Amendment.

11:30:39 20          And I think, as I say, we sort of ferreted out a

       21    number of exhibits and documents that we showed the Court

       22    I think in context.  But there's also been deposition

       23    testimony, there are also other documents.  I'm troubled

       24    by the idea of that decision being made at an early stage.

11:30:59 25          I understand that you say it seems gratuitous,

1    but showing it to a handful of lawyers in addition to a

2    judge also seems fairly trivial depending on what

3    restrictions or limitations the Court might want to place

4    on the usage we make of it.

11:31:18    5         And that's why I think I mentioned in one of our

6    briefs, we have the existing protective order.  Some

7    judges have and for some particular documents placed

8    additional restrictions for documents that they thought

9    were particularly sensitive.  I don't know whether these

10   are particularly -- I don't know whether it's the act of

11   turning it over or the contents of the document that they

12   are sensitive to.

11:31:40   13         THE COURT:  I think as the Massachusetts judge

14   emphasized, the concern is that by requiring production of

15   documents that these individuals clearly contemplated

16   would be maintained in confidence and not disclosed does

17   presumably carry a significant chilling effect and if a

18   person in a position of Father Regan -- is it Regan --

11:32:30   19         MS. BIERSTEIN:  I think it's Regan.

11:32:32   20         THE COURT:  But if such a person understandably

21   wants to have a priest evaluated for fitness for

22   assignment, the risk that whatever happens will be subject

23   to inspection by a Court and potentially adverse parties

24   in litigation is likely to constitute a significant

25   interference in the eyes of that person and maybe the

1    person will go ahead and take steps to try to correct a

2    security barrier, steps that were taken here, and maybe

3    those steps could be effective.  But as the descending

4    judges explained, that's the concern, and I think it's a

5    legitimate concern.  So I ask myself, well, recognizing

6    that this constitutes at least some burden for purposes of

7    this analysis, don't they need to have at least some value

8    in the information sought, and if I look and I see only

9    rather bland information, what do I do then?  Do I say

10   even though there appears to be nothing of real value here

11   I'm going to require its production notwithstanding that

12   it does carry with it a burden on the exercise of

13   religion?  Or do I say, you know, what?  The plaintiffs

14   will have to trust me on this, I've looked at this stuff

15   and there's really nothing there that's going to help you.

11:34:36  16        MS. BIERSTEIN:  Well, Your Honor, what I would

17   say is the chilling effect that you are describing -- and

18   it's a legitimate concern and I understand that -- is not

19   really a religious concern.  It's the same concern to some

20   extent that the Supreme Court was talking about in Jaffee

21   when it created the psychotherapist privilege.  But the

22   Court decided only to protect communications in the course

23   of treatment.

11:35:02  24        That is, in balancing this open discovery view

25   that we adopt in our courts, we have concerns about

1    employers who send people for evaluations.  The courts

2    have drawn the line to say, yes, it's always a chilling

3    effect if you're investigating an employee, you're trying

4    to figure out their fitness if the employee knows the

5    information might be shared.

11:35:26  6          Of course here, and this is the point, Father

7    Carrier always knew the information would be shared, he

8    always knew it wouldn't be confidential, which may be why

9    there isn't as much in there as maybe we're hoping.  But

10   it's less of a violation -- it's not a violation at all

11   because he knew it was never going to be confidential.

12   And I think the law reflects that.

11:35:45 13          What the RFRA test is getting at is not a burden

14   on the efficiency of deciding the fitness of your

15   employees, it's a burden on the exercise of your religion,

16   and I don't think that -- so I think the Court's concern

17   is legitimate, but I don't think it's part of the RFRA

18   analysis.  I think it comes in the privilege analysis or

19   relevance analysis because I think RFRA is much more

20   narrowly focused on the religious aspects.

11:36:24 21          The Court has said something different.  The

22   Court has said treatment is so important we need to

23   protect it.  But that's the only place.

11:36:30 24          And I should note, I mean, the federal law

25   doesn't even have a doctor/patient privilege.  It only has

1    the psychotherapy/patient privilege.

11:36:40    2         THE COURT:  Right.

11:36:41    3         MS. BIERSTEIN:  So I think the courts have

4    created and construed these privileges very narrowly, and

5    I think the concerns that Your Honor's raising are exactly

6    the kinds of concerns that went into the balancing in the

7    consideration, but the law hasn't come out to be as

8    protective as the dissenters in Massachusetts thought or

9    maybe where Your Honor would like to see the greater

10   protection.

11:37:03    11        I don't know what to say about the relevance of

12   the documents not having seen them other than to say if

13   Your Honor says trust me, there's nothing in there, then

14   that's what we're going to have to do.

11:37:13    15        Obviously we prefer to make that decision for

16   ourselves.  Even if we had to give them back, you know,

17   we'd prefer to receive them and see if there's something

18   that we see that Your Honor doesn't --

11:37:25    19        I mean, I will say that, this is not what we've

20   been discussing, but I think it ties in with the

21   relevance.  The defendants are focused on a heightened

22   relevance analysis, but they're looking at cases with

23   material that does not pertain to the defendant,

24   non-parties whose employment records suddenly get

25   implicated in a lawsuit, and the courts are pretty

1    protective of those, and I understand that.  But Father

2    Carrier is a party, and I think the protections and

3    confidentiality are different in that context.

11:37:54  4            THE COURT:  Well, we do need to take a break,

5    we've been at it for an hour and a half now and the

6    reporter's going to need a break.

11:38:04  7            Katelyn, may I speak with you, please?

11:38:09  8                 (Pause)

11:38:32  9            MS. BIERSTEIN:  I was finished with my argument

10    except for any additional questions the Court has.  So if

11    this is a good time for a break, that's fine.  If you have

12    additional questions for me after the break, either way,

13    whatever Your Honor prefers.

11:38:44 14            THE COURT:  Okay, thank you.  It would be

15    helpful to me if I had your input on what might be a

16    better focused question.

11:39:08 17            Let's assume that these evaluations of Father

18    Carrier disclose information about his mental and

19    emotional condition, and put that in the context of his

20    life, including his childhood, his relationship with his

21    parents and so forth, but at the same time these reports

22    provide virtually nothing on the topic at hand in this

23    litigation apart from a reaffirmation of a general denial

24    that anything improper occurred, period.

11:40:07 25            I can I understand why you would be interested

1    in having material so that you could have a better

2    understanding of Father Carrier as a person even though

3    there's nothing there in the way of new or different

4    information about what went on at PPT, even though there

5    are no damaging admissions, nothing that could be used

6    even to impeach the witness.

11:40:44  7         If that's the situation, how do I justify

8    requiring the production of these documents over the

9    objection that has been made?

11:40:57 10         MS. BIERSTEIN:  Well, I think, Your Honor, for

11    one thing, Father Carrier shared that information with

12    people who he knew were not going to keep it confidential

13    and were going to report it.  If he had told his best

14    friend --

11:41:12 15         THE COURT:  I'm not saying it's privileged.  I'm

16    not saying it's privileged, okay?

11:41:16 17         MS. BIERSTEIN:  I understand, but what I'm

18    saying is if he had told his best friend personal things

19    that were helpful.

11:41:24 20         Again, I understand, if you have a witness or a

21    peripheral figure in a case, it might not be fair to delve

22    deeply into their background and psyche.  Father Carrier

23    is the central figure here.  He's the nexus between

24    Douglas Perlitz and all the other defendants.  Each of the

25    institutions was an institution that he brought into with

65

1    his connection with Perlitz.  His relationship with

2    Perlitz is absolutely actually essential.

11:41:57    3         We allege that that had been a sexual

4    relationship, that Perlitz told the boy it was Father

5    Carrier that introduced him to these activities.

11:42:07    6         So I think the scope that might be relevant to

7    delve into with Father Carrier, even things as you say we

8    might find helpful and understanding him as a witness, is

9    broader than it would be for another party or another

10    witness.

11:42:21    11        I do think, for example, if he discusses his

12    sister in there -- because I know the issues of his sister

13    come through a lot -- it might be appropriate to redact

14    information about his sister because she's not a party and

15    wasn't in St. Louis or New York and she didn't consent to

16    share this information, and the Court might want to be

17    more protective of her than might be appropriate for a

18    party in this central position of Father Carrier.

11:42:50    19        So I do think that you've got to look at his

20    role in the case in thinking about is it unfair in some

21    way to delve into these things.  But I also think you have

22    to look at his expectation when he shared the information,

23    that if you went to -- if he went to confession, obviously

24    we know we wouldn't get that.  And if he was with his own

25    treating therapist where he understood that this was a

1    violation, then it's a different scenario.

11:43:19  2          But I think when you put those two things

3    together, if it's useful in us in the case and it's not

4    privileged and he didn't expect it to be confidential and

5    we have restrictions of what we can do with it so that

6    we're not publishing it in the newspaper tomorrow, I would

7    say yes, I think that they should be produced to us.

11:43:41  8          THE COURT:  Thank you.

11:44:35  9          Let me ask you to tell me what you have in mind

10    for me for the rest of the day.  I know that we have to

11    talk about your respective bellwether proposals.  I don't

12    know how long you think that discussion is going to take.

11:44:56  13          MR. HANLY:  Judge, from the plaintiffs' point of

14    view, probably three or four minutes.

11:45:05  15          MR. GOLDBERG:  Your Honor, these are the

16    fundamental issues that we need to move this case forward.

17    We're apart on a number of things.  Today's our

18    opportunity to work with each other, work with the Court,

19    to come to some resolution on these issues, and I would

20    hate to see that get unnecessarily truncated.

11:45:24  21          MR. HANLY:  But, Judge, all that I meant was,

22    all that I had to say I think would take three minutes.

11:45:30  23          THE COURT:  Okay.

11:45:31  24          MR. HANLY:  But I'm available obviously to have

25    a dialogue with the Court and with counsel altogether for

                1    however long it takes.  It's just the points that I wanted

                2    to make are pretty simple.

    11:45:48    3             THE COURT:  Have you spoke open in some detail

                4    about your respective positions prior to today?

    11:45:54    5             MR. GOLDBERG:  Your Honor, before these reports

                6    were submitted, we did, Mr. Hanly, Mr. Conroy, and I, we

                7    did speak back and forth.  We had some very good I think

                8    productive, constructive discussions.  But as the

                9    proposals show, those are the results of good faith

                10   efforts that did not come to fruition.

    11:46:15   11             THE COURT:  Okay.

    11:46:16   12             MR. GOLDBERG:  And we have, I think when we get

                13   through it, there were some areas of agreement in terms of

                14   the schedule, the selection of two cases each or a total

                15   of four cases.  I'm not sure that two cases each is

                16   completely agreed on, but a total of four cases.  The idea

                17   of using this as a vehicle to get to a mediation.  Those

                18   concepts I think we're on board and those are reflected in

                19   the respective proposals, but there are a number of

                20   significant differences.

    11:46:43   21             The most important of those, which we really I

                22   think need to -- we want a full opportunity to discuss is

                23   the number of depositions and how we can get to the point

                24   that people can choose the reasonable bellwether pool.

    11:46:59   25             And as Your Honor saw, we're apart on that and

                    1    we'd like to spend some time on that today.

11:47:04    2            THE COURT:  All right, then why don't we take

            3    our lunch break now and why don't we plan to reconvene at

            4    1:00?  All right?

11:47:18    5                    (Whereupon, a recess followed).

13:05:46    6            THE COURT:  Good afternoon.  We'll resume with

            7    argument on the motion to compel and cross motion for

            8    protective order.  We've heard from plaintiffs' counsel.

            9    We'll hear from defense counsel and then we'll turn to the

           10    parties' bellwether proposals.

13:06:35   11            MR. KERRIGAN:  Good afternoon, Your Honor.

13:06:36   12            THE COURT:  Good afternoon.

13:06:37   13            MR. KERRIGAN:  Michael Kerrigan on behalf of the

           14    Society of the Jesus of New England.  Your Honor, keeping

           15    in mind that we have other items on your agenda for this

           16    afternoon, I'll try to keep my comments brief, but I did

           17    think it was important to have a few counterpoints given

           18    to the Court with respect to some of the arguments that

           19    you've heard today.

13:06:56   20            The issue has been thoroughly briefed through

           21    both motion, replies and surreplies and the like, so I do

           22    think that the issues have coalesced to a discrete body of

           23    items for the Court to consider.

13:07:11   24            So what I'd like to do, Your Honor, if you're

           25    okay with this, is to take up the items in the order in

1    which they were taken up before the break, which is to

2    take up the federal psychotherapist/patient privilege and

3    then go to a little bit of New York just to rebut a few

4    points that my sister made and then address the free

5    exercise arguments.  And then if the Court would like to

6    hear just a touch on relevance, because it did come up

7    towards the end of the arguments previously.

13:07:52  8         Your Honor, I'd like to start on the federal

9    psychotherapist/patient privilege side.  Just with some,

10    first, principles, general principles.

13:08:04  11        I think the first thing we can all agree to,

12    Your Honor, and you have seen the documents, I have seen

13    the documents, but I don't think it's a leap for our

14    colleagues on the plaintiffs' side to understand that

15    these are the most sensitive and confidential types of

16    communications that one could have, communications between

17    the therapist and the patient, and these are

18    communications in which a correspondent with a therapist

19    is required to be frank, to be candid, to delve into one's

20    deepest emotions, fears, thoughts, all of these types of

21    things.

13:08:43  22        And so with that overlay, with that first

23    principle setup, it flavors the discussion here.  And the

24    importance of the confidential nature of these types of

25    conversations was recognized by the Supreme Court in

1    Jaffee back in 1996.  And here again we're discussing

2    first principles.

13:09:05  3         We have the principle which every man and woman

4    is entitled to in that context, and that is the principle

5    of law and longstanding.  And the court in Jaffee

6    recognized that that principle gives way in the face of an

7    overriding and a transcending good in society and the good

8    that was recognized was maintained in the confidentiality

9    of these types of communications.

13:09:33  10        THE COURT:  In that case an individual

11   voluntarily sought help and the materials consisted of the

12   communications and the notes of the communications and

13   there was no indication that these communications had been

14   shared with anybody.

13:09:53  15        MR. KERRIGAN:  Correct, correct.

13:09:55  16        THE COURT:  Quite different from our case.

13:09:57  17        MR. KERRIGAN:  It is, Your Honor, and I will get

18   to that in discussing the district courts and the various

19   courts that have discussed Jaffee.  And have tried to

20   construe Jaffee in a manner that is true to these first

21   principles.

13:10:11  22        THE COURT:  How do you distinguish this case

23   from the fit for duty cases which seems to go the other

24   way?

13:10:26  25        MR. KERRIGAN:  I would distinguish in a couple

1    of ways, Your Honor.  In looking at the legal landscape,

2    we are facing the fitness for duty evaluation cases.  We

3    haven't seen this in the religious context under the

4    federal standard.

13:10:42  5         THE COURT:  Is that true?  Isn't there at least

6    one case that does address this in the religious context?

13:10:48  7         MR. KERRIGAN:  Not under the federal standard.

8    I believe under state law there is.  Certainly there are

9    cases that have been cited from the Middle District of

10   Pennsylvania.  There's a case cited in New York state

11   court.  But I do not believe they address the federal

12   Jaffee standard, Your Honor.

13:11:04  13        THE COURT:  Do you think that's a meaningful

14   distinction?

13:11:09  15        MR. KERRIGAN:  I do, Your Honor, because each

16   one of the 50 states has there own formulation to keep in

17   mind.  These are all things mentioned in the Jaffee case,

18   that while there are privileges that exist in the 50

19   states, there are variations of the privileges.

13:11:30  20        But getting back to the distinction --

13:11:33  21        THE COURT:  Before we depart that, do you

22   maintain that these variations are dispositive?  In other

23   words, material that would be privileged in one state and

24   not be privileged in another?

13:11:47  25        MR. KERRIGAN:  I think depending on the wording

1    of the statute and various exceptions to the various state

2    statutes, I think that's true, Your Honor, that it would

3    be the case.

13:11:54  4        THE COURT:  Why should a religious institution,

5    a religious employer, be treated differently for fitness

6    of duty than a police department.

13:12:06  7        MR. KERRIGAN:  Because you're dealing with

8    officers of the law who have been trained and entrusted

9    with the exercise of the state's monopoly on the use of

10    deadly force, and therefore when these individuals are

11    being examined for fitness of duty evaluations, the public

12    interest in knowing what's in those reports, the interest

13    in an employer in knowing whether or not an individual is

14    fit for duty to return to duty to exercise that deadly

15    force, is an overriding concern, perhaps it's an unspoken

16    one, but it's a concern that would exist in that context

17    in a public agency and individuals in that formulation

18    that doesn't exist in a context where you have a private

19    religious organization with a priest and there are

20    treatment decisions being made, ministerial decisions

21    being made, evaluation decisions being made.

13:12:56  22        So that, Your Honor, I think is a distinction

23    that does have a difference between the fit for duty

24    examinations in the police context as opposed to the

25    religious context.

13:13:06   1              THE COURT:  You mean that the public has less

           2     reason to be concerned about whether a priest is fit for

           3     duty than a police officer?

13:13:15   4              MR. KERRIGAN:  I would state it the other way,

           5     Your Honor.  I would say the public has more of an

           6     interest in ensuring that an officer who is entrusted with

           7     the use of deadly force has the suitable mentality for

           8     effectuating the responsibilities as opposed to a priest

           9     or religious who does not have similar or comity

          10     responsibilities in that regard.

13:13:36  11              THE COURT:  Although surely given the priest

          12     custody of young children is something that implicates

          13     significant public concern.

13:13:47  14              MR. KERRIGAN:  A concern, not the concern we see

          15     in these fit for duty cases through Barmore and some of

          16     the others we've discussed here today, Your Honor.

13:13:58  17              But I would like to return to the issue of

          18     evaluation of treatment under the Jaffee standard.

13:14:05  19              What I heard and what is argued in the papers is

          20     that the fitness for duty evaluations by virtue of the

          21     fact that they're fitness for duty evaluations do not

          22     constitute diagnosis or treatment under the Jaffee

          23     standard and therefore they don't fall within the

          24     privilege.

13:14:21  25              And, of course, Your Honor, there is no guidance

1    from the United States Supreme Court on this when we're

2    looking at the district courts at all.  But I would note

3    for the Court, in one of the formulations of Barmore, and

4    I'm looking here at the 2012 decision in Barmore which the

5    plaintiffs rely, on which my sister referenced as having

6    it right, the Court indicates the following on the fitness

7    for duty type of evaluations and whether or not they

8    qualify for the privilege.

13:14:48  9          The Court says:  Since the Jaffee decision no

10    federal Court of Appeals' decision has addressed the

11    precise issue before this Court as to whether the

12    privilege applies in a situation of a required

13    psychological evaluation related to fitness for duty

14    following a traumatic incident following a police officer.

13:15:10  15         The Court goes on to say:  On the other hand

16    there have been several decisions by district court judges

17    or magistrates addressing the exact issues.  The majority

18    of those decisions have ruled that a fitness evaluation in

19    this context is in fact covered by the

20    psychotherapist/patient privilege recognized in Jaffee.

13:15:29  21         And then the Court goes on to determine whether

22    or not there was some kind of a written waiver or release

23    that would take the communication outside of Jaffee.

13:15:38  24         So I would submit, Your Honor, that even though

25    we're using a what I would consider an inept analogy of a

|  |  |
|---|---|
| | 1 |

1       policeman's fitness for duty exam when talking about

2       Father Carrier's treatment and evaluation, even in the

3       context of an exhibition for fitness for duty examination,

4       we have a --

13:15:58  5              THE COURT:  Why is that inept?

13:16:02  6              MR. KERRIGAN:  Just for the reasons I

7       articulated earlier.

13:16:05  8              THE COURT:  Because of the public interest in

9       the police officer's performance of his duty?

13:16:11 10              MR. KERRIGAN:  That's correct, Your Honor.

13:16:13 11              THE COURT:  So we would have varying privileges

12       apparently for people depending on the strength or

13       weakness of the public interest in what they do?

13:16:22 14              MR. KERRIGAN:  They're all fact specific

15       determinations on this.

13:16:25 16              THE COURT:  Isn't privilege law supposed to be

17       clear in order to make it effective?

13:16:29 18              MR. KERRIGAN:  It is supposed to be clear.

13:16:32 19              THE COURT:  And bright lines?

13:16:34 20              MR. KERRIGAN:  Bright lines.

13:16:34 21              THE COURT:  But we have one for police, one for

22       firemen, one for teachers, one for priests?

13:16:40 23              MR. KERRIGAN:  It would have to depend on the

24       circumstances of each individual.

13:16:44 25              THE COURT:  It doesn't sound like a bright line

1    to me.

13:16:47    2        MR. KERRIGAN:  Well, I think, Your Honor, that's

3    why we see in Barmore, we see one example with the 2013

4    decision, indicates that treatment records, that is

5    records of a policeman that was used to make fitness for

6    duty evaluation does not constitute a waiver.

13:17:01    7        THE COURT:  My view after studying the extensive

8    briefing is that you have not established the existence of

9    a privilege.  Why?  Because the evaluation was undertaken

10    at the direction of Father Regan.  I don't want to

11    mispronounce his name.

13:17:32   12        MR. KERRIGAN:  You are pronouncing it correctly.

13:17:34   13        THE COURT:  And the results of the examination

14    were shared with him and others, and this distinguishes

15    Father Carrier's case from the fitness for duty cases in

16    which there was no such disclosure.

13:17:48   17        So for me, I'm persuaded by the district courts

18    that have looked at the fitness for duty scenarios that

19    the privilege doesn't apply because of the lack of

20    confidentiality, and I then ask myself, well, should the

21    situation be different because this involves a religious

22    institution?

13:18:23   23        MR. KERRIGAN:  Your Honor, can I pick up that

24    point with Barmore to try to move you in another direction

25    just a little bit?

13:18:29  1          THE COURT:  Again, I don't want to be rude, but

       2    you've given me a lot of paper.  I've read it.  I've read

       3    the cases and I'm just being honest with you.

13:18:39  4          MR. KERRIGAN:  That's appreciated, Your Honor.

13:18:41  5          THE COURT:  I think it would be very hard for

       6    you to convince me that the privilege obtains even though

       7    most of the communications are not between the would be

       8    patient and the therapist, they're between other people.

13:18:56  9          MR. KERRIGAN:  And the communications that took

      10    place between Father Carrier and the therapist of course

      11    are what is embodied within the communications with Father

      12    Regan.  So that is one reason we're saying it does adhere,

      13    Your Honor, coupled with the fact that the Society always

      14    maintained the documents as confidential.  And in respect

      15    of that confidentiality, Father Regan and his leadership

      16    team at the Society kept them confidential.

13:19:21 17          I haven't seen anything to the contrary in any

      18    of the papers, Your Honor.  So even though there is some

      19    discussion with Father Carrier perhaps discussing these

      20    materials with others, there is no suggestion that at all

      21    times the Society and Father Regan did not treat them as

      22    strictly confidential pursuant to a waiver, the waiver

      23    we've seen in the Barmore case in 2013.

13:19:49 24          THE COURT:  I don't think waiver applies, it's

      25    just the lack of confidentiality from the beginning.

13:19:53   1              MR. KERRIGAN:  Your Honor, I can move onto the

           2     New York psychologist's patient privilege if Your Honor

           3     would find that useful.  If that's going to be any part of

           4     the decision.  But as far as we're concerned, it is a

           5     federal privilege issue for this particular discovery

           6     dispute.  I don't want to get into anything that's going

           7     to not be useful to the Court in adjudicating a decision.

13:20:16   8              THE COURT:  Thank you.

13:20:18   9              MR. KERRIGAN:  If you feel that New York law is

          10     moot, we --

13:20:21  11              THE COURT:  I don't propose to spend much time

          12     on it, thank you.

13:20:26  13              MR. KERRIGAN:  Thank you.

13:20:26  14              On the free exercise analysis, Your Honor, the

          15     first thing I would note about that is the free exercise

          16     analysis under the Religious Freedom Restoration Act

          17     compresses to the pre EEOC compelling state interest

          18     balancing test.  I don't think there's any dispute as to

          19     how that formulation works.  And the Religious Freedom

          20     Restoration Act gives of course a special solicitude to

          21     religious organizations.  It's something of a super

          22     statute that governs all government actions across the

          23     prospect of areas of interest and of course it has a

          24     constitutional lineage and of course not a constitutional

          25     issue per se.

13:21:15  1          The purpose was to protect a valued relationship

2      and a valued exercise of a societal good.  And in this

3      instance, Your Honor, the Society is not asking for any

4      kind of a sweeping pronouncement, not asking for any kind

5      of an exemption from the rules.  What the Society is

6      asking for is that the documents at issue not be compelled

7      to be disclosed based upon the Religious Freedom

8      Restoration Act.  The idea of course is the compelled

9      production of these documents would chill various

10     practices, various methods, various tenets like the

11     Society follows in evaluating, assigning, assessing its

12     ministerial personnel.

13:22:06 13          And I would just have a brief word, Your Honor,

14     on the notion of free exercise.

13:22:12 15          I think that the plaintiffs have a little bit of

16     a constrained notion as to what constitutes free exercise.

17     We saw it in the briefs, we heard a little bit of it

18     today.  It is not just a matter of belief or a religious

19     ritual or practice, it is conduct motivated by belief.

13:22:31 20          So I recall, Your Honor, in doing some of the

21     research that an earlier articulation of the Bill of

22     Rights in the First Amendment had a protection for freedom

23     of conscience, and that was changed to reflect the free

24     exercise of religion indicating a broader sense of what is

25     covered under this protection, and that would include

1    practices of the nature we're describing here, practices

2    of which a provincial is required by a religion to

3    evaluate ministers, assign ministers.  This is something

4    which is known in Jesuit parlance as cura personalis.  And

5    it's a holistic approach.  It's an approach that deals

6    with the spiritual formation of an individual, and it's

7    not just a matter of assignments that are managerial in

8    effect or secular in effect.

13:23:37  9          There was a distinction made in the papers and a

10    little bit of one heard in the argument in that the

11    activities that are going on here, the evaluation of the

12    minister and assignment to the minister, that they're

13    purely secular in nature, managerial, kind of like the

14    police manager and police superintendent in the Barmore

15    case, but that's not the case.

13:24:00  16          The difference here, Your Honor, is where your

17    distinction comes in.  This is a religious organization.

18    The Religious Freedom Restoration Act following from the

19    First Amendment does provide a special dispensation or a

20    special solicitude for religious organizations for

21    precisely these types of activities.  And the plaintiffs

22    concede in their papers that part of the purpose of having

23    the diagnosis, treatment and evaluations done, was too

24    find or assign a suitable ministry for a minister of the

25    church.  And there in and of itself is a religious

1    activity that is something that's motivated by religious

2    belief.

13:24:43  3         When we talk about the substantial burden, Your

4    Honor, you had picked up on this in your comments earlier

5    in that the chilling effect down to the Society is

6    substantial here if these communications, which again are

7    highly personal, highly sensitive and confidential, are

8    forced to be compelled.  We have the Supreme Judicial

9    Court of Massachusetts indicating that logic and common

10   sense would indicate that confidentiality is a very

11   important part of this process to encourage frank and open

12   communications not only between the priest and the

13   provincial but also between the priest and the evaluating

14   individual, whoever that mental health professional may

15   be.

13:25:24  16        And your review of the materials in camera no

17   doubt gave you some sense of the holistic approach, the

18   nature of the information that's being exchanged as part

19   of this process.  And you had asked earlier what

20   significance should that have on your analysis, on the

21   religious free exercise analysis.  I would suggest, Your

22   Honor, that the in camera review, which the plaintiffs

23   agree to and which we agree to, helps the Court to

24   understand the significance of the information and hence

25   the importance of the confidentiality of the information

1    as personal and as in depth as it is to the effective

2    evaluation and assignment and assessment of ministers of

3    the church.

13:26:09  4         So it factors into your determination whether or

5    not there was a burden being visited upon the Society in

6    this instance were the documents sought to be compelled.

13:26:20  7         One formulation of the substantial burden comes

8    from the Korte case, and this formulation is not an

9    unfamiliar one.  I think, Your Honor, but it's any kind of

10   a government action that bears any direct primary

11   fundamental responsibility for rendering a religious

12   exercise effectively impractical.

13:26:42 13         So it doesn't have to be a ritual or a belief.

14   It is an exercise that is motivated by religious belief

15   and it's being burdened here.

13:26:52 16         And we would again commend the Court to the

17   Massachusetts Supreme Judicial Court decision where the

18   Court did find that some burden was visited upon the

19   Society and in circumstances that were very similar to

20   these circumstances here.  And I say very similar because

21   it's not -- we don't have the priest who is being

22   prosecuted as was the case in the Society of Jesus case in

23   Massachusetts.

13:27:17 24         But what we do have, Your Honor, is an instance

25   in which we have communications between priests and

1    evaluator, priests and professional associates, Your

2    Honor, associates, Your Honor, is the assistant to the

3    privilege.  And also with an attorney.

13:27:33  4    And the Court did find, and this was a unanimous

5    finding because we had the dissenting justices agreeing

6    with the verdict, that there would be a burden upon the

7    Society as a result of the compelled disclosure.  My

8    sister indicated that the Court did not use the term

9    "substantial burden" in its analysis and that's accurate.

10   The words "some burden was used" and there was other

11   manifestations of the burden.  And it was absolutely the

12   case the Court found there was some kind of substantial

13   burden.  And there are a few reasons for that.

13:28:08  14   The first reason is even though the analysis by

15   the Supreme Judicial Court was undertaken pursuant to the

16   Massachusetts constitution, that provision compresses into

17   a Religious Freedom Restoration Act analysis simply

18   because they were all working under the compelling state

19   interests substantial burden analysis that was formulated

20   pre EEOC v. Smith or Employment Division v. Smith.

13:28:34  21   So there's no distinction to be made between

22   what analysis the Massachusetts Supreme Judicial Court

23   took, it's the same analysis that this Court's being asked

24   to take.

13:28:44  25   The second point, Your Honor, is that there

         1    would be absolutely no reason for the Court in the Society

         2    of Jesus case in Massachusetts to have proceeded on to

         3    determine whether or not there was a compelling state

         4    interest effectuated by the least restrictive means if the

         5    Court had not first found that there was a substantial

         6    burden visited upon the Society.

13:29:07  7            So for those reasons, Your Honor, we don't think

         8    that the Society of Jesus case out of Massachusetts is

         9    particularly confusing in that it's inapposite.  What we

        10    think is that it's a helpful case, a persuasive case, to

        11    help the Court assess whether or not to compel production

        12    of documents would effect a substantial burden upon the

        13    Society.

13:29:29 14            And I would note, Your Honor, that under First

        15    Amendment jurisprudence, again this is pre Employment

        16    Division v. Smith jurisprudence, there are cases that hold

        17    for the proposition that compel disclosure of information

        18    alone in and of itself can have a chilling effect on First

        19    Amendment rights.  I have in mind the First Circuit case

        20    of Surinach, which references the United States Supreme

        21    Court case of Buckley, and both of those cases vote for

        22    the proposition that simply compelling a production can

        23    effect a chilling and can effect a burden upon free

        24    exercise.

13:30:16 25            THE COURT:  Let's put aside a police department

1    and let's imagine a private employer who has a troubled

2    employee and is concerned about the employee and concerned

3    about the organization, and like the provincial wants

4    information to enable an appropriate decision to be made.

5    Why should that employer be required to divulge those

6    matters but not you?

13:30:58    7         MR. KERRIGAN:  If that employer, Your Honor, is

8    a secular employer, an employer that has no religious

9    basis, then the Religious Freedom of Information Act says

10   that special solicitude is to be given to a religious

11   organization.

13:31:10   12         So if we have that hypothetical Your Honor is

13   giving, the distinction and the difference is that we have

14   a statute, a federal statute, that applies specifically to

15   religiously motivated --

13:31:23   16         THE COURT:  I need to find the answer in the

17   statute.

13:31:26   18         MR. KERRIGAN:  In the statute and the case law

19   construing it, and I think that would allow Your Honor to

20   go back --

13:31:32   21         THE COURT:  If there's a double standard, that's

22   not my fault, that's Congress's fault?

13:31:36   23         MR. KERRIGAN:  I think Congress made a decision,

24   and I think it was a very strong decision in the aftermath

25   of Justice Scalia's decision in the Employment Division v.

1    Smith case, and the reaction was very prompt that Congress

2    decided that religiously motivated conduct was going to

3    get this special protection.

13:31:54  4         THE COURT:  Suppose this private employer is a

5    newspaper, does that matter?

13:32:02  6         MR. KERRIGAN:  I don't know that it would make a

7    difference in this particular case.  We're dealing with

8    the Religious Freedom Restoration Act, Your Honor.  That's

9    a specific species of the First Amendment rights that

10   we've carved out, and it's religiously motivated conduct,

11   activity and affairs.

13:32:22 12         So I don't know if you had a newspaper, which

13   has a First Amendment right, of course, but that is not

14   religiously based or motivated, again, would have that

15   distinction that the religiously motivated conduct, the

16   religious employer has a special solicitude under the

17   statute and under our interpretation that the secular

18   non-religious organization would not have.

13:32:48 19         THE COURT:  What do you say to the skeptic who

20   tells you that you should be obliged to take the

21   appropriate measures to protect the privacy of your

22   information that a private employer is obliged to take?

23   For instance, making sure that the person who does the

24   evaluation does not divulge the competences to the

25   superior but instead confines the report in a way that

1    serves to protect those underlying confidences as much as

2    possible?  Why isn't that fair and appropriately

3    respectful of the First Amendment interests?

13:33:35    4        MR. KERRIGAN:  I think, Your Honor, it is fair

5    and I think it was done in this case.

13:33:39    6        If you're asking did the Society take

7    appropriate steps as a secular non-religious organization

8    would be required to take to protect the confidentiality

9    of the information, I don't know what more the Society

10    could have done and that an evaluation for treatment for

11    assessment for ministry needed to be done, an individual

12    was asked to do that, to perform the evaluation in St.

13    Louis, another was asked to perform the evaluation for

14    various purposes in New York.  Those results, the

15    treatment recommendations, the diagnoses, the care and

16    treatment prospects, whatever they may have been, were

17    shared with a very discrete and narrow group of

18    individuals.  Insofar as I can determine from the papers

19    before the Court, your Honor, that would be Father Regan

20    and his immediate leadership team that would be making

21    these types of decisions.

13:34:36   22        So you, Your Honor, are not persuaded that the

23    federal psychotherapist/patient privilege applies because

24    the information was shared, but here under the Religious

25    Freedom Restoration Act analysis, the Society did

1    everything it could to keep these materials confidential.

2    And I think did not, again as I said, not in any documents

3    before the Court, did not share that information with

4    others.

13:35:02  5    So if that's answers your question, Your Honor,

6    I'll just move on briefly to address the compelling state

7    interests.  But I do want to answer any inquiries that

8    Your Honor may have.

13:35:12  9    THE COURT:  I'm a bit frustrated, because having

10    looked at these documents, I worry that we're spending so

11    much time and energy dealing with them when there's so

12    little there.  I understand the principles and I

13    understand the precedent is important, and I guess that's

14    why we're doing it.  But in the real world, in this

15    litigation, it appears to me to be a non-event.  So it's a

16    little frustrating.

13:35:42  17    MR. KERRIGAN:  I hear you, Your Honor, and I

18    would encourage you in that event in assessing whether or

19    not it's a substantial burden, given the information that

20    you have and given the heightened standard we have argued

21    for, that the Court would deny the motion to compel, allow

22    the protective order to protect the information.

13:36:00  23    But one last point to make on that, Your Honor,

24    and it comes back to the Religious Freedom Restoration Act

25    document is that on the compelling state interest prong

1    and a least restrictive prong, let's go to the compelling

2    state interest.  We're situated very differently than the

3    context you would see in the supreme judicial court case

4    in Massachusetts where there was a criminal investigation

5    ongoing.

13:36:36  6         There was also the matter of the general versus

7    specific compelling interest.  My sister had indicated

8    that there was an interest in discovering the truth for

9    litigation, in other words, the procedure on the federal

10   side, the enforceability is an interest here, but that,

11   Your Honor, is not good enough under the Religious Freedom

12   Restoration Act analysis.  It must be compelling reason of

13   the highest order, it's been called the most difficult

14   test under the Constitution back in the pre Employment

15   Division v. Smith days.  And to the extent that one could

16   say there's an interest in discovering the truth

17   generally, that would apply in the Religious Freedom

18   Restoration Act.  So there must be something more

19   compelling.

13:37:25  20        Last, Your Honor, the least restrictive means,

21   and this gets a little bit to your concerns about the

22   relevancy of the information and whether there's anything

23   there.  It not only has to be a compelling state interest,

24   which we suggest does not exist here, but it has to be

25   effectuated in the least restrictive means.

13:37:44  1          Here, Your Honor, the information which is

2     sought, you had hypothesized that perhaps that there's

3     information about the relationship with one's parents.  I

4     know that in the papers the plaintiffs have submitted,

5     they hypothesized that the documents may contain

6     information about Carrier's activities in Haiti or what

7     went on in Haiti or what folks should have known in Haiti.

8     These are all factual assertions.  These have nothing to

9     do with the conclusions in the report.

13:38:22 10          There are other ways to get to answers to

11    questions like what did Father Carrier do in Haiti.  I

12    suppose one could ask Father Carrier in a deposition what

13    he did in Haiti.

13:38:34 14          So in that sense, Your Honor, there are other

15    means of getting to information.  And I think, Your Honor,

16    to compel the documents here, it's not the least

17    restrictive means to go about doing that.

13:38:51 18          Your Honor, you have the grasp of the position

19    that we've taken that there is a heightened requirement

20    because of the nature of the information.  We're not

21    saying, Your Honor, that the Court is obligated to follow,

22    for example, Massachusetts law or Connecticut law on these

23    issues, but we are asking the Court to acknowledge that

24    the states with an interest in this, Massachusetts where

25    the Society is based, Connecticut where Father Carrier was

1    based at the time that these matters were ongoing, do

2    treat this type of information with a heightened

3    sensitivity, a heightened confidentiality, and there

4    should be a clear showing of relevance before any of this

5    information should be produced to opposing counsel, and

6    that's reflected on the federal side.

13:39:36   7              THE COURT:  Thank you.

13:39:38   8              MR. KERRIGAN:  Thank you, Your Honor.

13:39:42   9              MS. BIERSTEIN:  Your Honor, may I respond

10    briefly?

13:39:44  11              THE COURT:  Yes.

13:39:58  12              MS. BIERSTEIN:  I appreciate your indulging me.

13    I'll be brief.  I just want to make a couple quick points.

13:40:04  14              One with respect to the Society of Jesus case,

15    Mr. Kerrigan argues that although one -- although that

16    that's under Massachusetts constitution and he suggests

17    that because RFRA uses the same balancing test as the

18    Massachusetts constitution, because the Massachusetts

19    constitution uses the pre Smith test that was used in the

20    federal constitution, that therefore it's the same

21    analysis, but I think that's not necessarily true because

22    the balancing test looks at the same -- the prongs are the

23    same, but the case law I think can and has diverged.  That

24    is, Massachusetts courts are not bound to follow federal

25    precedent on RFRA in interpreting that balancing test

1        under their own constitution.

13:40:51  2            And so at the point at which Massachusetts

3        parted company with the federal courts over this issue of

4        constitution, I don't think that their analysis of their

5        constitution can be read to be the same necessarily to

6        apply to RFRA even if the words use the same test.

7        Because their courts are free to interpret that test

8        differently.

13:41:12  9            The next point I want to make is something Your

10       Honor made about the double standard between private

11       employer and religious employer, and Mr. Kerrigan says

12       that comes from RFRA because of this special solicitude

13       for religious organizations.  And I think it's important

14       to note it's not some untethered special solicitude.

15       There's a particular test, the balancing test of the

16       substantial burden balanced against the compelling state

17       interest.

13:41:41 18            So unless that test is satisfied, the fact that

19       there's a special solicitude -- they don't get to do

20       whatever they want.  The special solicitude isn't bodied

21       in the test.  So to the extent that that test does not

22       yield the result does not show that the governmental

23       interest doesn't outweigh the substantial burden, the

24       special solicitude goes away.  Special solicitude is the

25       existence of that test.

13:42:09  1          I think in looking at that test, it's important

2      to put the focus back on the disclosure aspect because we

3      don't at all contest, we don't disagree, that the value of

4      the process clearly has religious aspects for the Society

5      when they assess their priests, when they assign their

6      priests.  All of that we understand has a religious

7      component.

13:42:34  8          And if the Court were being asked to interfere

9      with that, to say anything about how they have -- you

10     know, what the assessment process has to be or what the

11     assignment should be, I think that's a different issue.

12     We need to be looking at the disclosure issue.

13:42:51 13          And the question is not whether the assignment

14     of Father Carrier or the assessment of Father Carrier is

15     religiously motivated.  The question is whether the

16     disclosure violates -- is a -- in keeping it what they

17     said confidential, whether that's religiously motivated.

18     And I think the problem is that that is not religiously

19     motivated conduct, the purported need for confidentiality

20     that extends even to production litigation.  I think

21     that's where the Court's focus needs to be.

13:43:24 22          And I think that's particularly important here,

23     because Mr. Kerrigan says, what more could we have done to

24     keep this confidential?  And yet the documents that they

25     produced are full of instances of not keeping things

1    confidential.

13:43:39  2         To begin with, they produced to us in the first

3    instance the various letters and memos that we submitted

4    as exhibits, including Father Carrier's soul searching

5    memos to Father Regan and to Father Grummer, his own

6    reflections on this process.  They produced to us the

7    email where the options offered to Father Carrier for

8    treatment were being shared around as gossip, and that was

9    the term in the email, I feel like a teenager sharing

10   gossip.

13:44:11 11         And so I think what the record shows is that

12   this information was not uniformly treated as

13   confidential.  It's not treated as confidential by Father

14   Carrier who had shared these with Hope Carter before he

15   went; that he was being made to go; and as I said, shared

16   with other people his views about what happened

17   afterwards.

13:44:31 18         So I don't think that they did particularly

19   maintain this.  They didn't act consistent with the idea

20   it was confidential.  And again, we're not wavering there,

21   but I think it does go to a lack of a sense on their part

22   of a need for confidentiality.

13:44:47 23         And the last point I want to touch on comes back

24   to the relevance point I think in two ways:

13:44:54 25         First, the Society put these documents on its

1    privilege log.  If the documents had been withheld as

2    non-responsive and irrelevant, I assume the Society has

3    lots of documents that when they got our document request

4    they didn't think were called for to be produced.  And

5    among their objections in the response, they object on

6    grounds of relevance.  So I'm assuming they did not

7    produce documents they thought had no relevance to the

8    case.  But they logged these.

13:45:25  9    So I think in logging them they made an initial

10    determination of responsiveness and I think in that a

11    relevance, because they didn't log presumably lots of

12    documents that just have nothing to do with the case.

13:45:41  13    So I think in the first instance it's a lot odd

14    for them now to come in and say there's no relevance when

15    they're the ones who made the initial determination that

16    they were sufficiently relevant that they needed to be

17    logged.

13:45:54  18    I also think, Your Honor, that there's a number

19    of things in the documents that may not bear directly on

20    what happened in Haiti or what Father Carrier said in

21    Haiti that would be highly relevant to this case.  Because

22    one of the issues in the case has to do with Father

23    Carrier's supervision of Perlitz in Haiti and his reaction

24    when the accusations were first made, when he was

25    completely in denial, made no effort to get to the bottom

1    of it.

13:46:24  2              We've alleged that the first investigation was

3    whitewashed.  His continued reaffirmation that there was

4    nothing wrong and that Douglas Perlitz was innocent, if

5    that's in there, would certainly be evidence of kind of a

6    blindness on his part as part of what we allege, that he

7    was really unsuited to be dealing with this because he was

8    unwilling or unable to have an open mind enough to look

9    into it or to even be concerned enough to think about

10   whether it's true or not, what sort of boundaries do we

11   need, do we need rules?

13:47:00  12             So I think even a lack of concern in the

13   documents, that is a showing of a lack of reflectiveness

14   or a lack of seriousness of taking the allegations or

15   unwillingness to consider that they might be true, would

16   definitely be relevant to our claims.  And to the idea

17   that he was -- that there was poor oversight and inability

18   perhaps to be objective in overseeing Perlitz or what his

19   attitude about rules might be because of the lack of the

20   rules that were put in here.

13:47:33  21             So I think there's a lot of information that,

22   even if it doesn't say "Perlitz" or "PPT," really goes to

23   his ability as a supervisor here or his inability to look

24   into what was happening.

13:47:51  25             THE COURT:  Thank you.

13:47:53 1          MR. KERRIGAN:  Your Honor, can I correct just

2      one point?  It will literally be 20 seconds.

13:47:59 3          The argument of essentially waiver that the

4      Society did not treat the documents as confidential by

5      virtue of the fact that they were produced in litigation

6      is mistaken.  The documents that the Court has before it

7      that are appended it to the plaintiffs' motion, the soul

8      searching letter Ms. Bierstein referenced, they were not

9      produced by the Society, Your Honor.  As I say, the

10     Society held those documents as a privileged documents and

11     logged them appropriately.  And to the extent that they

12     were Society documents, there's been no waiver, there's

13     been no production of those documents by the Society.

13:48:40 14         Thank you.

13:48:41 15         THE COURT:  Thank you.

13:48:50 16         Shall we turn then to the bellwether proposals?

13:48:53 17         MR. HANLY:  Yes, Your Honor.  Shall I address

18     the Court from here?  Because I have a sense there may be

19     back and forth among the counsel.

13:49:00 20         THE COURT:  That would be fine.

13:49:05 21         MR. HANLY:  So, Your Honor, I think perhaps the

22     best way to get at this is if I may first discuss those

23     items of the defendant's proposal as to which either the

24     plaintiffs don't have a corresponding item or as to which

25     the plaintiffs have a different response, and then I will

1      get to what I think is the meat of the dispute or the lack

2      of consensus, which is how many of these depositions will

3      there be.  Because I really think that that's what will

4      get this thing moving, if the Court can make that

5      determination.  So let me first discuss some items that

6      are in the defendants' proposal.

13:49:56  7            So at page B5, item E1, the defendants are

8      proposing that after dispositive motions -- obviously

9      after the discovery period -- that there will be

10     non-binding summary jury trials before the actual

11     bellwether trials themselves.  That's a step that the

12     plaintiffs really don't agree with, Your Honor.

13:50:25 13            We are totally prepared to go to mediation of

14     some sort at any time, but a non-binding summary jury

15     trial, as the Court well knows, would require an enormous

16     amount of work on the part of the jurists, on the part of

17     counsel on both sides.  None of the lawyers in this room

18     are going to try a non-binding summary jury trial without

19     the same degree of preparation that one would put into a

20     binding jury trial.  So that's adding an additional step,

21     huge expense, huge expenditure of the time of the Court or

22     whomever the Court might appoint as the jurist, and it's

23     something that the plaintiffs just are not -- do not think

24     is a good part of a bellwether process.  Although I will,

25     of course, concede that the manual does talk about that as

```
             1    one sort of aspect of what a trial judge might do in a

             2    multi party case.

13:51:29     3           Secondly, the defendants in item E2, they set

             4    forth, they want Your Honor to order at this point in time

             5    that each of the bellwether cases, four let's say, be

             6    tried seriatim.  We don't think that Your Honor needs to

             7    decide that now.  It may be that the Court at the close of

             8    discovery or after dispositive motions is familiar enough

             9    with the cases that the Court decides that maybe two or

            10    four cases should be tried together, and if at the

            11    appropriate time that's something the Court wants to think

            12    about, we can certainly provide the Court the authority

            13    from other districts in multi plaintiff cases where that

            14    is being done.  But the Court doesn't really need to get

            15    there yet in order to get the bellwether process started.

            16    And in our corresponding section, we just say the Court

            17    will decide that at a future date.

13:52:33    18           Next, the item E4 of the defendants' proposal,

            19    the defendants want a stipulation, and essentially an

            20    order at this point in time that after a bellwether case

            21    is tried that the judgment will have no collateral

            22    estoppel or res judicata effect.

13:53:02    23           Not only is it premature for the Court to make

            24    such a determination.  For the Court to make such a

            25    determination at this juncture is contrary to authority.
```

1    We submit that the Court could not properly make such a

2    determination in the abstract about all the bellwether

3    cases which haven't even been tried yet.

13:53:25  4        So again, making that determination now is both

5    premature, and should the Court require authority on that,

6    we could submit authority to the point that it would be

7    inappropriate for Your Honor to make that determination.

13:53:44  8        So those are the only major points of the

9    defendants' proposal that we have some quarrel with.  So

10   now I would just turn to the meat of the issue which is

11   the number of depositions that should be taken.

13:54:03 12        I believe that when last we were here, Your

13   Honor was having colloquy with Mr. Goldberg and me about

14   how many depositions should there be, I'm not sure if at

15   that time point Mr. Goldberg was at 37, but it was a high

16   number, and we thought four.  Four plaintiffs should be

17   deposed, four cases should be part of the discovery pool,

18   or maybe it was six.  I can't recall.

13:54:35 19        THE COURT:  It was six.

13:54:37 20        MR. HANLY:  Yes, you're right, Your Honor.

13:54:41 21        So in the interim we had some conference and we

22   thought about it, and our proposal would require a minimum

23   of 12 depositions with a maximum of 15 depositions.  So

24   that's a number that's sort of halfway between I think

25   where we were the last time.

13:55:11  1        Now, the defendants' proposal is that there

2    should be 28 of the 37 in what they call the bellwether

3    pool.  Twenty-eight of 37 of course is the vast majority

4    of the current inventory, if you will, of filed cases, and

5    that's not resembling a typical bellwether process at all.

6    It's basically deposing the entire flock of wethers,

7    whether they have bells or not.  And so that just seems an

8    extraordinarily inefficient, time consuming and frankly

9    inappropriate number of cases to go into the so-called

10   bellwether pool.

13:56:06 11        THE COURT:  On that note, looking at A3 of the

12   defendants' submission, subpart A2, this group of 28 would

13   include three cases in which the plaintiffs have already

14   been deposed?

13:56:23 15        MR. HANLY:  Yes, at that time there had been

16   only three plaintiffs deposed, and those were back in

17   March, but them since then, they deposed another three.

18   So as of today, the defendants have deposed six

19   plaintiffs.

13:56:39 20        THE COURT:  Okay.  Under their proposal, you

21   would designate five more and they would designate 17

22   more?

13:56:55 23        MR. HANLY:  That's correct.  For a total of 28.

13:57:03 24        THE COURT:  And your preference would be to

25   designate how many besides the six that have already been

                1    done?

13:57:11   2            MR. HANLY:  We would be able to designate six to

                3    nine?

13:57:22   4            MS. BIERSTEIN:  Yes, Your Honor, because the

                5    first three aren't really designated by anybody.  Those

                6    were taken before we knew there would be a bellwether

                7    process.  So the three in May would be defense picks, and

                8    they would get three more of which they could include some

                9    of the first three, and we would get six because we

               10    haven't picked any yet.  But we could include some of the

               11    first three if we chose to.

13:57:43  12            So we would pick six, they would pick three

               13    more, and if the first three were included in it, it would

               14    add to the -- then it would reduce the total number,

               15    approaching 12.

13:57:56  16            MR. HANLY:  Right.

13:57:59  17            THE COURT:  So under your proposal with regard

               18    to the number of depositions, the defendants would have

               19    the three cases in which the plaintiffs were recently

               20    deposed plus they would pick three more?

13:58:18  21            MR. HANLY:  Yes.

13:58:18  22            THE COURT:  And the plaintiffs would pick six

               23    and they could draw from any of these cases?

13:58:28  24            MR. HANLY:  That's correct, Your Honor.

13:58:32  25            THE COURT:  Thank you.

13:58:35   1          MR. HANLY:  Oh, Judge, one last point, if I may,

           2    and that is that as Your Honor sees in 2C of the

           3    defendants' proposal, the defendants are proposing five

           4    cases in June as to which they've already noticed those

           5    cases.

13:58:57   6          So they have noticed five cases for June and all

           7    that the plaintiffs would ask is that until Your Honor

           8    decides the structure and number -- I mean, if Your Honor

           9    is going to decide it today, then we'll deal with it.  But

          10    if Your Honor is going to take some time to consider this

          11    matter, we don't want to have to go forward with these

          12    five cases, preparing the witnesses and so on, not knowing

          13    where they fit into the bellwether process.

13:59:28  14          THE COURT:  Under the defendants' proposal, you

          15    as counsel for the plaintiffs would have an opportunity to

          16    designate five cases at this stage of the proceeding and

          17    instead, it's the defendants' counsel who have designated

          18    five?

13:59:52  19          MR. HANLY:  Well, they've noticed five because

          20    Your Honor has not dealt with the bellwether issue.  So I

          21    think in fairness to the defendants, they're just sort of

          22    proceeding as if there is no bellwether, which there

          23    isn't, and so I don't technically quarrel with their right

          24    to notice them, it's just if Your Honor's going to create

          25    a bellwether structure, we don't want to have to prepare

|  | 1 | these witnesses on sort of three-days' notice. |
| 14:00:24 | 2 | THE COURT:  Okay. |
| 14:00:32 | 3 | Yes? |
| 14:00:33 | 4 | MR. GOLDBERG:  Thank you.  I would like to |
|  | 5 | approach the podium. |
| 14:00:39 | 6 | Good afternoon, Your Honor. |
| 14:00:41 | 7 | With respect to some of the issues that |
|  | 8 | Mr. Hanly raised about the trial process itself, we agree |
|  | 9 | that we can talk about that at the end.  There's a lot of |
|  | 10 | flexibility there in terms of when the Court has to |
|  | 11 | decide.  There are some things that it might be useful to |
|  | 12 | get some guidance on.  But we agree that the threshold |
|  | 13 | issue is what's going to happen with these depositions and |
|  | 14 | what's a fair process for the depositions. |
| 14:01:07 | 15 | And I'd like to take a couple minutes to address |
|  | 16 | that, because it goes to how is the bellwether going to be |
|  | 17 | successful, which means, will it result in something |
|  | 18 | that's going to be dispositive or a mediation that |
|  | 19 | everyone feels comfortable will resolve all the cases. |
| 14:01:28 | 20 | We agree with the plaintiffs that, quote, if |
|  | 21 | bellwether trials are to produce reliable information, |
|  | 22 | then the specific plaintiffs and their claims should be |
|  | 23 | representative of the range of cases, end quote.  That's |
|  | 24 | their quotation in the proposed manual for complex |
|  | 25 | litigation. |

14:01:51    1    And I would like to direct the Court's attention

2    to page 83 of their proposal, and the first full paragraph

3    is plaintiffs' argument that the 28 depositions are

4    excessive.  And they go on to say in the beginning of the

5    third sentence, quote, the interrogatory answers that

6    plaintiffs have provided contain information sufficient to

7    determine the representativeness of each case.  Each

8    plaintiff is provided inter alia the time period of the

9    abuse, the age at which he was abused, the nature of the

10    particular sexual acts involved, the nature of the

11    coercion he was subjected to and the names of witnesses,

12    if any.  From this information, the parties are already in

13    a position to select a smaller number of discovery pool

14    cases plaintiffs' proposed which would reflect the range

15    of time periods, ages and other variables that may

16    differentiate these otherwise similar cases.  End quote.

14:03:03    17    This is the heart of our dispute.  We disagree

18    with everything in that proposition, and I'd like to take

19    a couple of minutes to explain our thoughts on this.

14:03:14    20    Plaintiffs have started with the idea the

21    bellwether processes are used in mass tort cases.  And in

22    all of the ones that we're familiar with, the product, the

23    defective product cases, the toxic tort cases, there are a

24    lot of commonalities.  For example, there's going to be a

25    documented record of exposure to contamination; there is

1    going to be a documented medical history of prescription

2    of drugs that are subject to a challenge; there is going

3    to be surgical records that show that a device was

4    implanted.  Those are facts that can be established by

5    records that are corroborated.

14:04:01  6         If the plaintiff suffered injuries, those

7    injuries will be documented by medical records; they will

8    be documented by treatment history; they will be

9    documented by lost earnings records; they will be bills

10   for services.  All of that information can come into

11   account and then you can choose the representativeness

12   based on the type of conduct, the type of exposure, the

13   type of injuries.

14:04:29 14         Here we have none of that.  There are no medical

15   records for any of the plaintiffs; there are no

16   corroborating witnesses for any of the plaintiffs; there

17   are no corroborating documents.  Every plaintiff's claim

18   of abuse depends and depends only on the testimony of that

19   particular plaintiff.  Unlike any of the mass tort cases

20   we have seen, the credibility of the plaintiff is the key

21   issue in the case, and so for us to choose representative

22   plaintiffs, we must know what the range is of the

23   credibility.

14:05:13 24         And, in fact, as we have said from the

25   beginning, one of our concerns -- and let me just get to

1     the flock for a second and I'll come back to this.

14:05:20  2          The flock of 37 is the consolidated cases.  But

3     of course there are already 48 cases that are pending and

4     another 91 cases that are out there, and others

5     potentially, so I don't want to go with this 28 out of 37.

6     We don't accept that.  But let me -- that's something that

7     we can come back to later.

14:05:46  8          For us to be able to determine how many of these

9     cases are real and how many are fabricated, we need to be

10    able to test and have a sense of credibility and see

11    ultimately in the bellwether trials how the jury reacts to

12    a small but fairly selected sample.

14:06:01 13          So this brings us back then to the statement

14    that is the heart of plaintiffs' side of this, that is

15    that we should rely on the interrogatory responses, and

16    there are several reasons we've always been concerned

17    about, but there were several reasons including based on

18    recent depositions that lead us to be very skeptical of

19    the interrogatory responses.

14:06:24 20          The first is just whether or not the plaintiffs

21    really appreciated what they were doing when these

22    interrogatories were submitted.  This is not a typical

23    case.  These are uneducated children, impoverished

24    children in Haiti.  We've already seen with Mr. Clervil,

25    and the explanation for Mr. Clervil is this is somebody

1    who had a limited education and understanding of legal

2    procedures and his obligations with them.

14:06:58    3         What we suspect, despite the best efforts of

4    plaintiffs and plaintiffs' counsel, to vet these, to make

5    sure that people understood, the circumstances are such

6    that we know at least one person misunderstood his

7    obligations to the system.  The question is, is that an

8    isolated example or a more common example.

14:07:22    9         There was one plaintiff who testified that he

10   had not read the interrogatory responses and was asked

11   were they read to you, and he said no.

14:07:30   12         So there's at least one plaintiff who has

13   testified so far, and just to give you a bit of the

14   testimony:

14:07:38   15         When you signed that with your name on July 10,

16   2014, did you understand what the various answers to the

17   interrogatories were?  Your answers?

14:07:46   18         Answer:  When I signed the document, I didn't

19   really read the document.

14:07:50   20         Question:  You didn't read it at all?

14:07:52   21         Answer:  No.

14:07:53   22         Question:  Did someone read the answers that

23   were your answers to you that you understood when you

24   signed this?

14:07:58   25         Answer:  No.

| | | |
|---|---|---|
| 14:08:00 | 1 | Question:  And you didn't read them? |
| 14:08:02 | 2 | Answer:  No. |
| 14:08:04 | 3 | Question:  So you don't know what they said? |
| 14:08:07 | 4 | Answer:  No. |
| 14:08:09 | 5 | This exacerbates our concern about the |
| | 6 | reliability of the answers. |
| 14:08:13 | 7 | A second issue that we've come across in even |
| | 8 | the small sampling of depositions so far are some dramatic |
| | 9 | inconsistencies between the interrogatory responses and |
| | 10 | the testimony itself.  And let me give you one example. |
| 14:08:29 | 11 | One of the plaintiffs in his interrogatory |
| | 12 | responses said, and I'm going to quote, I used to see |
| | 13 | Father Paul, that's Father Carrier, in Bellaire with |
| | 14 | Douglas in his bedroom.  Bellaire is the house where |
| | 15 | Perlitz lived and a lot of the activity that has come up |
| | 16 | in discovery has suggested that Perlitz was sleeping |
| | 17 | overnight with children alone in his bedroom at Bellaire. |
| 14:08:56 | 18 | So you can see that this is significant; that, |
| | 19 | this is a plaintiff who has said that I was at Bellaire |
| | 20 | and I saw Father Carrier in Perlitz's bedroom. |
| 14:09:08 | 21 | In his deposition testimony, he was asked if he |
| | 22 | went to Bellaire.  He said he was there once, that he was |
| | 23 | outside in the garden, was led in through a gate, was in |
| | 24 | the garden, Perlitz came out, told him to come back later, |
| | 25 | he left and he had never even been in the house at |

1    Bellaire.  So he clearly had never seen the bedroom, been

2    in the bedroom, seen Father Carrier in the bedroom.

14:09:34  3         This same plaintiff in response to the

4    interrogatories about his damages said he suffered alcohol

5    abuse and drug abuse.  In his deposition testimony he said

6    that he has never tried drugs and he said that there was

7    one incident once when he tried alcohol, just once.

14:09:51  8         So we're dealing with those inconsistencies and

9    it brings us back again to their point.

14:09:59 10         What they are saying is we are required to rely

11   on these interrogatories to choose the cases that are

12   going to lead to the bellwether trials and ultimately a

13   resolution of this case, and we don't think that that's

14   fair.  It's something that doesn't give us the opportunity

15   to really test the credibility of these people to find out

16   how many of them really have credible allegations of

17   abuse, the nature of that abuse, the circumstances under

18   which they were abused.

14:10:29 19         And beyond the fairness to us, we're concerned

20   that it's not going to reach the right result, because if

21   we end up with trials that are not fairly selected, it's

22   going to be more difficult to get to a local settlement

23   that is going to end this process.

14:10:46 24         And we suggest to the Court that what we should

25   be doing is coming up with a system now that will get us

1    enough discovery that we can get to this bellwether

2    process in a way that is going to get to a conclusion of

3    the case.  And if that requires more depositions now, so

4    be it.

14:11:06  5          There's an incredibly talented and large team of

6    lawyers over here.  We have resources over on this side.

7    The first two sets of depositions went forward, I

8    understand, very smoothly.  Three were taken.  On our side

9    at least we believe that we can take five in a week, five

10   one-day depositions, perhaps build in a sixth day as a --

11   in case something goes wrong; that we can do those over a

12   period of every six weeks; and get this done by October or

13   November with -- and both sides agree, we should shoot for

14   a fact discovery cutoff at the end of this year.

14:11:44  15         So yes, 28 is a much larger number.  It can be a

16   slightly smaller number.  It gives them up to five.  If

17   they choose a lower number, you know, there's nothing

18   magic in that.  But it's got to be a broad enough number

19   so we can find out what really happened.

14:12:00  20         There is one other thing I want to raise that's

21   come up at some of these depositions.  And again we

22   understand that plaintiffs' counsel are doing everything

23   they can to vet these cases, but they have pointed out the

24   problems they have.  Remember we had the discussion of

25   shouldn't they be filing those other 91 cases now, and

1    part of their concern was we have to do a lot of due

2    diligence, it's going to be a lot of follow-up work, and I

3    appreciate that.

14:12:30  4         But what we are learning is how some of these

5    cases came to be.  And there were kids who were at the

6    Village, which is one of the programs, it was the

7    residential program at the school, and at least one

8    witness's testimony, and some of this is consistent with

9    other witness's testimony, one of the former plaintiffs

10   was visiting kids who had previously been to the Village

11   and said, here, put your name on a list.  And your name

12   goes on the list, you were at the Village, and it goes to

13   a gentleman named Cyrus Sibert, who is a radio commentator

14   who is instrumental in the Perlitz incident, and you go to

15   Cyrus, and that's how you get your justice.  A lot of them

16   used the word "get your justice."  They know the first

17   group of plaintiffs got their justice and this is their

18   opportunity to get their justice.

14:13:25  19        Does that mean that all the people who signed

20   those names were not abused?  Of course not.  Maybe they

21   all were and by the time they get through this vetting

22   process, only the ones who had really done something would

23   get on the list.

14:13:38  24        But the concerns we have about the people coming

25   out of the woodwork, about the credibility of these

1       individual allegations, and certainly about the

2       reliability of what these people are telling others in

3       Haiti, even ultimately putting into their interrogatory

4       answers, is not something we take for granted.

14:13:56  5       So we think that when you look at that, Your

6       Honor, that the proposal we have, it's 28 depositions.

7       We've done six of them already.  It's four or five more

8       weeks of deposition over a period of seven months.  We

9       don't think under the circumstances of this case that

10      that's an unfair request.

14:14:18 11       THE COURT:  If I were to agree with you and

12      adopt your suggestion, how confident are you to feel that

13      this process would enable us to achieve a resolution?

14:14:37 14       MR. GOLDBERG:  The next steps would be that

15      there would be a selection from that pool down to four

16      individuals, and I think both sides are agreed on that.

17      And if this is a process that we're advocating, you at

18      least have all defense counsel standing behind it when we

19      go to argue to our insurers and the like about this

20      process and when we ultimately come to the Court.

21      Because, Your Honor, if it's a class settlement would have

22      to assess the reasonableness and fairness, and you're

23      going to say, well, the defendants got exactly what they

24      asked for, so how are they in a position now, how can

25      others say these haven't been adequately tested?

14:15:11  1        In the plaintiffs' perspective in justifying it,

2    they're going to say, wow, we thought it could be a much

3    more limited process, but it's a much more extensive

4    process, so how can one question the scope and

5    comprehensiveness of it.  That's how we would propose --

14:15:29  6        I'm sorry.

14:15:30  7        THE COURT:  Go ahead.

14:15:33  8        MR. GOLDBERG:  Once we have the four cases, I

9    guess the first question is how you pick the four?  What

10   we've proposed is that each side picks two.  Theirs would

11   be each side picks a larger number and the other side

12   strikes some.  It's like a veto, I gather, over two of the

13   cases.  They've left open for Your Honor perhaps to select

14   them.

14:15:52 15        We think our proposal works, just each side pick

16   two, but we're willing to have a discussion about that.

14:16:00 17        THE COURT:  Dealing with your proposal, why do

18   you think that having four, two chosen by each side, would

19   be sufficient?

14:16:15 20        MR. GOLDBERG:  We're trying to balance getting

21   through this, and particularly if we do seriatim trials,

22   and part of the reason we suggested summary jury trials is

23   they would be shorter.  But if they're going to be full

24   jury trials, and I think plaintiffs' counsel last time

25   indicated they thought it would be two to three weeks for

1        each trial.  The more trials we do, certainly the longer

2        the process would be.

14:16:38  3            We've always agreed I think among us that the

4        right number was four or six.  We thought paring it down

5        probably would do it as long as we know that we've had a

6        chance to select and see which ones we think are most

7        appropriate.

14:16:53  8            THE COURT:  On that note, wouldn't it be

9        expected that you would choose the two that were best from

10       your point of view and they would choose the two that were

11       best from their point of view rather than four that on the

12       clinical objective assessment seem to be most

13       representative of the total pool?

14:17:25 14            MR. GOLDBERG:  Under our proposal, which is the

15       two and two, they would pick the two most credible

16       witnesses with significant abuse, and we are likely to

17       pick a couple that we think show that the allegations to

18       the whole aren't credible.

14:17:41 19            THE COURT:  Right.  In that context, what value

20       would be the process to you in assessing all the other

21       people whose claims are possibly better founded?

14:17:59 22            MR. GOLDBERG:  I think there are two aspects.

23       The first is we need to take enough depositions so we can

24       really assess credibility.  Under the plaintiffs'

25       proposal, we've already taken six, and we're basically

1    done.  They said we can take up to three more.  But the

2    cost of taking those three is we lose the right to

3    designate some of the first three.  So it's almost a

4    tradeoff.  If you take these three, you give up on the

5    first three witnesses unless one of the plaintiffs happens

6    to designate that particular witness.

14:18:29  7          It's got to be a broad enough number that we can

8    look at it and really assess.  And the numbers that they

9    suggest are really way too low.

14:18:36 10          The other is even if you could come up with a

11   number that's smaller and get us to the point where we can

12   pick let's say the two weaker cases, ultimately in going

13   to settle this and to get a broader sense, if we've had --

14   the more that we've learned through this process, the more

15   we can say, the kids who were at the Carenage really don't

16   seem to have credible allegations, or that there seems to

17   be a theme to those, the kids that were at the Village

18   2005 present a different set of issues, and that will give

19   us guidance when we get to the settlement process.

14:19:16 20          So I understand Your Honor's point, do we need

21   in our case another 17?  Do we need another 17?  Not

22   necessarily.  It could be 12 or 14, or something along

23   those lines, but it's not three or six because there are

24   just too many uncertainties.  It's got to be enough.

14:19:39 25          THE COURT:  Thank you.

14:19:44  1              MS. BIERSTEIN:  Your Honor, if I could respond?

        2    Because I've had some involvement with some of the issues

        3    that were raised here.

14:19:50  4              And I want to start by saying to some extent I

        5    think Mr. Goldberg's presentation proves too much.  I

        6    think he's suggesting that if everything turns on the

        7    individual credibility of each plaintiff, then maybe

        8    there's no point in doing a bellwether process at all

        9    because one case isn't representative of another.  And if

       10    that's in fact the position, if we're going to take so

       11    many depositions because we really need to depose

       12    virtually all of them, then I think our position would be,

       13    well, then let's not have a bellwether process.  We have

       14    six plaintiffs who have been deposed, we can complete the

       15    rest of the factual discovery that we need on the

       16    liability case in a relatively short period of time, let's

       17    start trying the cases we have.  They can depose every

       18    single plaintiff in turn.  But there's no reason to hold

       19    up the first trials given that we're very close to being

       20    able to try some of the cases.

14:20:39 21              So I would suggest that if we really think we

       22    need to depose all of them, then let's, A, do that, and B,

       23    let's start trying the ones we have.  Because it's not

       24    fair to those plaintiffs that have been deposed to make

       25    them sit around for years while other plaintiffs' cases --

                1  these cases were consolidated for pretrial purposes, but

                2  to the extent Mr. Goldberg thinks that doesn't work when

                3  it comes to the plaintiffs' depositions, we think the

                4  thing to do is let the plaintiffs get started on their

                5  trials.

14:21:08        6           Having said that, that would be if you think the

                7  bellwether process doesn't really work, I want to try to

                8  convince Your Honor quickly that I think it is relevant

                9  and does work and does have some efficiencies, but I think

               10  that is a viable alternative to find the six who were

               11  deposed, fine, we'll try them in any order you want.

14:21:27       12           But I think there are good reasons to do the

               13  bellwether process and I would start with Mr. Goldberg's

               14  statement that the credibility of the plaintiff is the

               15  case, and that's simply bring not true.  That might be the

               16  case if it were a case against Perlitz, but somehow the

               17  Mr. Goldberg has eliminated the entire liability case

               18  against the Society, against Fairfield University, against

               19  Father Carrier.  This case is about what they did and what

               20  they didn't do and what level of responsibility they have.

               21  And those issues are common, Your Honor, and those issues

               22  lend themselves very well to representative cases for a

               23  time period because there may have been different

               24  supervision and different action or lack of action in

               25  different time periods and age of the plaintiff at the

1    time of abuse and any number of things.

14:22:20  2         And so I think that the notion that there is

3    nothing here but the individual credibility of the

4    plaintiffs is that's not true and there is a

5    representative issue that can be useful and done in a

6    abbreviated number of cases.

14:22:37  7         I also want to mention that if Mr. Goldberg

8    thinks that we really need to do so many of them because

9    the interrogatory answers are not useful in helping them

10   choose bellwether cases, it's not clear to me why we get

11   five picks and they get 23 on his proposal.  I mean, it

12   seems a little lopsided that they have 23 of the 28 that

13   they are supposed to select just to do the depositions.

14:23:06 14         But I want to respond to the issue of the

15   transcripts because I think it's important to say

16   something about that.

14:23:12 17         And I want to start by saying, Mr. Goldberg

18   hasn't favored us with the names of the deposition

19   transcripts he was reading, so there are some specifics

20   that I want to respond to.

14:23:24 21         But my understanding, I know that one of the

22   plaintiffs had said at one part of the deposition that he

23   didn't recall having the interrogatory answers read to

24   him.  Later in the deposition, he said that he did.

14:23:35 25         There are lots of translation process.  Took

1    them early in the deposition before the plaintiff was

2    comfortable.  If we had the name and the time we could

3    find you the place where the plaintiff says, well, no,

4    actually he did get those answers.

14:23:48  5        The issue about whether a plaintiff saw somebody

6    in Douglas Perlitz's room, Douglas Perlitz's bedroom has

7    windows, you can see somebody in there if you're not in

8    the house, so it's not necessarily inconsistent.  I know

9    there was some testimony about seeing people in the room

10    through a window.

14:24:06 11        So again, I don't know whether there's as much

12    inconsistency as Mr. Goldberg is making it out to be.  I

13    will say there are always going to be inconsistencies.  If

14    there were no inconsistencies between the interrogatory

15    answers and the deposition testimony, they would come in

16    and say it's all coached and memorized because everything

17    is identical.

14:24:27 18        People don't give you the exact same version

19    every time, and when you talk to them in the context of

20    writing up an answer through a translator and then you sit

21    them down in a room in a strange place, you're not going

22    to get identical testimony.  We understand that.  But I

23    don't think that is -- I don't think that's the test here.

14:24:53 24        So I think that the bellwether process can be

25    useful at least to see what happens to these liability

```
 1    cases to get a sense of how many of these plaintiffs are

 2    credible.

 3          I know Mr. Goldberg is unhappy with 12 and of

 4    how many picks we get.  But again it seems like if we're

 5    picking off answers that we think are useless, we might as

 6    well be picking at random.  So I'm not sure why you might

 7    have a problem with that.

 8          So I think this process is useful.  But if it's

 9    not, then let's go to trial on the six we have.

10          THE COURT:  I get the sense that your invitation

11    to have me go to trial on the six that we have is to be

12    understood as a rhetorical flourish more so than a serious

13    suggestion.  If we were to take that route, where would

14    that lead?

15          MS. BIERSTEIN:  Your Honor, it was not a

16    rhetorical flourish.

17          I think where it would lead is if the cases were

18    to be treated separately because there's no efficiency and

19    no representativeness, we could be trying cases and

20    putting in the liability case at the same time additional

21    depositions could be going forward.  So that some cases

22    will be tried, other cases would still be in discovery,

23    and at some point there will be enough trials -- the

24    results would inform the parties, and at some point, you

25    know, either side might say, we've seen enough trials,
```

1    maybe we can work something out.

14:26:26  2          But I think if -- if what Mr. Goldberg is saying

3    is that if you talk to ten people you won't know anything

4    about the other ten, then why not try the first ten and

5    discover the next ten and try that ten and keep going.

14:26:39  6          THE COURT:  So you're actually serious?

14:26:41  7          MS. BIERSTEIN:  I am serious.  Mr. Hanly's

8    serious, Mr. Garabedian is serious.  We would be prepared

9    to start trying cases of the plaintiffs that are ready.

14:26:54 10          MR. HANLY:  If I may, Judge, there's nothing

11   magical about a bellwether process.  What happens is the

12   district judge tries one or two or three or four cases and

13   the results of that, look across the country in all these

14   mass tort cases, is that after the first or the second or

15   the third, usually not as late as the fourth trial, the

16   parties come together and create a global settlement.

17   They're just trials.

14:27:23 18          So if --

14:27:25 19          THE COURT:  Has that been the experience with

20   cases involving child sexual abuse?

14:27:33 21          MR. HANLY:  I have not been involved in such a

22   case before, Judge.  So I can't answer that question.  I

23   don't believe so.

14:27:39 24          THE COURT:  Do you believe that's something that

25   might make this batch of cases different for the reasons

1  that were pointed out by defense counsel?

14:27:50  2          MR. HANLY:  No, I don't, for this reason, Your

3  Honor.

14:27:52  4          First of all, as my partner, Ms. Bierstein

5  indicated, there's commonality with respect to the

6  defendants who are represented here today.  We can call

7  them the non-Perlitz defendants.

14:28:04  8          THE COURT:  Right.  But not to prolong this, and

9  I don't want to engage in rhetorical exchange myself, I

10  think that the comments of defense counsel are well taken.

11  You're right, there are common issues concerning what

12  these defendants did or failed to do, but unlike a case

13  involving a product, the defendants are able to take the

14  position that there was no injury, that the plaintiff is

15  making it up, that there is no case, and that

16  distinguishes this from those cases, I think.

14:28:55  17          MR. HANLY:  With respect, Your Honor --

14:28:57  18          THE COURT:  Do you not allow for the possibility

19  that some of these allegations are not true?

14:29:02  20          MR. HANLY:  But that's true in any multiple

21  plaintiff scenario.

14:29:06  22          THE COURT:  A person with a cervical breast

23  implant that's the subject of a product liability case may

24  be lying when she says she had an implant?

14:29:15  25          MR. HANLY:  No, Your Honor.  But let's take a

1    typical pharmaceutical case where you have a thousand

2    cases they all say they took the drug Vioxx.  Your Honor

3    probably remembers that MDL.  There were hundreds of those

4    plaintiffs who in discovery it turned out they either took

5    the Vioxx at the wrong time or they weren't taking Vioxx

6    or their heart attack was for some other reason.

14:29:41  7         THE COURT:  That actually tends to reinforce the

8    defendants' concern here, does it not?  If that occurred

9    in that context, don't they have all the more reason to be

10   worried about what's going on in this context?

14:29:52  11        MR. HANLY:  Okay, but then what is the solution,

12   Your Honor?  We propose a solution with a number of cases

13   to be discovered and potentially tried.  As we said, 12 to

14   15 to be discovered.  And we, and Mr. Goldberg agreed, the

15   number to be tried, four in the first instance.

14:30:13  16        So, I mean, that's -- this system is not

17   perfect, as Your Honor recognizes.  We're looking to what

18   other district judges have done.  And our only point, the

19   principal point in response to the defendants is if we're

20   going to take that many depositions, then why don't we

21   just start with a couple of trials and, you know, both

22   sides may say, gees -- we may say, these cases are not

23   very valuable, or the defendants may say, well, you know,

24   let's try to get to some sort of a number.

14:30:49  25        As I said, there's no --

14:30:51  1                    THE COURT:  What have courts done in cases where

          2    a priest or a group of priests was alleged to have

          3    molested scores and scores of victims?  What have judges

          4    done in those situations?

14:31:03  5                    MR. GARABEDIAN:  Your Honor, I've had cases in

          6    Boston there were 84 plaintiffs and the Judge tiered the

          7    cases.

14:31:11  8                    In other words, he'd have the first six or ten

          9    be on one track, and the later cases, he broke the cases

         10    down into various tracks, and they were all on their own

         11    discovery tracks in terms of the first six or ten on one

         12    track, the next six or ten on another track.  And we

         13    scheduled them out that way so it was more manageable.

14:31:33 14                    While you were trying some cases, there would be

         15    depositions going on in other cases, for instance.  That's

         16    what we've done and that's what we've experienced in these

         17    cases.

14:31:45 18                    THE COURT:  And what happened in this group

         19    of --

14:31:49 20                    MR. GARABEDIAN:  The cases eventually resolved.

         21    We took a hundred depositions and an enormous amount of

         22    discovery, and the cases eventually settled.

14:32:01 23                    THE COURT:  How many cases were there?

14:32:03 24                    MR. GARABEDIAN:  Eighty-four.  We didn't have

         25    any trials.

| | | |
|---|---|---|
| 14:32:07 | 1 | THE COURT:  You had no trials? |
| 14:32:09 | 2 | MR. GARABEDIAN:  Except for the trial on the |
| | 3 | settlement itself.  But that was a breach of contract |
| | 4 | case. |
| 14:32:14 | 5 | THE COURT:  How did that happen?  How is it they |
| | 6 | settled 84 cases? |
| 14:32:20 | 7 | MR. GARABEDIAN:  We had a number of depositions |
| | 8 | and there was a lot of discovery, and there were |
| | 9 | commonalities as to supervisors, and eventually both sides |
| | 10 | said, why don't we attend mediation and try to resolve |
| | 11 | these cases. |
| 14:32:38 | 12 | THE COURT:  But that has not happened here? |
| 14:32:41 | 13 | MR. GARABEDIAN:  I'm sorry? |
| 14:32:42 | 14 | THE COURT:  That has not happened here? |
| 14:32:46 | 15 | MR. GARABEDIAN:  Well, what has not happened? |
| | 16 | I'm sorry. |
| 14:32:49 | 17 | THE COURT:  You have not managed to settle the |
| | 18 | cases based on the discovery that's been done. |
| 14:32:56 | 19 | MR. GARABEDIAN:  Well, we could put these cases |
| | 20 | on certain tracks and follow that model we had, and I |
| | 21 | could be more descriptive, I could provide you information |
| | 22 | concerning the model we had in those cases.  We could try |
| | 23 | with the first six being tried while we're conducting |
| | 24 | discovery in later cases. |
| 14:33:16 | 25 | THE COURT:  The objective is not to make it more |

127

```
                1  difficult but to make it easier.
14:33:23        2          Okay.  Anything new?  Anything different anybody
                3  wants to add?
14:33:27        4          MR. GOLDBERG:  If I understand, Your Honor,
                5  where that would leave us, it would just be a less
                6  efficient bellwether process.
14:33:35        7          What will happen is we'll complete discovery,
                8  we'll stay -- and we'll have to agree on a track --
                9  shooting for December 15 or December 31.  And that would
               10  be realistic if we don't go with the Bellwether process.
               11  But we will complete the 37 depositions, we'll finish it
               12  off, and then Your Honor would have to figure out an order
               13  for trial.
14:33:53       14          So we're going to be back figuring out which
               15  case goes first, which case goes second, how they're done,
               16  instead of doing it through with something where the
               17  parties are trying to select representative cases.  It
               18  will be done in some other way.
14:34:08       19          So I don't really see that as being anything
               20  other than a less efficient bellwether process because
               21  we're doing it the same way.  Seriatim trials without the
               22  comfort that we've got a process that's going to lead to
               23  some mediation.
14:34:22       24          MR. GARABEDIAN:  Again, we could create separate
               25  tracks.  We don't have to have 37 cases on one track.  The
```

1    first track could be six cases, ten cases.

14:34:35  2             MR. DAILEY:  Might I be heard for a moment, Your

3    Honor?

14:34:37  4             THE COURT:  Yes.

14:34:37  5             MR. DAILEY:  Thank you.  William Dailey, Your

6    Honor, for the New England Province of the Jesuits.

14:34:46  7             I adopt everything that Tom Goldberg has said,

8    but I also would like to pick up on the inquiry you made

9    what has happened here.  And what I suggest has happened

10   here is this:

14:34:59  11            We went to mediation with very, very little

12   discovery, no depositions, interrogatory answers, and we

13   settled 24 cases.  We paid a lot of money.  As a matter of

14   fact, I indicated several times during the mediation

15   session that I was kicking in basically all of the

16   coverage that the Jesuits had and I wanted an assurance

17   that there were no more cases coming.  I was told that as

18   far as they were aware, there were no more cases.  We also

19   had the benefit of the colloquy that took place at the

20   criminal disposition where it was indicated that Perlitz

21   may have abused 22 to 25 young people, as I remember that

22   was the range.  We settled 24.  We had a good degree of

23   confidence that we were wrapping up the whole picture.  We

24   had a number of very experienced claims people there.

14:35:57  25            What we have now is a situation where we don't

1    have any idea how many cases there are.  We think we know

2    there is around 140 that have already been identified.

3    There is no assurance that there aren't a whole lot more

4    that are coming.

14:36:13    5         These claims people are not going to buy into

6    this process without knowing that there's some end in

7    sight and that they're wrapping up the whole picture.

14:36:23    8         We don't have interrogatory answers we now know

9    of that are of any benefit.  The depositions have clearly

10   demonstrated that.  What we do know is this:

14:36:33    11        After the first 24 cases were settled and

12   information started to circulate that money had been paid,

13   two young people who were deposed were told by Mr. Sibert,

14   who would be an advocate or a runner or whatever you would

15   call him, to go out with a list and sign up people who

16   would want to indicate that they would get in line because

17   they were abused also.

14:37:05    18        I was at the first three depositions.  It was my

19   understanding that these two people, young men, went out

20   and got 70 names on list, which presumably are part of the

21   140, if that's the right number, and these were collected

22   within two or three hours or several hours.

14:37:25    23        If we were to settle these cases today, I think

24   every one of the defendants believes that we would see

25   another 140 come out of the woodwork.  There is no end and

1        there's no incentive to the claims people, and there's no

2        incentive to me to tell the Jesuits they should come up

3        with a certain amount of money out of their own treasury

4        not knowing what's coming down the line.

14:38:00    5            I would advocate that we follow through on what

6        Mr. Goldberg has suggested, but I think it benefits the

7        plaintiffs' side if they could assure us somehow that

8        whatever the number is it is.  And that's the only way

9        they're only going to get a group of claims people who

10       will be willing to pay money.  Absent that, I don't see

11       the prospect for a favorable mediation process whether we

12       have a couple of trials in the normal course, whether we

13       have four bellwether cases and then try to go to

14       mediation.

14:38:32    15           I think what I'm suggesting is something that

16       will benefit the plaintiffs, and that is, they have to

17       come up with some suggestion that this is the end of the

18       line and we can rely on the fact that there are this

19       number of cases, or some mechanism where people have to

20       line up and join the process by a certain date.

14:38:53    21           THE COURT:  I agree.  We've discussed this

22       before.  I appreciate your revisiting it.  Your comments

23       make perfectly good sense to me.

14:39:05    24           I can well understand the view of the claims

25       personnel as you describe it; and so, yes, I would wish

1    that we could establish a mechanism whereby we could

2    provide comfort to the claims people that they can safely

3    go ahead and resolve cases, but I'm told that there's

4    nothing that we can do.  At least that's the message that

5    I think is conveyed.

14:39:47 6          I invite you to brainstorm with anybody and

7    everybody involved in this case or not to see if you can

8    come up with a mechanism, because I'd be happy to have

9    your help.

14:40:01 10         MR. DAILEY:  Thank you very much.  I think at

11   the end of the day, we could make a meaningful difference

12   in the lives of some impoverished people who do deserve to

13   be compensated.

14:40:12 14         THE COURT:  Well, that would be good.

14:40:14 15         MR. DAILEY:  Thank you, Your Honor.

14:40:15 16         MS. BIERSTEIN:  Your Honor, if I might?  We long

17   ago did propose a mechanism that would give the defendants

18   precisely the peace Mr. O'Neill is looking for, which was

19   the class settlement, and the defendants have never been

20   willing to entertain that seriously, and so we have

21   offered that up as a possibility.

14:40:39 22         But to the extent the defendants believe it

23   doesn't work or they don't want to do that, if

24   Mr. Dailey's message is we can't settle the case, then the

25   response is, well then, we're going to need to try them.

1          And I think Mr. Garabedian's suggestion about materials

2          and getting started on the trial is appropriate.

14:40:57  3                Because if it's a prerequisite to settlement

4          that there's some kind of promise this is the end, I think

5          a classwide release would be the only way.

14:41:07  6                I will say Mr. Garabedian certainly has never

7          said the first group were the end.  We always knew there

8          might be more.  But putting that aside, we have offered

9          them an alternative.  I'm not saying the defendants don't

10         have arguments or reasons why they haven't entertained it,

11         but it is there as a possibility.  But if Mr. Dailey

12         doesn't want to settle, then let's start trying cases.

14:41:30  13               MR. GOLDBERG:  Your Honor, I do need to respond

14         to that.  This was discussed at the last conference.

14:41:35  15               We do appreciate the possibility that a

16         classwide settlement following mediation may be a vehicle

17         to get this to the end and is probably the best way to get

18         it to the end.  So the whole reason we went to the

19         bellwether process in competing proposals was to get to

20         something that would lead to when we actually get to a

21         mediation where we could assess and, as Mr. Dailey put it,

22         impress upon the insurers the benefits of coming to a

23         final number and a final resolution which then we would

24         come back to the Court and seek classwide relief with a

25         classwide release.

14:42:12  1        So while I think the way I put it last time, and

2     I'll try to be consistent, is that there's not a lot of

3     case law on this.  It's a little bit untested in this

4     context, there's nothing that says this clearly can be

5     done, but we do think it's a potentially viable mechanism.

14:42:28  6        So I want to make clear to Ms. Bierstein and the

7     plaintiffs' side, we are willing to consider that.  But we

8     think you need to get there, and the way you get there is

9     we're going to have to have the bellwether process or

10    some other process that puts us in a position that we can

11    sell this kind of classwide relief.

14:42:48 12        THE COURT:  Okay.  Thank you.

14:42:51 13        MR. O'NEILL:  I have just one brief comment if I

14    may, Your Honor, Timothy O'Neill for Father Paul Carrier.

14:42:56 15        It seems to me, I was at the first three

16    depositions.  In fact took the first one.  And that young

17    man testified that when shining SUVs appeared in the

18    streets of Cap-Haitien and they realized that the first

19    group had received very significant money, new houses were

20    being built, a large group of PPT young men gathered

21    around Cyrus Sibert's radio station.  He called the police

22    on them -- this was corroborated by the other two

23    depositions that week -- called the police on them, the

24    crowd was dispersed of these very noisy loud boisterous

25    crowd, Sibert then sent emissaries to tell some leaders to

1    gather a list, and those happened serendipitously to be

2    the people that we had noticed for the deposition.

14:43:54   3         They gathered the list, they didn't tell anyone

4    that this is about abuse or the purpose of the list.  They

5    got the names -- this is their own testimony -- got the

6    names and gave that list to Sibert.

14:44:08   7         The first deposition, which I took, the witness

8    denied ever having seen the interrogatories, ever having

9    had them read to him.  He did sign his name at the end.

10   He was illiterate.  He count read Creole.

14:44:23  11         So, you know, enough has been said about that.

12   But what I want to address is these trials.

14:44:30  13         I think to do anything other than a summary

14   trial or a trial that gives a verdict that isn't a

15   judgment that is enforced would simply destroy any

16   usefulness of the trial process, because there would be

17   another feeding frenzy group arrive around the block when

18   that person arrived with the million dollars he got in

19   that case or whatever.

14:44:55  20         So I think it has to be an advisory verdict so

21   we can gather the 139 and any other more that they vet or

22   claim are possible files and gather them into a mediation

23   setup.  That's the only way I think it would work.

14:45:12  24         If we do the bellwether weather process, I agree

25   with Mr. Goldberg's assessment of how that will go.  But

1    the verdict has to be advisory or else it's more money in

2    the streets that will create more problems.  It should be

3    a different process for mediation.

14:45:35  4         MR. GARABEDIAN:  Your Honor, if I may?

14:45:35  5         The sexual abuse cases where a predator has been

6    abusing children for decades, you're going to have

7    hundreds of victims.  That's what we have here.  We have

8    139 victims who have come forward.

14:45:48  9         This man who is at Rue 13, then he was at

10   Carenage, he was at the Village, he was at the Center.  He

11   was everywhere, he pled guilty and he received a 19-year,

12   seven-month jail sentence for molesting children.

14:46:12  13        At the mediation we had, I specifically told

14   defense counsel there are more clients, there are more

15   victims.  They knew that and where they -- I don't know

16   where they pulled this out of the hat that we told them

17   there were no more victims.  They knew that.  And I've

18   been dealing with some of these defense counsel here for

19   years, and they know in these cases, the nature of these

20   cases, there are many, many victims.

14:46:38  21        So to portray their clients as the victim or

22   victims here is ludicrous.  I say that with all due

23   respect to everyone.

14:46:49  24        THE COURT:  That's unfortunate.  I sit here and

25   listen to counsel on both sides make representations that

1    are in conflict and I don't know what to think.  But you

2    say that to me and half of the lawyers on the other side

3    of the room are shaking their heads looking at each other

4    and essentially saying through expressive body language

5    that you're not telling the truth.

14:47:22    6            MR. GARABEDIAN:  But --

14:47:23    7            THE COURT:  I'm not here to resolve that, I'm

8    just trying to explain why this is unfortunate.

14:47:30    9            I think that if we're going to make progress, we

10    probably need to have a smaller group of people coming in

11    to sit down with me and talk about what we're doing.  I

12    appreciate everybody's interest and I don't want to offend

13    anybody or suggest that your participation isn't welcome,

14    but I do think that it's an unwieldy process that we have

15    for purposes of case management when we have 20 people in

16    the room.  I think that it would be better if each side

17    could designate a couple of people and we could get

18    together from time to time and see how things are going.

14:48:19    19            If I'm wrong about that, I'm perfectly happy to

20    have you correct me, put from my point of view, this

21    doesn't work very well.  This gives you an opportunity to

22    vent a little, it gives you an opportunity to give me your

23    respective positions, but I think what we need is a team

24    that can work together toward a goal, and I don't think

25    that having 20 people on the team is necessary or helpful.

1    So I would ask you to please get back to me on that.

14:48:52  2           I realize there are a lot of people on the

3    defense side representing a number of clients, and it may

4    be that this is going to be difficult to do, but would you

5    please do that?  I would be more comfortable, and you can

6    trust me when I tell you that I think I can be of more

7    assistance to you if I'm meeting with a group of a few

8    people, four people, rather than sitting on the bench

9    looking at 20 people.

14:49:27 10           I hope that makes sense to you.

14:49:30 11           MR. GOLDBERG:  Your Honor, among the defense

12    group, even though we have all different positions and

13    interests in the case, there have been quite an effort to

14    work together and make sure that we can do this as

15    efficiently as possible, and I'm quite confident that we

16    can put something together and arrange to meet with Your

17    Honor.

14:49:53 18           THE COURT:  I think it would be a good thing to

19    try.

14:49:56 20           In my experience with class actions involving

21    institutional reform litigation, forming a group like that

22    proved to be really helpful.  You're able to build trust,

23    which is lacking, I submit; you're able to build an

24    effective working relationship that appears to me to be

25    missing right now; and it would be helpful if we had those

1    things working in our favor.

14:50:31  2         I think that what we're doing is unprecedented.

3    I'm not aware of any cases that like this one.  I think

4    that the idea of just starting to try cases, last I knew

5    getting plaintiffs to come to the United States was going

6    to be a significant undertaking.

14:51:10  7         Are we going to get people here to appear in

8    front of an American jury?

14:51:15  9         MR. HANLY:  Judge, we don't know.

14:51:16 10         THE COURT:  We don't know.  That's my point.

11    And I'm not inviting a dialogue at this point, Mr. Hanly.

12    I'm just thinking out loud.

14:51:26 13         MR. HANLY:  Yes.

14:51:27 14         THE COURT:  So while I understand that may be in

15    my interest to just start trying cases, I think what

16    you're thinking is get the plaintiffs here; well, when you

17    going to do that?  I don't know.  How long is that going

18    to take?  Could be six months, might be longer.  Could be

19    never.

14:51:44 20         And instead of taking that path, allowing for

21    the possibility that you would exhaust yourself after four

22    trials and leave, as enticing as that is, I don't think

23    that's the way to go.

14:51:56 24         And I think that if what we're talking about is

25    the bellwether approach, then we need to use an approach

1    that's going to work for the defendants.  Because if it

2    doesn't work for the defendants, it doesn't work for

3    anybody.  If what the defendants want is 17 depositions,

4    if that's what they need to make this process work for

5    them, then to my mind, that's a small price to pay if it's

6    going to work.

14:52:27  7         For me to refuse to do that, for me to say, no,

8    no, you only get six, and then at the end have the defense

9    say, you know what?  You blew it because this process has

10   not gotten us to where we need to get, well, that's not a

11   path I want to take either.

14:52:48 12         So I think that it is best to accommodate the

13   defendants' legitimate interest in having enough discovery

14   so that they can position themselves to actually make this

15   process work.  If they're telling me that it means however

16   many more depositions it is -- Mr. Goldberg, what is the

17   number?

14:53:21 18         MR. GOLDBERG:  On our side, Your Honor, it would

19   be a total of 23 depositions of which we have already

20   taken six.

14:53:28 21         THE COURT:  Then' let's do that.  That's my

22   decision.  Let's do that.

14:53:40 23         And having addressed what you referred to as the

24   core matter, is there anything else that you want me to

25   decide while we're together this afternoon?

14:53:51  1                MR. GOLDBERG:  I think, Your Honor, we need to

        2    get through this issue before you can address the others.

14:53:57  3                THE COURT:  Okay.  Well, we're talking about

        4    doing this number of depositions during what time period?

14:54:06  5                MR. GOLDBERG:  Between now and the end of the

        6    year.  We've got seven months.

14:54:11  7                THE COURT:  So that works out to how many

        8    depositions per month?

14:54:13  9                MR. GOLDBERG:  The way we were looking at is, if

       10    there were five depositions, it would be up to one week

       11    every five to six weeks.

14:54:24 12                And to be clear when I say what we need, we also

       13    have said that the plaintiffs can designate depositions as

       14    well, and if they said they want a larger number, they can

       15    designate as far as I'm concerned as many as they choose.

14:54:36 16                In terms of knowing who they want to use, they

       17    don't need to take depositions, they can just hear from

       18    their clients.  But if they want somebody that we're going

       19    to have to go to trial against, then we would want the

       20    opportunity to take the deposition.

14:54:54 21                MR. GORDON:  Your Honor, just very briefly on

       22    not the number, but we have found it very difficult to

       23    prepare the clients for their deposition.

14:55:05 24                We had -- at one of these depositions, one of

       25    the deponents was asked:  Have you ever filed suit before?

1    To which he responded, I don't even have a jacket.

14:55:15  2        It just is very difficult to just explain to

3    them the process and how you present yourself.  And what

4    we have found workable, and it's hard, but -- and it takes

5    us awhile to get them ready so they understand how to

6    conduct themselves.  You've got to answer these questions

7    and the lawyer is representing the other side.  We find we

8    can manage three when we go down for a week, and that's

9    been taking three to four to five days.  Five would be

10   extremely difficult to do, and what we find manageable is

11   three.

14:55:58  12        THE COURT:  Okay.  What I'll do is I will look

13   at the proposed schedules and I'll issue an order and I'll

14   hope to hear from you with regard to a group that I can

15   meet with from time to time as we go forward, and by time,

16   I mean monthly, and I'll get the rulings to you on the

17   motions that have been discussed today.

14:56:53  18        MR. GOLDBERG:  Your Honor, to be clear, the

19   order isn't going to address the selection process, all of

20   the things that we said the parties are at issue about but

21   don't need to be decided right now?

14:57:03  22        THE COURT:  Right.  I think that if we are able

23   to put together a team, these are matters that could be

24   taken up by the team and come to a consensus.

14:57:23  25        MR. GOLDBERG:  Good, thank you.

14:57:24   1                    THE COURT:   Thank you.

           2                         (Proceedings adjourned.)

           3

           4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

```
1                    C E R T I F I C A T E

2

3              In Re: ST. LOUIS vs. PERLITZ

4

5

6           I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                    /s/_____
16
                    DARLENE A. WARNER, RDR-CRR
17                    Official Court Reporter
                     450 Main Street, Room #223
18                  Hartford, Connecticut 06103
                        (860) 547-0580
19

20

21

22

23

24

25
```