UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GERVIL ST. LOUIS,<br><br>        Plaintiff,<br><br>   vs.<br><br>DOUGLAS PERLITZ, et al.,<br><br>        Defendants. | Civ. A. No. 3:13-cv-01132-RNC<br><br><br>Dated: November 17, 2015 |

*This document relates to:*

*All Cases*

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF CONCERNING IMPROPER PAYMENTS TO PLAINTIFFS

### PRELIMINARY STATEMENT

The plaintiffs' counsel, through their agent, Cyrus Sibert, are paying the living expenses of at least some of their clients. This is not just a violation of the applicable rules of professional conduct. In light of the plaintiffs' extreme poverty, it creates a significant risk of a miscarriage of justice.

In this motion, we seek an order prohibiting the plaintiffs' counsel, or their agents, servants, and employees, from making any payments in cash or in kind to the plaintiffs, with limited exceptions described below that are consistent with the rules of professional conduct and with Connecticut's "anti-runner" laws. We seek acknowledgment from Mr. Sibert that he understands this Court's order. We also seek an order compelling certain plaintiffs to answer questions about whether they received money from their lawyers or from Mr. Sibert. These plaintiffs refused to answer those questions on their lawyers' instructions, and because the

questions did not call for privileged information, the instructions were clearly improper. We seek an order forbidding the plaintiffs' counsel to use Mr. Sibert or other "runners" to solicit or pay potential plaintiffs to bring actions against the defendants. We seek an accounting of all payments made to plaintiffs to date and a copy of any agreements between plaintiffs' counsel and Mr. Sibert. We seek an order requiring plaintiffs' counsel to inform their clients promptly that neither they nor their agents, including Mr. Sibert, can make payments to them in cash or in kind, except for expenses of the litigation, unless approved by the Court. Finally, we seek an order requiring the plaintiffs to produce Mr. Sibert for a deposition in the United States, and to produce the documents in his possession, custody, or control that are responsive to the subpoena *duces tecum.*

FACTS

A.    The Plaintiffs Are Extremely Impoverished.

In their own words, the plaintiffs are "some of the most vulnerable children in the world." (Pls' Opp. To Carrier's Mot. To Compel at 3).[1] They are so poor that the threat "to withhold food and shelter" was enough to make them agree to "comply with [Perlitz's] sexual demands." (Compl. ¶ 3).[2] The plaintiffs "who were willing to accede" to Perlitz's sexual demands "were provided with new clothes and shoes, as well as cash," while the boys who were not "were forced to go without basic necessities." (Id. ¶ 70).

The plaintiffs' testimony to date has made their poverty even clearer. None who have testified so far have regular jobs, and some have not looked for a job in years. Some do odd jobs such as washing cars or taking out trash for a few gourdes (a gourde, the Haitian currency, is

---

[1] *In re Fr. Paul E. Carrier, S.J.,* No. 2:14-MC-0044 (D. Me.), ECF No. 17. A true copy is attached to this memorandum as Exhibit 1.
[2] References to the Complaint are to the Complaint of Gervil St. Louis (ECF No. 1).

worth $0.019 at current rates). [3] (Bernardin Dep. 55:23-56:19; Jerome Dep. 54:23-55:2; Gesner Lecenat Dep. 136:9-17).[4]

Poverty is not the plaintiffs' only disadvantage. Many of them are uneducated. It became apparent during the depositions that some of them could not read or write and that they had a very limited understanding of the proceedings. Here, for example, is the testimony of Dorat Jean about his interrogatory answers:

> Q.    Do you read Creole?
>
> A.    No, not read.
>
> Q.    Do you remember anybody asking you questions that they wanted you to answer about this lawsuit?
>
> A.    What is a lawsuit?
>
> Q.    Okay. Did you ever meet with Cyrus Sibert?
>
> A.    Today?
>
> Q.    No, not today. Do you know who he is?
>
> A.    Yes, I know.
>
> Q.    And have you ever met him?
>
> A.    If I already met him?
>
> Q.    Yes.
>
> A.    Yes, I've met him.
>
> Q.    Have you met him many times, or one time?
>
> A.    Twice. He needs me to sign a paper.
>
> Q.    Is this [Exhibit 1, the answers to interrogatories] the paper he needed you to sign?
>
> MR. GARABEDIAN:          Objection.

---

[3] *See* https://www.fiscal.treasury.gov/fsreports/rpt/treasRptRateExch/currentRates.htm for current exchange rates.
[4] Excerpts of the Bernadin, Jerome, and Gesner Lecenat transcripts are attached as Exhibits 2, 3, and 4, respectively.

A.      Yes, I remember it.

BY MR. FOLKMAN:

Q.      And did he say anything to you?

A.      No, he didn't tell me anything. He said all the truth that I said, I'm signing them here.

Q.      Okay. Did anybody read the document to you before you signed it?

A.      No.

(D. Jean Dep. 41:13-42:22).[5]

In short, these are among the most disadvantaged people, from a socioeconomic perspective, whom one can imagine bringing claims in a United States District Court.

The plaintiffs' apparent lack of understanding of the process they have begun, and the lack of care that evidently was taken in the preparation of their written statements (e.g., Mr. Jean's testimony that he couldn't read and that no one read his interrogatory answers to him before he signed them) is a particular concern given the significant discrepancies between what the plaintiffs say when testifying and what they or their lawyers have said in writing. There are many, many examples of such discrepancies. For illustrative purposes, consider the following discrepancies in the accounts given by Geffrard Lecenat.

- Like all of the plaintiffs, Mr. Lecenat testified that Mr. Perlitz "provided things of value" to him, in particular "sneakers," "in return for illicit sexual conduct." (Geffrard Lecenat Compl. at ¶ 101).[6] But when he testified he denied that Mr. Perlitz ever gave him shoes in exchange for the abuse or that he ever gave

---

[5] Excerpts of the D. Jean transcript are attached as Exhibit 5.
[6] The Lecenat complaint is ECF No. 1 in case 13-CV-1642.

him *anything* in exchange for sex. (Geffrard Lecenat Dep. 159:18-160:7). [7]

Mr. Lecenat's claim against Father Carrier in Count 7 of his complaint relies on his allegation that Mr. Perlitz caused him to engage in a commercial sex act, which is defined to mean "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

- Mr. Lecenat alleged in his complaint that Mr. Perlitz "fondled [his] genitals." (Geffrard Lecenat Compl. ¶ 100). But in his testimony, he denied it. (Geffrard Lecenat Dep. 159:2-16).

- In his answers to interrogatories, Mr. Lecenat said that he "spoke to Perlitz about the matters alleged in the Complaint while he was still in Haiti." (Geffrard Lecenat Ans. to Int. 41[8]). But in his testimony, he denied ever speaking with Mr. Perlitz about the abuse he says he suffered. (Geffrard Lecenat Dep. 147:8-16; 157:19-24).

- In his complaint, Mr. Lecenat alleged that he was first abused in or about 2007 and then abused again in 2008. (Geffrard Lecenat Compl. ¶ 99). In his testimony, he testified that he was first abused in 2006 and then abused in 2007. (Geffrard Lecenat Dep. 127:13-23; 147:2-5). Mr. Lecenat sued in November 2013, so claims against Father Carrier based on abuse in 2006—and perhaps abuse in 2007—are barred by the statute of limitations for the same reasons given in the pending motion to dismiss Counts 8 and 12 in the *Michel* matter (ECF No. 484).

---

[7] Excerpts of the Geffrard Lecenat transcript are attached as <u>Exhibit 6</u>.
[8] A true copy of the Geffrard Lecenat Ans. to Int. is attached as <u>Exhibit 7</u>.

B.   Cyrus Sibert Is The Agent Of The Plaintiffs' Lawyers For All Purposes Relating To
     These Cases.

We need not do much to prove that Cyrus Sibert was the agent of the plaintiffs' lawyers

for all purposes relating to these cases. The plaintiffs' lawyers have been very explicit on this

point. The clearest statement of their assertion comes from the recent deposition of Louis Saint

Cirin. After some back-and-forth, the plaintiffs' counsel put their position thus:

> It is Plaintiffs' counsel's position that Cyrus has always been counsel's agent, but it's
> really case-specific. The privilege doesn't extend to the client until the client retains
> Plaintiffs' counsel. So we have to look at each case to determine those facts.

(Saint Cirin Dep. 177:16-22).[9] The plaintiffs' counsel elaborated in the following colloquy:

> MR. KERRIGAN: Would you take the position, Mitchell, that Cyrus Sibert is the
> Plaintiffs' counsel agent for all purposes relating to these consolidated cases in Haiti?
>
> MR. GARABEDIAN: Yes. Again, he was counsel's agent, Plaintiffs' counsel's agent
> before Mr. [Saint Cirin], for instance, retained Plaintiffs' counsel.

(Id. 178:22-179:4). To drive the point home:

> MR. KERRIGAN: That much of your position is clear, though I disagree with it.
>
> And the other portion that I just want to confirm with you is that you deem Cyrus Sibert
> to be the Plaintiffs' counsel's agent for all purposes in Haiti in connection with the
> consolidated cases?
>
> MR. GARABEDIAN: Yes, that's accurate.

(Id. 179:10-17).

C.   In Haiti, Incomes Are Extremely Low.

According to the World Bank, the gross national income per capita in Haiti is $820 per

year as of 2014.[10] That, of course, is an average. Haiti, according to the US government, has the

highest level of income inequality in the world outside of a handful of African countries.[11]

---

[9] Excerpts of the Saint Cirin transcript are attached as Exhibit 8.
[10] http://data.worldbank.org/indicator/NY.GNP.PCAP.CD
[11] https://www.cia.gov/library/publications/the-world-factbook/rankorder/2172rank.html#ha

Statistics are difficult to come by, but one of the plaintiffs estimated that when he worked as a mason he would make 100 or 150 gourdes per day—as much as $2.85 per day at current exchange rates. (Jasmin Joseph Dep. 31:24-32:1; see also Jean-Pierre Dep. 72:21-73:3).[12] That might amount to $1,000 a year if a plaintiff worked seven days a week with no time off, though as the depositions have shown, none of the plaintiffs seem to have regular work let alone full-time work. By way of example, Jasmin Joseph, the young man who discussed the wages of a mason, said he could not remember the last time he had had such work (Jasmin Joseph Dep. 31:21-23).

D.    Mr. Sibert Was Intimately Involved In Obtaining Clients For The Plaintiffs' Lawyers.

       Although we have noticed Mr. Sibert's deposition, we have been unable to serve him with a subpoena *duces tecum*, nor have the plaintiffs' lawyers responded to our written request to make Mr. Sibert available for a deposition. (Folkman Decl. ¶ 2 & Ex. 1). We have, however, been able to piece together some of the story of his involvement in these cases through the testimony of others, including the plaintiffs, and through documents produced by Paul Kendrick over the plaintiffs' unfounded privilege objections.

- All thirty-six of the plaintiffs who have answered interrogatories to date have stated in their answers that they were referred to counsel by Mr. Sibert. (Ans. to Int. 12).[13]

- Two of the plaintiffs, Jose Bernardin and Wisky Jerome, solicited some of the plaintiffs to sign their names on a list, which they then delivered to Mr. Sibert. (D. Jean Dep. 197:9-199:8). Shoubert Hedouville, who also goes by the name "Jean-

---

[12] Excerpts of the Jasmin Joseph and Jean-Pierre transcripts are attached as Exhibits 9 and 10.
[13] Because they are voluminous, we do not attach the plaintiffs' answers to interrogatories as exhibits.

Gary" (Geffrard Lecenat Dep. 63:6-13), and who is one of the *Jean-Charles* plaintiffs whose cases were settled for large sums of money, was also involved in the circulation of the list and its delivery to Mr. Sibert. (Id. 49:20-50:8). When he circulated the list, Mr. Hedouville said that "all the kids in the Village should put their name on it. … [I]f you were in the Village, he didn't need to know anything else, you just put your name on it." (Id. 50:16-51:1). In other cases, Mr. Hedouville approached plaintiffs and directed them to Mr. Sibert without asking them first to sign a list. (Dorcine Dep. 113:20-114:8).[14]

- Paul Kendrick, whom the plaintiffs' counsel have also claimed as their agent for a time, communicated with Mr. Sibert and plaintiffs' counsel about the process of finding counsel for some of the former PPT students (Folkman Decl. ¶ 3 & Ex. 2), about getting them to sign contingent fee agreements with plaintiffs' counsel (Folkman Decl. ¶ 4 & Exs. 3, 4, and 5), and recommending that Mr. Sibert take his time in vetting the potential plaintiffs (Folkman Decl. ¶ 5 & Ex. 6). Indeed, according to Mr. Kendrick, Mr. Sibert, the one who pays the plaintiffs, is also the one who vets their claims for plaintiffs' counsel. (Kendrick Dep. 192:19:23; 193:15-19).[15]

E.     <u>Mr. Sibert Paid Hundreds Of US Dollars To Some Of The Plaintiffs.</u>

The evidence we have been able to obtain from the minority of plaintiffs that we have had the opportunity to question shows that Mr. Sibert, the agent of the plaintiffs' lawyers, has

---

[14] Excerpts of the Dorcine transcript are attached as <u>Exhibit 11</u>.
[15] Excerpts from the Kendrick transcript are attached as <u>Exhibit 12</u>.

made cash payments to many of the plaintiffs. In light of his role in the case and the deep poverty of the plaintiffs, this evidence is deeply troubling:

- Mr. Sibert gave Jheempson Brismac Joseph $100 (US) "when I came to sign a paper." (J.B. Joseph Dep. 180:21-25).[16] Before the deposition, Mr. Sibert gave him $2,400 "Haitian dollars," or 12,000 gourdes.[17] Mr. Joseph used the money to buy clothes, shoes, food, and "a little perfume," though it "wasn't even enough for everything I wanted to do." (Id. 179:16-180:10). Mr. Sibert also gave him 1,000 gourdes each time Mr. Joseph traveled to Port-au-Prince—Mr. Joseph could not say how many times that had happened. (Id. 179:8-15). When Mr. Sibert gave Mr. Joseph the $100 (US), Mr. Joseph understood that "he was sort of my boss, because he was helping me. When somebody is helping you, he's sort of your boss." (Id. 181:13-17).

- Mr. Sibert gave Gesner Lecenat $100 (US) on three occasions. Mr. Lecenat used the $300 for food and doctors' visits. (Gesner Lecenat Dep. 44:9-18; 49:11-52:8). This despite the fact that at least as of September 19, 2014, the date he verified the answers to his interrogatories, Lecenat says that the only time he had been treated by a doctor or health care professional since 1995 was treatment he received while he was living at PPT. (Gesner Lecenat Ans. to Int. 33).[18]

- On two occasions, Mr. Sibert gave Kensley Prévil $100 (US) for food and clothes. A person named Mathieu, whose role is not yet clear, gave Mr. Prévil an additional $100 shortly before the deposition. Mr. Prévil used the first two $100

---

[16] Excerpts from the J.B. Joseph transcript are attached as Exhibit 13.

[17] A "Haitian dollar" is an informal term for five gourdes, stemming from the period in the twentieth century when the gourde was pegged to the US dollar at a fixed rate of five to one.

[18] A true copy of the Gesner Lecenat Ans. to Int. is attached as Exhibit 14.

payments for clothes and food, and the third payment for sandals, clothes, and food. (Prévil Dep. 132:21-133:12, 134:9-17, 184:24-186:6).[19] Mr. Prévil understood that the money "didn't come really from Mathieu, it came directly from Cyrus." (Id. 185:3-17).

- Mr. Sibert, again through Mathieu, paid Emile Jean-Pierre a total of $480 in installments. At least two of the payments were after the lawsuit was filed. He used part to buy food and clothes, he gave some to his mother and sister, and he saved some. (Jean-Pierre Dep. 27:22-32:2).

- Mr. Sibert, once on his own and once through Mathieu, gave Ilguens Jean two payments of $100 (US). The first was on the day they met. Mr. Sibert did not say what the money was for; Mr. Jean used it to buy food. He spent the second sum on cloths, a suitcase, shoes, and food. (I. Jean Dep. 96:25-97:23, 98:9-99:17).[20]

- Mr. Sibert gave Wadson Dorcine $100 (US) on two occasions. (Dorcine Dep. 148:12-149:24). Shortly before Mr. Dorcine's deposition, he gave Mr. Dorcine 5,000 gourdes (about $95 at current rates). Mr. Wadson did not know the exact reason, but Mr. Sibert told him, "you can't go just any old way, you have to prepare yourself a little bit to go, you have to put something on." (Id. 149:25-150:15).

- Mr. Sibert gave Jasmin Joseph $350 (US) in four installments. Mr. Joseph used the money to buy food and clothes. He said the money he received from

---

[19] Excerpts from the Prévil transcript are attached as <u>Exhibit 15</u>.
[20] Excerpts from the I. Jean transcript are attached as <u>Exhibit 16</u>.

Mr. Sibert was his only source of money. (Jasmin Joseph Dep. 197:25-199:15, 201:7-11).

F.     The Plaintiffs' Counsel Admit They Are Employing A "Runner" In Haiti.

Our concerns about improper payments to the plaintiffs, and solicitations of plaintiffs in Haiti, are compounded by an article that appeared in the Connecticut Law Tribune just days ago. The article, titled "Attorney Files Dozens More Conn. Lawsuits in Haiti Sex Abuse Case," recounts the earlier round of cases, which settled, and then notes that plaintiffs' counsel "said he's had an 'advocate' working in Haiti to try to find additional sex abuse victims." Counsel, according to the article, "has identified 147 additional possible plaintiffs." Megan Spicer, *Attorney Files Dozens More Conn. Lawsuits in Haiti Sex Abuse Case,* Connecticut Law Tribune, Nov. 12, 2015.[21] The article does not name the "advocate," but we believe it to be Mr. Sibert. If it is someone else, the problems we describe in this motion are simply compounded.

## ARGUMENT

A.     The Connecticut Rules of Professional Conduct Govern In This Proceeding.

The Connecticut Rules of Professional Conduct apply to the conduct of lawyers in proceedings in this Court. L.R. 83.2(a)(1). In this memorandum, we focus, therefore, on the relevant Connecticut rule.

B.     A Lawyer Cannot Provide Financial Assistance To His Client, Except For The Expenses Of Litigation.

The Connecticut rule is clear. With the exception of "court costs and expenses of litigation," a lawyer "shall not provide financial assistance to a client in connection with pending or contemplated litigation." Conn. R. Prof'l Conduct 1.8(e). Connecticut's rule is nearly identical

---

[21] A true copy of the article is attached as Exhibit 17.

to the Model Rule, and indeed, to the rule in most American jurisdictions. *See* Model R. Prof'l Conduct 1.8(e).[22]

Why is this the rule? According to the Connecticut official commentary, which is taken from the comment to the Model Rule, one reason lawyers cannot provide financial assistance to clients is that "to do so would encourage clients to pursue lawsuits that might not otherwise be brought." Conn. R. Prof'l Conduct 1.8, cmt.; Model R. Prof'l Conduct 1.8. cmt. [10] ; *see also Rubenstein v. Statewide Grievance Committee*, 2003 WL 21499265, at *5 (Conn. Super. Ct. 2003) ("The ethics rules are themselves designed to prevent lawyers from enticing clients with the promise of monetary advances."). That is why Connecticut has disciplined attorneys for "providing bus tokens to clients" and for paying their medical expenses. *Id.* at *2, 13. It is also why Connecticut recognizes "no humanitarian exception to the prohibition against a lawyer providing financial assistance to a client." *Conn. Informal Ethics Op.* 2011-10 ("Payment of a water bill is a living expense for which there is no exception found in Rule 1.8(e)'s prohibition against a lawyer providing a client with financial support."); *Conn. Informal Ethics* Op. 90-3 (lawyer may not advance money to client for rent payments even under threat of client's eviction). And it is why the payments here are improper: the plaintiffs, we believe, are being induced to bring claims by the money they are receiving from the agents of the lawyers bringing the claims.

C.    Plaintiffs' Counsel Must Cease Violating The Rule.

There can be no real dispute that payments to the plaintiffs for their living expenses violate Rule 1.8. Rule 1.8 allows lawyer to advance certain litigation-related expenses to their

---

[22] In the exception for court costs and expenses of litigation, Connecticut has "pay" where the Model Rule has "advance." The difference is not material to this motion. If anything, Connecticut's rule seems more ironclad than the Model Rule, because "pay" covers cases where repayment is expected and cases where it is not, whereas "advance" suggests that the client will repay the money if the litigation is successful.

clients (for example, filing fees). But it is clear from the testimony we cite above that not all of these payments were intended to cover the expenses of the litigation, and that not all of them were used to cover the expenses of the litigation. And payment of the expenses of the litigation are the *only* exception to the general rule forbidding financial assistance that Rule 1.8 permits. *Rubenstein*, 2003 WL 21499265 at *5; *Conn. Informal Ethics Op.* 2011-10; *Conn. Informal Ethics Op.* 90-3.

The amounts Mr. Sibert gave to these plaintiffs may seem *de minimis* in an American context, but they are anything but *de minimis* in Haiti. The payments to Mr. Jean-Pierre, for example, amount to more than half a year's income for the *average* Haitian. And these plaintiffs are not average Haitians but are among the poorest of the poor in that impoverished country. In one case a plaintiff explained that he had no other source of money besides what Mr. Sibert had given him. (Jasmin Joseph Dep. 201:7-11). No court would stand for a lawyer in a personal injury case paying half a year's income to an impoverished American personal injury client.

The payments are particularly troubling in light of what some of the plaintiffs have said about the obligations they feel to people who give them money. As noted above, Jheempson Brismac Joseph testified that because he received money from Mr. Sibert, he regarded Mr. Sibert as his "boss." Mr. Clervil, the plaintiff who voluntarily dismissed his own claim with prejudice after submitting supplemental interrogatory answers that made damaging assertions against Father Carrier that were completely at odds with his prior answers, said something similar in his declaration explaining why he had changed his statements under penalty of perjury about Father Carrier. He claimed to believe that Father Carrier was the one who had arranged for Mr. Garabedian to represent him. "Since I believed that Father Paul had sent the lawyers bringing the cases against Douglas Perlitz," he wrote," in July 2014 I did not believe I could tell

the truth about what Father Paul did to me." (Clervil Decl. ¶ 4).[23] But "since [he] learned that

Father Paul is not working with Attorney Mitchell Garabedian on [his] case," he decided he

could make allegations about Father Carrier. (Id.). In short, it is particularly worrisome when a

lawyer, through his agent, pays the living expenses of his client in a society where, at least

according to the testimony of two of the plaintiffs themselves, there is some tendency for people

who receive money to feel they have to do the bidding of their benefactors.

Counsel may well say that they themselves made no payments to their clients and that

they cannot be held responsible for Mr. Sibert. It is well-settled, however, that violations of the

Rules of Professional Conduct are wrongful even when committed "through the acts of another."

Conn. Rule of Prof. Conduct 8.4(1); *cf. N.Y. Ethics Op. No.* 855 (Mar. 14, 2011) (Rule 1.8 does

not permit attorneys to use a third party "as a front for advancing improper financial assistance to

a client for whom the lawyer is conducting litigation"). Plaintiffs' counsel has previously

affirmed that "Cyrus Sibert [is] the Plaintiffs' counsel's agent for all purposes in Haiti in

connection with the consolidated cases." (Saint Cirin Dep. 179:10-17). Where (as here) counsel

has "employed or retained" a nonlawyer to act on his or her behalf, counsel has an affirmative

obligation to "make reasonable efforts to ensure that the person's conduct is compatible with the

professional obligations of the lawyer." Conn. Rule of Prof. Conduct 5-3(2). The plaintiffs'

counsel should not be heard to disavow Mr. Sibert's conduct or disclaim responsibility for his

actions, particularly when, in depositions, they have instructed some of their clients not to

answer questions about whether the clients received money from their lawyers directly. (Dorcine

Dep. 151:3-152:20; J.B. Joseph Dep. 183:8-25). Moreover, technical issues about the scope of

Mr. Sibert's agency cannot really decide the question for a few reasons: we have been unable to

---

[23] ECF No. 452-1.

question Mr. Sibert about the agency; counsel for the plaintiffs have asserted that the payments are so closely related to the representation that the fact of the payments is itself within the attorney-client privilege; and what is at stake is not the vicarious liability of counsel for Mr. Sibert's acts, but rather their ethical obligations. If a legal assistant in a plaintiffs' law firm in the United States made significant cash payments to the firm's clients, no court would approve the payments on the grounds that the assistant's motives were purely charitable and had nothing to do with her work for the firm; the integrity of the proceedings would have to take precedence over such considerations.

Counsel also suggests that some of the payments were made before the plaintiffs who were paid retained counsel. But there is no basis for arguing that counsel's conduct is immunized because payments occurred before the clients retained them. This is so for two reasons. First, as the testimony shows, in at least some cases Mr. Sibert made payments to plaintiffs after the lawsuits were filed, i.e., after the plaintiffs retained counsel, for things other than filing fees or the expenses of attending their depositions. For example, Geffrard Lecenat testified that he received money from Mr. Sibert for medical expenses in approximately April 2015. (Geffrard Lecenat Dep. 61:11-62:11). Ilguens Jean testified that he received money unsolicited from Mr. Sibert on the first day that they met and used it to buy food. (I. Jean Dep. 96:25-97:23).

Second, and more fundamentally, such an argument would fail because Mr. Sibert was intimately involved in the process of steering the plaintiffs to their counsel. Mr. Sibert has acted as conduit and recruiter for clients and has therefore been an agent of plaintiffs' counsel even before individual plaintiffs have signed engagement agreements and filed complaints. Indeed, as we explain below, if Mr. Sibert "pa[id], remunerate[d], or reward[ed] any other person with something of value to induce such other person to bring a cause of action to, or to come to, an

attorney or to seek an attorney's professional services" in Connecticut, he would be guilty of a felony. *See* Conn. Gen. Stat. § 51-87(a)(5). Several plaintiffs testified that they had heard Mr. Sibert on the radio discussing Perlitz's abuse of PPT students, the success of some abuse victims taking legal action, and the fact that other victims should come to him. (Guillaume Dep. 166:18-168:1, Jasmin Joseph Dep. 180:5-13).[24] Mr. Paul Kendrick, a self-appointed advocate for former PPT students and initial point of contact with plaintiffs' counsel (Kendrick Dep. 82:8-20), testified that Mr. Sibert was involved in vetting the plaintiffs' claims and that Mr. Sibert "is the only person in Haiti to bring the cases to Mr. Garabedian" (Kendrick Dep. 192:7-194:1). And plaintiffs' counsel recently informed the *Connecticut Law Tribune* that "he's had an 'advocate'"—unnamed in the article, but likely Mr. Sibert—"working in Haiti to try to find additional sex abuse victims." Spicer, *Attorney Files Dozens More Conn. Lawsuits*, *supra*. There is little doubt that Mr. Sibert is recruiting and paying plaintiffs on counsel's behalf.

D.     The Court Has Authority To Enjoin These Improper Payments.

We are not seeking disqualification of the plaintiffs' counsel on account of the evident violation of Rule 1.8, primarily because we believe disqualification would greatly delay resolution of these cases and because we are not eager to deprive these plaintiffs of counsel on account of the missteps of their representatives. Nor are we seeking any other punitive sanction. We do, however, seek an order requiring the payments to plaintiffs to stop. The Court has inherent power to punish misconduct by counsel in "the actions that led to the lawsuit … or conduct of the litigation." *United States v. Seltzer,* 227 F.3d 36, 41-42 (2d Cir. 2000). *A fortiori* it has the power to instruct counsel to cease the misconduct without imposing any sanction.

---

[24] Excerpts of the Guillaume transcript are attached as Exhibit 18.

The plaintiffs' counsel have suggested that although Mr. Sibert is their agent they may lack control over him in some respects. To the extent this poses a dilemma, the burden of choosing belongs with plaintiffs' counsel. When a lawyer retains the services of a nonlawyer, the lawyer has a professional obligation to "make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." *See* Conn. R. Prof. Conduct 5.3(3). Plaintiffs' counsel must therefore choose either to continue to use Mr. Sibert as their agent on the understanding that he is forbidden to make additional payments to the plaintiffs, or else to cease using him as their agent. In order to ensure compliance with the Court's orders, the plaintiffs' counsel should be required to inform the Court of their intentions, and if they do intend to continue working with Mr. Sibert, Mr. Sibert should be required to submit a declaration acknowledging his understanding of the Court's orders. In particular, the declaration should include a statement indicating Mr. Sibert's understanding that he cannot cause others to make payments to the plaintiffs on his behalf or on the behalf of plaintiffs' counsel.

E.     Some Payments Should Be Permitted.

Plaintiffs' counsel is permitted under Rule 1.8(e) to advance or even pay outright the "court costs and expenses of litigation" to the plaintiffs. We do not seek to prohibit such payments. But to avoid further improper payments, we ask the Court to itemize the payments that may properly be made. In our view, these include the costs of transporting the plaintiffs to their depositions and the cost of their food and lodging while there, the similar costs that will be incurred in order to transport the plaintiffs to trial and to feed and lodge them while in Connecticut, the costs of applying for necessary travel documents such as passports and visas, and the costs of legal representation in Haiti necessary to obtain such documents. All of these costs, incidentally, can be treated as payments in kind on the plaintiffs' behalf without requiring

the plaintiffs' counsel to pay cash to the plaintiffs. Any other payments in cash or kind should, in our view, require prior approval of the Court.

F.    <u>Plaintiffs' Counsels' Instructions To Plaintiffs Wadson Dorcine And Jheempson Brismac Joseph Not To Answer Questions About Payments Were Improper.</u>

"The attorney-client privilege protects communications between client and attorney when made in confidence for the purpose of seeking or giving legal advice." *Ullmann v. State*, 230 Conn. 698, 711 (1994) (citation omitted). "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Bernstein v. Mafcote, Inc.*, 43 F. Supp.3d 109, 114 (D. Conn. 2014) (citations omitted). "The burden of establishing the applicability of the privilege rests with the party invoking it." *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 248 (2d Cir. 1986).

Two of the plaintiffs, Jheempson Brismac Joseph and Wadson Dorcine, were instructed not to answer questions about payments they received. In the Dorcine deposition, plaintiffs' counsel contended that "if there was any payment by [counsel] to a witness, to [counsel's] client, that's a form of communication" and therefore shielded by attorney-client privilege involving communications. (Dorcine Dep. 152:3-20; *see also* J.B. Joseph Dep. 183:8-20). Payments from the lawyer to the client are not privileged for the same reason that payments from the client to the lawyer are not privileged. With regard to payment of legal fees, the Second Circuit has noted: "While consultation with an attorney, and payment of a fee, may be necessary to obtain legal advice, their disclosure does not inhibit the ordinary communication necessary for an attorney to act effectively, justly, and expeditiously." *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d at 247-48. Similarly, disclosures of payments from lawyers (or their agents) to clients does

not inhibit the ordinary communication between lawyers and clients "necessary for an attorney to act effectively, justly, and expeditiously."

G.     The Plaintiffs' Counsel Should Be Forbidden To Use Mr. Sibert Or Others as "Runners."

Just as it is improper, for the reasons we gave above, to pay the plaintiffs' living expenses, it is improper to use a "runner" to solicit them to bring cases. Connecticut law has three prohibitions relevant here. First is the prohibition against non-lawyers inducing potential plaintiffs to bring actions if the person offering the inducement is compensated or if the case is a contingent fee matter:

> A person who has not been admitted as an attorney in this state under the provisions of section 51-80 shall not solicit, advise, request or induce another person to cause an action for damages to be instituted, from which action or from which person the person soliciting, advising, requesting or inducing the action may, by agreement or otherwise, directly or indirectly, receive compensation from such other person or such person's attorney, or in which action the compensation of the attorney instituting or prosecuting the action, directly or indirectly, depends upon the amount of the recovery therein.

Conn. Gen. Stat. § 51-86. Second is the prohibition against paying someone to solicit clients for attorneys or employing runners.

> Any person who (1) pays, remunerates or rewards any other person with something of value to solicit or obtain a cause of action or client for an attorney-at-law or (2) employs an agent, runner or other person to solicit or obtain a cause of action or a client for an attorney-at-law or (3) pays, remunerates or rewards any other person with something of value for soliciting or bringing a cause of action or a client to an attorney-at-law or (4) pays, remunerates or rewards with something of value a police officer, court officer, correctional institution officer or employee, a physician, any hospital attaché or employee, an automobile repairman, tower or wrecker, funeral director or any other person who induces any person to seek the services of an attorney or (5) pays, remunerates or rewards any other person with something of value to induce such other person to bring a cause of action to, or to come to, an attorney or to seek an attorney's professional services shall be guilty of a class E felony.

And third is the prohibition against acting as a "runner," i.e., "an individual who, for a pecuniary benefit, procures or attempts to procure a client, patient or customer at the direction of, request of or in cooperation with a provider whose purpose is to seek to obtain benefits under an insurance

contract or assert a claim against an insured or an insurance company for providing services to

the client, patient or customer …" Conn. Gen. Stat. § 53-54a(a)(3):

> An individual who knowingly acts as a runner or uses, solicits, directs, hires or employs another individual to act as a runner shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.

Conn. Gen. Stat. § 53-340a(b).

The policy behind these statutes is the overwhelming potential for abuse. The

Connecticut Trial Lawyers Association explained the concern in its comments in support of the

bill that became § 53-540a:

> First, runners prey disproportionately on specific populations: poor, minority and city dwelling. Those affected do not have health insurance, often lack facility with the English language and generally have only limited access to transportation. Although legitimately injured, these accident victims are pulled into a scheme that is designed to make money for the participants who solicit the victims but not to provide good medical care or legal representation for the injured victims. A second concern is that while everyone contacted by a runner has been involved in an accident, not everyone has been injured. However, runners approach all accident victims—whether injured or not—and tell them that they can receive free medical care and be set up with a lawyer to pursue a claim on their behalf. The promise of money to be made is at least implicit. Such a system will inevitably lead to the pursuit of fraudulent claims by persons who are not hurt. The filing of fraudulent claims, in turn, hurts both those who have valid claims which are made suspect by the existence of such invalid claims and the consumers who are forced to pay higher insurance rates.

Letter from CTLA to Members of the Judiciary Committee, March 20, 2009, regarding *Support

of Raised Bill 6642—An Act Concerning the Solicitation of Clients, Patients or Customers*.

The conduct of the plaintiffs' counsel and Mr. Sibert raises precisely the concerns about

abuse that motivated the statutes. Mr. Sibert is not a lawyer. He is the agent of plaintiffs'

counsel. He solicited plaintiffs in an area of Cap-Haitien known as Carenage Square, where poor

young men hoping to find work would go. He canvassed young men who had attended PPT and

took their names and phone numbers; soon after, these young men received a telephone call from

plaintiffs' counsel. (J.B. Joseph Dep. 168:14-174:12). To date we have not been able to

determine whether Mr. Sibert received money directly from plaintiffs' counsel, but we know that he did receive money from others who have worked closely with plaintiffs' counsel and even acted as their agent, in particular Mr. Kendrick. (Kendrick Dep. 158-24:159-20). We also understand, based on comments to the news media, that Mr. Sibert's recruiting efforts are conducted on behalf of plaintiffs' counsel, who have engaged "an 'advocate' working in Haiti to try to find additional sex abuse victims." Spicer, *Attorney Files Dozens More Conn. Lawsuits in Haiti Sex Abuse Case*, *supra.*

Mr. Sibert, and any other agents of the plaintiffs' counsel, must cease these violations of the rules against solicitation and "runners." Given the poverty of the plaintiffs and potential plaintiffs, this conduct poses a grave and unacceptable risk to the integrity of these proceedings.

H.     The Plaintiffs' Counsel Should Be Required To Produce Mr. Sibert For A Deposition And To Produce His Documents.

On April 2, 2014 we sought unsuccessfully to serve Mr. Sibert with a subpoena.  Since then, we have prepared another subpoena and given it to our process servers.[25] Mr. Sibert lives, we understand, in Orlando, Florida (Kendrick Dep. 163:22-164:17). Our process servers, however, have been unable to serve him there, and because Mr. Kendrick refused to provide his address (Kendrick Dep. 164:24-165:4), we are not certain that we are attempting service at the right place.

Given the agency relationship between the plaintiffs' counsel and Mr. Sibert and his close connection with these cases, counsel should be required to produce Mr. Sibert for a deposition and to produce his relevant documents. He obviously is within their control.

---

[25] A copy of the schedule to the subpoena, showing the documents sought, is attached as <u>Exhibit 19</u>.

<u>CONCLUSION</u>

For the foregoing reasons, Father Carrier respectfully requests that the Court grant this motion for the following relief:

1.      An order to the plaintiffs' counsel and their agents, servants, and employees requiring them to cease making payments in cash or in kind to the plaintiffs without leave of court (with the exceptions stated above).

2.      An order requiring an accounting of all payments or benefits in cash or kind that Mr. Sibert or anyone else working on counsel's behalf have made to any plaintiff or potential plaintiff.

3.      An order compelling plaintiffs' counsel to produce copies of all contracts or agreements between counsel and Mr. Sibert.

4.      An order requiring plaintiffs' counsel to inform the Court promptly of their intentions with regard to continued use of Mr. Sibert as their agent. If counsel do intend to continue working with Mr. Sibert, the Court should order Mr. Sibert to submit a declaration showing that he understands he is forbidden to make any payments in cash or in kind to the plaintiffs with the exceptions noted above.

5.      An order requiring plaintiffs' counsel to inform their clients promptly that neither they nor their agents, including Mr. Sibert, can pay the plaintiffs' expenses, except for expenses of the litigation, unless approved by the Court.

6.      An order compelling further answers from Mr. Dorcine and Mr. Joseph regarding whether they received payments from their lawyers or from Mr. Sibert and declaring that the response to these questions does not implicate the attorney-client privilege.

7.      An order forbidding plaintiffs' counsel, directly or through their agents, from employing runners or acting as runners or solicitors in violation of Connecticut law.

8.      An order requiring the plaintiffs to produce Mr. Sibert for a deposition in the United States and to produce the documents in his possession, custody, or control, that are responsive to the subpoena *duces tecum*.

9.      Other relief that the court deems appropriate in the circumstances.

Respectfully submitted,

PAUL E. CARRIER, S.J.

By his attorneys:

/s/ Theodore J. Folkman
Timothy P. O'Neill (phv04968)
Theodore J. Folkman (phv04969)
Amanda Moger Rettig (phv04967)
MURPHY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
Tel. (617) 423-0400
Fax (617) 423-0498
toneill@murphyking.com
tfolkman@murphyking.com
arettig@murphyking.com


THE SOVEREIGN MILITARY
HOSPITALLER ORDER OF ST. JOHN OF
JERUSALEM OF RHODES AND MALTA,
AMERICAN ASSOCIATION, U.S.A.

By its attorney:

/s/ Bradford S. Babbitt
Bradford S. Babbitt (ct13938)
ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, Conn. 06103
Tel. (860) 275-8214
Fax (860) 275-8299
bbabbitt@rc.com


THE SOCIETY OF JESUS OF
NEW ENGLAND

By its attorneys:

/s/ Michael J. Kerrigan
William J. Dailey, Jr. (phv05018)
Michael J. Kerrigan (phv05175)
SLOANE & WALSH, LLP
3 Center Plaza, 8th Floor
Boston, Mass. 02108
Tel. (617) 523-6010
Fax (617) 227-0927
wdaileyjr@sloanewalsh.com
mkerrigan@sloanewalsh.com


FAIRFIELD UNIVERSITY

By its attorneys:

/s/ John W. Cerreta
Stanley A. Twardy, Jr. (ct05096)
Thomas D. Goldberg (ct04386)
Paul D. Williams (ct05244)
John W. Cerreta (ct28919)
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, Conn. 06901
Tel. (203) 977-7300
Fax (203) 977-7301
satwardy@daypitney.com
tgoldberg@daypitney.com
pdwilliams@daypitney.com
jcerreta@daypitney.com

HOPE CARTER

By her attorneys:

/s/ Jeffrey W. Kennedy
Christopher F. Wanat (ct02164)
Jeffrey W. Kennedy (ct16419)
MILANO & WANAT LLC
471 East Main Street
Branford, Conn. 06405
Tel. (203) 315-7000
Fax (203) 315-7007
cwanat@mwllc.us
jkennedy@mwllc.us

Dated: November 17, 2015

CERTIFICATE OF SERVICE

I certify that on November 17, 2015, a copy of the foregoing document was filed

electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system and by first-class mail to all parties who are unable to accept electronic

filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the

Court's CM/ECF system.

I further certify that on November 17, 2015, I caused a copy of the foregoing document to

be served by first-class mail, postage prepaid, on counsel for the defendant, Douglas Perlitz, who

is unable to accept electronic service, and Haiti Fund, Inc.:

David T. Grudberg, Esq.                    Michael McCooey
Carmody & Torrance, LLP                    Chairman, Haiti Fund, Inc.
195 Church St.                             475 Polly Park Road
PO Box 1950                                Rye, N.Y. 10580
New Haven, Conn. 06509-1950

                                           /s/ Theodore J. Folkman

698402

24