| | |
|---|---|
| GERVIL ST. LOUIS, a/k/a ST. LOUIS GERVIL, <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS PERLITZ; FATHER PAUL E. CARRIER, S.J.; HOPE E. CARTER; HAITI FUND, INC.; FAIRFIELD UNIVERSITY; THE SOCIETY OF JESUS OF NEW ENGLAND; SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA, AMERICAN ASSOCIATION, U.S.A., a/k/a ORDER OF MALTA, AMERICAN ASSOCIATION, USA; JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; JOHN DOE FOUR; JOHN DOE FIVE; JOHN DOE SIX; and JOHN DOE SEVEN, <br><br> Defendants. | Civil Action No.: 3:13-cv-01132 (RNC) <br><br> Consolidated with: <br> 3:13-cv-1225-RNC; 3:13-cv-1269-RNC; <br> 3:13-cv-1437-RNC; 3:13-cv-1480-RNC; <br> 3:13-cv-1626-RNC; 3:13-cv-1627-RNC; <br> 3:13-cv-1628-RNC; 3:13-cv-1629-RNC; <br> 3:13-cv-1630-RNC; 3:13-cv-1631-RNC; <br> 3:13-cv-1633-RNC; 3:13-cv-1634-RNC; <br> 3:13-cv-1635-RNC; 3:13-cv-1636-RNC; <br> 3:13-cv-1637-RNC; 3:13-cv-1638-RNC; <br> 3:13-cv-1639-RNC; 3:13-cv-1640-RNC; <br> 3:13-cv-1641-RNC; 3:13-cv-1642-RNC; <br> 3:13-cv-1644-RNC; 3:13-cv-1645-RNC; <br> 3:13-cv-1647-RNC; 3:13-cv-1648-RNC; <br> 3:13-cv-1701-RNC; 3:13-cv-1767-RNC; <br> 3:13-cv-1768-RNC; 3:13-cv-1769-RNC; <br> 3:13-cv-1881-RNC; 3:13-cv-1906-RNC; <br> 3:13-cv-1907-RNC; 3:14-cv-0125-RNC <br> 3:14-cv-0668-RNC |
| *This document applies to:* <br> All Actions | January 21, 2016 |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION CONCERNING PAYMENTS TO PLAINTIFFS

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ..................................................................................................................1

FACTS ...............................................................................................................................5

    The Nature of Mr. Sibert's Employment on Behalf of Plaintiffs ......................................5

    Payments to Plaintiffs ........................................................................................... 11

ARGUMENT ..................................................................................................................... 14

    I.     THIS COURT SHOULD NOT PRECLUDE COUNSEL FROM PROVIDING PLAINTIFFS MONEY NECESSARY TO ALLOW THEM TO PARTICIPATE IN THESE CASES, INCLUDING THE FOOD AND CLOTHING NECESSARY FOR THEM TO ATTEND DEPOSITIONS IN THE DOMINICAN REPUBLIC ...................................................... 14

    II.    DEFENDANTS HAVE NOT SHOWN, AND CANNOT SHOW, ANY VIOLATION OF THE CONNECTICUT "ANTI-RUNNER" STATUTE ................................................. 17

CONCLUSION ................................................................................................................... 23

i

## TABLE OF AUTHORITIES

*Page*

**Cases**

*Kennerson v. Thames Towboat Co.*, 89 Conn. 367, 94 A. 372 (1915) .......................................... 18

*State v. Cardwell*, 246 Conn. 721, 718 A.2d 954 (1998) ............................................................. 18

**Statutes, Rules, and Regulations**

Conn. Gen. Stat. § 51-86 ............................................................................................................... 19

Conn. Gen. Stat. § 51-87 ........................................................................................................... 18, 19

Conn. Gen. Stat. § 53-340a ........................................................................................................... 19

Conn. Gen. Stat. § 53-54a ............................................................................................................. 19

CT R RPC Rule 1.8(e) .................................................................................................................... 14

**INTRODUCTION**

Plaintiffs in these cases are impoverished young men who were sexually abused by Douglas Perlitz when they were children attending Project Pierre Toussaint ("PPT"), a charity program in Haiti founded, supported, and overseen by the five appearing Defendants, Father Paul E. Carrier, the Society of Jesus of New England, Fairfield University, The Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes and Malta, American Association, U.S.A., and Hope Carter (collectively, "Defendants"). Plaintiffs were part of PPT, where they became victims of Perlitz's pedophilia, because they were homeless or destitute children, and they remain impoverished today, at least in part because of the consequences of Perlitz's criminal actions towards them.

Because of their extreme poverty and because of conditions in Haiti (including the lack of social services), Plaintiffs lack resources that would be taken for granted in the United States and which are necessary for participation in litigation: shoes to travel to a deposition; clothing to wear to the deposition; sufficient food to sit and concentrate for hours providing information to answer interrogatories, or prepare for and attend a deposition; medical care sufficient to ensure that defense counsel can sit in the same room as Plaintiffs at their depositions without fear of contracting an infectious disease; a working cell phone to enable Plaintiffs (who do not have access to landlines) to speak to their lawyers when necessary. Such expenses are in addition to the costs of court reporters and translators; of obtaining passports and visas (costs Defendants long ago insisted Plaintiffs' counsel could and should bear); of travel to meetings with counsel in Haiti; travel to the Dominican Republic and back for depositions; and lodging in the Dominican Republic during the deposition. All of these costs have been borne by Plaintiffs' counsel, as expenses of litigation.[1]

---

[1] As discussed below, while some of these expenses (such as the cost of court reporters and translators) are paid directly by Plaintiffs' counsel, others are disbursed by

*(footnote continues on next page)*

Defendants acknowledge that it is proper for counsel to pay the expenses of litigation, but take a narrow view of what those expenses are. They ask the Court to construe "expenses of litigation" as narrowly as they would be construed if Plaintiffs lived in Connecticut, and to ignore the reality that a much broader scope of expenses is directly tied to, and arises from, this litigation because the Plaintiffs live in Haiti, and not in Connecticut. Thus, Defendants ask the Court to permit counsel to pay for Plaintiffs to eat on the actual day of the deposition, but not during the time needed to prepare for it; to pay for bus fare between Haiti and the Dominican Republic, but not for the shoes Plaintiffs need to wear on the bus; for all the logistical arrangements of depositions in the Dominican Republic, but not for the medicine necessary for defense counsel to be willing to sit in the deposition room with a plaintiff who has contracted a disease. Plaintiffs' counsel welcome guidance from the Court on the proper scope of "expenses" in this litigation, but urge the Court to construe this term broadly to cover all of the expenses necessary for the litigation, given the situations of the Plaintiffs, and, in particular, the conditions in Haiti. To the extent that Defendants' motion seeks to preclude counsel from paying legitimate expenses of litigation, as applicable in this situation, it should be denied.

Beyond the question of the expenses of litigation, Defendants seek to prevent Plaintiffs' counsel from employing an agent in Haiti to facilitate communication with the Plaintiffs, and to make all the logistical arrangements that are necessary to assist in that litigation: arranging phone calls and meetings; obtaining passports and visas; locating particular Plaintiffs when they are needed; arranging for travel to the Dominican Republic; taking messages from witnesses and potential plaintiffs who wish to speak to Plaintiffs' counsel but do not know how to reach them. Plaintiffs' counsel

Plaintiffs' agent in Haiti, Cyrus Sibert and occasionally by someone else assisting Mr. Sibert.

are confident that each of the law firms representing the Defendants employ staff members to carry out similar or analogous functions.  But, without a shred of evidence, Defendants contend that Plaintiffs' agent in Haiti, Cyrus Sibert, acts illegally as a "runner" – an employee paid to find clients – rather than as an investigator and assistant to counsel in pursuing this litigation.

Defendants insinuate that Mr. Sibert is paid to find clients; that he seeks them out and solicits them to bring lawsuits; that his compensation is dependent on the number of cases he signs up, and even that he pays Plaintiffs in order to induce them to retain counsel and/or file lawsuits, but the evidence shows that none of this is true.  What the sworn deposition testimony of the Plaintiffs, and the declarations of Mitchell Garabedian and Cyrus Sibert, show instead is that:

- Victims of Douglas Perlitz have sought out Mr. Sibert because they heard he could help them find justice; Mr. Sibert has passed along to Plaintiffs' counsel names and other information provided to him by those who have sought him out.

- Certain Perlitz victims have collected names of witnesses and other potential victims and passed those along to Mr. Sibert, but Plaintiffs counsel have never asked them or paid them to do this.

- Plaintiffs' counsel have retained ultimate responsibility for interviewing witnesses and assessing which potential clients have cases.

- Mr. Sibert acts as an investigator and assistant in Haiti and is paid for his work there; he has no interest in any of the cases and has never been paid to find people to be clients or start cases.

- Mr. Sibert has never been promised money out of the proceeds of any lawsuit, either by Plaintiffs' counsel or by any Plaintiff.

- Although Mr. Sibert has disbursed money to some of the Plaintiffs, none of the money provided to Plaintiffs has ever been conditioned on filing a case or speaking to a lawyer.  Mr. Sibert gives money to indigent Haitians and in particular to Perlitz victims without regard to whether they are interested in filing a lawsuit or not.  Money has at times been provided before Mr. Sibert knew whether an individual would file suit; it has also been provided to persons entirely unassociated with PPT.

- Not one of the Plaintiffs has promised to pay Mr. Sibert anything out of the proceeds of a lawsuit or otherwise compensate or reimburse him for his charity.

On these facts, discussed in detail below, the Court can readily conclude that Mr. Sibert is not, and has never been, a "runner" within the meaning of Connecticut law (which is of doubtful applicability in a foreign country in any event). Moreover, without any evidence that Mr. Sibert has ever behaved improperly, there is no basis to require Mr. Sibert to provide an accounting or to submit a declaration stating his understanding of the scope of permissible duties, any more than Plaintiffs have a basis to demand that employees of defense counsel submit to such inquiries. Similarly, there is no basis to require production of any employment agreement between Plaintiffs' counsel and Mr. Sibert. Counsel have represented that Mr. Sibert is their agent, and both Mr. Sibert and Mr. Garabedian have provided sworn statements that Mr. Sibert is not employed on a contingent-fee basis. Further details of Mr. Sibert's employment are irrelevant and outside the scope of disclosure.[2] The prong of Defendants' motion seeking to limit Mr. Sibert's activities, to require him to provide Defendants with an accounting, to submit a declaration stating his understanding of the scope of his duties, and to provide any employment contract he has with Plaintiffs' counsel should be denied in its entirety.[3]

---

[2] Should the Court clarify the scope of permissible expense payments, any such order will be binding on Plaintiffs' counsel who will bear responsibility to the Court for complying with it. But it should be noted that any such order, grounded, as Defendants have requested, in the Connecticut Rules of Professional Conduct, governs what is permissible for counsel, whether acting directly or through counsel's agents and employees, not what it is permissible for individuals who are not lawyers and are not before this Court, to do when they are acting outside the scope of their agency or employment.

[3] Defendants' motion seeks two other types of relief, both of which are moot. First, Defendants seek to compel Mr. Sibert to appear for deposition and to produce documents in connection with that deposition. Plaintiffs have already agreed to provide Mr. Sibert for deposition and produce documents, and are working with defense

*(footnote continues on next page)*

FACTS

In response to the suggestions, innuendo, and hearsay submitted by Defendants, Plaintiffs have provided the Court with full transcripts of the depositions of 15 plaintiffs (Exhibits C through Q hereto), along with sworn declarations from Mr. Sibert and Mr. Garabedian. Taken together, this evidence shows the true nature of Mr. Sibert's employment on behalf of Plaintiffs' counsel and the circumstances under which Mr. Sibert had given money to the Plaintiffs.

**The Nature of Mr. Sibert's Employment on Behalf of Plaintiffs**

The nature of Mr. Sibert's duties in Haiti and his relationship to the Plaintiffs is set forth in the Sibert Declaration, the Garabedian Declaration, and the depositions testimony of the Plaintiffs themselves. To begin with, the evidence clearly establishes that Mr. Sibert does not seek out or solicit plaintiffs and is not paid to find or sign them. Mr. Sibert clearly states: "I do not seek out victims for Mr. Garabedian to represent" and "I am not paid to find victims to bring lawsuits; I am paid to help the lawyers with the boys who come to me to seek justice." Sibert Decl. ¶¶ 7, 9. He further states that "[t]he lawyers have not promised me any money out of what they may receive if the boys win their cases. I am paid for my work now and am not working in exchange for a share of any of the cases." *Id.* at ¶ 8. Mr. Garabedian confirms that this is so:

> We do not pay [Mr. Sibert] to get us clients; we pay him for investigative work; to facilitate communication with witnesses and clients; to assist in obtaining passports; and to assist us with logistics in Haiti. I have never

---

counsel to schedule the deposition for a time when Mr. Sibert will be in the United States. Second, Defendants seek to compel two of the Plaintiffs, Wadson Dorcine and Jheempson Brismac Joseph, to answer questions about whether they have received money directly from Plaintiffs' counsel. Plaintiffs' counsel have permitted other Plaintiffs to answer similar questions and agree that such questions may properly be posed to these Plaintiffs, but preserve their objections, grounded in attorney-client privilege and/or work-product, with respect to conversations and communications between plaintiffs and their lawyers. The prongs of Defendants' motion pertaining to these matters should be denied as moot.

asked Mr. Sibert to find people to become clients and have never promised Mr. Sibert that he would receive a share of any recovery from these cases.

Garabedian Dec. ¶ 6.

The testimony of the Plaintiffs upon examination at deposition confirms what both Mr. Sibert and Mr. Garabedian have said; that testimony shows that it is Plaintiffs who have sought out Mr. Sibert, not the other way around, and that he has put them in touch with Mr. Garabedian or co-counsel when they have asked for his help in obtaining justice.  For example, Jason Maxwel Deriza testified:

A.  When I talked to [Mr. Sibert] I went to him to file a complaint so he could take care of my own file, my own case.

Q.   And when did you –

A.   So I could find my own justice.

Q.   So you went to Cyrus to find your justice?

A.   Yes.

Exhibit I at 17:3-10.   He further explained:

Q. Did Cyrus indicate that he'd help you find your justice?

A. Yes.

Q. Did Cyrus tell you how he would help you find your justice?

A. He told me he would put me in contact with someone who would help me get my justice.

Q.  And who was that person that would help you get your justice, sir?

A. He put me in contact with these lawyers.

Id. at 22:18-23:3.  Similarly, Jamesly Guillaume testified that he went to see Cyrus at the radio station where he broadcasts "because he's a journalist, because he could help, he could help me in this case."   Exhibit J at 154:11-16.   After Mr. Guillaume asked Mr. Sibert for his help, Mr. Sibert took his name and phone number and "he said to charge my phone because he's going to have the attorney call me, the attorney can help me with the situation." Id. at 157:1-3.  Jasmin Joseph, too, testified that, after hearing Cyrus Sibert on the radio, he looked for Mr. Sibert because he understood that Mr. Sibert

would help him find justice. Exhibit K at 179:17-181:2. Mr. Joseph then "tried to look for [Mr. Sibert]" and, when he found him, told him he was one of Perlitz's victims. *Id.* at 180:14-23. Mr. Sibert then told him that "he would put me in contact with the lawyers for what had happened to me so I could get justice." *Id.* at 180:24-181:2. Louis Saincirin testified that he sought out Mr. Sibert and told him "'I'm a victim, please, I would like very much to have someone who is very serious listen to what I have to say," and that Mr. Sibert then put him in touch with a lawyer. Exhibit D at 146:13-20. Gesner Lecenat explained that he was introduced to Mr. Sibert by another victim and that the reason for the introduction was because "it's Cyrus who would help me find someone to do this, to find justice for what happened to me." Exhibit Q at 48:25-49:4. The testimony of Jean Moise Emile is similar:

> Q.: Why did you go to see Cyrus Sibert?
>
> A.: I went to see Cyrus, I went where was for a – to explain to him something that happened to me.
>
> Q: What made you want to go see Cyrus to explain this to him?
>
> A.: Well there was – I went to see him because there was a white person who was taking care of me, and he chose to abuse me, so I went to see him so he could make me – help me find someone who could help me get justice.
>
> Q: How did you know that Cyrus Sibert would be able to help you find justice?
>
> A: Well, I used to hear people talk about him, so I just went to him.

Exhibit M at 39:1-15. Jean Moise Emile further explained that after he explained his story to Mr. Sibert, Mr. Sibert "took my name, took my phone number, and he said he would call me." *Id.* at 43:23-24. In fact, the follow-up call he received was from Mr. Garabedian. *Id.* at 43:25-44:3. Raynel Odilbert testified that he went to see Mr. Sibert "[b]ecause I know Cyrus Sibert is a journalist, he is able to publish this for me, have this published for me, that is why I went to see him." Exhibit O at 51:18-52:6.

This testimony clearly and consistently establishes that Plaintiffs have sought out Mr. Sibert, not the other way around. Far from soliciting them, Mr. Sibert has responded to their requests for assistance when they have sought him out. He not only is not paid to find clients, but in fact does not initiate contact with the Plaintiffs, who seek him out because he is well known in Haiti and known to be able to connect victims with a lawyer if they want one.

Moreover, in light of the sworn declarations of both Mr. Sibert and Mr. Garabedian, there is not the slightest hint of evidence that Mr. Sibert is paid to find plaintiffs, or that he benefits in any way from "signing up" a client. Indeed, Plaintiffs who were asked specifically testified that they have made no promises to give Mr. Sibert any money from their cases. *See* Exhibit P at 193:18-194:17 (Geffrard Lecenat made no written or oral agreement to give Cyrus any portion of any damages recovered); Exhibit K at 199:25-201:11 (testimony of Jasmin Joseph: "So if you win this lawsuit and you get money, you will not give any of that money to Cyrus Sibert?" "No."); Exhibit Q at 54:12-20 (Gesner Lecenat had no agreement to pay Cyrus back or give him money from the lawsuit); Exhibit E at 37:4-11 (Emile Jean-Pierre testified that he will not give Cyrus any money he recovers); Exhibit O at 165:9-19 (Raynel Odilbert has never told Cyrus he would pay him if he won his case); Exhibit N (Jheempson Brismac Joseph did not know if Cyrus would get money from his case); Exhibit L at 153:5-18, 190:22-191:1 (Wadson Dorcine testified he had not told Cyrus he will get money from the lawsuit); Exhibit M at 47:5-17 (Jean Moise Emile had no agreement to repay Cyrus; if he receives money in the case will not be giving any of it to Cyrus). The suggestion that Mr. Sibert has any kind of financial interest in these cases simply cannot be squared with the facts.

Nor is there the slightest evidence that any plaintiff has been paid to commence a lawsuit. Again, both Mr. Garabedian and Mr. Sibert provide sworn testimony this is not the case:

> I have never told anyone that I will give him money on the condition that he contacts or hires Mr. Garabedian or any other lawyer, or agrees to bring a case, or gives me another name to pass along. I have never told anyone that "signing up" with me was necessary in order to receive money from me.

Sibert Decl. ¶ 12. Mr. Garabedian concurs: "Under no circumstances have . . . payments [to plaintiffs] ever been made contingent on a victim retaining my firm or filing a lawsuit. . . I have never paid, and never authorized Mr. Sibert to pay, any of the plaintiffs to bring a case." Garabedian Decl. ¶ 10.

Again, the testimony of the Plaintiffs confirms what Mr. Sibert and Mr. Garabedian have said. Emile Jean-Pierre, for example, was asked if he was provided any money for giving his name to Mr. Sibert. His answer was unequivocal: "No." Exhibit E at 46:5-7. Gesner Lecenat testified that Mr. Sibert gave him money when he was sick or hungry, and that when Mr. Sibert gave him money, "he didn't give me with any conditions attached." Exhibit Q at 54:12-15. His brother, Geffard Lecenat, testified that he went to see Mr. Sibert for help when the stigma of having been abused by Perlitz became too great. He asked Mr. Sibert for help, and Mr. Sibert gave him money to help him move away. Asked why Mr. Sibert helped him, he explained, "[i]t's a person who has a good heart, he's sensitive and he – if he can help you, he will find a way to help you out." Exhibit P at 48:25-49:3. Moreover, it is clear that Mr. Sibert provided Mr. Lecenat with money before Mr. Lecenat retained counsel or filed a lawsuit. *Id.* at 52:12-53:9. Ilguens Jean similarly explained that Mr. Sibert gave him money because he "has a good heart, sensitive heart. He, Cyrus doesn't like when people suffer, he doesn't like this type of abuse." Exhibit F at 101:3-11. Mr. Jean surmised this, because Mr. Sibert, who gave him money the first time they met, did not tell him why he was giving it to him. *Id.* at 96:14-97:15, 100:15-18. Emile Jean Pierre was asked specifically if he was given money for providing his name to Mr. Sibert; he answered "No." Exhibit E at 6-7. Wadson Dorcine testified that he received money as a gift from Mr. Sibert and that Mr. Sibert said nothing to him about the gift. Exhibit L at 149:8-24. Jean Moise Emile

explained that it was not until after he had signed the responses to interrogatory answers in this case (and thus well after he retained his lawyers and commenced his action) that he first received money from Mr. Sibert because "I'm in poverty, so he gave me a little bit of change." Exhibit M at 45:7-24. Louis Sancirin similarly testified that the reason Mr. Sibert gave him money was "I didn't have clothes, I was also hungry. . . . " Exhibit D at 151:11-13.

Defendants make much of certain "lists," compiled by some Perlitz victims, through which the names and contact information for additional victims or witnesses has been collected and provided to Mr. Sibert. *See* Def. Br. at 7-8. But whether some victims collect names of witnesses or other victims to pass along to Mr. Sibert or to Plaintiffs' counsel is of no significance. As set forth in Mr. Garabedian's declaration, he has never asked anyone to collect names in this manner and has never paid anyone for doing so. Garabedian Dec. ¶ 7. Mr. Sibert, for his part, acknowledges that when additional plaintiffs or witnesses are identified, he passes that information along to Plaintiffs' counsel. Sibert Dec. ¶ 9. As he explains, "It's as if I have taken a message to pass along to Mr. Garabedian." *Id.* at ¶ 10. There is nothing sinister in this arrangement. Indeed, several of the Plaintiffs have testified that they asked to have their names passed along to Mr. Sibert in this way. *See, e.g.,* Exhibit P at 49:9-50:11 (Geffrard Lecenat put his name on list collected by "Jean-Gary" and "we brought it to Cyrus"); Exhibit Q at 45:22-47:1 (Gesner Lecenat wrote his name on the list to give to Mr. Sibert because he wanted to bring a case);[4] Exhibit E at 39:16-44:21 (Emile Jean-Pierre gave his information to Jean-Gary to be passed along to Mr. Sibert).

Moreover, both Mr. Sibert and Mr. Garabedian agree that it is not Mr. Sibert's role to decide which individuals have cases: "I do not decide which boys Mr.

---

[4] Gesner Lecenat also noted that "the requirement we had to satisfy before we could put our name on the list was to tell the truth, not to lie." *Id.* at 47:14-23.

Garabedian will agree to represent and I don't know in advance which victims will decide to hire Mr. Garabedian or bring cases. I just arrange for the boy to speak to Mr. Garabedian or one of the other lawyers and they decide." Sibert Dec. ¶ 10. Mr. Garabedian agrees: "It is not part of Mr. Sibert's job to determine whether a particular person was a victim or a witness, or has a valid claim, or can or should file a lawsuit. That is something only the lawyers and the individuals in question can decide." Garabedian Dec. ¶ 8. In this context, the compilation of lists of names of boys who were at PPT (regardless of whether they were victims or merely witnesses), the passing of such lists to Mr. Sibert and the forwarding of the names on the list to Mr. Garabedian is not evidence of misbehavior, but rather of responsible investigation.

**Payments to Plaintiffs**

As discussed above, the declarations of Mr. Sibert and Mr. Garabedian, and the deposition testimony of numerous plaintiffs, establishes what payments made by Mr. Sibert to certain plaintiffs were *not* for. This same evidence establishes what the payments in fact were for.

As discussed above, Plaintiffs in these cases are indigent. They live in poverty, as do the majority of those around them. The evidence in this cases establishes that Mr. Sibert has frequently given them money to pay for expenses associated with the litigation, such as attending depositions and attending meetings with counsel. For example, Kensley Previl testified at his deposition that he received $100 approximately one week before his deposition and that he "bought sandals and clothes and things to eat because I didn't have clothes and shoes to come here." Exhibit C at 186:2-6. Louis Saincirin similarly testified that he used money he was given by Mr. Sibert to buy the clothes he wore to the deposition and "[a]lso to pay for transportation so I can go back home." Exhibit D at 154:20-155:6. Mr. Saincirin added that it was necessary to buy clothes because "I couldn't be dressed any old way to come here." *Id.* at 22-24. Wadson Dorcine similarly testified that "when I was coming here, [Mr. Sibert] gave me 5,000

gourdes." Exhibit L at 150:2-3.  (Five thousand Haitian gourdes is approximately $85).
He continued:

> Q. Why did he do that?
>
> A.  He said – I don't know why exactly, but he said, you know, "you can't go just any old way, you have to prepare yourself a little bit to go, you have to put something on.

*Id.* at 150:4-8.  And in fact, Mr. Dorcine "bought clothes. I bought things for my – to wear on my feet. And that's it."  *Id.* at 150:13-15.

Emile Jean-Pierre testified that Cyrus "gave me money because I had to come do the deposition so I could buy clothes and things." Exhibit E at 28:14-23. He further explained that "because, you know, I have to come do this deposition, I bought clothes, shoes and food." Id. at 31:13-22. Ilguens Jean explained that he was given money "so I could buy clothes, suitcase, things for the feet, shoes, and food so I could come here." Exhibit F at 98:9-99:4.  Jason Maxwel Deriza similarly testified that he received money (from Mr. Sibert, through Mathieu who sometimes assists him) for "my preparation so I could come to the depo, deposition." Exhibit I at 32:18-33:1. Pressed for details, Mr. Deriza explained:

> Q.  What did you use that money for, sir?
>
> A. So I could buy everything I didn't have, and to do the trip.
>
> Q. What did you buy?
>
> A. Shoes, clothes, everything I would need to use.

*Id.* at 33:5-10.[5]

Jheempson Brismac Joseph was given 2,400 Haitian dollars (12,000 Haitian gourdes, or approximately $200 U.S. dollars) in connection with his deposition. As Mr. Joseph explained, he used the money to buy "[t]his, jeans, these shoes, the majority of

---

[5] Mr. Deriza also testified that he had previously received money for transportation, but could not recall whether the transportation was for a meeting with counsel.  Exhibit I at 31:19-32:9.

things I came here with," as well as the suitcase to bring them in. Exhibit N at 179:20-180:20. He also received money for carfare when he had to travel to sign documents for the litigation. *Id.* at 177:10-179:18.

Expenses associated with the litigation are not, however, limited to the costs of attending depositions and dressing appropriately for them. As Mr. Garabedian explains in his declaration, a plaintiff who has not eaten in days is not in a position to assist counsel, whether in answering interrogatories, or in preparing for a deposition. *See* Garabedian Decl. ¶¶ 12-13. And buying food accounts for the vast majority of the rest of the payments Plaintiffs have received. *See, e.g.,* Exhibit C at at 186:2-6; Exhibit F at 98:9-99:4; Exhibit D at 155:7-13; Exhibit K at 199:3-8; Exhibit P at 55:25-56:2; Exhibit Q at 50:9-51:2; Exhibit E at 30:16-31:12; Exhibit F at 97:2-20; Exhibit O at 48:8-21; Exhibit N at 180:21-181:5. Defendants acknowledge this, *see* Def. Br. at 9-10, yet they fail to see the connection between being fed and being able to assist counsel in discovery.

There may be a similar connection between medical costs and the litigation, as illustrated by a recent incident. The deposition of Jacques Mackenson was scheduled to take place in the Dominican Republic on Monday, January 11, 2016. As Plaintiffs' counsel explained on the record before the court reporter that morning:

> Jacques Mackenson was diagnosed and treated for tuberculosis a year ago, in 2014. He has recently began presenting with symptoms consistent with an active case of tuberculosis. None of us are medical providers. We realized this yesterday in the preparation of Jacques Mackenson that he still had an active cough and he has fever, so we raised our concerns to defense counsel and all of the people that would be in the room with him for his deposition, and have explored potential ways in which to accomplish his deposition.

Exhibit B at 7:4-15. Defense counsel determined that taking the deposition as scheduled would not be safe for the lawyers, the court reporter, or the interpreter. *Id.* at 8:8-22. Defense counsel asked that Plaintiffs' counsel provide proof that Mr. Mackenson in fact has tuberculosis and agreed to postpone the deposition until proof was provided and

Mr. Mackenson was treated.  *Id.* at 8:10-11, 9:24-10:11.  *See also* Garabedian Dec. ¶ 14. Defense counsel appear to be presume that Plaintiffs' counsel will supply the money for Mr. Mackenson to be tested for tuberculosis, and treated, if need be, so that his deposition can eventually go forward.  So this medical expenses, at least, would seem to qualify as a litigation expense.  Of course, if Mr. Mackenson had been able to afford proper treatment in 2014, the deposition could have gone forward as scheduled.  The same may be true for others. *See* Exhibit C at 65:18-66:4 (Kensley Previl was coughing blood, but could not afford to buy medicine for it). These expenses, like Mr. Mackenson's current medical expenses, may also be viewed, in Haiti, as expenses of this litigation.

**ARGUMENT**

I.  **THIS COURT SHOULD NOT PRECLUDE COUNSEL FROM PROVIDING PLAINTIFFS MONEY NECESSARY TO ALLOW THEM TO PARTICIPATE IN THESE CASES, INCLUDING THE FOOD AND CLOTHING NECESSARY FOR THEM TO ATTEND DEPOSITIONS IN THE DOMINICAN REPUBLIC**

Plaintiffs' counsel do not dispute the applicability of the Connecticut Rules of Professional Conduct to their conduct in these cases.  Plaintiffs' counsel also do not dispute that, under those rules, financial assistance to a client is limited to paying expenses of litigation.  *See* CT R RPC Rule 1.8(e).  Counsel may pay such expenses without any obligation on the part of an indigent client to repay them.  *Id.*  The issue here, however, is which expenses are expenses of litigation?

Defendants assume this term should be narrowly construed, as it would be if the Plaintiffs were located in Connecticut.  But there is no reason why this should be so.  As described above, there can be little doubt that, in this case, money for clothes and shoes to attend a deposition are in fact expenses of the litigation, although they would not necessarily be considered as such if the plaintiff lived in Connecticut.  Providing the plaintiff with enough food to ensure that he can assist counsel in drafting a complaint, answering interrogatories, and preparing for deposition, as well as attend the actual

deposition, should also be viewed as litigation expenses in this context. Defense counsel should not be heard to say there is no connection until they have tried to concentrate on answering questions for several hours without having eaten in a day or two or three. Similarly, paying for medicine so that a plaintiff such as Jacques Mackenson can attend a deposition (or so that defense counsel will be willing to sit in a room with him) also should be considered an expense of litigation.

Plaintiffs are unable to locate any authority on the scope of the term "expenses" in this context. Plaintiffs suggest, however, that extension of the term in the manner suggested here would not overwhelm the rule or render it a nullity, primarily because the basis for expanding the scope here is the specific context of the Plaintiffs' situation in Haiti. As already noted, Plaintiffs were victimized by Douglas Perlitz in the first instance because they were indigent and thus were in attendance at PPT. Plaintiffs' situation was made worse by the stigma attached to pedophiliac homosexual acts in Haiti and by the widespread knowledge in and around Cap-Haitien of what Perlitz had done. *See, e.g.,* Exhibit H at 213:25-214:216 (Wisky Jerome was called "gay" or Douglas's wife"; was told "they don't give Douglas's fag work"); Exhibit P at 31:23-32:10 (Geffrard Lecenat's girlfriend left him because he was known as "Douglas's wife," "Douglas's fag" and "she didn't want to be the girlfriend of a fag"); Exhibit Q at 122:16-25 (Gesner Lecenat feels like an outcast in society because "everybody is calling me Douglas's wife."). The extraordinary level of poverty and the absence of social services (or even functional government) in Haiti is an important consideration as well. This, of course, is what brought PPT to Haiti in the first place, and what made victims like the plaintiffs so vulnerable to predators like Perlitz.

But separate and apart from the origins of Plaintiffs' plight, the lack of money and social services in Haiti puts Plaintiffs in a situation unlike that of any Connecticut client a lawyer might represent. Compassionate lawyers in Connecticut, faced with a client in need, can refer that client to a soup kitchen, a homeless shelter, a social worker,

a government program, or a private charity program. Where can Plaintiffs' counsel send plaintiffs in Haiti who cannot answer questions because they are distracted by hunger, who cannot afford shoes to wear to their depositions? Where can Plaintiffs' counsel send a plaintiff with tuberculosis who cannot afford medicine or a doctor's visit, but whose deposition cannot be taken until defense counsel can be assured he does not carry a contagious disease? How can these medical expenses not be litigation expenses when defense counsel require them as a condition of taking the plaintiff's deposition?

Defendants suggest that the temptation for indigent Haitians to invent claims in order to receive charity renders such assistance improper. But their point proves too much. As Defendants themselves insist, Plaintiffs are so poor that, according to Defendants, they require little incentive beyond the hope of recovery in the case in order to commence a lawsuit. But *every* individual plaintiff in any kind of case anywhere has that incentive; Defendants have offered no evidence that any plaintiff in this litigation has ever fabricated a claim.[6] Indeed, given the testimony of several of the Plaintiffs about the stigma associated with having been the victim of pedophiliac homosexual abuse, *see supra* at 15, it is difficult to believe that any, to say nothing of many, young men would be willing to say they had been abused in this fashion if they

---

[6] In the past, Defendants have claimed that the withdrawal of the action brought by Emmanuel Clervil is evidence that Mr. Clervil fabricated his claim. As Plaintiffs have previously pointed out, however, nothing could be further from the truth. Mr. Clervil failed to be entirely truthful with counsel when he failed to identify Father Carrier as an additional abuser, because he believed that Father Carrier was "off limits" for such allegations. He later admitted that he had been abused by Father Carrier as well as by Douglas Perlitz. Mr. Clervil may have been an unsuitable plaintiff because of his initial lack of candor, but his actions provide no support for Defendants' theory that any plaintiff has ever manufactured a claim in these cases. *See, e.g.,* Reply Memorandum in Further Support of Motion for Voluntary Dismissal (Doc. # 517);

had not been. Moreover, at least some of the plaintiffs have made clear that their interest is in justice, and not in money. Thus, Jose Bernardin testified:

> Q. And is the justice that you're looking for, is that in dollars?
>
> . . .
>
> A. No, it's not the money. Douglas doesn't have enough money to compensate for. I want justice, justice, justice.

Exhibit G at 194:22-195:2; *see also id.* at 223:16-22 ("I don't need money. I want justice. The judge will decide the justice I get. Douglas doesn't have enough money to compensate us. I just want – I'm looking for justice."). This is consistent with the remainder of the testimony cited above, that Plaintiffs sought out Mr. Sibert in order to obtain justice. *See supra* at 6-7.

In addition, the record here is clear that Cyrus Sibert has given money to all who seek his assistance, *without regard to whether that individual ends up a plaintiff with a lawsuit.* In this circumstance, allowing Plaintiffs' counsel broadly to construe the expenses of litigation in order to ensure that none of the Plaintiffs is forced to withdraw his claim through lack of the resources to maintain it would not offend the policies of Connecticut law, which are intended to be applied in an entirely different context, against an entirely different backdrop of alternative avenues for assistance. This Court should provide guidance to the parties on which expenses qualify as litigation expenses and should construe that term broadly to permit counsel to pay expenses for all the basic necessities of participation in this action, including food, clothing, shoes, and immediate medical care necessary to ensure Plaintiff's continued participation in the action.

## II. DEFENDANTS HAVE NOT SHOWN, AND CANNOT SHOW, ANY VIOLATION OF THE CONNECTICUT "ANTI-RUNNER" STATUTE

Defendants ask this Court to preclude Plaintiffs' counsel from using Mr. Sibert, or anyone else as a "runner" in violation of various provisions of Connecticut law. Defendants insist that Mr. Sibert's conduct "raises precisely the concerns about abuse

that motivated the [anti-runner] statutes," *see* Def. Br. at 20, but do not even attempt to show that any of the relevant statutes have been violated. Nor can they, for the declarations of Mr. Sibert and Mr. Garabedian establish that there has been no violation.

Defendants assume, at the outset, that the provisions of Connecticut law they cite are applicable, but there is no basis to believe that is so. None of Mr. Sibert's conduct occurred in Connecticut; as his declaration makes clear, the only time he has been here was for Perlitz's sentencing in 2010. Defendants have been quick to raise arguments about extra-territoriality in connection with conduct in this case that took place in Haiti, but have apparently abandoned such concerns in the context of Mr. Sibert: they cite no authority to suggest that Mr. Sibert is subject to the Connecticut General Statutes for conduct occurring entirely in Haiti. The law of extra-territoriality provides otherwise. *See Kennerson v. Thames Towboat Co.*, 89 Conn. 367, 94 A. 372, 375-76 (1915) ("Unless the intention to have a statute operate beyond the limits of a state is clearly expressed or reasonably to be inferred from the language of the act, or from its purpose, subject–matter, or history, the presumption is that the statute is intended to have no extraterritorial effect."); *see also State v. Cardwell*, 246 Conn. 721, 739, 718 A.2d 954, 963 (1998)**.** This is especially true because the statutes on which Defendants rely are criminal statutes. *Cardwell,* 246 Conn. At 739, 718 A.2d at 963 ("a criminal statute that does not indicate that it is to have . . . an [extraterritorial] effect will be operative only within the boundaries of this state."). Here, there is no indication that the "anti-runner" statute in question, Conn. Gen. Stat. § 51-87, is intended to apply outside Connecticut, and it should not be construed to govern Mr. Sibert's conduct in Haiti.

Nor do the statutes at issue apply to Plaintiffs' counsel. Counsel have, of course, agreed to abide by the Connecticut Rules of Professional Conduct and do not dispute that those rules are fully applicable to counsel's conduct in this case, regardless of where the conduct occurs. But, unlike the provisions on which Defendants rely in connection with their arguments about counsel's payments to the Plaintiffs, the "anti-

runner" statutes Defendants cite *are not part of the Connecticut Rule of Professional Conduct.* Instead, they are part of the Connecticut General Statutes, which govern conduct in Connecticut, but not outside it. Thus, it is doubtful these provisions apply even to Plaintiffs' counsel, none of whom are located in Connecticut.

The issue is of no moment, however, because the facts clearly show that neither Mr. Sibert nor anyone else has acted as a "runner" for Plaintiffs' counsel. Three behaviors lie at the heart of the provisions on which Defendants rely: (a) solicitation by a non-lawyer of a client to bring a lawsuit from which the "runner," or the lawyer, will benefit financially; (b) payment to the "runner" for soliciting or obtaining a cause of action; and (c) payment to a potential client to induce that person to commence a lawsuit. *See* Def. Br. at 19-20; *see also* Conn. Gen. Stat. §§ 51-86, 51-87.[7] Not one of these things has occurred here.

First, Mr. Sibert has never solicited or induced anyone to bring a lawsuit. Mr. Sibert's declaration clearly states the boys who attended PPT *have approached him* over the years and asked for his assistance in obtaining justice for what happened there. Sibert Dec. ¶¶ 9-10. Mr. Sibert is a well-known journalist in Haiti and first broke the story of Perlitz's abuse to the public here. *Id.* at ¶ 1. It is not surprising that young men who were at PPT know who he is, or have heard that, if they wish to retain a lawyer or otherwise obtain justice for what happened to them, Mr. Sibert is the person who can facilitate. Mr. Garabedian confirms that it is not part of Mr. Sibert's job to solicit clients: "We do not pay [Mr. Sibert] to get us clients; we pay him for investigative work; to

---

[7] Defendants also cite Conn. Gen. Stat. §§ 53-54a and 53-340a, *see* Def. Br. at 19-20, but the former has been repealed and the latter applies only to so-called "runners" "whose purpose is to seek to obtain benefits under an insurance contract or assert a claim against an insured or an insurance company for providing services to the client, patient or customer, or to obtain benefits under or assert a claim against a state or federal health care benefits program or prescription drug assistance program. . . ." Conn. Gen. Stat. Ann. § 53-340a. This latter provision is entirely inapplicable here.

facilitate communication with witnesses and clients; to assist in obtaining passports; and to assist us with logistics in Haiti." Garabedian Dec. ¶ 6. Moreover, and significantly, as described in detail above, Plaintiffs' deposition testimony confirms that this is the case. Over and over, Plaintiffs described how they decided to contact Mr. Sibert, to seek him our or submit their name to him. *See supra* pp. 6-7. The wealth of this testimony precludes any finding that Mr. Sibert is engaged in finding persons and inducing them to bring claims.

In addition, the evidence is crystal clear that Mr. Sibert has no financial interest in any of these cases. Every plaintiff who was asked if Mr. Sibert would receive money from the proceeds of these cases answered that he would not. *See supra at* p. 8. Mr. Sibert also affirms that this is true. *See* Sibert Dec. ¶ 8 ("The lawyers have not promised me any money out of what they may receive if the boys win their cases. I am paid for my work now and am not working in exchange for a share of any of the cases."); *see also id.* ¶ 13 ("I do not expect to be paid back for the money I give and no one has promised me any part of what the victim may receive if they win their cases"). Mr. Garabedian does as well. Garabedian Dec. ¶ 6 ("I . . . have never promised Mr. Sibert that he would receive a share of any recovery from these cases.").

Nor does the fact that some of the Perlitz victims have taken it upon themselves to collect names of victims and witnesses and provide those names to Mr. Sibert turn him into a "runner." Again, the evidence is clear: if victims are collecting names for Mr. Sibert, it is not at Mr. Garabedian's instigation and they are not being paid by counsel to do it. *See* Garabedian Dec. ¶ 7. Nor is Mr. Sibert instigating the collection of such names. *See* Sibert Dec. ¶¶ 9-10. Moreover, Mr. Sibert clearly states in his declaration that he has only passed to Plaintiffs' counsel the names and telephone numbers of individuals who have asked for assistance in obtaining justice, that, in effect, he was taking messages for the lawyers in the United States, passing along to them the names and numbers of boys who wished to speak to them. *Id.* This is the

opposite of "running" – Mr. Sibert does not go looking for plaintiffs who can bring lawsuit, he refers victims who have sought his guidance for justice to lawyers he knows in the United States.

Second, Mr. Sibert has never been paid to solicit or obtain clients or causes of action.  Rather, as he clearly explains in his declaration, Mr. Sibert is paid for enormous amounts of work he does to assist Plaintiffs' counsel in keeping in touch with those who have sought counsel's assistance and those who eventually become clients; to arrange phone calls and in-person meetings with plaintiffs; to transport plaintiffs to meetings; to obtain passports and visas; and to accompany plaintiffs to the Dominican Republic for their depositions.  Sibert Dec. at ¶¶ 4-9.  Mr. Sibert specifically states that "[n]one of the money the lawyers pay me depends on whether I find or sign clients for them, or whether boys who come to see me end up bringing cases," *see* Sibert Dec. at ¶ 7, and that he is "not paid to find victims to bring lawsuits"; rather, he is "paid to help the lawyers with the boys who come to me to seek justice."  *Id.* Mr. Garabedian's declaration confirms that this is so, that Mr. Sibert has never been paid to solicit or obtain clients or to induce anyone to file a lawsuit.  Garabedian Dec. at ¶¶ 6, 9.  Defendants claim that Plaintiffs' counsel has *admitted* paying Mr. Sibert to solicit clients, but this is simply false.  Defendants rely entirely on a newspaper article that inaccurately reports (without quotation marks) a statement to Mr. Garabedian that he never made.  As Mr. Garabedian explains in his declaration:

> Defendants have provided the Court a copy of an article that apparently appeared in the *Connecticut Law Tribune*. That article contains the following sentence: "Since the time of the settlement, Garabedian said he's had an 'advocate' working in Haiti to try to find additional sex abuse victims." As is so often the case with information that appears in the newspaper, the statement in the newspaper is inaccurate. The "Garabedian" referenced is me and I did speak to Megan Spicer, whose byline appears on the article. *But I never told Ms. Spicer that I had an "advocate" (or anyone else) "trying to find additional sex abuse victims."* I never said that to Ms. Spicer and never would have said it because it was not and is not true. *At no time have I ever hired anyone to find additional Perlitz*

*victims*. I did tell Ms. Spicer that I had identified additional victims and I may have told her that I was being assisted by someone in Haiti, however, it appears that she incorrectly interpreted what I said to mean that the individual in Haiti was employed by me for the purpose of finding victims.

Garabedian Dec. ¶ 9 (emphasis added).   In truth, there is no evidence whatsoever that Mr. Sibert is paid to solicit anyone.   Nor, as discussed above, is Mr. Sibert compensated with an interest in any of the cases.

Finally, as discussed above, the evidence is clear that none of the plaintiffs (indeed, none of the victims) has been paid in exchange for filing a lawsuit.   Indeed, Mr. Sibert states unequivocally "I have never told anyone that I will give him money on the condition that he contacts or hires Mr. Garabedian or any other lawyer, or agrees to bring a case, or gives me another name to pass along."   Sibert Dec. ¶ 12. He also states that he has "never told anyone that 'signing up' with me was necessary in order to receive money from me."   *Id.*   Indeed, he explains, "[t]he money I have given is without strings attached and without any promises either way, but simply for the purpose of helping those in need."   *Id.*   Again, the testimony of the Plaintiffs confirms what Mr. Sibert and Mr. Garabedian have said.   Not one of the Plaintiffs testified to being given anything in exchange for filing suit, nor indeed to any connection between being a plaintiff and receiving money from Mr. Sibert or Plaintiffs' counsel.   *See supra* at pp. 8-10.

Thus, there is absolutely no evidence that *any* of the elements of the "runner" statute are satisfied here.   Defendants have failed to establish any basis to enjoin Mr. Sibert's activities, or to require him to provide an accounting, or otherwise disclose further details of his employment with Plaintiffs' counsel.   Mr. Sibert is an invaluable resource as a liaison in Haiti between counsel and the Plaintiffs.   Defendant should not be permitted to disrupt his employment relationship or prevent Plaintiffs' counsel from employing assistants as needed in Haiti to facilitate communication and logistics with the Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs' counsel should be permitted to continue paying litigation expenses for Plaintiffs, as construed herein; the remainder of Defendants' motion should be denied in its entirety.[8]

Dated: January 21, 2016        By:    Mitchell Garabedian (phv04676)
    garabedianlaw@msn.com (phv04677)
    William H. Gordon
    wgordon@garabedianlaw.com
    100 State Street, 6th Floor
    Boston, MA 02109
    Phone:  (617) 523-6250

    /s/ Andrea Bierstein
    Andrea Bierstein (phv04678)
    abierstein@simmonsfirm.com
    Paul J. Hanly, Jr. (phv04680)
    phanly@simmonsfirm.com
    Jayne Conroy (phv04679)
    jconroy@simmonsfirm.com
    SIMMONS HANLY CONROY
    112 Madison Ave., 7th floor
    New York, New York 10016
    Phone:  (212) 784-6400

    Steven J. Errante (ct04292)
    SErrante@ltke.com
    Marisa A. Bellair (ct23802)
    MBellair@ltke.com
    LYNCH, TRAUB, KEEFE, & ERRANTE, P.C.
    P.O. Box 1612
    52 Trumbull Street
    New Haven, CT 06510
    Phone:  (203) 787-0275
    Fax:  (203) 782-0278

    Attorneys for Plaintiffs

---

[8] As noted above, *see supra* n. 3, the prongs of Defendants' motion that seek to compel the deposition of Mr. Sibert and that seek to compel Jheempson Brismac Joseph and Wadson Dorcine to answer questions about whether they received money directly from Plaintiffs' counsel should be denied as moot.

## CERTIFICATE OF SERVICE

I certify that on January 21, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on January 22, 2016, the foregoing document will be sent by first-class mail, postage prepaid, to:

        (1) Counsel for Defendant Douglas Perlitz at the below address:
             David T. Grudberg, Esq.
             Carmody & Torrance, LLP
             195 Church St.
             PO Box 1950
             New Haven, Conn. 06509-1950

        (2) Defendant Haiti Fund, Inc. at the below address:
             Haiti Fund, Inc.
             c/o Mr. Michael McCooey
             Chairman
             475 Polly Park Road
             Rye, NY 10580

        /s/    Andrea Bierstein
          Andrea Bierstein