**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| GERVIL ST. LOUIS, a/k/a ST. LOUIS GERVIL,<br><br>                           Plaintiff,<br>      v.<br><br>DOUGLAS PERLITZ; FATHER PAUL E. CARRIER, S.J.; HOPE E. CARTER; HAITI FUND, INC.; FAIRFIELD UNIVERSITY; THE SOCIETY OF JESUS OF NEW ENGLAND; SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA, AMERICAN ASSOCIATION, U.S.A., a/k/a ORDER OF MALTA, AMERICAN ASSOCIATION, USA; JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; JOHN DOE FOUR; JOHN DOE FIVE; JOHN DOE SIX; and JOHN DOE SEVEN,<br><br>                           Defendants.<br><br>*This document applies to:*<br>All Actions | Civil Action No.: 3:13-cv-01132 (RNC)<br><br>Consolidated with:<br>3:13-cv-1225-RNC; 3:13-cv-1269-RNC;<br>3:13-cv-1437-RNC; 3:13-cv-1480-RNC;<br>3:13-cv-1626-RNC; 3:13-cv-1627-RNC;<br>3:13-cv-1628-RNC; 3:13-cv-1629-RNC;<br>3:13-cv-1630-RNC; 3:13-cv-1631-RNC;<br>3:13-cv-1633-RNC; 3:13-cv-1634-RNC;<br>3:13-cv-1635-RNC; 3:13-cv-1636-RNC;<br>3:13-cv-1637-RNC; 3:13-cv-1638-RNC;<br>3:13-cv-1639-RNC; 3:13-cv-1640-RNC;<br>3:13-cv-1641-RNC; 3:13-cv-1642-RNC;<br>3:13-cv-1644-RNC; 3:13-cv-1645-RNC;<br>3:13-cv-1647-RNC; 3:13-cv-1648-RNC;<br>3:13-cv-1701-RNC; 3:13-cv-1767-RNC;<br>3:13-cv-1768-RNC; 3:13-cv-1769-RNC;<br>3:13-cv-1881-RNC; 3:13-cv-1906-RNC;<br>3:13-cv-1907-RNC; 3:14-cv-0125-RNC<br>3:14-cv-0668-RNC<br><br>January 21, 2016 |

      I, Mitchell Garabedian, declare under penalty of perjury that the following is true and correct:

      1.    I am an attorney admitted to practice in the Commonwealth of Massachusetts and admitted in this Court *pro hac vice* in connection with the above-captioned matters. Along with co-counsel, I represent the Plaintiff in the lead case and in each of the consolidated cases, as well as in each of the unconsolidated cases filed in this Court arising out of the same matters. I submit this declaration in opposition to the motion filed by the Defendants that have appeared in the case ("Defendants") seeking relief with respect to payments made to several of the Plaintiffs.

2. Prior to 2011, I was contacted by Cyrus Sibert about the possible representation of victims of Douglas Perlitz in Haiti. Since that time, Mr. Sibert has continued to contact me whenever he receives a request for representation from one of Mr. Perlitz's victims; typically, Mr. Sibert will provide me with contact information for the potential client, often with a time for a call that has been arranged by Mr. Sibert.

3. Once I began representing the Perlitz victims, it became clear that Mr. Sibert, a Haitian native who resides in Haiti and in Florida, was an invaluable resource. He is well known in Haiti and, in particular, because of his role as a radio journalist in exposing Perlitz's pedophilia, victims in Haiti know of him and know that he has contacts in the United States and can refer them to a lawyer. Among other tasks, Mr. Sibert is able to arrange phone calls and in-person meetings between the victims and the lawyers representing them from my firm and from Simmons Hanly Conroy ("SHC"), co-counsel in representing these plaintiffs. His frequent presence in Haiti allow the lawyers in these cases to maintain contact with the clients to an extent that would not be possible without an assistant on the ground there.

4. Accordingly, as more and more victims of Douglas Perlitz came forward, my law firm and the SHC predecessor law firm ("HC") retained Mr. Sibert as an investigator and an assistant in these cases. His dealings with witnesses, potential plaintiffs and plaintiffs in this litigation stand on the same footing as those of an assistant employed in a law office.

5. Although, as described above, Mr. Sibert's duties originally involved assisting victims who were seeking representation, arranging phone calls and meetings between the victims and the lawyers, and transporting plaintiffs to meetings in Haiti with the lawyers, those duties expanded exponentially once it became necessary for large numbers of the victims to travel to the Dominican Republic for depositions. Many of the plaintiffs lack the basic documentation, such as a birth certificate, necessary to obtain a passport, itself a prerequisite to a visa for travel to the Dominican Republic. It is my

understanding Mr. Sibert is familiar with the bureaucratic procedures necessary to obtain a passport and has undertaken to obtain passports and visas for each plaintiff who has travelled to the Dominican Republic. From what I have seen, this work has been both time-consuming and expensive. At times, Mr. Sibert has also travelled with some of the victims to the Dominican Republic for those depositions.

6. The money that my firm pays Mr. Sibert is not contingent in any way on his finding clients or on the outcome of the case. We do not pay him to get us clients; we pay him for investigative work; to facilitate communication with witnesses and clients; to assist in obtaining passports; and to assist us with logistics in Haiti. I have never asked Mr. Sibert to find people to become clients and have never promised Mr. Sibert that he would receive a share of any recovery from these cases.

7. I have been told that certain of the Perlitz victims have gathered lists of names to give to Mr. Sibert. I have never asked anyone to collect names for Mr. Sibert and have not paid anyone to do so. If victims are collecting names for Mr. Sibert, they are not doing it at my instigation, and are not being paid by my firm to do it. So far as I am aware, the same is true for my co-counsel at SHC.

8. It is my understanding that Mr. Sibert passes along to us all names he has been given of individuals who may be Perlitz victims, or may have been witnesses to Perlitz's conduct at PPT, or who have otherwise asked to speak to someone about the events at Project Pierre Toussaint. It is not part of Mr. Sibert's job to determine whether a particular person was a victim or a witness, or has a valid claim, or can or should file a lawsuit. That is something only the lawyers and the individuals in question can decide.

9. Defendants have provided the Court a copy of an article that apparently appeared in the *Connecticut Law Tribune*. That article contains the following sentence: "Since the time of the settlement, Garabedian said he's had an 'advocate' working in Haiti to try to find additional sex abuse victims." As is so often the case with information that appears in the newspaper, the statement in the newspaper is inaccurate. The

3

"Garabedian" referenced is me and I did speak to Megan Spicer, whose byline appears on the article. But I never told Ms. Spicer that I had an "advocate" (or anyone else) "trying to find additional sex abuse victims." I never said that to Ms. Spicer and never would have said it because it was not and is not true. At no time have I ever hired anyone to find additional Perlitz victims. I did tell Ms. Spicer that I had identified additional victims and I may have told her that I was being assisted by someone in Haiti, however, it appears that she incorrectly interpreted what I said to mean that the individual in Haiti was employed by me for the purpose of finding victims.

10. Because so many of the Perlitz victims are destitute, it has been my understanding, from the beginning, that Mr. Sibert has from time to time, provided them with limited amounts of money. In many instances, these payments have come from money that my firm or the SHC firm sent to him. Under no circumstances have such payments ever been made contingent on a victim retaining my firm or filing a lawsuit, although for reasons that will become clear the majority of the money Mr. Sibert has distributed has in fact gone to plaintiffs in these cases. I have never paid, and never authorized Mr. Sibert to pay, any of the plaintiffs to bring a case.

11. In the course of litigating these cases, we have learned that conditions in Haiti are so different from conditions in the United States that a broader array of expenses is associated directly with the cases. For example, in the United States, it has never been necessary for me to purchase shoes for a client to attend a deposition. In Haiti, however, often the plaintiffs do not have shoes. They cannot travel barefoot to the Dominican Republic for their depositions, nor appear at the depositions in the rags that would often be the only clothing they have. Therefore, in addition to paying their travel expenses to get to the Dominican Republic for these depositions, we have frequently given the clients money for clothing and shoes specifically for the purpose of their depositions. It is not surprising then, that, when asked at their depositions if they have received money, so many of these plaintiffs have in fact recently been given funds – it was precisely to enable

4

their attendance at the deposition that such distributions were necessary.

12. Ensuring that plaintiffs have clothing and shoes to wear to the depositions is not always sufficient to allow them to participate in discovery as required in these cases. A young man who has not eaten for several days cannot sit in a room for hours at a time and answer questions. This is true whether the questions are being asked by one or more of the Defendants' lawyers or by the plaintiff's own lawyers, for example, in obtaining answers to interrogatories. In one instance, I personally travelled to Haiti to speak to some of the victims in order to obtain answers to interrogatories propounded by the Defendants. One plaintiff arrived at the meeting (he was transported there by Mr. Sibert, who had arranged the meeting) and before I could discuss any of the interrogatory questions with him, he asked me if he could have something to eat, as he had not eaten in several days. Feeding that young man seemed to me then, and still seems to me now, part of the expenses of the litigation, as he was simply unable to concentrate and provide the information required in discovery without having food in his stomach.

13. The same is true for the depositions. Each deposition requires the plaintiff to travel to the Dominican Republic, meet with lawyers to prepare for the deposition, and then sit for several hours under questioning from the defense lawyers. These depositions cannot take place if the plaintiff in question is malnourished and cannot afford to eat. Moreover, simply feeding him on the day of the deposition is not sufficient to ensure that he can prepare for, attend, and complete the deposition. For that reason, it is hardly surprising that when Mr. Sibert has provided funds for shoes and clothing for the deposition, he has also provided sufficient funds to allow the young man in question also to buy food.

14. Another example of the scope of litigation expenses concerns Jacques Mackenson, who arrived in the Dominican Republic for his deposition last week with what appeared to be an active case of tuberculosis. (A copy of the transcript from what would have been Mr. Mackenson's deposition is provided as an exhibit to *Plaintiffs'*

5

*Opposition to Defendants' Motion Concerning Payments to Plaintiffs and Memorandum in Support Thereof* ("Plaintiffs' Opposition").) Mr. Mackesnon had been diagnosed with tuberculosis in 2014 and, as described in the transcript, the symptoms with which he arrived were consistent with an active case of that disease. As shown on the transcript, upon being informed of the situation, Defendants' counsel decided it would not be safe to proceed with the deposition, a conclusion with which my co-counsel who were present did not entirely disagree. Counsel for Father Carrier specifically stated, on the record, "[W]e would ask that we get some proof that this person is actively infectious with tuberculosis at some point" and agreed to postpone Mr. Mackenson's deposition until his health situation could be determined and addressed. This clearly will involve visits to a doctor and, potentially, payment for medication to treat his condition (especially if it turns out that Mr. Mackenson once again, or still, has tuberculosis.) With Defendants demanding that Mr. Mackenson see a doctor as a prerequisite to sitting for deposition, it does not seem unreasonable to treat the costs of his medical treatment as litigation expenses. Indeed, if Mr. Mackenson had had the money to be treated properly for tuberculosis in 2014, it is likely his deposition could have been completed as scheduled. In this context, it does not seem unreasonable to me to treat at least some of Plaintiffs' medical bills as litigation costs as well.

15. I note that, in March, 2014, Defendants opposed our motion that would have permitted the Plaintiffs to have their depositions taken in Haiti. In their opposition memorandum, Defendants urged the Court to reject our argument that the Plaintiffs were too poor to travel for their depositions. They wrote:

> The plaintiffs may be poor. But it is clear on this record that all of their litigation expenses – from their filing fees to their immigration-law expert – are almost certainly being advanced by their attorneys, who will undoubtedly advance plaintiffs' "travel and lodging" expenses to facilitate their appearance at depositions."

Memorandum of Law in Opposition to Plaintiffs' Motion for Protective Order (Doc.

# 250) at 2-3. (A copy of the memorandum is provided as an exhibit to Plaintiffs' Opposition.) When the parties agreed to compromise by locating the depositions in the Dominican Republic, the parties were effectively agreeing that the Defendants were correct when they suggested that Plaintiff counsel could and would advance significant sums to facilitate those depositions.

16.     As shown in the transcripts provided as exhibits to Plaintiffs' Opposition, the deposition testimony of the Plaintiffs makes clear that much of the money Plaintiffs have received has, in fact, been used to pay for food, clothing, and travel specifically in connection with their depositions.  *See* Exhibits C, D, E, and F.  For example, Kensley Previl testified at his deposition that he received $100 approximately one week before his deposition and that he "bought sandals and clothes and things to eat because I didn't have clothes and shoes to come here".  Exhibit C at 186:2-6.  Louis Sancircin similarly testified that he used money he was given by Cyrus to buy the clothes he wore to the deposition and "[a]lso to pay for transportation so I can go back home."  Exhibit D at 154:20-155:6.  Emile Jean Pierre testified that Cyrus "gave me money because I had to come do the deposition so I could buy clothes and things."  Exhibit E at 28:14-23.  He further explained that "because, you know, I have to come do this deposition, I bought clothes, shoes and food."  *Id.* at 31:13-22. Ilguens Jean explained that he was given money "so I could buy clothes, suitcase, things for the feet, shoes, and food so I could come here." Exhibit F at 98:9-99:4.   All of these payments should be viewed as litigation expenses.

17.     I recognize that not every dollar of the money that has been given to the Plaintiffs was associated with a deposition or may not be viewed as traditional litigation expenses.  But in the context of the extreme poverty in Haiti, and the lack of social services available in that country, it would be both heartbreaking and callous for us to refuse to view the remainder of the money in these cases as necessary litigation expenses in these cases.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing

`

is true and correct.

    Executed in Boston, MA on January 21, 2016

_____
Mitchell Garabedian

## CERTIFICATE OF SERVICE

I certify that on January 21, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on January 22, 2016, the foregoing document will be sent by first-class mail, postage prepaid, to:

(1) Counsel for Defendant Douglas Perlitz at the below address:
 David T. Grudberg, Esq.
 Carmody & Torrance, LLP
 195 Church St.
 PO Box 1950
 New Haven, Conn. 06509-1950

(2) Defendant Haiti Fund, Inc. at the below address:
 Haiti Fund, Inc.
 c/o Mr. Michael McCooey
 Chairman
 475 Polly Park Road
 Rye, NY 10580


 /s/    Andrea Bierstein
  Andrea Bierstein