GERVIL ST. LOUIS,

        Plaintiff,

vs.

DOUGLAS PERLITZ, et al.,

        Defendants.

Civ. A. No. 3:13-cv-01132-RNC

Dated: December 16, 2015

*This document relates to:*

*All Cases*

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION CONCERNING IMPROPER PAYMENTS TO PLAINTIFFS

A.      The Plaintiffs' Counsel Fail To Account For All Their Payments To Their Clients.

Most of the plaintiffs' brief is taken up with payment for items such as medical care, food, and clothing. That is to be expected. But what about Jheempson Brismac Joseph's perfume (J.B. Joseph Tr. 179:16-180:10)? What about Emile Jean-Pierre's gifts to his mother and sister, or the money he saved for a rainy day (Jean-Pierre Tr. 27:22-32:2)? What about Kensley Prévil, who says he used $100 he received shortly before the deposition for "sandals, clothes and food," but who also received two other earlier payments totaling $200 for clothes and food, apparently not related to his deposition (Prévil Tr. 132:21-133:12, 134:9-17, 184:24-186:6)? What about the "things for school" that Jason Maxwel Deriza bought with money Mr. Sibert gave him (Deriza

Tr. 25:15-20)? What about the two telephones Johnson Audate bought with Mr. Sibert's money (Audate Tr. 29:6-21)?[1]

Even if counsel's arguments had merit on their own terms, it is clear from the testimony that counsel and their agent, Mr. Sibert, have done more than counsel seem willing to admit. Jasmin Joseph said that money received from Mr. Sibert was his sole income. (Tr. at 197:25-199:15, 201:7-11). Mr. Sibert, in other words, was necessarily paying all his living expenses.

B.     It Is Improper To Pay A Client's Living Expenses. Living Expenses Are Not "Expenses of the Litigation."

Plaintiffs' counsel stake out a bold position. A plaintiff, they suggest, cannot really assist his lawyers in litigating his case unless he is provided with the necessities of life. Therefore, the necessities of life that the lawyer provides to the plaintiff are expenses of the litigation, permissible under the Rules of Professional Conduct. (E.g., Mem. at 13) ("As Mr. Garabedian explains in his declaration, a plaintiff who has not eaten in days is not in a position to assist counsel, whether in answering interrogatories, or in preparing for a deposition").

This argument runs afoul of the authorities we cite, which the plaintiffs make no real effort to rebut. In a 2011 informal ethics opinion, the Connecticut Bar Association's Professional Ethics Committee concluded that it would be improper for a lawyer to pay an indigent client's water bill even though the utility company had turned off the client's water service, and even if the lawyer was to make the payment anonymously or by donation to a church knowing that the funds would be used to pay the bill. Water, of course, is just as much a necessity of life as the food and clothing the plaintiffs' point to in the instant case. In the Informal Opinion, the client was "indigent, disabled and was recently released from the hospital after having major surgery. An eighteen month old child [was] living with her." Despite these highly sympathetic facts, the

_____

[1] Excerpts of the testimony of Mr. Audate are attached as Exhibit 1.

Committee pointed to the longstanding authority holding that there is no humanitarian exception to Rule 1.8(e). *Conn. Informal Ethics Op.* 2011-10.

Similarly, in Informal Ethics Opinion 90-3, which the 2011 Informal Opinion cites, the Committee refused to condone an advance for rent payments even though the lawyer's client was about to be evicted with the client's spouse and two children. Housing, like food and water, is one of the necessities. The Committee concluded that the rule should be "strictly construed," again finding that such payments were improper. *Conn. Informal Ethics Op.* 90-3.

Counsel suggest that the payments they made are not really humanitarian payments at all, but payments made for the purpose of ensuring that the plaintiffs would be able to participate adequately in the litigation. But the court in *Rubenstein v. Statewide Grievance Committee,* 35 Conn. L. Rptr. 34, 2003 WL 21499265 (Conn. Super. Ct. 2003), specifically rejected this argument. There, the plaintiff's counsel claimed that if they could not advance their clients' medical expenses "that are necessary to obtain evidence and present a case, it places that the client at the mercy of more wealthy opponents and of the system." *Id.* at *7. The court rejected this argument as contrary to the ABA's refusal to reconsider Rule 1.8(e)'s absolute prohibition of advances for living expenses. *Id.* The court also rejected a constitutional argument, similar to the argument the plaintiffs make here (though the plaintiffs do not cast their arguments in constitutional terms), that refusal to allow the payment of such expenses would result in denying the plaintiff his day in court. *Id.* at *10.

The plaintiffs cite no authority for the proposition that living expenses, even if necessary to allow the plaintiffs effectively to pursue their claim, are "expenses of the litigation." As far as we can determine, there is none.

The plaintiffs also suggest that there is a "Third World" exception to the ordinary rules that apply in the United States. (Mem. at 15) ("the basis for expanding the scope here is the specific context of the Plaintiffs' situation in Haiti"). Again, there is no authority for this claim. The plaintiffs could have brought suit in Haiti, the country where the alleged torts occurred and where they suffered their injuries. Instead, they chose to bring suit in the United States. The plaintiffs have sued in Connecticut, but their counsel have been supporting them in ways that even the plaintiffs' counsel seem to acknowledge would never be acceptable in the case of an American plaintiff. With the benefits of this forum come the burdens—burdens designed to ensure that the proceedings are fair.

We understand the humanitarian appeal of the plaintiffs' argument—how can it be wrong to give a poor person food, clothing, or shelter? The answer: lawyers are officers of the court charged not just with zealous representation of their clients but ensuring the integrity of the proceedings. Plaintiffs' counsel cannot have it both ways. They are bound by the rules of professional responsibility even though, in this case, their professional obligations preclude them from doing what for anyone other than a lawyer representing these plaintiffs—or the lawyer's agent—would be permissible. And most important, where (as here) the lawyer is paying his clients the equivalent of several months' salary for an average Haitian, the payments can create a sense of obligation on the part of the plaintiffs to their lawyers (see Defs. Mem. at 13-14), and thus create an enormous incentive for additional plaintiffs to come forward in the hope of getting similar benefits. Notwithstanding counsel's stated purpose, the practical effect of counsel's payments is almost certainly to "entic[e] clients with the promise of monetary advances." *See Rubenstein*, 2003 WL 21499265, at *5.

Moreover, while we acknowledge the plaintiffs' poverty, the plaintiffs' counsel do not provide a basis on which the Court could conclude that their clients could not cooperate with them because they have not "eaten in a day or two or three." (Br. at 15). The citation is to Mr. Garabedian's declaration, which recounts a discussion he says he had with an unnamed plaintiff. (Garabedian Dec. ¶ 12). Without minimizing the plaintiffs' economic straits, it does not appear that Mr. Sibert's largesse depended on the plaintiffs' particular economic circumstances. The wide range of uses to which the plaintiffs put the money they received from Mr. Sibert—school fees, savings, gifts to relatives, perfume, in addition to food—also undermines counsels' claim that the plaintiffs' ability to participate in the litigation depended on counsels' financial support.

C.    Jacques Mackenson's Tuberculosis

Although the plaintiffs now say Jacques Mackenson was diagnosed with tuberculosis in 2014, the first we heard of it was the evening of January 10, 2016, the night before his deposition, while this motion was pending. While counsel stated on the record at Mr. Mackenson's aborted January 11 deposition that he "was diagnosed and treated" for tuberculosis in 2014 (Tr. at 7:4-15), Mr. Mackenson's interrogatory answers do not mention tuberculosis at all. He identifies no medical providers whom he saw (Ans. to Int. 33),[2] he says only that he had an "infection" in 2014 (Ans. to Int. 34), and he could not identify any particular medicine that he was prescribed (Ans. to Int. 35). Although we have requested medical records for all of the plaintiffs including Mr. Mackenson, none have ever been provided. Mr. Mackenson's interrogatory answers make it clear that he himself did not know that he had tuberculosis. Whom did the plaintiffs' counsel speak with, then, to be in a position to make the representations they

_____

[2] Mr. Mackenson's answers to interrogatories are attached as Exhibit 2.

made? Who diagnosed and treated Mr. Mackenson? Where are the records that show that what they say is true?

Counsel also represented that Mr. Mackenson had "recently beg[u]n presenting with symptoms consistent with an active case of tuberculosis." (Id. at 7:6-8). Active tuberculosis is serious and dangerous, and so all involved acted prudently in calling off Mr. Mackenson's deposition once his counsel represented that he had tuberculosis and that he might have an active case. If Mr. Mackenson had a dangerous case of active tuberculosis, why did plaintiffs' counsel bring him to a tourist resort? If they only discovered the dangerous infection on January 10, once he had arrived, why was he having dinner at the resort with one of the other plaintiffs, Jason Maxel Deriza, presumably at the resort restaurant, on January 12 (Deriza Tr. 41:17-23)?

The plaintiffs say that the defendants have somehow conceded that it is okay for the plaintiffs' counsel to pay Mr. Mackenson's medical expenses because the defendants have asked for documentation that what they have said about his tuberculosis is true. Not so. Counsel have already represented that Mr. Mackenson was diagnosed and treated or tuberculosis years ago. We are asking simply for the information on which they based that representation—the records containing the diagnosis, the prescription for treatment, etc. No further medical expenses should be necessary to do this.[3]

D.      The "Anti-Runner" Statute.

We are surprised that the plaintiffs have argued at such length that the Connecticut statutes we cite do not have extraterritorial effect. They misunderstand the thrust of our

---

[3] We think it would be prudent for the plaintiffs' counsel also to confirm that Mr. Mackenson does not have an active case of tuberculosis in advance of his rescheduled deposition, and the defendants would not object to counsel's payment of the expenses involved in the necessary medical examination and testing for that purpose. If Mr. Mackenson turns out to have an active case of tuberculosis, the parties should confer to determine the best course of action.

argument. We are not trying to punish anyone, including Mr. Sibert. We have no interest in having him prosecuted in Connecticut. And we were specific in saying, in our memorandum (at 15-16) that *if* Mr. Sibert had paid money to someone to induce him to bring an action *"in Connecticut, he would be guilty"* of violating the statute. In other words, we have already recognized that the plaintiffs' point about extraterritoriality is likely correct. The point is not whether the statutes apply extraterritorially. The point is that the policy of the statutes, which mirrors the policy of Rule 1.8(e), does not allow runners.

Contrary to the plaintiffs' contention, the plaintiffs did not "take[] it upon themselves to collect names of victims and witnesses and provide those names to Mr. Sibert." (Br. at 20). One of the plaintiffs testified at first that the list was the idea of "a friend, a guy called Walky." (Bernadin Tr. at 179:17-21). But when pressed he admitted that "the list was not Walky's idea, it was Cyrus's idea." (Id. at 182:19-22). It may be that Mr. Sibert, while he was working for plaintiffs' counsel, waited for young men to come to him rather than searching the streets for them. But that hardly changes the reality of the situation, which was that by virtue of his radio show and word of mouth, the former PPT students knew that they could go to Cyrus, who would put them in touch with the lawyer and also perhaps provide them with money. Here, for example, is Johnson Audate's account of his interaction with Mr. Sibert, when Mr. Audate came upon him sitting in Carenage Square in Cap-Haitien:

Q.  Well, what did you tell him, sir?

MS. POLLOCK:  You can tell him what you told—you can testify about what you told Cyrus in the square that day.

A.  He just asked me if I was a child—a Pierre Toussaint child.  I said yes.

BY MR. KENNEDY:

Q. What else?

A. I said—I talked to him, I said "yes, I was at the Village." He said "wait there, I'm going to make you talk to someone." He made me stay there, and so I could talk to a lawyer, so I did talk to a lawyer.

Q. Did you tell Cyrus in the square in Carenage on that day that Douglas abused you?

A. No.

Q. Did he ask if Douglas abused you?

A. We just explained. He asked "were you at the Village?" I said "yes."

Q. That's all the conversation you had with him, with Mr. Sibert in the square in Carenage that day?

A. And then I talked to the lawyer. It's not something—I wanted to explain to people.

Q. Did you speak to the lawyer that day, sir?

A. Yes.

Q. Who was the lawyer, sir?

A. Mitch.

* * *

Q. And on that day, did Cyrus give you money, sir?

A. At that time I didn't have a phone. He gave me money to buy a phone.

(Audate Tr. at 199:11-200:14; 201:8-11).

While we are entitled to explore Mr. Sibert's financial interest in this case—whether that be straight compensation or some sort of interest in the outcome—we do not have to prove that Mr. Sibert has a contingent stake in the cases. Nor do we have to show that Mr. Sibert solicited the plaintiff. What we have to show, under Section 51-86, is merely that he "advised" the

plaintiff to cause the action to be instituted and that he was compensated by the plaintiff's attorney; *or* that the plaintiff's attorney had a contingent fee arrangement. Under Section 51-87(a)(5), all we have to show is that Mr. Sibert paid one of the plaintiffs or gave him something of value to induce him to "come to[] an attorney or to seek an attorney's professional services." The evidence establishes that this is precisely what occurred.

To be sure, Mr. Garabedian has contradicted one item of evidence we have cited, namely, his own admission that he had an advocate, presumably Mr. Sibert, looking for additional "victims." Mr. Garabedian has stated, in his declaration, that the *Connecticut Law Tribune* reporter, Megan Spicer, misquoted him, and that he never told her that he "had an 'advocate' (or anyone else) trying to find additional sex abuse victims." (Garabedian Dec. ¶ 9). Although to the best of our knowledge Mr. Garabedian has not sought a correction from the *Law Tribune,* we provisionally accept his representation that he never made the statement attributed to him (though we reserve the right to inquire further). But whether Mr. Garabedian had hired Mr. Sibert to find additional alleged victims, that is precisely what Mr. Sibert—whom Mr. Garabedian has characterized as counsel's agent "for all purposes relating to these consolidated cases" (Saint Cirin Dep. 178:22-179:4)—was doing. Mr. Sibert suggested circulation of the list, and when people came to him, sometimes in response to this suggestion, he passed them along to Mr. Garabedian.

E.      The Court Should Order Mr. Sibert's Deposition, and Production of His Documents.

The plaintiffs' counsel suggest that all issues relating to Mr. Sibert's deposition have been worked out. In fact, after the plaintiffs successfully managed to serve Mr. Sibert with a subpoena in Florida, plaintiffs' counsel unilaterally adjourned the deposition (Folkman Decl. Ex. 1). Defendants' counsel have twice (on December 18 and January 4) suggested dates in February, when plaintiffs' counsel indicated Mr. Sibert would be available. (Folkman Decl. Ex.

2-3). But plaintiffs' counsel have not responded. Nor have they indicated whether they represent Mr. Sibert or whether they will produce his documents, as we have requested. (Folkman Decl. ¶ 3). So counsels' assertions that they are working with defense counsel to arrange Mr. Sibert's deposition are not accurate. The defendants request that the Court grant the relief requested regarding Mr. Sibert's documents and deposition.[4]

Respectfully submitted,

PAUL E. CARRIER, S.J.

By his attorneys:

/s/ Theodore J. Folkman
Timothy P. O'Neill (phv04968)
Theodore J. Folkman (phv04969)
Amanda Moger Rettig (phv04967)
MURPHY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
Tel. (617) 423-0400
Fax (617) 423-0498
toneill@murphyking.com
tfolkman@murphyking.com
arettig@murphyking.com

THE SOCIETY OF JESUS OF
NEW ENGLAND

By its attorneys:

/s/ Michael J. Kerrigan
William J. Dailey, Jr. (phv05018)
Michael J. Kerrigan (phv05175)
SLOANE & WALSH, LLP
3 Center Plaza, 8th Floor
Boston, Mass. 02108
Tel. (617) 523-6010
Fax (617) 227-0927
wdaileyjr@sloanewalsh.com
mkerrigan@sloanewalsh.com

---

[4] There is another issue about Mr. Sibert is likely to arise at his deposition but that must await resolution at that point. We do not believe that Mr. Sibert's communications with the plaintiffs can be privileged. We have given some reasons for this position in our successful motions in the District of Maine seeking production of documents the plaintiffs claimed as privileged, citing Mr. Sibert's status as their agent. If Mr. Sibert refuses to answer questions at his deposition on privilege grounds, we anticipate bringing a motion to compel. We may also bring a motion to compel to obtain unredacted copies of communications between Louis Saint Cirin, one of the plaintiffs, and Mr. Sibert, which the plaintiffs have only recently produced. Again, no privilege attaches to these communications. Last, it appears from some recent depositions that Mr. Sibert himself had an agent, Mathieu, and that the plaintiffs similarly seek to assert a privilege as to communications between him and the plaintiffs. The defendants do not accept this assertion and will seek the deposition of Mathieu and if necessary a ruling on the privilege issue.

THE SOVEREIGN MILITARY
HOSPITALLER ORDER OF ST. JOHN OF
JERUSALEM OF RHODES AND MALTA,
AMERICAN ASSOCIATION, U.S.A.

By its attorney:

/s/ Bradford S. Babbitt
Bradford S. Babbitt (ct13938)
ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, Conn. 06103
Tel. (860) 275-8214
Fax (860) 275-8299
bbabbitt@rc.com


HOPE CARTER

By her attorneys:

/s/ Jeffrey W. Kennedy
Christopher F. Wanat (ct02164)
Jeffrey W. Kennedy (ct16419)
MILANO & WANAT LLC
471 East Main Street
Branford, Conn. 06405
Tel. (203) 315-7000
Fax (203) 315-7007
cwanat@mwllc.us
jkennedy@mwllc.us


Dated: January 26, 2016

FAIRFIELD UNIVERSITY

By its attorneys:

/s/ John W. Cerreta
Stanley A. Twardy, Jr. (ct05096)
Thomas D. Goldberg (ct04386)
Paul D. Williams (ct05244)
John W. Cerreta (ct28919)
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, Conn. 06901
Tel. (203) 977-7300
Fax (203) 977-7301
satwardy@daypitney.com
tgoldberg@daypitney.com
pdwilliams@daypitney.com
jcerreta@daypitney.com

<u>CERTIFICATE OF SERVICE</u>

I certify that on January 26, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on January 26, 2016, I caused a copy of the foregoing document to be served by first-class mail, postage prepaid, on counsel for the defendant, Douglas Perlitz, who is unable to accept electronic service, and Haiti Fund, Inc.:

David T. Grudberg, Esq.                     Michael McCooey
Carmody & Torrance, LLP                Chairman, Haiti Fund, Inc.
195 Church St.                                    475 Polly Park Road
PO Box 1950                                      Rye, N.Y. 10580
New Haven, Conn. 06509-1950

/s/ Theodore J. Folkman

702558

12