1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3

4       - - - - - - - - - - - - - - - x
                                      :
5       GERVIL ST. LOUIS,             :  No. 3:13CV1132(RNC)
                      Plaintiff,      :
6                                     :
                 vs                   :
7                                     :
        DOUGLAS PERLITZ, ET AL,       :
8                       Defendants.   :  JANUARY 27, 2016
        - - - - - - - - - - - - - - - x
9

10

11                         ORAL ARGUMENT

12

13

14       BEFORE:  HON. ROBERT N. CHATIGNY, U.S.D.J.

15

16

17

18

19                                  Darlene A. Warner, RDR-CRR
                                    Official Court Reporter
20

21

22

23

24

25

1    APPEARANCES:

2        FOR GERVIL ST. LOUIS:

3            SIMMONS HANLY CONROY, LLP
                 112 Madison Avenue; 7th Floor
4                New York, New York 10016
             BY:  PAUL J. HANLY, JR., ESQ.
5                 ANDREA BIERSTEIN, ESQ.

6            LAW OFFICES OF MITCHELL GARABEDIAN
                 100 State Street
7                6th Floor
                 Boston, Massachusetts 02109
8            BY:  MITCHELL GARABEDIAN, ESQ.
                  WILLIAM H. GORDON, ESQ.

9

         FOR FAIRFIELD UNIVERSITY:
10
             DAY PITNEY LLP-STMFD
11               One Canterbury Green
                 Stamford, Connecticut 06901
12           BY:  THOMAS D. GOLDBERG, ESQ.
                  JOHN W. CERRETA, ESQ.

13

         FOR HOPE E. CARTER:
14
             MILANO & WANAT
15               471 East Main Street
                 Branford, Connecticut 06405
16           BY:  JEFFREY WILLIAM KENNEDY, ESQ.
                  ADAM F. ACQUARULO, ESQ.

17

         FOR PAUL E. CARRIER:
18
             MURPHY & KING, PC
19               One Beacon Street
                 21st Floor
20               Boston, Massachusetts 02108
             BY:  THEODORE J. FOLKMAN, ESQ.
21                TIMOTHY P. O'NEILL, ESQ.

22       FOR SOVEREIGN MILITARY HOSPITALLER ORDER OF
             ST. JOHN OF JERUSALEM OF RHODES AND OF
23           MALTA, AMERICAN ASSOCIATION, U.S.A.:

24           ROBINSON & COLE
                 280 Trumbull Street
25               Hartford, Connecticut 06103
             BY:  BRADFORD S. BABBITT, ESQ.

APPEARANCES CONTINUED:

     FOR SOCIETY OF JESUS OF NEW ENGLAND:

          SLOANE & WALSH, LLP
               Three Center Plaza
               Boston, Massachusetts 02108
          BY:  MICHAEL J. KERRIGAN, ESQ.
               WILLIAM J. DAILEY, ESQ.

1               4:30 P.M.

2

3          THE COURT:  This is oral argument in the Perlitz

4     matter regarding the defendant's motion for relief

5     concerning payments to the plaintiffs

6          MR. FOLKMAN:  Thank you, Your Honor.

7          I think as I read the papers, there's little

8     question that if payments like these had been made in a

9     case involving American resident plaintiffs in the United

10    States that they would be improper, and I want to pretend

11    for a moment that all of the payments that were made were

12    for the necessities of life, even though we know that

13    that's not the case.  And if you look, for example, at

14    page one of our reply brief, we list some examples of

15    payments for things that, you know, plainly don't fall

16    within that kind of "necessities of life" category.

17          So the question is, pretending for the moment

18    that we're only talking about payments for things that the

19    kids needed to survive and cooperate with their lawyers:

20    Is there a humanitarian exception to Rule 1.8(e)?  Is

21    there a Haiti exception to Rule 1.8(e)?  Is there a third

22    world exception to Rule 1.8(e)?

23          We've cited the authorities in both of our

24    briefs and I don't want to belabor the authorities.  I

25    wanted to make two suggestions to you about how we think

1   about this.

2          You know, there's a famous quote, a foreign

3   judge said once that as a moth is drawn to the flame,

4   litigants are drawn to the courts of the United States.

5   And I think that this case has a lot of examples that

6   explains why that's the case.

7          Look at what these plaintiffs have done.  These

8   are the poorest kids in the poorest country in the

9   hemisphere and they have come to our courts; they've been

10  able to retain excellent counsel; they have been able to

11  get tens of thousands if not more than a hundred thousand

12  pages of documents from major educational and religious

13  institutions in the United States, including many

14  documents that my client, at least, and I think all of the

15  defendants, would rather have not produced; they have

16  taken many depositions.  Apparently they intend to seek

17  the deposition of Cardinal Dolan.  It's a testament to the

18  fairness of the procedures that our court provides to all

19  litigants, the poorest and the richest, that they're able

20  to come to the United States and do that.

21         It's something that even though no defendant

22  says, I'm happy that we had to give discovery, I think

23  everybody in the room ought to be proud that we have such

24  procedures, and that's why people come to our courts

25  because we have procedures and rules that are intended to

1    lead to fair outcomes.

2              In the case of these poor plaintiffs, it's rules

3    about getting discovery from people who socially and

4    economically are in a different place than they are.

5              But there's another kind of rule that we have

6    also, and it's a rule that's intended to guard and

7    safeguard the integrity of the proceedings, and I'm

8    talking of course about Rule 1.8(e).

9              It seems to us that you can't come to the United

10   States and have the benefits of procedures that are

11   intended to lead to fair outcomes and not accept the

12   burden of procedures and rules that are intended to lead

13   to fair outcomes.

14             Basically what we're asking you to do is to

15   apply the rules that all the authorities say should be

16   applied in every case.  There is no humanitarian exception

17   and it's for a good reason.

18             The good reason in this case is even stronger

19   than the usual reason in a case of a poor or indigent

20   American plaintiff, and the reason I say that is not

21   because I want to make some sort of stereotyping

22   generalization about kids in Haiti, people in Haiti, but

23   because I read what they have pleaded and I read what some

24   of them have said in declarations and affidavits and so

25   forth.

1          What they have pleaded is that they are so poor

2     and so disadvantaged that the prospect of something worth

3     much less than what Mr. Sibert has paid them was enough to

4     induce them to allow Mr. Perlitz to sexually abuse them.

5     And that's not me saying that, that's the pleading in the

6     complaint.

7          We see Mr. Clervil, and I know you remember him

8     because he's come up in a few instances.  Mr. Clervil said

9     he thought Father Carrier was helping to provide him with

10    the necessities of life and that's why he thought it was

11    okay to write something under oath and present it in this

12    litigation that wasn't true.  We have kids who have said

13    that when they received money from someone in Haiti they

14    regard that person as their boss.  The implication of

15    course is you do what your boss says.

16         So we are very concerned that in this case in

17    particular, I think it's true in every case, but in this

18    case in particular, the circumstances of these young men

19    are dire.  We don't dispute that.  They're dire.  And so

20    the incentives that this money creates are not okay.

21         And I say that without casting any aspersions on

22    the motives of plaintiffs' counsel, whether their motives

23    were humanitarian or whether their motives were to

24    actually enable their clients to assist them in the

25    litigation.  There are some things that anybody else in

1    the world can do that if you're a lawyer with a client you

2    can't do, because we're officers of the court and we do

3    have this obligation to do what we can to make sure that

4    the proceedings have integrity.

5              There's a couple of subsidiary points we make in

6    the motion I want to address very quickly.

7              One is the issue of the young man with the

8    active tuberculosis.  We lay this out in the reply brief.

9    We really just don't understand how the representations

10   that were made to my colleagues in the Dominican Republic

11   at the time of his deposition can square with his

12   interrogatory answers and we're concerned -- obviously we

13   think he should be tested again.  I don't think it's safe

14   to be in a room with someone with an active case of

15   tuberculosis.

16             So we have no objection to them at their expense

17   testing him to make sure that's not the case.  But we

18   really would like to know where this notion that he had

19   tuberculosis comes from because it wasn't in his

20   interrogatory answers.

21             They say he's been diagnosed and treated for it,

22   but as you know from listening to the status conference,

23   we've seen no records of that.  It seems to us from his

24   interrogatory answers that at least at the time he wrote

25   them, he didn't know he had tuberculosis.  That's not what

1    he said in his answers, he said he had an infection.  So

2    we just want to get to the bottom of it.

3              With regard to Mr. Sibert's deposition, I think

4    we're going to be able to work out dates.  We did correct,

5    from our perspective at least, a little bit of the record

6    for what the situation was.  But I think we're going to

7    get dates on that.  I think we're going to work out

8    locations and so forth.

9              I do think it's important that Your Honor order

10   that the plaintiff's counsel produce Mr. Sibert's

11   documents in advance of the deposition.  It seems to us

12   beyond dispute that he's their agent for all purposes.  In

13   fact, that may be a direct quote from them.  The documents

14   are in their control.  He's their guy.  So I think we need

15   to see the documents that he has that are responsive to

16   our requests.  And we're particularly interested of course

17   in flows of money from the United States to him and from

18   him to plaintiffs.  But in addition, I think he's probably

19   got a lot of stuff that's relevant to the case that's

20   responsive to our general requests.

21             For example, we know that he interviewed many --

22   some, at least, of these boys on his radio show, and that

23   was one of the instigators of people coming forward.  We

24   see in an email that has been produced to us in reference

25   to MP4 files, which is a digital file that's a sound

1    recording.  So if there are any sound recordings of

2    plaintiffs or former plaintiffs or people at PPT that are

3    not plaintiffs, if he has any documents that are related

4    to PPT, to Mr. Perlitz, to Father Carrier to the other

5    institutional defendants, I think we are entitled to see

6    them.

7         Thank you.

8         THE COURT:  Thank you.

9         MS. BIERSTEIN:  Good afternoon, Your Honor,

10   Andrea Bierstein for the plaintiffs.

11        I think the plaintiffs see this motion rather

12   differently from the defendants.  Mr. Folkman

13   characterizes that we're asking for various exceptions to

14   the rule.  We don't view it as a question of exceptions to

15   the rule.  We think this rule is not as clear as they

16   claim it is.  Although they claim it's very clear on the

17   one hand, but on the other hand, I think the positions

18   they take illustrate that it's very -- very much less than

19   clear.

20        They concede that we can pay for a medical exam

21   for Jacques Mackenson because they think that's an expense

22   of litigation, but they apparently think we can't pay for

23   him to be treated for it.  And I assume they think we

24   couldn't have paid for him to be treated for it six months

25   in advance of the deposition so they wouldn't have had to

1    take to waste their time not being able to take his

2    deposition.

3    They concede that we can pay for hotel rooms and

4    meals in the Dominican Republic during the deposition, but

5    apparently are of the view that a meal the day before or

6    the day of the prep session or a day when the client needs

7    to assist the lawyer in answering questions, that those

8    meals are outside the boundaries.

9    They agree that we can pay for the plaintiffs to

10   take the bus from Haiti to the Dominican Republic, but

11   they say that the shoes that the plaintiff wears when he

12   gets on the bus in order to make him do that are outside

13   the bounds.

14   They seem to be upset about paying for cell

15   phones when cell phones are the only way for counsel to

16   communicate with clients who don't have land lines in

17   their home, and yet they insist that we be able to talk to

18   the clients and gather the information needed for the

19   interrogatory answers.

20   I think part of the problem here, Your Honor, is

21   that it's not entirely clear to us, and it has not been

22   clear to us, where the line between litigation expenses

23   ends and where other things begin.  I think you saw in

24   Mr. Garabedian's declaration when you have a client that

25   shows up and you want to sit down and have a working

1    session with him and he says, okay, but first I haven't

2    eaten in a few days.  The idea that it's not an expense of

3    litigation to feed someone who cannot help you in

4    answering the questions that you need to have him assist

5    his case, we view that as litigation expenses.

6         Now, my understanding is that this motion is

7    forward looking in terms of what should happen going

8    forward, and as we said in our papers, we welcome guidance

9    from the Court.  But I think this is not as

10   straightforward an issue as the defendants have presented

11   it.  There's a very murky line here about what we can and

12   should and need to be able to pay for and what may be

13   viewed as perhaps going too far.  And in that respect, I'd

14   like to make two additional points.

15        Mr. Folkman waxes kind of lyrical about the

16   wonders of the American justice system, but none of those

17   advantages and none of those procedures are going to make

18   any difference if the plaintiffs can't participate, and so

19   there is this question about what is needed for them to be

20   able to participate.  And I think we've laid out in our

21   papers why we think that's a little fuzzier here than it

22   might be elsewhere, and I note elsewhere outside of

23   Connecticut.  And I should note that there are courts in

24   the U.S. that interpret this rule differently, and I

25   understand we're dealing with the rules in Connecticut.

1   But the notion that the rule is rigid and inflexible, it's

2   the same rule as other jurisdictions in the U.S. but not

3   all of them interpret it exactly the same way.  So I think

4   the notion that there is some flexibilities here is, you

5   know, in terms of what this rule means is important and we

6   look to the Court for guidance on that.

7          I should also mention, Your Honor, we do not

8   disavow what Mr. Sibert has done and we have said many

9   times that he is our agent and we don't want to pretend

10  that all of this is kind of behind our back, and it's not,

11  and we accept responsibility for that.  But I wanted to

12  note to Your Honor, and I think this is clear from

13  Mr. Sibert's declaration, some of the money that he gives

14  to people who may be plaintiffs, to people at PPT -- who

15  are at PPT who have never become plaintiffs, to people he

16  sees on the street who have no connection to PPT, is his

17  own personal, charitable contributions.  And I think it's

18  important to note that I don't think anything that we're

19  doing here can or should affect that.

20         Obviously whatever the rules are in terms of

21  what we can do, we understand we can't have Mr. Sibert do

22  instead.  We can't tell him to make payments that we can't

23  make, and we appreciate that.  But whatever the rules are

24  in terms of money that is passed through him, it needs to

25  be clear that for a Haitian, Mr. Sibert is much better off

1       than many of the people in that country.  He's employed by

2       us.  He has other employment there.  His wife is employed

3       and they live in the United States.  And it is not I think

4       realistic or fair to ask that he cease to be a generous

5       person and do what he wants to do but, you know, in a

6       personal way but that that needs to be separated to some

7       extent from was he does on our behalf as our agent.  And I

8       wanted to point that out.

9               Two other things that Mr. Folkman raised.  One

10      has to do with the representations about tuberculosis and

11      I want to explain that a little to the best I can.

12              When Mr. Mackenson answered his interrogatories,

13      he stated that he had been treated for an infection in

14      2014.  He didn't specify what the infection was, and my

15      understanding from what I've been able to gather in trying

16      to get to the bottom of this is that:  Unlike in the

17      United States, tuberculosis is not unusual, it's not

18      remarkable and apparently he didn't think it was

19      significant to say what the infection was.  He had an

20      infection and that's what he -- and so he noted it and he

21      noted -- it's in the interrogatory answers -- that he was

22      treated, and he didn't specify the nature of it.

23              My understanding is that in preparation for the

24      deposition in terms of reviewing that, he elaborated to a

25      greater extent that it was tuberculosis which would not in

1    and of itself been an issue, because presumably it would

2    have either been elaborated on at the deposition or

3    somewhere else, but when he showed up at the resort with

4    this active hacking, liquidy, productive cough, as it's

5    been described to me, I wasn't there, it raised alarm

6    bells because of the fact that he had clarified that this

7    infection from 2014 had in fact been tuberculosis.

8            We have not seen the medical records.  I can't

9    confirm to Your Honor that's what he had.  But he had told

10   us that that's what this infection was before he showed up

11   apparently with the cough.

12           And so there wasn't any intent here to hide the

13   ball or play fast and loose with it.  The infection was

14   disclosed.  It just hadn't been labeled with a diagnosis,

15   which we had no idea that that was the case or that it

16   would ever be relevant frankly if he hadn't shown up as

17   sick as he did.

18           I think with regard to Mr. Sibert's deposition

19   and documents, I just want to note, Mr. Folkman is right,

20   I think we'll be able to work out the dates.  I don't

21   think there's a need for a court order.  I don't think

22   there's an order for documents.  We agree that documents

23   need to be produced in advance of the depositions.  Some

24   may be withheld on grounds of privilege and they'll be

25   logged as appropriate, you know, where it's appropriate to

1  do that.  We are working to get those documents ready and

2  to get logged what needs to be logged and we intend to

3  make a production before that.

4          I just want to note that the issues of

5  scheduling Mr. Sibert's deposition are tied up first of

6  all with the need to take care of the document production

7  first because we want to make sure that's done in advance

8  and, second of all, with the need for him to remain in

9  Haiti to get the last six passports and visas that were

10  discussed earlier.  So if he were to come back to the U.S.

11  now they could do the deposition sooner, but it would

12  compromise the ability of the rest of the plaintiffs'

13  depositions.

14          So given those constraints, we are working with

15  him to get dates that don't interfere with anything, but

16  we do intend to produce him for deposition, and we do

17  intend to produce his documents.

18          So just to sum up:

19          On the issue of the payments, we're not

20  suggesting that there are no limits here.  I will say that

21  in terms of the incentives, there is not the slightest

22  shred of testimony here that any of the plaintiffs has in

23  any way fabricated the allegations.  Despite all these

24  depositions, there's none of that here.  In fact there's a

25  fair amount of testimony about the disincentives to come

1    forward and say that you are a victim of Douglas Perlitz

2    because of the stigma in Haiti about homosexuality and the

3    boys who have been labeled fags, who have been called

4    Douglas's wives who can't get jobs because of that.  I

5    think what we've seen is this is not something that these

6    people come forward and say lightly.

7           And in fact, as I think we tried to demonstrate

8    to Your Honor, there's not as much focus on the money as

9    defendants suggest when you actually look at the

10   plaintiffs' testimony.

11          But putting aside the incentive issue, we think

12   that this expenses of litigation should be construed

13   realistically here in a way that allow these particular

14   plaintiffs to participate in the litigation and allow us

15   to advance to them the money that is necessary for them to

16   do that so that none of them has to drop his case for the

17   inability to assist his lawyers in preparing his case,

18   provide the discovery needed or even, you know, be well

19   enough to travel to participate in his deposition.  And we

20   would ask Your Honor to construe the rule appropriately to

21   allow for that.

22          THE COURT:  All right.

23          MR. FOLKMAN:  Your Honor, just a handful of

24   points in response.

25          I think the issue of paying for treatment versus

1  paying for examination is an issue that's dealt with in

2  the Rubenstein case, which we cite.  We think it is

3  appropriate to pay for the examination because it is

4  clearly litigation related in the sense we're trying to

5  make it safe for him to attend the deposition without

6  risking anybody else's health.

7          In terms of the amount of money, I just want to

8  remind Your Honor what the per capita income is in Haiti

9  is.  I mean, the going rate for these kids apparently is

10  about $300, some receive more, some receive less.  But in

11  general what we hear when we ask is over time I received a

12  total of 300 U.S. dollars.  The average income for an

13  average Haitian is a thousand dollars a year.  So when we

14  look at that and we imagine paying an American plaintiff

15  four months salary, we think about what those incentives

16  would be like.  Human nature in America is the same as

17  human nature in Haiti, and that's our concern about the

18  money.

19          With regard to Mr. Sibert, I don't think it's

20  acceptable to say, he's our agent for all purposes, but if

21  he's doing charitable stuff on his own time, there's

22  nothing we can do to stop him.  They don't have to employ

23  him.  They can employ someone else.  If he's going to be

24  their agent, their guy down there who is doing all the

25  work for them, he cannot be the one to be charitable

1    towards these kids.

2              I don't want to sound cold about it.  My

3    personal wish is that all of these kids could have what

4    they need.  But it's just not appropriate for their own

5    lawyers or their own lawyers' agents to pay.  If you were

6    Mr. Garabedian's secretary and you wanted to be charitable

7    and send down money to one of these kids, that would not

8    be okay.

9              With regard to the -- the last point I want to

10   make with regard to the stigma in Haiti and what these

11   kids face coming forward.  I want to make sure you

12   understand how we understand the testimony.

13             As I understand it, any kid who attended PPT, if

14   it's known that they attended PPT, they're regarded as --

15   I'm going to put it in quotes, "a fag" or "Douglas's

16   wife."  In other words, people who have no knowledge

17   whether they were abused or not will call them that

18   because they know they attended the school.  So we think

19   the kids are already laboring under a stigma and I don't

20   think it's a correct reading of the evidence to say they

21   face disincentives to come forward.  In fact, since they

22   already face the stigma, the incentive is to come forward

23   because the harm has already been suffered.

24             Thank you.

25             THE COURT:  Is any publicity given to their

1    involvement in the litigation?

2         MR. FOLKMAN:  In Haiti?  I don't know the answer

3    to that today.  Certainly Mr. Sibert has widely publicized

4    the fact of the abuse.  Certain kids have been interviewed

5    on his show in the past.  And the fact that cases settled

6    is well-known in Haiti.

7         THE COURT:  But the identity of plaintiffs were

8    currently before this court?

9         MR. FOLKMAN:  What we hear when we ask them

10   questions like that, you know, it's funny, I've asked

11   kids, you know, what happens when you go to apply for a

12   job.  They'll say, well, you know, I won't get hired

13   because he says, you know, you're Douglas's wife.  That's

14   I guess a Haitian way of saying you've been homosexually

15   abused.  And I say, well, do you know the person who

16   you're talking to?  And in some cases the answer is no.

17   They just sort of somehow know that this child had gone to

18   the school and therefore they make an assumption.  Or

19   sometimes the answer is, yes, I know the person.  Well,

20   have you ever applied for a job with someone who didn't

21   know?  No.

22        So it's very difficult for us to get a clear

23   picture of that.  But my sense is that in the

24   neighborhood, so to speak, it is known that these kids

25   were at the school and all the harms that apparently the

1    plaintiffs say follow from that attach to the kids whether

2    they were abused or not.

3            THE COURT:  I see.  Thank you.

4            MS. BIERSTEIN:  Your Honor, if I could have

5    another 30 seconds?

6            THE COURT:  Thirty seconds.

7            MS. BIERSTEIN:  On the issue about charitable

8    donations of employees, the suggestion that we shouldn't

9    employ Mr. Sibert if he's making charitable contributions,

10   I would suggest that it's unlikely that defense counsel

11   knows what charities all their employees in their office

12   contribute to and it would be inappropriate to inquire

13   into and I think it would be equally inappropriate to

14   inquire into what Mr. Sibert does with his own money.

15           In terms of the issue of the stigma, I mean,

16   there's a huge stigma in Haiti and I think the defendants

17   on the one hand claim that almost no one at PPT was

18   actually abused because they insist it was a tiny

19   percentage of the people there, and yet they also claim

20   that all of them share in the stigma.  I think part of the

21   reason there's a widespread stigma is because there was

22   widespread abuse.  And one of the plaintiffs has testified

23   about his girlfriend breaking up with him because of the

24   stigma.  And I don't think we read the testimony in terms

25   of the issue the way they do.

1          THE COURT:  You have the last word if you're

2    interested.

3          MR. FOLKMAN:  Thank you, Your Honor.

4          I would just like to encourage the Court to the

5    extent it's possible to give us a ruling sufficiently in

6    advance of the next round of depositions which are

7    supposed to be beginning on February 29.  To some extent

8    the bell is already rung and we can't unring it.  We're

9    not going to get a second shot at the kids who we have

10   already deposed who have been paid, but it would be

11   interesting for us to be able to depose some kids who have

12   been made aware, as we're requesting, that in fact they

13   can't be on the payroll of Mr. Sibert or their lawyers.

14         THE COURT:  Okay.  Well, thank you for your

15   input.

16         You seek my guidance on how this rule should be

17   construed and applied.  I'll do my best to be of some

18   assistance.

19         Rule 1.8(e), which applies here, prohibits a

20   lawyer from providing financial assistance to a client in

21   connection with a pending or contemplated litigation.  The

22   rule provides for one exception:  Court costs and expenses

23   of litigation.

24         Counsel for the plaintiff submits that the rule

25   is murky and should be construed realistically to permit

1    the payment of money to or on behalf of these impoverished

2    plaintiffs in a way that would not be permissible in the

3    state of Connecticut.

4            I gather that the financial circumstances of the

5    plaintiffs and their peers are desperate.  Counsel paints

6    a picture of perspective client sitting down with counsel

7    being unable to have a discussion without first getting

8    something to eat.  I would say that's pretty dire.  I

9    think that it is appropriate to consider the financial

10   circumstances of these plaintiffs in deciding what conduct

11   is prohibited and what conduct is permitted.

12           Based on my reading of your papers, I think the

13   best guidance I can provide is that responsible counsel

14   should proceed with extreme caution recognizing that the

15   interest in the integrity of the proceeding, and the

16   appearance of the integrity of the proceeding, must be

17   given scrupulous attention at all times.  I think

18   especially in this case if behooves counsel to err on the

19   side of dotting every "i", crossing every "t" and doing

20   whatever can be done to minimize the risk of an appearance

21   of impropriety.

22           That said, it seems to me that cash payments

23   should not be made except when unavoidably necessary.  If

24   a plaintiff needs some form of assistance that can

25   honestly and reasonably be characterized as an expense of

1   litigation, then that payment should not be made in cash

2   to the plaintiff unless absolutely necessary, but instead

3   should be made to the provider of the needed service, be

4   it transportation or food or healthcare, and in this way I

5   think the compelling interest in maintaining the integrity

6   of the proceedings and the appearance of integrity can be

7   maintained; otherwise I think the risk of an impropriety

8   and the appearance of impropriety is sufficient to justify

9   an order prohibiting the payment.

10              I think counsel can appreciate my concern.  If I

11  haven't eaten for three days and it's my understanding

12  that by signing up with Mr. Sibert I can get $100 and in

13  short order perhaps $200 or $300, and all I need to do is

14  say that I was at PPT and Douglas Perlitz abused me,

15  someone who's desperately hungry wouldn't have to be the

16  worst person in the world to succumb to that temptation;

17  and there's no reason why anybody should be paying any of

18  these people hundreds of dollars.  If a person needs a

19  pair of shoes, then, okay, I am not sure how that

20  qualifies as an expense of litigation, but if counsel want

21  to maintain that it does because of the particular

22  circumstances confronting that person, then counsel should

23  arrange to have the shoes purchased for the person.  The

24  wrong thing to do would be to give the person money to buy

25  shoes, again, because of the risk of impropriety and the

1    appearance of impropriety.  I don't need to belabor it, I

2    hope.

3            With regard to Mr. Sibert, I think transparency

4    is vital and I think Mr. Sibert needs to be available to

5    respond to counsel's reasonable questions and I think that

6    the documents that he has relating to the subject matter

7    of this case need to be produced.  If there's a claim of

8    privilege with regard to a document, fine, but generally

9    speaking, based on what you have asked me to read, it

10   appears that there is no privilege and he should produce

11   the documents.

12           With regard to his inclination to be generous

13   toward these plaintiffs with his own funds, I agree with

14   defense counsel that he needs to make a choice.  If he

15   wants to continue to be the agent of plaintiffs' counsel

16   in these cases, then he needs to understand that his role

17   as agent for plaintiffs' counsel restricts his freedom

18   when it comes to making payments to plaintiffs or

19   prospective plaintiffs in the interest of avoiding

20   impropriety and the appearance of impropriety, and if he

21   is inclined to continue to pay money to these folks, then

22   he needs to stop working as the agent for plaintiffs'

23   counsel.  I don't think that's unreasonable and indeed I

24   think it's necessary to preserve the integrity and

25   appearance of integrity of the proceeding.

1          I think an objective observer informed of that

2     which has been made known to me could reasonably be

3     concerned that Mr. Sibert has been engaged in activities

4     that run afoul of the rules that would apply to him here.

5     I'm not saying that this is the case.  I'm simply asking

6     you to be sensitive to the appearance of things.

7          It is distressing to me, as I hope you can

8     appreciate, to see this article in the Connecticut Law

9     Tribune about how Mr. Garabedian has an advocate in Haiti

10    essentially beating the bushes for people who have been

11    abused so that they can be plaintiffs in this case here.

12    I understand the reporter got it wrong, but that

13    underscores the need to be scrupulously careful to avoid

14    giving people the impression that that's what we're doing.

15    That doesn't need to be repeated.

16          So that's the best I can tell you.  I think it's

17    incumbent on counsel to proceed with the utmost caution

18    and to err on the side of withholding assistance when

19    providing the assistance could reasonably create an

20    appearance of impropriety.

21          MR. FOLKMAN:  Your Honor, if I may?  I believe I

22    understand your order.  One of the forms of relief that we

23    requested is actually backwards looking, which is to say

24    we've requested an accounting of payments that have been

25    made, and I wonder if you would be willing to order that

1    we receive an accounting.

2            THE COURT:  Yes.  I think you're entitled to it,

3    and I think I'm entitled to it.

4            It may be an inconvenience, but I think that

5    it's a reasonable request.

6            Counsel say that there's no evidence that there

7    has been any actual corruption.  Well, that's very good

8    and I'm glad, but what really does that prove?  I mean, I

9    think that the information needs to be put on the table so

10   that people can examine it and satisfy themselves that

11   indeed what counsel represents to be true is true:  That

12   there has been no corruption; that Mr. Sibert has not

13   corrupted people with the prospect of hundreds of dollars

14   and perhaps even hundreds of thousands of dollars.  And to

15   suggest that that's an unreasonable request is to my mind

16   not helpful.  Not helpful.

17           I mean, I've thought about the First Amendment

18   freedom enjoyed by lawyers to solicit clients.  I see the

19   faces of counsel plastered on the buses that fill the

20   streets of Hartford, and it's something that I personally

21   regret, but I give due weight to the First Amendment

22   interest and I accept that this is the way the world is

23   today, but that doesn't mean that people should be going

24   around giving people hundreds of dollars when the people

25   are otherwise penniless and going hungry.  It worries me,

1  and so I think I'm entitled to an accounting and I'd like

2  to have one.

3         Anything else?

4         MR. FOLKMAN:  No, Your Honor.

5         THE COURT:  All right.  Thank you.

6             (Proceedings adjourned at 5:12 p.m.)

C E R T I F I C A T E


In Re: ST. LOUIS vs. PERLITZ



        I, Darlene A. Warner, RDR-CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




        /s/_____

            DARLENE A. WARNER, RDR-CRR
             Official Court Reporter
            450 Main Street, Room #223
            Hartford, Connecticut 06103
                 (860) 547-0580