UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

GERVIL ST. LOUIS,

                    Plaintiff,

        vs.

DOUGLAS PERLITZ, et al.,

                    Defendants.

Civ. A. No. 3:13-cv-01132-RNC

Dated: November 14, 2016

*This document relates to:*

*Lecenat v. Perlitz, No. 13-1633*
*Dorcine v. Perlitz, No. 13-1701*
*Mackenson v. Perlitz, No. 14-125*
*Deriza v. Perlitz, No. 14-668*

**MEMORANDUM IN SUPPORT OF FATHER CARRIER'S
MOTION FOR SUMMARY JUDGMENT**

Timothy P. O'Neill (phv04968)
Theodore J. Folkman (phv04969)
Amanda Moger Rettig (phv04967)
MURPHY & KING, P.C.
One Beacon Street
Boston, Mass. 02108
Tel. (617) 423-0400
Fax (617) 423-0498
toneill@murphyking.com
tfolkman@murphyking.com
arettig@murphyking.com

*Counsel for Father Carrier*

## TABLE OF CONTENTS

_Toc466880203Table of Authorities ............................................................................. ii

Preliminary Statement .......................................................................................... 1

Argument .............................................................................................................. 3

   A.  Standard of Decision ..................................................................................... 3

   B.  Father Carrier Is Entitled To Summary Judgment On Count 2 ........................ 4

      1.  Section 2255 Does Not Create A Cause Of Action For Plaintiffs Who Suffered No Injury In The United States. ................................................................................. 6

      2.  The Plaintiffs Cannot Prove A Causal Link Between Father Carrier's Supposed Facilitation Of Travel And Their Injuries ............................................................... 9

      3.  There Is No Admissible Evidence That Father Carrier Arranged Or Facilitated *Any Particular* Act Of Travel. ............................................................................. 12

      4.  The Plaintiffs Cannot Prove A Causal Link Between Father Carrier's Supposedly Financial Purpose And His Supposed Facilitation Of Travel. ............................... 13

   C.  Father Carrier Is Entitled To Summary Judgment on Counts 3 and 5. ........................... 14

      1.  Haitian Law Governs ......................................................................... 15

      2.  Background To Haitian Law ................................................................ 20

      3.  Under Haitian Law, Father Carrier Cannot Be Liable For Negligence, Because Mr. Perlitz Was Not His Agent Or Employee, And Because Father Carrier Himself Was The Agent Of the Haiti Fund, Inc. ................................................... 22

      4.  There Is No Claim For Breach of Fiduciary Duty Under Haitian Law ......................... 27

      5.  The Plaintiffs Cannot Prove That Father Carrier Had a Fiduciary Duty To Them under Connecticut Law, Let Alone That He Breached It. ........................................ 28

Conclusion .......................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Abdullahi v. Pfizer, Inc.,* 562 F.3d 163 (2d Cir. 2009) ........................................................ 16, 19

*Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694 (5th Cir. 1999) ............................ 4

*Ahern v. Kappalumakkel,* 97 Conn. App. 189, 903 A.2d 266 (2006) .................................... 29, 30

*Amy v. Kennedy,* 2014 WL 793365 (W.D. Wash. Feb. 25, 2014) ................................................. 10

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................................. 4

*Bonelli v. Giguere,* 2004 WL 424089 (Conn. Super. Ct. Feb. 18, 2004) .................................... 20

*Cammarota v. Guerrera,* 148 Conn. App. 743, 87 A.3d 1134 (2014) ........................................ 32

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................ 4

*Censor v. ASC Techs. Of Conn., LLC,* 900 F. Supp. 2d 181 (D. Conn. 2012) ........................... 29

*Doe v. Norwich Roman Catholic Diocesan Corp.,* 2012 WL 2335308 (Conn. Super. Ct. May 24, 2012) ....................................................................................................................................... 32

*Doe v. Norwich Roman Catholic Diocese Corp.,* 48 Conn. L. Rptr. 59 (Super. Ct. 2009) .......... 32

*Dugan v. Mobile Med. Testing Servs., Inc.,* 265 Conn. 791, 830 A.2d 752 (2003) ..................... 18

*Gibson v. Fullin,* 172 Conn. 407, 374 A.2d 1061 (1977) ............................................................ 15

*Golek v. St. Mary's Hosp., Inc.,* 133 Conn. App. 182, 34 A.3d 452 (2012) ................................. 31

*Iacuri v. Sax,* 313 Conn. 786, 99 A.3d 1145 (2014) .............................................................. 29, 30

*Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659 (2013) ............................................... 6, 8

*Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941) ................................................... 15

*McCrae Assocs. v. Universal Capital Mgmt., Inc.,* 746 F. Supp. 2d 389 (D. Conn. 2010) .......... 17

*Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247 (2010) ....................................................... 6

*Murphy v. Wakelee,* 247 Conn. 396, 721 A.2d 1181 (1998) ................................................. 32, 33

*O'Connor v. O'Connor,* 201 Conn. 632, 519 A.2d 13 (1986) ....................................... 16, 17, 18

*Paroline v. United States,* 134 S. Ct. 1710 (2014) ..................................................................... 12

*Pfizer, Inc. v. Gov't of India,* 434 U.S. 308 (1978) ..................................................................... 9

*Poe v. Doe,* 2000 WL 1228660 (Conn. Super. Ct. Aug. 18, 2000) ............................................. 32

*RJR Nabisco, Inc. v. European Community,* 136 S. Ct. 2090 (2016) ............................... 6, 7, 8, 9

*Sherwood v. Danbury Hosp.,* 278 Conn. 163 (2006) .................................................................. 32

*Simatis v. Flood,* 182 Conn. 24, 437 A.2d 828 (1990) ............................................................... 17

*United States v. Han,* 230 F.3d 560 (2d Cir. 2000) ..................................................................... 9

*Western Dermatology Consultants, PC v. VitalWorks, Inc.,* 146 Conn. App. 169, 78 A.3d 167 (2013) ................................................................................................................................. 18, 19

*Zerman v. Ball,* 735 F.2d 15 (2d Cir. 1984) .............................................................................. 15

## Statutes

18 U.S.C. § 1957(d)(2) ................................................................................................................ 8

18 U.S.C. § 1961 ......................................................................................................................... 7

18 U.S.C. § 1961(1) ..................................................................................................................... 7

18 U.S.C. § 1962 ...................................................................................................................... 7, 8

18 U.S.C. § 1962(a) ..................................................................................................................... 7

18 U.S.C. § 1962(c) ..................................................................................................................... 7

18 U.S.C. § 1963 ......................................................................................................................... 7

18 U.S.C. § 1964(c) ................................................................................................................. 7, 8

18 U.S.C. § 2255(a) .................................................................................................... passim
18 U.S.C. § 2423(b) ................................................................................................. 1, 9, 10
18 U.S.C. § 2423(d) .................................................................................................... passim
28 U.S.C. § 1350 ................................................................................................................ 6
Clayton Act § 1, 15 U.S.C. § 12 ...................................................................................... 9
Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b)....................................... 6

## Foreign Authorities

Bruno Dondero, *Définition de la faute séparable des fonctions du dirigeant social,* 2003 Dalloz, 2623.......................................................................................................... 27
Code Civil [C. Civ.] [Civil Code] art. 1140 (Haiti) .................................................... 24
Code Civil [C. Civ.] [Civil Code] art. 1170 (Haiti) .............................................. 22, 23
Code Civil [C. Civ.] [Civil Code] art. 1384 (Fr.) ....................................................... 22
Cour de cassation [Cass.] [supreme court for judicial matters] crim. May 20, 2003, D. 2003, 2623, n. B. Dondero ............................................................................................ 27
Haiti Const. art. 128 ........................................................................................................ 21
Ordonnance 2016-131 du 10 février 2016 portant réforme du droit des contrats, du régime général et de la preuve des obligations [Ordinance 2016-131 of 10 February 2016 on the reform of contract law and the general regime of proof of obligations], Journal Officiel de la République Française [J.O.] [Official Gazette of France], Feb. 11, 2016, text no. 26 ............ 22

## Rules

Fed. R. Civ. P. 44.1 .......................................................................................................... 4
Fed. R. Civ. P. 56(a) ......................................................................................................... 3
Fed. R. Civ. P. 56(c)(2) .................................................................................................. 10
Fed. R. Evid. 804(b)(3) ................................................................................................... 10

## Other Authorities

16 Thomas B. Merritt, *Connecticut Practice: Elements of an Action* § 8.1 ................................. 29
Peter G. Stein, *Roman Law, Common Law, and Civil Law,* 66 Tul. L. Rev. 1591 (1992)........... 21
9A Charles A. Wright *et* 2012 WL 2335308 *al.*, *Federal Practice & Procedure* § 2444 (3d ed. 2008 & Supp. 2016)........................................................................................................ 4
*Restatement (First) of Conflict of Laws* § 377 (1934) ................................................. 15
*Restatement (Second) of Conflict of Laws* § 145 (1971)............................................. 16

## PRELIMINARY STATEMENT

Douglas Perlitz sexually abused several young men who, at the time of the abuse, were students at Project Pierre Toussaint, a school Mr. Perlitz founded in Cap-Haitien, Haiti. Mr. Perlitz, after steadfastly denying his guilt and pulling the wool over the eyes of his friends, family, and supporters, pleaded guilty to an information charging him with traveling from New York to Haiti in June 2005 for the purpose of engaging in illicit sexual conduct with a young man identified only as P.G., in violation of 18 U.S.C. § 2423(b). As part of his plea agreement with the government, he admitted to other acts of travel undertaken for the purpose of engaging in illicit sexual conduct with seven other young men, also identified only by initials. At the sentencing hearing, the government asserted that there were up to twenty-two young men who had been abused or had witnessed abuse. (Tr. of 12/21/10 at 120).[1]

A group of twenty-three young men, including those Mr. Perlitz admitted he had abused, sued Mr. Perlitz in 2011 and also asserted claims against people and institutions that had played some role in supporting PPT, including Father Paul E. Carrier, S.J. Before discovery got underway in earnest, Father Carrier and the other defendants (except for Mr. Perlitz, who never participated in the litigation, and the Haiti Fund, Inc., which only participated at a very early stage before defaulting) settled twenty-four claims for $12 million in total, without any admission of liability.[2]

Now fifty-four more young men have brought similar claims. We are told that plaintiffs' counsel represent 147 plaintiffs and prospective plaintiffs in total. The total number who may come forward is unclear.

---

[1] Excerpts of the transcript of the sentencing hearing are attached to this memorandum as <u>Exhibit 1</u>.
[2] Twenty-four claims were settled even though only twenty-three plaintiffs had sued, because plaintiffs' counsel asserted that they represented a twenty-fourth claimant who had not yet sued.

THE COURT:	Is there no end to it?

MR. GARABEDIAN:	I don't see an end to it.

(Tr. of 11/8/13 at 17:14-15).[3]

The parties have engaged in extensive discovery and have taken more than fifty depositions throughout the United States and abroad. The claims remaining after dispositive motion practice are for negligence (count 3), breach of fiduciary duty (count 5), and (for some but not all of the plaintiffs) wrongful facilitation of Mr. Perlitz's travel from the United States to Haiti (count 2).

According to the Government, there were approximately two dozen young men who were victimized and about 125 young men who were not. (*See* Ex. 1 (Sentencing Hearing Tr.) at 124). Given what the Government concluded about the scope of Mr. Perlitz's crimes, the lack of corroborating evidence, and the evidence showing that the plaintiffs received improper inducements to come forward—we will not rehearse that evidence here—we have grave doubts that many of the current group of fifty-four plaintiffs were in fact abused. But this is a motion for summary judgment. So we set those doubts aside and assume, as we must and as the Court must, that each plaintiff who testified he was abused was in fact abused. The fact remains: the plaintiffs' claims against Father Carrier necessarily fail even assuming the truth of the allegations of abuse, for the reasons we give in this memorandum. Our reasons, in summary, are these:

- The claim in count 2 under 18 U.S.C. §§ 2423(d) and 2255(a) fails, because § 2255(a) does not apply extraterritorially, and also because the plaintiffs cannot prove that Father Carrier arranged or facilitated Mr. Perlitz's travel to Haiti in a way that was causally related to any act of abuse; that he did so for his own

---

[3] Excerpts of the transcript of the November 8, 2013 Status Conference hearing are attached to this memorandum as Exhibit 2.

financial benefit; or that there was a causal connection between any act of travel and any instance of alleged abuse.

- The claims for negligence and breach of fiduciary duty (counts 3 and 5) are governed by the law of Haiti. Those claims fail because Father Carrier was the agent of the Haiti Fund, Inc., and under Haitian law, when an agent is negligent in carrying out his responsibilities, the principal, not the agent, is liable; and because Haitian law does not recognize a tort of breach of fiduciary duty. The claim for breach of fiduciary duty also would fail if Connecticut law governed.

None of this is to diminish the tragedy of what happened at PPT. What happened there was a tragedy for the young men who were abused. It was a tragedy in a different way for the young men—if there are any—who attended PPT but never claimed to have been abused, and for any young men who attended PPT and who have falsely claimed they were abused. The plaintiffs' testimony makes it clear that for the most part, they come from backgrounds of the direst poverty, and that until PPT came into their lives they had no real economic or educational prospects. The closure of PPT, they say, has left them with no prospects for the future. The social and economic reality of Haiti in general, and of these young men in particular, is sad and infuriating. But despite the tragedy, Father Carrier is not liable for the harm that Mr. Perlitz inflicted on those young men whom he did abuse.

<u>ARGUMENT</u>

A.    <u>Standard of Decision</u>

When a party moves for summary judgment on one or more claims or defenses, or parts of one or more claim or defense, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a fact is "genuine" if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). There is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law, where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The Court must credit the evidence of the non-movant and draw all justifiable inferences in his favor. *Liberty Lobby,* 477 U.S. at 255.

This motion raises issues of foreign law. The Court must treat such issues as raising questions of law, not fact. Fed. R. Civ. P. 44.1. Thus a disagreement about the substance of the foreign law does not create a dispute of material fact that can defeat a motion for summary judgment. *See Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 713 (5th Cir. 1999); 9A Charles A. Wright *et al.*, *Federal Practice & Procedure* § 2444 at nn.31-33 (3d ed. 2008 & Supp. 2016).

B.    <u>Father Carrier Is Entitled To Summary Judgment On Count 2.</u>

Count 2 alleges a violation of 18 U.S.C. § 2423(d):

> Whoever, for the purpose of commercial advantage or private financial gain, arranges, induces, procures, or facilitates the travel of a person knowing that such person is traveling in interstate commerce for the purpose of engaging in illicit sexual conduct shall be fined.

Violations of this criminal statute give rise to civil liability under 18 U.S.C. § 2255(a), which provides:

> Any person who, while a minor, was a victim of a violation of section … 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains and the cost of the suit, including a reasonable attorney's fee.

Section 2255(a) says nothing about extraterritorial application, and as we show below, in light of recent Supreme Court precedent, it has none. Moreover, even if the statute reached claims of injuries suffered in Haiti, the plaintiffs cannot prove the elements of their claim. In fact, they can prove *none* of the elements of the claim, though in this motion we focus only on the plaintiffs' inability to prove that they suffered an injury as a result of Father Carrier's facilitation of Mr. Perlitz's travel.

Thus for purposes of this motion, we assume that Mr. Perlitz abused each plaintiff. We assume that Father Carrier facilitated or arranged Mr. Perlitz's travel from the United States to Haiti, at *some* time, even though the admissible evidence shows, at most, that Father Carrier and others raised money for PPT and the Haiti Fund, Inc., and that Haiti Fund money was used to pay for travel (Carter Dep. 185:11-17[4]; Tisdale Dep. 227:20-25[5]; Fiorda Dep. 152:6–153:7, 154:10–158:1[6] & Exs. 5, 6, 12, 15[7]; Carrier Dep. 181:2-5[8] & Ex. 21[9]), and even though there is no admissible evidence of arranging or facilitating any particular trip. We assume that Father Carrier knew that the purpose of Mr. Perlitz's travel was to engage in illicit sexual conduct. And we assume that Father Carrier did all of this for the purpose of commercial advantage or private financial gain, even though the only even arguably financial gain the plaintiffs could hope to prove is reimbursement for travel to the poorest country in the western hemisphere (their assertions and insinuations about money misappropriated from the Haiti Fund, Inc. and Fairfield University having come to naught, except for an internal review at Fairfield that found some lax

---

[4] Excerpts of the Deposition of Hope Carter are attached to this memorandum as <u>Exhibit 3</u>.
[5] Excerpts of the Deposition of Thomas L. Tisdale are attached to this memorandum as <u>Exhibit 4</u>.
[6] Excerpts of the Deposition of Barbara Fiorda are attached to this memorandum as <u>Exhibit 5</u>.
[7] Exhibits 5, 6, 12, and 15 to the Deposition of Barbara Fiorda are attached to this memorandum as <u>Exhibits 6</u>, <u>7</u>, <u>8</u>, and <u>9</u>.
[8] Excerpts of the Deposition of Paul E. Carrier are attached to this memorandum as <u>Exhibit 10</u>.
[9] Exhibit 21 to the Deposition of Paul E. Carrier is attached to this memorandum as <u>Exhibit 11</u>.

internal controls that the Department of Campus Ministry corrected). (Von Arx 30(b)(6) Dep. 88:10-19[10] & Ex. 16[11]).[12]

1.    Section 2255 Does Not Create A Cause Of Action For Plaintiffs Who Suffered No Injury In The United States.

We assume, for purposes of this motion, that 18 U.S.C. § 2423(d) applies extraterritorially. But in light of *RJR Nabisco, Inc. v. European Community,* 136 S. Ct. 2090 (2016), the plaintiffs cannot prevail unless the statute that creates the private right of action, 18 U.S.C. § 2255(a), applies extraterritorially, too. It does not. Because the plaintiffs are Haitian nationals residing in Haiti who suffered no injury in the United States (SUMF ¶¶ 1-2),[13] their claim fails.

The basic rule on the extraterritorial application of federal statutes is that they presumptively have no extraterritorial effect. The presumption can be overcome only if "there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect." *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010). Or as Justice Scalia put it: "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

This rule applies both to statutes that directly regulate conduct (Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which proscribes securities fraud, in *Morrison*) and to purely jurisdictional statutes. *See Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659, 1664 (2013) (the rule of *Morrison* applies to the Alien Tort Statute, 28 U.S.C. § 1350, even though that statute is "strictly jurisdictional" and merely "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law").

---

[10] Excerpts of the Deposition of Jeffrey Von Arx 30(b)(6) are attached to this memorandum as Exhibit 12.
[11] Exhibit 16 to the Deposition of Jeffrey Von Arx 30(b)(6) is attached to this memorandum as Exhibit 13.
[12] We reserve the right to attack all of the elements of the claim at trial.
[13] "SUMF" refers to the statement of undisputed material facts required by Local Rule 56(a)(1).

In *RJR,* the Court applied these basic principles to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.,* a statutory scheme that, stripped of some extra complexities, is just like the statutory scheme in this case in the relevant respects. RICO defines "racketeering activity" to mean various criminal offenses under state and federal law. *See* 18 U.S.C. § 1961(1). RICO forbids engaging in a "pattern of racketeering activity" in various ways, e.g., receiving income from engaging in a pattern of racketeering activity and using it to acquire an interest in an enterprise, 18 U.S.C. § 1962(a), or for an employee of an enterprise to conduct its affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c). Under 18 U.S.C. § 1963, violations of § 1962 are punishable by fine or imprisonment. Congress also enacted 18 U.S.C. § 1964(c), which creates a private right of action for "any person injured in his business or property by reason of a violation of section 1962."

Just like 18 U.S.C. § 2423(d), 18 U.S.C. §§ 1962 and 1963 define prohibited conduct and prescribe criminal punishment for violations. Just like 18 U.S.C. § 2255(a), a separate statute, 18 U.S.C. § 1964(c), creates a civil cause of action for violations of the underlying criminal statute.

In *RJR,* the claim was that non-US drug traffickers were smuggling drugs into Europe and then selling them for euros, which the traffickers used to pay for shipments of RJR cigarettes. The EU claimed that RJR was part of the scheme, and it brought a civil RICO action. The alleged racketeering activity included money laundering, giving material support to foreign terrorist organizations, etc. The racketeering activities alleged all took place outside the United States, and the EU suffered its injury outside the United States.

The first holding in *RJR* is that some of RICO's substantive criminal prohibitions *do* apply extraterritorially, because the presumption against extraterritorial application has been

rebutted. For example, one of the crimes referenced in 18 U.S.C. §1962 is engaging in monetary transactions in criminally derived property, and under 18 U.S.C. § 1957(d)(2), that crime expressly applies to crimes outside the United States if committed by US persons. Thus, the Court held, Congress had given a "clear, affirmative indication that § 1962 applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *RJR,* 136 S. Ct. at 2102. So far, *RJR* is just like our case, because we assume for present purposes that the underlying criminal statute here, 18 U.S.C. § 2423(d), does apply extraterritorially.[14]

In *RJR,* there was a separate civil statute, 18 U.S.C. § 1964(c), that creates the private civil cause of action, just as there is here, 18 U.S.C. § 2255(a). Neither statute says anything about extraterritorial application. In *RJR,* the Court held that the presumption against extraterritorially applied to § 1964(c)—in other words, even though the underlying criminal statute applied extraterritorially, the plaintiff had to show separately that the civil statute applied extraterritorially, too. The Court reasoned that *Kiobel* made it clear that the presumption was not limited to statutes defining or proscribing the wrongful conduct. "The same logic [as *Kiobel*] requires that we separately apply the presumption against extraterritoriality to RICO's cause of action despite our conclusion that the presumption has been overcome with respect to RICO's substantive prohibitions." *RJR,* 136 S. Ct. at 2106. The civil statute at issue in *RJR* is just like the statute here, and the same rule must apply.

*RJR* is also just like this case insofar as both involve injuries suffered only abroad. In *RJR,* the Court held that because the EU had failed to overcome the presumption against

---

[14] Although in RICO the predicate criminal acts are defined in one statute, 18 U.S.C. § 1962, but made criminal in another, 18 U.S.C. § 1963, the Supreme Court held that that added complexity was immaterial. *See RJR* 136 S. Ct. at 2102-03.

extraterritoriality, the EU could not prevail unless it could "allege and prove a *domestic* injury." *RJR,* 136 S. Ct. at 2106. The EU could not prove a domestic injury there, and the plaintiffs cannot prove a domestic injury here. The Court distinguished *Pfizer, Inc. v. Government of India,* 434 U.S. 308 (1978), which held that § 1 of the Clayton Act, 15 U.S.C. § 12, created a private right of action for foreign injuries, noting that the Clayton Act defined the group of "persons" eligible to sue to include "corporations and associations existing under or authorized by … the laws of any foreign country." That language, the Court said, was "critical." *RJR,* S. Ct. at 2109-10. There is nothing like it in 18 U.S.C. § 2255(a).

Because the situation in our case is the same as the situation in *RJR* in all relevant respects, *RJR* governs. Section 2255(a) has no extraterritorial application, and it cannot apply in a case that alleges only a foreign injury.

 2. <u>The Plaintiffs Cannot Prove A Causal Link Between Father Carrier's Supposed Facilitation Of Travel And Their Injuries.</u>

In a criminal case, the government need not prove that the defendant actually engaged in any illicit sexual conduct in order to prove its case against a sex tourist under § 2423(b) or against a sex tour operator under § 2423(d). The crime is complete when the sex tourist travels in interstate or foreign commerce with the appropriate mens rea, or when the sex tour operator arranges or facilitates the sex tourist's travel with the appropriate mens rea, even if the sex tourist does not engage in any illicit sexual conduct. *See United States v. Han,* 230 F.3d 560, 562-63 (2d Cir. 2000).

In a civil action, on the other hand, the action must be brought by a "victim of a violation of section … 2423" who "suffers personal injury as a result of such violation." 18 U.S.C. § 2255(a). There can only be a "victim" of a violation of § 2423(b) if the sex tourist actually engages in illicit sexual conduct. There can only be a "victim" of a violation of § 2423(d) if the

sex tourist actually engaged in sexual conduct after the sex tour operator arranged or facilitated his travel. And the victim has to prove that he suffered a personal injury "as a result of" the violations of § 2423(b) and § 2423(d). In other words, there has to be a causal connection between the unlawful arranging or facilitating of travel and the act of sexual abuse that caused the injury. *See Amy v. Kennedy,* 2014 WL 793365, at *1 (W.D. Wash. Feb. 25, 2014) (The words "as a result of" in § 2255(a) require "some causal connection").

        a.    <u>There Is Admissible Evidence Of Only One Date Of Mr. Perlitz's Travel From Haiti To The United States.</u>

While the record contains many references to Mr. Perlitz's travel, there is admissible evidence of only one of the dates of his travel between the United States and Haiti.[15] That evidence is Mr. Perlitz's admission, in his guilty plea, that he traveled from the United States to Haiti on June 6, 2005 (Plea Agreement at 12[16]; Tr. of 8/18/10, at 47:22–48:7).[17] This admission is hearsay as to Father Carrier but because we assume that the plaintiffs could show that Mr. Perlitz is an unavailable witness on account of his refusal to answer any questions in light of his Fifth Amendment privilege against self-incrimination, the statement is likely admissible nonetheless as a statement against penal interest. *See* Fed. R. Evid. 804(b)(3).

---

[15] In a few places in this memorandum, we make the point that there is no admissible evidence of certain alleged facts. Here, we say that with one exception, there is no admissible evidence of the dates of Mr. Perlitz's travel. Elsewhere, we say there is no admissible evidence that Father Carrier facilitated or arranged particular instances of Mr. Perlitz's travel. Of course, we have reviewed the entire record, and we know there are some documents that might bear on these questions. Under Fed. R. Civ. P. 56(c)(2), we will have the right to object to the use of any documents or other evidence that "cannot be presented in a form that would be admissible in evidence." We do not know what the plaintiffs will argue, so we will raise any such issues in the reply, but when we say that no admissible evidence supports a fact, we are saying that we do not believe the plaintiffs will be able to meet the requirements of Rule 56(c)(2).

[16] Excerpts of the August 18, 2010 Plea Agreement are attached to this memorandum as <u>Exhibit 14</u>.

[17] Excerpts of the August 18, 2010 Trial transcript are attached to this memorandum as <u>Exhibit 15</u>.

b.   <u>There Is No Evidence Of The Dates of the Abuse That Can Be Tied To Any Particular Instance of Travel.</u>

But the evidence regarding June 6, 2005 relates in any case to a single instance of travel. None of the plaintiffs can link their alleged abuse to that or any other instance of travel. Mr. Deriza says he was abused once but he cannot identify the year. (SUMF ¶ 9). Mr. Dorcine says he was abused once, sometime in 2006 or 2007. (SUMF ¶ 10). Mr. Lecenat claims he was abused twice, the first "at the end of May in approximately 2006" and the second "less than a year after the first time." (SUMF ¶ 11). Mr. Mackenson has no memory of when the two alleged incidents of abuse took place, or how long passed between them, "because [he] was sniffing a lot of paint thinners" (SUMF ¶ 12), though in his interrogatory answers he claims that the abuse happened "when Jessica was in Haiti," i.e., in or after August 2007, and "while boys were living at Rue 14." (*Id.*)

The plaintiffs' inability to give even approximate dates for their abuse or to give dates for Mr. Perlitz's travel is fatal. Each plaintiff has to prove that Father Carrier arranged or facilitated an act of travel that was causally related to the sexual abuse and the consequent harm they say they suffered. It is not enough to show that a plaintiff was abused following a particular instance of travel (though the plaintiffs cannot even do that). The plaintiffs must also show that Father Carrier arranged or facilitated that particular instance of travel. They cannot make that showing.

The Court cannot simply throw up its hands and say that since Mr. Perlitz traveled to and from the United States from time to time, it can simply presume a causal link between *some* act of travel and the alleged abuse. Suppose Father Carrier arranged and paid for a round-trip flight from Haiti to the United States for Mr. Perlitz in January, that Mr. Perlitz made the trip, and that in March he made the same trip, but without any assistance from Father Carrier. Suppose further that Mr. Perlitz abused one of the plaintiffs in April. On those facts, plainly Father Carrier would

not be liable. The plaintiffs can offer no evidence that puts their claims on any surer footing than this hypothetical.

This is not a case where there is some *conceptual* reason why it is impossible to determine whether Father Carrier's acts were causally related to the plaintiffs' alleged injuries. *Contrast Paroline v. United States,* 134 S. Ct. 1710 (2014) (In criminal digital child pornography case, where statute made restitution mandatory, victim entitled to restitution from downstream possessor of pornography "in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses," where, because of the large number of possessors, "recourse to a more traditional causal inquiry" would not serve the purposes of the statute). In a straightforward § 2423(d) case, the causal link is simple to make. The plaintiff shows that the sex tour operator arranged for the sex tourist to travel abroad in order to have sex with an underage victim, and the sex tourist actually abused the victim, causing an injury. Here the problem is not conceptual but evidentiary. The plaintiffs, despite all the discovery they have taken, cannot prove the dates of abuse or the dates of travel, let alone the dates of travel that Father Carrier arranged or facilitated. Thus they cannot prove any causal link. They have the burden of proof. So their claim must fail.

    3.    <u>There Is No Admissible Evidence That Father Carrier Arranged Or Facilitated</u> <u>*Any Particular* Act Of Travel.</u>

As noted above, for purposes of this motion we are assuming that Father Carrier facilitated or arranged *some* of Mr. Perlitz's travel from the United States to Haiti. The basic evidence on this point is that Father Carrier raised money for the Haiti Fund, Inc., and that the Haiti Fund, Inc., did pay for some of Mr. Perlitz's travel. (Ex. 3 (Carter Dep.) at 185:11-17; Ex. 4 (Tisdale Dep.) at 227:20-25; Ex. 5 (Fiorda Dep.) at 152:6–153:7, 154:10–158:1; Exs. 6-9 (Fiorda Dep Exs. 5, 6, 12, 15); Ex. 10 (Carrier Dep.) at 181:2-5; Ex. 11 (Carrier Dep. Ex. 21)). We do

not think this evidence supports a finding that Father Carrier facilitated or arranged travel, but we do not make that argument in this motion. But this evidence does not support the proposition that all of Father Carrier's solicitations of funds were causally related to Mr. Perlitz's travel. Indeed, the evidence is to the contrary. To take one example, Father Carrier wrote a letter in the summer of 2002 to the "Friends of Project Pierre Toussaint" soliciting gifts to support the work Mr. Perlitz and another volunteer, Andy Schultheis, were to do in the coming year. Donations were to be sent to Barbara Fiorda, and checks made out to the Order of Malta. The solicitation included a budget showing amounts for "travel," "in-country travel," and "travel-contingency." (*See* Ex. 7, (Fiorda Dep. Ex. 6)). But Ms. Fiorda, who testified about this letter, did not recall **anyone** sending a check in response to the solicitation (*See* Ex. 5 (Fiorda Dep.) at 38:22–39:10), and there is no other evidence that the solicitation resulted in anything, let alone that it had a causal connection with any act of travel. Nor can the plaintiffs offer any other admissible evidence to show that Father Carrier did anything connected with any particular act of travel. Without such evidence, they cannot make the necessary causal link.

4.  <u>The Plaintiffs Cannot Prove A Causal Link Between Father Carrier's Supposedly Financial Purpose And His Supposed Facilitation Of Travel.</u>

Even if the plaintiffs could show that Father Carrier arranged or facilitated a particular act of travel, the plaintiffs' claim would fail because they cannot show that Father Carrier arranged or facilitated the travel for the purpose of commercial advantage or private financial gain.

In the cases the statute is meant to reach, this causal link is an easy showing to make: the sex tour operator is paid by the sex tourist to arrange for the travel. Here, though, the undisputed evidence is that Mr. Perlitz never paid Father Carrier anything—indeed, *no one* paid Father Carrier anything or gave him anything of value in return for arranging or facilitating Mr. Perlitz's travel. (SUMF ¶ 3). There is no evidence that could show that the reason Father Carrier arranged

13

or facilitated travel was in order to get paid or to be reimbursed for his expenses. Nor could there be. Father Carrier's Fairfield salary was always paid over directly to the Fairfield Jesuit Community, so the plaintiffs cannot say that Father Carrier was motivated by his salary. (SUMF ¶ 17). There is no evidence that Father Carrier misappropriated funds from anyone (SUMF ¶¶ 14-16, 18-20). At most, the plaintiffs could claim that Father Carrier was motivated by the desire to obtain reimbursement of his travel expenses to Haiti. But he would have been reimbursed for his expenses in any case, whether or not Mr. Perlitz traveled to and from the United States and whether or not Father Carrier or anyone else arranged or facilitated that travel. (SUMF ¶ 22).

C.    Father Carrier Is Entitled To Summary Judgment on Counts 3 and 5.

The remainder of this memorandum demonstrates that Father Carrier is entitled to judgment on the non-statutory claims, which are claims of negligent supervision and breach of fiduciary duty. To summarize the conclusions:

- Haitian law governs these claims.

- Father Carrier was acting as the officer and director of the Haiti Fund, Inc., as the plaintiffs themselves argue.

- Under Haitian law, when an agent is negligent in the scope of his agency, the principal is liable but the agent is not.

- Also under Haitian law, only an employer or a principal can be liable for failing to supervise, and Father Carrier was neither Mr. Perlitz's employer nor his principal.

- Haitian law does not recognize a claim for breach of fiduciary duty.

- The claim for breach of fiduciary duty would fail even if Connecticut law governed, because the plaintiffs cannot prove any self-dealing.

14

1.    <u>Haitian Law Governs.</u>

The plaintiffs are Haitian nationals who claim they were sexually abused in Haiti by

Mr. Perlitz, an American residing in Haiti, and who suffered their injuries in Haiti. They say that

Father Carrier, who was frequently in Haiti, negligently failed to supervise Mr. Perlitz, whose

place of work was in Haiti. They say that Father Carrier breached a fiduciary duty to them, and

any relationship between them and Father Carrier was centered in Haiti. In short, leaving aside

the federal statutory claim (which fails because it does not apply to injuries suffered in Haiti, and

for other reasons), this is a Haitian tort case that the plaintiffs have chosen to bring in the courts

of the United States. Haitian law governs.

a.    <u>The Court Must Apply Connecticut Conflict Of Laws Principles.</u>

When exercising diversity jurisdiction, the Court must apply the conflict of law principles

of the state where it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496-97 (1941).

Here, the Court's jurisdiction rests not just on diversity of citizenship but also on the federal

questions raised in the statutory counts. The Court must apply the *Klaxon* rule to those claims

that are not governed by federal law. *See, e.g., Zerman v. Ball,* 735 F.2d 15, 19-20 (2d Cir. 1984)

(in case with federal securities law claims and common law claims, "in deciding a question of

state law, the federal court must apply the forum state's choice of law rules to determine which

state's law governs"). Thus this Court must apply Connecticut's conflict-of-laws rules.

b.    <u>The *Lex Loci Delicti* Applies.</u>

Formerly, Connecticut strictly applied the *lex loci delicti,* the law of the place of the tort.

*See Gibson v. Fullin,* 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977). Under that traditional

rule, the place of the tort is "where the last event necessary to make an actor liable for an alleged

tort takes place." *Restatement (First) of Conflict of Laws* § 377 (1934). In a bodily injury case

such as this, that is the place where the bodily injury was inflicted. *Id*  cmt. 1. Here, of course,

that means that the *lex loci delicti* is the law of Haiti, where Mr. Perlitz sexually abused the plaintiffs.

Thirty years ago, Connecticut softened its strict approach to the traditional rule. It adopted "the guidelines of the Restatement [(Second) of Conflict of Laws] as the governing principles for those cases in which application of the doctrine of *lex loci* would produce an arbitrary, irrational result." *O'Connor v. O'Connor,* 201 Conn. 632, 649-50, 519 A.2d 13, 21-22 (1986).

But unless an arbitrary or irrational result would occur, Connecticut still adheres to the traditional rule:

> Under Connecticut law, *lex loci delicti* … typically applies. … Connecticut, however, has conspicuously retreated from a rigid application of the doctrine. The Connecticut Supreme Court held that *lex loci delicti* does not apply to a tort claim when doing so would undermine expectations of the parties or an important state policy, produce an arbitrary or irrational result, or where "reason and justice" counsel for the application of a different principle.

*Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 190 (2d Cir. 2009) (citing *O'Connor*, 201 Conn. at 637-650, 519 A.2d at 21-22).

i.   <u>The Parties Had No Expectation That Connecticut Law Would Govern.</u>

In a case like this, it would be entirely artificial to ask about the expectation of the parties concerning the law that would govern their legal relations. *See Restatement (Second) of Conflict of Laws* § 145 cmt. b (1971) ("… the protection of the justified expectations of the parties, which is of extreme importance in such fields as contracts … is of lesser importance in the field of torts," because people "usually act without giving thought to the law that may be applied to determine the legal consequences of" tortious conduct). Certainly Father Carrier gave the matter no thought. (SUMF ¶ 23). There is no evidence that the plaintiffs, who were impoverished street children, had any expectation at relevant times that Connecticut law would apply.

  ii.  Application of the *Lex Loci Delicti* Does Not Undermine Important State Policies.

There are no cases that support the notion that Connecticut's important policies would be undermined by application of Haitian law here. Of course Connecticut has some interest in application of its law to people who are domiciled in Connecticut even when they are acting abroad. But that cannot be sufficient, since the state always has that kind of general interest in application of its laws.

Connecticut has no interest here in applying a comprehensive statutory scheme, as it had in *Simatis v. Flood,* 182 Conn. 24, 437 A.2d 828 (1990), where the court held that application of the *lex loci delicti* to a Connecticut employer and a Connecticut employee who happened to be injured in another state would undermine the policies of the state's worker's compensation statute. Nor does the state have an interest here in applying a similarly comprehensive statutory scheme, its corporations law, which the court, in a dictum in *McCrae Associates v. Universal Capital Management, Inc.,* 746 F. Supp. 2d 389, 396 n.1 (D. Conn. 2010), suggested might be sufficient to justify a departure from the *lex loci delicti.* Instead, there is simply Connecticut's ordinary interest in seeing its law enforced with respect to people living in Connecticut, which, as a general matter, exists whenever a Connecticut resident is accused of a tort abroad.

  iii.  Application of the *Lex Loci Delicti* Does Not Produce Arbitrary or Irrational Results.

Application of the *lex loci delicti* can be arbitrary or irrational where the plaintiff's location, at the time of the injury, was merely fortuitous. In *O'Connor,* for example, the parties—driver and passenger in a one-car automobile accident—were domiciled in Connecticut and were taking a "one day pleasure trip that began, and was intended to end, in Vermont." But the accident occurred in Québec. Under Connecticut law the passenger had a tort claim against the driver, but under Québec law there is no private right of action in such cases; the law provides

17

instead for government-funded compensation. The geographical location of the automobile when the accident occurred was a "purely fortuitous circumstance." *O'Connor,* 201 Conn. at 645-46, 519 A.3d at 20.

Similarly, in *Dugan v. Mobile Medical Testing Services, Inc.,* 265 Conn. 791, 830 A.2d 752 (2003), the plaintiff, a New York firefighter, was domiciled in New York. The defendant conducted a physical examination of the firefighter in New York and told him he was healthy, but the firefighter suffered a heart attack in Connecticut and sued for negligence. The plaintiff's presence in Connecticut was not as fortuitous as the parties' presence in Québec in *O'Connor,* because he lived there. Nevertheless, the location where he suffered the heart attack was "merely incidental to the ... controversy." *Id.* at 804, 830 A.2d at 761. He might just as well have suffered the heart attack while at work in New York.

This case's connection with Haiti is, of course, not similarly fortuitous as in *O'Connor* or *Dugan*. The plaintiffs lived in Haiti. There is no evidence that they ever were anywhere else, except that Mr. Mackenson traveled to the Dominican Republic after the alleged abuse and Mr. Dorcine tried to travel to the Dominican Republic but he was "stopped and expulsed from the company before [he] could come over" the border. (SUMF ¶ 24). They say they were abused in Haiti. They suffered their injuries in Haiti.

Our case is more like *Western Dermatology Consultants, PC v. VitalWorks, Inc.,* 146 Conn. App. 169, 78 A.3d 167 (2013). There, the plaintiff was a dermatologist in New Mexico. The defendant, a software merchant, did business in Connecticut and later Missouri. It demonstrated some software for the plaintiff in California and then New Mexico, and after seeing it, the plaintiff signed a contract to purchase the software. The plaintiff later sued, alleging

claims under Connecticut law, but the court held that the law of New Mexico, the *lex loci delicti*, applied:

> [T]he place of the plaintiff's injury, New Mexico, did not turn upon a fortuitous circumstance, nor was the fact that the injury happened in New Mexico a matter of happenstance. The plaintiff was located in New Mexico at the beginning and throughout its contractual relationship with the defendants, while the corporate location of the defendants shifted from Connecticut to … Missouri …. The goods and concomitant services purchased under the contract were installed and performed in New Mexico per the agreement. …

> The choice of law resulting from applying lex loci delicti, i.e. New Mexico law, is not an arbitrary, irrational result, such that the choice of law analysis may stop there under *O'Connor* and New Mexico law should apply.

*Western Dermatology,* 146 Conn. App. at 205-06, 78 A.3d at 191.

There is nothing arbitrary or irrational about applying Haitian law to a claim for personal injuries suffered by Haitian nationals on account of intentional torts committed in Haiti, where the claim is that Father Carrier had a fiduciary relationship with the plaintiffs—necessarily centered in Haiti, as none of the plaintiffs ever interacted with Father Carrier in the United States—or was negligent in his supervision of Perlitz—again, necessarily in Haiti, as nothing Perlitz did or failed to do was done in the United States. If Father Carrier learned of the abuse, or learned things that should have led him to suspect abuse, he learned in Haiti. If he spoke to people or failed to speak to people who had relevant information, it happened in Haiti. This case is all about Haiti. Nothing about the facts of the case really turns on whether Father Carrier traveled to Haiti from Connecticut, from Massachusetts (where he lives today), or from anywhere else in the United States.

### iv.    Reason And Justice Support Application of Haitian Law.

*Abdullahi,* read literally, lists "reason and justice" as a separate prong of the test to determine whether the court should follow the *lex loci delicti* rule. But in practice, the courts focus on arbitrariness, the parties' expectations, and state interests. We know of no case where a

court has held that applying the *lex loci delicti* is not arbitrary or irrational, does not contradict the parties' expectations, is not contrary to important state interests, but where reason and justice nevertheless require application of some other law. Application of a foreign country's law can hardly be unreasonable or unjust where the plaintiff is a national of that country, the injury occurred in that country, and the relationship between the plaintiff and the defendant was centered in that country.

But in any event, reason and justice clearly support the application of Haitian law. Haiti has a clear and direct interest in the outcome of this case, because the plaintiffs are nationals of Haiti whose domicile is in Haiti and because the conduct described in the complaint took place in Haiti. Connecticut's interest is weaker: Connecticut's interest in protecting the plaintiffs is, of course, weaker than Haiti's interest in protecting them, and its interest in regulating the conduct of Americans like Father Carrier while in Haiti, in connection with his dealings with a program operated in Haiti for Haitians, is stronger than Connecticut's interest. *See Bonelli v. Giguere,* 2004 WL 424089, at *2-3 (Conn. Super. Ct. Feb. 18, 2004) (courts must make a "contextual inquiry" into various states' interests in each case to determine which law applies). To apply the law of a state that none of the plaintiffs had ever visited at the time of the alleged abuse is unreasonable. And to subject the plaintiffs to Connecticut legal rules, doctrines, and restrictions without any proof that they even understood where Connecticut is located, is unjust.

    2.    <u>Background To Haitian Law</u>

Haiti is a part of the most prominent legal tradition that is an alternative to our common law tradition, namely the civil law. We will not give a lengthy exposition on the differences between the civil law and the common law here, but to understand what we say about Haitian law, it is important to understand a few points.

The most well-known difference between the two legal systems is that the common law is developed through judicial precedents, as modified by statutes, whereas the civil law is codified in comprehensive codes. (Curran Decl. ¶ 4; Succar Decl. ¶ 9-10). *See generally* Peter G. Stein, *Roman Law, Common Law, and Civil Law,* 66 Tul. L. Rev. 1591, 1594-98 (1992). In the civil law, judicial precedents are not a binding source of law. A judge's decision in a case must rest on the law itself (a code, or an executive decree), not merely on judicial precedent. (Succar Decl. ¶ 9; Curran Decl. ¶ 4). Indeed, in Haiti, the constitution itself provides that the power to interpret the law rests not with the judiciary, but with the legislature, which exercises the power of interpretation by enactment of another law. *See* Haiti Const. art. 128 ("The Legislative Branch alone has the authority to interpret laws, which it does in the form of a law").

The code that is most relevant in our case, as we discuss below, is the *Code Civil d'Haïti* ("the Haitian Civil Code"). In a civil law system, a civil code codifies much of what we would call the law of property, contracts, torts, marriage, inheritance, and family law. The Haitian Civil Code was adopted in 1825, after the Haitian Revolution, and is (at least with respect to the articles that are at issue in this case) nearly identical to the French *Code Civil* adopted in 1804 ("the French Civil Code"). Because the Haitian legal system derives from the French legal system, Haitian lawyers will consult French sources in order to determine what the rationale of the law is (Succar Decl. ¶ 9-12). In support of the arguments we make in this motion, we are offering two opinions: one of a leading Haitian lawyer, Michel Succar of Cabinet Lissade, a Port-au-Prince law firm, the other of Vivian Curran, a leading American scholar of comparative law and of French law in particular. Professor Curran's opinion regarding French law serves to bolster Mr. Succar's opinion about Haitian law by showing that the outcome under Haitian law would be the same in France. Mr. Succar, in addition to providing his own analysis under Haitian

law, has confirmed that Professor Curran's opinion is persuasive and correctly states the outcome

under Haitian law. (Succar Decl. ¶ 12). This memorandum includes only the highlights of the

two experts' legal opinions: their declarations give the analysis in full.

> 3.   Under Haitian Law, Father Carrier Cannot Be Liable For Negligence, Because
>       Mr. Perlitz Was Not His Agent Or Employee, And Because Father Carrier
>       Himself Was The Agent Of the Haiti Fund, Inc.

A Haitian lawyer or a French lawyer presented with the facts of this case would begin by

asking which article of the Civil Code is the correct article under which to analyze Father

Carrier's potential liability to the plaintiffs who claim Mr. Perlitz sexually abused them. Under

both Haitian law and French law, and to a civil lawyer generally, the relevant article would be

Article 1170 of the Haitian Civil Code (Article 1384 of the French Civil Code),[18] which reads:

> *On est responsable non-seulement du dommage que l'on cause par son propre fait, mais*
> *encore de celui que est causé par le fait des personnes dont on doit répondre, ou des*
> *choses que l'on a sous sa garde.*
>
> \* \* \*
>
> *La commettants, du dommage causé par leurs préposés, dans les fonctions auxquelles ils*
> *les ont employés.*
>
> "One is liable not only for the harm one causes by one's own act, but also for that caused
> by persons for whom one must answer, or for things in one's custody … [including]
>
> "Principals, for the harm caused by their agents in the duties in which they [the
> principals] have employed them [the agents.]"

Code Civil [C. Civ.] [Civil Code] art. 1170 (Haiti); *cf.* Code Civil [C. Civ.] [Civil Code] art.

1384 (Fr.).[19] (Succar Decl. ¶¶ 13-14; Curran Decl. ¶ 9).

---

[18] Very recent French legislation, effective October 1, 2016, resulted in a renumbering of the Code provisions, and
what we refer to in this memorandum as Article 1384 is now Article 1242. *See* Ordonnance 2016-131 du 10 février
2016 portant réforme du droit des contrats, du régime général et de la preuve des obligations [Ordinance 2016-131
of 10 February 2016 on the reform of contract law and the general regime of proof of obligations], Journal Officiel
de la République Française [J.O.] [Official Gazette of France], Feb. 11, 2016, text no. 26. We continue to refer to
Article 1384 in this memorandum.
[19] There is a minor textual difference between the Haitian and French codes. Whereas (Haitian) Article 1170 refers
to *les commettants* ("the principals"), (French) Article 1384 refers to *les maîtres et les commettants* ("the masters

There are two important principles at work in Article 1170. First, under the law, in order to be liable for the harm done by another, one must be the other person's principal, i.e., the other person must be one's agent. Second, under the law, when a person is himself the agent of another, he is not personally liable for negligent performance of his duties: only the principal is liable.

     a.    <u>Under Haitian Law, Father Carrier Was Not Mr. Perlitz's Principal And Cannot Be Liable For The Harm Mr. Perlitz Caused.</u>

The plaintiffs' implausible case is that *all* of the defendants were Mr. Perlitz's principals and employers—that each of them hired him, had the duty to supervise him, and wrongfully retained him (Compl. ¶ 123). This is obviously implausible on its face. Moreover, under Haitian law, it is clear that the only principal or employer who is answerable for Mr. Perlitz's wrongful acts is the Haiti Fund, Inc.

Haitian law defines an "employee" as "any person who undertakes to rent his services for a salary under the direction and authority of another physical or moral person." (Labor Code art. 19). There must be a "labor contract" (id.), which may be oral rather than in writing. (Labor Code art. 16). To determine whether an employer-employee relationship exists, Haitian law asks: (1) was a salary paid? (2) was the employee performing a task? and (3) was the employee under the control or authority of the employer? (Succar Decl. ¶ 29; *cf.* Curran Decl. ¶ 12 (French law requires a showing of authority and a relationship of subordination).

The answer to all three questions here is "yes."

First, it is undisputed that the Haiti Fund, Inc., paid Mr. Perlitz compensation (SUMF ¶ 39). At first, the Haiti Fund paid Mr. Perlitz as an independent contractor, but it came to

---

and the principals"). Similarly, Haitian law refers to *préposés* ("agents"), while French law refers to *domestiques et préposés* ("servants and agents").

understand that that was a mistake and reclassified him as an employee. (SUMF ¶ 39). The Haiti Fund, Inc.'s payments to Mr. Perlitz and its acknowledgment that it should have been treating Mr. Perlitz as an employee for US tax purposes is highly probative, under Haitian law, because admissions are regarded as the strongest form of proof in light of Article 1140 of the Civil Code. (Succar Decl. ¶ 31).

Second, it is undisputed that Mr. Perlitz performed a task, namely running PPT. Staff testified that he was in charge and made decisions for the school. (SUMF ¶¶ 40-41). Staff viewed Mr. Perlitz as their supervisor and went to him with questions and requests for approval. (SUMF ¶ 40). Mr. Perlitz was in charge of hiring, issuing salary, and general decision-making. (SUMF ¶ 41).

Third, it is undisputed that he was under the Haiti Fund, Inc.'s authority. The staff considered the Haiti Fund, Inc. to be ultimately in charge. (SUMF ¶ 42). Mr. Perlitz had to seek approval of the Board of the Haiti Fund, Inc., for major expenditures or changes to PPT's program. (SUMF ¶ 43). The Board had an operating committee. (SUMF ¶ 43). But the best evidence of this undisputed fact is that when the allegations of Mr. Perlitz's wrongdoing became known, the Haiti Fund, Inc., effectively fired him. (SUMF ¶ 44).

By the same token, none of these factors are present with respect to Father Carrier. There is no evidence that Father Carrier ever paid Mr. Perlitz any compensation. (SUMF ¶ 35). And there is no evidence that Father Carrier had control or authority over Mr. Perlitz. (SUMF ¶¶ 30-34). The only evidence the plaintiffs can point to is the testimony of several plaintiffs that they heard Mr. Perlitz describe Father Carrier as the school's "grandfather," or words to that effect.

(Bernardin Dep. 148:12-24[20]; Dorat Dep. 273:5-25[21]; Jheempson Joseph Dep. 118:15–119:12[22]; Gesner Lecenat Dep. 79:14–80:1).[23] This evidence, of course, is hearsay as to Father Carrier, because the question is not whether the young men *believed* Mr. Perlitz when they heard him, or even whether Mr. Perlitz believed what he was saying, but rather, whether Father Carrier really was exercising control or authority over Mr. Perlitz. The best evidence on this point relates, again, to Mr. Perlitz's removal. Father Carrier did not remove him, and indeed, he opposed, unsuccessfully, the efforts of the Haiti Fund, Inc., to do so. (SUMF ¶ 38).

In summary, the Haiti Fund, Inc., did everything that shows that it employed Mr. Perlitz. It paid him and supervised him, and indeed, acknowledged him as its employee. Father Carrier did nothing that shows that he employed Mr. Perlitz, and in fact he did not employ him.

Under Haitian law, once it is established that the Haiti Fund, Inc., not Father Carrier, employed Mr. Perlitz, it follows that the Haiti Fund, Inc., not Father Carrier, is liable. (Succar Decl. ¶¶ 23, 34). The reason for this conclusion is that under Article 1170, "principals" are liable for the harm caused by their "agents" in the duties in the principals have "employed" the agents. So unless the plaintiffs can prove the existence of the necessary agency relationship between Mr. Perlitz and Father Carrier—they cannot, as we have shown—Article 1170 does not come into play. (Curran Decl. ¶ 10 and authorities cited).

---

[20] Excerpts of the Deposition of Joseph Bernardin are attached to this memorandum as Exhibit 16.
[21] Excerpts of the Deposition of Jean Dorat are attached to this memorandum as Exhibit 17.
[22] Excerpts of the Deposition of Jheempson Joseph are attached to this memorandum as Exhibit 18.
[23] Excerpts of the Deposition of Gesner Lecenat are attached to this memorandum as Exhibit 19.

     b.   <u>Father Carrier Was The Agent of the Haiti Fund, Inc. and Cannot Be Liable For the Harm Mr. Perlitz Caused.</u>[24]

There is no dispute that Father Carrier was in Haiti and at PPT as agent as representative of the Haiti Fund, Inc. He was a member of the Board and an officer. (Compl. ¶ 19, 32). "As the Chairman and then President" of the corporation, the plaintiffs allege, Father Carrier "was obliged to supervise and monitor the program at PPT." (Compl. ¶ 55). Father Carrier, the plaintiffs allege, "acted as the eyes and ears of the Haiti Fund" and kept the Haiti Fund, Inc. "informed about activities at PPT and at the staff residences in Bel Air." (Compl. ¶ 93). The Haiti Fund, Inc., had the responsibility for hiring, retaining, directing, and supervising Father Carrier. (Compl. ¶ 128).

The plaintiffs' allegations, on their own, are enough to put Father Carrier's status as an agent of the Haiti Fund, Inc., beyond any dispute. But if more is needed, the evidence unequivocally supports the plaintiffs' allegations on this point:

- Father Carrier regularly reported to the Board of Directors on his visits to PPT and served as an intermediary between the Board of Directors and Mr. Perlitz on many occasions. (SUMF ¶ 25).

- The Board of Directors knew of and approved all of Father Carrier's travel to Haiti. (SUMF ¶ 26).

- Father Carrier regularly brought cash and supplies furnished by the Haiti Fund, Inc. to PPT and Mr. Perlitz. (SUMF ¶ 27).

---

[24] For some of his visits to Haiti, namely the visits known as "mission volunteer trips," on which Father Carrier led a group of Fairfield student volunteers, or on a single trip with other members of the faculty, it is not disputed that Father Carrier was acting as an employee of Fairfield University. (SUMF ¶ 29). Without waiving our right to make arguments about Fairfield at trial, in this motion, we focus solely on the Haiti Fund, Inc.

- The Haiti Fund, Inc. paid for all of Father Carrier's travel to Haiti except for the mission volunteer and faculty trips paid for by Fairfield University, and with the exception of one or two trips paid for by the New England Province of the Society of Jesus, of the approximately 60 to 100 trips to Haiti he took between 1997 and 2008. (SUMF ¶ 28-29).

So there can be no doubt that Father Carrier, for all relevant purposes, was the agent of the Haiti Fund, Inc. (Succar Decl ¶ 32; Curran Decl. ¶ 20).

Once it is established that the Haiti Fund, Inc., not Father Carrier, was Mr. Perlitz's employer, it follows that only the Haiti Fund, Inc., can be liable for Father Carrier's negligent supervision. This is made most clear in the French legal literature. As Professor Curran demonstrates in her opinion (Curran Decl. ¶¶ 21-26), under the civil law corporate officers and directors bear individual tort liability for their conduct in the service of the corporation only in cases of "intentional tort of special gravity that is incompatible with the normal exercise of his corporate duties." Cour de cassation [Cass.] [supreme court for judicial matters] crim. May 20, 2003, D. 2003, 2623, n. B. Dondero. Not only must the intentional tort be "of special gravity," it must be "without any link whatsoever to his functions." Bruno Dondero, *Définition de la faute séparable des fonctions du dirigeant social,* 2003 Dalloz, 2623. Here, the only person accused of an intentional tort is Mr. Perlitz, and the claims against Father Carrier and the Haiti Fund, Inc., namely negligence in the hiring, retention, and supervision of Mr. Perlitz, are precisely the matters that an officer or director of the Haiti Fund, Inc. was required to do on behalf of that corporation.

    4.    <u>There Is No Claim For Breach of Fiduciary Duty Under Haitian Law.</u>

In substance, the claim for breach of fiduciary duty is no more than a rehashing of the claim for negligent supervision. In both cases, the real accusation against Father Carrier is that he

failed to take steps that would have protected the plaintiffs from the abuse they allege they suffered. Whether one says that he breached a duty of care to the plaintiffs or that he breached a *fiduciary* duty of care or loyalty to the plaintiffs makes no real difference.

Thus there is nothing radical about the fact that Haiti does not recognize claims for breach of fiduciary duty. (Succar Decl. ¶ 35). Nor does France, where the duty of loyalty is recognized only in cases involving financial disloyalty to a corporation or to one's partners. (Curran Decl. ¶¶ 14-19). Since the claim simply does not exist in Haiti, the plaintiffs cannot prevail on it if Haitian law governs.

5.   <u>The Plaintiffs Cannot Prove That Father Carrier Had a Fiduciary Duty To Them under Connecticut Law, Let Alone That He Breached It.</u>

If the Court determines that Connecticut law should govern, the claim for breach of fiduciary would fail,[25] because under Connecticut law, and on the undisputed facts, the plaintiffs could not possibly show that Father Carrier is their fiduciary.

The elements of a claim for breach of fiduciary duty in Connecticut are:

1.   That a fiduciary duty existed, which gave rise to:

   a.   A duty of loyalty on the part of the defendant to the plaintiff;

   b.   An obligation on the part of the defendant to act in the best interests of the plaintiff; and

   c.   An obligation on the part of the defendant to act in good faith in any manner relating to the plaintiff;

2.   That the defendant advanced his own interests to the detriment of the plaintiff;[26]

---

[25] We do not seek summary judgment on the claim of negligence in the event the Court finds that Connecticut law rather than Haitian law governs.

[26] The plaintiffs have suggested elsewhere that it is enough to prove negligence, and that the inclusion of this element in statements of the elements of the claim by many courts and treatises is incorrect (ECF 261). We address this point below.

3. That the plaintiff sustained damages; and

4. That the damages were proximately caused by the fiduciary's breach of his fiduciary duty.

*See Censor v. ASC Techs. Of Conn., LLC,* 900 F. Supp. 2d 181, 213 (D. Conn. 2012); 16 Thomas B. Merritt, *Connecticut Practice: Elements of an Action* § 8.1. On the undisputed facts, the plaintiffs cannot prove elements (1) or (2): they cannot prove the existence of a fiduciary duty or that Father Carrier advanced his own interests at the plaintiffs' expense.

<u>a.   Father Carrier Had No Fiduciary Duty To The Plaintiffs.</u>

"[S]ome actors are per se fiduciaries by the nature of the functions they perform." *Iacuri v. Sax,* 313 Conn. 786, 800, 99 A.3d 1145, 1154 (2014). Thus "agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians" are *per se* fiduciaries. *Id.* Note that these are all statuses of offices. A fiduciary *per se* is a fiduciary even if, in fact, he has no real relationship with the person to whom he owes the fiduciary duty. A trustee, for example, owes fiduciary duties to the beneficiary even if they never meet or speak, just by virtue of the trust relationship that equity imposes on them. Similarly with lawyers, executors, and the others.

Father Carrier was not a *per se* fiduciary of the plaintiffs. He does fall within a couple of the *per se* fiduciary categories: he was a director of the Haiti Fund, Inc., and he was an agent of Fairfield University in the sense that he was an employee of the University. But in those cases, he owed his *per se* fiduciary duties to the Haiti Fund, Inc. and to the University, not to the plaintiffs. The only status Father Carrier had that could give rise to a *per se* fiduciary relationship with the plaintiffs was his status as a priest. But a pastor is not a fiduciary *per se* of the faithful in his parish. *Ahern v. Kappalumakkel,* 97 Conn. App. 189, 198-99, 903 A.2d 266, 272 (2006). And in any event, Father Carrier was not a pastor in Haiti or anywhere else; he had no status in the archdiocese of Cap-Haitien that could make him a *per se* fiduciary for the Catholics there

(SUMF ¶ 49). One of the four bellwether plaintiffs, Mr. Dorcine, is not even a Roman Catholic (SUMF ¶ 51). The only function Father Carrier carried out in Haiti as a priest with respect to the plaintiffs was occasional concelebration of the Mass with a Haitian priest, in one instance at the time that some of the PPT students received their first communion. (SUMF ¶ 50).

If Father Carrier is not a *per se* fiduciary, the question is whether he was a fiduciary on account of his relationship with the plaintiffs on the particular facts of the case. Connecticut takes a "flexible approach" to this question. *Iacuri,* 313 Conn. at 800, 99 A.3d at 1154. A fiduciary duty exists if there is a relationship that is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Id.; see also Ahern,* 97 Conn. App. At 194, 903 A.2d at 270.

On that point the facts are undisputed: Father Carrier had *no* actual relationship with any of the plaintiffs, let alone a relationship "characterized by a unique degree of trust and confidence."

- None of the plaintiffs ever spoke to Father Carrier, and he never spoke to them, beyond exchanging simple greetings. (SUMF ¶ 47). Indeed, Father Carrier could not communicate with the plaintiffs beyond such greetings. (SUMF ¶ 46) It follows that none of the plaintiffs ever confided in Father Carrier or asked him to take any action on their behalf. (SUMF ¶¶ 47-48). Indeed, according to the plaintiffs themselves, Father Carrier "failed to speak to the boys in a setting where the boys could feel safe about reporting what they were experiencing at PPT." (*See* Gesner Lecenat Compl. at ¶ 86, W. Dorcine Compl. at ¶ 86, J. Mackenson Compl. at ¶ 86,

30

and J. Deriza Compl. at ¶ 86). That is, according to them he *went out of his way to avoid* forming a relationship with them.

- Mr. Lecenat testified that Mr. Perlitz told him and others, in Creole, that Father Carrier and Mrs. Carter "were the boss of the village," "above Douglas" (Ex. 19 (Lecenat Dep.) at 79:14–80:1). Mr. Dorcine testified that Mr. Perlitz told him and others that Father Carrier was "one of the sponsors of the village," (Dorcine Dep. 87:11–88:4).[27] On the other hand, Mr. Deriza testified that he had heard from other students that Mr. Perlitz and Mrs. Carter, not Father Carrier, were "the boss in the village" (Deriza Dep. 152:19–153:2).[28] Assuming that Mr. Perlitz made these kinds of statements to the Mr. Lecenat and Mr. Dorcine in Creole, a language Father Carrier cannot speak and does not understand (SUMF ¶ 45),[29] and assuming that those statements induced them to trust or believe in Father Carrier, such statements could not create a fiduciary relationship between Father Carrier and those two plaintiffs. "The fact that one party trusts another is not dispositive of whether a fiduciary relationship exists; rather, proof of a fiduciary duty requires an evidentiary showing of a unique degree of trust and confidence between the parties such that the [defendant] undertook to act primarily for the benefit of the plaintiff." *Golek v. St. Mary's Hosp., Inc.,* 133 Conn. App. 182, 197, 34 A.3d 452, 463 (2012) (citations and internal quotation marks omitted).

- Aside from the exchange of simple greetings, Father Carrier's participation in a few masses that some of the plaintiffs attended, and Mr. Perlitz's supposed statements

---

[27] Excerpts of the Deposition of Wadson Dorcine are attached to this memorandum as Exhibit 20.
[28] Excerpts of the Deposition of Jason Maxwel Deriza are attached to this memorandum as Exhibit 21.
[29] Father Carrier does understand French, though not as a native speaker, but he cannot speak Creole. (SUMF ¶ 45).

to the plaintiffs about Father Carrier's general importance to the project, there is no evidence at all of any actual relationship between Father Carrier and any of the plaintiffs. This is not a case like *Doe v. Norwich Roman Catholic Diocese Corp.,* 48 Conn. L. Rptr. 59 (Super. Ct. 2009), or *Doe v. Norwich Roman Catholic Diocesan Corp.,* 2012 WL 2335308 (Conn. Super. Ct. May 24, 2012) , where a diocese was liable to parishioners for breach of fiduciary duty when the diocese actively taught and induced the plaintiffs to put their trust in a priest who abused them. Here, Father Carrier never said anything at all to the plaintiffs about Mr. Perlitz. The claim is precisely the opposite: that Mr. Perlitz made statements to the plaintiffs about Father Carrier. Nor is this a case like *Poe v. Doe,* 2000 WL 1228660 (Conn. Super. Ct. Aug. 18, 2000), where a priest who acted as the plaintiff's counselor was held to be a fiduciary.

    b.   <u>Father Carrier Did Not Act To Benefit Himself At The Plaintiffs' Expense.</u>

        i.   <u>The Claim Fails Without Such Self-Dealing.</u>

As an initial matter, it is necessary to address the plaintiffs' argument that in light of *Murphy v. Wakelee,* 247 Conn. 396, 721 A.2d 1181 (1998), the plaintiffs need not prove that Father Carrier "advanced his own interests to the detriment of the plaintiff." According to the plaintiffs (ECF No. 261 at 17), there is a type of claim for breach of fiduciary duty that "arises from ordinary negligence."

But "[n]egligence alone is insufficient to support a claim of a breach of fiduciary duty." *Cammarota v. Guerrera,* 148 Conn. App. 743, 759, 87 A.3d 1134, 1143 (2014). The Connecticut cases reject claims for breach of fiduciary duty that are based solely on a breach of the duty of care and not on a breach of the duty of loyalty. *See Sherwood v. Danbury Hosp.,* 278 Conn. 163 (2006); *Cammarota,* 148 Conn. App. at 759, 87 A.3d at 1143.

In *Murphy,* Wakelee was the conservator of the estate of Sylvan. Sylvan, in turn, was the beneficiary of an irrevocable trust, who was living in a residence for the mentally handicapped. An administrative judge determined that the assets of the trust could be used to pay for Sylvan's care and thus denied Sylvan's application for benefits. Murphy replaced Wakelee as conservator and sued Wakelee, arguing that his failure to appeal from the administrative judge's decision was negligent. The jury found that Wakelee was not liable. On appeal, the question was whether the judge had properly instructed the jury on the burden of proof. Wakelee argued two grounds for affirming: first, he argued that the plaintiff had not even alleged a breach of fiduciary duty; and second, he argued that assuming a breach had been alleged, the court was not required to give a burden-shifting instruction. The Connecticut Supreme Court agreed with the second argument and affirmed on that basis. *Murphy,* 247 Conn. at 398-99, 721 A.2d at 1183. That is, the court never reached the question our motion raises, namely, whether a claim of mere negligence, without some form of disloyalty, can support a cause of action for breach of fiduciary duty. That is the question that *Cammarota,* which came several years after *Murphy,* addressed, holding that a plaintiff must indeed plead something more than negligence.

        ii.      <u>There Is No Evidence Of Self-Dealing Or Disloyalty Here.</u>

There is no evidence that Father Carrier acted to advance his own interests, let alone that he did so to the plaintiffs' detriment. Father Carrier never took any money from the Haiti Fund, Inc. He was never paid a salary or other wage by the Haiti Fund, Inc. (SUMF ¶ 13). The only funds he ever received from the Haiti Fund, Inc. were reimbursements for expenses authorized by the Haiti Fund Inc., or funds given to him for delivery to Mr. Perlitz or others at PPT. (SUMF ¶ 14). He never misappropriated any Haiti Fund, Inc. funds. (SUMF ¶ 15). The plaintiffs can point to no testimony even remotely suggesting that Father Carrier misappropriated any money belonging to the Haiti Fund, Inc., as their complaint implies. Nor can the plaintiffs show that

Father Carrier took any money from Fairfield. In fact, he did not. (SUMF ¶ 16). The evidence is that in 2005, Fairfield's Director of Financial Services, Maria Regan, conducted a routine operational review of the Campus Ministry department, which Father Carrier headed. (*See* Ex. 12 (Von Arx 30(b)(6) Dep.) at 64:15-20; Ex. 13 (Von Arx 30(b)(6) Ex. 16)). The review noted several deficiencies in internal controls, for example, petty cash reimbursements that were not classified with sufficient detail or had no statement of their purpose, a failure of the Department head, Father Carrier, to obtain supervisory approval from the President's office for his own expense reports, and the use of checks payable to Father Carrier to facilitate sending money to Haiti. (*See* Ex. 13 (Von Arx 30(b)(6) Ex. 16) at 3-4, 8-9). Campus Ministry indicated that it would correct these deficiencies. (Id.). None of these internal control deficiencies, alone or together, can support the conclusion that Father Carrier misappropriated any funds. Indeed, the operational review concluded that "there are no significant issues of concern with Campus Ministry." (SUMF ¶ 18). The President of the University, Fr. Von Arx, found "no reason to be dissatisfied with Father Carrier" after reading it. (SUMF ¶ 19).

Nor can the plaintiffs point to Father Carrier's salary. Father Carrier did nominally receive a salary from Fairfield. But because he was a Jesuit, he had assigned his right to receive income from his employment to the Fairfield Jesuit Community. By agreement between the Society and Fairfield, his salary was paid directly to the Society. (SUMF ¶ 17). So nothing he did could have been motivated by the desire for his pay.

But in any event, even if there were evidence of some sort of self-dealing or disloyalty, it would be self-dealing or disloyalty *to Fairfield or to the Haiti Fund, Inc.,* not to the plaintiffs; and in any event any funds taken or misappropriated would have been to the detriment *of Fairfield or of the Haiti Fund, Inc.,* not of the plaintiffs.

The plaintiffs may seek to point to non-monetary benefits that Father Carrier sought, for example, paid travel to and from Haiti. As an initial matter, it is laughable to assert that travel to the poorest country in the hemisphere was some sort of valuable perquisite of Father Carrier's work. In fact, nothing Father Carrier did was motivated by the desire to obtain reimbursement for his travel to and from Haiti. (SUMF ¶ 20). But more to the point, obtaining travel to Haiti was not at the expense of, or to the detriment of, the plaintiffs. It was to the detriment of whomever was paying for the travel. No matter how one views it, the plaintiffs simply cannot point to any benefit Father Carrier sought to obtain for himself at their expense. Thus their claim fails.

<u>CONCLUSION</u>

If Mr. Perlitz did abuse these plaintiffs, they cannot prove that Father Carrier is liable to them for the harm Mr. Perlitz caused. The Court should grant this motion and enter judgment for Father Carrier.


*[signature page to follow]*


35

Respectfully submitted,

PAUL E. CARRIER, S.J.

By his attorneys:


/s/ Theodore J. Folkman
Timothy P. O'Neill (phv04968)
Theodore J. Folkman (phv04969)
Amanda Moger Rettig (phv04967)
MURPHY & KING, P.C.
One Beacon St., 21st Fl.
Boston, Mass. 02108
(617) 423-0400
tpo@murphyking.com
tjf@murphyking.com
amr@murphyking.com


Gene S. Winter (ct05137)
Benjamin C. White (ct27211)
ST. ONGE STEWARD
JOHNSTON & REENS LLC
986 Bedford St. Stamford, Conn. 06905
(203) 324-6155
gwinter@ssjr.com
Dated: November 14, 2016          bwhite@ssjr.com


*717390*

36

## CERTIFICATE OF SERVICE

I certify that on November 14, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on November 14, 2016, I caused a copy of the foregoing document to be served by first-class mail, postage prepaid, on counsel for the defendant, Douglas Perlitz, who is unable to accept electronic service:

| | |
|---|---|
| David T. Grudberg, Esq. | Michael McCooey |
| Carmody & Torrance, LLP | Chair, Haiti Fund, Inc. |
| 195 Church Street, P.O. Box 1950 | 475 Polly Park Road |
| New Haven, Conn. 06509-1950 | Rye, N.Y. 10580 |

/s/ Theodore J. Folkman