UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GERVIL ST. LOUIS,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>DOUGLAS PERLITZ, et al.,<br><br>　　　　　Defendants. | Civ. A. No. 3:13-cv-01132-RNC<br><br>Dated: November 14, 2016 |
| *This document relates to:*<br><br>*Lecenat v. Perlitz, No. 13-1633*<br>*Dorcine v. Perlitz, No. 13-1701*<br>*Mackenson v. Perlitz, No. 14-125*<br>*Deriza v. Perlitz, No. 14-668* | |

## **DECLARATION OF VIVIAN GROSSWALD CURRAN**

1.　　My name is Vivian Grosswald Curran.  I serve as Distinguished Professor of Law at the University of Pittsburgh School of Law.  I have been a tenured professor of law since 1999.  I teach and write in the area of comparative law, and specialize in French, German, international and transnational law. I am an elected member of the International Academy of Comparative Law, the American Law Institute, the Société de Législation Comparée, of which I serve as President of the North-American section, and am President of the American Society of Comparative Law. I am Editor, with Mortimer Sellers, of Cambridge University Press' *American Society of Comparative Law's Comparative Law Series*. I frequently publish scholarly work in French in books and law journals and have worked for many years with a group of French scholars, lawyers and judges, including Supreme Court judges, at the Collège de France.  I also


often lecture in French universities. I was raised speaking French at home as a mother tongue and attended a French school as a child in Paris.  In 2013, I was decorated by the French government as a *Chevalier des palmes académiques*.

2. A copy of my résumé is attached hereto as Exhibit 1. All translations from the French in this Declaration are mine. I am paid for my time at my ordinary hourly rate of $400; my opinions are not contingent on my compensation.

3. I submit this opinion about Father Carrier's potential liability under French tort law at the request of counsel for Father Carrier, a defendant in this action. I have been asked to assume certain facts for the purposes of this opinion, which I attach hereto as Exhibit 2.

I. <u>French Legal Interpretation: General Remarks</u>

4. In keeping with the Continental European civil-law tradition, based on Roman law, in theory all of French law is codified, and its spirit is to be found in the Civil Code.  While this is an overly simplistic statement of today's reality, it is important as it still means that judges must decide each case based on textual law of some kind.  Primary French legal authority is written law, whether a Code article or a statute enacted thereunder. French tort law is unusual, however, in that only six Civil Code articles deal with it: as of revisions of October 1, 2016, they are Articles 1240-1245. Until October 1, 2016, only five existed, Articles 1382-1386. Consequently, Supreme Court cases have had a greater influence on its development than in many other areas of law.

5. Supreme Court cases do have an important influence in French law in general if they meet one of three criteria, even though they still are not considered a primary source of law. Nevertheless, they will be followed where: (1) the most renowned scholars approve of the result; or (2) the Supreme Court has met *en banc*, or, in literal translation from the French, in plenary session (*assemblée plénière*). In that situation, the decisions are said to lay down *principles* for

future application *("arrêts de principe")*; or (3) where the Supreme Court has ruled in the same way not just once but many times, even though the Court was not sitting *en banc* in these decisions.  This latter situation is known as a "continuous line of decisions" (*"jurisprudence constante"*).  Since *stare decisis* does not exist in France, the power of these three situations lies in that they endow the decisions with reliability as a predictor of future, like decisions, albeit not a legally required one.

6. A French judge deciding a pending case is primarily tasked with deciding which Code provision(s) apply to the case, and applying them.  He or she would be familiar with the important scholarly treatises in the area as well as with prior Supreme Court cases on the same subject, but the Supreme Court judge is confined to drafting a decision composed of one sentence that identifies the applicable textual law, the parties' legal arguments, and the result mandated by the correct deductive application of the text to the legal issues.

7. In recent years, all Supreme Court and appellate court decisions have been made available on French government sites online, but no lawyer would consider them useful without seeing them presented in the context of scholarly commentary.  Even where, as is especially the case with appellate court decisions, the text seems understandable, the scholar's opinion of the decision is needed as guidance in terms of whether future courts should and may be likely to follow it. French legal research therefore requires reading the important scholarly treatises and the Supreme Court cases as presented by scholars in the weekly publications of case analyses. The latter include the text of the cases themselves.

8. I am not an expert in Haitian law; however, in nations whose codified laws are based on French laws, courts may refer to French law where, as in the instant situation, a Code provision is identical in wording to the corresponding one in French law, and in fact was derived

from it. *See Banque canadienne c. Soucisse* [1981], 2 R.C.S. (Supreme Court of Canada stating that French law "has considerable weight because the Napoleonic [French] law it applies is the same as our own"); *accord*, *Houle c. Banque nationale du Canada*, [1990] 3 R.C.S. 122 (Canadian Supreme court stating that French law is relevant to pending case once Court has verified that it was basis for corresponding Canadian law); *Banque de Montréal c. Bail Ltée* [1992]2 RCS 554 (Canadian Supreme Court looks to French scholars for clarification of French doctrine of good faith in order to apply it to pending Canadian case under Canadian Quebec law.) *See also* Brigitte Lefèbvre*, L'évolution de la justice contractuelle en droit québécois : une influence marquée du droit français quoique non exclusive*, L'ACCULTURATION EN DROIT DES AFFAIRES 191, 212 (2007). Judicial consultation of French law also occurs in Louisiana. *See* Joseph Dainow, *Planiol Citations by Louisiana Courts: 1959-1966,* 27 LA. L. REV. 231 (1967).

II.   The Supervisory Claim against Father Carrier for Perlitz's Conduct

9.   Looking at the facts of this case, a French lawyer or judge would conclude that the applicable Code provision for this claim is Article 1384 (5) of the Civil Code:[1]

> One is liable not only for the harm one causes by one's own act, but also for that caused by persons for whom one must answer, or for things in one's custody … [including]
>
> Masters and principals, for the harm caused by their servants and agents in the duties in which they [the principals] have employed them [the agents].

The agent must commit a tort for the principal to come within the purview of this provision. Cass. 2e civ. 8 oct. 1969. Bull. Civ. II no. 269; JACQUES FLOUR & JEAN-LUC AUBERT, II LES OBLIGATIONS para 212 (4e éd. Armand Colin 1989).

10.   The primary element of French agency is a relationship of subordination which the victim must prove. FRANCOIS TERRE et al.,DROIT CIVIL DES OBLIGATIONS, para.829 (a), *and*

---

[1] Article 1384 was renumbered on October 1, 2016 and now is Article 1242, but the two are textually identical.

*sources cited therein* (Dalloz, 11ᵉ éd. 2013). The Supreme Court has defined this relationship as the principal's right and authority to give the agent orders as to how to carry out his or her job. Cass. Civ. 12 janv, 1977, no. 75-10.517, and by the agent's acting on behalf of the principal. *See* MIREILLE BACACHE-GIBEILI, LES OBLIGATIONS: LA RESPONSABILITE CIVILE EXTRACONTRACTUELLE para.s 289, 295, 298 (Economica, 3ᵉ éd. 2016).

  11. Although an employment contract is not strictly required for such an employment relationship to exist if the facts reflect a relationship of subordination between the two parties, ALAIN BENABENT, DROIT CIVIL: LES OBLIGATIONS, paras. 578, 579 (2007), it is a rare case in which Art. 1384 (5) is applied without one. Thus, Professor Benabent notes that a contract must exist between the two parties, and that "[t]his contract in principle *is* the employment contract." *Id*. at para. 579 (emphasis added). Father Carrier was not the employer of Perlitz under any employment contract under the facts as I understand them.

  12. Under these criteria, French law would not sanction a finding that Father Carrier is liable as Perlitz's principal unless the plaintiffs were able to establish that he had the authority to order Perlitz as to how to carry out his job, and that a relationship of subordination existed between the two. As noted above, other than in exceptional circumstances, it also would be necessary under French law to find that Perlitz worked for Father Carrier under an employment contract. Perhaps equally importantly, my review of French cases reflecting agency liability of the kind being alleged here indicates that it generally is found where the principal is a legal person, not an individual.

  13. Thus, under the standards set forth above, Father Carrier would not be liable for negligence due to Perlitz's conduct under French law.

III.   The Claim against Father Carrier for Breach of Fiduciary Duty.

14.   French law does not have a real equivalent to the concept of fiduciary duty. Corporate directors and others in positions of power within corporations have what, literally translated, is a "duty of loyalty" to their corporation and shareholders. The French duty of loyalty is a judicially developed doctrine derived from what was Article L.225-251 of the Code of Commerce:[2]

> The [corporate] administration and the president are jointly and severally liable as the case may be to the company or to third parties, either for violations of statutes or regulations applicable to limited liability companies, or for violations of the articles of incorporation, or for wrongdoing committed in their management…

15.   The duty of loyalty resembles a duty of good faith dealing, which is the general meaning of "*loyal*" or its opposite, "*déloyal*," in French law. The French corporate duty of loyalty is not heightened in degree as is the U.S. fiduciary duty, which carries the highest level of obligation possible. In France, the duty is special because it is recognized as a specific one in addition to the general duty of good faith of everyone in business, *i.e.*, it is a particular duty corporate directors and CEOs owe to their partners, companies and shareholders. Some commentators have likened it to the common law fiduciary duty, but that is inasmuch as both require that the corporate director or CEO be free of conflicts of interests and act in good faith towards his or her partners, company and shareholders. *See* KARINE GREVAN-LEMERCIER, LE DEVOIR DE LOYAUTE EN DROIT DES SOCIETES,  para.s 120-133 (2013).

As the following paragraphs explain, the French corporate duty of loyalty has been applied only to financial transactions where the defendant is alleged to have profited personally

---

[2] A new version of the French Code of Commerce entered into force on November 1, 2016. For the identical text in the current Code of Commerce, see Article L. 223-22.

6

at the financial expense of the victim or to have undermined the financial wellbeing of the company through financially-directed matters.

16. In 2012, the French Supreme Court extended the duty of loyalty from its limited context of dealings in sales, divestments and stock matters in which directors and other corporate leaders were involved to where the director of a medical corporation was held liable for acquiring personal title to the building in which his professional company practiced, when he did not inform his partners thereof, and where the company wanted to acquire the building in the company's name. Cass, com., 18 déc. 2012. His duty of loyalty was to his fellow partners and the corporation on whose board of directors he sat. *Id.*

17. The most recent case to extend the duty of loyalty still remains entirely rooted in financial matters.  Decided by the Supreme Court in July of 2016, it involved a director whose employment contract stipulated that he would receive a severance package if discharged, except if for serious wrongdoing. He was discharged without severance pay for having undermined the company's prospects and its economic model at executive meetings, for trying to create hostility between the corporation and its majority shareholder in individual communications with potential investors, and by hiding information, thus putting the company's refinancing plan at risk. Cass. Com. 5 juillet 2016, no. 14-23.904.  The Supreme Court upheld his discharge without the golden parachute for breach of loyalty to his company. *Id.*

18. French duty of loyalty cases have focused on self-serving conduct that inures to the personal profit of the defendant or, in its newest extension, to the direct financial detriment of the corporation. In commenting on the 2016 case, a French scholar has noted that it is not even certain that the Supreme Court would have ruled in the same way had the 2016 golden parachute suit involved only the director's duty of loyalty to the majority shareholder. Bruno Dondero, *La*

*loyauté du dirigeant due à la société et à l'actionnaire*, https://brunodondero.com/2016/07/14/la-loyaute-du-dirigeant-due-a-la-societe-et-a-lactionnaire-cass-com-5-juil-2016-n-14-23904/. *See also* GREVAIN-LEMERCIER, *supra* para. 15, at para.s 549-569 (recounting permutations of corporate management personal liability, with potential personal liability under French law of one in corporate management always involving allegations brought by the allegedly injured corporation, fellow management members or shareholders, and where allegations concerned financial abuse, generally to the personal profit of defendant).

19.   In conclusion, although an allegation of breach of fiduciary duty by Father Carrier would have no exact equivalent in France, under French law a duty of loyalty by Father Carrier would have been owed in his capacity as director and President of Haiti Fund, Inc. to Haiti Fund, Inc., and to his fellow officers and shareholders. Under the French duty of loyalty, he would not have owed a duty to the plaintiffs in the instant case because they were neither (1) a corporate entity which he directed; his partners in such a corporate entity; or (3) shareholders thereof.

IV.   Father Carrier's Potential Liability as Director and President of Haiti Fund, Inc.

20.   Under the facts I have been asked to assume, Father Carrier was a director of Haiti Fund, Inc. for all of the time relevant to this action, and President for much of it; Haiti Fund, Inc. paid for his travels to Haiti; and he reported to the corporation about his activities there on a regular basis. I have reviewed the plaintiffs' Complaint and note that they themselves allege that he travelled there as Haiti Fund, Inc's representative, para. 54; and that Father Carrier supervised PPT in his capacity as Haiti, Inc.'s representative: *i.e.,* "[a]s the Chairman and then President of the Haiti Fund," para. 55; and that he "acted as the eyes and ears of the Haiti Fund," para. 93. Finally, they conclude in paragraphs 127-135 that the Haiti Fund, Inc. is responsible for Father Carrier's alleged torts, along with other corporate defendants whom he represented.

21.     Under French law, it is more difficult to establish the personal liability of a corporate director or CEO than that of a corporation or other party in a tort action because the French Supreme Court has held that "corporations are responsible for the wrongdoing for which they have made themselves liable through their representatives." Cass. Civ. 2$^e$, 17 juill. 1967 («corporations are liable for the wrongdoing of their representatives. ») *Accord*, Aix-en-Provence, 20 févr. 1969 (company committee's tort); CA Paris, 30 janv. 1970 (corporation's tort); Cass. Com. 18 févr. 1997, no. 95-12617; Cass. Soc. 26 janv. 2000, no. 97-15291, Bull. civ. V, n° 38 (union's tort). Critics who perceive the law as granting virtual immunity to corporate directors have commented that "the [French] Supreme Court [of private law] protects corporate directors the way the [French] Supreme Court of Administrative Law protects civil servants, namely in an environment of *unaccountability*." M. COZIAN, F. DEBOISSY, A. VIANDER, DROIT DES SOCIETIES, 161 (23e éd., 2010) (emphasis added), *quoted in* Pauline Blaise, *La recherche de la responsabilité de l'actionnaire dominant* 18 (dir. Elsa Peskine & Antoine Lyon-Caen, 2012-2013), available at https://www.academia.edu/10416890/La_Recherche_de_la_responsabilit%C3%A9_de_lactionnaire_dominant_m%C3%A9moire_. This is an area where scholars are often critical of the great extent to which the French Supreme Court protects corporate directors and CEOs from personal liability for misconduct, but where such disapproval has not changed the course of the Supreme Court. *See* Blaise, *supra* this para, at 19.

Based on the plaintiffs' own allegations, it seems uncontested that Father Carrier was Haiti Fund, Inc.'s representative with respect to the conduct at issue, and that, under the standards set forth above and below in this section IV, that he would not be liable to plaintiffs under French law for tortious acts as director or President of Haiti Fund, Inc.

22. A corporate director can be personally liable under French law for a tort only under restricted circumstances, defined by the Supreme Court in an often-repeated phrase as "where the director commits an intentional tort of special gravity that is incompatible with the normal exercise of his corporate duties." Cass. Crim. 20 mai 2003, D. 2003 2623, note B. Dondero. In any case in which the director was exercising his normal corporate functions, the party responsible for his tort is the corporation. BENABENT, *supra* para. 12, at para. 588. Particularly noteworthy in this context is that even "[t]he fact that [the underlying act] is a *criminal* violation is not sufficient to make it automatically incompatible with the normal exercise of his functions." *Id., citing* Cass. Civ. 1re, 4 janvier 2006, Bull. Civ. I, no. 7 (emphasis added). Unintentional torts, such as those alleged against Father Carrier, therefore do not suffice.

23. It has been specifically emphasized that under the French Supreme Court standard, even intentional torts do not subject a director to personal liability, provided that they are not "of a special gravity," and that, in order for a director to be held personally liable for a tort, the act must also be "*without any link whatsoever to his functions…*" Bruno Dondero, *Définition de la faute séparable des fonctions du dirigeant social*, 2003 DALLOZ, 2623 (emphasis added). *See also* Blaise, *supra*, para.21, at 19 (findings of severability are made only in the most exceptional circumstances where there is no relation whatsoever between the act of the defendant and the corporation). This standard echoes laws of corporations passed under the French Code of Commerce (L. 223-22 and 225-251). *Id.*

24. While French corporate law, L-223-22 in particular, refers to the need for severability of the director's act from his corporate functions for his personal liability to be envisaged, it also makes clear that it contemplates personal liability for his *mismanagement of the company* (referring to directors' "wrongdoing committed in their management" and "in the fulfillment of

10

their mandate"). *See* Dondero, *supra* para. 22. The conduct of Father Carrier that plaintiffs allege to have been tortious to my understanding did not involve corporate management and therefore would not entail personal liability in France under this standard.

25. An illustrative case decided by the Supreme Court in 2013 involved a complaint for personal liability against a director who decided to pay corporate dividends beyond what the company could afford, making it unable to pay the salary of their employee, who sued the director. Cass. Comm. 12 mars 2013, F-D, n° 12-11.514. Although the Court acknowledged that the plaintiff alleged an act by the director defendant that knowingly would deprive the employee of her salary in order for the director to be personally enriched, it held that the defendant's act was committed in the course of exercising corporate functions. *Id.*

26. In conclusion, to the extent that the plaintiffs do not allege either an intentional tort or criminal conduct by Father Carrier, and that they could not prove both that (1) alleged intentional torts were of a special gravity in his companies' management activities, and also (2) that they had no connection to the exercise of Father Carrier's corporate functions by virtue, *e.g.*, of being acts destined to inure purely to his personal profit or to the ruin of his company, under French law Father Carrier was Haiti, Inc.'s representative, and that if plaintiffs establish torts, Haiti, Inc. would be the sole party liable for the torts alleged against Father Carrier in his capacity as its director and president.

27. Under the facts I have been asked to assume, further buttressed by plaintiffs' own allegations in their Complaint, my conclusion is that Father Carrier would not be liable to the plaintiffs under French tort law or the duty of loyalty.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 11, 2016.

/s/ Vivian Grosswald Curran
Vivian Grosswald Curran

CERTIFICATE OF SERVICE

I certify that on November 14, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on November 14, 2016, I caused a copy of the foregoing document to be served by first-class mail, postage prepaid, on counsel for the defendant, Douglas Perlitz, who is unable to accept electronic service:

| | |
|---|---|
| David T. Grudberg, Esq. | Michael McCooey |
| Carmody & Torrance, LLP | Chair, Haiti Fund, Inc. |
| 195 Church Street, P.O. Box 1950 | 475 Polly Park Road |
| New Haven, Conn. 06509-1950 | Rye, N.Y. 10580 |

/s/ Theodore J. Folkman

717591