EXHIBIT A

COUR DE DISTRICT DES ETATS-UNIS -
DISTRICT DU CONNECTICUT

| | |
|---|---|
| WADSON DORCINE, également connu sous le nom de DORCINE WADSON,<br><br>    Le plaignant,<br><br>    contre<br><br>DOUGLAS PERLITZ ; FATHER PAUL E. CARRIER, S.J. ; HOPE E. CARTER ; HAITI FUND, INC. ; FAIRFIELD UNIVERSITY ; THE SOCIETY OF JESUS OF NEW ENGLAND ; SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA, AMERICAN ASSOCIATION, U.S.A., DIT ORDER OF MALTA, AMERICAN ASSOCIATION, USA JOHN DOE ONE ; JOHN DOE TWO ; JOHN DOE THREE ; JOHN DOE FOUR ; JOHN DOE FIVE ; JOHN DOE SIX ; ET JOHN DOE SEVEN,<br><br>    Les défendeurs. | Action civile N° :<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>vendredi 15 novembre 2013 |

# PLAINTE ET DEMANDE DE PROCES DEVANT JURY
## INTRODUCTION

    1.  Ce procès fait suite aux attouchements sexuels pratiqués sur des douzaines de garçons haïtiens, y compris le plaignant Wadson Dorcine, dit Dorcine Wadson, par le Défendeur Douglas Perlitz (« Perlitz »), alors que Perlitz dirigeait un pensionnat sous les auspices et la supervision des Défendeurs l'Université de Fairfield, la Société de Jésus de Nouvelle Angleterre (« l'Ordre Jésuite de Nouvelle Angleterre »), le « Haiti Fund, Inc. » (le fonds d'Haïti ), l'Ordre souverain militaire hospitalier de Saint-Jean de Jérusalem, de Rhodes et de Malte, Association américaine, États-Unis. (dit Ordre de Malte, Association américaine, États-Unis) (« l'Ordre de Malte »), Hope Carter (« Carter »), et le Père E. Carrier, S.J. (Le « Père Carrier »). En 2011, Perlitz a été condamné pour violation de l'article 18 U.S.C. § 2423(b), Transport de mineur avec

intention de se livrer à des conduites sexuelles illégales, après avoir abusé sexuellement de nombreux enfants sous sa garde sur une période de plusieurs années, sans qu'aucun des autres Défendeurs ne prenne une mesure quelconque pour arrêter ce comportement abusif exécrable. En fait, les Défendeurs ont aidé et facilité les actes de Perlitz, en lui procurant les moyens de les commettre, et au moins l'un des Défendeurs semble l'avoir aidé alors que celui-ci tentait de dissimuler les crimes de Perlitz.

2.      Perlitz, le Père Carrier, l'Université de Fairfield, l'Ordre de Malte, Carter et le Fonds Haïti ont établi un pensionnat en République d'Haïti, le pays le plus pauvre de l'hémisphère occidental. Cette école, le Projet Pierre Toussaint, également appelé Projet Vénérable Pierre Toussaint (« PPT »), a été conçu pour fournir des services aux enfants les plus pauvres d'Haïti, dont beaucoup étaient dépourvus de domicile et de repas réguliers. Perlitz, qui résidait à Haïti, était directeur du PPT, ce qui lui conférait une image de confiance et d'autorité non négligeable.

3.      Perlitz s'est servi de cette confiance et de cette autorité pour abuser sexuellement du Plaignant et de nombreux autres garçons mineurs qui résidaient au PPT. Perlitz a également menacé des enfants pauvres sous sa garde de les priver de leur nourriture et hébergement s'il ne se pliaient pas à ses demandes sexuelles, les forçant de fait à gagner leur nourriture et abri en payant ces commodités à l'aide de faveurs sexuelles.

4.      Les autres Défendeurs ont aidé Perlitz en lui procurant les moyens de voyager et de séjourner en Haïti et en lui donnant les moyens de diriger le PPT de cette manière. Ils n'ont apporté aucune directive ou supervision appropriées à la direction du PPT. Ils ont négligé les signes précurseurs qui auraient dû les alerter quant à la nature inacceptable des relations de Perlitz avec certains des garçons sous sa garde et ont continué à apporter des fonds au PPT bien après qu'il fût ou qu'il aurait dû être clair que Perlitz abusait de la confiance qui avait été placée en lui. Au moins un Défendeur autre que Perlitz a pris des mesures pour empêcher l'application des lois portant sur la protection des mineurs contre le type de comportement de Perlitz.

5.      Le Plaignant réclame aujourd'hui un dédommagement au titre de ses blessures personnelles conformément aux articles 18 U.S.C. § 2255, 18 U.S.C. § 1595 et aux règles du Common law.

## JURIDICTION ET LIEU

6.      La présente Cour est compétente au regard de la plainte formelle du Plaignant aux termes de l'article 28 U.S.C. § 1331 puisque la demande du Plaignant relève du droit des États-Unis, en particulier l'article 18 U.S.C. §§ 1595 et 2255. Cette Cour est également compétente sur ce sujet aux termes de l'article 28 U.S.C. § 1332, car le Plaignant est citoyen d'un pays étranger et que les Défendeurs sont citoyens du Connecticut, du Colorado et du Massachusetts, et dispose également d'une compétence supplémentaire aux termes de l'article 28 U.S.C. § 1367.

7.      Le présent District constitue un lieu approprié aux termes de l'article 28 U.S.C. § 1391(b) (3) car au moins un Défendeur y réside.

## PARTIES

8.      La Plaignant Wadson Dorcine, dit Dorcine Wadson, (« Le Plaignant » ou « Wadson Dorcine » ou « Dorcine »), est citoyen de la République d'Haïti et réside à Cap-Haïtien, Haïti.

9.      Le Défendeur Douglas Perlitz (« Perlitz ») est un individu qui, au moment de son arrestation, en 2009, était citoyen de l'État du Colorado. Avant de résider dans l'État du Colorado, le Défendeur Pertlitz a résidé dans l'État du Connecticut. Alors qu'il était résident du Connecticut, le Défendeur Perlitz a voyagé entre le Connecticut et la République d'Haïti pour des séjours couvrant des périodes de temps conséquentes en République d'Haïti. Le 21 décembre 2010, le tribunal de district américain du District de Connecticut a déclaré le Défendeur Perlitz coupable d'infraction au titre de l'article 18 U.S.C. §2423(b), Transport de mineur avec l'intention de se livrer à des conduites sexuelles illégales. Perlitz a été condamné à une peine de 19 ans et 7 mois en prison fédérale. Il purge actuellement sa peine au Federal Correctional Institution de

Seagoville, au Texas.

10. Le Défendeur Haiti Fund, Inc. (Le « Fonds Haïti ») est une société constituée sous le régime de l'État du Connecticut. Aux termes de l'article 28 U.S.C. § 1332(c) (1), le Fonds Haïti est par conséquent citoyen du Connecticut. Le Fonds Haïti a financé, géré, contrôlé et dirigé le Projet Pierre Toussaint (PPT) de Cap-Haïtien (Haïti), un programme qui proposait des services aux garçons mineurs de Cap-Haïtien et de ses environs, à Haïti. Durant toutes les périodes concernées, le PPT a géré un centre d'admission dans un premier lieu, et deux internats situés dans deux lieux différents ; ces trois entités étaient situées à Cap-Haïtien ou dans sa région. Le directeur du PPT à Haïti était Perlitz. Le Fonds Haïti a recruté Perlitz et l'a maintenu en fonction tout au long de la période de temps qui nous concerne. Durant toutes les périodes concernées, le Fonds Haïti avait l'obligation d'exercer une attention particulière quant au recrutement et au maintien du personnel, et notamment ceux de Perlitz. Durant toutes les périodes qui concernent cette affaire, alors que Perlitz était directeur du PPT à Haïti, il incombait au Fonds Haïti de le superviser et de le diriger, afin que celui-ci exerce ses fonctions correctement. le Fonds Haïti n'avait donc pas le droit de bénéficier financièrement, en connaissance de cause, d'une institution se livrant à des activités violant l'article 18 U.S.C. § 1591, et ne devait en aucun cas faciliter les voyages de Perlitz vers Haïti, sachant que Perlitz effectuait ces voyages dans le but de se livrer à des conduites sexuelles illégales.

11. L'Université de Fairfield, le défendeur, est une société constituée sous le régime de l'État du Connecticut, son siège étant situé à Fairfield, au Connecticut. Aux termes de l'article 28 U.S.C. § 1332(c) (1), l'Université de Fairfield est par conséquent citoyen du Connecticut.

12. Le Défendeur Université de Fairfield a recruté le Père Carrier et l'a maintenu dans ses fonctions tout au long de la période concernée. Durant toute la période concernée, l'Université de Fairfield avait l'obligation d'exercer une attention particulière quant au recrutement et au maintien du personnel, notamment ceux du

4

Père Carrier dans ses fonction. Durant toutes les périodes concernées, il incombait à l'Université de Fairfield de superviser et de diriger le Père Carrier en faisant preuve de responsabilité.

13.     L'Université de Fairfield a embauché Perlitz en accord avec le PPT et l'a maintenu dans ses fonctions tout au long de la période concernée. Durant toutes les périodes concernées, l'Université de Fairfield avait l'obligation d'exercer une attention particulière quant au recrutement et au maintien du personnel, et notamment ceux de Perlitz. Durant toutes les périodes qui concernent cette affaire, il incombait à l'Université de Fairfield de superviser et de diriger Perlitz, en faisant preuve de responsabilité, et il lui était interdit de bénéficier financièrement, en connaissance de cause, d'une institution se livrant à des activités violant l'article 18 U.S.C. § 1591, et de faciliter les voyages de Perlitz vers Haïti, sachant que Perlitz effectuait ces voyages dans le but de se livrer à des conduites sexuelles illégales.

14.     Durant toute la période concernée, l'Université de Fairfield a placé des employés, cadres ou agents de l'Université de Fairfield à des postes de gestion et/ou de direction du Fonds Haïti. Durant toutes les périodes concernées, lesdits employés, cadres ou agents de l'Université de Fairfield ont occupé des postes de gestion et/ou de direction du Fonds Haïti.

15.     Durant toutes les périodes concernées, l'Université de Fairfield a déclaré que le Fonds Haïti se livrait à des activités soutenues, gérées et parrainées par l'Université de Fairfield.

16.     La Société de Jésus de Nouvelle Angleterre, le défendeur (« l'Ordre jésuite de Nouvelle Angleterre ») est une association à but non lucratif constituée sous le régime du Commonwealth du Massachusetts et ayant ses activités au Connecticut. Aux termes de l'article 28 U.S.C. § 1332(c) (1), l'Ordre jésuite de Nouvelle Angleterre est par conséquent citoyen du Connecticut. L'Ordre jésuite de Nouvelle Angleterre, le défendeur, a recruté le Père Carrier et l'a maintenu dans ses fonctions tout au long de la période concernée. Durant toutes les périodes concernées, l'Ordre jésuite de Nouvelle

Angleterre avait l'obligation d'exercer une attention particulière sur le recrutement et le maintien du personnel, notamment ceux du Père Carrier. Durant toutes les périodes concernées, il incombait à l'Ordre jésuite de Nouvelle Angleterre de superviser et de diriger le Père Carrier en faisant preuve de responsabilité.

17.    L'Ordre souverain militaire hospitalier de Saint-Jean de Jérusalem, de Rhodes et de Malte, le défendeur et association américaine appelé communément Ordre de Malte, Association américaine, États-Unis (« l'Ordre de Malte »), est une association à but non lucratif constituée sous le régime de l'État de New-York. L'Ordre de Malte est l'une des trois entités affiliées de l'Ordre souverain militaire hospitalier de Saint-Jean de Jérusalem, de Rhodes et de Malte, (« l'Ordre souverain de Malte »), un ordre religieux laïc de l'Église Catholique établi par le Pape. Les membres de l'Ordre de Malte sont désignés par les termes « Chevalier » et « Dame ».

18.    L'Ordre de Malte a embauché Perlitz en accord avec le PPT et l'a maintenu dans ses fonctions tout au long de la période concernée. L'Ordre de Malte avait l'obligation d'exercer avec une attention particulière le recrutement et le maintien du personnel, et notamment ceux de Perlitz. Durant les périodes concernées, il incombait à l'Ordre de Malte de superviser et de diriger le Père Carrier en faisant preuve de responsabilité. Durant la période concernée, l'Ordre de Malte a placé plusieurs de ses Chevaliers et Dames au Conseil d'administration du Haiti Fund.

19.    Le le Père Paul E. Carrier, S.J, défendeur. Le Père Carrier est un citoyen de l'État de Massachusetts résidant à Weston, au Massachusetts. Au cours de la période de temps concernée, le Père Carrier était prêtre de l'Ordre jésuite de Nouvelle Angleterre ; Aumônier de l'Université/Directeur de l'Aumônerie du Campus et du Service communautaire de l'Université de Fairfield ; Président du Conseil d'administration, Président et/ou Vice-Président du Haiti Fund ; et Aumônier magistral de l'Ordre de Malte. Le Père Carrier a recruté Douglas Perlitz et l'a maintenu en fonctions tout au long de la période de temps qui nous concerne. Durant toutes les périodes concernées, le Père Carrier avait l'obligation d'exercer une attention particulière sur le recrutement

6

et le maintien du personnel, notamment ceux de Perlitz. Durant toutes les périodes qui concernent cette affaire, il incombait au Père Carrier de superviser et de diriger Perlitz, en faisant preuve de responsabilité. le Père Carrier n'avait donc pas le droit de bénéficier financièrement, en connaissance de cause, d'une institution se livrant à des activités violant l'article 18 U.S.C. § 1591, etde faciliter les voyages de Perlitz vers Haïti, sachant que Perlitz effectuait ces voyages dans le but de se livrer à des conduites sexuelles illégales.

20.     La Défenderesse Hope E. Carter est une citoyenne de l'État du Connecticut résidant à New Canaan, au Connecticut. Au cours de la période concernée, la Défenderesse Carter était Dame de l'Ordre de Malte ; membre du Conseil d'administration du Haiti Fund ; Secrétaire du Conseil d'administration du Haiti Fund ; et au cours de la période qui nous importe ici, elle avait l'obligation de superviser et de diriger Perlitz en faisant preuve de responsabilité, et il lui incombait de ne pas aider Perlitz à se livrer à des conduites criminelles. Au cours de la période concernée, Carter a officié durant au moins une partie des deux périodes de trois ans au « Board of Councillors », l'instance dirigeante de l'Ordre de Malte.

21.     Les Défendeurs John Doe One, John Doe Two, John Doe Three, John Doe Four et John Doe Five sont des individus dont l'identité est actuellement inconnue du Plaignant ; par conséquent, le Plaignant intente l'action désignée ci-dessus contre les Défendeurs John Doe One, John Doe Two, John Doe Three, John Doe Four et John Doe Five selon lesdits noms fictifs. Les Défendeurs John Doe One, John Doe Two, John Doe Three, John Doe Four et John Doe Five sont citoyens de l'État du Connecticut ou d'autres États des États-Unis. Le Plaignant demandera l'autorisation de modifier la présente Plainte pour ajouter les vrais noms des Défendeurs John Doe One, John Doe Two, John Doe Three, John Doe Four et John Doe Five lorsque lesdits noms auront été déterminés. Le Plaignant affirme que les Défendeurs John Doe One, John Doe Two, John Doe Three, John Doe Four et John Doe Five étaient responsables du recrutement, de la supervision, de la direction et du maintien en poste du Défendeur Perlitz.

22.      Les Défendeurs John Doe Six et John Doe Septsont des individus dont l'identité est actuellement inconnue du Plaignant ; par conséquent, le Plaignant intente l'action désignée ci-dessus contre les Défendeurs John Doe Six et John Doe Sept selon lesdits noms fictifs. Les Défendeurs John Doe Six et John Doe Sept sont citoyens de l'État du Connecticut ou d'autres États des États-Unis. Le Plaignant demandera l'autorisation de modifier la présente Plainte pour ajouter les noms véritables des Défendeurs John Doe Six et John Doe Septlorsque lesdits noms auront été déterminés. Le Plaignant affirme que les Défendeurs John Doe Six et John Doe Sept étaient responsables du recrutement, de la supervision, de la direction et du maintien en poste du Défendeur, le Père Carrier.

## EXPOSE DES FAITS

**Contexte et financement du PPT**

23.      Durant toute la période concernée, le Père Carrier était prêtre de l'Ordre jésuite de Nouvelle Angleterre et était soumis à la supervision et à la direction de l'Ordre jésuite de Nouvelle Angleterre.

24.      L'Université de Fairfield est une Université jésuite, dirigée par l'Ordre jésuite de Nouvelle Angleterre. Durant la période de temps concernée, l'Université de Fairfield se décrivait elle-même sur son site web comme « une institution jésuite complète ». Durant toute la période concernée, l'Ordre jésuite de Nouvelle Angleterre a déclaré qu'il dirigeait l'Université de Fairfield.

25.      Au cours des quatre dernières décennies, plusieurs membres de l'Ordre jésuite de Nouvelle Angleterre ont abusé sexuellement de nombreux enfants. Au lieu de prendre des actions en temps opportun pour prévenir la maltraitance d'enfants, la pratique de l'Ordre jésuite de Nouvelle Angleterre a consisté à payer, des années plus tard, des milliers, sinon des millions de dollars en compensation des torts que ses membres ont causé aux enfants. L'Ordre jésuite de Nouvelle Angleterre a été tristement constante dans sa méthode de gestion et de supervision d'autres cas d'abus sexuels d'enfants.

26.     A la fin des années 1980, Perlitz, alors qu'il était étudiant en première année à l'Université de Fairfield, s'est engagé dans une relation sexuelle avec le le Père Carrier, qui était son Aumônier. Bien que cette relation sexuelle avec un jeune étudiant de l'Université de Fairfield aurait dû alerter l'Université de Fairfield et l'Ordre jésuite de la Nouvelle Angleterre sur le fait que le Père Carrier était une personne au comportement répréhensible n'étant pas en mesure ni de respecter ni de comprendre les limites d'un comportement approprié envers des individus vulnérables, ces derniers n'ont en aucun cas sanctionné le Père Carrier. En 1997, moins de dix ans après le début de cette relation entre le Père Carrier et Perlitz, le Père Carrier a aidé Perlitz à obtenir des fonds pour démarrer et faire fonctionner le PPT.

27.     Perlitz a affirmé à un certain nombre de ses victimes que le Père Carrier était la personne qui l'avait initié aux activités homosexuelles lorsque Perlitz était étudiant, à un moment où le Père Carrier était Aumônier de l'Université de Fairfield, dirigée par l'Ordre jésuite de Nouvelle Angleterre.

28.     Au début de l'année 1996, Perlitz a officié pendant un an dans un hôpital à Milot, Haïti, alors géré par l'Ordre de Malte, via une entité appelée CRUDEM (Centre pour le développement rural de Milot).

29.     En 1997, Perlitz, avec l'aide du Père Carrier, Carter, de l'Université de Fairfield, et de John Doe Un à John Doe Cinq, a obtenu l'approbation, le soutien et le financement de l'Ordre de Malte pour ouvrir et gérer le PPT, une école pour garçons à Cap-Haïtien, à Haïti. Le financement original du PPT provenait de l'Ordre de Malte. Par conséquent, l'Ordre de Malte et l'Université de Fairfield ont fourni une bonne partie du financement et du personnel de ce projet. Le Haiti Fund (fonds Haïti) a été créer pour lever les fonds d'ouverture et de gestion du PPT, mais le ce dernier n'était qu'une simple extension de l'Université de Fairfield et de l'Ordre de Malte.

30.     Le PPT a établi un centre d'admission désormais appelé le Programme d'admission de la 13e rue. Le PPT a proposé des services à des garçons de tout âge, dont la plupart étaient sans domicile. Les plus jeunes des enfants fréquentant le PPT

9

avaient six ans. Le PPT fournissait divers services aux garçons mineurs, notamment, sans s'y limiter, des repas, un accès à l'eau courante pour les bains ou douches, des cours de classe primaire et des activités sportives. Perlitz a embauché aussi bien des américains que des Haïtiens pour travailler au PPT.

31.     Plus ou moins en 1999, avec l'aide du Père Carrier, de Carter, du Fonds Haïti, de l'Université de Fairfield, de l'Ordre de Malte et de John Doe Un à John Doe Cinq, Perlitz a obtenu des financements supplémentaires pour développer le PPT afin d'y inclure une installation résidentielle appelée le Village.

32.     Depuis la création du Haiti Fund, le Père Carrier a occupé son poste de directeur. Durant la première année après la création du Haiti Fund, le Père Carrier est devenu l'un des responsables de ses responsables. Pour qu'il puisse occuper une fonction de responsable au Haiti Fund, le règlement régissant l'Ordre jésuite de Nouvelle Angleterre exigeait que l'organisme nome le Père Carrier et que celui-ci accepte le poste et ses responsabilité.

33.     En sus du Père Carrier, plusieurs membres du conseil d'administration du Fonds Haïti avaient des liens avec l'Université de Fairfield : Deb Picarazzi, l'assistant opérationnel de l'Aumônerie du Campus de l'Université de Fairfield a officié au Conseil du Haiti Fund, tout comme Larry Miners, professeur d'économie de l'Université de Fairfield ; Sue MacAvoy, ancienne professeur d'infirmerie de l'Université de Fairfield ; Fred Wheeler, vice-président au développement à l'Université de Fairfield ; et Cathy Lozier, ancienne assistante de l'entraineur de tennis de l'Université de Fairfield. Bien que Hope Carter, qui siégeait au Conseil d'administration du Haiti Fund, n'était pas associée à l'Université Fairfield, elle était cependant associée à l'Ordre de Malte.

34.     Le Père Carrier et Hope Carter se rendaient chacun fréquemment à Haïti pour effectuer des contrôles et pour superviser les activités du PPT au nom de l'Université de Fairfield, de l'Ordre jésuite de Nouvelle Angleterre et de l'Ordre de Malte.

**Fonctionnement, soutien et supervision du PPT**

35.     Tout au long de la première décennie du 21e siècle, les Défendeurs ont fourni des fonds et autres soutiens au PPT et spécifiquement à Perlitz afin de lui permettre de pursuivre la gestion du PPT.

36.     Sous la direction du Père Carrier, l'Université de Fairfield, qui était gérée par l'Ordre jésuite de Nouvelle Angleterre, a affecté des étudiants volontaires par le biais de son Programme de bénévolat « Mission Volunteers ».Pendant toute la période concernée, les bénévoles ont travaillé au PPT et ont été supervisés par le Père Carrier et l'Ordre jésuite de Nouvelle Angleterre.

37.     Pendant environ dix ans où le PPT était en service, le Père Carrier s'est rendu à Haïti pour visiter et superviser le PPT sur une base régulière et fréquente, souvent mensuelle. Le Père Carrier a caractérisé son engagement à Haïti comme « une partie significative de mon travail comme Aumônier de l'Université et professeur du programme des Études Paix et Justice [à Fairfield]. » Une brochure décrivant le Projet Pierre Toussaint mentionne le Père Carrier comme l'interlocuteur ; l'adresse e-mail fournie est pecarrier@mail.fairfield.edu. En 2004, *Fairfield Now*, le magazine de l'Université de Fairfield, a mentionné que le Père Carrier était « intimement impliqué dans le Projet Pierre Toussaint. . . . »

38.     Cette même année, *Fairfield Now* a également annoncé avec fierté que « Fr. Carrier a passé les vacances de Printemps à Cap-Haïtien et a réalisé des interviews quotidiennes sur CNN, pour parler des personnes qu'il a rencontré, de leurs sentiments et leurs peurs. » Les transcriptions des apparitions du Père Carrier sur CNN montrent que Carrier a toujours été identifié comme appartenant à l'Université de Fairfield ; le PPT est décrit à plusieurs reprises comme une école ou un programme dirigé par l'Université de Fairfield. Le 18 mars 2004, après avoir été présenté sur les ondes nationales de CNN comme « le Père Carier de l'Université de Fairfield au Connecticut », le Père Carrier a évoqué les programmes menés par le PPT :

Voici des enfants qui, il y a deux ou trois ans, déambulaient dans les rues de

11

Cap-Haïtien vivant, comme je l'ai dit, sur les stands du marché. Et ils ont pu participer à un programme que nous menons. . .

Le Père Carrier ajoute, sans y être sollicité, « Je voudrais juste dire que, vous savez, *nous qui faisont partie de Fairfield* sommes très fiers de *nos membres* qui ont consacré leurs vies à ce projet et qui ont su faire face à toutes les difficultés. » (Soulignement ajouté).

39.     L'Université de Fairfield elle-même, gérée par l'Ordre jésuite de Nouvelle Angleterre, a promu le PPT comme une mission à laquelle les étudiants de l'Université de Fairfield ou les futurs étudiants pouvaient participer. Jusqu'au moment où Perlitz a cessé de diriger le PPT, l'Université de Fairfield a promu le PPT comme un programme permettant d'attirer les prospects étudiants à l'Université de Fairfield. Elle a félicité Perlitz pour son travail, en lui décernant d'abord un grade honorifique, puis une Récompense humanitaire. En fait, Perlitz était l'orateur d'ouverture de l'Université de Fairfield en 2002, dix ans après avoir obtenu son diplôme. Comme le Doyen des affaires étudiantes de l'Université de Fairfield l'exprime dans une lettre d'information de juin 2003, « A moins que vous ayez vécu dans une grotte pendant les 20 dernières années, vous ne pouvez pas vous recueillir à la chapelle Egan de [l'Université de Fairfield] ni travailler à l'Université de Fairfield sans connaître le nom de Doug Perlitz. » En 2004, le Père Carrier a créé une campagne via e-mail pour solliciter des donations et soutenir les travaux de Perlitz à Haïti. L'objet de l'e-mail était, en partie, « besoin de nouvelles prières pour la Mission d'Haïti dirigée par les missionnaires de l'Université de Fairfield Doug Perlitz et Andy. » Perlitz était un « fils chéri » de l'Université de Fairfield et, jusqu'à ce qu'il soit arrêté pour abus sexuels sur enfants, il travaillait à l'école.

40.     Durant les périodes concernées, l'Université de Fairfield, qui était gérée par l'Ordre jésuite de Nouvelle Angleterre, a collecté plus de 600 000 $ pour le Haiti Fund lors d'événements organisés à l'Université Fairfield. Une grande partie de cet argent était collecté lors de l'événement de levée de fonds annuel « Jazz It Up for Haïti ». Un communiqué de presse consécutif à la réunion de levée de fonds de 2006 a décrit l'engagement « d'une équipe universitaire de distribution de repas, de maintenance, d'impression, de médias, d'aumônerie du Campus, de l'administration

12

d'un Centre Barone et de bien d'autres personnels du campus. » L'université de Fairfield a transféré ces sommes soit vers le PPT, soit vers le Haiti Fund. Durant les années concernées, l'Université de Fairfield a financé directement le Fonds Haïti à hauteur de 51 000 $. De plus, de 1997 à 2006, l'Université de Fairfield a versé au Père Carrier approximativement 120 000 $, dont tout ou partie a été dépensé pour soutenir les activités du Père Carrier au PPT.

41.    Les donations en soutien au PPT étaient fréquemment faites sous formes de chèques libellés à l'ordre de l'« Université de Fairfield », de l'« Aumônerie du campus de l'Université de Fairfield », ou du «Fonds Haïtien de l'Université de Fairfield ». Une lettre de couverture accompagnant l'un de ces chèques - libellé à l'ordre de l'« Aumônerie du Campus de l'Université de Fairfield » - décrivait spécifiquement la donation comme « une subvention au Haiti Fund ». Certains chèques libellés à l'ordre de l'Aumônerie du campus de l'Université de Fairfield contenaient des notes sur la face précisant qu'ils étaient destinés au « Haiti Fund », à la « Mission Haïti », au « Projet Haïti », au « PPT » ou au « Projet Pierre Toussaint ».

42.    Les chèque libellés à l'ordre de l'Université de Fairfield, de l'Aumônerie du campus, de l'Aumônerie du Campus de l'Université de Fairfield ou du Fonds Haïtien de l'Université de Fairfield étaient couramment déposés sur le compte bancaire du Fonds Haïti. Inversement, les chèques libellés à l'ordre du « Projet Pierre Toussaint » et du « Haiti Fund » étaient déposés sur les comptes de fonds affectés de l'Université de Fairfield. Ainsi, aucune distinction n'était faite entre les Haiti Fund et l'Université de Fairfield en ce qui concerne le PPT.

43.    En novembre 2005, le Père Carrier et les « Jésuites de la communauté de Fairfield » ont organisé une réunion de levée de fonds pour « soutenir les missions de Haïti et Bridgeport ». L'invitation demandait aux participants de libeller leurs chèques à l'ordre de l'Aumônerie du Campus de l'Université de Fairfield ». A l'issue de cette réunion de levée de fonds des Jésuites et de l'Université de Fairfield, 4 100 $ de donations ont été collectés ; la majorité des chèques ont été libellés à l'ordre de

13

« l'Aumônerie du campus de l'Université de Fairfield », comme cela a été demandé. L'argent a été transmis au Haiti Fund.

44.     En 2005, l'Université de Fairfield a signé un contrat, pour des matériaux de construction du PPT. Le contrat déclare que « l'Université de Fairfield, via son projet Vénérable Pierre Toussaint, s'est mise au service des familles pauvres d'Haïti ». . . . » Le contrat a été signé par le Père Carrier au nom « du Projet Pierre Toussaint, Université de Fairfield ».

45.     L'Ordre de Malte, également, présente le PPT et Perlitz comme son domaine propre. Même après que l'Université de Fairfield a commencé à lever de larges sommes d'argent pour le PPT, l'Ordre de Malte a continué à fournir des fonds, sous la forme d'une subvention de 25 000 $ chaque année. Hope Carter a été activement impliquée dans la supervision du programme au nom de l'Ordre de Malte.

46.     En 2003, l'Ordre de Malte a reconnu le PPT comme un « travail » officiel de l'Ordre de Malte. En 2004, le Haiti Fund a mentionné cette désignation officielle à la Fondation Raskob en lien avec une demande de subvention. Le Fonds Haïti a expliqué que « la désignation de travail de l'Ordre implique non seulement un soutien financier, mais également une implication concrète. » . . . « Dans d'autres cas, l'Ordre de Malte a lui-même fait des demandes de subventions au nom du Haiti Fund ».

47.     Une brochure d'information non datée de l'Ordre de Malte cite le PPT comme l'une des « œuvres internationales » de l'Ordre de Malte. Dans son bulletin d'hiver 2007-2008, l'Ordre de Malte indiquait que son président avait remis un prix à « Doug Perlitz en reconnaissance de son travail et de son dévouement à l'École Pierre Toussaint de Malte pour les garçons à Haïti ». Pour célébrer l'anniversaire du PPT, la Fondation CRUDEM, l'entité de l'Ordre de Malte qui exploite l'hôpital de Milot, à Haïti, a créé une affiche ou une plaque annonçant : « La Fondation CRUDEM félicite le Projet Pierre Toussaint, l'œuvre de son organisme proche, l'Ordre de Malte à Haïti, pour ses dix ans de service ! » Une autre affiche ou plaque continuait :

14

> Les Chevaliers et Dames de l'Ordre souverain militaire hospitalier de Saint-Jean de Jérusalem, de Rhodes et de Malte : L'Association américaine des États-Unis salue les missionnaires de Malte pour leurs dix années au service de la jeunesse haïtienne ! Andy, Joanie, Tim, Nick, Britt et Jess, sous la direction de Doug et le chef spirituel du PPT, le père Paul.

« Doug » est Doug Perlitz ; Andy, Joanie, Tim, Nick, Britt et Jess étaient tous des bénévoles américains au PPT. Ainsi, le PPT était l'œuvre de l'Ordre de Malte et ses membres du personnel étaient des « missionnaires de Malte ».

48.     Le père Carrier écrivait des lettres périodiques aux « Amis maltais du PPT », dans lesquelles Perlitz était décrit comme un « missionnaire de Malte » et le PPT comme le « Projet Pierre Toussaint de la Communauté de Malte ». Les Amis maltais du PPT étaient informés que leurs dons soutiendraient directement Perlitz.

49.     Une lettre signée par le père Carrier et envoyée à l'été 2002 aux « Amis du Projet Pierre Toussaint » décrivait également Perlitz et l'un des bénévoles au PPT comme des « missionnaires laïques de Malte ». La lettre demandait aux destinataires de faire des dons en vue de soutenir ces missionnaires laïques maltais. Il était également indiqué que les chèques « peuvent être établis à l'ordre de l'Ordre de Malte au Connecticut ».

50.     Les ordinateurs utilisés au PPT appartenaient directement à l'Ordre de Malte, et une voiture utilisée par le PPT était immatriculée au nom de l'Ordre de Malte ou d'une entité affiliée à Malte et fournie au PPT.

51.     En tout temps, l'Ordre des Jésuites de la Nouvelle-Angleterre a déclaré qu'il pouvait envoyer ses membres n'importe où dans le monde pour les mettre au service des autres. En tout temps, les membres de l'Ordre des Jésuites de la Nouvelle-Angleterre ont souvent été envoyés en mission dans des régions exploitées par d'autres provinces, partout dans le monde, y compris à Haïti.

52.     Au cours de la période qui nous intéresse, les jésuites en formation étaient envoyés pour travailler au PPT. Un de ces jésuites en formation a vécu dans la résidence

du personnel du PPT au début de l'année 2008.

53.     De 1999 au moins jusqu'en 2008, le défendeur, M. Perlitz, a voyagé de la République d'Haïti aux États de Floride et de New York en prenant des vols aériens. Depuis la Floride et New York, Perlitz se rendait ensuite au Connecticut pour mener des activités de collecte de fonds pour Haiti Fund auprès des résidents du Connecticut, de New York et d'autres États, en vue de soutenir les activités du PPT à Haïti. Après avoir mené ces activités de collecte de fonds à cette période, Perlitz retournait ensuite du Connecticut vers la Floride et New York, où il achetait des billets d'avion pour rentrer à Haïti. Haiti Fund, le père Carrier et l'Université de Fairfield facilitaient les voyages de Perlitz à Haïti en lui fournissant des fonds pour financer de tels voyages et/ou en planifiant les voyages de Perlitz à Haïti.

54.     Entre 1999 au moins et 2008, le père Carrier et Mme Carter ont participé à l'importante collecte de fonds destinés à Haiti Fund auprès des résidents du Connecticut, de New York et d'autres États en vue de soutenir les activités du PPT à Haïti. Au cours de cette période, le père Carrier et Mme Carter voyageaient régulièrement du Connecticut à la Floride ou à New York, où ils achetaient des billets d'avion à destination d'Haïti afin de visiter et de superviser le PPT. Le père Carrier et Mme Carter retournaient alors d'Haïti par voie aérienne vers la Floride ou New York et rentraient ensuite au Connecticut. Le père Carrier et Mme Carter effectuaient ces voyages en tant que représentants de l'Université de Fairfield, de l'Ordre des Jésuites de la Nouvelle-Angleterre, d'Haiti Fund et de l'Ordre de Malte.

55.     À titre de président du Conseil d'administration puis de président d'Haiti Fund, ainsi que de directeur de la Pastorale et du service communautaire à l'Université de Fairfield, le père Carrier était tenu de superviser et de surveiller le programme au PPT, qui était financé par des fonds d'Haiti Fund et de l'Université de Fairfield, et qui comptait entre autres parmi son personnel des bénévoles et des missionnaires de l'Université de Fairfield et des jésuites en formation. Le père Carrier savait que Perlitz utilisait une grande partie des fonds d'Haiti Fund et de l'Université de Fairfield pour

16

financer ses voyages fréquents et ses séjours prolongés à Haïti.

56.     D'avant 2003 jusqu'en 2008, Perlitz et Haiti Fund, soit directement, soit par l'intermédiaire du PPT, ont acheté des fournitures aux États-Unis qui ont été envoyées à Haïti pour être utilisées au PPT.

57.     Au cours de la période qui nous intéresse, une maison à Bel Air, à Haïti, a été conservée en tant que résidence du personnel du PPT. Perlitz habitait la maison de Bel Air et y possédait sa propre chambre. Des bénévoles résidaient également dans la maison de Bel Air. Les jésuites qui rendaient visite au PPT séjournaient également dans cette maison.

58.     Le PPT a été créé sans assurer au préalable des mesures de protection minimales pour les enfants de la région. Perlitz n'avait pas d'expérience ni de formation pertinente pour diriger un tel programme lorsqu'il a été embauché par Carrier, Carter, l'Université de Fairfield, l'Ordre de Malte et/ou Haiti Fund en vue de diriger le PPT. Aucun des fondateurs ou des bienfaiteurs du PPT n'a fourni de règles, de normes, d'orientation ou de supervision concernant le maintien des limites et/ou la protection des enfants qui seraient entièrement dépendants du programme et de son directeur. Aucun des fondateurs ou donateurs du PPT n'a mis en place ou n'a fourni de structure pour la supervision ou l'évaluation du programme, ni pour le suivi des résultats obtenus par Perlitz. Ils ont envoyé Perlitz à Haïti investi de leur autorité et, dans la mesure de la sécurité des enfants qui y étaient pris en charge, n'ont accordé aucune attention à la façon dont il dirigeait le programme dont ils avaient financé la mise en place.

59.     Cette situation contraste avec les « Politiques de Sécurité » qu'Haiti Fund et son Conseil d'administration avaient créées pour le Projet Pierre Toussaint, afin d'assurer la sécurité des volontaires américains qui se rendaient à Haïti afin de travailler pour le programme. Il existait de nombreuses règles et interdictions concernant les voyages à Haïti et la « résidence », à savoir la maison de Bel Air où résidait le personnel américain du PPT. Il n'existait cependant aucune règle concernant les limites à respecter

entre le personnel et les enfants, ni aucune règle concernant le fait de laisser les enfants seuls avec un seul membre du personnel. Par ailleurs, les membres du personnel qui vivaient dans la résidence du personnel, principalement de jeunes bénévoles inexpérimentés, n'avaient reçu aucune formation qui leur aurait permis de reconnaître que les modalités relatives au coucher à la résidence du personnel, où les garçons dormaient régulièrement dans la chambre de Perlitz, étaient irrégulières et inappropriées.

60.     L'absence de politiques pour protéger les enfants au PPT était également contraire aux politiques et recommandations de l'Église catholique. En 1995, la Conférence nationale des évêques catholiques publiait un document intitulé « Marche dans la lumière : une réponse pastorale aux abus sexuels sur des mineurs ». Le document reconnaissait le problème des abus sexuels sur des mineurs et la nécessité pour l'Église de prendre des mesures afin d'y remédier. En 2002, lors d'une réunion largement médiatisée, la Conférence des évêques catholiques des États-Unis publiait un document intitulé « Charte pour la protection des enfants et des jeunes ». Ce document reconnaissait le besoin de normes claires et largement diffusées quant au comportement ministériel et aux limites appropriées pour le clergé et pour tout autre membre de l'Église occupant des postes de confiance et ayant des contacts réguliers avec les enfants et les jeunes. L'Ordre des Jésuites de la Nouvelle-Angleterre déclare qu'il respecte la « Charte pour la protection des enfants et des jeunes ». Malgré la demande de normes claires et largement diffusées quant au comportement et aux limites à respecter, aucune norme de la sorte n'a été établie au PPT par l'Ordre des Jésuites de la Nouvelle-Angleterre, par l'Université de Fairfield, une institution jésuite, par l'Ordre de Malte ou par Haiti Fund, qui était sous le contrôle de l'Université de Fairfield et de l'Ordre de Malte.

**Abus de garçons par Perlitz au PPT**

61.     Par l'intermédiaire du PPT, Perlitz était en contact avec les garçons qui participaient ou recevaient des services au PPT, et sur lesquels il exerçait une autorité et

un contrôle. En tout temps, le père Carrier, Mme Carter, Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre des Jésuites de la Nouvelle-Angleterre et John Doe One par l'entremise de John Doe Five avaient connaissance de l'accès de Perlitz, de son autorité et de son contrôle sur les garçons au PPT.

62.     Le rôle de Perlitz au PPT le positionnait comme une personne en qui les garçons mineurs participant à ou recevant des services au PPT pouvaient avoir confiance. En tout temps, le père Carrier, Mme Carter, Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre des Jésuites de la Nouvelle-Angleterre et John Doe One par l'entremise de John Doe Five savaient qu'en raison du poste de Perlitz, les garçons mineurs participant au PPT pensaient pouvoir avoir confiance en lui.

63.     Par son rôle au PPT, Perlitz était dans une position où les garçons mineurs participant à ou recevant des services au PPT avaient la certitude que le comportement adopté par Perlitz visait à servir leurs meilleurs intérêts. En tout temps, le père Carrier, Mme Carter, Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre des Jésuites de la Nouvelle-Angleterre et John Doe One par l'entremise de John Doe Five savaient qu'en raison du poste de Perlitz, les garçons mineurs participant au PPT auraient la certitude que le comportement adopté par Perlitz visait à servir leurs meilleurs intérêts.

64.     Le père Carrier et Mme Carter se rendaient fréquemment à Cap-Haïtien, à Haïti, pour rendre visite à Perlitz et au Projet Pierre Toussaint, ou participaient d'une autre manière aux activités du PPT. Le père Carrier et Mme Carter constatèrent que Perlitz adoptait un comportement mettant en danger des garçons mineurs participant au PPT. Malgré cette information, le père Carrier et Mme Carter aidèrent et facilitèrent les efforts de Perlitz d'abuser sexuellement des mineurs participant au PPT et les efforts de Perlitz de cacher ses abus sexuels sur des mineurs participant au PPT.

65.     Perlitz a abusé de sa position au PPT et a trahi la confiance que les garçons mineurs lui avaient accordée en abusant de nombreux garçons mineurs dont il était responsable.

66.     Perlitz mit en place plusieurs tactiques en vue d'abuser de garçons

mineurs dont il était responsable. Dans de nombreux cas, Perlitz suggérait aux garçons de dormir à la résidence du personnel du PPT à Bel Air, où Perlitz résidait, plutôt que dans l'établissement résidentiel du PPT. En effet, même si les garçons du PPT étaient supposés dormir dans les installations résidentielles du PPT, Perlitz faisait fréquemment venir plusieurs garçons à sa résidence dans la maison du PPT à Bel Air. Un ou plusieurs garçons dormaient souvent dans la chambre de Perlitz tandis que Perlitz y dormait également. Plus d'un des garçons séjourna uniquement à la maison de Bel Air pendant une longue période de temps.

67.    Perlitz faisait venir des garçons des installations résidentielles du PPT à la maison de Bel Air dans le but de les agresser sexuellement. Les membres du personnel étaient chargés d'envoyer certains garçons à Bel Air au cours de la soirée. Parfois, Perlitz venait dans les installations résidentielles du PPT et y agressait des garçons dans leur lit.

68.    Tandis que les garçons dormaient ou s'apprêtaient à dormir, Perlitz commençait à les agresser et/ou à exiger qu'ils aient des relations sexuelles avec lui.

69.    Avant d'agresser sexuellement ses victimes mineures, Perlitz leur faisait souvent prendre des substances intoxicantes pour fausser leur jugement et affaiblir leur résistance.

70.    Dans d'autres cas, Perlitz aurait demandé des faveurs sexuelles en échange de chaussures, vêtements, argent ou autres produits. Les garçons qui étaient prêts à répondre aux demandes de Perlitz recevaient de nouveaux vêtements et chaussures, ainsi que de l'argent, tandis que les garçons qui s'opposaient à ses demandes étaient contraints de partir sans recevoir aucun produit de base.

71.    Dans de nombreux cas, Perlitz aurait fait croire aux garçons que, s'ils voulaient continuer à vivre dans les installations du PPT où ils recevaient des services d'hébergement, de conseil et d'éducation, ils devaient avoir des relations sexuelles avec lui. Ces garçons avaient bien conscience que s'ils ne pouvaient pas continuer à vivre dans les installations du PPT, ils devraient faire face à la dure réalité de devoir

retourner vivre dans la rue.

72.    Perlitz poussa des garçons mineurs au PPT à se livrer à du commerce sexuel en les forçant à se livrer à des actes sexuels en échange d'argent, de nourriture, d'hébergement, de chaussures, de vêtements ou d'autres produits de base. Perlitz continua à recruter, à attirer et à garder ces garçons mineurs en sachant qu'il les obligerait à se livrer à ces actes sexuels commerciaux.

73.    Lorsque des garçons du PPT demandaient à Perlitz, à son bureau, une aide financière afin d'acheter des articles de première nécessité, comme des chaussures ou des vêtements, Perlitz leur disait de s'adresser à l'administrateur haïtien de l'une des installations résidentielles du PPT. Lorsque ces garçons avaient quitté son bureau, Perlitz appelait alors l'administrateur du PPT et lui ordonnait de refuser l'aide financière demandée. Après le refus de l'administrateur, ces garçons faisaient appel à Perlitz qui leur demandait alors des relations sexuelles en échange de l'aide financière.

74.    Perlitz conservait des photos et des films pornographiques sur son ordinateur. À de nombreuses reprises, Perlitz montra ce matériel aux garçons qu'il agressait.

**Notification des activités de Perlitz**

75.    En tout temps, le père Carrier, Mme Carter, l'Université de Fairfield exploitée par l'Ordre des Jésuites de la Nouvelle-Angleterre, l'Ordre des Jésuites de la Nouvelle-Angleterre lui-même, l'Ordre de Malte et Haiti Fund savaient que le PPT fournissait des services de base à des mineurs haïtiens extrêmement vulnérables. En tout temps, les défendeurs savaient que ces mineurs haïtiens vulnérables n'avaient pas d'endroit où dormir, si ce n'est dans les installations résidentielles du PPT ; ne bénéficiaient d'aucun programme éducatif, si ce n'est dans les installations du PPT ; et ne disposaient d'aucun financement pour acheter des produits de base, comme des vêtements et de la nourriture, à l'exception des fonds que le PPT leur octroyait.

76.    La plupart des agressions infligées par Perlitz à des garçons mineurs eurent lieu à la résidence du personnel du PPT à Bel Air, où vivait Perlitz. Cette

résidence était une maison extrêmement petite. Au moins une des pièces avait été ajoutée à la maison après la construction d'origine, et les fenêtres qui faisaient autrefois face à l'extérieur de la maison se trouvaient maintenant en face de la chambre supplémentaire. En outre, la forme et la conception de la maison étaient telles que la fenêtre extérieure de la chambre de Perlitz était visible depuis d'autres pièces de la maison, de sorte qu'une personne à l'intérieur de la maison pouvait regarder par la fenêtre, dans la chambre de Perlitz. En conséquence, il y avait peu d'intimité et il était difficile de dissimuler au reste de la maison des activités ayant lieu dans n'importe quelle partie de celle-ci.

77. En janvier 2008, un stagiaire jésuite arriva à Cap-Haïtien pour une affectation au PPT. Après trois semaines, le stagiaire remarqua de nombreux problèmes au PPT, y compris des préoccupations quant aux relations de Perlitz avec les enfants du programme. Le stagiaire remarqua rapidement l'irrégularité des garçons dormant dans la chambre de Perlitz.

78. La salle de bain utilisée par Perlitz se trouvait à travers un passage de la chambre de Perlitz. À un moment donné, ce passage fut utilisé comme un lieu de couchage par le stagiaire jésuite en visite. Le stagiaire put ainsi constater que Perlitz faisait dormir des garçons dans sa chambre et qu'il fermait la porte de sa chambre lorsqu'un garçon y dormait avec lui. Par ailleurs, une fenêtre se trouvait entre le passage et la chambre de Perlitz, de sorte que toute personne dans le passage pouvait voir dans la chambre à coucher. Les sons faisaient facilement écho dans la maison. Même si la porte de la chambre de Perlitz était fermée, le stagiaire jésuite pouvait entendre des voix venant de l'intérieur. L'emplacement et la direction des voix indiquaient que Perlitz et le garçon partageaient le même lit. Le stagiaire remarqua également que Perlitz portait une serviette lorsqu'il traversait la salle de bain, mais qu'il semblait être nu quand il était dans sa chambre avec les garçons mineurs.

79. Le stagiaire jésuite en visite au PPT observa également que les garçons qui étaient les favoris de Perlitz avaient des vêtements chers, un iPod haut de gamme et des

privilèges dont les autres garçons ne semblaient pas bénéficier.

80.     En février 2008, le stagiaire jésuite rencontra une religieuse à Haïti que le père Carrier lui avait suggéré de contacter. Lorsque le stagiaire partagea ses réserves au sujet du PPT et de Perlitz, la religieuse l'informa qu'elle et d'autres personnes à Haïti partageaient ses réserves et ses préoccupations. À la fin du mois de février, le stagiaire avait discuté avec d'autres bénévoles à Haïti des problèmes au PPT, y compris de l'irrégularité de la situation à la résidence du personnel où beaucoup de garçons passaient la nuit. Ces bénévoles confirmèrent qu'ils partageaient ses préoccupations à propos de Perlitz et du projet, mais qu'ils n'avaient pas été en mesure d'obliger Perlitz à traiter les questions soulevées.

81.     L'expérience du stagiaire jésuite à Haïti montre à quel point les préoccupations au sujet de Perlitz et du PPT étaient évidentes et connues de tous à Cap-Haïtien, et à quel point il était facile d'accéder à ces informations pour quiconque les cherchait.

82.     Des panneaux d'information et d'avertissement étaient également mis à la disposition des membres du personnel du PPT, en particulier de ceux qui séjournaient dans la résidence du personnel. Des bénévoles du personnel du PPT étaient présents à la résidence du personnel à Bel Air les matins où des garçons mineurs qui avaient passé la nuit dans la chambre de Perlitz étaient là et y avaient clairement passé la nuit. Des membres américains du PPT, dont des bénévoles de l'Université de Fairfield qui était dirigée par l'Ordre des Jésuites de la Nouvelle-Angleterre ainsi que, apparemment, l'Ordre des Jésuites de la Nouvelle-Angleterre lui-même, tous sous la supervision du père Carrier, résidaient également dans la résidence du personnel. Ces membres du personnel voyaient des garçons mineurs le soir, puis les voyaient encore dans la maison tôt le lendemain matin. En outre, ces membres du personnel voyaient des garçons dans la chambre de Perlitz dans la maison de la résidence du personnel pendant la journée, et voyaient encore au coucher des garçons venir dormir dans la chambre de Perlitz.

83.     Certains des garçons qui étaient sodomisés par Perlitz dans sa chambre se

plaignaient bruyamment pendant que Perlitz les pénétrait, de sorte que d'autres personnes dans la maison auraient pu les entendre et les auraient entendus.

84.     À plusieurs reprises, des garçons qui avaient été abusés par Perlitz informèrent le personnel du PPT de ces violences. Par exemple, plusieurs des garçons abusés par Perlitz parlèrent à Margaret Joseph, une psychologue/assistante sociale employée par Haiti Fund et/ou le PPT de ces abus. Au moins un des garçons informa un des tuteurs de la situation. D'autres membres du personnel, y compris les enseignants, les chauffeurs et un cuisinier, savaient que Perlitz abusait sexuellement de certains garçons au PPT. Certains des membres du personnel du PPT qui étaient au courant des abus étaient américains, tandis que d'autres étaient haïtiens.

85.     Le père Carrier et Mme Carter se rendaient fréquemment à Haïti pour visiter le PPT et rencontrer Perlitz à la maison de Bel Air. Beaucoup des garçons victimes de Perlitz, si ce n'est tous les garçons, connaissaient à la fois le père Carrier et Mme Carter de par leurs fréquentes visites. Les garçons qui connaissaient le père Carrier et Mme Carter les respectaient et leur faisaient confiance. Le père Carrier, un prêtre religieux de l'Ordre des Jésuites de la Nouvelle-Angleterre, aumônier magistral de l'Ordre de Malte et aumônier de l'université/directeur de la Pastorale et du service communautaire de l'Université de Fairfield, célébrait souvent la messe pour les élèves mineurs du PPT.

86.     Le père Carrier et Mme Carter ne s'entretinrent à aucun moment avec les garçons dans un endroit où ils pouvaient se sentir en sécurité pour leur faire part de ce qu'ils vivaient au PPT. Si le père Carrier et/ou Mme Carter avaient été mis au courant des abus par les nombreux membres du personnel qui le savaient, y compris les employés américains et les bénévoles sous la supervision du père Carrier, ces derniers n'ont pris aucune mesure en vue d'enrayer la situation ou d'y remédier de quelque façon que ce soit.

87.     Pendant plusieurs années, le père Carrier rencontra régulièrement un administrateur haïtien du personnel du PPT à Cap-Haïtien pour s'informer de la

24

situation du PPT et des enfants dont le PPT avait la charge. Lorsque cet administrateur haïtien du personnel apprit que Perlitz abusait sexuellement de mineurs, il confronta Perlitz et essaya d'empêcher Perlitz de continuer. Après cet événement, le père Carrier cessa de consulter, ou même de saluer cet administrateur haïtien du personnel du PPT.

88.     Le père Carrier connaissait la religieuse à Haïti vers laquelle il avait dirigé le stagiaire jésuite en visite. La religieuse était au courant des problèmes au PPT, y compris des problèmes dans la relation entre Perlitz et les garçons dont il était responsable. Dans la mesure où le père Carrier ne se renseigna pas auprès des religieuses qu'il connaissait à Haïti au sujet des conditions au PPT et de Perlitz en particulier, il fit preuve de négligence grave dans sa supervision de Perlitz au nom de l'Université de Fairfield, de l'Ordre des Jésuites de la Nouvelle-Angleterre, d'Haiti Fund et de l'Ordre de Malte. Si, d'autre part, le père Carrier avait effectivement été mis au courant par cette religieuse de signes avant-coureurs au PPT, il ne prit aucune mesure pour remédier au problème.

89.     Non seulement le père Carrier et Mme Carter ne se renseignèrent aucunement sur la gestion du PPT par Perlitz, mais ils ignorèrent également les signes d'alerte indiquant que Perlitz avait des relations inappropriées avec les garçons mineurs au PPT, incluant :

   a.   Le père Carrier et Mme Carter étaient présents à la résidence du personnel de Bel Air tandis que des garçons mineurs participant au PPT étaient également sur les lieux. Le père Carrier et Mme Carter virent tous deux des garçons mineurs du PPT dans la chambre de Perlitz dans la maison de Bel Air. Étant donné que le PPT disposait d'installations résidentielles, il n'y avait aucune raison légitime à ce que les garçons soient présents dans la maison de Perlitz, encore moins à ce qu'ils soient dans sa chambre à coucher dans la maison de Bel Air.

   b.   Le père Carrier vit Perlitz montrer à au moins un étudiant du PPT une vidéo pornographique sur l'ordinateur de Perlitz dans sa chambre de la

résidence du personnel de Bel Air.

c. Le père Carrier et Mme Carter étaient tous deux au courant que l'un des garçons au moins vivait dans la maison de Bel Air.

d. À une occasion au moins, le père Carrier était présent lorsque Perlitz organisa un rendez-vous à la maison de Bel Air avec l'un des garçons tard dans la soirée.

e. Le père Carrier était présent lorsque Perlitz prit dans ses bras un étudiant mineur du PPT de sorte que le devant du corps de Perlitz était pressé contre le dos du corps de ce mineur.

f. Le père Carrier passa une soirée à la résidence du personnel de Bel Air dans une chambre à l'étage alors que ce soir-là, un autre mineur dormait dans la chambre de Perlitz en bas et était abusé sexuellement par Perlitz. Le père Carrier savait qu'un autre mineur dormait dans la chambre de Perlitz dans la maison de Bel Air.

g. Le père Carrier était bien conscient que la résidence de Bel Air se trouvait à plusieurs kilomètres des installations résidentielles du PPT et qu'il n'y avait aucun transport disponible pour ramener les garçons au PPT tard dans la nuit. Lorsque le père Carrier vit des garçons tard le soir dans la maison, il savait qu'ils y passeraient toute la nuit.

90. Toutes ces circonstances auraient dû alerter le père Carrier et Mme Carter que quelque chose n'allait pas dans les relations de Perlitz avec les garçons dont il était responsable au PPT. Au cours de tous ces événements, le père Carrier et Mme Carter étaient des responsables d'Haiti Fund et des membres de l'Ordre de Malte, dont le père Carrier était également l'aumônier magistral. Au cours de tous ces événements, le père Carrier était un prêtre religieux de l'Ordre des Jésuites de la Nouvelle-Angleterre et un aumônier de l'université/directeur de la Pastorale et du service communautaire de l'Université de Fairfield exploitée par l'Ordre des Jésuites de la Nouvelle-Angleterre.

91. Les visites au PPT du père Carrier, un prêtre religieux de l'Ordre des

◇ Jésuites de la Nouvelle-Angleterre, et de Mme Carter, qui avait déjà été nommée ou élue à des postes de direction dans des organisations catholiques affiliées, comme l'Ordre de Malte et l'École Canterbury de New Milford, au Connecticut, sont survenues à un moment où les dirigeants d'organisations affiliées à l'Église catholique étaient conscients du risque d'abus sexuel de mineurs par des adultes chargés de veiller à leur bien-être. Comme nous l'avons déjà mentionné, la Conférence nationale des évêques catholiques avait publié un document reconnaissant le problème de l'abus sexuel des enfants et la nécessité pour l'Église de prendre des mesures pour y remédier en 1995, trois ans avant la fondation du PPT. En outre, la « Charte pour la protection des enfants et des jeunes », qui reconnaissait le besoin de normes claires et largement diffusées quant au comportement ministériel et aux limites appropriées pour le clergé et pour tout autre membre de l'Église occupant des postes de confiance et ayant des contacts réguliers avec les enfants et les jeunes, avait été publiée en 2002. En outre, l'Ordre des Jésuites de Nouvelle-Angleterre a promulgué, en janvier 2006, une « Éthique d'orientation du Ministère » qui interdit la conduite adoptée par M. Perlitz.

92.    Ainsi, au moment où M. Perlitz abusait des mineurs qui étaient à sa charge, l'Église catholique et ses affiliées avaient été mises au courant des abus sexuels et des signes indiquant qu'un membre du clergé ou un laïc adulte en charge d'enfants avait des relations inappropriées avec les enfants. Pourtant, aucune mesure pour protéger les enfants qui étaient à la charge de M. Perlitz n'a été prise ni par le Père Carrier, ni par l'Université de Fairfield gérée par l'Ordre des Jésuites de Nouvelle-Angleterre, ni par l'Ordre des Jésuites de Nouvelle-Angleterre lui-même, ni par Carter, ni par le Haiti Fund, ni par l'Ordre de Malte. Au contraire, les susmentionnés ont facilité les crimes de M. Perlitz en continuant à lui fournir l'argent et les installations nécessaires aux activités du PPT malgré toutes les preuves que M. Perlitz entretenait des relations inappropriées avec les garçons dont il avait la garde.

93.    Bien que les défendeurs n'aient pris aucune mesure pour protéger les enfants qui étaient à la garde de M. Perlitz, il est clair qu'ils étaient tenus au courant des ◇ activités menées dans le cadre du PPT et dans la résidence du personnel de Bel Air et

que le Père Carrier ainsi que Mme Carter faisaient lieu d'observateurs pour le Haiti Fund, l'Université de Fairfield, l'Ordre des Jésuites de Nouvelle-Angleterre et l'Ordre de Malte à Haïti. Ainsi, lors de ses visites à Haïti, le Père Carrier a appris qu'un bénévole adulte avait une petite amie haïtienne adulte qui passait parfois la nuit à la résidence de Bel Air. Peu après, un membre du conseil du Haiti Fund (et un employé ou ex-employé de l'Université de Fairfield) a téléphoné au volontaire à Haïti pour lui reprocher le caractère inapproprié de la présence de cette femme dans la résidence. De toute évidence, le Haiti Fund et l'Université de Fairfield recevaient suffisamment d'informations sur leurs représentants sur le terrain pour être en mesure de savoir qui vivait dans la maison de Bel Air et pour intervenir dans ces arrangements lorsqu'ils choisissaient de le faire.

94.     Tandis que le Père Carrier a négligé de surveiller et/ ou de signaler les activités illicites de M. Perlitz sur le PPT, l'Université de Fairfield a négligé de superviser comme il convenait le Père Carrier en sa qualité de Chapelain et Directeur de l'aumônerie du campus et, en particulier, eu égard à son rôle sur le PPT. Ainsi, l'Université de Fairfield a négligé de surveiller correctement les activités du PPT ou du Père Carrier à Haïti et d'interroger le Père Carrier pour vérifier que ce dernier exécutait correctement ses fonctions de supervision du programme du PPT.

95.     L'Ordre des Jésuites de Nouvelle-Angleterre, dont Père Carrier était membre et qui gérait l'Université de Fairfield, a négligé de superviser de manière adéquate ledit Père Carrier et l'Université de Fairfield en ce qui concerne la direction et le contrôle des activités du PPT.

96.     De même, l'Ordre de Malte a négligé de superviser Carter et le Père Carrier dans leur fonction de contrôle du projet de l'Ordre de Malte à Haïti. L'Ordre de Malte a négligé de s'assurer que Carter et le Père Carrier exerçaient de manière adéquate le contrôle du PPT et de vérifier que des garanties et procédures appropriées avaint été mises en place sur le projet dont il revendiquait la paternité.

97.     Les défendeurs M. Perlitz, le Père Carrier, Carter et le Haiti Fund ont

28

entravé, retardé et empêché la communication, aux forces de l'ordre, y compris aux forces de l'ordre des États-Unis, de toute information relative aux violations par M. Perlitz des articles 2423 et 1591 du titre 18 du Code des États-Unis, et ce au moins dans les circonstances suivantes :

a. En fin 2007 et début 2008, après avoir pris connaissance des déclarations selon lesquelles M. Perlitz avaient molesté des garçons sur le PPT, le Haiti Fund a mené une enquête visant à discréditer ces allégations et à exonérer M. Perlitz. Cette enquête n'a pas été conduite de bonne foi. Au lieu de cela, le Père Carrier, Carter et/ ou d'autres agents du Haiti Fund ont manipulé l'enquête et/ ou permis à M. Perlitz de la manipuler, en empêchant et interdisant à d'autres membres du conseil du Haiti Fund – ou toute autre personne – d'interroger des témoins indépendants potentiels ou d'engager de toute autre manière une enquête sérieuse. En conséquence, le rapport initial du Haiti Fund a déclaré que les allégations selon lesquelles M. Perlitz agressait sexuellement des garçons sur le PPT étaient sans fondement. Si le Haiti Fund avait mené une véritable enquête à ce moment, il n'aurait pas disculpé M. Perlitz et aurait réalisé qu'il aurait dû informer les forces de l'ordres des États-Unis de la conduite illégale de ce dernier.

b. En 2008, suite à une deuxième enquête du Haiti Fund sur les activités de M. Perlitz à Haïti, M. Perlitz et Carter ont pris des mesures pour empêcher les enquêteurs engagés par le Conseil d'administration du Haiti Fund d'entrer dans la chambre à coucher de M. Perlitz à la maison de Bel Air, Haïti. Au cours de cette même année, dans un nouvel effort pour faire obstacle à toute enquête réelle sur la conduite de M. Perlitz, le Père Carrier et Carter ont écrit une lettre aux donateurs du Haiti Fund affirmant que les accusations contre M. Perlitz étaient sans fondement, malgré le fait qu'à cette époque, le Père Carrier et Carter avaient été informés d'une possible conduite illégale de la part de ce dernier. Ces actions ont réussi à

29

retarder la conclusion de la deuxième enquête. Si le Père Carrier, Carter et d'autres membres du conseil du Haiti Fund n'avaient pas retardé la deuxième enquête, le Haiti Fund se serait rendu compte plus tôt qu'il devait informer les forces de l'ordre des États-Unis de la conduite illégale de M. Perlitz afin que celui-ci puisse être poursuivi – et arrêté – plus tôt que cela n'a été le cas.

c. En 2008, à la demande de M. Perlitz (qui avait alors interdiction de retourner à Haïti), Carter a pris l'avion pour Haïti pour récupérer un ou plusieurs ordinateurs de M. Perlitz se trouvant dans la maison de Bel Air et elle les a emmenés avec elle aux États-Unis. Il semble clair que Carter a retiré le(s) ordinateur(s) afin d'empêcher les enquêteurs, y compris les agents des services fédéraux, de découvrir sur le(s) ordinateur(s) du matériel pornographique susceptible de contenir également du matériel relatif aux jeunes gens molestés. Plutôt que de mettre le(s) ordinateur(s) à la disposition des enquêteurs s'intéressant à la conduite de M. Perlitz, Carter les a livrés à ce dernier. Un an après que Carter ait mis les ordinateurs hors de portée des enquêteurs, un de ceux-ci a été saisi au moment de l'arrestation de M. Perlitz. Les enquêteurs américains ont constaté que M. Perlitz avait utilisé cet ordinateur pour visiter des sites Web présentant des contenus à caractère sexuel relatifs aux garçons, tels que EXTREMEGAYBOYS.COM, www.photosgayboys.com/teenboys, et www.spankteenboys.com.

98. De 1999 à 2008, le Haiti Fund, avec une participation substantielle de l'Université de Fairfield, a collecté des millions de dollars pour soutenir des activités de M. Perlitz sur le projet PPT. M. Perlitz a utilisé une partie de ces fonds pour entretenir ses victimes mineures et leur offrir des cadeaux ou de l'argent en échange d'actes sexuels. Le Haiti Fund et l'Université de Fairfield savaient que M. Perlitz utilisait une partie substantielle de ces fonds pour financer ses voyages fréquents et ses séjours prolongés à Haïti. Le Haiti Fund et l'Université Fairfield gérée par l'Ordre des Jésuites

de Nouvelle-Angleterre ont négligé de mettre en place les garanties généralement acceptées - ou toute autre garantie - pour prévenir les abus qui ont eu lieu.

**Faits se rapportant à Wadson Dorcine**

99.     En 2006 ou peu après, lorsque le demandeur Wadson Dorcine avait 13 ans environ, M. Perlitz, le défendeur, alors qu'il était à Haïti, s'est engagé dans un comportement sexuel explicite et des actes obscènes et lubriques avec le demandeur, notamment des actes sexuels illicites.

100.     Sans restreindre la portée générale du paragraphe précédent ou le nombre précis de cas de conduite illicite au cours de la période susmentionnée, le défendeur, M. Perlitz, a contraint le demandeur à exécuter des actes sexuels illicites au moyen de menaces implicites. Entre autres choses, M. Perlitz s'est engagé dans des actes de sodomie avec le demandeur.

101.     Sans restreindre la portée générale des deux paragraphes précédents ou le nombre précis de cas de conduite illicite, au cours de la période susmentionnée, le défendeur, M. Perlitz, a offert des cadeaux de valeur au demandeur en échange de relations sexuelles illicites, notamment la possibilité de continuer d'aller à l'école. Le demandeur a compris que, pour pouvoir continuer de fréquenter le PPT, bénéficier des repas fournis par le PPT et recevoir une éducation dans le cadre du PPT, il devait se soumettre aux abus sexuels de M. Perlitz. Le défendeur, M. Perlitz, a également contraint le demandeur à se livrer à des actes sexuels, en lui faisant croire que, s'il refusait à M. Perlitz d'effectuer lesdits actes, il subirait un préjudice financier.

102.     En conséquence de la conduite sexuelle illicite, du comportement obscène et lubrique du défendeur, M. Perlitz qui offrait des cadeaux de valeur à un mineur pour des actes sexuels, et du recours à des moyens de coercition pour amener le demandeur à se livrer à des actes sexuels payés, le demandeur a souffert, souffre encore, et continuera de souffrir de profondes douleurs physiques et émotionnelles.

103.     Pendant toute la période durant laquelle se sont déroulés les événements précités, le défendeur, M. Perlitz, a faussement représenté et caché au demandeur le

31

caractère illicite des actes et autres activités à caractère sexuel ainsi que le fait que ces activités pourraient porter préjudice au demandeur.

104.    Les enfants victimes d'abus sexuel ont souvent des difficultés à se rappeler l'ampleur de l'abus qu'ils ont subi ou, même lorsqu'ils ne s'en rappellent pas, peuvent être incapables de communiquer tous les détails de cet abus. Ils peuvent également ignorer, ou être incapables de communiquer toute la portée du préjudice qu'ils ont subi suite à de tels abus. En tant que victime d'abus sexuels de la part de M. Perlitz, le demandeur ne peut pas, à ce moment, faire la description complète de tous les détails desdits abus et de la portée du préjudice qu'il a subi en conséquence.

## DEMANDES DE MESURES REPARATOIRES

### PREMIERE DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR

### Recours civil pour dommages corporels, en vertu de l'article 2255 du titre 18 du Code des États-Unis (contre le défendeur, M. Perlitz)

105.    Le demandeur répète, réaffirme et intègre par référence dans les présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-104 énoncées plus haut.

106.    Le défendeur, M. Perlitz, a violé l'article 2423(b) du titre 18 du Code des États-Unis - Voyage avec intention de se livrer à une activité sexuelle illicite - et a été reconnu coupable d'une telle violation. Alors qu'il était mineur, le demandeur a été victime d'une violation de l'article 2423(b) du titre 18 du Code des États-Unis de la part du défendeur, M. Perlitz.

107.    Le demandeur a subi des préjudices substantiels résultant des violations de l'article 2423(b) du titre 18 du Code des États-Unis de la part du défendeur, M. Perlitz.

108.    En raison de ce qui précède, M. Perlitz est redevable au demandeur des dommages d'un montant à établir par la Cour, ainsi que du paiement des frais de justice et des honoraires raisonnables d'avocat en vertu de l'article 2255 du titre 18 du Code des États-Unis.

### DEUXIEME DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR :

### Recours au civil pour dommages corporels, en vertu de l'article 2255 du titre 18 du Code des États-Unis (contre les défendeurs, le Père Carrier, le Haiti Fund et l'Université de Fairfield)

109.     Le Demandeur répète, réaffirme et intègre par référence aux présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-108 ci-dessus.

110.     Le défendeur, M. Perlitz, a violé l'article 2423(b) du titre 18 du Code des États-Unis - Voyage avec intention de se livrer à une activité sexuelle illicite.

111.     Le Haiti Fund et l'Université de Fairfield ont sciemment profité financièrement du PPT en vantant leur engagement dans le projet aux fins des activités de financement. Le Haiti Fund et l'Université de Fairfield ont reçu des contributions sur la base et/ ou en raison de leur participation au PPT.

112.     Le Père Carrier a sciemment profité financièrement du PPT en tant que responsable du Haiti Fund, lequel a reçu d'importantes sommes d'argent, des montants substantiels n'ayant apparemment pas été pris en compte.

113.     Le Père Carrier, le Haiti Fund et l'Université de Fairfield savaient ou auraient dû savoir que M. Perlitz s'était engagé dans des activités en violation de l'article 2423(b) du titre 18 du Code des États-Unis.

114.     En violation de l'article 2423(d) du titre 18 du Code des États-Unis, le Père Carrier, le Haiti Fund et l'Université de Fairfield ont organisé ou facilité les nombreux voyages et séjours prolongés de M. Perlitz à Haïti afin de promouvoir le PPT et de recevoir des avantages financiers de leur engagement dans le PPT même lorsqu'ils savaient ou auraient dû savoir que M. Perlitz partait à Haïti pour s'y livrer à des actes sexuels illicites avec des mineurs.

115.     En raison de ce qui précède, le Père Carrier, le Haiti Fund et l'Université de Fairfield sont redevables au demandeur des dommages-intérêts d'un montant à établir par la Cour ainsi que des honoraires raisonnablement établis, conformément à l'article 2255 du titre 18 du Code des États-Unis.

## TROISIEME DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR

### Négligence dans l'embauche, le maintien, la direction et la supervision
### (contre le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre des Jésuites de Nouvelle-Angleterre et John Doe Un, John Doe Deux, John Doe Trois, John Doe Quatre et John Doe Cinq, les défendeurs)

116.     Le Demandeur répète, réaffirme et intègre par référence aux présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-115 ci-dessus.

117.     Durant toutes les périodes pertinentes pour cette action, les responsabilités du Père Carrier, de Carter, du Haiti Fund, de l'Ordre de Malte, de l'Université de Fairfield, de l'Ordre Jésuite de Nouvelle Angleterre, de John Doe One, John Doe Two, John Doe Three, John Doe Four et John Doe Five (ci-après, les « Défendeurs superviseurs de M. Perlitz ») comprenaient l'embauche, le maintien en fonction, la direction et la supervision de Perlitz.

118.     Durant toutes les périodes pertinentes pour cette action, les Défendeurs, superviseurs de M. Perlitz savaient ou auraient dû savoir que M. Perlitz allait s'occuper ou s'occupait de certaines personnes, y compris des mineurs, et plus spécifiquement, du Plaignant.

119.     Durant toutes les périodes pertinentes pour cette action, les Défendeurs, superviseurs de Perlitz avaient une relation spéciale avec Perlitz et/ou le Plaignant.

120.     Durant toutes les périodes pertinentes pour cette action, les Défendeurs, superviseurs de M. Perlitz, étaient tenus de prendre le plus grand soin dans l'embauche, le maintien en fonction, la direction et la supervision de personnes de bonne réputation et moralité qui, on le savait, s'occuperaient de mineurs en République d'Haïti.

121.     Durant toutes les périodes pertinentes pour cette action, les Défendeurs, superviseurs de M. Perlitz ont, par négligence, violé lesdites obligations concernant la nomination et le maintien en fonction de M. Perlitz, une personne dont les Défendeurs, superviseurs de M. Perlitz, savaient ou auraient dû savoir qu'il était de réputation et de

34

moralité douteuse et incapable de s'occuper de mineurs de façon convenable. Les Défendeurs, superviseurs de M. Perlitz, ont dirigé et supervisé M. Perlitz de façon inappropriée et inadéquate.

122.    Durant toutes les périodes pertinentes pour cette action, les Défendeurs, superviseurs de M. Perlitz savaient ou auraient dû savoir que la conduite intentionnelle et négligente de Perlitz résulterait en de graves souffrances mentales et émotionnelles du Plaignant.

123.    En conséquence directe et immédiate de la conduite négligente des Défendeurs, superviseurs de M. Perlitz, le Plaignant a souffert et continuera d'endurer dans le futur : une grave détresse mentale et des blessures émotionnelles permanentes, des dépenses financières pour les soins et traitements médicaux et thérapeutiques qui s'imposent, une perte à long terme de ses capacités à gagner sa vie ; de même que d'autres dommages.

124.    En raison de ce qui précède, les Défendeurs, superviseurs de M. Perlitz, sont responsables envers le Plaignant de négligence dans leurs activités de recrutement, maintien, direction et supervision, à un degré qui devra être déterminé lors du procès.

### QUATRIEME DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR

### Négligence dans l'embauche, le maintien, la direction et la supervision (Contre les Défendeurs, le Haiti Fund, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle Angleterre, John Doe Six et John Doe Seven)

125.    Le Demandeur répète, réaffirme et intègre par référence aux présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-124 ci-dessus.

126.    Durant toutes les périodes pertinentes pour cette action, les responsabilités du Haiti Fund, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle Angleterre, John Doe Six et John Doe Seven (ci-après, les « Défendeurs superviseurs du Père Carrier ») comprenaient le recrutement, le maintien, la direction et la supervision du Défendeur, le Père Carrier.

127.    Durant toutes les périodes pertinentes pour cette action, les Défendeurs superviseurs du Père Carrier savaient ou auraient dû savoir que le Père Carrier était directement impliqué dans la gestion, la supervision, le contrôle et la direction de M. Perlitz, dont les Défendeurs superviseurs du Père Carrier savaient ou auraient dû savoir qu'il s'occupait de mineurs, et plus spécifiquement du Plaignant.

128.    Durant toutes les périodes pertinentes pour cette action, les Défendeurs superviseurs du Père Carrier avaient une relation spéciale avec le Père Carrier et/ou le Plaignant.

129.    Durant toutes les périodes pertinentes pour cette action, les Défendeurs superviseurs du Père Carrier étaient tenus de prendre le plus grand soin dans l'embauche, le maintien en fonction, la direction et la supervision de personnes de bonne réputation et moralité qui supervisaient, contrôlaient et dirigeaient directement M. Perlitz, lequel s'occupait lui-même, quotidiennement, de mineurs extrêmement vulnérables en République de Haïti.

130.    Durant toutes les périodes pertinentes pour cette action, les Défendeurs superviseurs du Père Carrier ont, par négligence, violé lesdites obligations concernant la nomination et le maintien en fonction du Père Carrier, une personne dont les Défendeurs superviseurs du Père Carrier savaient ou auraient dû savoir qu'il était de réputation et de moralité douteuse et incapable de gérer, superviser, contrôler et diriger M. Perlitz, qui s'occupait quotidiennement de mineurs extrêmement vulnérables en République de Haïti.Les Défendeurs superviseurs du Père Carrier ont dirigé et supervisé le Père Carrier de façon inappropriée et inadéquate.

131.    Durant toutes les périodes pertinentes pour cette action, les Défendeurs superviseurs du Père Carrier savaient ou auraient dû savoir que la conduite intentionnelle et négligente du Père Carrier résulterait en de graves souffrances mentales et émotionnelles chez le Plaignant.

132.    En conséquence directe et immédiate de la conduite négligente des Défendeurs superviseurs du Père Carrier, le Plaignant a souffert et continuera

◇ d'endurer dans le futur : une grave détresse mentale et des blessures émotionnelles permanentes, des dépenses financières pour les soins et traitements médicaux et thérapeutiques qui s'imposent, une perte à long terme de sa capacité à gagner sa vie ; de même que d'autres dommages.

133.　　En raison de ce qui précède, les Défendeurs superviseurs du Père Carrier sont responsables envers le Plaignant de négligence dans leurs activités de recrutement, maintien, direction et supervision, à un degré qui devra être déterminé lors du procès.

◇

CINQUIEME DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR

**Violation des obligations fiduciaires**
**(contre les défendeurs le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte,**
**l'Université de Fairfield, l'Ordre Jésuite de Nouvelle-Angleterre et John Doe**
**One à John Doe Seven)**

134.    Le Demandeur répète, réaffirme et intègre par référence aux présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-133 ci-dessus.

135.    Durant toutes les périodes pertinentes, le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle Angleterre, et John Doe One à John Doe Seven savaient que le PPT, géré et contrôlé par le Défendeur, M. Perlitz, fournissait des services à des mineurs extrêmement vulnérables en République de Haïti.

136.    Durant toutes les périodes pertinentes, le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle Angleterre, et John Doe One à John Doe Seven ont parrainé et promu le PPT dont les Défendeurs savaient qu'il fournissait des services à des mineurs extrêmement vulnérables en République de Haïti.

137.    Le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle Angleterre, et John Doe One à John Doe Seven avaient chacun une obligation fiduciaire envers les mineurs Haïtiens participant au PPT, en particulier envers le Plaignant.

138.    Le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle-Angleterre et John Doe One à John Doe Seven ont tous manqué à leurs obligations fiduciaires envers le Plaignant.

139.    En conséquence directe et immédiate de la violation de leurs obligations fiduciaires par les Défendeurs le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre Jésuite de la Nouvelle-Angleterre et John Doe One à John Doe Seven, le Plaignant a souffert et continuera d'endurer dans le futur : une

◇

grave détresse mentale et des blessures émotionnelles permanentes, des dépenses financières pour les soins et traitements médicaux et thérapeutiques qui s'imposent, une perte à long terme de sa capacité à gagner sa vie ; de même que d'autres dommages.

140.     Au vu de ce qui précède, le Père Carrier, Carter, le Haiti Fund, l'Ordre de Malte, l'Université de Fairfield, l'Ordre Jésuite de Nouvelle-Angleterre et John Doe One à John Doe Seven sont redevables envers le Plaignant d'un montant qui doit être déterminé par le présent procès.

### SIXIEME DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR

### Recours civil pour dommages corporels, en vertu de l'article 1595 du titre 18 du Code des États-Unis (contre le défendeur, M. Perlitz)

141.     Le demandeur répète, réaffirme et intègre par référence aux présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-140 ci-dessus.

142.     M. Perlitz a contraint le Plaignant, qui avait moins de 18 ans, à se livrer à un commerce sexuel en faisant pression sur lui afin qu'il se livre à des activités sexuelles en échange de commodités de valeur, notamment la possibilité de poursuivre à l'école. Le demandeur a compris que, pour pouvoir continuer de fréquenter le PPT, bénéficier des repas fournis par le PPT et recevoir une éducation dans le cadre du PPT, il devait se soumettre aux abus sexuels de M. Perlitz. M. Perlitz a aussi recruté, attiré et maintenu le Plaignant sachant qu'il le ferait participer à ces actes sexuels rémunérés. Les fonds qui finançaient les activités de M. Perlitz provenaient des États-Unis, de sorte que la conduite de M. Perlitz relevaient du commerce extérieur.

143.     Les actes de M. Perlitz constituent une violation de l'article 18 du Code des États-Unis § 1591 qui interdit le trafic sexuel d'enfants. Le Demandeur a été victime d'une violation de l'article 1591 de la part de M. Perlitz.

144.     En raison de ce qui précède, M. Perlitz est redevable envers le Plaignant de dommages dont le montant sera déterminé lors du procès, ainsi que du coût des honoraires d'avocat raisonnables en vertu du titre 18 du Code des États-Unis § 1595.

SEPTIEME DEMANDE DE MESURES REPARATOIRES DU DEMANDEUR

**Recours au civil pour dommages corporels, en vertu de l'article 1595 du titre 18 du Code des États-Unis (contre les défendeurs, le Père Carrier, le Haiti Fund et l'Université de Fairfield)**

145.     Le Demandeur répète, réaffirme et intègre par référence aux présentes chacune des allégations jusqu'ici invoquées aux paragraphes 1-144 ci-dessus.

146.     Le Haiti Fund et l'Université de Fairfield ont sciemment profité financièrement du PPT en vantant leur engagement dans le projet aux fins des activités de financement. Le Haiti Fund et l'Université de Fairfield ont reçu des contributions sur la base et/ ou en raison de leur participation au PPT.

147.     Le Père Carrier a sciemment profité financièrement du PPT en tant que responsable du Haiti Fund, lequel a reçu d'importantes sommes d'argent, des montants substantiels n'ayant apparemment pas été pris en compte.

148.     Le Père Carrier, le Haiti Fund et l'Université de Fairfield savaient ou auraient dû savoir que le PPT, par le biais de Perlitz, s'était livré à des activités en violation de l'article 1591 du titre 18 du Code des États-Unis.

149.     En raison de ce qui précède, le Père Carrier, le Haiti Fund et l'Université de Fairfield sont redevables au demandeur des dommages-intérêts d'un montant à établir par la Cour ainsi que des honoraires raisonnablement établis, conformément à l'article 1595 du titre 18 du Code des États-Unis.

DEMANDE DE MESURES REPARATOIRES

EN CONSEQUENCE DE QUOI, le Plaignant Wadson Dorcine demande respectueusement une sentence de 20 000 000 $ de dommages et intérêts contre chaque Défendeur pour chaque plainte que le Plaignant Watson Dorcine a formulée contre chacun des Défendeurs, des dommages punitifs, plus les frais, intérêts, frais d'avocat et toute autre réparation que la présente Cour jugera juste et équitable.

Affaire 3:13-cv-01701 Document 1 déposé le 11/15/13 Page 42 sur 42

## PLAINTE ET DEMANDE DE PROCES DEVANT JURY

Le Plaignant demande un procès avec jury sur toutes les plaintes jugées pertinentes.

Date vendredi 15 novembre 2013

Par les avocats du plaignant,

Par :   /s/     Steven J. Errante
Steven J. Errante (ct04292)
SErrante@ltke.com
Marisa A. Bellair (ct23802)
LYNCH, TRAUB, KEEFE, & ERRANTE, P.C.
P.O. Box 1612
52 Trumbull Street
New Haven, CT 06510
Téléphone : (203) 787-0275
Fax : (203) 782-0278

*Pour le conseiller :*
Mitchell Garabedian (phv04676)
garabedianlaw@msn.com
William H. Gordon (phv04677)
garabedianlaw@earthlink.net
CABINET JURIDIQUE DE MITCHELL GARABEDIAN
100 State Street, 6th Floor
Boston, MA 02109
Téléphone : (617) 523-6250

Paul J. Hanly, Jr. (phv04680) phanly@hanlyconroy.com
Jayne Conroy (phv04679)
jconroy@hanlyconroy.com
Andrea Bierstein (phv04678)
abierstein@hanlyconroy.com

41

◇ HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP
112 Madison Ave., 7th floor
New York, New York 10016
Téléphone : (212) 784-6400

COUR DE DISTRICT DES ÉTATS-UNIS
DISTRICT DU CONNECTICUT

| | |
|---|---|
| GERVIL ST. LOUIS, | Civ. A. N° 3:13-cv-01132-RNC |
| Demandeur, | |
| vs. | En date du : 14 novembre 2016 |
| DOUGLAS PERLITZ, et al., | |
| Défendeurs. | |

Ce document se rapporte à :

Lecenat v. Perlitz, N° 13-1633
Dorcine v. Perlitz, N° 13-1701
Mackenson v. Perlitz, N° 14-125
Deriza v. Perlitz. N°14-668

## DÉCLARATION DE MICHEL EMMANUEL SUCCAR

1.      Je suis un avocat autorisé à pratiquer le droit à Haïti. J'ai obtenu mon diplôme en droit à la Faculté de droit de l'Université d'État d'Haïti à Port-au-Prince en 1997.

2.      J'ai obtenu une maîtrise en droit comparé à l'École de Droit de l'Université de Miami, à Coral Gables, en Floride, en 2002.

3.      J'ai pratiqué le droit pendant plus de quinze ans et je suis un membre en règle de l'association du barreau d'Haïti, de l'association du barreau de Port-au-Prince et de l'Ordre des Avocats de Port-au-Prince.

4.      Je suis un partenaire du Cabinet Lissade, un cabinet d'avocats de Port-au-Prince noté par Chambers & Partners, une agence européenne d'évaluation des cabinets d'avocats de premier plan. Mon activité concerne le droit civil et commercial, le droit des sociétés et le droit de la propriété intellectuelle.

5.      J'ai été choisi par le conseiller juridique du père Paul E. Carrier afin d'exprimer mon opinion sur des questions de droit haïtien, en considérant que le droit haïtien est d'application dans cette affaire. Il ne m'a pas été demandé d'exprimer une opinion sur la question de savoir si le droit haïtien s'applique effectivement : je comprends que la cour de justice américaine tranchera sur la question en vertu de la loi du for. J'ai facturé mes services de conseil pour le père Carrier à mon taux ordinaire de 300 USD. Le montant total qui m'a été payé à ce jour s'élève à 14 990 USD. Les honoraires reçus pour cette charge ne sont pas subordonnés à, ou ne dépendent pas d'un quelconque accord par lequel je devrais exprimer une opinion plutôt qu'une autre. Il ne m'a rien été demandé d'autre que d'exprimer une opinion impartiale sur ce qui est prévu par le droit haïtien.

6.      Je ne connaissais pas le dossier Perlitz ni le Projet Pierre Toussaint avant d'avoir été engagé par le conseiller juridique du père Carrier. Je n'ai aucune connaissance personnelle des faits liés au dossier et je ne connais personnellement ni les demandeurs ni les défendeurs, ou pour autant que je sache, personne qui ait été associé d'une manière ou d'une autre au PPT.

7.      Il m'a été demandé d'exprimer une opinion sur les deux questions suivantes :

   a.  Au vu des faits soumis, les victimes de M. Perlitz peuvent-elles, en vertu du droit haïtien, déposer une plainte à l'encontre du père Carrier en déclarant que ce dernier est coupable à leur égard de négligence pour avoir embauché ou manqué de superviser M. Perlitz ou pour l'avoir maintenu à son poste ?

   b.  Au vu des faits soumis, les victimes de M. Perlitz peuvent-elles, en vertu du droit haïtien, déposer une plainte à l'encontre du père Carrier en déclarant que ce dernier est coupable à leur égard du fait qu'il était leur fiduciaire et qu'il a manqué à une obligation fiduciaire qui lui incombait à leur égard ?

8.      Pour répondre à ces questions, un exposé des faits m'a été présenté et il m'a été demandé de considérer ledit exposé comme véridique. J'ai joint une copie de cet exposé des faits à ma déclaration, en Annexe 1.

A.    Bref contexte historique du système juridique haïtien.

9.    Avant de traiter la question, il est important de noter que le droit haïtien découle du Code Napoléon, c'est-à-dire du droit romano-germanique. C'est pourquoi nous nous référons de temps à autre à des verdicts rendus par les tribunaux français. Dans le système judiciaire haïtien, nous (avocats et juges) prenons comme référence des décisions prises par d'autres juges afin de convaincre le juge actuel d'émettre un verdict semblable à celui prononcé par les juges précédents. Encore une fois, ces décisions passées ne lient en rien le juge, mais elles peuvent le persuader de se prononcer de la même façon.

10.    Il est également important de noter que les lois haïtiennes n'ont pas beaucoup changé depuis l'occupation française, même si les lois en vigueur en France ont, quant à elles, beaucoup évolué au fil des années. Un juge haïtien pourra donc se référer à une décision de justice française pour mieux fonder son verdict sur un raisonnement juridique, même si le système judiciaire haïtien n'est pas soumis aux lois françaises à strictement parler. Certaines décisions prises en France reposeront sur des lois appliquées en France mais n'ayant aucun effet à Haïti.

11.    Pour conclure, les verdicts antérieurs de juges français peuvent ou non être pertinents ou applicables aux yeux des juges haïtiens en fonction du moment où ils ont été prononcés et de la loi à laquelle ils se réfèrent. Par exemple, une loi édictée en France mais pas à Haïti peut entraîner, auprès des tribunaux français, certaines décisions découlant de l'interprétation de ladite loi. Ces décisions ne seront pas prises en compte par le juge haïtien. Par contre, des décisions prises par des juges français interprétant le Code civil seront certainement suivies par les juges haïtiens, car la plupart des articles des Codes civils haïtien et français sont identiques.

12.    Selon mon opinion juridique dans le présent dossier, les verdicts rendus par les tribunaux français ainsi que les opinions issues des études des principales autorités juridiques en France sont pleinement applicables et devront être considérés comme convaincants par les juges

haïtiens, car le dossier renvoie à l'article 1170 du Code civil d'Haïti qui est également valide, sous un autre numéro d'article, dans le Code civil français et qui est encore applicable à ce jour. Les mots utilisés sont les mêmes et les articles respectifs portent sur le même point juridique. J'ai également examiné l'opinion juridique de Mme Viviane CURRAN, une juriste française, et ai conclu que, au vu du droit français, son opinion quant au présent cas serait convaincante et que le résultat serait le même en vertu du droit haïtien.

B.   <u>Responsabilité en vertu du droit haïtien découlant d'un acte ou d'une omission ayant entraîné des dommages à autrui (droit de responsabilité délictuelle)</u>

13.   La responsabilité délictuelle en général est abordée dans le Code civil d'Haïti aux articles 1168, 1169 et 1170. Sur la base des faits rapportés dans le dossier, je conclus que l'article applicable est l'article 1170 du Code civil d'Haïti.

14.   L'article 1170 du Code civil d'Haïti indique (traduction personnelle) :

« On est responsable non seulement du dommage que l'on cause par son propre fait, mais encore de celui qui est causé par le fait des personnes dont on doit répondre ou des choses que l'on a sous sa garde.

* * *

Les commettants [sont responsables] du dommage causé par leurs préposés, dans les fonctions auxquelles ils les ont employés. »

*Each person is responsible not only for the damage he causes by his own act, but also for the acts of other persons whom he should answer for, or for things that are in his custody. The principals are liable for the damages caused by their agents in the execution of the functions that they have been employed for."*

15.   Plusieurs décisions prises par la Cour de cassation d'Haïti ont toutes confirmé qu'un lien de causalité et de responsabilité doit exister pour les dommages à reconnaître. Dans une décision de la Cour de cassation, la plus haute cour de justice a ainsi établi que « La reconnaissance des dommages n'est justifiée que si tant la faute que le préjudice ont tous deux été établis ainsi que leur lien de causalité. » <u>*Voir Cass. 2ème section, 7 avril 1949, Bull. 1948-1949, pp 197 et seq.*</u> Dans une autre décision, la plus haute cour de justice a clairement établi que : « La reconnaissance des dommages sans établissement de la faute et du préjudice est un abus de pouvoir du juge. » <u>*Voir Cass. 7 novembre 1927, Aff. Rodriguez vs Bereny*</u>.

16.    Dans une autre affaire encore, la Cour de cassation a établi que : « Le jugement est fondé dans le cas où, sur un dossier d'électrocution, la faute de la société ainsi que les dommages sont reconnus après avoir constaté l'absence des mesures de protection requises alors que des câbles à haute tension étaient posés à moins de 1,50 m d'une maison. » *Voir Cass. 4 novembre 1948, Bull., 1948-49, pp 22 et seq.* ;

17.    Les éléments requis pour prouver la négligence sont : un acte ou une omission constituant une faute, un préjudice et, enfin, un lien de causalité entre l'acte ou l'omission et le préjudice. La charge de la preuve revient au demandeur.

1.    Analyse de l'article 1170 du Code civil d'Haïti.

18.    Dans la présente affaire, l'article 1170 est l'article de référence du Code parce qu'il légifère sur la responsabilité d'une personne pour toute action produite par un préposé de ladite personne. Nous supposons dans cette analyse que M. Perlitz est soit un préposé sous la supervision du père Carrier, soit un préposé sous la supervision d'une entité dénommée Haiti Fund, Inc.

a.    Domestique du père Carrier (personne physique).

19.    Dans la présente affaire, si l'on considère que M. Perlitz agissait en tant que préposé ou employé d'un commettant ou d'un employeur responsable de superviser son travail et de diriger ses activités, le commettant ou employeur sera responsable des actions produites par M. Perlitz.

20.    Conformément au droit, si M. Perlitz était un employé ou un préposé du père Carrier, alors cela suffirait à prouver la responsabilité du père Carrier en vertu de l'article 1170, sur la base des faits qui m'ont été présentés.

b.    Domestique d'une entité (personne morale)

21.    Dans le cas où la relation de commettant à préposé, ou d'employeur à employé existerait entre M. Perlitz et une entité juridique, alors la responsabilité reviendrait à ladite entité, et non pas à ses préposés, pour autant que l'entité soit un corps constitué.

22.    Dans la présente affaire, selon les faits qui m'ont été présentés, plusieurs années après que le Projet Pierre Toussaint a été lancé, un certain nombre de personnes ayant activement contribué aux activités de l'école ont créé l'association Haiti Fund, Inc. (« Haiti Fund »), une association à but non lucratif du Connecticut.

23.    La question à poser revient donc à savoir qui a embauché M. Perlitz ou qui était son employeur. La réponse à cette question permettra de résoudre le problème de la responsabilité pour négligence. Si suffisamment de preuves existent pour suggérer qu'Haiti Fund était l'employeur, la responsabilité pour négligence incombera alors à ladite association. Si, par contre, le père Carrier était le superviseur et l'employeur de M. Perlitz, la responsabilité pour négligence incombera au père Carrier.

2.    Définition des termes Employé, Employeur et Contrat de travail, qui représentent des critères importants pour l'établissement d'une relation Employé/Employeur.

24.    Selon l'article 19 du Code haïtien du travail, un employeur est : « toute personne physique ou morale [« personne morale » désigne un corps constitué] qui, en vertu d'un contrat de travail, loue les services d'autrui moyennant salaire pour l'exécution d'un travail déterminé. »

25.    Le même article définit un employé comme suit : « toute personne qui s'engage à prêter ses services moyennant rémunération, sous la direction et l'autorité d'une autre personne physique ou morale. »

26.    Selon l'article 13 du Code haïtien du travail, un contrat de travail est défini comme « toute convention par laquelle une personne s'oblige à louer ses services à une autre sous le contrôle ou la dépendance de celle-ci, moyennant une rétribution. »

27.     De plus, le même article 19 stipule clairement que : « Les directeurs, gérants, administrateurs, capitaines de navire et en général toute personne occupant des fonctions de direction ou d'administration au nom de l'employeur sont des représentants de l'employeur et en cette qualité engagent celui-ci vis-à-vis des travailleurs. »

28.     Il devient très important, dans la présente affaire, de déterminer la nature de la relation qui existait entre M. Perlitz et le père Carrier ou entre M. Perlitz et Haiti Fund, c'est-à-dire d'établir si M. Perlitz était un employé du père Carrier, un employé d'Haiti Fund, ou s'il agissait sous sa propre responsabilité, lorsqu'il commettait ces actes.

3.     M. Perlitz était-il un employé du père Carrier ou d'Haiti Fund, Inc. ?

29.     Il est important de noter qu'une personne est réputée être un employé si un salaire est versé en l'échange de l'exécution d'une certaine tâche. Toutefois, il est également important de noter qu'un contrat écrit de travail n'est pas la seule preuve qu'une telle relation existe. Un contrat peut également être verbal. Ce qui est important pour établir ce point, c'est de prouver que : a) un salaire était payé sous quelque forme que ce soit ; b) une tâche était exécutée par l'employé ; et c) l'employé était sous le contrôle ou l'autorité de l'employeur ;

30.     Après que le père Carrier a été congédié du conseil d'administration d'Haiti Fund, Inc., ledit conseil a également relevé M. Perlitz de « son poste » sur le Projet Pierre Toussaint et lui a interdit de revenir. La question reste de savoir à quel poste M. Perlitz était affecté et quel était son rôle. Qui le supervisait ?

31.     Certains éléments indiquent qu'Haiti Fund Inc. savait que M. Perlitz était présent et actif à Haïti pour l'exécution de certaines tâches (bien que non spécifiées dans le détail) et que le conseil d'administration savait qu'il était à Haïti pour travailler pour l'association. Haiti Fund Inc. supervisait et gérait l'ensemble des opérations du Projet Pierre Toussaint et, fait le plus significatif établissant que M. Perlitz était un employé d'Haiti Fund Inc., l'association reconnaissait qu'elle devait le traiter comme un employé aux fins de l'imposition fédérale. Il y a absence de contrat écrit, mais un contrat écrit n'est pas une obligation aux termes du droit haïtien, comme

susmentionné. Un contrat verbal est valide et peut établir une relation employeur/employé en vertu du Code haïtien du travail - *voir* article 16 du Code haïtien du travail. La raison pour laquelle il était considéré comme un employé est dénuée de pertinence. Haiti Fund Inc., en tant que corps constitué, assume la responsabilité de définir sa relation avec autrui, que ce soit dans le cadre d'un contrat de « contractant indépendant » ou d'une relation employeur/employé. En considérant M. Perlitz comme un employé, Haiti Fund Inc. a levé tout doute possible quant à la nature de leur relation. L'aveu d'une personne est reconnu par le droit haïtien, et est considéré par les juristes, comme la preuve la plus solide en droit haïtien. (Voir l'article 1140 du Code civil d'Haïti).

32.     Un certain degré d'interaction existait entre le père Carrier et M. Perlitz, du fait qu'ils étaient tous deux à Cap-Haïtien. La nature de cette relation est celle d'un représentant du Conseil d'administration à Haïti visitant le PPT au nom de l'association Haiti Fund, Inc. ; si l'on prend en compte l'analyse ci-dessus, il est probable qu'un tribunal haïtien aurait établi que M. Perlitz était un employé ou un préposé d'Haiti Fund Inc., et non un employé ou préposé du père Carrier.

33.     Sur la base des faits propres à la présente affaire, j'en conclus que M. Perlitz n'était pas un employé du père Carrier, mais bien d'Haiti Funds Inc. Selon le droit des sociétés à Haïti, les corps constitués sont des personnes morales assumant la responsabilité de leurs propres actes et de ceux de leurs préposés ou employés. M. Perlitz ayant agi en tant que préposé ou employé d'Haiti Fund. Inc., il est présumé que ladite association est responsable des actes de M. Perlitz en raison de la relation commettant/préposé ou employeur/employé ayant existé entre les deux, et une telle présomption peut être infirmée par Haiti Fund Inc., à qui la charge d'une telle infirmation revient.

34.     Pour conclure, s'il avait été établi que le père Carrier était l'employeur de M. Perlitz, selon l'article 1170 du Code civil d'Haïti, alors effectivement, les victimes de M. Perlitz pourraient déposer une plainte contre le père Carrier en vertu du droit haïtien en déclarant le père Carrier responsable à leur encontre de négligence pour avoir embauché ou manqué de superviser M. Perlitz, ou pour l'avoir maintenu à son poste. Mais au vu des faits, le

père Carrier n'est pas personnellement responsable car il n'était pas l'employeur de M. Perlitz. Ni les interactions ni les exposés des faits ne peuvent rendre le père Carrier responsable dans le cadre d'une poursuite au civil.

C.  Sur la base des faits soumis et en vertu du droit haïtien, les victimes de M. Perlitz peuvent-elles déposer une plainte à l'encontre du père Carrier en le déclarant responsable à leur égard du fait qu'il était leur fiduciaire et qu'il a manqué à l'obligation fiduciaire qui lui incombait à leur égard ?

35.  Le fiduciaire est un concept qui n'existe pas dans le droit haïtien. Les principaux éléments pris en compte dans le droit haïtien de responsabilité délictuelle sont ceux de « négligence », d'« action », d'« omission », de « faute » et de « causalité ». Par conséquent, les victimes de M. Perlitz ne peuvent pas, en vertu du droit haïtien, déposer une plainte à l'encontre du père Carrier en le déclarant responsable à leur égard du fait qu'il était leur fiduciaire et qu'il a manqué à l'obligation fiduciaire qui lui incombait à leur égard.


Par la présente, je déclare, sous peine des sanctions prévues en cas de parjure par la législation des États-Unis d'Amérique, que ce qui précède est véridique et exact. Signé le 14 novembre 2016.


/s/ Michel Succar _____
Michel Succar

ATTESTATION DE NOTIFICATION

Je certifie que, le 14 novembre 2016, une copie du document ci-dessus a été déposée par voie électronique. Un avis de ce dépôt sera envoyé à toutes les parties par courrier électronique via le système de dépôt électronique du tribunal et par courrier prioritaire à toutes les parties ne pouvant pas recevoir de communications via ledit système, comme indiqué dans l'avis de dépôt électronique. Les parties peuvent accéder au présent dépôt via le système CM/ECF du tribunal.

Je certifie par ailleurs que, le 14 novembre 2016, j'ai pris les mesures pour qu'une copie du document qui précède soit délivrée par courrier prioritaire prépayé au conseiller juridique du défendeur, M. Douglas Perlitz, qui ne peut pas recevoir de courrier électronique :

| | |
|---|---|
| David T. Grudberg, Esq. | Michael McCooey |
| Carmody & Torrance, LLP | Président, Haiti Fund, Inc. |
| 195 Church Street, P.O. Box 1950 | 475 Polly Park Road |
| New Haven, Conn. 06509-1950 | Rye, N.Y. 10580 |

/s/ Theodore J. Folkman

717583

## ARGUMENT DE PÈRE CARRIER SUR L'APPLICABILITÉ DU DROIT HAÏTIEN DANS L'AFFAIRE PERLITZ

2.    Contexte du droit haïtien

Haïti fait partie de la tradition juridique la plus connue qui est une alternative à notre tradition de common law, à savoir le droit civil. Nous ne nous étendrons pas sur les différences entre le droit civil et la common law, mais pour comprendre notre point de vue sur le droit haïtien, il est important de comprendre quelques points.

La différence la plus connue entre les deux systèmes juridiques est que la common law se développe à travers des antécédents judiciaires, et est modifiée par des lois, tandis que le droit civil est codifié dans des codes complets. (Décl. Curran °4 ; Décl. Succar 9-10). *Voir* Peter G. Stein, *Roman Law, Common Law, and Civil Law* (*Droit Romain, Common Law et Droit Civil)*, 66 Tul. L. Rev. 1591, 1594-98 (1992). Dans le droit civil, les antécédents judiciaires ne sont pas une source de droit contraignante. La décision d'un juge dans une affaire doit reposer sur la loi elle-même (un code ou un décret exécutif), pas seulement sur un antécédent judiciaire. (Décl. Succar 9; Décl. Curran 4). En effet, à Haïti, la constitution elle-même prévoit que le pouvoir d'interpréter la loi ne repose pas sur le judiciaire mais sur la législature, qui exerce le pouvoir d'interprétation par l'adoption d'une autre loi. *Voir* Const. d'Haïti, art. 128 (« L'interprétation des lois par voie d'autorité, n'appartient qu'au Pouvoir législatif, elle est donnée dans la forme d'une loi »).

Le code le plus pertinent dans notre cas, comme abordé ci-dessous, est le *Code civil d'Haïti*. Dans un système de droit civil, le code civil codifie la majeure partie de ce que nous appelons le droit de la propriété, les contrats, les actes délictuels, le mariage, la succession et le droit familial. Le Code civil d'Haïti a été adopté en 1825, après la Révolution haïtienne, et est (du moins concernant les articles pertinents dans cette affaire) presque identique au *Code civil* français adopté en 1804. Étant donné que le système juridique haïtien découle du système juridique français, les avocats haïtiens consulteront les sources françaises afin de déterminer les justifications de la loi (Décl. Succar 9-12). À l'appui des arguments présentés dans cette motion, nous proposons deux opinions : celle d'un avocat haïtien de premier plan, Michel Succar du Cabinet Lissade, un cabinet d'avocats de Port-au-Prince, et celle de Vivian Curran, une éminente spécialiste américaine du droit comparé et en particulier du droit français. L'opinion du professeur Curran à propos du droit français permet de réaffirmer l'opinion de M. Succar concernant le droit haïtien en montrant que le résultat en vertu du droit haïtien serait identique en France. M. Succar, en plus de sa propre analyse en vertu du droit haïtien, a confirmé que l'opinion du professeur Curran est convaincante et indique le résultat conforme au droit haïtien. (Décl. Succar 12). Ce mémorandum inclut uniquement les grands points des opinions juridiques des deux experts : l'ensemble de l'analyse se trouve dans leurs déclarations respectives.

3. <u>En vertu du droit haïtien, le père Carrier ne peut être tenu responsable de négligence, car M. Perlitz n'était ni son préposé ni son employé, et parce que le père Carrier lui-même était le préposé d'Haiti Fund, Inc.</u>

Un avocat haïtien ou français à qui l'affaire serait présentée commencerait par se demander quel article du Code civil est pertinent pour l'analyse de la responsabilité potentielle de père Carrier vis-à-vis des demandeurs qui affirment que M. Perlitz a sexuellement abusé d'eux. Conformément au droit haïtien et français et aux yeux d'un avocat civil en général, l'article pertinent serait l'article 1170 du Code civil d'Haïti (Article 1384 du Code civil français),[18] qui indique :

*On est responsable non seulement du dommage que l'on cause par son propre fait, mais encore de celui qui est causé par le fait des personnes dont on doit répondre ou des choses que l'on a sous sa garde.*

*\* \* \**

*Les commettants [sont responsables] du dommage causé par leurs préposés, dans les fonctions auxquelles ils les ont employés. »*

*"One is liable not only for the harm one causes by one's own act, but also for that caused by persons for whom one must answer, or for things in one's custody … [including]*

*"Principals, for the harm caused by their agents in the duties in which they [the principals] have employed them [the agents.]"*

Code civil [C. Civ.] art. 1170 (Haïti) ; *cf.* Code civil [C. Civ.] art. 1384 (Fr.).[19] (Décl. Succar 13-14 ; Décl. Curran 9).

---

[18] Législation française très récente, effective au 1er octobre 2016, a donné lieu à la renumérotation des dispositions du Code. Ainsi, ce à quoi nous faisons référence dans ce mémorandum comme l'article 1384 est maintenant l'article 1242. *Voir* Ordonnance 2016-131 du 10 février 2016 portant réforme du droit des contrats, du régime général et de la preuve des obligations, Journal Officiel de la République Française [J.O.] , 11 fév. 2016, texte n° 26. Nous continuerons à nous référer à l'article 1384 dans ce mémorandum.

[19] Il existe une différence textuelle mineure entre les codes haïtien et français. Tandis que l'article 1170 (haïtien) se réfère aux *commettants*, l'article 1384 (français) se réfère aux *maîtres et commettants.* De la même façon, le droit haïtien se réfère aux préposés, tandis que le droit français se réfère aux domestiques et préposés.

- 3 -

Il existe deux principes importants en action dans l'article 1170. Tout d'abord, en vertu de la loi, pour être tenu responsable du tort causé par autrui, il faut être le commettant de cette autre personne, c'est à dire que l'autre personne doit être son préposé. Deuxièmement, toujours en vertu de la loi, lorsqu'une personne est elle-même le préposé d'autrui, elle n'est pas personnellement responsable de toute négligence dans l'accomplissement de ses fonctions : seul le commettant est responsable.

        a.   <u>En vertu du droit haïtien, le père Carrier n'était pas le commettant de M. Perlitz et ne peut être tenu responsable du tort causé par M. Perlitz.</u>

Le cas invraisemblable des demandeurs est que *tous* les défendeurs étaient les commettants et les employeurs de M. Perlitz - que chacun d'entre eux l'a employé, avait la fonction de le superviser et l'ont, à tort, maintenu à son poste (Compl. 123). À première vue, ceci est manifestement invraisemblable. De plus, en vertu du droit haïtien, il est clair que le seul commettant ou employeur responsable des actes répréhensibles de M. Perlitz est l'association Haiti Fund, Inc.

Le droit haïtien définit un « employé » comme toute personne qui s'engage à prêter ses services moyennant rémunération, sous la direction et l'autorité d'une autre personne physique ou morale. (Code du travail art. 19). Il doit y avoir un « contrat de travail » (id.) qui peut être verbal plutôt qu'écrit. (Code du travail art. 16). Pour déterminer l'existence d'une relation employeur-employé, le droit haïtien pose les questions suivantes : (1) un salaire était-il versé ? (2) l'employé accomplissait-il une tâche ? et (3) l'employé était-il sous le contrôle ou l'autorité de l'employeur ? (Décl. Succar 29 ; *cf.* Décl. Curran 12 (le droit français exige une preuve d'autorité et une relation de subordination).

Dans le cas présent, la réponse à ces trois questions est « oui ».

Premièrement, il est incontestable qu'Haiti Fund, Inc., offrait une rémunération à M. Perlitz (SUMF 39). Au début, Haiti Fund payait M. Perlitz en tant qu'entrepreneur indépendant, mais il fut entendu qu'il s'agissait d'une erreur et il fut reclassé comme employé.

(SUMF 39). Les paiements d'Haiti Fund, Inc. à M. Perlitz et le fait qu'Haiti Fund, Inc. ait reconnu qu'il aurait dû traiter M. Perlitz comme un employé pour des raisons fiscales sont extrêmement probants, en vertu du droit haïtien, car les aveux sont considérés comme la forme de preuve la plus solide à la lumière de l'article 1140 du Code civil. (Décl. Succar 31). Les paiements d'Haiti Fund, Inc. à M. Perlitz et le fait qu'Haiti Fund, Inc. ait reconnu qu'il aurait dû traiter M. Perlitz comme un employé pour des raisons fiscales sont extrêmement probants, en vertu du droit haïtien, car les aveux sont considérés comme la forme de preuve la plus solide à la lumière de l'article 1140 du Code civil. (Décl. Succar 31).

Deuxièmement, il est incontesté que M. Perlitz exécutait une tâche, en l'occurrence diriger le PPT. Le personnel a affirmé qu'il était responsable et qu'il prenait des décisions pour l'école. (SUMF 40-41). Les membres du personnel considéraient M. Perlitz comme leur superviseur et lui soumettaient des questions et des demandes pour approbation. (SUMF 40). M. Perlitz était responsable du recrutement, du paiement des salaires et des prises de décision en général. (SUMF 41).

Troisièmement, il est incontesté qu'il était sous l'autorité d'Haiti Fund, Inc. Le personnel considérait Haiti Fund, Inc. comme responsable ultime. (SUMF 42). M. Perlitz devait demander l'autorisation du Conseil d'administration d'Haiti Fund, Inc. pour les dépenses importantes ou les modifications du programme PPT. (SUMF 43). Le Conseil d'administration disposait d'un comité exécutif. (SUMF 43). Mais la meilleure preuve de ce fait incontesté est que lorsque les allégations des méfaits de M. Perlitz ont été connues, Haiti Fund, Inc. l'a effectivement licencié. (SUMF 44).

Au même titre, aucun de ces facteurs n'est présent concernant le père Carrier. Il n'existe aucune preuve que le père Carrier ait offert une rémunération à M. Perlitz. (SUMF 35). Et il n'existe aucune preuve que le père Carrier ait exercé une autorité ou un contrôle sur M. Perlitz. (SUMF 30- 34). La seule preuve que les demandeurs peuvent citer est le témoignage de plusieurs demandeurs qui affirment avoir entendu M. Perlitz décrire le père Carrier comme le

« grand-père » de l'école ou une formulation similaire. (Dép. Bernardin 148:12-24[20] ; Dép. Dorat 273:5-25[21] ; Dép. Jheempson Joseph 118:15– 119:12[22] ; Dép. Gesner Lecenat 79:14–80:1).[23] Cette preuve, bien entendu, est un ouï-dire concernant le père Carrier, car la question n'est pas de savoir si les jeunes hommes ont *cru* M. Perlitz lorsqu'ils l'ont entendu, ou même si M. Perlitz croyait ce qu'il disait, mais plutôt de savoir si le père Carrier exerçait réellement un contrôle ou une autorité sur M. Perlitz. La meilleure preuve concernant ce point a une fois de plus un lien avec le licenciement de M. Perlitz. Le père Carrier ne l'a pas licencié et il s'est d'ailleurs opposé sans succès aux efforts d'Haiti Fund, Inc. d'y parvenir. (SUMF 38).

En résumé, tous les actes d'Haiti Fund, Inc. montrent que l'association était l'employeur de M. Perlitz. Haiti Fund, Inc. l'a payé et l'a supervisé et l'a en effet reconnu comme son employé. Le père Carrier n'a rien fait pouvant indiquer qu'il était l'employeur de M. Perlitz, et ne l'a effectivement pas employé.

En vertu du droit haïtien, une fois qu'il est établi que c'est Haiti Fund, Inc., et non le père Carrier, qui employait M. Perlitz, il en découle que c'est Haiti Fund, Inc., et non le père Carrier, le responsable. (Décl. Succar 23, 34). La raison à l'appui de cette conclusion est que selon l'article 1170, les « commettants » sont responsables du tort causé par leurs « préposés » dans les fonctions pour lesquelles les commettants ont « employé » les préposés. Donc, à moins que les demandeurs ne puissent prouver l'existence de la relation de mandat nécessaire entre M. Perlitz et le père Carrier - ils ne le peuvent pas, comme nous l'avons montré - l'article 1170 n'entre pas en jeu. (Décl. Curran 10 et ouvrages cités).

---

[20] Des extraits de la déposition de Joseph Bernardin sont joints à ce mémorandum comme Pièce 16.

[21] Des extraits de la déposition de Jean Dorat sont joints à ce mémorandum comme Pièce 17.

[22] Des extraits de la déposition de Jheempson Joseph sont joints à ce mémorandum comme Pièce 18.

[23] Des extraits de la déposition de Gesner Lecenat sont joints à ce mémorandum comme Pièce 19.

b.  Le père Carrier était le préposé d'Haiti Fund, Inc. et ne peut être tenu responsable du tort causé par M. Perlitz.[24]

Il est incontestable que le père Carrier était à Haïti et au sein du PPT comme préposé comme représentant d'Haiti Fund, Inc. Il était membre du Conseil d'administration et un des directeurs. (Compl. 19, 32). « En tant que Directeur, puis Président » de la société, allèguent les demandeurs, le père Carrier « était obligé de superviser et de surveiller le programme du PPT. » (Compl. 55). Le père Carrier, allèguent les demandeurs, « était les yeux et les oreilles d'Haiti Fund » et tenait Haiti Fund, Inc. « informé des activités au PPT et aux logements du personnel à Bel Air. » (Compl. 93). Haiti Fund, Inc., avait la responsabilité de recruter, de garder, de diriger et de superviser le père Carrier. (Compl. 128).

Les allégations seules des demandeurs suffisent à donner au père Carrier le statut incontestable de préposé d'Haiti Fund, Inc. Mais s'il faut aller plus loin, les preuves justifient sans équivoque les allégations des demandeurs sur ce point :

- Le père Carrier communiquait régulièrement avec le Conseil d'administration sur ses visites au PPT et servait à de nombreuses occasions d'intermédiaire entre le Conseil d'administration et M. Perlitz. (SUMF 25).

- Le Conseil d'administration avait connaissance et avait approuvé tous les voyages du père Carrier à Haïti. (SUMF 26).

- Le père Carrier apportait régulièrement au PPT et à M. Perlitz de l'argent liquide et du matériel fourni par Haiti Fund, Inc. (SUMF 27).

_____

[24] Pour certaines de ses visites à Haïti, en l'occurrence les visites connues sous le nom de « voyages volontaires de mission », durant lesquelles le père Carrier dirigeait un groupe d'étudiants volontaires de Fairfield, ou durant un voyage avec d'autres membres de la faculté, il est incontesté que le père Carrier agissait en tant qu'employé de l'Université de Fairfield. (SUMF 29). Sans pour autant renoncer à notre droit de faire valoir des arguments à propos de l'Université de Fairfield devant la cour, dans cette motion, nous nous concentrons uniquement sur Haiti Fund, Inc.

- Haiti Fund, Inc. a payé pour tous les voyages du père Carrier à Haiti, sauf pour les voyages volontaires de mission et de la faculté payés par l'Université de Fairfield et à l'exception d'un ou deux voyages payés par la Province de la Nouvelle Angleterre de la Compagnie de Jésus, sur les 60 à 100 voyages que le père Carrier a effectué vers Haïti entre 1997 et 2008. (SUMF 28-29).

Il ne peut donc subsister aucun doute sur le fait que le père Carrier, à toutes les fins pertinentes, était le préposé d'Haiti Fund, Inc. (Décl. Succar 32 ; Décl. Curran 20).

Une fois qu'il est établi que c'est Haiti Fund Inc., et non le père Carrier, qui était l'employeur de M. Perlitz, il en découle que seul Haiti Fund, Inc. peut être tenu responsable de la négligence dans la supervision du père Carrier. Ceci apparaît clairement dans les ouvrages juridiques français. Comme le démontre le Professeur Curran dans son opinion (Décl. Curran 21-26), selon le code civil, les mandataires et les directeurs portent une responsabilité civile individuelle pour leur conduite au service de la société uniquement en cas de « délit intentionnel d'une gravité particulière incompatible avec l'exercice normal de leurs fonctions dans la société. » Cour de cassation [Cass.] [Cour suprême pour les affaires judiciaires] crim. 20 mai 2003, D. 2003, 2623, n. B. Dondero. Le délit intentionnel doit non seulement être « d'une gravité particulière », mais aussi « sans aucun lien avec leurs fonctions. » Bruno Dondero, *Définition de la faute séparable des fonctions du dirigeant social,* 2003 Dalloz, 2623. Ici, la seule personne accusée de délit intentionnel est M. Perlitz et les plaintes déposées contre le père Carrier et Haiti Fund, Inc., en l'occurrence négligence dans le recrutement, le maintien en poste et la supervision de M. Perlitz, sont exactement les responsabilités qu'un responsable ou directeur d'Haiti Fund, Inc. Doit assumer au nom de la société.

4.    Il n'existe pas de plainte pour manquement à une obligation fiduciaire en vertu du droit haïtien.

En substance, la plainte pour manquement à une obligation fiduciaire n'est autre qu'une répétition de la plainte pour négligence de supervision. Dans les deux cas, la véritable

accusation contre le père Carrier est qu'il n'a pris aucune mesure qui aurait pu protéger les demandeurs des torts qu'ils affirment avoir subis. Que l'on dise qu'il a manqué à son obligation de vigilance envers les demandeurs ou qu'il a manqué à une obligation de vigilance fiduciaire ou de loyauté envers les demandeurs ne fait aucune véritable différence.

Il n'y a donc rien de radical à ce qu'Haïti ne reconnaisse pas les plaintes pour manquement à une obligation fiduciaire. (Décl. Succar 35). La France, où l'obligation de loyauté est reconnue uniquement dans les cas de déloyauté financière envers une société ou un partenaire, ne les reconnaît pas non plus. (Décl. Curran 14-19). Puisque la plainte n'existe tout simplement pas à Haïti, les demandeurs ne peuvent s'en prévaloir si le droit haïtien prévaut.