EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WADSON DORCINE, a/k/a DORCINE WADSON, | Civil Action No.: |
| Plaintiff, | |
| v. | |
| DOUGLAS PERLITZ; FATHER PAUL E. CARRIER, S.J.; HOPE E. CARTER; HAITI FUND, INC.; FAIRFIELD UNIVERSITY; THE SOCIETY OF JESUS OF NEW ENGLAND; SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA, AMERICAN ASSOCIATION, U.S.A., a/k/a ORDER OF MALTA, AMERICAN ASSOCIATION, USA JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; JOHN DOE FOUR; JOHN DOE FIVE; JOHN DOE SIX; and JOHN DOE SEVEN, | |
| Defendants. | |
| | November 15, 2013 |

# COMPLAINT AND JURY TRIAL DEMAND
## INTRODUCTION

1.     This case arises from the sexual molestation of dozens of Haitian boys, including Plaintiff Wadson Dorcine, a/k/a Dorcine Wadson, by Defendant Douglas Perlitz ("Perlitz"), while Perlitz was operating a residential school under the auspices and supervision of Defendants Fairfield University, the Society of Jesus of New England (the "New England Jesuit Order"), the Haiti Fund, Inc. (the "Haiti Fund"), the Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes and of Malta, American Association, U.S.A. (a/k/a Order of Malta, American Association, USA) (the "Order of Malta"), Hope Carter ("Carter"), and Father Paul E. Carrier, S.J. ("Father Carrier").  In 2011, Perlitz was convicted of violating 18 U.S.C. § 2423(b), Travel With

1

Intent To Engage In Illicit Sexual Conduct, but not before he had molested numerous children in his care over a period of many years, without any of the other Defendants taking any steps whatsoever to prevent or stop this horrendous pattern of abuse. Indeed, Defendants assisted and facilitated Perlitz's acts, providing him with the means to commit them, and at least one of the defendants appears to have assisted in attempting to conceal Perlitz's crimes.

2.      Perlitz, Father Carrier, Fairfield University, the Order of Malta, Carter, and the Haiti Fund established a residential school in the Republic of Haiti, the poorest country in the Western Hemisphere.   This school, Project Pierre Toussaint, a/k/a Project Venerable Pierre Toussaint ("PPT"), purported to provide services to the poorest children of Haiti, many of whom lacked homes and regular meals.  Perlitz, residing in Haiti, was the director of PPT, which provided him with an image of substantial trust and authority.

3.      Perlitz used that trust and authority to sexually molest Plaintiff and numerous other minor boys who attended PPT.  Perlitz also threatened to withhold food and shelter from the impoverished children in his care if they did not comply with his sexual demands, in effect forcing them to earn their food and shelter by trading sexual favors for those necessities.

4.      The other Defendants assisted Perlitz by providing him the means to travel to and stay in Haiti and by providing him the means to operate PPT in this manner.   They failed to provide appropriate guidelines and supervision for the operation of PPT.  They disregarded warning signs that should have alerted them to the improper nature of Perlitz's relationship with some of the boys in his care and continued to provide funds to PPT long after it was, or should have been clear, that Perlitz was abusing the trust that had been placed in him.   At least one Defendant other

2

than Perlitz actively took steps to prevent enforcement of laws meant to protect minors from the conduct in which Perlitz engaged.

5. Plaintiff now seeks damages for his personal injuries pursuant to 18 U.S.C. § 2255, 18 U.S.C. § 1595, and the common law.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Plaintiff's statutory claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, specifically 18 U.S.C. §§ 1595 and 2255. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because Plaintiff is a citizen of a foreign state and defendants are citizens of Connecticut, Colorado, and Massachusetts, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (3) in that at least one defendant may be found here.

## PARTIES

8. Plaintiff Wadson Dorcine, a/k/a Dorcine Wadson, ("Plaintiff" or "Wadson Dorcine" or "Dorcine"), is a citizen of the Republic of Haiti residing in Cap-Haitien, Haiti.

9. Defendant Douglas Perlitz ("Perlitz") is an individual who, at the time of his arrest in 2009, was a citizen of the State of Colorado. Prior to residing in the State of Colorado, Defendant Perlitz had resided in the State of Connecticut. While a resident of Connecticut, Defendant Perlitz frequently traveled from Connecticut to the Republic of Haiti to reside for extended periods of time in the Republic of Haiti. On December 21, 2010, the United States District Court for the District of Connecticut adjudged Defendant Perlitz guilty of violating 18 U.S.C. §2423(b), Travel With Intent To Engage In Illicit Sexual Conduct. Perlitz was sentenced to serve 19 years and 7 months in

3

federal prison.   He is currently serving his sentence in the Federal Correctional Institution in Seagoville, Texas.

10.     Defendant Haiti Fund, Inc. (the "Haiti Fund") is a corporation organized under the laws of the State of Connecticut.  Pursuant to 28 U.S.C. § 1332(c) (1), the Haiti Fund is, therefore, a citizen of Connecticut. The Haiti Fund funded, managed, controlled and directed Project Pierre Toussaint of Cap-Haitien, Haiti, a program that provided services for minor boys in and around Cap-Haitien, Haiti.  At all relevant times, PPT operated an intake center at one location, and two different residential schools at two different locations; all the locations were in or around Cap-Haitien, Haiti. The Director of PPT in Haiti was Perlitz.  The Haiti Fund hired Perlitz and retained him throughout the relevant time period.  At all relevant times, the Haiti Fund had a duty to exercise due care in its hiring and retention, including its hiring and retention of Perlitz. At all times material hereto, while Perlitz was Director of PPT in Haiti, the Haiti Fund had a duty to supervise and direct him, to exercise due care in doing so, a duty not to knowingly benefit financially from participating in a venture engaged in activities in violation of 18 U.S.C. § 1591, and a duty not to facilitate Perlitz's travel to Haiti knowing that Perlitz was travelling to Haiti to engage in illicit sexual conduct.

11.     Defendant Fairfield University is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Fairfield, Connecticut. Pursuant to 28 U.S.C. § 1332 (c) (1), Fairfield University is, therefore, a citizen of Connecticut.

12.     Defendant Fairfield University hired Father Carrier and retained him throughout the relevant time period.  At all relevant times, Fairfield University had a duty to exercise due care in its hiring and retention, including its hiring and retention of Father Carrier.  At all relevant times, Fairfield University had a duty to supervise and

4

direct Father Carrier and to exercise due care in doing so.

13.     Fairfield University hired Perlitz in connection with PPT and retained him during the relevant time period.  At all relevant times, Fairfield University had a duty to exercise due care in its hiring and retention, including its hiring and retention of Perlitz. At relevant times, Fairfield University had a duty to supervise and direct Perlitz, to exercise due care in doing so, a duty not to knowingly benefit financially from participating in a venture engaged in activities in violation of 18 U.S.C. § 1591, and a duty not to facilitate Perlitz's travel to Haiti knowing that Perlitz was travelling to Haiti to engage in illicit sexual conduct.

14.     During the relevant time period, Fairfield University placed employees, officers, or agents of Fairfield University in management and/or leadership positions of the Haiti Fund.  At all relevant times, such employees, officers, or agents of Fairfield University held positions of management and/or leadership at the Haiti Fund.

15.     At all relevant times, Fairfield University represented that the Haiti Fund was engaged in activities supported, managed and sponsored by Fairfield University.

16.     Defendant The Society of Jesus of New England (the "New England Jesuit Order") is a not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts and doing business in Connecticut.  Pursuant to 28 U.S.C. § 1332 (c)(1), the New England Jesuit Order is a citizen of Massachusetts. The New England Jesuit Order hired Father Carrier and retained him throughout the relevant time period.  At all relevant times, the New England Jesuit Order had a duty to exercise due care in its hiring and retention, including its hiring and retention of Father Carrier.  At all relevant times, the New England Jesuit Order had a duty to supervise and direct Father Carrier and to exercise due care in doing so.

17.     Defendant Sovereign Military Hospitaller Order of St. John of Jerusalem of

5

Rhodes and of Malta, American Association, U.S.A., a/k/a Order of Malta, American Association, USA (the "Order of Malta"), is a not-for-profit corporation organized and existing under the laws of the State of New York.  The Order of Malta is one of three American affiliates of the Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and Malta (the "Sovereign Order of Malta"), a lay religious order of the Catholic Church established by the Pope.  The members of the Order of Malta are referred to as Knights and Dames.

18.     The Order of Malta hired Perlitz in connection with PPT and retained him during the relevant time period.  The Order of Malta had a duty to exercise due care in its hiring and retention, including its hiring and retention of Perlitz.  At relevant times, the Order of Malta had a duty to supervise and direct Perlitz and to exercise due care in doing so.  During the relevant time period, the Order of Malta placed several of its Knights and Dames on the Board of Directors of the Haiti Fund.

19.     Defendant Father Paul E. Carrier, S.J. ("Father Carrier") is an individual who is a citizen of the State of Massachusetts with a domicile in Weston, Massachusetts.  During the relevant time period, Father Carrier was a religious priest of the New England Jesuit Order; University Chaplain/Director of Campus Ministry and Community Service of Fairfield University; Chairman, President and/or Vice-President of the Haiti Fund; and a Magistral Chaplain of the Order of Malta.  Father Carrier hired Douglas Perlitz and retained him throughout the relevant time period.  At all relevant times, Father Carrier had a duty to exercise due care in his hiring and retention, including his hiring and retention of Perlitz.  At all relevant times, Father Carrier had a duty to supervise and direct Perlitz, to do so with due care, a duty not to knowingly benefit financially from participating in a venture engaged in activities in violation of 18 U.S.C. § 1591, and a duty not to facilitate Perlitz's travel to Haiti knowing that Perlitz

6

was travelling to Haiti to engage in illicit sexual conduct.

20.    Defendant Hope E. Carter is an individual who is a citizen of the State of Connecticut with a domicile in New Canaan, Connecticut.  During the relevant time period Defendant Carter was a Dame of the Order of Malta; a member of the Board of Directors of the Haiti Fund; Secretary of the Board of Directors of the Haiti Fund; and at times material hereto, had a duty to supervise and direct Perlitz, to do so with due care, and a duty not to assist Perlitz in engaging in criminal conduct.  During relevant times Carter served at least portions of two three-year terms on the Board of Councillors, the governing body of the Order of Malta.

21.    Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five are individuals whose identities are presently unknown to Plaintiff; therefore, Plaintiff files the above-captioned action against Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five by such fictitious names.  Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five are citizens of the State of Connecticut or other states of the United States. Plaintiff will seek leave to amend this Complaint to add the true name or names of Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five when said name or names have been ascertained.   Plaintiff alleges that Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five were responsible for the hiring, supervision, direction and retention of Defendant Perlitz.

22.    Defendants John Doe Six and John Doe Seven are individuals whose identities are presently unknown to Plaintiff; therefore, Plaintiff files the above-captioned action against Defendants John Doe Six and John Doe Seven by such fictitious names. Defendants John Doe Six and John Doe Seven are citizens of the State of

Connecticut or other states of the United States. Plaintiff will seek leave to amend this Complaint to add the true name or names of Defendants John Doe Six and John Doe Seven when said name or names have been ascertained. Plaintiff alleges that Defendants John Doe Six and John Doe Seven were responsible for the hiring, supervision, direction and retention of Defendant Father Carrier.

## STATEMENT OF FACTS

**Background and Founding of PPT**

23.    At all relevant times Father Carrier was a religious priest of the New England Jesuit Order and was subject to supervision and direction of the New England Jesuit Order.

24.    Fairfield University is a Jesuit university, operated by the New England Jesuit Order.   During the relevant time period, Fairfield University described itself on its website as a "comprehensive Jesuit institution." At all relevant times the New England Jesuit Order stated and represented that it operated Fairfield University.

25.    Over the last four decades the New England Jesuit Order has had several members who have sexually abused numerous children.  Rather than take timely action to prevent sexual abuse of children, the New England Jesuit Order's practice has been years later to pay hundreds of thousands, if not millions, of dollars in compensation for the harm its members caused to children.   The New England Jesuit Order's management and supervision in this case was, sadly, consistent with the way it managed other instances involving the sexual abuse of children.

26.    In the late 1980's, when Perlitz was a freshman at Fairfield University and Father Carrier was its Chaplain, Father Carrier and Perlitz began a sexual relationship. Although this sexual relationship with a young student at Fairfield University should have put Fairfield University and the New England Jesuit Order on notice that Father

8

Carrier was a person of bad character who could not maintain nor understand appropriate boundaries with vulnerable individuals, neither Fairfield University nor the New England Jesuit Order disciplined Father Carrier.  In 1997, less than ten years after Father Carrier began his relationship with Perlitz, Father Carrier assisted Perlitz in obtaining funding to start and operate PPT.

27.     Perlitz told a number of his victims that Father Carrier was the one who introduced Perlitz to homosexual activities when Perlitz was a student, at a time when Father Carrier was Chaplain for Fairfield University, operated by the New England Jesuit Order.

28.     Beginning in 1996, Perlitz served for a year at a hospital in Milot, Haiti, which is run by the Order of Malta through an entity called CRUDEM (Center for the RUral DEvelopment of Milot).

29.     In approximately 1997, Perlitz, with the assistance of Father Carrier, Carter, Fairfield University, and John Doe One through John Doe Five obtained approval, support, and funding from the Order of Malta to start and operate PPT, a school for boys in Cap-Haitien, Haiti.  The original funding for PPT came from the Order of Malta. Thereafter, the Order of Malta and Fairfield University provided much of the funding and personnel for the project. The Haiti Fund was formed to be the vehicle to raise money for, and operate, PPT, but the Haiti Fund was little more than an extension of Fairfield University and the Order of Malta.

30.     PPT established an intake center that came to be referred to as the 13th Street Intake Program.  PPT provided services to boys of all ages, many of whom were street children.  The youngest children served by PPT were six years of age.  PPT provided a variety of services to the minor boys, including but not limited to, meals, access to running water for baths or showers, basic classroom instruction, and sports

activities.  Perlitz employed both Americans and Haitians to work at PPT.

31.     In or about 1999, with the assistance of Father Carrier, Carter, the Haiti Fund, Fairfield University, the Order of Malta, and John Doe One through John Doe Five, Perlitz obtained additional funding to expand PPT to include a residential facility referred to as the Village.

32.     From the formation of the Haiti Fund, Father Carrier served as a director of the Haiti Fund.  Within a year of the formation of the Haiti Fund, Father Carrier became an officer of the Haiti Fund.  To have served as an officer of the Haiti Fund, the rules governing the conduct of the New England Jesuit Order required the New England Jesuit Order to give permission to Father Carrier to engage in the work of the Haiti Fund and to accept positions of authority and responsibility from the Haiti Fund.

33.     In addition to Father Carrier, several members of the Haiti Fund Board of Directors were associated with Fairfield University:  Deb Picarazzi, the operation assistant for Fairfield University Campus Ministry served on the Haiti Fund board, as did Larry Miners, a Fairfield University economics professor; Sue MacAvoy, a former Fairfield University nursing professor; Fred Wheeler, the vice president for development at Fairfield University; and Cathy Lozier, a former assistant tennis coach at Fairfield University.  Although Hope Carter, who sat on the Haiti Fund Board of Directors, was not associated with Fairfield University, she was, instead, associated with the Order of Malta.

34.     Father Carrier and Hope Carter each travelled frequently to Haiti to check up on and supervise the activities at PPT on behalf of Fairfield University, the New England Jesuit Order, and the Order of Malta.

**Operation, Support, and Supervision of PPT**

35.     Throughout most of the first decade of the 21st century, Defendants

10

provided funding and other support to PPT and specifically to Perlitz to allow him to continue operating PPT.

36.     Under the direction of Father Carrier, Fairfield University, which was operated by the New England Jesuit Order, supplied student volunteers through its Mission Volunteers program; at all relevant times, the volunteers worked at PPT and were supervised in that work by Father Carrier on behalf of Fairfield University and the New England Jesuit Order.

37.     During the approximately ten years that PPT was in operation, Father Carrier travelled to Haiti to visit and supervise PPT on a frequent and regular basis, as often as once a month.  Father Carrier characterized his involvement in Haiti as "a significant part of my work as University Chaplain and professor in the Peace and Justice Studies program [at Fairfield]."  A brochure describing Project Pierre Toussaint lists Father Carrier as the contact person; the email address provided is pecarrier@mail.fairfield.edu.   In 2004, *Fairfield Now*, "the Magazine of Fairfield University," reported that Father Carrier was "intimately involved with Project Pierre Toussaint . . . ."

38.     That same year, *Fairfield Now* also proudly reported that "Fr. Carrier spent spring break in Cap Hatien and commented daily on CNN, reporting about the people to whom he had spoken, their feelings, and their fears."  Transcripts of Father Carrier's appearances on CNN show that Carrier was always identified as being from Fairfield University; PPT was repeatedly referred to as a school or program run by Fairfield University. On March 18, 2004, after being introduced on the CNN national broadcast as "Father Carrier from Fairfield University in Connecticut," Father Carrier discussed the programs run by PPT:

> [T]hese are the children who two or three years ago were on the streets of

11

> Cap Haitien living, like I said, off the stalls of the marketplace. And they were able to participate in a day program that we have . . .

Father Carrier added, unprompted, "I would just say that, you know, *all of us at Fairfield* are so proud of *our people* who have given their lives to this project and who have stayed through all the difficulties." (Emphasis added).

39.     Fairfield University itself, operated by the New England Jesuit Order, promoted PPT as a mission in which Fairfield University students or prospective students could participate.  Until the time Perlitz ceased to direct PPT, Fairfield University marketed PPT as a program to attract prospective students to Fairfield University.  It honored Perlitz for his work there, first with an honorary degree and later with its Humanitarian Award.  Indeed, Perlitz was Fairfield University's commencement speaker in 2002, ten years after his own graduation.  As the Fairfield University Dean of Students put it in a PPT newsletter in June 2003, "Unless you have your head in the sand, you cannot worship at [Fairfield University's] Egan Chapel or work in Fairfield University and not know the name Doug Perlitz."  In 2004, Father Carrier sent a mass email soliciting donations to support Perlitz's work in Haiti. The subject line of the email read, in part, "Need new prayers for Haiti Mission headed by Fairfield U. missionaries Doug Perlitz and Andy."  Perlitz was a Fairfield University "favorite son" and – until he was arrested as a child molester -- his work was the school's work.

40.     During relevant times, Fairfield University, which was operated by the New England Jesuit Order, raised over $600,000 for the Haiti Fund at events held at Fairfield University.  Much of this money was raised at Fairfield University's annual "Jazz It Up for Haiti" fundraiser.  A press release after the 2006 fundraiser described the involvement of "a University team of food service, maintenance, printing, media, Campus Ministry, Barone Center administration and many other campus personnel."

Fairfield University transferred those monies either to PPT or the Haiti Fund. During relevant years Fairfield University directly funded the Haiti Fund with $51,000. In addition, from 1997 through 2006, Fairfield University paid Father Carrier approximately $120,000, some or all of which was spent to support Father Carrier's activities with PPT.

41.     Donations to support PPT were frequently made in the form of checks made out to "Fairfield University," "Campus Ministry," "Fairfield University Campus Ministry," or "The Haitian Fund of Fairfield University." A cover letter accompanying one such check – made out to "Fairfield University Campus Ministry" – specifically described the donation as "a grant to the Haiti Fund." Some checks made out to Fairfield University Campus Ministry contain notations on the front that they were for "Haiti Fund," "Haiti Mission," "Haiti Project," "PPT," or "Project Pierre Toussaint."

42.     Checks made out to Fairfield University, Campus Ministry, Fairfield University Campus Ministry, or the Haitian Fund of Fairfield University were routinely deposited into the bank account of the Haiti Fund. Conversely, checks made out to "Project Pierre Toussaint" and the "Haiti Fund" were deposited into Fairfield University Restricted Funds Accounts. Thus, no distinction was maintained between the Haiti Fund and Fairfield University with respect to PPT.

43.     In November, 2005, Father Carrier and the "Jesuits in the Fairfield Community" held a fundraiser "to support the missions in Haiti and Bridgeport." The invitation asked attendees to "[m]ake checks payable to Fairfield University Campus Ministry." As a result of this Jesuit and Fairfield University fundraiser, $4,100 in donations was collected; the majority of the checks were made out to "Fairfield University Campus Ministry," as requested. The money was turned over to the Haiti Fund.

13

44.     In 2005, Fairfield University entered into a contract for building materials for PPT.  The contract states that "Fairfield University, through its Project Venerable Pierre Toussaint, has been serving poor families in Haiti . . . ."  The contract was signed by Father Carrier on behalf of "the Pierre Toussaint Project, Fairfield University."

45.     The Order of Malta, too, claimed PPT and Perlitz as its own.  Even after Fairfield University began raising large sums of money for PPT, the Order of Malta continued to provide funding, in the form of a $25,000 grant each year.  Hope Carter was actively involved in supervising the program on behalf of the Order of Malta.

46.     In 2003, the Order of Malta recognized PPT as an official "work" of the Order of Malta.  In 2004, the Haiti Fund reported this official designation to the Raskob Foundation in connection with a grant application.  The Haiti Fund explained that "the designation of 'work' of the Order necessitates not just financial support but also hands-on involvement. . . . "  In other instances, the Order of Malta itself applied for grants on behalf of the Haiti Fund.

47.     An undated Order of Malta informational brochure lists PPT as one of the "international works" of the Order of Malta.  In its Winter 2007-08 newsletter, the Order of Malta reported that its president had presented an award to "Doug Perlitz in recognition of his work and dedication to Malta's Pierre Toussaint School for Boys in Haiti."  To celebrate PPT's anniversary, CRUDEM, the Order of Malta entity that operates the hospital in Milot, Haiti, created an advertisement or plaque that announced:  "The CRUDEM Foundation congratulates Project Pierre Toussaint, its sister Order of Malta work in Haiti, on ten years of service!"  Another ad or plaque continued:

> The Knights and Dames of the Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes and of Malta: American Association, U.S.A salute the Malta Missionaries for ten years of service to Haitian youth!

> Andy, Joanie, Tim, Nick, Britt and Jess under the leadership of Doug  and PPT's spiritual leader Fr. Paul.

"Doug" is Doug Perlitz; Andy, Joanie, Tim, Nick, Britt, and Jess were all American volunteers at PPT.  Thus, PPT was the Order of Malta's work and its staff members were "Malta Missionaries."

48.     Father Carrier wrote periodic letters to "Malta Friends of PPT," in which Perlitz was described as a "Malta Missionary" and PPT was described as the "Project Pierre Toussaint Malta Community."  The Malta Friends of PPT were told that their gifts would directly support Perlitz.

49.     A letter signed by Father Carrier in the summer of 2002 to the "Friends of Project Pierre Toussaint" also described Perlitz and one of the PPT volunteers as "Malta lay missionaries."  The letter asked recipients to make donations to support these Malta lay missionaries; checks, it said, "may be made out to the Order of Malta in CT."

50.     Computers used at PPT were owned directly by the Order of Malta; a car dedicated to use by PPT was registered to the Order of Malta or to a Malta-affiliated entity and provided to PPT.

51.     At all relevant times, the New England Jesuit Order has stated that it may send its members anywhere in the world to serve.  At all relevant times, members of the New England Jesuit Order have often been sent on missions to areas operated by other provinces in places around the world, including Haiti.

52.     During relevant times, Jesuits in training were sent to work at PPT.  One such Jesuit trainee lived in the PPT staff residence in the early part of 2008.

53.     From at least 1999 to sometime in 2008, Defendant Perlitz travelled from the Republic of Haiti via airline flights to the States of Florida and New York.  From Florida and New York Perlitz would then travel to Connecticut to engage in fundraising to raise substantial funds for the Haiti Fund from residents of Connecticut,

15

New York and other states to support activities of PPT in Haiti. After engaging in such fundraising in and around this time period, Perlitz would then travel from Connecticut to Florida and New York where Perlitz purchased airline tickets to return to Haiti. The Haiti Fund, Father Carrier and Fairfield University facilitated Perlitz's travel to Haiti by providing funds for such travel and/or scheduling Perlitz's trips to Haiti.

54.     From at least 1999 to sometime in 2008, Father Carrier and Carter participated in raising substantial funds for the Haiti Fund from residents of Connecticut, New York and other states to support activities of PPT in Haiti. In and around this time period Father Carrier and Carter would regularly travel from Connecticut to Florida or New York where they purchased airline tickets to travel to Haiti to visit and supervise PPT. Father Carrier and Carter would then return from Haiti via airline flights to Florida or New York and then travel back to Connecticut. Father Carrier and Carter made these trips as representatives of Fairfield University, the New England Jesuit Order, the Haiti Fund, and the Order of Malta.

55.     As the Chairman and then President of the Haiti Fund, and as Director of Campus Ministry and Community Service at Fairfield University, Father Carrier was obliged to supervise and monitor the program at PPT, which was being supported with funds from the Haiti Fund and from Fairfield University, and which was being staffed, in part by volunteers and missionaries from Fairfield University and by Jesuits in training. Father Carrier knew that Perlitz used substantial portions of funds from the Haiti Fund and from Fairfield University to finance Perlitz's frequent trips to, and extended stays in, Haiti.

56.     From prior to 2003 to sometime in 2008, Perlitz and the Haiti Fund, either directly or through PPT, purchased supplies in the United States which were taken to Haiti and used at PPT.

16

57.     During the relevant time period, a house in Bel Air, Haiti was maintained as a PPT staff residence.  Perlitz lived in the house in Bel Air and had his own bedroom there.  Staff volunteers also resided in the Bel Air house. Jesuits who visited PPT also stayed there.

58.     PPT was set up without even minimal safeguards for the children there. Perlitz had no relevant experience or training in running such a program when he was hired by Carrier, Carter, Fairfield University, the Order of Malta, and/or the Haiti Fund to direct PPT.  None of PPT's founders and benefactors provided any rules, standards, guidance, or supervision about the maintenance of boundaries and/or the protection of the children who would be utterly dependent on the program and its director.  None of PPT's founders or funders set up or provided any structure for oversight or evaluation of the program or for monitoring how Perlitz was performing.  They sent Perlitz to Haiti invested with their authority and, insofar as the safety of the children served there, paid no attention to how he ran the program they gave him the money to set up.

59.     This stands in contrast to the "Safety Policies" the Haiti Fund and its board created for Project Pierre Toussaint, to ensure the safety of the American volunteers who travelled to Haiti to work in the program.  There were numerous rules and prohibitions regarding travel within Haiti and with respect to the "residence," the house in Bel Air where PPT American staff resided.  There were no rules regarding boundaries to be maintained between staff and children, and no rules about leaving children alone with a single staff member.  Nor were the staff members who lived in the staff residence – primarily young, inexperienced volunteers -- provided any training that would have helped them recognize that the sleeping arrangements at the staff residence, where boys routinely slept in Perlitz's bedroom, were irregular and improper.

17

60.     The lack of policies to safeguard the children at PPT was also in violation of the policies and recommendations of the Catholic Church.  In 1995, the National Conference of Catholic Bishops released a document entitled "Walk in the Light:  a Pastoral Response to Child Sex Abuse."  The document recognized the problem of child sex abuse and the need for the Church to take steps to address it.   In 2002, the United States Conference of Catholic Bishops at a widely publicized meeting issued a document entitled "Charter for the Protection of Children and Young People."  This document recognized the need for clear and well-publicized "standards of ministerial behavior and appropriate boundaries for clergy and for any other church personnel in positions of trust who have regular contact with children and young people."  The New England Jesuit Order states that it abides by the "Charter for the Protection of Children and Young People." Despite the call for clear and well-publicized standards of behavior and boundaries, no such standards of behavior or boundaries were established at PPT by the New England Jesuit Order, by Fairfield University, a Jesuit institution, by the Order of Malta, or by the Haiti Fund, which was under the control of Fairfield University and the Order of Malta.

**Perlitz's Abuse of Boys at PPT**

61.     Through PPT, Perlitz had access to, authority over, and control over the boys attending or receiving services at PPT.  At all relevant times, Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Five knew about Perlitz's access to, authority over, and control over the boys at PPT.

62.     Through his role at PPT, Perlitz was in a position that the minor boys attending or receiving services at PPT would believe they could trust him.  At all relevant times, Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield

Case 3:13-cv-01132-RNC   Document 900-2   Filed 01/16/13   Page 19 of 40

University, the New England Jesuit Order, and John Doe One through John Doe Five knew that because of Perlitz's position, the minor boys participating in PPT would believe they could trust Perlitz.

63.     Through his role at PPT, Perlitz was in a position that the minor boys attending or receiving services at PPT would have confidence that the conduct Perlitz engaged in was to further their best interests.  At all relevant times, Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Five knew that because of Perlitz's position, the minor boys participating in PPT would have confidence that the conduct Perlitz engaged in was to further their best interests.

64.     Father Carrier and Carter frequently traveled to Cap-Haitien, Haiti to visit Perlitz and Project Pierre Toussaint, or otherwise participated in activities at PPT. Father Carrier and Carter became aware that Perlitz was engaged in conduct that endangered minor boys participating in PPT.  In spite of this information, Father Carrier and Carter assisted and facilitated Perlitz in Perlitz's efforts to sexually abuse minor boys participating in PPT and in Perlitz's efforts to conceal his sexual abuse of minors participating in PPT.

65.     Perlitz abused his position at PPT and betrayed the trust the minor boys placed in him by abusing many of the minor boys in his care.

66.     Perlitz employed several different tactics in his abuse of the minor boys in his care.  In many instances, Perlitz suggested that boys sleep at the PPT staff residence in Bel Air, where Perlitz resided, rather than at the PPT residential facility.   Indeed, although the boys at PPT were supposed to sleep at PPT's residential facilities, Perlitz frequently had several boys stay at his home in the PPT house at Bel Air. Often one or more boys slept in Perlitz's bedroom, while Perlitz was also sleeping there.  More than

one of the boys lived outright at the house in Bel Air for a substantial period of time.

67.     Perlitz summoned boys from PPT's residential facilities to the house in Bel Air for the purpose of sexually molesting them; staff members were directed to send particular boys to Bel Air in the evening.  On occasions, Perlitz came to the residential facilities at PPT and molested boys in their beds at the PPT residential facility.

68.     While the boys were sleeping, or about to sleep, Perlitz would begin molesting them and/or demanding that they engage in sexual conduct with him.

69.     Prior to Perlitz sexually assaulting the minor victims, Perlitz often provided intoxicating substances to the the minor victims to cloud their judgment and weaken their resistance.

70.     In other instances, Perlitz would demand sexual favors in exchange for shoes, clothing, money or other necessities.  Boys who were willing to accede to Perlitz's demand were provided with new clothes and shoes, as well as cash, while boys who refused Perlitz's demands were forced to go without basic necessities.

71.     In many instances, Perlitz would cause the boys to believe that for those boys to continue to live at PPT's facilities where the boys were provided room, board and educational services, the boys had to engage in sexual activity with Perlitz.  Those boys understood if they could not continue to live at PPT's facilities, they were faced with the stark reality that they would have to return to living on the streets.

72.     Perlitz caused minor boys at PPT to engage in commercial sex by pressing them to engage in sexual acts in exchange for cash, food, shelter, shoes, clothing or other necessities.  Perlitz further recruited, enticed, and maintained these minor boys knowing that he would cause them to engage in these commercial sex acts.

73.     When boys at PPT would ask Perlitz at his office for financial assistance to buy necessities, such as shoes or clothes, Perlitz would direct those boys to request that

20

financial assistance from the Haitian administrator of one of PPT's residential facilities. When those boys would leave Perlitz's office, Perlitz would then call that PPT administrator and direct that administrator to deny the requested financial assistance. After rejection from the administrator, those boys appealed to Perlitz who then demanded sex in exchange for financial assistance.

74.     Perlitz kept pornographic photos and films on his computer.   On numerous occasions, Perlitz showed this material to the boys he was molesting.

**Notice of Perlitz's Activities**

75.     At all relevant times, Father Carrier, Carter, Fairfield University, operated by the New England Jesuit Order, the New England Jesuit Order itself, the Order of Malta, and the Haiti Fund knew that PPT was providing basic services to extremely vulnerable Haitian minor children. At all relevant times, the Defendants knew that these vulnerable Haitian minor children had no place to sleep, except at PPT's residential facilities; had no educational opportunity, except at PPT facilities; and had no funds for necessities, such as clothes and food, except for the funds PPT gave these minor children.

76.     Much of Perlitz's molestation of minor boys took place at the PPT staff residence in Bel Air where Perlitz lived.   That residence was an extremely small house. At least one of the rooms had been added to the house after the original construction, and windows that had once faced the outside of the house now faced into the added room.   In addition, the shape and design of the house were such that the outside window to Perlitz's room was visible from other rooms in the house, so that someone inside the house could look out, through the window, back into Perlitz's room.   As a result, there was little privacy and it was difficult to conceal from the rest of the house activities taking place in any part of it.

77.     In January, 2008, a Jesuit trainee arrived in Cap-Haitien for an assignment at PPT.  Within three weeks, the trainee noted numerous problems at PPT, including concerns about Perlitz's relationships with the children in the program. The trainee quickly noted the irregularity of the boys sleeping in Perlitz's bedroom.

78.     The bathroom that Perlitz used was across a passage from Perlitz's bedroom; at one point, that passage was used as a sleeping area by the visiting Jesuit trainee. The trainee was thus able to observe that Perlitz had boys sleeping in his bedroom and also that Perlitz closed the door to his room when there was a boy sleeping there with him.  Indeed, there was a window between the passage and Perlitz's bedroom, so that anyone in the passage could see into the bedroom.  Sounds carried easily within the house.  With the door to Perlitz's room closed, the Jesuit trainee could nonetheless hear voices from inside; the location and direction of the voices suggested that Perlitz and the boy were sharing the bed. The trainee also observed that Perlitz put on a towel when crossing to the bathroom, but otherwise appeared to be naked when he was in his room with the minor boys.

79.     The Jesuit trainee visiting PPT also observed that boys who were Perlitz's favorites had expensive clothes, a high-end iPod, and privileges that other boys did not seem to share.

80.     In February, 2008, the Jesuit trainee met with a nun in Haiti whom Father Carrier had suggested he contact.  When the trainee shared his reservations about PPT and about Perlitz, the nun informed him that she and others in Haiti shared his reservations and concerns.  By the end of February, the trainee had spoken to other volunteers in Haiti about problems at PPT, including the irregularity of the situation at the staff residence where many of the boys spent the night.  These volunteers confirmed that they, too, had concerns about Perlitz and the project, but they had been unable to

get Perlitz to address any of the issues they raised.

81.     The experience of the Jesuit trainee in Haiti shows how obvious and well-known concerns about Perlitz and PPT were in Cap-Haitien and how readily available the information was to anyone who looked for it.

82.     Information and warning signs were also available to PPT staff members, especially those who resided in the staff residence.  Staff volunteers from PPT were present at the staff residence in Bel Air in the morning when minor boys who had spent the night in Perlitz's bedroom were there and had obviously spent the night.   American staff members from PPT, including volunteers from Fairfield University which was operated by the New England Jesuit Order, and apparently directly from the New England Jesuit Order, all under the supervision of Father Carrier, also resided in the staff residence.  These staff members saw minor boys in the evening and then saw those same boys in the house early the next morning.  These staff members further saw boys in Perlitz's bedroom in the staff residence house during the day, and at bedtime saw boys go to sleep in Perlitz's bedroom.

83.     Some of the boys who were anally raped by Perlitz in Perlitz's bedroom complained loudly while Perlitz penetrated them, such that other persons in the house could have and would have heard them.

84.     On several occasions, boys who had been abused by Perlitz told staff at PPT about the abuse. For example, several of the boys that Perlitz abused told Margaret Joseph, a psychologist/social worker employed by the Haiti Fund and/or PPT about the abuse.  At least one boy told one of the tutors.  Other staff members, including teachers, drivers, and a cook were aware that Perlitz was sexually abusing some of the boys at PPT.  Some of the staff at PPT who were informed of the abuse were Americans, while others were Haitian.

85.     Father Carrier and Carter travelled frequently to Haiti to visit PPT and meet with Perlitz at the house in Bel Air.  Many, if not all, of the boys that Perlitz abused knew both Father Carrier and Carter from their frequent visits.  The boys who knew Father Carrier and Carter respected and trusted Father Carrier and Carter.  Father Carrier, a New England Jesuit Order religious priest, a Magistral Chaplain of the Order of Malta, and University Chaplain/Director of Campus Ministry and Community Service of Fairfield University, often celebrated mass for the PPT minor students.

86.     Father Carrier and Carter failed to speak to the boys in a setting where the boys could feel safe about reporting what they were experiencing at PPT.  If Father Carrier and/or Carter learned of the abuse from the numerous staff persons who knew about it, including American staff persons and volunteers under Father Carrier's supervision, they failed to take any steps to stop it or address it in any way.

87.     For a number of years Father Carrier regularly met with a PPT Haitian staff administrator in Cap-Haitien to inquire about the PPT and the children served by PPT. When that Haitian staff administrator learned that Perlitz was sexually abusing minors, he confronted Perlitz and tried to stop Perlitz from continuing this behavior.  Thereafter Father Carrier stopped consulting, or even greeting that PPT Haitian staff administrator.

88.     Father Carrier was acquainted with the nun in Haiti to whom he sent the visiting Jesuit trainee for advice.  The nun was aware of problems at PPT, including problems in the relationship between Perlitz and the boys in his care.  To the extent that Father Carrier failed to inquire of the nuns he knew in Haiti about conditions at PPT and about Perlitz in particular, Father Carrier was grossly negligent in his supervision of Perlitz on behalf of Fairfield University, the New England Jesuit Order, the Haiti Fund, and the Order of Malta.  If, on the other hand, Father Carrier did learn from her

24

about warning signs at PPT, he failed to take any steps to address them.

89.     Not only did Father Carrier and Carter neglect to seek out information about Perlitz's conduct of PPT, they ignored warning signs that Perlitz was engaged in improper relationships with the minor boys at PPT, including:

a.   Father Carrier and Carter were present in the Bel Air staff residence while minor boys participating in PPT were also there.  Both Father Carrier and Carter saw minor boys from PPT in Perlitz's bedroom in the Bel Air house.  Because PPT had residential facilities, there was no legitimate reason for the boys to be present at Perlitz's home, even less to be in his bedroom in the Bel Air house.

b.   Father Carrier saw Perlitz show at least one PPT student a pornographic video on Perlitz's computer in Perlitz's bedroom in the Bel Air staff residence.

c.   Both Father Carrier and Carter were aware that at least one of the boys was living in the Bel Air house.

d.   On at least one occasion, Father Carrier was present when Perlitz arranged a rendezvous at the Bel Air house with one of the boys for late in the evening.

e.   Father Carrier was present when Perlitz hugged one PPT minor student so that the front of Perlitz's body was pressed against the back of that minor's body.

f.    Father Carrier spent an evening at the Bel Air staff residence in an upstairs bedroom when another minor slept in Perlitz's bedroom downstairs and was sexually abused by Perlitz that evening.  Father Carrier knew that yet another minor was sleeping in Perlitz's bedroom in

25

the Bel Air house.

g.   Father Carrier was well aware that the Bel Air residence was several miles from PPT's residential facilities and that there was no transportation available to take boys back to PPT late at night.  When Father Carrier saw boys there late at night, he knew they would be spending the entire night there.

90.     All of these circumstances should have alerted Father Carrier and Carter that something was amiss in Perlitz's dealings with the boys in his care at PPT.  During all these events Father Carrier and Carter were officers of the Haiti Fund and members of the Order of Malta, of which Father Carrier was a Magistral Chaplain.   During all these events Father Carrier was a New England Jesuit Order religious priest and University Chaplain/Director of Campus Ministry and Community Service of Fairfield University which was operated by the New England Jesuit Order.

91.     The visits to PPT by Father Carrier, a religious priest of the New England Jesuit Order, and Carter, who had previously been appointed to, or elected to, leadership positions in Catholic affiliated organizations, such as the Order of Malta and the Canterbury School of New Milford, Connecticut, occurred at a time when those in leadership positions of organizations affiliated with the Catholic Church were well aware of the potential for sexual abuse of minor children by adults charged with looking after their well-being.  As already noted, the National Conference of Catholic Bishops released a document recognizing the problem of child sex abuse and the need for the Church to take steps to address it in 1995, three years before PPT was founded.  Moreover, the "Charter for the Protection of Children and Young People," which recognized the need for clear and well-publicized "standards of ministerial behavior and appropriate boundaries for clergy and for any other church personnel in positions

Case 3:13-cv-01132-RNC   Document 90-2   Filed 11/15/13   Page 27 of 48

of trust who have regular contact with children and young people" was issued in 2002. In addition, the New England Jesuit Order in January 2006 promulgated the New England Jesuit Order's "Ethics in Ministry Policies" which proscribed the conduct in which Perlitz engaged.

92.     Thus, by the time that Perlitz was abusing minor boys in his care, the Catholic Church and its affiliates had been put on notice of the problem of child sex abuse and of the signs that a clergy member or a lay adult in charge of children was engaging in improper relationships with those children.  Nonetheless, neither Father Carrier, nor Fairfield University, operated by the New England Jesuit Order, nor the New England Jesuit Order itself, nor Carter nor the Haiti Fund nor the Order of Malta – took any steps to protect the children in Perlitz's care. On the contrary, they facilitated Perlitz's crimes by continuing to provide him money and facilities to run PPT in the face of evidence that Perlitz was maintaining inappropriate relationships with boys in his care.

93.     Although defendants failed to take any steps to protect the children in Perlitz's care, it is clear that defendants were kept informed about activities at PPT and at the staff residence in Bel Air and that Father Carrier and Mrs. Carter acted as the eyes and ears of the Haiti Fund, Fairfield University, the New England Jesuit Order, and the Order of Malta in Haiti.  Thus, during his visits to Haiti, Father Carrier learned that an adult volunteer had an adult Haitian girlfriend who occasionally spent the night at the Bel Air residence.  Shortly thereafter, a member of the Haiti Fund board (and Fairfield University employee or former employee) phoned the volunteer in Haiti to admonish him about the inappropriateness of his girlfriend staying in the house.  Clearly, the Haiti Fund and Fairfield University were receiving sufficient information for their representatives on the ground to monitor who was living in the Bel Air house and to

involve themselves in those arrangements when they chose.

94.     While Father Carrier failed to monitor and/or report Perlitz's improper activities at PPT, Fairfield University failed to properly supervise Father Carrier in his capacity as Chaplain and Director of Campus Ministry and, in particular, with respect to his role at PPT.  Thus, Fairfield University failed to properly monitor PPT's or Father Carrier's activities in Haiti and failed to question Father Carrier to ensure that Father Carrier was carrying out his duties to appropriately supervise the program at PPT.

95.     The New England Jesuit Order, of which Father Carrier was a member, and which operated Fairfield University failed to properly supervise Father Carrier and Fairfield University with respect to their activities managing and overseeing PPT.

96.     The Order of Malta similarly failed to supervise Carter and Father Carrier with respect to their oversight of the Order of Malta's project in Haiti.  The Order of Malta failed to ensure that Carter and Father Carrier were properly supervising PPT and failed to ensure that proper procedures and safeguards were put in place at the project it claimed as its own.

97.     Defendants Perlitz, Father Carrier, Carter, and the Haiti Fund hindered, delayed, and prevented communication to law enforcement officers, including law enforcement officers of the United States, of information relating to Perlitz's violations of 18 U.S.C. § 2423 and 18 U.S.C. § 1591, in at least the following ways:

  a.  In late 2007 and early 2008, after learning of claims that Perlitz had been molesting boys at PPT, the Haiti Fund conducted an investigation designed to discredit those claims and exonerate Perlitz.  This investigation was not conducted in good faith. Instead, Father Carrier, Carter, and/or other officers of the Haiti Fund manipulated the investigation, and/or allowed Perlitz to manipulate it, by preventing and

28

precluding other Haiti Fund board members – or anyone else -- from questioning potential independent witnesses or otherwise engaging in any serious investigation.  As a result, the Haiti Fund's initial report declared there was no merit to claims Perlitz was sexually abusing boys at PPT.  Had the Haiti Fund conducted a bona fide investigation at this time, it would not have exonerated Perlitz and would have realized it should convey information about Perlitz's illegal conduct to law enforcement officers of the United States.

b.  In 2008, after the Haiti Fund initiated a second investigation of Perlitz's activities in Haiti, Perlitz and Carter took steps to bar investigators hired by the Haiti Fund Board of Directors from entering Perlitz's bedroom at the house in Bel Air, Haiti. That same year, in a further effort to prevent any real investigation into Perlitz's conduct, Father Carrier and Carter wrote a letter to Haiti Fund donors stating that the accusations against Perlitz were groundless, despite the fact that, by this time, both Father Carrier and Carter were on notice of Perlitz's probable illegal conduct.  These actions successfully delayed the conclusion of the second investigation.  Had Father Carrier, Carter and other members of the Haiti Fund board not delayed the second investigation, the Haiti Fund would have realized sooner than it did that it should convey information about Perlitz's illegal conduct to law enforcement officers of the United States, so that Perlitz could have been prosecuted – and stopped – earlier than in fact occurred.

c.  In 2008, at the behest of Perlitz (who was at that time barred from returning to Haiti himself), Carter flew to Haiti and removed one or more

of Perlitz's computers from the Bel Air house and took them with her to the United States. It appears that Carter removed the computer or computers to prevent investigators, including, ultimately, federal law enforcement personnel, from discovering pornographic material, which may have included pornography relating to young boys, stored on the computer or computers. Rather than turn the computer or computers over to investigators looking into Perlitz's conduct, Carter delivered them to Perlitz. A year after Carter spirited the computers away from investigators, one of these computers was seized when Perlitz was arrested. United States investigators found that Perlitz had used that computer to visit websites focusing on sexual material relating to boys, such as EXTREMEGAYBOYS.COM, www.photosgayboys.com/teenboys, and www.spankteenboys.com.

98. From 1999 until 2008 the Haiti Fund, with substantial participation of Fairfield University, raised millions of dollars to support Perlitz's activities with PPT. Perlitz used portions of these funds to groom his minor victims and to provide them with gifts or money in exchange for sexual acts. The Haiti Fund and Fairfield University knew that Perlitz used substantial portions of these funds to finance his frequent trips to, and extended stays in, Haiti. The Haiti Fund and Fairfield University, operated by the New England Jesuit Order, failed to institute generally- accepted safeguards – or any safeguards -- to prevent the abuses which occurred.

**Facts Pertaining to Wadson Dorcine**

99. In or around 2006 when Plaintiff Wadson Dorcine was approximately 13 years of age, Defendant Perlitz, while in Haiti, engaged in explicit sexual behavior and lewd and lascivious behavior with Plaintiff, including but not limited to illicit sexual

acts with Plaintiff.

100.    Without limiting either the generality of the preceding paragraph or the specific number of instances of illicit conduct, during the time period referenced above, Defendant Perlitz coerced Plaintiff into performing illicit sexual conduct by means of implicit threats to Plaintiff.  Among other things, Perlitz engaged in acts of sodomy with Plaintiff.

101.    Without limiting either the generality of the two immediate preceding paragraphs or the specific number of instances of illicit conduct, during the time period referenced above, Defendant Perlitz provided things of value to Plaintiff in return for illicit sexual conduct, including, among other things, the opportunity to continue at school.  Plaintiff understood that to continue to be able to attend PPT, eat meals provided by PPT, and receive an education at PPT, Plaintiff had to allow Perlitz to sexually abuse Plaintiff.  Defendant Perlitz also coerced Plaintiff into engaging in sexual acts by, among other things, causing Plaintiff to believe that if Plaintiff failed to allow Perlitz to engage in certain sexual acts with the Plaintiff, Plaintiff would suffer financial harm.

102.    As a result of Defendant Perlitz's illicit sexual conduct, lewd and lascivious conduct, providing things of value to a minor for sex acts, and use of means of coercion to cause Plaintiff to engage in commercial sex acts, Plaintiff has suffered deep emotional and physical pain, is suffering deep emotional and physical pain, and will suffer future deep emotional and physical pain.

103.    At all times material hereto, Defendant Perlitz misrepresented and concealed from Plaintiff the wrongful nature of the sexual and related activity and that such activity could harm Plaintiff.

104.    Victims of child sex abuse frequently have difficulty remembering the full

extent of the abuse they suffered or, even when they do recall, may be unable to communicate all of the details of that abuse. They may also be unaware, or unable to communicate, the full extent of injury they have suffered from such abuse. As a victim of Perlitz's sexual abuse, Plaintiff is unable at this time to fully describe all of the details of that abuse and the extent of the harm he suffered as a result.

## CLAIMS FOR RELIEF

### PLAINTIFF'S FIRST CLAIM FOR RELIEF

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 2255
(against Defendant Perlitz)**

105.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-104 set forth above.

106.    Defendant Perlitz violated 18 U.S.C. § 2423(b), Travel With Intent To Engage In Illicit Sexual Conduct and was convicted of doing so.  Plaintiff, while a minor, was a victim of Defendant Perlitz's violation of 18 U.S.C. § 2423(b).

107.    Plaintiff has suffered substantial injuries as a result of Defendant Perlitz's violations of 18 U.S.C. § 2423(b).

108.    By reason of the foregoing, Perlitz is liable to Plaintiff  for damages in an amount to be proved at trial, as well as the cost of this suit, and reasonable attorney's fees pursuant to 18 U.S.C. § 2255.

### PLAINTIFF'S SECOND CLAIM FOR RELIEF:

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 2255
(against Defendants Father Carrier, the Haiti Fund and Fairfield University)**

109.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-108 above.

110.    Defendant Perlitz violated 18 U.S.C. § 2423 (b), Travel With Intent To Engage In Illicit Sexual Conduct.

111.    The Haiti Fund and Fairfield University knowingly benefitted financially

32

from PPT by touting their involvement in PPT as a basis for fund-raising activities. The Haiti Fund and Fairfield University received contributions based on and/or because of their involvement in PPT.

112.   Father Carrier knowingly benefitted financially from PPT in that Father Carrier was an officer of the Haiti Fund, which received large sums of money, apparently with substantial sums not accounted for.

113.   Father Carrier, the Haiti Fund, and Fairfield University knew or should have known that Perlitz was engaged in activities in violation of 18 U.S.C. § 2423(b).

114.   In violation of 18 U.S.C. § 2423(d), Father Carrier, the Haiti Fund, and Fairfield University, in order to promote PPT and receive the financial benefits from their involvement with PPT, arranged for, or facilitated, Perlitz's numerous trips to, and extended stays in, Haiti when Father Carrier, the Haiti Fund, and Fairfield University knew or should have known that Perlitz was traveling to Haiti to engage in illicit sexual conduct with minors in Haiti.

115.   By reason of the foregoing, Father Carrier, the Haiti Fund and Fairfield University are liable to Plaintiff for damages in an amount to be proved at trial, as well as reasonable attorney's fees pursuant to 18 U.S.C. § 2255.

### PLAINTIFF'S THIRD CLAIM FOR RELIEF

**Negligent Hiring, Retention, Direction and Supervision
(against Defendants Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five)**

116.   Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-115 above.

117.   At all times relevant to this action, the responsibilities of Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe

33

Five (hereinafter referred to as the "Perlitz Supervisory Defendants") included the hiring, retention, direction, and supervision of Perlitz.

118.   At all times relevant to this action, the Perlitz Supervisory Defendants knew or should have known that Perlitz would interact and was interacting with individuals, including minors, and more specifically, was interacting with Plaintiff.

119.   At all times relevant to this action, the Perlitz Supervisory Defendants had a special relationship with Perlitz and/or with Plaintiff.

120.   At all times relevant to this action, the Perlitz Supervisory Defendants had a duty of care to properly hire, retain, direct, and supervise individuals of good reputation and character who, it was known, would be interacting with minors in the Republic of Haiti.

121.   At all times relevant to this action, the Perlitz Supervisory Defendants negligently breached said duty by hiring and retaining Perlitz, an individual whom the Perlitz Supervisory Defendants knew or should have known was of bad character and reputation and unable to properly interact with minors. The Perlitz Supervisory Defendants improperly and inadequately directed and supervised Perlitz.

122.   At all times relevant to this action, the Perlitz Supervisory Defendants knew or should have known that Perlitz's intentional and negligent conduct would result in severe mental and emotional suffering by Plaintiff.

123.   As a direct and proximate result of the Perlitz Supervisory Defendants' negligent conduct, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

124.   By reason of the foregoing, the Perlitz Supervisory Defendants are liable

34

to Plaintiff for negligent hiring, retention, direction, and supervision, in an amount to be proved at trial.

### PLAINTIFF'S FOURTH CLAIM FOR RELIEF

### Negligent Hiring, Retention, Direction, and Supervision
### (against Defendants the Haiti Fund, Fairfield University, the New England Jesuit Order, John Doe Six and John Doe Seven)

125.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-124 above.

126.    At all times relevant to this action, the responsibilities of the Haiti Fund, Fairfield University, the New England Jesuit Order, John Doe Six and John Doe Seven (hereinafter referred to as the "Father Carrier Supervisory Defendants") included the hiring, retention, direction, and supervision of Defendant Father Carrier.

127.    At all times relevant to this action, the Father Carrier Supervisory Defendants knew or should have known that Father Carrier was directly managing, supervising, controlling and directing Perlitz who the Father Carrier Supervisory Defendants knew or should have known was interacting with minors, and more specifically, was interacting with Plaintiff.

128.    At all times relevant to this action, the Father Carrier Supervisory Defendants had a special relationship with Father Carrier and/or with Plaintiff.

129.    At all times relevant to this action, the Father Carrier Supervisory Defendants had a duty of care to properly hire, retain, direct, and supervise individuals of good reputation and character who directly managed, supervised, controlled and directed Perlitz who was interacting on a daily basis with extremely vulnerable minors in the Republic of Haiti.

130.    At all times relevant to this action, the Father Carrier Supervisory Defendants negligently breached said duty by hiring and retaining Father Carrier, an

individual whom the Father Carrier Supervisory Defendants knew or should have known was of bad character and reputation and unable to properly manage, supervise, control and direct Perlitz who was interacting on a daily basis with extremely vulnerable minors in the Republic of Haiti. The Father Carrier Supervisory Defendants improperly and inadequately directed and supervised Father Carrier.

131.    At all times relevant to this action, the Father Carrier Supervisory Defendants knew or should have known that Father Carrier's intentional and negligent conduct would result in severe mental and emotional suffering by Plaintiff.

132.    As a direct and proximate result of the Father Carrier Supervisory Defendants' negligent conduct, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

133.    By reason of the foregoing, the Father Carrier Supervisory Defendants are liable to Plaintiff for negligent hiring, retention, direction and supervision in an amount to be proved at trial.

### PLAINTIFF'S FIFTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**
**(against Defendants Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven)**

134.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-133 above.

135.    At all relevant times, Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven knew that PPT, operated, managed and controlled by Defendant Perlitz, was providing services to extremely vulnerable minors in the Republic of Haiti.

36

136.    At all relevant times, Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven sponsored and promoted PPT which the Defendants knew was providing services to extremely vulnerable minors in the Republic of Haiti.

137.    Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven each had a fiduciary obligation to the Haitian minors participating in PPT, specifically including Plaintiff.

138.    Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven each breached their fiduciary duty to Plaintiff.

139.    As a direct and proximate result of the breach of fiduciary duty by Defendants Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

140.    By reason of the foregoing, Defendants Father Carrier, Carter, the Haiti Fund, the Order of Malta, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Seven are liable to Plaintiff in an amount to be proved at trial.

### PLAINTIFF'S SIXTH CLAIM FOR RELIEF

### Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 1595
### (against Defendant Perlitz)

141.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-140 above.

37

142.    Perlitz caused Plaintiff, who was then under the age of 18, to engage in commercial sex in Haiti by pressing him to engage in sexual acts in exchange for things of value, including but not limited to, the opportunity to continue at school.  Plaintiff understood that to continue to be able to attend PPT, eat meals provided by PPT, and receive an education at PPT, Plaintiff had to allow Perlitz to sexually abuse Plaintiff. Perlitz further recruited, enticed, and maintained Plaintiff knowing that Perlitz would cause him to engage in these commercial sex acts.  The money to finance Perlitz's venture came from the United States, so that Perlitz's conduct affected foreign commerce.

143.    Perlitz's acts constitute a violation of 18 U.S.C. § 1591 which prohibits sex trafficking of children.  Plaintiff was a victim of Perlitz's violations of § 1591.

144.    By reason of the foregoing, Perlitz is liable to Plaintiff for damages in an amount to be proved at trial, as well reasonable attorney's fees pursuant to 18 U.S.C. § 1595.

### PLAINTIFF'S SEVENTH CLAIM FOR RELIEF

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 1595**
**(against Defendants Father Carrier, the Haiti Fund and Fairfield University)**

145.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-144 above.

146.    The Haiti Fund and Fairfield University have knowingly benefitted financially from PPT by touting their involvement in PPT as a basis for fund-raising activities.  The Haiti Fund and Fairfield University received contributions based on and/or because of their involvement in PPT.

147.    Father Carrier knowingly benefitted financially from PPT in that Father Carrier was an officer of the Haiti Fund, which received large sums of money, apparently with substantial sums not accounted for.

38

148.    Father Carrier, the Haiti Fund, and Fairfield University knew or should have known that PPT, through Perlitz, was engaged in activities in violation of 18 U.S.C. § 1591.

149.    By reason of the foregoing, Father Carrier, the Haiti Fund and Fairfield University are liable to Plaintiff for damages in an amount to be proved at trial, as well as reasonable attorney's fees pursuant to 18 U.S.C. § 1595.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff Wadson Dorcine respectfully demands judgment of $20,000,000 in damages against each Defendant for each claim Plaintiff Wadson Dorcine states against each Defendant, punitive damages, plus costs, interest, attorneys' fees, and such other and further relief as this Court deems just and equitable.

### PLAINTIFF'S JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  November 15, 2013

By Plaintiff's Attorneys,

By:    /s/    Steven J. Errante
Steven J. Errante (ct04292)
SErrante@ltke.com
Marisa A. Bellair (ct23802)
LYNCH, TRAUB, KEEFE, & ERRANTE, P.C.
P.O. Box 1612
52 Trumbull Street
New Haven, CT 06510
Phone:  (203) 787-0275
Fax:  (203) 782-0278

*Of counsel:*
Mitchell Garabedian (phv04676)
garabedianlaw@msn.com
William H. Gordon (phv04677)

39

garabedianlaw@earthlink.net
LAW OFFICES OF MITCHELL GARABEDIAN
100 State Street, 6th Floor
Boston, MA 02109
Phone:  (617) 523-6250

Paul J. Hanly, Jr. (phv04680)
phanly@hanlyconroy.com
Jayne Conroy (phv04679)
jconroy@hanlyconroy.com
Andrea Bierstein (phv04678)
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP
112 Madison Ave., 7th floor
New York, New York 10016
Phone:  (212) 784-6400

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GERVIL ST. LOUIS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>DOUGLAS PERLITZ, et al.,<br><br>                    Defendants. | Civ. A. No. 3:13-cv-01132-RNC<br><br><br>Dated: November 14, 2016 |

*This document relates to:*

*Lecenat v. Perlitz, No. 13-1633*
*Dorcine v. Perlitz, No. 13-1701*
*Mackenson v. Perlitz, No. 14-125*
*Deriza v. Perlitz, No. 14-668*

### <u>DECLARATION OF MICHEL EMMANUEL SUCCAR</u>

1.      I am a lawyer licensed to practice law in Haiti. I received my law degree from the

State University of Haiti Law School in Port-au-Prince in 1997.

2.      I received a master's degree in comparative law from the University of Miami

School of Law, in Coral Gables, Florida, in 2002.

3.      I have practiced law for more than fifteen years, and I am a member in good

standing of the Haitian Bar Association, the Port-au-Prince Bar Association, and the Port-au-

Prince Lawyer's Board.

4.      I am a partner of Cabinet Lissade, a law firm in Port-au-Prince, listed in

Chambers & Partners, a leading European law firm rating company. My practice focuses on civil

and commercial law as well as corporate law and the law of intellectual property.

5.      I have been retained by counsel for Fr. Paul E. Carrier to provide opinions on questions of Haitian law, assuming that Haitian law applies in this action. I have not been asked to give an opinion on whether Haitian law does apply: I understand that the American court will decide that question under the law of the forum. I have charged Fr. Carrier's counsel for my time at my ordinary rate of $300. The total amount I have been paid to date is $14,990. My compensation for this engagement is not contingent and is not dependent on my agreement to offer any particular opinion. I have been asked only to provide an impartial opinion about what Haitian law provides.

6.      Until Father Carrier's counsel retained me, I was not familiar with the Perlitz case or with Project Pierre Toussaint. I have no personal knowledge of the facts of the case, and I do not personally know any of the plaintiffs or defendants, or, to the best of my knowledge, any person who was associated in any way with PPT.

7.      I have been asked to opine on the following two questions:

a.   On the facts given, can Mr. Perlitz's victims state a claim under Haitian law that Father Carrier is liable to them because he negligently failed to hire or supervise Mr. Perlitz, or because he negligently retained him in his position?

b.   On the facts given, can Mr. Perlitz's victims state a claim under Haitian law that Father Carrier is liable to them because he was their fiduciary and he breached a fiduciary duty he owed to them?

8.      In answering these questions, I have been given a statement of facts that I have been asked to assume are true. I have attached a copy of this statement of facts to my declaration as Exhibit 1.

A.     Brief Historical Background of the Haitian Legal System.

9.     Prior to addressing the issue, it is important to note that Haitian law derives from the Napoleonic Code, which is the Roman-German law. This is why we sometimes refer to decisions rendered by French courts. In the Haitian judicial system, we (lawyers and judges) refer to decisions made by judges as a reference to convince the actual judge to rule the same way previous judges have done so. These decisions, again, are not binding upon the judges but can persuade them to rule the same way.

10.     It is also important to note that Haitian laws have not changed much since the occupation of the French in Haiti, even though in France, there have been extensive changes in the law over the years. A Haitian judge may consider a decision by a French judge to better seek the legal reasoning for his ruling, even though French laws are not strictly binding upon the Haitian judicial system. Some decisions in France will be made based on these laws enacted in France which have no effect on Haiti.

11.     In conclusion, previous decisions of French judges may be or may not be relevant or applicable for Haitian judges depending on the time they were rendered and the law they are referring to. For example, a law enacted in France but not in Haiti may lead to decisions by French courts on the interpretation of the said law. These decisions will not be considered by the Haitian judge. On the other hand, decisions rendered by French judges interpreting the Civil Code will certainly be followed by the Haitian judges, because most articles in the Haitian and French Civil Codes remain the same.

12.     In my legal opinion in this case, decisions rendered by French courts and the scholarly opinions of leading French legal authorities are fully applicable and will be considered as persuasive by the Haitian judges because the case involves article 1170 of the Haitian Civil Code, which is also valid, under a different article number, in the French Civil Code and is still

3

applicable to this day. It has the same language and addresses the same legal issue. I have also reviewed the legal opinion of Mrs. Viviane CURRAN, a French legal expert, and I conclude that her opinion of the case in view of French law would be persuasive and that the outcome would be the same under Haitian law.

B.      Liability Under Haitian Law Pursuant to an Act or Omission which Caused Damages too Third Parties (Tort Law)

13.     Tort liability in general is addressed in the Haitian Civil Code by articles 1168 and 1169, 1170. Based on the facts of the case, I conclude that the applicable article is Article 1170 of the Haitian Civil Code.

14.     Article 1170 of the Haitian Civil Code provides (my translation):

On est responsable non-seulement du dommage que l'on cause par son propre fait, mais encore de celui que est causé par le fait des personnes dont on doit répondre, ou des choses que l'on a sous sa garde.

* * *

La commettants, du dommage causé par leurs préposés, dans les fonctions auxquelles ils les ont employés.

Each person is responsible not only for the damage he causes by his own act, but also for the acts of other persons whom he should answer for, or for things that are in his custody. The principals are liable for the damages caused by their agents in the execution of the functions that they have been employed for."

15.     Several decisions by the Haitian Supreme Court have all confirmed that causality and fault must exist for damages to be awarded. In one Supreme Court decision, the highest court ruled that "The award of damages is justified only if the fault and the prejudice have both been established and their link through causality." *See Cass. 2ème section, 7 april 1949, Bull 1948-1949, pp 197 et seq.* In another decision, the highest court made it clear that:" The award of damages without any motive establishing fault and prejudice, is an excess of power by the judge." *See Cass. 7 novembre 1927, Aff. Rodriguez vs Bereny.*

4

16.    In another case, the Supreme Court ruled that:" Is founded, the judgment which, in an electrocution case, admits the company's fault and award damages, after having found the absence of protective measures necessary, when high voltage wire was installed at less than 1m50 from a house. " *See Cass. 4 november 1948, Bull., 1948-49, pp 22 and on*;

17.    The elements required to prove negligence are an act or an omission which constitutes a fault, a prejudice, and finally, the causality link between the act or omission and the prejudice. The plaintiffs have the burden of proof.

1.    <u>Analysis of Article 1170 of the Haitian Civil Code.</u>

18.    In the instant case, Article 1170 is the relevant article of the Code, because it governs the responsibility of a person for an act caused by the person's agent. We assume in this analysis that Mr. Perlitz is either an agent under the supervision of Father Carrier, or an agent under the supervision of an entity, the Haiti Fund, Inc.

a.    <u>Servant of Father Carrier (Physical Person).</u>

19.    In the instant case, with the assumption that Mr. Perlitz was acting as an agent or employee of a principal or employer who is responsible to supervise his work, and also responsible to direct his tasks, the principal or employer will be liable for an act caused by Mr. Perlitz.

20.    According to law, if Mr. Perlitz were Father Carrier's employee or agent, then there would be sufficient evidence, on the facts I have been given, to find Father Carrier liable under Article 1170.

5

b.      Servant of the Entity (Moral Person)

21.     In case that the relationship of a principal and agent or employer and employee is between Mr. Perlitz and a legal entity, the entity, and not any of its agents, will be liable as long as the entity is a corporation.

22.     In the instant case, according to the facts given, after Project Pierre Toussaint had been in existence for a few years, several of the people active in aiding the school formed The Haiti Fund, Inc. ("Haiti Fund"), a Connecticut not-for-profit corporation.

23.     The relevant question becomes who hired Mr. Perlitz, or who was Mr. Perlitz's employer? The answer to that question will solve the issue of liability for negligence. If enough evidence exists to suggest that Haiti Fund was the employer, then the responsibility for negligence lies with the said corporation. If on the other hand, Father Carrier was the supervisor and the employer of Mr. Perlitz, the responsibility for negligence lies with Father Carrier.

2.      Definition of an Employee, Employer, and Labor Contract, Which Are Important Criterias To Establish An Employee/Employer Relationship.

24.     According to article 19 of the Haitian Labor Code, an employer is : "any physical or moral person ["Moral person" means a corporation] who, by virtue of a labor agreement, rent the services of others providing that a salary is paid for the execution of a specific task."

25.     The same article defines an employee as : "any person who undertakes to rent his services for a salary under the direction and the authority of another physical or moral person."

26.     According to article 13 of the Haitian labor code, a labor contract is defined as:"any agreement by which a person rents his services to another person under his control or dependent on him, providing that a salary is given to that person."

27.     Moreover, the same article 19 states clearly that:" Directors, managers, administrators, vessel captains and in general all persons in the position of directing and

6

managing in the name of the employer are representatives of the latter, and as such, they engage

the employer vis-à-vis the employees."

28.     It becomes very important in the instant case to determine the nature of the

relationship that existed between Mr. Perlitz and Father Carrier or Mr. Perlitz and Haiti Fund,

i.e., whether Mr. Perlitz was an employee of Father Carrier, an employee of Haiti Fund, or

whether he was acting on his own in committing these acts.

       3.     <u>Was Mr. Perlitz and Employee of Father Carrier, Or Of Haiti Fund, Inc.?</u>

29.     It is important to note that a person is deemed to be an employee if a salary is

given to perform a specific task. However, it is important to note that a written labor contract is

not the only proof that such a relationship exist. A contract may also be verbal. What is

important to help make that determination is to prove that a) there is a salary paid in whatever

form it may be; b) a task is being performed by the employee; and c) the employee is under the

control or authority of the employer;

30.     After Father Carrier was removed from the board of directors of the Haiti Fund,

Inc., the Board removed Mr. Perlitz from "his position" at Project Pierre Toussaint and forbade

him to return. The question remains: in what position Mr. Perlitz was affected and what was his

role? Who was supervising him?

31.     There is evidence that Mr. Perlitz was present and acting in Haiti with the

knowledge of the Haiti Fund Inc. for performing some tasks (although not specifically defined)

and that the board knew he was in Haiti doing works for the Fund. The Haiti Fund Inc.

supervised and managed the overall operation of Project Pierre Toussaint, and the most relevant

fact as proof that Mr. Perlitz was an employee of the Haiti Fund Inc. is that the Fund

acknowledged that it was required to treat him as an employee of the corporation for federal tax

purposes. Even though there was no written contract but under Haitian law, as stated above, a

written contract is not mandatory A verbal contract is valid and can establish an employer/employee relationship under the Haitian Labor Code, *see* Article 16 of the Haitian Labor Code. The reason why he was characterized as an employee is irrelevant. The Haiti Fund Inc., a corporation, holds the responsibility of defining its relationship with a third party, whether it is an "independent contractor" agreement or whether it is an employer/employee relationship. The Haiti Fund Inc., by characterizing Mr. Perlitz as an employee, has eliminated all doubts that could exist in the nature of that relationship. The admission of someone is recognized by Haitian law and is considered by scholars to be the strongest proof in Haitian law. (See article 1140 of the Haitian Civil Code).

32.     There were some interactions between Father Carrier and Mr. Perlitz, since they both were in Cap Haitian. The nature of this relationship is that of a representative from the Board in Haiti, visiting PPT on behalf of Haiti Fund, Inc. taking into account the analysis above, it is likely that a Haitian court would have found that Mr. Perlitz was an employee or agent of the Haiti Fund Inc., not an employee or agent of Father Carrier.

33.     It is my conclusion that based on the facts of the instant case Mr. Perlitz was not an employee of Father Carrier but was an employee of the Haiti Funds Inc. According to the corporate laws of Haiti, corporations are moral persons who are responsible and liable for their own acts and also for the acts of their agents and employees. Since Mr. Perlitz was acting as the agent or employee of Haiti Fund. Inc., there is a presumption that the fund is liable for the acts of Mr. Perlitz because of the principal/agent or employer/employee relationship that existed between both and such presumption can be reversed by the Fund who has the burden to do so.

34.     In conclusion, if there were evidences that Father Carrier was the employer of Mr. Perlitz, according to article 1170 of the Haitian civil code, yes, Mr. Perlitz's victims could state a

claim under Haitian law that Father Carrier is liable to them because he negligently hired or failed to supervise Mr. Perlitz, or because he negligently retained him in his position. But, according to the facts, Father Carrier is not personally liable because he was not the employer of Mr. Perlitz.  The interactions and all the statements of facts cannot render Father Carrier liable for the purpose of a civil lawsuit.

C.      <u>On The Facts Given, Can Mr. Perlitz's Victims State A Claim Under Haitian Law That Father Carrier Is Liable To Them Because He Was Their Fiduciary And He Breached A Fiduciary He Owed To Them?</u>

35.      In Haitian law, we do not have the concept of fiduciary. "Negligence", "action", "omission", "fault" and "causality" are the main elements considered in Haitian tort law. Therefore, Mr. Perlitz's victims cannot state a claim under Haitian law that Father Carrier is liable to them because he was their fiduciary and he breached a fiduciary duty he owed to them.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct. Executed on November 14, 2016.

/s/ Michel Succar
Michel Succar

## CERTIFICATE OF SERVICE

I certify that on November 14, 2016, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

I further certify that on November 14, 2016, I caused a copy of the foregoing document to be served by first-class mail, postage prepaid, on counsel for the defendant, Douglas Perlitz, who is unable to accept electronic service:

<table>
<tr><td>David T. Grudberg, Esq.</td><td>Michael McCooey</td></tr>
<tr><td>Carmody & Torrance, LLP</td><td>Chair, Haiti Fund, Inc.</td></tr>
<tr><td>195 Church Street, P.O. Box 1950</td><td>475 Polly Park Road</td></tr>
<tr><td>New Haven, Conn. 06509-1950</td><td>Rye, N.Y. 10580</td></tr>
</table>

/s/ Theodore J. Folkman

717583

10

## FATHER CARRIER'S ARGUMENT ON APPLICABILITY OF HAITIAN LAW IN THE PERLITZ CASES

2.  <u>Background to Haitian Law</u>

Haiti is a part of the most prominent legal tradition that is an alternative to our common law tradition, namely the civil law. We will not give a lengthy exposition on the differences between the civil law and the common law here, but to understand what we say about Haitian law, it is important to understand a few points.

The most well-known difference between the two legal systems is that the common law is developed through judicial precedents, as modified by statutes, whereas the civil law is codified in comprehensive codes. (Curran Decl. ¶ 4; Succar Decl. ¶ 9-10). *See generally* Peter G. Stein, *Roman Law, Common Law, and Civil Law,* 66 Tul. L. Rev. 1591, 1594-98 (1992). In the civil law, judicial precedents are not a binding source of law. A judge's decision in a case must rest on the law itself (a code, or an executive decree), not merely on judicial precedent. (Succar Decl. ¶ 9; Curran Decl. ¶ 4). Indeed, in Haiti, the constitution itself provides that the power to interpret the law rests not with the judiciary, but with the legislature, which exercises the power of interpretation by enactment of another law. *See* Haiti Const. art. 128 ("The Legislative Branch alone has the authority to interpret laws, which it does in the form of a law").

The code that is most relevant in our case, as we discuss below, is the *Code Civil d'Haïti* ("the Haitian Civil Code"). In a civil law system, a civil code codifies much of what we would call the law of property, contracts, torts, marriage, inheritance, and family law. The Haitian Civil Code was adopted in 1825, after the Haitian Revolution, and is (at least with respect to the articles that are at issue in this case) nearly identical to the French *Code Civil* adopted in 1804 ("the French Civil Code"). Because the Haitian legal system derives from the French legal system, Haitian lawyers will consult French sources in order to determine what the rationale of the law is (Succar Decl. ¶ 9-12). In support of the arguments we make in this motion, we are offering two opinions: one of a leading Haitian lawyer, Michel Succar of Cabinet Lissade, a Port-au-Prince law firm, the other of Vivian Curran, a leading American scholar of comparative law and of French law in particular. Professor Curran's opinion regarding French law serves to bolster Mr. Succar's opinion about Haitian law by showing that the outcome under Haitian law would be the same in France. Mr. Succar, in addition to providing his own analysis under Haitian law, has confirmed that Professor Curran's opinion is persuasive and correctly states the outcome under Haitian law. (Succar Decl. ¶ 12). This memorandum includes only the highlights of the two experts' legal opinions: their declarations give the analysis in full.

3.     <u>Under Haitian Law, Father Carrier Cannot Be Liable For Negligence,
Because Mr. Perlitz Was Not His Agent Or Employee, And Because Father
Carrier Himself Was The Agent Of the Haiti Fund, Inc.</u>

A Haitian lawyer or a French lawyer presented with the facts of this case would begin by

asking which article of the Civil Code is the correct article under which to analyze Father

Carrier's potential liability to the plaintiffs who claim Mr. Perlitz sexually abused them. Under

both Haitian law and French law, and to a civil lawyer generally, the relevant article would be

Article 1170 of the Haitian Civil Code (Article 1384 of the French Civil Code),[18] which reads:

*On est responsable non-seulement du dommage que l'on cause par son propre fait, mais encore
de celui que est causé par le fait des personnes dont on doit répondre, ou des choses que l'on a
sous sa garde.*

*\* \* \**

*La commettants, du dommage causé par leurs préposés, dans les fonctions auxquelles ils les ont
employés.*

"One is liable not only for the harm one causes by one's own act, but also for that caused by
persons for whom one must answer, or for things in one's custody … [including]

"Principals, for the harm caused by their agents in the duties in which they [the principals] have
employed them [the agents.]"

Code Civil [C. Civ.] [Civil Code] art. 1170 (Haiti); *cf.* Code Civil [C. Civ.] [Civil Code] art. 1384

(Fr.).[19] (Succar Decl. ¶¶ 13-14; Curran Decl. ¶ 9).

---

[18] Very recent French legislation, effective October 1, 2016, resulted in a renumbering of the Code provisions, and
what we refer to in this memorandum as Article 1384 is now Article 1242. *See* Ordonnance 2016-131 du 10 février
2016 portant réforme du droit des contrats, du régime général et de la preuve des obligations [Ordinance 2016-
131 of 10 February 2016 on the reform of contract law and the general regime of proof of obligations], Journal
Officiel de la République Française [J.O.] [Official Gazette of France], Feb. 11, 2016, text no. 26. We continue to
refer to Article 1384 in this memorandum.
[19] There is a minor textual difference between the Haitian and French codes. Whereas (Haitian) Article 1170 refers
to *les commettants* ("the principals"), (French) Article 1384 refers to *les maîtres et les commettants* ("the masters

There are two important principles at work in Article 1170. First, under the law, in order to be liable for the harm done by another, one must be the other person's principal, i.e., the other person must be one's agent. Second, under the law, when a person is himself the agent of another, he is not personally liable for negligent performance of his duties: only the principal is liable.

a.  <u>Under Haitian Law, Father Carrier Was Not Mr. Perlitz's Principal And Cannot Be Liable For The Harm Mr. Perlitz Caused.</u>

The plaintiffs' implausible case is that *all* of the defendants were Mr. Perlitz's principals and employers—that each of them hired him, had the duty to supervise him, and wrongfully retained him (Compl. ¶ 123). This is obviously implausible on its face. Moreover, under Haitian law, it is clear that the only principal or employer who is answerable for Mr. Perlitz's wrongful acts is the Haiti Fund, Inc.

Haitian law defines an "employee" as "any person who undertakes to rent his services for a salary under the direction and authority of another physical or moral person." (Labor Code art. 19). There must be a "labor contract" (id.), which may be oral rather than in writing. (Labor Code art. 16). To determine whether an employer-employee relationship exists, Haitian law asks:  (1) was a salary paid? (2) was the employee performing a task? and (3) was the employee under the control or authority of the employer? (Succar Decl. ¶ 29; *cf.* Curran Decl. ¶ 12 (French law requires a showing of authority and a relationship of subordination).

The answer to all three questions here is "yes."

First, it is undisputed that the Haiti Fund, Inc., paid Mr. Perlitz compensation (SUMF ¶ 39). At first, the Haiti Fund paid Mr. Perlitz as an independent contractor, but it came to

and the principals"). Similarly, Haitian law refers to *préposés* ("agents"), while French law refers to *domestiques et préposés* ("servants and agents").

understand that that was a mistake and reclassified him as an employee. (SUMF ¶ 39). The Haiti Fund, Inc.'s payments to Mr. Perlitz and its acknowledgment that it should have been treating Mr. Perlitz as an employee for US tax purposes is highly probative, under Haitian law, because admissions are regarded as the strongest form of proof in light of Article 1140 of the Civil Code. (Succar Decl. ¶ 31).

Second, it is undisputed that Mr. Perlitz performed a task, namely running PPT. Staff testified that he was in charge and made decisions for the school. (SUMF ¶¶ 40-41). Staff viewed Mr. Perlitz as their supervisor and went to him with questions and requests for approval. (SUMF ¶ 40). Mr. Perlitz was in charge of hiring, issuing salary, and general decision-making. (SUMF ¶ 41).

Third, it is undisputed that he was under the Haiti Fund, Inc.'s authority. The staff considered the Haiti Fund, Inc. to be ultimately in charge. (SUMF ¶ 42). Mr. Perlitz had to seek approval of the Board of the Haiti Fund, Inc., for major expenditures or changes to PPT's program. (SUMF ¶ 43). The Board had an operating committee. (SUMF ¶ 43). But the best evidence of this undisputed fact is that when the allegations of Mr. Perlitz's wrongdoing became known, the Haiti Fund, Inc., effectively fired him. (SUMF ¶ 44).

By the same token, none of these factors are present with respect to Father Carrier. There is no evidence that Father Carrier ever paid Mr. Perlitz any compensation. (SUMF ¶ 35). And there is no evidence that Father Carrier had control or authority over Mr. Perlitz. (SUMF ¶ 30- 34). The only evidence the plaintiffs can point to is the testimony of several plaintiffs that they heard Mr. Perlitz describe Father Carrier as the school's "grandfather," or words to that

effect.  (Bernardin Dep. 148:12-24[20]; Dorat Dep. 273:5-25[21]; Jheempson Joseph Dep. 118:15–119:12[22]; Gesner Lecenat Dep. 79:14–80:1).[23] This evidence, of course, is hearsay as to Father Carrier, because the question is not whether the young men *believed* Mr. Perlitz when they heard him, or even whether Mr. Perlitz believed what he was saying, but rather, whether Father Carrier really was exercising control or authority over Mr. Perlitz. The best evidence on this point relates, again, to Mr. Perlitz's removal. Father Carrier did not remove him, and indeed, he opposed, unsuccessfully, the efforts of the Haiti Fund, Inc., to do so. (SUMF ¶ 38).

In summary, the Haiti Fund, Inc., did everything that shows that it employed Mr. Perlitz. It paid him and supervised him, and indeed, acknowledged him as its employee. Father Carrier did nothing that shows that he employed Mr. Perlitz, and in fact he did not employ him.

Under Haitian law, once it is established that the Haiti Fund, Inc., not Father Carrier, employed Mr. Perlitz, it follows that the Haiti Fund, Inc., not Father Carrier, is liable. (Succar Decl. ¶¶ 23, 34). The reason for this conclusion is that under Article 1170, "principals" are liable for the harm caused by their "agents" in the duties in the principals have "employed" the agents. So unless the plaintiffs can prove the existence of the necessary agency relationship between Mr. Perlitz and Father Carrier—they cannot, as we have shown—Article 1170 does not come into play. (Curran Decl. ¶ 10 and authorities cited).

---

[20] Excerpts of the Deposition of Joseph Bernardin are attached to this memorandum as Exhibit 16.
[21] Excerpts of the Deposition of Jean Dorat are attached to this memorandum as Exhibit 17.
[22] Excerpts of the Deposition of Jheempson Joseph are attached to this memorandum as Exhibit 18.
[23] Excerpts of the Deposition of Gesner Lecenat are attached to this memorandum as Exhibit 19.

b.  <u>Father Carrier Was The Agent of the Haiti Fund, Inc. and Cannot Be Liable For the Harm Mr. Perlitz Caused.</u>[24]

There is no dispute that Father Carrier was in Haiti and at PPT as agent as representative of the Haiti Fund, Inc. He was a member of the Board and an officer. (Compl. ¶ 19, 32). "As the Chairman and then President" of the corporation, the plaintiffs allege, Father Carrier "was obliged to supervise and monitor the program at PPT." (Compl. ¶ 55). Father Carrier, the plaintiffs allege, "acted as the eyes and ears of the Haiti Fund" and kept the Haiti Fund, Inc. "informed about activities at PPT and at the staff residences in Bel Air." (Compl. ¶ 93). The Haiti Fund, Inc., had the responsibility for hiring, retaining, directing, and supervising Father Carrier. (Compl. ¶ 128).

The plaintiffs' allegations, on their own, are enough to put Father Carrier's status as an agent of the Haiti Fund, Inc., beyond any dispute. But if more is needed, the evidence unequivocally supports the plaintiffs' allegations on this point:

- Father Carrier regularly reported to the Board of Directors on his visits to PPT and served as an intermediary between the Board of Directors and Mr. Perlitz on many occasions. (SUMF ¶ 25).

- The Board of Directors knew of and approved all of Father Carrier's travel to Haiti. (SUMF ¶ 26).

- Father Carrier regularly brought cash and supplies furnished by the Haiti Fund, Inc. to PPT and Mr. Perlitz. (SUMF ¶ 27).

---

[24] For some of his visits to Haiti, namely the visits known as "mission volunteer trips," on which Father Carrier led a group of Fairfield student volunteers, or on a single trip with other members of the faculty, it is not disputed that Father Carrier was acting as an employee of Fairfield University. (SUMF ¶ 29). Without waiving our right to make arguments about Fairfield at trial, in this motion, we focus solely on the Haiti Fund, Inc.

- The Haiti Fund, Inc. paid for all of Father Carrier's travel to Haiti except for the mission volunteer and faculty trips paid for by Fairfield University, and with the exception of one or two trips paid for by the New England Province of the Society of Jesus, of the approximately 60 to 100 trips to Haiti he took between 1997 and 2008. (SUMF ¶ 28-29).

So there can be no doubt that Father Carrier, for all relevant purposes, was the agent of the Haiti Fund, Inc. (Succar Decl ¶ 32; Curran Decl. ¶ 20).

Once it is established that the Haiti Fund, Inc., not Father Carrier, was Mr. Perlitz's employer, it follows that only the Haiti Fund, Inc., can be liable for Father Carrier's negligent supervision. This is made most clear in the French legal literature. As Professor Curran demonstrates in her opinion (Curran Decl. ¶¶ 21-26), under the civil law corporate officers and directors bear individual tort liability for their conduct in the service of the corporation only in cases of "intentional tort of special gravity that is incompatible with the normal exercise of his corporate duties." Cour de cassation [Cass.] [supreme court for judicial matters] crim. May 20, 2003, D. 2003, 2623, n. B. Dondero. Not only must the intentional tort be "of special gravity," it must be "without any link whatsoever to his functions." Bruno Dondero, *Définition de la faute séparable des fonctions du dirigeant social,* 2003 Dalloz, 2623. Here, the only person accused of an intentional tort is Mr. Perlitz, and the claims against Father Carrier and the Haiti Fund, Inc., namely negligence in the hiring, retention, and supervision of Mr. Perlitz, are precisely the matters that an officer or director of the Haiti Fund, Inc. was required to do on behalf of that corporation.

4.     There Is No Claim For Breach of Fiduciary Duty Under Haitian Law.

In substance, the claim for breach of fiduciary duty is no more than a rehashing of the claim for

negligent supervision. In both cases, the real accusation against Father Carrier is that he failed to take steps that would have protected the plaintiffs from the abuse they allege they suffered. Whether one says that he breached a duty of care to the plaintiffs or that he breached a *fiduciary* duty of care or loyalty to the plaintiffs makes no real difference.

Thus there is nothing radical about the fact that Haiti does not recognize claims for breach of fiduciary duty. (Succar Decl. ¶ 35). Nor does France, where the duty of loyalty is recognized only in cases involving financial disloyalty to a corporation or to one's partners. (Curran Decl. ¶¶ 14-19). Since the claim simply does not exist in Haiti, the plaintiffs cannot prevail on it if Haitian law governs.