# Exhibit 20

SOVEREIGN MILITARY HOSPITALLER ORDER OF
ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA
AMERICAN ASSOCIATION, U.S.A.

Minutes of the Special Board of Councillors Meeting
February 25, 2011
New York LaGuardia Airport Marriott Hotel
102-05 Ditmars Boulevard • East Elmhurst, New York 11369

A special meeting of the Board of Councillors of the American Association of the Order of Malta was held on Friday, February 25, 2011, beginning at 10:00AM ET in Salon D and E at the New York LaGuardia Airport Marriott Hotel, East Elmhurst, NY.

**President Joseph H. Miller and the following Officers and Councillors were in attendance:** Chancellor Howard V. Redgate, Hospitaller Mary C. McCooey, Vice Hospitaller Thomas J. Reedy (by phone), Secretary Marie L. Garibaldi, Treasurer James F. O'Connor and Councillors Thomas F. Carney, Jr., Hope E. Carter, Michael P. Castine, Kenneth R. Craig (by phone), Sheila D. Feitelberg, Christopher J. Godfrey (by phone), Peter J. Kelly, MD, Peter C. Krause, JoAnne M. Kuehner (by phone), Carole B. Less, Peggy Lyons (by phone), Meg Lyons, Peter F. Muratore, P. Declan O'Sullivan (by phone), Thomas F. Schlafly, Ellen S. Shafer, John F. Shine, Ph.D., John R. Sise (by phone), Joseph Sokolowski, MD (by phone), Msgr. Kevin W. Wallin, Spiritual Advisor to the Board and Joseph G. Metz, Ph.D., Regent of the Subpriory of Our Lady of Lourdes, was also in attendance.

**Also present:** Non-Board Members of the Review Committee: John T. Bycraft, Robert J. Fredericks, Ph.D., Richard D. Milone, MD (by phone), and Jack E. Pohrer were also in attendance. Rev. Dr. Jeffrey R. Trexler, Executive Director, and Raymond J. LaRose, from the New York office, were present for the meeting.

Mr. Miller called the meeting to order and the meeting was opened with a prayer. He thanked everyone for attending the special meeting. He also thanked the Committee for its work and turned the meeting over to Judge Garibaldi, Chair of the Special Committee, who presented the following Committee Report.

Report of the Review Committee

INTRODUCTION

At the January 13, 2011 Board Meeting, the Board of Councillors of the American Association approved the formation of a Review Committee which was charged to review the involvement of the American Association, including its Areas, with Project Pierre Toussaint (PPT) and the Haiti Fund, Inc and to report its findings and any recommendations to the Board of Councillors within thirty days.

The members of this Committee included: The Honorable Marie L. Garibaldi, DM – Chair, John T. Bycraft III, KM, Thomas F. Carney, Jr., KMOb., Robert J. Fredericks, Ph.D., KMOb., Richard D. Milone, M.D., KM, Jack E. Pohrer, KM, and Chancellor Howard V. Redgate, KM.

1

EXHIBIT 26
WIT: Carter
DATE: 2/7/14
MAUREEN O. POLLARD

MALTA008328

Exhibit 20

After members of the Committee examined Court and other documents, including Association and Area records that were relevant to this matter, the Committee met in New York City on February 9th and 10th, 2011, to personally interview key individuals who were involved in the allegations.

RELATIONSHIP OF THE ORDER OF MALTA AND PPT/HAITI FUND

To begin, one needs to clarify the terms, PPT and the Haiti Fund. PPT was begun around 1997/1998 by Douglas Perlitz, a graduate of Fairfield University, and Fr. Paul Carrier, SJ, who at that time was a chaplain of the campus ministry at Fairfield University. PPT was a program that began by providing street boys in Cap Haitien, Haiti, with education, clothing, food, and eventually expanded to provide housing for these homeless boys. Initially, all funds were funneled through the Campus Ministry Program at Fairfield University. As the program expanded and donations increased, a separate 501(c)(3) organization was established under the not-for-profit-corporation name of Haiti Fund, Inc., which had its own Board and provided oversight and funding for PPT. At that time, PPT then became the trade name. Therefore, both of these terms have been used somewhat interchangeably for the same ministry project throughout its years of existence.

Shortly after the inception of PPT, a member of the Order of Malta, and members of the Chapel Group from Fairfield University (some of which later became members of the Order of Malta), became involved in volunteering their time, talent, and treasure into this project. Some even served on the Haiti Fund Board through the years. During the years PPT was a functioning entity, the Order of Malta, American Association, awarded money to PPT/Haiti Fund through its normal grant policy procedure.

PPT/Haiti Fund is in itself a separate entity from the American Association; PPT has never been owned or operated at any time by the Order of Malta, American Association. The Association periodically gave grant monies for this worthwhile project in which some of its members were active in various capacities. During the years from 2000 to 2008, PPT received 11 grants totaling $194,600 and the Haiti Fund received 7 grants totaling $51,600. When you combine both amounts, the American Association gave a total sum of $246,200 to PPT/Haiti Fund over that nine year period. To place this in perspective, during that period, the Association awarded 612 grants totaling $11,126,122 to projects in 19 states and 13 foreign countries.

In late 2007, rumors of sexual abuse of some of the students at PPT by the Executive Director, Douglas Perlitz, began to surface. The Board of the Haiti Fund initiated their own investigation. The investigation found no credible evidence for the allegations made. Immediately after that first investigation was completed, other reliable sources came forward with similar allegations of sexual abuse and a second investigation commenced. During the time of both investigations, Mr. Perlitz was on a sabbatical from PPT and was traveling outside of Haiti. During the second investigation, Mr. Perlitz was advised by the Haiti Fund Board not to return to PPT and that he was being dismissed as Executive Director. Mr. Perlitz never returned to Haiti.

In the summer of 2008, the Executive Director of the Order of Malta, American Association was notified by the Co-Chairs of the Connecticut Area, Tom and Jeanie Tisdale, about allegations regarding sexual abuse of children by the former Executive Director of PPT. They asked that the grant money earmarked for PPT be withheld due to their understanding that the school (PPT) was not going to re-open. Dr. Trexler in turn then notified President Kelly and Chancellor Pohrer of this information and a

MALTA008329

stop payment order on the Association's grant check was issued. Later in the year, the American Association President (Dan Kelly) was notified that the school was again operating, this time under new management, and the grant money was then released to PPT.

In February of 2010, the American Association was served with a Federal Subpoena, requiring that any of our records showing our association with PPT be turned over to the Federal Grand Jury for investigation. The subpoena also indicated that the former Executive Director of PPT, Douglas Perlitz, was being indicted for the sexual abuse of some of the boys at PPT. The law firm of Davis, Polk & Wardell, of New York, was hired by the Board of Councillors to prepare our records for submission to the Federal Grand Jury. Our headquarters in New York assisted them in these efforts. Eventually Douglas Perlitz pleaded guilty and on December 21, 2010, he was sentenced to nearly twenty years in Federal Prison.

## ALLEGATIONS, FINDING, AND RECOMMENDATIONS

Various allegations were made against the American Association, the Connecticut Area, and some individual members who were involved at various times with PPT and/or the Haiti Fund. Some of these allegations were made by the Attorney General's office and some by people who were associated with the Haiti Fund/PPT or the American Association. Each allegation was looked at very carefully by the Review Committee to determine if the evidence supported such allegations, and if so, to then determine what, if any, action should be recommended to the Board of Councillors.

The following allegations were reviewed:

1. *That an Officer or Officers held back information from the Board and the general membership of the American Association regarding the PPT scandal.*

This allegation was considered by the Review Committee to be unfounded.

As noted above, President Daniel Kelly first became aware of the allegations in this matter in the summer of 2008. Thereafter, documentation shows that the Board was notified of the status of the matter either through the Executive Committee level, or the full board level. Regarding notifying the membership, evidence showed that our counsel advised the Board of Councillors to keep the information confidential until the Association was released from the legal regulations of the Federal Subpoena. After the Association was released, the Chancellor informed the membership at the Annual Business Meeting of the Association, and the President sent letters to the entire membership, informing them of the facts.

2. *That a letter signed by twelve people including Tom and Jeanie Tisdale, Madeline Lacovara, and Hope Carter that was sent to the donors of PPT caused the demise of PPT.*

This allegation was considered by the Review Committee to be unfounded.

3

MALTA008330

First, the letter was not written by our members just named, but rather by another individual who had served on the board of the Haiti Fund, Inc., and who was not a member of the Association. The named persons were signatories of the letter. The Committee thought that the real cause of the demise of the PPT Project was the criminal action, specifically pedophilia, of Douglas Perlitz.

   3. *That Hope Carter obstructed justice by taking the computer(s) of Douglas Perlitz in Haiti, and therefore she exhibited actions not becoming of a Dame of the Order.*

This allegation was considered by the Review Committee to be unfounded. However, the review of this allegation revealed another issue.

Mrs. Carter, then a member of the Board of the Haiti Fund, stated that she went to Haiti in May 2008 to get things ready for their Annual Basketball Camp. Prior to her travels, she asked Douglas Perlitz if he needed anything that she could bring back for him. Mr. Perlitz was on a Sabbatical from PPT when the Haiti Board decided to dismiss him from his position as Executive Director, telling him not to return to Haiti. Mr. Perlitz asked Mrs. Carter to bring back his computer(s) and his personal belongings. Mrs. Carter has admitted that she took the computer(s), along with some of Mr. Perlitz's clothes and personal items. Mrs. Carter then gave these items to him when she returned to the US. Mrs. Carter had knowledge that the Haiti Fund Board was investigating Douglas Perlitz and that he had been dismissed as Executive Director of PPT. At a June 2008 meeting of the Haiti Fund Board, Mrs. Carter submitted a detailed account of her visit to Haiti. However, Mrs. Carter did not inform anyone from the Haiti Fund Board that she had retrieved the items for Douglas Perlitz. It only became known when an investigator for the Haiti Fund asked for the computer(s) and was told that Mrs. Carter had taken the computer(s). Therein lies the concern of the Committee.

The Committee also noted that the Federal prosecutor has never charged Mrs. Carter with obstructing justice.

The Committee's concern is based on the fact that Mrs. Carter, as a member of the Board of the Haiti Fund, did not notify any Board Member of the Haiti Fund, Inc. that she had removed the computer(s) and other items from PPT and returned them to Douglas Perlitz. Mrs. Carter's actions are therefore considered <u>a breach of fiduciary responsibility to the Haiti Fund Board of Directors.</u>

The Committee recommends to the Board of Councilors that Mrs. Carter be reprimanded by temporarily suspending her from the Board of Councillors immediately and that the suspension end on December 31, 2011, after which time Mrs. Carter would resume her position on the Board.

In making our recommendation to suspend Mrs. Carter, the Committee took into account a number of factors: Mrs. Carter breached her fiduciary duty to the Haiti Fund and not to the American Association's Board; Mrs. Carter was deeply committed to Douglas Perlitz and believed him to be innocent until he pled guilty; and Mrs. Carter's long and continuing charitable activities.

   4. *Serious allegations of wrong doing have been made against Fr. Paul Carrier.*

MALTA008331

The Committee understands that Fr. Paul Carrier, SJ, has been temporarily suspended from his priestly ministry at this time, including performing any chaplain's duties for the Order of Malta.

At this time, the Committee recommends that the Board of Councillors take no action until the Society of Jesus has completed their investigation of Fr. Carrier and made their final determination. Depending on the outcome of the Jesuits' final decision, the Board can consider whether any Association actions should be taken regarding Father Carrier.

OTHER ISSUES

Prior to this Committee convening, it should be noted that the Treasurer of the American Association was asked by the President and Chancellor to analyze the documentation of financial transactions and events inclusive of bank statements, records, and Area Quarterly Reports of the Connecticut Area. Upon the recommendation of the Treasurer, permission was obtained to have a Forensic Auditor retained to further expand the forgoing analysis.
It should be noted that the Forensic Auditor's report is still forthcoming.

During the review proceedings, other concerns surfaced through testimony, as well as through documents that were presented as evidence regarding the financial procedures and liability issues in the Areas. These issues have been referred to the Association's Treasurer.

CONCLUDING REMARKS

*Before concluding, the members of the Review Committee express their thank you and appreciation for the tenacious efforts of Michael McCooey, KM, on behalf of the abused boys in Cap Haitian, as well as his efforts to identify a reliable group to care for the former PPT boys.*

The Committee would also like to thank all of the witnesses who appeared before the Committee to testify during the two days of inquiry. Their informative comments were very useful to the members of the Committee, and helped to provide answers to many of the questions that the Committee had.

The Committee concluded that, in their judgment, all of the members of the American Association who were involved in any way with the PPT/Haiti Fund, Inc, were people acting with the best intentions and driven by fierce loyalty. These good people were not willfully acting improperly. They were duped by a very convincing criminal.

Respectfully submitted,


The Honorable Marie L. Garibaldi, DM, Chair
John T. Bycraft III, KM
Thomas F. Carney, Jr., KMOb.

MALTA008332

Robert J. Fredericks, Ph.D., KMOb.
Richard D. Milone, M.D., KM
Jack E. Pohrer, KM
Howard V. Redgate, KM

At the conclusion of the report, Judge Garibaldi thanked the Committee for its work. She commended the witnesses and the office staff for their cooperation with the Committee. She suggested that the Board members take ten minutes to review the report and said that discussion would begin then and that any voting would be by secret ballot.

Mrs. Feitelberg asked what a forensic auditor is. Mr. O'Connor said that a forensic auditor looks for irregularities, illegalities and the appropriateness of financial transactions.

Dr. Shine said that to open the discussion, he made a motion that the Board accept the committee report. The motion was seconded, followed by discussion.

Mr. Schlafly asked for clarification on what section of the bylaws covered the actions that the committee was recommending. Related to the recommendation on Father Carrier, it was explained that Rome is responsible for Chaplains. Mr. Miller said that Archbishop Dolan, as Principal Chaplain, was consulted and agreed that the Association should wait until the Jesuits have completed their review. With regard to the recommendation to suspend a member, the issue was discussed by the Committee who felt that the Board was considered to have the implied power to take such action.

Dr. Shine said that Board elections are only complete when the results are certified by Rome. He asked if the Board had the power to suspend a member. Judge Garibaldi said that she believed that the Board could suspend a Board member temporarily but could not permanently remove a Board member. Mr. Bycraft said that the Committee had reviewed the provisions of the Code of the Order and they felt their recommendations were in conformity with the regulations. Mrs. Shafer asked if the committee reviewed all of the documentation regarding the gap in communication on the subject. Judge Garibaldi said that the office had prepared an extract of all of the minutes of the BOC since the beginning of 2008 in which the subject of PPT had been raised and the Committee had reviewed them all. Judge Garibaldi said that the Committee agreed that subject had been covered frequently at Executive Committee and regular Board meetings.

A question was raised regarding the people whom the Committee interviewed. Judge Garibaldi said that the Committee had interviewed Michael McCooey, Tim Joyce, Brian Russell, Ted Polubinski, Jack Pohrer, Dan Kelly, Joe Miller, Tom and Jeanie Tisdale, Madeline Lacovara, and Hope Carter.

Mrs. McCooey asked why the Board was not informed when Michael McCooey had met with Mr. Miller almost exactly one year ago. Judge Garibaldi read sections from the minutes of the February 23, 2010 BOC meeting, the March 24, 2010 Executive Committee meeting, and the May 20, 2010 Board meeting to indicate that the subject of PPT was discussed. Mrs. McCooey said that it was the largest sexual perversion case in US history and certain members have never apologized. Mrs. Feitelberg said she was very troubled by the situation and had spoken to a canonical lawyer, Father Mark Hession, who said that justice comes first and that mercy requires atonement.

6

MALTA008333

Dr. Kelly asked for some clarification on what a breach of fiduciary responsibility was. Judge Garibaldi said that as a Board member, you have a responsibility to that Board, to put the interests of the Board above your own personal interests. . She said that everyone on the Haiti Fund Board knew that a second investigation of Mr. Perlitz was underway when Mrs. Carter removed the computers from PPT and returned them to Mr. Perlitz. Judge Garibaldi said that the issue was not about removing the computers but about not informing the Haiti Fund Board that she had done so. She pointed out that some of the people involved were incredibly loyal to Mr. Perlitz. Mr. Bycraft said that he asked each witness when they thought Douglas Perlitz was guilty and many said that until he pled guilty, they still believed in his innocence. Mrs. Carter said that nothing had been mentioned to her about the computers.

Dr. Kelly said that in the report, the committee said it took into account a number of factors in recommending that Mrs. Carter be suspended. He asked for clarification. Judge Garibaldi said that the committee would have recommended something worse. Dr. Kelly said that many Board members serve on multiple Boards and the Board of Councillors might be taking on broad responsibilities if it reprimanded every Board member for actions taken on another Board. Mr. Pohrer said that it was very common on Corporate Boards and he felt that it applied to Non-Profit Boards that a Board member whose actions were not appropriate on another Board would also be dismissed from an unrelated Board. Mrs. Less said that it was hard to understand why someone would have taken Mr. Perlitz's word that he was innocent when a Knight, Michael McCooey, had said he was guilty.

Mr. Schlafly said that he was still concerned about the Board's authority to suspend a Board member. He said that he agreed that the Board clearly had the authority to pass a resolution of reprimand but he asked if the Board had the authority to take away rights that it did not grant. Mr. Pohrer said that the issue of PPT was discussed with the Grand Chancellor while in Rome and the Grand Chancellor said that the Association should take care of the matter internally.

Mr. Muratore said that it had been stated that it was a known fact that Douglas Perlitz's materials should not be touched; he asked if the Committee had reviewed any documentation that stated that. Judge Garibaldi said that there was no question that Mrs. Carter was aware of the charges against Mr. Perlitz and that he was dismissed by the Haiti Fund Board. Mr. Muratore asked if the recommendation to suspend Mrs. Carter was based on her taking the computers. Judge Garibaldi said that it was not for taking the computers but because she failed to inform the Board of the Haiti Fund that she had done so. It was only after the investigators went to retrieve the computers that they discovered what had been done. Mr. Muratore said that it was not clear that it was said in her presence that no one should remove the computers. Judge Garibaldi said that Mr. Perlitz had been dismissed. It was a sad case and people were blind to the truth and they made bad judgments.

Mrs. Carter said that she apologizes for taking the computer and for not letting anyone know. She said she had made a terrible mistake.

Dr. Shine asked who owned the computer. It was said that it was not clear. Mr. Bycraft said that removal of the computers was not the issue; the issue was that Mrs. Carter did not tell anyone on the Haiti Fund Board.

Dr. Kelly asked if the recommendation was the unanimous decision of the Committee. Judge Garibaldi said that all the recommendations were the unanimous recommendation of the Committee.

7

Judge Garibaldi asked if there was any further discussion. There being none, she said there was a motion on the floor which had been seconded to accept the report of the Committee. Mr. Muratore asked what would happen once the meeting was over. It was stated that a letter had been committed and would be sent to all members.

Mr. Miller asked that it be clarified what the Board was voting on. Judge Garibaldi said that a vote yes would be a yes on the Committee's recommendations. Mr. Schlafly said that there were a number of allegations and Committee responses. Judge Garibaldi said that a vote to adopt the entire report would include all of the Committee recommendations. Mr. Muratore suggested that there should be one vote on each of the recommended actions. Mr. Schlafly said there should be one vote to accept the findings of the Committee and one vote on each of the recommendations.

Dr. Fredericks said that the code provides for three levels of discipline: the lowest is a warning, the second is a reprimand, and the third, most severe, is a censure. Mr. Pohrer said that if you accept the report, all of the recommendations are accepted. Mr. Muratore made a motion to amend the motion on the floor to require separate votes on the committee's recommendations/findings for each allegation. His motion was seconded.

> A motion was made, seconded and unanimously adopted to amend the motion on the floor to require separate votes on each of the four committee findings/recommendations.

Dr. Kelly asked for a clarification of the procedure for voting. Each person was given an index card and asked to put the numbers 1, 2, 3, 4 on it and to vote yes to approve the Committee's recommendation regarding allegations 1, 2, 3, and 4 or to vote no to disapprove the committee's recommendations. It was stated that for allegations one and two, the vote yes would be to approve the Committee's findings. For allegation three, a vote yes would be to approve the temporary suspension of Mrs. Carter from the Board of Councillors. And a vote yes for allegation four would be to approve the Committee's recommendation that no action be taken at this time regarding Father Paul Carrier.

The balloting was done in secret; Mrs. Carter did not vote. Dr. Trexler called each member of the Board who was on the phone individually to register their votes. Judge Garibaldi supervised the counting of the ballots. The meeting was in brief recess during the counting of the ballots. When Judge Garibaldi returned to the room with the results, Mr. Miller called the meeting to order.

Judge Garibaldi said that all four items had been approved. She announced the voting results:
- on the Committee's findings regarding allegation 1: 20 yes, 4 no.
- on the Committee's findings regarding allegation 2: 22 yes, 2 no.
- on the Committee's recommendation to suspend Mrs. Carter from the Board: 14 yes, 10 no.
- on the Committee's recommendation to take no action at this time regarding Fr. Carrier: 23 yes, 1 no

MALTA008335

A question was raised on why the balloting was done secretly when everyone should be transparent and a secret ballot does not facilitate the process of healing and moving on. Judge Garibaldi said the Committee thought that a secret ballot would be less hurtful.

At this point, Mrs. Carter, having been suspended by the Board, left the meeting.

Mr. Bycraft said the Committee members did not volunteer for the job. Mistakes were made on every side, all well-intentioned. He said that Michael McCooey persisted and that was the primary reason that Douglas Perlitz was in jail. When the funds ran out, he found Kids Alive and made a proposal to Fairfield University and the American Association to help the boys. Mr. Bycraft said that he thought Michael McCooey was a hero. Mr. Bycraft said that the Tisdales worked desperately to try to help the boys and he thought they are heroes too. He said there were wounds remaining from this whole event and he hoped they heal and that the entire group could move on.

Mrs. Less said that she and Mrs. Feitelberg would like to introduce a resolution that Dr. Trexler send a letter on behalf of the Board to Michael McCooey to recognize him for his efforts to raise the issue of the serious problems at PPT related to the heinous crimes of Mr. Perlitz and for his efforts on behalf of the boys in Haiti. Mrs. Less recommended that Mr. McCooey should receive the acknowledgement in writing.

> A motion was made, seconded and unanimously adopted to instruct Dr. Trexler to send a letter to Michael McCooey for his efforts to identify the crimes of Mr. Perlitz and for his work on behalf of the boys in Haiti.

Dr. Metz said that as the head of the Subpriory, his wish was that all the people named in the report personally apologize for what they had done so that there could be peace and justice in the Association.

Mr. Schlafly asked if the Attorney's office mentioned in the report was a state of federal office and he was told that it was the US Attorney's office.

Mr. Redgate said that it was astounding how much information was made available as a result of the case. The Association's response to the Federal subpoena resulted in the submission of over 500 doubled sided pages. People who came to the Committee's meeting room to testify had volumes of information. Mr. Redgate said that casual communications such as e-mails become less than casual under a subpoena for information.

Mr. Redgate said that the area of greatest concern is that whenever an Area deposits a check into a local Area account, it becomes part of the assets of the Association, resulting in Association reporting responsibilities. It all becomes a fairly complex banking relationship for a fairly simple organizational component.

Mr. O'Connor said that the American Association is a not for profit organization. a charter corporation with an IRS approved 501(c)3 tax exempt designation. Each Area is not a separate corporation but is

MALTA008336

better characterized as a branch of the Association. Anything that happens in the Areas creates a potential liability for the Association.

Mr. O'Connor addressed the following points in his report:

1.      Reinforce and insure that Area Chairs and officers understand that any funds deposited into local Area checking accounts, etc. become and are part of the general treasury of AASOM by virtue of common tax identification number and the use of the Associations 501(c)(3), used in opening bank accounts also requires reporting activities in AASOM's quarterly and annual financial statements. In essence, each Area's activity obligates AASOM and its responsibility for, among other things, all records and bookkeeping. Tax deductible letters should not be issued by any Area unless AASOM is specifically notified and approved on the appropriateness of separate issuing, all of which suggests a separate 501(c)(3) and not AASOM's, since each Area is solely a branch of AASOM and not a separate tax reporting entity.

2.      Area Chairs, officers, and key members need to understand that any inquiry made by a US or state government supervisory authority that request information through subpoena, or any other means, triggers an automatic reporting obligation of AASOM. The Treasurer and the Executive Director, upon notification from an Area, will direct appropriate responses to such an authority and the appropriate generation of answers to the request for information.

3.      Each Area should limit the scope of its fundraising activities in the name of the local Area in order to direct Area events, such as the Annual Dinner, Recollection Days, St. John's Anniversary liturgies, and any specific requests made by AASOM. Exceptions may be made for modest beginnings of fundraising activities that ultimately require a separate 501(c)(3) in the charity's name and not be part of reportable events of AASOM. Guidance and direction should be obtained from the Executive Director of AASOM. Checks received in the Area's name intended for organizations other than the Area should be returned to the submitting entity and instructed to cancel the check and re-write it to the designated charity. Further, under no circumstances should such checks be deposited in to the Area's account or accounts, which then obligates AASOM as noted above.

4.      Substantial events and transactions, well beyond the scope of the Area's day-to-day events, should be conducted in a separate corporate entity with express approval and supervision of AASOM's BOC or a committee established by the Board. Specifically, the Youth Summer Pilgrimage to Lourdes sponsored by the Connecticut area uses Malta's name, etc., and checks submitted to the Connecticut Area for reservations and transportation, which are ultimately cashed by this Area, obligates AASOM such that it has full responsibility and liability for the Project. Yet, there has been no initial approval, organizational input or post-activity reporting by the Area to the BOC.

5.      All Areas have controls and procedures governed by the Area Chair Hospitaller/Guidebook which states, among other things, that all bank accounts and related activities are reported quarterly on applicable dates to AASOM. Each account should only have the Area Chair and the Treasurer as authorized signatories and all checks/wire transfers over $5,000 require two signatories.

Mr. O'Connor said that a forensic accountant had been engaged. At this point, he noted that no improprieties in the Connecticut Area were found. The Chancellor asked that the Treasurer recommend

MALTA008337

a special committee to review the Areas' handling of finances including accounting and transactions. Mr. O'Connor said that the Area Support Committee (himself, Mr. Redgate, and Mr. reedy) would be meeting in the next six weeks with all of the Area chairs. His meeting with NY and New England Areas would be in Westchester on April 8th.

Mr. O'Connor said that there was an excellent manual for the Area Chairs and Area Hospitallers which the office maintains. Mr. O'Connor said that he had spent a lot of time with Mr. Tisdale who had been nothing but gracious and helpful.

Mr. Redgate said that what seemed to be a minor item could become serious. He gave as an example, a local Area producing tax exempt letters under the Association's 501(c)3 designation could jeopardize the Association's tax exempt status if the letters were deemed to have been issued in error. There should be a general awareness that tax exempt determinations need to be reviewed and approved before an Area issues tax letters.

Mr. O'Connor said that it was important to get the Areas to submit timely financial reports (quarterly and yearly). In the Connecticut Area, the signatory on most things is the bookkeeper; Mrs. Carter and Mrs. Tisdale were signatories on a Haiti account.

> A motion was made, seconded and unanimously adopted to approve the formation of a committee to review and implement policies and procedures for standard handling of financial accounting and transaction handling in the Areas.

Mr. O'Connor said that people need to understand the seriousness of the need for timely and accurate reporting. He said he hoped the new committee would share views on the Area's processes and take a broader sample of what is going on. He expected the committee to be populated by BOC members and by Area Chairs. Mr. Schlafly asked if there might be issues with the smaller areas. Mr. Redgate said it was just the opposite. He said that Area Chairs pass the books on to their successors and the process, right or wrong, continues. He indicated that the Youth Pilgrimage, which is run through the CT. Area, passes $300K through the CT Area books. Mr. Miller said that the Youth Pilgrimage liabilities have to be addressed.

There being no further discussion on this issue, Mr. Redgate indicated that the assignment of the Review Committee was now complete.

**Update on Kids Alive Project**
Mr. Miller said that Al Lackey, the head of Kids Alive, had contacted him and Father Von Arx of Fairfield University to tell them that the situation in Haiti has become very dangerous for the people working on the Kids Alive project. The PPT boys' behavior has become unmanageable and Mr. Lackey felt that he had to withdraw Kids Alive from the project because his workers have been threatened and he feared for their safety.

Mr. Miller said that Mr. Lackey told them of a variety of actions that had occurred, indicating the growing level of concern. Kids Alive had been told by Michael McCooey that they could go to PPT and

11

take supplies (bedding, furniture, etc.) to use for the boys. Kids Alive workers went to retrieve materials and the boys took their cell phones preventing them from calling for help; some of the boys had machetes and guns. It is believed that Cyrus Siebert was leading the boys to believe that Kids Alive has $20M that belongs to the boys. Eighty boys had refused food and said they wanted their money and for Kids Alive to build them homes.

Mr. Lackey believed that Cyrus and possibly Paul Kendrick were feeding the boys misinformation. He said the boys had been doing well and now, suddenly, it changed. Mr. Lackey said he thinks that Cyrus is counting on being the agent for any money received and would take a percentage of the money for himself.

Mr. Lackey told Mr. Miller that he had spoken to Paul Kendrick, telling him he did not think there was any basis for a lawsuit. He said that Mr. Kendrick responded that he did not expect to win the lawsuit but would get a settlement so the Order and the College could avoid bad publicity. Mr. Lackey said he felt that Paul Kendrick will say that we gave the money to the wrong organization and now the boys are homeless again. Mr. Lackey said the Mr. Kendrick was adamant about having American therapists go to Haiti to treat the boys while Mr. Lackey insisted that people in Haiti were better suited to assist the boys.

Mr. Lackey is worried about his staff, no matter what happens. If things end abruptly, that will trigger much anger. He would like to set up something to continue to help the boys. Mr. Miller said that it seemed imprudent to put anyone at risk, given the situation.

Mr. Miller said that the sad part about this whole episode is that we could have helped the boys. Everything we have done there has fallen apart.

**Speaker for the Annual Dinner**
Mr. Miller indicated that Mr. O'Connor had recommended a speaker for the Annual Dinner, Father Jim Martin, SJ. He provided a biography of Fr. Martin and confirmed that he was an excellent speaker.

> A motion was made, seconded and anonymously adopted to approve Father Jim Martin, SJ, as speaker for the Annual Dinner.

**Adjournment**
There being no further business, Mr. Miller asked for a motion to adjourn the meeting.

> A motion was made, seconded and unanimously adopted to adjourn the meeting.

12

MALTA008339