Exhibit 25

Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Civil Action No.
3:13-cv-01132(RNC)

*****************************

GERVIL ST. LOUIS, a/k/a ST.
LOUIS GERVIL,

              Plaintiff,

    v.

DOUGLAS PERLITZ, FATHER
PAUL E. CARRIER, S.J.; HOPE
E. CARTER; HAITI FUND,
INC.; FAIRFIELD UNIVERSITY;
THE SOCIETY OF JESUS OF NEW
ENGLAND; SOVEREIGN MILITARY
HOSPITALLER ORDER OF ST.
JOHN OF JERUSALEM OF RHODES
AND OF MALTA, AMERICAN
ASSOCIATION, U.S.A.; a/k/a
ORDER OF MALTA, AMERICAN
ASSOCIATION, U.S.A.; JOHN
DOE ONE; JOHN DOE TWO; JOHN
DOE THREE; JOHN DOE FOUR;
JOHN DOE FIVE; JOHN DOE SIX
and JOHN DOE SEVEN,

              Defendants.

Consolidated with:
3:13-cv-1225-RNC
3:13-cv-1269-RNC
3:13-cv-1437-RNC
3:13-cv-1480-RNC
3:13-cv-1626-RNC
3:13-cv-1627-RNC
3:13-cv-1628-RNC
3:13-cv-1629-RNC
3:13-cv-1630-RNC
3:13-cv-1631-RNC
3:13-cv-1632-RNC
3:13-cv-1633-RNC
3:13-cv-1634-RNC
3:13-cv-1635-RNC
3:13-cv-1636-RNC
3:13-cv-1637-RNC
3:13-cv-1638-RNC
3:13-cv-1639-RNC
3:13-cv-1640-RNC
3:13-cv-1641-RNC
3:13-cv-1642-RNC
3:13-cv-1644-RNC
3:13-cv-1645-RNC
3:13-cv-1647-RNC
3:13-cv-1648-RNC
3:13-cv-1701-RNC
3:13-cv-1767-RNC
3:13-cv-1768-RNC
3:13-cv-1769-RNC
3:13-cv-1881-RNC
3:13-cv-1904-RNC
3:13-cv-1906-RNC
3:13-cv-1907-RNC

*****************************
This document applies to:
All of the above referenced cases
And those to be filed
*****************************
CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
VIDEOTAPED DEPOSITION OF DIEU-DABEL BERNARD

Wednesday, May 25, 2016
9:08 a.m.

**Exhibit 25**

Confidential - Subject to Further Confidentiality Review

Page 2

1        VIDEOTAPED DEPOSITION OF DIEU-DABEL BERNARD

2

3

Held At:

4

5        Iberostar Costa Dorada

6        Carretera Luperón, km 4

7        Puerto Plata, Dominican Republic

8

9

10   REPORTED BY:

11   Maureen O'Connor Pollard

12   Realtime Systems Administrator

13   RMR, CLR, LSR #473, CSR #149108

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1   APPEARANCES:
 2   FOR THE PLAINTIFF:
 3       LU XIA, ESQ.
 4           LAW OFFICES OF MITCHELL GARABEDIAN
 5           100 State Street, Sixth Floor
 6           Boston, Massachusetts 02109
 7           617-523-6250
 8           lxia@garabedianlaw.com
 9               -and-
10       JO ANNA POLLOCK, ESQ.
11           SIMMONS HANLY CONROY
12           One Court Street
13           Alton, Illinois 62002
14           jpollock@simmonsfirm.com
15
16   FOR THE DEFENDANT PAUL E. CARRIER, S.J.:
17       TIMOTHY P. O'NEILL, ESQ.
18           MURPHY & KING
19           One Beacon Street, 21st Floor
20           Boston, Massachusetts 02108
21           617-423-0400
22           tpo@murphyking.com
23
24
25
```

Confidential - Subject to Further Confidentiality Review

Page 4

1   APPEARANCES (Continued):

2

3   FOR THE DEFENDANT HOPE E. CARTER:

4        ADAM ACQUARULO, ESQ.

5             MILANO & WANAT LLC

6             471 East Main Street

7             Branford, Connecticut 06405

8             203-315-7000

9             aacquarulo@mwllc.us

10

11   FOR THE DEFENDANT ORDER OF MALTA AMERICAN

12   ASSOCIATION, U.S.A.:

13        BRADFORD S. BABBITT, ESQ.

14             ROBINSON & COLE LLP

15             280 Trumbull Street

16             Hartford, Connecticut 06103

17             860-275-8209

18             bbabbitt@rc.com

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 5

1   APPEARANCES (Continued):

2

3   FOR THE DEFENDANT FAIRFIELD UNIVERSITY:

4        PAUL D. WILLIAMS, ESQ.

5             DAY PITNEY LLP

6             One Canterbury Green

7             Stamford, Connecticut 06901

8             860-275-0223

9             pwilliams@daypitney.com

10

11  FOR THE DEFENDANT THE SOCIETY OF JESUS OF

12  NEW ENGLAND:

13       ROBERT GAYNOR, ESQ.

14            SLOANE AND WALSH, LLP

15            Three Center Plaza, Suite 830

16            Boston, Massachusetts 02108

17            617-523-6010

18            rgaynor@sloanewalsh.com

19

20  Videographer:  Christopher Coughlin

21

22  Interpreter:  Carole Wilson

23

24  Also Present:

25  Jean Elyseé Pierre Louis, Interpreter

Confidential - Subject to Further Confidentiality Review

Page 6

1                        INDEX

2     EXAMINATION                              PAGE

3     DIEU-DABEL BERNARD

4      BY MR. GAYNOR                            10

5      BY MR. WILLIAMS                         144

6      BY MR. O'NEILL                          187

7      BY MR. BABBITT                          211

8      BY MR. ACQUARULO                        226

9

10

11           E X H I B I T S

12     NO.        DESCRIPTION                   PAGE

13     1     Plaintiff Dieu-Dabel Bernard's
             Response to Certain Defendants'
14           First Set of Interrogatories.........100

15     2     Plaintiffs' Provisional Accounting
             of Payments to or on Behalf of the
16           Plaintiffs..........................157

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 7

```
 1              P R O C E E D I N G S
 2
 3              THE VIDEOGRAPHER:  We are now on the
 4    record.  My name is Chris Coughlin, I'm a
 5    videographer for Golkow Technologies.  Today's
 6    date is May 25, 2016, and the time is 9:08 a.m.
 7              This video deposition is being held in
 8    Puerto Plata, Dominican Republic, in the matter
 9    of Gervil St. Louis a/k/a St. Louis Gervil
10    versus Douglas Perlitz, et al, in the United
11    States District Court, District of Connecticut,
12    Lead Civil Action Number 3:13-cv-1132-RNC.
13              The deponent is Dieu-Dabel Bernard.
14              Will counsel please identify
15    yourselves for the record.
16              MR. GAYNOR:  Yes.  My name is Robert
17    Gaynor.  I represent the Society of Jesus.
18              MR. WILLIAMS:  Paul Williams for
19    Fairfield University.
20              MR. O'NEILL:  Timothy O'Neill
21    representing Father Paul Carrier of the Society
22    of Jesus.
23              MR. BABBITT:  I'm Bradford Babbitt.  I
24    represent American Association of the Order of
25    Malta.
```

Confidential - Subject to Further Confidentiality Review

Page 8

```
 1              MR. ACQUARULO:  Adam Acquarulo for
 2    Hope Carter.
 3              MS. POLLOCK:  Jo Anna Pollock from
 4    Simmons Hanly Conroy for the Plaintiffs.
 5              MS. XIA:  Lu Xia for Plaintiffs.
 6              THE VIDEOGRAPHER:  The court reporter
 7    is Maureen Pollard, and she will now swear in
 8    the witness and the interpreter.
 9
10              CAROLE WILSON, Interpreter,
11    having been duly sworn to translate the
12    questions and the answers to the best of her
13    ability, translated as follows:
14
15              DIEU-DABEL BERNARD,
16    having been first duly sworn, was examined and
17    testified as follows through the interpreter:
18
19              MR. GAYNOR:  As far as I understand,
20    we'll be operating under the so-called usual
21    stipulations; that being that objections except
22    to the form of the question will be reserved
23    until trial, motions to strike will be reserved
24    until trial, the witness will be afforded an
25    opportunity to read and sign the deposition
```

Confidential - Subject to Further Confidentiality Review

Page 9

1    transcript within 60 days of receipt, and that

2    notarization and filing will be waived.  Is that

3    the normal?

4              MS. POLLOCK:  That's as I understand

5    them.

6              MR. GAYNOR:  Do you want to add

7    whatever the remaining ones are?

8              MR. O'NEILL:  Just stipulation of

9    confidentiality.

10             MS. POLLOCK:  I don't know what that

11   means.

12             MR. GAYNOR:  Do you want to state it?

13   I'm not sure what you're referring to.

14             MR. O'NEILL:  I think we usually do

15   that, the confidentiality?

16             MR. BABBITT:  Any deposition -- under

17   the protective order that's in place, any

18   deposition can be marked confidential either

19   during the deposition or after.  I don't know

20   that the Plaintiffs have done that.  But it can

21   be done.  Other depositions have been marked

22   confidential.

23             MS. POLLOCK:  Of the Plaintiffs?

24             MR. BABBITT:  I don't know about the

25   Plaintiffs.  There have been other depositions.

Confidential - Subject to Further Confidentiality Review

Page 10

1    I don't recall whether the Plaintiff had -- the

2    depositions have been marked.

3              MR. O'NEILL:  No one knows.  Okay.

4              MR. GAYNOR:  Shall we proceed?

5              DIRECT EXAMINATION

6    BY MR. GAYNOR:

7         Q.    Good morning, Mr. Bernard.

8         A.    Good morning.

9         Q.    Could I ask you please, if you could,

10   to keep your voice up so that we can hear you

11   and that the interpreter can hear you?

12        A.    Okay.

13        Q.    Thank you.

14              Mr. Bernard, do you speak Haitian

15   Creole?

16        A.    Yes.

17        Q.    Do you read Haitian Creole?

18        A.    A little.  I'm not too good at it.

19        Q.    Do you write Haitian Creole?

20        A.    I can write a few things.

21        Q.    Do you speak or write in any other

22   language?

23        A.    No, I don't speak any other languages.

24        Q.     If you don't understand a question

25   that I ask you, please let me know so that I can

Confidential - Subject to Further Confidentiality Review

Page 11

```
 1   make sure you are answering a question that you
 2   understand.
 3        A.    Yes.
 4        Q.    Thank you.
 5              Is there any reason that you cannot
 6   testify accurately and truthfully today?
 7        A.    What?
 8        Q.    Are you taking any type of medication,
 9   drug, or anything that might prevent you from
10   accurately and truthfully testifying?
11        A.    I didn't take anything.
12        Q.    Are you in generally good health?
13        A.    Yes.
14        Q.    I noticed you were wearing an
15   interesting T-shirt today.  I know you're cold,
16   but could we just take a quick peak at it?  I
17   was wondering if there was any significance to
18   that.
19        A.    No.  I'm just wearing a T-shirt.
20        Q.    Okay.  Thank you.
21              Mr. Bernard, where were you born?
22        A.    I was born in St. Michel.
23        Q.    Is that in Haiti?
24        A.    Yes.
25        Q.    And what is your mother's name?
```

Confidential - Subject to Further Confidentiality Review

Page 12

```
 1      A.    Selida Estimable.
 2      Q.    Is she still alive?
 3      A.    Yes.
 4      Q.    Where does she live?
 5      A.    Cap-Haïtien.
 6      Q.    And who does she live there with, if
 7   you know?
 8      A.    With my father, my brothers, and my
 9   sisters.
10      Q.    And who is your father?
11      A.    Bernard Salnave.
12      Q.    Were your father and mother ever
13   legally married?
14      A.    Yes.
15      Q.    And what is your brother's name?
16            THE INTERPRETER:  Excuse me,
17   Counselor.
18      Q.    Actually you have three brothers,
19   correct?
20      A.    I have four brothers.
21      Q.    Four brothers.
22            And if you could just give us their
23   names and ages, please?
24            MS. POLLOCK:  I think -- did you still
25   have something to translate?
```

Confidential - Subject to Further Confidentiality Review

Page 13

1            THE INTERPRETER:  He was giving me the

2    names.

3        A.    I don't remember the ages.

4    BY MR. GAYNOR:

5        Q.    Are they older or younger than you?

6        A.    Just one is younger than I am.

7        Q.    What is your date of birth?

8        A.    I was born in 1994.

9        Q.    What month and year?

10        A.    November, November 21st.

11        Q.    Do you have any sisters?

12        A.    Yes.

13        Q.    What are their names?

14        A.    Samine Bernard, Roselène Bernard,

15    Ludiamène Bernard, Rosenie Bernard, Siane-Rose

16    Bernard.

17        Q.    And do your brothers live with your

18    family?

19        A.    Some of them are not there, but yes.

20        Q.    Where do -- the ones that don't live

21    with your family, where are they?

22        A.    Most of them are married and living

23    with their wives.

24        Q.    Do your sisters live with the family?

25        A.    The others live with my family.

Confidential - Subject to Further Confidentiality Review

Page 14

```
 1        Q.    And where do you live?

 2        A.    I live with a friend.

 3        Q.    What is your friend's name?

 4        A.    Johnson Audate.

 5        Q.    And where is that?

 6        A.    In another house, Blue Hills City.

 7        Q.    How long have you lived at that

 8   address?

 9        A.    Since 2006.

10        Q.    '6?

11        A.    '6.

12        Q.    And you have lived there with Johnson?

13        A.    Yes.

14        Q.    And do you pay rent?

15        A.    No, somebody allows him to sleep at

16   the house, and then I stay there with him.

17        Q.    So since 2006, you've been allowed to

18   stay there for free?

19        A.    No.

20        Q.    Did you ever pay for rent?

21        A.    No.

22        Q.    What did you do?

23        A.    To live with him?

24        Q.    I think you told us you've lived with

25   Johnson at a house in Blue Hills since 2006, am
```

Confidential - Subject to Further Confidentiality Review

Page 15

1    I correct?

2        A.    No.  2015.

3        Q.    Oh, 2015.  Thank you.

4              And who owns the house?

5        A.    I don't know.

6        Q.    Does Johnson pay rent?

7        A.    No.

8        Q.    And how is it that you get to stay

9    there for free?

10       A.    The house belongs to a lady, she no

11   longer lives there, but he's handling the house,

12   he's taking care of the house.

13       Q.    Does anybody else live there?

14       A.    Another of his brothers.

15       Q.    Do you work presently?

16       A.    No.  Sometimes I find an odd job, I do

17   it.

18       Q.    What odd jobs do you do?

19       A.    Sometimes I work days as a mason.

20       Q.    And what companies do you work for?

21       A.    No, it's not a company, somebody

22   that's building a house.

23       Q.    And what do you do for them?

24       A.    I mix the mortar, or I stock the

25   bricks.

Confidential - Subject to Further Confidentiality Review

Page 16

1       Q.      So you work as a laborer?

2       A.      Yes.

3       Q.      And how much do you get paid when you

4    do that?

5       A.      Sometimes they give you 50, 60 Haitian

6    dollars.

7       Q.      Is that per day?

8       A.      Yes.

9       Q.      And how often do you work?

10      A.      Once in a while.

11      Q.      What's once in a while?

12      A.      Sometimes I spend months, I don't find

13   anything, and one day somebody says "come and

14   work for me for the day."

15      Q.      In the last six months, how many days

16   a week have you worked?

17      A.      I don't know how many days.

18      Q.      More than five?

19      A.      I don't remember.

20      Q.      What do you do when you're not working

21   for money?

22      A.      Well, I check out the people that are

23   comfortable with me, and if they cook, sometimes

24   they feed me, they share the food with me.

25      Q.      Do you have a cell phone?

Confidential - Subject to Further Confidentiality Review

Page 17

1       A.    Yes.

2       Q.    When did you get your cell phone?

3       A.    I don't remember the date.

4       Q.    What year?

5       A.    I don't remember.

6       Q.    You can't help us at all?

7             MS. POLLOCK:  Objection.  Vague.

8       A.    I don't remember what year.

9    BY MR. GAYNOR:

10      Q.    Have you had it for more than two

11   years?

12      A.    Yes.

13      Q.    How do you pay for the cell phone

14   service?

15      A.    Someone purchased it for me.

16      Q.    Who was that?

17      A.    Cyrus.

18      Q.    When did Cyrus purchase the phone for

19   you?

20      A.    I don't remember.

21      Q.    Was it in 2013?

22      A.    Maybe, but I don't remember the date.

23      Q.    Why did he purchase a phone for you?

24            MS. POLLOCK:  Objection.

25            I'm going to instruct the witness not

Confidential - Subject to Further Confidentiality Review

Page 18

1    to disclose any communications that you had with

2    Cyrus or with your counsel on the grounds that

3    the communication is protected by the

4    attorney/client privilege.

5    BY MR. GAYNOR:

6        Q.    Is Cyrus your attorney?

7        A.    Someone that's working with my lawyer.

8        Q.    When did you first meet Cyrus?

9        A.    I don't remember the exact date.

10       Q.    Well, was it while you were living at

11   the Village?

12       A.    No.

13       Q.    Was it just after you left the

14   Village?

15       A.    No.

16       Q.    How long after the Village -- that you

17   left the Village did you meet Cyrus?

18       A.    I don't remember.

19       Q.    How did you meet Cyrus?

20       A.    After I came from here, from the

21   Dominican Republic.

22       Q.    How did you learn about Cyrus?

23       A.    When I got to Haiti I saw a few of the

24   kids that used to be in the Village with me, and

25   they told me that there's this gentleman named

Confidential - Subject to Further Confidentiality Review

Page 19

1    Cyrus that is asking questions, and I was just

2    curious.

3        Q.    When was that?

4        A.    I don't remember the exact date.

5        Q.    Were you living in the Dominican

6    Republic?

7        A.    Yes.

8        Q.    When did you move to the Dominican

9    Republic from Haiti?

10        A.    When the Village was -- when the

11    Village was closed, or destroyed.

12        Q.    When was that?

13        A.    I don't remember the exact date.

14        Q.    You don't remember the year?

15        A.    No.

16        Q.    If I suggested that was sometime

17    around 2009, would that help you with your

18    memory?

19        A.    No, I don't remember.

20        Q.    Why did you go to the Dominican

21    Republic?

22        A.    I was looking for a better life.

23        Q.    How were you able to travel to the

24    Dominican Republic?

25        A.    I came on foot.  I went through the

Confidential - Subject to Further Confidentiality Review

Page 20

1    bushes.

2         Q.    So you did not have papers, Visas, to

3    go to the Dominican Republic?

4         A.    No.

5         Q.    Did you get arrested in the Dominican

6    Republic?

7         A.    Yes.

8         Q.    Was that for not having proper papers?

9         A.    Yes.

10        Q.    Did you spend time in jail?

11        A.    Yes.

12        Q.    How long?

13        A.    Two days.

14        Q.    What happened after that?

15        A.    I got released.

16        Q.    Did you -- were you deported?

17        A.    No.

18        Q.    You were allowed to stay?

19        A.    Yes.

20        Q.    Where were you living?

21        A.    Sosua.

22        Q.    And did you live with anybody there?

23        A.    Yes, one of my brother-in-laws.

24        Q.    Did you work in the Dominican

25    Republic?

Confidential - Subject to Further Confidentiality Review

Page 21

1      A.    Yes.

2      Q.    What did you do?

3      A.    Mason.

4      Q.    For who?

5      A.    I don't know them.

6      Q.    Did you work for a company?

7      A.    No, some people that asked me to work

8    for the day, they give me a job for the day.

9      Q.    Did you work with your brother-in-law?

10     A.    No.

11     Q.    What is his name?

12     A.    Daniel.

13     Q.    And who is he married to?

14     A.    With Roselène -- Rosenie.

15     Q.    That's one of your sisters?

16     A.    Yes.

17     Q.    How long did you stay in the Dominican

18   Republic?

19     A.    Eight months.

20     Q.    Why did you leave?

21     A.    They sent me back.

22     Q.    Your brother-in-law sent you back?

23     A.    No.

24     Q.    Who sent you back?

25     A.    Police.

Confidential - Subject to Further Confidentiality Review

Page 22

```
 1            MR. GAYNOR:  I'm sorry?
 2            THE INTERPRETER:  The police.
 3       Q.   So they deported you?
 4       A.   Yes.
 5       Q.   And when you left the Dominican
 6  Republic, do you know what year that was?
 7       A.   I don't remember.
 8       Q.   Do you remember how old you were?
 9       A.   No.
10       Q.   When you returned to Haiti, where did
11  you go?
12       A.   I went back to the same place I was
13  before.
14       Q.   Where was that?
15       A.   My parents' house.
16       Q.   How long did you live with your
17  parents?
18       A.   I don't remember.
19       Q.   Approximately.
20       A.   I don't remember.
21       Q.   Was it months, years?
22       A.   Years.
23       Q.   And when you went back and lived with
24  your parents, were you trying to work?
25       A.   Same thing; when I find a job, I do
```

Confidential - Subject to Further Confidentiality Review

Page 23

1    it.

2        Q.    And did your father -- is your father

3    alive?

4        A.    Yes.

5        Q.    Was he working?

6        A.    No.

7        Q.    Did he ever work?

8        A.    No.

9        Q.    Did he do odd jobs?

10       A.    No.

11       Q.    Is there some reason why he didn't

12   work at all?

13       A.    Yes.

14       Q.    What?

15       A.    He has high blood pressure.

16       Q.    Did he get any money from anybody to

17   help support himself?

18       A.    My mother.

19       Q.    And did your mother work?

20       A.    Yes.

21       Q.    What was her job?

22       A.    She works at somebody's house.

23       Q.    Does she do cleaning and take care of

24   the house?

25       A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 24

1      Q.    And was she the sole support of the
2   household?

3      A.    Yes.

4      Q.    Did your brothers and sisters work
5   while they were living at the house?

6      A.    No, the ones that are still living
7   there are small.  The other ones are no longer
8   there.

9      Q.    At any time while they were living at
10  the house, did they work?

11     A.    No.

12     Q.    Do they work now?

13     A.    I don't know.  I don't see them.

14     Q.    You have stepbrothers and sisters?

15     A.    No.

16     Q.    You have no stepbrothers or sisters?

17     A.    No.

18     Q.    Who is Sovèn or Angelo or Topi and
19  Chifra Nicholas?

20     A.    Sovèn is Daniel.

21     Q.    Okay.  Are they related to you?

22     A.    My brother-in-law.

23     Q.    Who is Clenise?

24     A.    My sister-in-law.

25     Q.    Do you have any children?

Confidential - Subject to Further Confidentiality Review

Page 25

1    A.    No.

2    Q.    Do you have a girlfriend?

3    A.    No.

4    Q.    Have you ever had a girlfriend?

5    A.    I used to.

6    Q.    When did you have a girlfriend?

7    A.    I don't remember that.

8    Q.    Well, was it before or after you went

9  to the Village?

10    A.    After.

11    Q.    And what was her name?

12    A.    I don't remember her name.

13    Q.    And how long were you with her?

14    A.    A little while.

15    Q.    What's a little while, sir?

16    A.    Like not a lot of time.

17    Q.    I don't know what that means.  Tell me

18  the best you can recall how long you were with

19  this woman.

20    A.    We spent a few months together, and

21  then I broke it off.

22    Q.    Did you live with her?

23    A.    No.

24    Q.    Where did she live?

25    A.    At her parents' house.

Confidential - Subject to Further Confidentiality Review

Page 26

```
 1      Q.    And you don't remember her name?
 2      A.    No.
 3      Q.    And where were you living?
 4      A.    At my parents' house.
 5      Q.    Is she the only girlfriend you've had
 6   since leaving the Village?
 7      A.    Yes.
 8      Q.    Did you have relations with her?
 9      A.    No.
10      Q.    Have you had relations with a woman?
11      A.    Yes.
12      Q.    And who?
13      A.    I don't remember.
14      Q.    Were these just casual people you met?
15      A.    Yes.
16      Q.    How many times have you had -- and you
17   know what I mean by "relations"?  I'm talking
18   about sexual relations.
19      A.    Yes.
20      Q.    And how many times have you had sexual
21   relations with women since leaving the Village?
22            MS. POLLOCK:  Counsel, are you asking
23   how many women, or how many times?
24   BY MR. GAYNOR:
25      Q.    How many women have you had sexual
```

Confidential - Subject to Further Confidentiality Review

Page 27

1    relations with since leaving the Village?

2        A.    Two.

3        Q.    Do you remember their names?

4        A.    No.

5        Q.    But you never had sexual relations

6    with your girlfriend that you saw for several

7    months?

8        A.    No.

9        Q.    And you don't have a girlfriend now?

10       A.    No.

11       Q.    Do you meet women at all?

12             THE INTERPRETER:  I'm sorry?

13       Q.    Do you meet women now?

14       A.    I meet them.

15       Q.    When is the last time you were with a

16   woman?

17             MS. POLLOCK:  Objection.  Vague.

18       A.    I don't remember.

19   BY MR. GAYNOR:

20       Q.    Did you ever live on the streets?

21       A.    In the streets?

22       Q.    Yes.

23       A.    The only -- first time I did that was

24   when I was in the Dominican Republic.

25       Q.    You lived on the streets in the

Confidential - Subject to Further Confidentiality Review

Page 28

1    Dominican Republic?

2        A.    Yes.

3        Q.    What happened to your brother-in-law;

4    didn't he take you in?

5        A.    Because I found him after.

6        Q.    So you went to the Dominican Republic

7    and lived on the streets first, and then moved

8    in with your brother-in-law when you found him?

9        A.    Yes.

10       Q.    How long were you on the street?

11       A.    A month.

12       Q.    How did you survive?

13       A.    I survived.

14       Q.    Now, before you went to the Village,

15   did you ever live on the streets?

16       A.    No.

17       Q.    Did you always live with your parents?

18       A.    Yes.

19       Q.    And was that in a house?

20       A.    Yes.

21       Q.    Did you know -- did you have friends

22   that lived on the street?

23       A.    Yes.

24       Q.    In Haiti?

25       A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 29

```
 1      Q.    How did they survive?
 2      A.    I couldn't explain it to you because I
 3  don't know.  I wasn't there with them.
 4      Q.    You've been to various schools?
 5      A.    Yes.
 6      Q.    What was the first school you went to?
 7      A.    I don't remember the name of the
 8  school.
 9      Q.    Do you remember how old you were when
10  you first went to school?
11      A.    No.
12      Q.    What was the first school you do
13  remember going to?
14      A.    Saint Raphaël, in an area called Saint
15  Raphaël.
16      Q.    And was that first through third
17  grade?
18            THE INTERPRETER:  Counselor, I need --
19  we don't have the same system, so I need to do
20  it --
21            MR. GAYNOR:  Let me ask him.  I'll
22  rephrase the question.
23  BY MR. GAYNOR:
24      Q.    What grades did you attend at Saint
25  Raphaël?
```

Confidential - Subject to Further Confidentiality Review

Page 30

```
 1       A.    I don't remember, because I was small.
 2       Q.    Do you remember what you studied, what
 3  you learned?
 4       A.    No.
 5       Q.    What was the next school you went to?
 6       A.    I went to the Village.
 7       Q.    Did you go to a school called Rue 13?
 8       A.    Yes.
 9       Q.    Was that before the Village?
10       A.    Yes.
11       Q.    And do you remember what grades you
12  attended at Rue 13?
13       A.    No.  Rue 13, no.
14       Q.    What did you learn at Rue 13?
15       A.    I don't remember.
16       Q.    And where did you go after Rue 13?
17       A.    Carenage.
18       Q.    Do you remember what grades you
19  attended at Carenage?
20       A.    Third year.
21             MR. GAYNOR:  I'm sorry?
22             THE INTERPRETER:  Third year.
23       Q.    And what did you study at Carenage?
24       A.    I don't remember.  I don't remember
25  those things.
```

Confidential - Subject to Further Confidentiality Review

Page 31

1        Q.    Do you know if there was any
2    connection between Carenage and the Village?
3        A.    Yes.
4        Q.    What was the connection?
5        A.    I could say it was the same project.
6        Q.    Did you live at Carenage?
7        A.    No.
8        Q.    You lived at home?
9        A.    Yes.
10       Q.    And how did you get to school every
11   day?
12       A.    I woke up early, and I walked.
13       Q.    Who did you understand ran Carenage?
14       A.    Nicholas.
15       Q.    Who was Nicholas?
16       A.    Some guy.  I don't know.
17       Q.    What did Nicholas do at Carenage?
18       A.    He was there to tell us what to do,
19   like anything.
20       Q.    Were there teachers at Carenage?
21       A.    Yes, there were.
22       Q.    Do you remember the names of any of
23   the teachers?
24       A.    I don't remember, but I can tell you
25   one, only one.

Confidential - Subject to Further Confidentiality Review

Page 32

1      Q.    Okay.  Who was that?

2      A.    Luckson.

3      Q.    What did Luckson -- is Luckson a male

4   or female?

5      A.    A male.

6      Q.    And what did Luckson teach?

7      A.    I don't remember.

8      Q.    Do you remember any of the courses you

9   took at Carenage?

10     A.    If I remember?

11     Q.    Yes.

12     A.    Which?

13     Q.    Do you remember any classes, any

14   courses or classes that you took at Carenage?

15     A.    No.  It was only one teacher giving us

16   a few things, telling us a few things, teaching

17   us a few things.

18     Q.    And that was Luckson?

19     A.    Yes.

20     Q.    You don't remember what they taught

21   you?

22     A.    No.

23     Q.    Did they teach you any reading or

24   writing skills?

25     A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 33

```
1       Q.    What did you learn?
2             MS. POLLOCK:  Objection.  Vague.
3    BY MR. GAYNOR:
4       Q.    What reading and writing skills did
5    you learn?
6       A.    They taught us how to write the
7    alphabet.
8       Q.    Was that in Creole, or some other
9    language?
10      A.    In Creole.
11      Q.    Did they teach you how to read?
12      A.    Yes.
13      Q.    And did they teach you how to write?
14      A.    Yes.
15      Q.    Did you read books while you were at
16   Carenage?
17      A.    Small, little small books.
18      Q.    Did you have homework?
19      A.    No.
20      Q.    What else did you do at Carenage?
21      A.    Played.
22      Q.    Did they feed you at Carenage?
23      A.    Yes.
24      Q.    Did they give you -- what meals did
25   they give you at Carenage?
```

Confidential - Subject to Further Confidentiality Review

Page 34

1    A.    Two or three times.

2    Q.    Did they give you breakfast?

3    A.    Yes.

4    Q.    Did they give you lunch?

5    A.    Yes.

6    Q.    Did they give you dinner?

7    A.    Yes.

8    Q.    Were you eating better at Carenage

9    than you were at home?

10    A.    Yes.

11    Q.    Was that one of the good things about

12    going to Carenage?

13    A.    Yes.

14    Q.    Did you like going to Carenage?

15    A.    Yes.

16    Q.    Did you know anybody other than

17    Nicholas and Luckson that either worked or had

18    something to do with running Carenage?

19    A.    I knew, but I don't remember.

20    Q.    Who were these -- if you don't --

21    putting aside their names, what did these other

22    people do?

23    A.    The others were teachers.

24    Q.    So they were -- they stayed at

25    Carenage?

Confidential - Subject to Further Confidentiality Review

Page 35

```
 1     A.    No.
 2     Q.    Were they visitors?
 3     A.    No.  They came every morning.
 4     Q.    And they taught classes?
 5     A.    Yes.
 6     Q.    Did you ever see visitors come to
 7  Carenage?
 8     A.    Yes.
 9     Q.    Do you know who they were?
10     A.    Yes.  Sometimes Douglas came.
11           MR. GAYNOR:  Who?
12           THE INTERPRETER:  Douglas came.
13     Q.    Is that the first time you heard about
14  Douglas, when you were at Carenage?
15     A.    I heard the name at Rue 13, 13th
16  Street.
17     Q.    Did you meet Douglas?
18     A.    Yes, I've seen him.
19     Q.    Did you personally meet him at
20  Carenage?
21     A.    No.  He came by.
22     Q.    So you saw him at Carenage and you
23  knew who he was, is that true?
24     A.    Yes.
25     Q.    But you had no conversations with him
```

Confidential - Subject to Further Confidentiality Review

Page 36

1    personally?

2        A.    No.

3        Q.    Did you understand what Douglas's role

4    was?

5        A.    No.  I just knew it was somebody that

6    came from the Village.

7        Q.    And when you were at Carenage, did you

8    know what the Village was?

9        A.    They told me it was a big place where

10   people lived.

11       Q.    Okay.  Did you understand that it was

12   a place to go and go to school?

13       A.    Yes.

14       Q.    Did you have some plan or desire to go

15   to the Village after you finished with Carenage?

16       A.    I wanted to go.

17       Q.    And how would -- did you know how you

18   could get into the Village?

19       A.    No.

20       Q.    Did you understand how -- were all the

21   students from Carenage accepted at the Village?

22       A.    Sometimes they would take a few of

23   them.

24       Q.    Do you know how they selected the

25   students to go to the Village?

Confidential - Subject to Further Confidentiality Review

Page 37

```
 1        A.     No, I didn't know what to do.
 2        Q.     Did you tell people at the school you
 3   would like to go to the Village?
 4        A.     Yes.
 5        Q.     Did you know anybody that lived --
 6   studied at the Village?
 7        A.     No.
 8        Q.     Other than Douglas, did you ever see
 9   any other visitors come to Carenage?
10        A.     I don't remember the others.
11        Q.     Were there some, but you just don't
12   remember?
13        A.     No.  Sometimes, but there were others
14   that came, but I don't remember.
15        Q.     Do you remember how old you were when
16   you went to Carenage?
17        A.     No.
18        Q.     Do you know how old you were when you
19   finished Carenage?
20        A.     No.
21        Q.     Do you know how old you are now?
22        A.     Yes.
23        Q.     How old are you now?
24        A.     21.
25        Q.     When you finished Carenage, where did
```

Confidential - Subject to Further Confidentiality Review

Page 38

1    you go?

2         A.    Mère Berg.

3         Q.    What's that?

4         A.    It's a school.

5         Q.    And where is that?

6         A.    In the town itself.

7         Q.    Is that Cap-Haïtien?

8         A.    Yes.

9         Q.    What type of a school was that?

10        A.    A school where you go to learn how to

11   read and write.

12        Q.    Did you learn how to read and write

13   there?

14        A.    Yes.

15        Q.    How many years did you go there?

16        A.    Just one.

17        Q.    And after your one year there, where

18   did you go?

19        A.    To the Village.

20        Q.    How did you happen to get into the

21   Village?

22        A.    That's why Nicholas took me to school

23   at Mère Berg.

24        Q.    Who was Nicholas?

25        A.    The person that was managing Carenage.

Confidential - Subject to Further Confidentiality Review

Page 39

1      Q.    And he's the one that got you into
2   Mère Berg?
3      A.    Yes.
4      Q.    Could you have gone right to the
5   Village from Carenage?
6      A.    I don't know.  I wasn't the one
7   deciding.
8      Q.    Okay.  Did you have to pay money to go
9   to Mère Berg?
10     A.    Nicholas paid for me.
11     Q.    Did Nicholas pay for other students to
12  go to Mère Berg, if you know?
13     A.    Yes.
14     Q.    Did you have other classmates that
15  went from Carenage to Mère Berg with you?
16     A.    Yes.
17     Q.    Who ran Mère Berg, if you know?
18     A.    I don't remember.
19     Q.    Was Douglas there?
20     A.    No.
21     Q.    Was Nicholas there?
22     A.    No, he wasn't there.
23     Q.    Who did you have for teachers at Mère
24  Berg?
25     A.    Other people.  I don't know.

Confidential - Subject to Further Confidentiality Review

Page 40

```
 1       Q.    Did you read books at Mère Berg?
 2       A.    Yes.
 3       Q.    Was that Creole?
 4       A.    Yes.
 5       Q.    Did they try to teach you any other
 6  languages?
 7       A.    No.
 8       Q.    Did you do mathematics?
 9       A.    I don't remember.
10       Q.    Did you ever study mathematics?
11       A.    I don't remember those things.
12       Q.    And after one year at Mère Berg, where
13  did you go?
14       A.    To the Village.
15       Q.    Who arranged for you to go to the
16  Village?
17       A.    Nicholas.
18       Q.    And did Nicholas come by to Mère Berg
19  from time to time?
20       A.    Yes.
21       Q.    Did he stay in touch with you?
22       A.    Yes.
23       Q.    What did he tell you about the
24  Village?
25       A.    He didn't say -- never said anything
```

Confidential - Subject to Further Confidentiality Review

Page 41

1    to me.

2        Q.    Did he ask you if you wanted to go to

3    the Village?

4        A.    He never told me anything.

5        Q.    Well, how did you decide to go?

6        A.    At the end of the year he chose the

7    students with good grades.

8        Q.    You had good grades?

9        A.    Yes.

10       Q.    Did you like school?

11       A.    Yes.

12       Q.    What did you do when you weren't at

13   school?

14             MS. POLLOCK:  While he was attending?

15             MR. GAYNOR:  I'm sorry?

16             MS. POLLOCK:  While he was attending

17   Mère Berg?

18             MR. GAYNOR:  Yes.

19       A.    No, because I came from Mère Berg and

20   went straight to the Village.

21   BY MR. GAYNOR:

22       Q.    I'm sorry, my question was bad.

23             When you were not at school during the

24   day, what did you do when you finished for the

25   day?

Confidential - Subject to Further Confidentiality Review

Page 42

1      A.    I played.

2      Q.    Did you have friends that you played

3   with?

4      A.    Yes.

5      Q.    And was Mère Berg near your home?

6      A.    No.

7      Q.    How did you get there?

8      A.    I walked.

9      Q.    Do you know how far it was from your

10  home to Mère Berg?

11     A.    No.  It is a long distance.

12     Q.    Did you tell Nicholas you were looking

13  -- that you were glad to be selected to go to

14  the Village?

15     A.    Yes.

16     Q.    Did Nicholas have to talk to your

17  parents?

18     A.    No.

19     Q.    He just spoke with you?

20     A.    Yes.

21     Q.    And you decided to go to the Village?

22     A.    Yes.

23     Q.    And that's something you wanted to do?

24     A.    Yes.

25     Q.    Had you heard good things about the

Confidential - Subject to Further Confidentiality Review

Page 43

 1    Village?

 2        A.    Yes.

 3        Q.    Did you ever hear any bad things about

 4    the Village before you went?

 5        A.    No.

 6        Q.    Did you understand who ran the

 7    Village?

 8        A.    Yes.

 9        Q.    Who was that?

10        A.    Douglas.

11        Q.    Other than Douglas, did you have any

12    understanding of who else may have assisted in

13    running the Village?

14        A.    Yes.

15        Q.    Who was that?

16        A.    Pere Paul.

17        Q.    Anybody else?

18        A.    Mrs. Carter.

19        Q.    Anybody else?

20        A.    Other people.  I don't remember.

21        Q.    When did you meet -- when did you hear

22    the name Pere Paul?

23        A.    When I went -- when I was inside the

24    Village, once I was there.

25        Q.    Okay.  So you didn't know those names

Confidential - Subject to Further Confidentiality Review

Page 44

1   before you went to the Village?

2        A.    No.

3        Q.    Do you know any other organizations or

4   associations that assisted in running or

5   operating the Village?

6        A.    I used to hear the name Malta, but I

7   don't know what it means.

8        Q.    Any other names that you recall that

9   had something to do with the Village that you

10  can recall as you sit here today?

11       A.    What kind of names?  Names of what?

12       Q.    Of either associations, businesses,

13  corporations, anything else that -- any other --

14  anything else that might have run or assisted in

15  running the Village, did you know those names?

16       A.    I've heard the name Jesuits, Fairfield

17  University.

18       Q.    What did you hear about Jesuits?

19       A.    I used to hear them say they were the

20  boss of the Village, they were the one that held

21  the Village together.

22       Q.    Who told you that?

23       A.    I heard that from Douglas's mouth.

24       Q.    Okay.  When did Douglas tell you that?

25       A.    I don't remember when.

Confidential - Subject to Further Confidentiality Review

Page 45

1      Q.    What did he say the Jesuits did?

2      A.    I don't have a clear explanation of

3    that.  I just heard the name.  I heard them

4    talking about it.

5      Q.    Okay.  Other than Douglas mentioning

6    the name Jesuit, did you ever speak to anybody

7    that you believe was connected with Jesuits?

8          MS. POLLOCK:  I'm going to object and

9    remind you not to disclose any conversations

10   that you've had with your lawyers in answering

11   the question.

12   BY MR. GAYNOR:

13     Q.    My question -- let me make my question

14   clear.

15          Other than hearing from Douglas the

16   name Jesuit, did you ever speak to anybody that

17   you understood was connected to the Jesuits?

18          MS. POLLOCK:  Again, I'm going to

19   remind you not to disclose any conversations

20   that you've had --

21          MR. GAYNOR:  My question didn't relate

22   to attorney/client, it related to him speaking

23   directly to someone he thought might have been a

24   Jesuit at the time he was at the Village.

25   That's my question.

Confidential - Subject to Further Confidentiality Review

Page 46

```
 1      A.    No.
 2  BY MR. GAYNOR:
 3      Q.    Okay.  Did you ever hear any other
 4  names mentioned that you believed were connected
 5  to Jesuits?
 6      A.    Could you tell me that again, please?
 7      Q.    Did you ever hear any other names
 8  mentioned while you were at the Village that you
 9  believed were connected to the Jesuits?
10      A.    Pere Paul.
11      Q.    Okay.  Anybody else?
12      A.    I don't know.
13      Q.    Do you know the name Sylvester Tan?
14      A.    Yes.
15      Q.    Who was he?
16      A.    He was one of the people that helped
17  us at the chapel.
18      Q.    Do you know who he was affiliated
19  with?
20      A.    After the Village was closed or
21  destroyed, that's when I heard that he was
22  connected to the Jesuits.
23      Q.    While you were at the Village, did you
24  know that?
25      A.    No.
```

Confidential - Subject to Further Confidentiality Review

Page 47

1    Q.    Did you ever talk with Sylvester Tan?

2    A.    No.

3    Q.    Did he teach any of your classes?

4    A.    No.  He used to talk to me about the

5    bible.

6    Q.    So he did talk to you?

7    A.    When we're together at the church.

8    Q.    Were you alone with him, or were you

9    with a group that he was teaching or talking

10   about the bible to?

11   A.    No, a group.

12   Q.    So he was teaching bible studies?

13   A.    Yes.

14   Q.    Did you ever have any conversation

15   with just you and Mr. Tan?

16   A.    I don't know who he is.

17   Q.    Silvester.

18   A.    No.

19   Q.    How old were you when you went to the

20   Village?

21   A.    I don't remember.

22   Q.    You can't give us an approximate year?

23   A.    No, I don't remember.

24   Q.    Do you remember what year it was when

25   you went to the Village?

Confidential - Subject to Further Confidentiality Review

Page 48

1      A.    No.

2      Q.    Do you remember what grade you were in

3  when you went to the Village?

4      A.    Yes.

5      Q.    What grade?

6      A.    Third year.

7      Q.    And how old were most of the kids that

8  were in the third year?

9      A.    Can you tell me again?

10      Q.    How old were most of the kids when

11  they were in the third year with you?

12      A.    I don't remember.

13      Q.    When you went to the Village, would

14  you describe it for me, please, the facility?

15      A.    What do you mean, "describe"?

16      Q.    What did it look like?

17      A.    There was a big wall around it, and a

18  big gate.

19      Q.    And did you have to go through the

20  gate to get in?

21      A.    Yes.

22      Q.    Was the gate kept open, or locked?

23      A.    It was closed.

24      Q.    Was it locked?

25      A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 49

1      Q.    How would you get in?

2      A.    You knock.

3      Q.    And who would come -- typically who

4    would come to open the gate?

5      A.    A security guard.

6      Q.    And was there a security guard kept --

7    was the security guard at the gate during the

8    day?

9      A.    Yes.

10     Q.    Was there a security guard there at

11   night?

12     A.    Yes.

13     Q.    Did you ever try to get into the

14   Village at night?

15     A.    No.

16     Q.    Did you ever leave on a weekend?

17     A.    No.

18     Q.    Did you ever leave for a vacation?

19     A.    I usually stayed in the city when they

20   closed.

21     Q.    During the time you lived at the

22   Village, were there times when you would leave

23   the Village?

24     A.    No, I didn't live inside the Village.

25     Q.    You never lived there?

Confidential - Subject to Further Confidentiality Review

Page 50

1      A.    No.

2      Q.    So you just went for the days?

3      A.    Yes.

4      Q.    Did some people live in the Village?

5      A.    Yes.

6      Q.    Were you given the choice to live in

7    the Village, or live outside?

8      A.    No.

9      Q.    And you lived with your parents while

10   you went to the Village?

11     A.    Yes.

12     Q.    And what time would you come to the

13   Village in the morning?

14     A.    7.

15     Q.    And what time would you leave?

16     A.    6.

17     Q.    At night?

18     A.    Yes.

19     Q.    And was there always a security guard

20   near the gate?

21     A.    Yes.

22     Q.    And when you would come, would he open

23   the door?

24     A.    Yes.

25     Q.    Did you ever try to get into the

Confidential - Subject to Further Confidentiality Review

Page 51

1   Village after 6 at night?

2        A.   No.

3        Q.   Do you know if you could get into the

4   Village at night after 6?

5        A.   No.

6             MR. GAYNOR:  I'm sorry?

7             THE INTERPRETER:  No.

8        Q.   You didn't know, or you couldn't do

9   it?

10       A.   I couldn't.

11       Q.   Why not?

12       A.   They wouldn't let me in.

13       Q.   Did you ever try?

14       A.   No.

15       Q.   So how do you know that they wouldn't

16  let you in?

17       A.   They told me that.

18       Q.   What did you -- was Nicholas at the

19  Village?

20       A.   No.

21       Q.   Who ran the Village?

22            MS. POLLOCK:  Objection.  Asked and

23  answered.

24       A.   Douglas.

25  BY MR. GAYNOR:

Confidential - Subject to Further Confidentiality Review

Page 52

```
 1      Q.    Did you ever -- before the allegation
 2   -- strike that.
 3            Before the abuse occurred with
 4   Douglas, did you ever speak to him one-on-one?
 5      A.    No.
 6      Q.    When was the first time you actually
 7   spoke personally to Douglas?
 8      A.    When it happened.
 9      Q.    Before it happened, meaning the abuse,
10   did you ever hear any rumors from students or
11   anybody else that Douglas was abusing kids?
12      A.    No.
13      Q.    There was never any talk among your
14   classmates about Douglas abusing kids?
15      A.    No.
16      Q.    When is the first time you heard
17   anything about Douglas abusing kids?
18      A.    I haven't heard that.
19      Q.    Did you ever hear it?
20      A.    No.
21      Q.    So at any time you never heard from
22   any children or kids that Douglas had abused
23   children or kids?
24      A.    No.
25            MS. POLLOCK:  Counsel, we've been
```

Confidential - Subject to Further Confidentiality Review

1  going an hour, I just want to stop you at a
2  natural stopping point.
3           MR. GAYNOR:  Sure.  Whenever.
4           MS. POLLOCK:  I don't have to stop
5  right this second.
6           MR. GAYNOR:  Any time.  Do you want to
7  do it now?
8           MS. POLLOCK:  Sure.
9           THE VIDEOGRAPHER:  Going off the
10 record.  The time is 10:09.
11          (Whereupon, a recess was taken.)
12          THE VIDEOGRAPHER:  Back on the record.
13 The time is 10:26.
14 BY MR. GAYNOR:
15    Q.    Mr. Bernard, who were your good
16 friends at the Village when you were attending
17 school there?
18    A.    Talking about whom?
19    Q.    Did you have friends at the Village?
20    A.    My classmates.
21    Q.    And who were your closest friends?
22    A.    Johnson.
23    Q.    And Johnson is who you've been living
24 with recently?
25    A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 54

1      Q.     Anybody else other than Johnson that
2   you considered a close friend when you were at
3   the Village?

4      A.     Yes, I had a few.

5      Q.     What were their names?

6      A.     I don't remember their names.

7      Q.     So you had close friends, but you
8   don't remember either their first or last names?

9      A.     I was comfortable with them, but they
10  were not good friends.

11     Q.     Okay.  But you don't remember their
12  names?

13     A.     I don't remember.

14     Q.     Do you remember any of your
15  classmates' names other than Johnson?

16     A.     My own -- my classroom?

17     Q.     Yes.  I was waiting for an answer.

18     A.     Yes, I'm thinking.

19     Q.     Okay.  Take your time.

20     A.     I don't remember the name of my
21  classmates, but I remember the name of other
22  students that were at the school.

23     Q.     Were they in different years?

24     A.     Yes.

25     Q.     What names do you remember?

Confidential - Subject to Further Confidentiality Review

Page 55

1        A.    I remember Victor.

2        Q.    What's Victor's last name?

3        A.    I don't remember.

4        Q.    Have you seen or heard of Victor after

5    you left the Village?

6        A.    No.

7        Q.    Anybody else?

8        A.    Yes.

9        Q.    Who else?

10       A.    Peterson.

11       Q.    And is that his first or last name?

12       A.    I don't know.

13       Q.    Have you seen or heard from Peterson

14    since you left the Village?

15       A.    I see him sometimes.

16       Q.    Did you ever tell Peterson that you

17    had been abused by Douglas Perlitz?

18       A.    No.

19       Q.    Anybody else that you recall the names

20    of?

21       A.    There are a lot of other people.

22       Q.    Are you still friendly with any of

23    them?

24       A.    Sometimes we cross each other and we

25    say hello.

Confidential - Subject to Further Confidentiality Review

Page 56

```
1      Q.    Okay.  Do you know the names of any
2  other students at the Village who claim that
3  they were abused by Doug Perlitz?
4      A.    Yes.
5      Q.    Who?
6      A.    Johnson.
7      Q.    Anybody else?  You have to say out
8  loud.
9      A.    No, I don't know.
10     Q.    So Johnson's the only other student at
11 the Village that you understand had been abused
12 by Doug Perlitz?
13     A.    I don't know.
14     Q.    So my statement is true?
15     A.    How?
16     Q.    I asked you, so Johnson's the only
17 other student at the Village that you understand
18 had been abused by Doug Perlitz, is that correct
19 or not?
20     A.    It's a secret between the other
21 people.  I don't know.
22     Q.    So am I correct that you do not know?
23     A.    I don't know.
24     Q.    Did you tell Johnson that you were
25 abused by Doug Perlitz?
```

Confidential - Subject to Further Confidentiality Review

1       A.     Yes.

2       Q.     When did you first tell him?

3       A.     I don't remember when.

4       Q.     Was it while you were still at the

5   Village?

6       A.     No.

7       Q.     How soon after you left the Village

8   did you tell Johnson?

9       A.     After a while.

10      Q.     What's after a while, sir?  That

11  doesn't help me at all.  What's after a while?

12      A.     After a few years.

13      Q.     So there were at least several years

14  between the time that you left the Village and

15  you first had a conversation with Johnson about

16  your being abused, is that correct?

17      A.     Yes.

18      Q.     Did Johnson tell you he was abused?

19      A.     Yes, he told me first, and then I told

20  him.

21      Q.     Was it all at the same time?

22             MS. POLLOCK:  Objection.  Vague.

23      A.     Same time?

24  BY MR. GAYNOR:

25      Q.     In the same conversation when Johnson

Confidential - Subject to Further Confidentiality Review

Page 58

1    told you he had been abused, did you tell him
2    you had been abused?
3        A.    Yes.
4        Q.    Okay.  And that was a couple of years,
5    two years after you left the Village?
6        A.    A few years.
7        Q.    More or less than two?
8        A.    I don't remember.
9        Q.    What was the circumstances of you
10   having that discussion?
11       A.    We were sitting together, it wasn't
12   far from the Village, and I saw him crying, and
13   I said "what's wrong?"  And he explained it to
14   me.
15       Q.    And is that the first time you'd ever
16   heard anything about any other student being
17   abused?
18       A.    Yes.
19       Q.    Did you ever see some writing or
20   graffiti on the walls of the Village about Doug
21   Perlitz?
22       A.    Yes.
23       Q.    When did you see that?
24       A.    I don't remember.  I don't remember
25   the date, but I've seen them.

Confidential - Subject to Further Confidentiality Review

Page 59

1      Q.    And that was while you were at the
2    Village?
3      A.    After the Village was destroyed.
4      Q.    Did you see it before the Village was
5    destroyed?
6      A.    No.
7      Q.    What did it say?
8      A.    I don't remember.
9      Q.    You have no idea what it said?
10     A.    No.
11     Q.    Were you interested in what it said?
12     A.    No.
13     Q.    Did you see it yourself?
14     A.    When I walked by I see it.
15     Q.    Did it say something about Doug
16    Perlitz being gay?
17     A.    I didn't read it.
18     Q.    You had been abused by Doug Perlitz,
19    that's your testimony, correct?
20     A.    Yes.
21     Q.    And that was while you were attending
22    the Village?
23     A.    Yes.
24     Q.    And you walked by the wall at some
25    point after the Village closed and saw writing

Confidential - Subject to Further Confidentiality Review

Page 60

1    about Doug Perlitz, is that right?

2        A.    Yes.

3        Q.    And how did you know it was about Doug

4    Perlitz if you didn't read it?

5        A.    I didn't say it was about him.  I just

6    saw something written on the wall.

7        Q.    I asked you if you had seen something

8    written on the wall about Doug Perlitz, I

9    thought you told me you did.

10       A.    No, maybe I didn't hear.

11       Q.    Okay.  So you didn't hear me

12   correctly, is that right?

13       A.    No.

14       Q.    So what was the writing on the wall

15   about?

16       A.    I don't remember.

17       Q.    Was it anything to do with Doug

18   Perlitz, the writing on the wall?

19       A.    I don't know.

20       Q.    But you did see some writing on the

21   wall?

22       A.    Yes.

23       Q.    And you had been abused by Doug

24   Perlitz?

25       A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 61

```
 1      Q.    And you didn't bother to read it, is
 2   that what you're telling us?
 3      A.    Yes, I didn't.
 4      Q.    And you didn't see the name Doug
 5   Perlitz in writing on the wall when you went by
 6   and saw the writing?
 7      A.    No, because it wasn't up for very
 8   long.  They painted over it.
 9      Q.    I'm not concerned, sir, how long it
10   was up.
11            You went by and you saw writing on the
12   wall after the Village closed, that's what
13   you're telling us today, correct?
14      A.    Yes.
15      Q.    And you're telling us that even though
16   you had been abused by someone at the Village,
17   Doug Perlitz, that you didn't read what was on
18   the wall?
19      A.    No.
20            MS. POLLOCK:  I'm going to object.
21   Assumes facts not in evidence.
22   BY MR. GAYNOR:
23      Q.    And you didn't see the name Doug
24   Perlitz written on the wall?
25      A.    I don't remember that.
```

Confidential - Subject to Further Confidentiality Review

Page 62

1        Q.    If you had seen the name Doug Perlitz
2    written on the wall, as someone that had abused
3    you on two occasions as your testimony in these
4    answers in your case, wouldn't you have bothered
5    to read it?
6            MS. POLLOCK:  Objection.  Objection.
7    Assumes facts not in evidence, mischaracterizes
8    the witness's testimony, and vague.
9            But you can answer.
10       A.    Huh?
11   BY MR. GAYNOR:
12       Q.    Can you answer the question, please?
13       A.    So what you're saying is that what
14   happened to me is such a wonderful thing that I
15   can take my time and read what's written on the
16   wall?
17       Q.    That's not what I asked you, sir.
18            I said, wouldn't you be interested if
19   you saw the name Doug Perlitz written on the
20   wall of the Village, as someone who had
21   allegedly abused you, wouldn't that be of
22   interest to you?
23            MS. POLLOCK:  Objection.  Vague,
24   assumes facts not in evidence.
25       A.    I was not interested.

Confidential - Subject to Further Confidentiality Review

Page 63

 1   BY MR. GAYNOR:
 2       Q.    How many years did you go to the
 3   Village?
 4       A.    I spent one year.
 5       Q.    You're claiming that you were abused
 6   by Doug Perlitz at some time while you were a
 7   student at the Village, is that correct?
 8       A.    Yes.
 9       Q.    When did that occur?
10       A.    I don't remember when.
11       Q.    How long into the school year did it
12   happen?
13       A.    I don't remember the date.
14       Q.    About how far into the -- when does
15   the school year start?
16       A.    I don't remember.
17       Q.    Did it start in the summer, fall,
18   spring, winter?  What season did school start?
19           MS. POLLOCK:  Object to form.
20       A.    I don't remember.
21   BY MR. GAYNOR:
22       Q.    Can you tell me about how many weeks
23   or months you had been at the Village before
24   this event occurred with Doug Perlitz?
25       A.    I don't remember how many months.

Confidential - Subject to Further Confidentiality Review

Page 64

1      Q.    So let me see if I get this right,
2  sir.  You don't remember how old you were when
3  you went to the Village, is that correct?
4      A.    I was 12, 13.
5      Q.    You don't remember when you -- what
6  month you started going to the Village?
7      A.    No.
8      Q.    You don't remember what year you
9  started the Village?
10     A.    Yes.
11     Q.    You do?
12     A.    Yes.
13     Q.    Is there some reason why you didn't
14 answer that when I asked you before?
15          MS. POLLOCK:  Objection.
16 Argumentative.
17     A.    How did you ask me?
18 BY MR. GAYNOR:
19     Q.    What year did you start the Village?
20     A.    2007.
21     Q.    And you can't tell us how many weeks
22 or months it was that you attended that year at
23 the Village before the event with Doug Perlitz
24 happened?
25     A.    No.

Confidential - Subject to Further Confidentiality Review

Page 65

1     Q.    Tell me how that event occurred.
2  Where were you?
3            MS. POLLOCK:  Hold on.  Objection.
4            Do you mean the abuse?
5  BY MR. GAYNOR:
6     Q.    Where did the abuse occur?
7     A.    Bel Air.
8     Q.    Okay.  Were you at Bel Air?
9     A.    Explain to me?
10    Q.    Did you go to Bel Air?
11    A.    Yes.
12    Q.    Was that the first time you had gone
13 to Bel Air?
14    A.    Yes.
15    Q.    What was Bel Air?
16    A.    A place where people live.
17    Q.    Who lived -- who did you understand
18 lived at Bel Air?
19    A.    I don't remember that.
20    Q.    Okay.  So you don't have any idea who
21 lived at Bel Air?
22    A.    No.
23    Q.    How did you happen to go to Bel Air?
24    A.    Douglas went with me.
25            MR. GAYNOR:  I'm sorry?

Confidential - Subject to Further Confidentiality Review

```
 1              THE INTERPRETER:  Douglas went with
 2    me.
 3         Q.   How did that happen?
 4         A.   He put me in his car, and he went with
 5    me.
 6         Q.   Had you -- you knew who Douglas was?
 7         A.   Yes.
 8         Q.   Had you ever had any conversation with
 9    Douglas one-on-one before that?
10         A.   No.
11         Q.   So were you at the Village?
12         A.   Yes.
13         Q.   And tell me what happened at the
14    Village.
15         A.   Like what would you like me to tell
16    you what happened at the Village?
17         Q.   Well, Douglas was there, and you were
18    there, right?
19         A.   Yes.
20         Q.   Okay.  Where was Douglas?
21         A.   At the Village.
22         Q.   Where in the Village?
23         A.   Inside of the Village.
24         Q.   Where?  There's lots of places in the
25    Village.  Where did you meet up with Douglas?
```

Confidential - Subject to Further Confidentiality Review

Page 67

```
 1      A.    What do you mean where I met up with
 2   him?
 3      Q.    Was it on the ball field?  Was it in a
 4   classroom?  Where did you have a discussion with
 5   Douglas?
 6      A.    Where I spoke to him?
 7      Q.    Yeah, where?
 8      A.    I don't understand.
 9      Q.    Do you remember where you were when
10   you had a conversation with Douglas about going
11   to Bel Air?
12           MS. POLLOCK:  Objection.  Assumes
13   facts not in evidence.
14      A.    I was inside the Village, that's where
15   I was.
16   BY MR. GAYNOR:
17      Q.    Okay.  Where inside the Village?
18      A.    In the yard.
19      Q.    Okay.  In the yard.
20           Was this a ball field?
21      A.    No, where they play, the ball field is
22   separate.
23      Q.    Okay.  Was this inside the gate?  Just
24   when you walk through the gate, is there a yard?
25      A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 68

1    Q.    Is that where you met up with Douglas?

2    A.    No.  He said to me "let's go out."

3    There wasn't any conversation that happened.

4    Q.    So I'm trying to understand what

5    happened.

6          You were in the yard, correct?

7    A.    Yes.

8    Q.    Were you with anybody?

9    A.    No, I was alone.

10   Q.    Okay.  What were you doing?

11   A.    I was walking in the yard.

12   Q.    Was it school hours, before school,

13   after school?

14   A.    I don't remember.

15   Q.    So you don't remember what time of day

16   it was?

17   A.    No.

18   Q.    You don't remember if it was before or

19   after school?

20   A.    No.

21   Q.    And was there anybody else in the

22   yard?

23   A.    Yes.

24   Q.    Who else was in the yard?

25   A.    Everybody was there.

Confidential - Subject to Further Confidentiality Review

Page 69

1      Q.    Name some individual that you know was
2    in the yard at that time.
3      A.    You already know, I told you, all the
4    kids were in the Village, and the teachers.
5      Q.    No, no, no.  I want to know if you can
6    give me the name of even one student who you say
7    was in the yard near where you and Douglas
8    Perlitz were talking.
9      A.    I don't remember that.  I don't
10   remember that.
11     Q.    Was Johnson there?
12     A.    I don't remember that.
13     Q.    So you can't tell us the name of one
14   student that was near where you and Douglas were
15   talking?
16     A.    I wasn't following that.
17     Q.    Okay.  Did Douglas come up to you, or
18   did you come up to Douglas?
19     A.    He called me.
20     Q.    He called you over -- he called you to
21   come over to him?
22     A.    Yes, next to the car.
23     Q.    Okay.  He knew your name?
24     A.    Yes.
25     Q.    And you had never spoken directly with

Confidential - Subject to Further Confidentiality Review

Page 70

1    Douglas before, I think you told us, is that
2    correct?
3        A.    Before the date he did that?
4        Q.    Yes.
5        A.    Yes, what I told you.
6        Q.    That you had never spoken to him
7    directly?
8        A.    Yes, except that day.
9        Q.    So this was the first time you
10   actually had a conversation with Douglas?
11       A.    Yes.
12       Q.    And he called you over, and he had his
13   car.  Where was the car?
14       A.    In the yard.
15       Q.    It was inside the yard?
16       A.    Inside the yard.
17       Q.    Was there a driveway there?
18       A.    Yes.
19       Q.    Do you know how the car gets in and
20   out of the yard?
21       A.    Yes, it goes through the gate.
22       Q.    Okay.  And was Douglas alone?
23       A.    Yes.
24       Q.    What kind of a car was it?
25       A.    I don't remember.

Confidential - Subject to Further Confidentiality Review

Page 71

1        Q.    What color was the car?

2        A.    I don't remember.

3        Q.    Was it a sedan, or a sports car?

4              MS. POLLOCK: Objection. Vague, and

5    compound.

6        A.    I don't remember.

7    BY MR. GAYNOR:

8        Q.    Was it a hard top or a convertible?

9        A.    I don't know anything about that.

10       Q.    Was it a two door or a four door

11   vehicle?

12       A.    I don't remember.

13       Q.    Was it an old car, or a new car?

14             MS. POLLOCK: Objection. Vague.

15       A.    I don't remember.

16   BY MR. GAYNOR:

17       Q.    Was he standing next to the car?

18       A.    He was inside the car.

19       Q.    Was the window up or down?

20       A.    It was down.

21       Q.    And he called out?

22       A.    Yes.

23       Q.    Did he call you by name?

24       A.    Yes.

25       Q.    How far away were you from the car

Confidential - Subject to Further Confidentiality Review

Page 72

1    when he called you?

2         A.    I wasn't far.

3         Q.    What's not far?

4         A.    That was close by.

5         Q.    Okay.  Closer than -- did you walk

6    over to the car?

7              THE INTERPRETER:  I'm sorry, did you

8    walk over?

9         Q.    Did you walk over to the car?

10        A.    Can you repeat it again?

11        Q.    Did you walk over to the car when

12   Douglas called you?

13        A.    Yes.

14        Q.    Was anybody next to you, or playing

15   near you when Douglas called you over?

16        A.    I wasn't following that.

17             MR. GAYNOR:  I'm sorry?

18        A.    I wasn't watching that.  I wasn't

19   following that.

20        Q.    Were you playing in the yard?

21        A.    Yes.  I was walking.

22        Q.    Where were you walking to?

23        A.    In the yard.

24        Q.    Was it a recess?

25        A.    I don't remember.

Confidential - Subject to Further Confidentiality Review

Page 73

1      Q.    What did you do?  What happened when

2   you went over to the car?

3      A.    He told me to "get in the car, let's

4   go out."

5      Q.    Did he say what for?

6      A.    No.

7      Q.    Did he say where you were going?

8      A.    Yes.

9      Q.    Where did he say you were going?

10     A.    Bel Air.

11     Q.    Did he say why?

12     A.    No.

13     Q.    Did you ask him why?

14     A.    No.

15     Q.    Was anybody else around the car when

16   this was being said?

17     A.    No.

18     Q.    Did you get in the car?

19     A.    Yes.

20     Q.    What happened after you got in the

21   car?

22     A.    He started the car, and we left.

23     Q.    Okay.  Where did you go?

24     A.    Bel Air.

25     Q.    And you had never been there before?

Confidential - Subject to Further Confidentiality Review

Page 74

```
 1      A.    No.
 2      Q.    How did you know it was Bel Air?
 3      A.    He told me that.
 4      Q.    But he never told you why he was
 5   driving you to Bel Air?
 6      A.    No.
 7      Q.    Did you ask him?
 8      A.    No.
 9      Q.    So you just got in the car and he said
10   "we're going to Bel Air," but you didn't have
11   any further discussion with him about that, or
12   why?
13      A.    No.
14      Q.    Did he say he was going to give you
15   anything?
16      A.    No.
17      Q.    Had he ever given you anything before?
18      A.    No.
19      Q.    Money, clothing, sneakers?
20      A.    No.
21      Q.    Did you think it was a little odd that
22   he was asking you to go in the car and drive to
23   Bel Air?
24      A.    No.
25      Q.    Did you know of anybody else that had
```

Confidential - Subject to Further Confidentiality Review

Page 75

1    -- any of the other students driven with him to

2    Bel Air?

3        A.    No.

4        Q.    You'd never heard about that?

5        A.    No.

6        Q.    Did you have any -- did you speak to

7    him while you were driving?

8        A.    I don't remember what we said.

9        Q.    Was there something said?

10       A.    Yes.

11       Q.    But you don't remember?

12       A.    No.

13       Q.    And you didn't ask him why you're

14   going to Bel Air?

15       A.    No.

16             MS. POLLOCK:  Objection.  Asked and

17   answered.

18   BY MR. GAYNOR:

19       Q.    And you weren't curious about why you

20   were going to Bel Air?

21       A.    No.

22       Q.    How long did it take you to get to

23   Bel Air?

24       A.    I don't remember.

25       Q.    You can't tell us whether it was

Confidential - Subject to Further Confidentiality Review

Page 76

1    minutes or hours?

2        A.    I don't remember.

3        Q.    What happened when you got to Bel Air?

4        A.    We went into the yard.

5        Q.    What is Bel Air?

6        A.    It's a house.

7        Q.    Was there a gate or a wall around it?

8              MS. POLLOCK:  Objection.  Compound.

9        A.    Yes.

10   BY MR. GAYNOR:

11       Q.    When Douglas drove up to Bel Air, what

12   did he do to get inside?

13       A.    You got to the gate.

14       Q.    Was there anybody at the gate?

15       A.    Yes.

16       Q.    Who was at the gate?

17       A.    I don't know.

18       Q.    Was it a security person?

19       A.    I don't know if he was.

20       Q.    Was a person wearing a uniform?

21       A.    I don't remember.

22       Q.    Did the person open the gate?

23       A.    Yes.

24       Q.    Can you describe anything about that

25   person?

Confidential - Subject to Further Confidentiality Review

Page 77

```
 1      A.     I don't remember.
 2      Q.     When you pulled into the yard, were
 3  there any other cars there?
 4      A.     I don't remember.
 5      Q.     Had you ever driven in a car before?
 6      A.     Yes.
 7      Q.     Whose cars had you driven in?
 8      A.     Douglas.
 9      Q.     Before that day, had you ever driven
10  in a car?
11      A.     No.
12      Q.     That was your first ride in a car?
13      A.     No.
14             MS. POLLOCK:  You asked have you ever
15  driven in a car.
16  BY MR. GAYNOR:
17      Q.     Have you ever been a passenger in a --
18  had you ever been a passenger in a car before
19  the day Douglas took you to Bel Air?
20      A.     Yes.
21      Q.     Whose car had you driven in?
22      A.     Coming from Saint Raphaël going to
23  Cap-Haïtien.
24      Q.     Whose car was that?
25      A.     People that are doing the route.  I
```

Confidential - Subject to Further Confidentiality Review

Page 78

1    pay for that.

2        Q.    You're talking about bus?

3        A.    Yes.

4        Q.    I'm talking about an automobile,

5    passenger automobile.  Had you ever ridden in a

6    passenger automobile before the day Doug Perlitz

7    drove you to Bel Air?

8        A.    What do you mean?

9        Q.    Do you know the difference between an

10   automobile and a bus?

11       A.    No.

12       Q.    Did Douglas have an automobile?

13       A.    Yes.

14       Q.    Was it a bus?

15       A.    No.

16       Q.    Had you ever been in an automobile

17   similar to Douglas's automobile before he took

18   you to Bel Air?

19       A.    No.

20       Q.    That was your first ride in a car?

21       A.    Yes.

22       Q.    After Douglas drove through the gate,

23   what happened?

24       A.    He went into the yard, we got out of

25   the car into the yard, and then we walked

Confidential - Subject to Further Confidentiality Review

Page 79

```
 1    inside.
 2         Q.    Had there been any talk about why you
 3    were going to Bel Air up to that point?
 4         A.    No.
 5         Q.    Why didn't you ask him?
 6         A.    I didn't think about it.
 7         Q.    You weren't curious at all?
 8         A.    No.
 9         Q.    So you had never talked to Douglas
10    before personally, correct?
11         A.    Before what?
12         Q.    Before that day you'd never had a
13    conversation with Douglas, isn't that what you
14    told us?
15         A.    Yes.
16         Q.    You had never ridden in an automobile
17    before?
18         A.    No.
19         Q.    Douglas calls you over, someone you
20    had never actually spoken with?
21         A.    Yes.
22         Q.    Told you to get in a car?
23         A.    Yes.
24         Q.    Didn't tell you why he asked you to
25    get in the car?
```

Confidential - Subject to Further Confidentiality Review

Page 80

```
1        A.    No.

2        Q.    And you got in the car?

3        A.    Yes.

4        Q.    And you rode to Bel Air?

5        A.    Yes.

6        Q.    And you have no idea how long it took

7   you to get there?

8        A.    No.

9        Q.    And all that time, whatever time it

10  was that you were in the car with Douglas, you

11  don't remember a thing that either he said to

12  you or you said to him?

13       A.    Yes.

14       Q.    And you never asked him why you were

15  going to Bel Air?

16       A.    No.

17       Q.    And you weren't the least bit curious

18  as to why you were going to Bel Air?

19       A.    No.

20       Q.    That's what you want to leave it with?

21  That's what you want to tell this jury?

22            MS. POLLOCK:  Objection.

23  Argumentative, vague.

24       A.    What do you mean?  Explain.

25  BY MR. GAYNOR:
```

Confidential - Subject to Further Confidentiality Review

Page 81

```
 1      Q.     That's your testimony here today under
 2   oath?
 3      A.     That's what you asked me.
 4      Q.     Now, did you go into the house?
 5      A.     Yes.
 6      Q.     How did you get into the house?
 7      A.     They opened the door.
 8      Q.     Which door?
 9      A.     The door to the house.
10      Q.     Was there more than one door?
11      A.     Yes.
12      Q.     Could you describe that door and the
13   entranceway into the house?
14             MS. POLLOCK:  Objection.  Vague.
15             Do you mean the door he actually
16   entered, or any of the doors?
17   BY MR. GAYNOR:
18      Q.     The door you entered, could you
19   describe it for us?
20      A.     They just opened the door, I walked
21   through it.
22      Q.     Was it on the same level as the yard?
23      A.     I don't remember.
24      Q.     Did you have to go upstairs to get to
25   the door?
```

Confidential - Subject to Further Confidentiality Review

Page 82

 1        A.    I don't remember.

 2        Q.    Did you have to go downstairs to get

 3   to the door?

 4        A.    I don't remember.

 5        Q.    Was there more than one door that you

 6   saw to get into the house?

 7        A.    Yes.

 8        Q.    Did Douglas open the door?

 9        A.    Yes.

10        Q.    Did you follow him in?

11        A.    Yes.

12        Q.    And up to this point, you still had

13   not had any discussion with Douglas as to why

14   you were there?

15        A.    No.

16        Q.    When you got through the door, what

17   room -- what kind of room were you in?

18        A.    We went into a room in the house.

19        Q.    What kind of room was it?

20        A.    A room with a bed.

21        Q.    So was it a bedroom?

22        A.    Yes.

23        Q.    What happened when you walked into

24   that room?

25        A.    When we got in, he started touching

Confidential - Subject to Further Confidentiality Review

Page 83

1    me, and I did not agree, and he started

2    threatening me, tell me that if I don't agree,

3    if I don't accept, I will not be able to stay at

4    the Village.  That's when I said "well, why did

5    you bring me here?"  And then he pulled my pants

6    down.  And I didn't want to, I didn't want to.

7    And as I was crying, he pulled down my pants,

8    and then he penetrated me with his penis in my

9    rear.

10        Q.    How long did that take from the first

11   time he touched you to the time he finished?

12        A.    I don't remember.

13        Q.    What did you say to him when he

14   started to touch you?

15        A.    I told him no.

16        Q.    Where did he start to touch you?

17        A.    My rear end.

18        Q.    Was that before or after he pulled

19   your pants down?

20        A.    Before.

21        Q.    Was that immediately after you entered

22   the room?

23        A.    What did you say?

24        Q.    Was that right after you entered the

25   room that he started to touch you?

Confidential - Subject to Further Confidentiality Review

Page 84

1            MS. POLLOCK:  Objection.  Vague.

2       A.    After a little while.

3   BY MR. GAYNOR:

4       Q.    What did you do before he started to

5   touch you?

6       A.    He didn't do anything else.

7       Q.    So how long was it from the time you

8   entered the room until he started to touch you?

9       A.    Not a long time.

10      Q.    Minutes, hours, days?

11      A.    Minutes.

12      Q.    And what did you do for the minutes

13  before he started to touch you?

14      A.    I didn't do anything.

15      Q.    Did he say anything to you before he

16  started to touch you?

17      A.    No.

18      Q.    Did you have any conversation with him

19  before he started to touch you?

20      A.    No, I didn't say anything.

21      Q.    Was the door open or closed?

22      A.    It was closed.

23      Q.    Was it locked or unlocked?

24      A.    Yes.

25      Q.    Was it locked or unlocked, if you

Confidential - Subject to Further Confidentiality Review

Page 85

1    know?

2         A.    I don't know.  I don't remember that.

3         Q.    What else was in the room besides a

4    bed?

5         A.    I don't remember.

6         Q.    Did you ever see anybody else other

7    than the gatekeeper at the house from the time

8    you got there to the time you left?

9         A.    No.

10        Q.    Did you try to fight him off?

11        A.    I told him "no," but when he said

12   that, I had to accept.

13        Q.    So he told you that if you didn't

14   comply you would be kicked out of the Village,

15   is that more or less what he told you?

16             MS. POLLOCK:  Objection.  Vague.

17        A.    Yes.

18   BY MR. GAYNOR:

19        Q.    Why didn't you just leave?

20        A.    I didn't want them to kick me out of

21   the Village.

22        Q.    So rather than be kicked out, be

23   threatened with -- strike that.

24             How long did -- how long was Douglas

25   touching you and having this abuse?

Confidential - Subject to Further Confidentiality Review

Page 86

```
 1              MS. POLLOCK:  Objection.  Asked and
 2    answered.
 3              You can answer if you can.
 4        A.    I don't remember how long.
 5    BY MR. GAYNOR:
 6        Q.    Minutes, days, hours?
 7        A.    I don't remember how long.
 8        Q.    Did he penetrate your rectum?
 9        A.    Yes.
10        Q.    Did he ejaculate?
11        A.    I don't know.
12        Q.    What happened after he finished?
13        A.    He pulled up his pants, he pulled up
14    my pants, we left.
15        Q.    You left the room?
16        A.    Yes.
17        Q.    You got back in the car?
18        A.    Yes.
19        Q.    Did the security guard open the gate?
20        A.    Yes.
21        Q.    Did you see anybody else there?
22        A.    No.
23        Q.    Did he drive you back to the Village?
24        A.    Yes.
25        Q.    Did you have any conversation in the
```

Confidential - Subject to Further Confidentiality Review

Page 87

1    car on the way back?

2        A.    No.

3        Q.    It was just silence?

4        A.    Yes.

5        Q.    When you drove back -- when he drove

6    you back to the Village, did he let you out?

7        A.    Yes.

8        Q.    Did he say anything to you, or did you

9    say anything to him?

10       A.    He told me not to tell anyone.

11       Q.    Did you tell anybody?

12             MS. POLLOCK:  Objection.

13             I'm going to remind the witness not to

14   disclose any conversations you've had with your

15   counsel.

16   BY MR. GAYNOR:

17       Q.    I'm not interested in what you've said

18   to your lawyers later.  I'm talking about right

19   after this happened, did you tell anybody?

20       A.    No.

21       Q.    So the first person you ever said this

22   to was years later to Johnson, is that right?

23       A.    Yes.

24       Q.    And no one ever told you or you never

25   heard any rumors about Doug Perlitz before you

Confidential - Subject to Further Confidentiality Review

Page 88

1    had that conversation with Johnson?

2         A.    Can you repeat it again?

3         Q.    No one ever told you, or you never

4    heard any rumors about Doug Perlitz before you

5    had that conversation with Johnson?

6         A.    Yes.

7         Q.    Now, did you go back to your normal

8    routine at the Village?

9              MS. POLLOCK:  Objection.  Vague.

10        A.    What do you mean?

11   BY MR. GAYNOR:

12        Q.    Did you go back to attending school

13   every day?

14        A.    Yes.

15        Q.    Showed up in the morning?

16        A.    Yes.

17        Q.    You never told your parents?

18        A.    No.

19        Q.    You never told your brothers and

20   sisters?

21        A.    No.

22        Q.    You never told Nicholas?

23        A.    No.

24        Q.    And did you have any physical problems

25   after this happened?

Confidential - Subject to Further Confidentiality Review

Page 89

```
 1        A.    Yes.

 2        Q.    What problems did you have?

 3        A.    I was bleeding.

 4        Q.    How long were you bleeding?

 5        A.    Two days.

 6        Q.    Did you go to the hospital?

 7        A.    No.

 8        Q.    Did you go to a doctor?

 9        A.    No.

10        Q.    Did you get any medical care at all?

11        A.    No.  I just put some alcohol on it.

12        Q.    Where did you get the alcohol?

13        A.    He gave it to me.

14        Q.    Who?

15        A.    Douglas.

16        Q.    When was that?

17        A.    The same day.

18        Q.    So after this happened, Douglas gave

19   you alcohol?

20        A.    Yes.

21        Q.    And where did you put the alcohol?

22        A.    I put it on the wound.

23        Q.    What did that feel like?

24              MS. POLLOCK:  Objection.  Vague.

25        A.    It burned.
```

Confidential - Subject to Further Confidentiality Review

Page 90

1    BY MR. GAYNOR:

2        Q.    Is that the only time you put anything

3    on it?

4        A.    Yes.

5        Q.    Did you speak to Douglas any time

6    after that?

7        A.    No.

8        Q.    Okay.  So when was the next time you

9    had any dealings with Douglas?

10            MS. POLLOCK:  Objection.  Vague.

11   Objection.  Vague.

12            You can answer if you understand.

13       A.    I don't remember exactly the time, the

14   when or the time.

15   BY MR. GAYNOR:

16       Q.    Did you ever have any further

17   conversation, or did you ever -- strike that.

18            Did you ever meet up with Douglas

19   again?

20       A.    Yes.

21       Q.    When is the next time you met up with

22   Douglas?

23       A.    The second time he went with me.

24       Q.    How long after the first time was

25   that?

Confidential - Subject to Further Confidentiality Review

Page 91

 1            THE INTERPRETER:  I'm sorry,
 2    Counselor.
 3        A.    I don't remember.
 4        Q.    Days, weeks, months?
 5        A.    I don't remember.
 6        Q.    No idea?
 7        A.    No.
 8        Q.    So this event that happened to you was
 9    a significant event, correct?
10            MS. POLLOCK:  Objection.  Vague.
11            You can answer if you understand.
12            Can you translate that?
13        A.    I can't even explain it to you.
14    BY MR. GAYNOR:
15        Q.    Was that about the worst thing that
16    had ever happened to you?
17        A.    Yes.
18        Q.    You're telling us in this testimony
19    here today that Douglas raped you, correct?
20        A.    Yes.
21        Q.    That was a terrible thing?
22        A.    Yes.
23        Q.    Something that you would remember?
24            MS. POLLOCK:  Objection.
25    Argumentative.

Confidential - Subject to Further Confidentiality Review

Page 92

1        A.    Yes.

2    BY MR. GAYNOR:

3        Q.    And you can't tell us when the next

4    time Douglas approached you?

5              MS. POLLOCK:  Objection.  Asked and

6    answered.

7        A.    I don't remember when.

8    BY MR. GAYNOR:

9        Q.    Okay.  What were the circumstances?

10             MS. POLLOCK:  Objection.  Vague.

11       A.    What do you mean?  Explain it to me.

12   BY MR. GAYNOR:

13       Q.    Where did you next see Douglas when

14   you had some interaction with him?

15       A.    I always see him around in the

16   Village.

17       Q.    When is the next time you actually

18   spoke to him personally?

19       A.    The second time.

20       Q.    Okay.  Where were you when that

21   happened?

22       A.    At the Village.

23       Q.    Where were you?

24       A.    Where did I meet him?

25       Q.    Yes.  Where were you when you had --

Confidential - Subject to Further Confidentiality Review

Page 93

1    the second time?

2         A.    At the Village.

3         Q.    Were you in the yard?

4         A.    Yes.

5         Q.    Same place you were the first time it

6    happened?

7         A.    No.

8         Q.    Where were you?

9         A.    At the Village itself.

10        Q.    Okay.  Were you in the yard?

11        A.    Yes.

12        Q.    Was that the same yard you were in

13   when Douglas called you over to his car the

14   first time?

15        A.    Yes.

16        Q.    Was he in his car?

17        A.    No.

18        Q.    Where was he?

19        A.    He was in the yard.

20        Q.    Did he come over to you?

21        A.    Yes.

22        Q.    Was there anybody else around?

23        A.    There were people in the yard, but

24   they were not close.

25        Q.    Can you name any one student that was

Confidential - Subject to Further Confidentiality Review

Page 94

1    in the yard close enough to hear what you were

2    saying?

3         A.    I wasn't following -- I wasn't looking

4    for -- I wasn't watching that, or following

5    that.

6         Q.    After the first time this happened,

7    did you try to stay away from Douglas?

8         A.    Yes.

9         Q.    Did Douglas come over to you in the

10   yard this second time?

11        A.    Yes.

12        Q.    When he started to come over, did you

13   stay there, or did you try to run away?

14        A.    I was sitting down.  I stayed where I

15   was.

16        Q.    You were sitting down?

17        A.    Yes.

18        Q.    Where were you sitting?

19        A.    Under a tree.

20        Q.    Douglas walked up to you?

21        A.    Yes.

22        Q.    Were you sitting there with anybody

23   else?

24        A.    No.

25        Q.    What time of day was it?

Confidential - Subject to Further Confidentiality Review

Page 95

1      A.    I don't remember.

2      Q.    Was it before school, after school,

3  during school?

4            MS. POLLOCK:  Objection.  Compound.

5      A.    I don't remember.

6  BY MR. GAYNOR:

7      Q.    So just like the first time, you don't

8  have a clue, you don't have a memory of what

9  time of day it was, or what school -- what

10  things were happening at school?

11            MS. POLLOCK:  Objection.  Vague,

12  compound, mischaracterizes the witness's

13  testimony.

14  BY MR. GAYNOR:

15      Q.    Am I correct, sir, that you do not

16  have any idea what time of day it was or what

17  activities were going on at school at the time

18  Douglas approached you while you were sitting on

19  the ground under the tree?

20      A.    No.

21      Q.    What did he say to you?

22      A.    He said if I don't remember the time

23  or what activities was going on at school --

24      Q.    No.  What did Douglas say to you when

25  he came over to you when you were sitting under

Confidential - Subject to Further Confidentiality Review

Page 96

1    the tree?

2        A.    He told me "we're going to Bel Air."

3        Q.    And what did you say to him?

4        A.    I didn't say anything.

5        Q.    Did you tell him "no, I don't want to

6    go"?

7        A.    No, I can't.

8        Q.    Did you try to walk away?

9        A.    Yes.

10       Q.    Yes what?

11       A.    I walked, I walked ahead.

12       Q.    No.  Did you try to walk away from

13   Douglas when he asked you to -- when he told you

14   you were going to Bel Air with him?

15       A.    No.

16       Q.    You had already had one horrible

17   experience with Douglas at Bel Air, correct?

18       A.    Yes.

19       Q.    When Douglas came to you the second

20   time and told you you were going to go to Bel

21   Air with him, you knew that that was going to be

22   a problem?

23            MS. POLLOCK:  Objection.  Vague.

24       A.    Yes.

25   BY MR. GAYNOR:

Confidential - Subject to Further Confidentiality Review

Page 97

1      Q.    You knew what he intended?

2      A.    Yes.

3      Q.    And you went along with him?

4      A.    Yes.

5      Q.    So did you get into his car?

6      A.    Yes.

7      Q.    And he drove you to Bel Air?

8      A.    Yes.

9      Q.    How long did it take you to get there?

10     A.    I don't remember.

11     Q.    What time of day was it?

12           MS. POLLOCK:  Objection.  Asked and

13     answered.

14     A.    I don't remember.

15  BY MR. GAYNOR:

16     Q.    Was it daylight?

17     A.    Yes.

18     Q.    Do you know if any of your fellow

19  classmates saw you go off with him?

20     A.    People must have seen me, but I didn't

21  think that anybody would think anything of it.

22     Q.    Did anybody ever ask you after you

23  came back from both of these occasions what you

24  were doing with Douglas?

25     A.    No.

Confidential - Subject to Further Confidentiality Review

1      Q.    When you got to Bel Air, was there a
2   guard at the gate?
3      A.    Yes.
4      Q.    Did he drive in?
5      A.    Yes.
6      Q.    Was it the same vehicle?
7      A.    Yes.
8      Q.    Do you remember the color?
9      A.    No.
10      Q.    Do you remember whether there was two
11   doors or four doors?
12      A.    No.
13      Q.    Do you remember if it was a hard top
14   or --
15            MS. POLLOCK:  Let everyone have a
16   chance to finish what they're saying, please.
17            THE INTERPRETER:  For the prior
18   question, no.  About the doors, no.
19   BY MR. GAYNOR:
20      Q.    Do you remember if it was two doors or
21   four doors?
22      A.    I don't remember.
23      Q.    Do you remember if it was a
24   convertible or a hard top?
25      A.    I don't remember.

Confidential - Subject to Further Confidentiality Review

 1      Q.    Was there anybody else in the vehicle
 2   with you and Douglas?
 3      A.    No.
 4      Q.    Were you in the front seat, or the
 5   back seat?
 6      A.    Front seat.
 7      Q.    When you got to Bel Air and Douglas
 8   drove into the yard, did you go through the same
 9   door to get in?
10      A.    Yes.
11      Q.    Was it on the level of the yard, or
12   was it up or down?
13      A.    I don't remember.
14            THE VIDEOGRAPHER:  I need to change.
15            MS. POLLOCK:  Do we want to take --
16   we've been going an hour, do you want to take
17   another --
18            MR. GAYNOR:  Sure.
19            MS. POLLOCK:  -- break?
20            THE VIDEOGRAPHER:  Going off the
21   record.  The time is 11:25.
22            (Whereupon, a recess was taken.)
23            THE VIDEOGRAPHER:  Back on the record.
24   The time is 11:43.
25   BY MR. GAYNOR:

Confidential - Subject to Further Confidentiality Review

                                                    Page 100

 1      Q.    Mr. Bernard, before I forget, in the
 2   course of this litigation you were asked to fill
 3   out some written questions called
 4   interrogatories, and I'm going to show you
 5   Exhibit 1 that we've marked which would be the
 6   answers that you prepared in both English and
 7   translated into Creole.
 8            Would you mind taking a look at that,
 9   please?
10            MS. POLLOCK:  Do you have a copy for
11   me?
12            MR. GAYNOR:  That's the exhibit.
13            MS. POLLOCK:  I know.  Do you have a
14   courtesy copy for counsel?
15            MR. GAYNOR:  I don't have an extra one
16   here, I'm sorry.  You can use that one.
17            MS. POLLOCK:  Thank you.
18            (Whereupon, Bernard Exhibit Number 1,
19            Plaintiff Dieu-Dabel Bernard's
20            Response to Certain Defendants' First
21            Set of Interrogatories, was marked for
22            identification.)
23      A.    Okay.
24   BY MR. GAYNOR:
25      Q.    Do you remember answering some written

Confidential - Subject to Further Confidentiality Review

Page 101

1    questions?

2        A.    Yes.

3        Q.    And you understood those were an

4    important document in your case?

5        A.    Can you repeat it again?

6        Q.    You understood that that was an

7    important document?

8        A.    Yes.

9        Q.    And you understood that you were

10   answering those questions under oath?

11       A.    Yes.

12       Q.    And you understood that the answers

13   you gave had to be truthful to the best of your

14   knowledge?

15       A.    Yes.

16       Q.    And if I could refer you, sir, to the

17   last page, I believe it's the last page in

18   Exhibit 1, and you will see that at the end of

19   the written questions there is a signature line.

20   Yes?

21       A.    Yes.

22       Q.    And that's your signature there?

23       A.    Yes.

24       Q.    And when you signed that, you attested

25   to the fact that the answers you had provided

Confidential - Subject to Further Confidentiality Review

Page 102

1    were true to the best of your knowledge?

2        A.    Yes.

3        Q.    Thank you.  We're done with that for

4    now.

5              Now, I think before the break we were

6    discussing the second occurrence with Douglas

7    Perlitz when he again asked you to come with him

8    to Bel Air, and you had gotten to the point, I

9    think, of going into the house.

10             And once you got into the house with

11   Doug Perlitz, was it the same room that you had

12   been in once before?

13       A.    Yes.

14       Q.    And you had not been there -- you had

15   not been there other than the first time, that's

16   correct?

17       A.    Yes, just the first time.

18       Q.    And what happened now the second time

19   when you got into the room with Mr. Perlitz?

20       A.    I went into the room with him, and

21   once again he put his penis in my rear end.

22       Q.    Did he just -- well, can you tell us

23   exactly what he did?

24             MS. POLLOCK:  Objection.  Vague.

25       A.    He asked me to put my hands on the

Confidential - Subject to Further Confidentiality Review

Page 103

1    bed, my feet are on the ground, and then he

2    entered me with his penis.

3        Q.    Did he say anything to you when you

4    were in the room before this happened?

5        A.    What did you say?

6        Q.    Did he say anything to you before he

7    -- before he had his penis into your rectum?

8        A.    Yes, he told me to pull my pants down.

9        Q.    Did he say anything else?

10       A.    He said to put my hands on the bed.

11       Q.    Was there any conversation on the ride

12   over?

13       A.    No.

14       Q.    There was none, or you just don't

15   remember what it was?

16       A.    I didn't say anything to him.

17       Q.    Did he say anything to you on the ride

18   over?

19       A.    No.

20       Q.    So there was just silence between the

21   two of you for the whole ride?

22       A.    Yes.

23       Q.    And you don't know how long that ride

24   was?

25            MS. POLLOCK:  Objection.  Asked and

Confidential - Subject to Further Confidentiality Review

Page 104

1    answered.

2        A.    No.

3    BY MR. GAYNOR:

4        Q.    And you knew what was going to happen

5    once you got there, didn't you?

6            MS. POLLOCK:  Objection.

7    Argumentative, asked and answered.

8        A.    If I knew what was going to happen to

9    me the second time?

10   BY MR. GAYNOR:

11       Q.    Yes.

12       A.    Yes.

13       Q.    How long did it last that Mr. Perlitz

14   had this encounter with you?

15           MS. POLLOCK:  Objection.  Vague.

16       A.    I don't remember.

17   BY MR. GAYNOR:

18       Q.    Was there any other touching that went

19   on other than when he put his penis into your

20   rectum?

21       A.    Yes.

22       Q.    What was that?

23       A.    My penis.

24       Q.    Who did what to whom?

25       A.    I don't understand.

Confidential - Subject to Further Confidentiality Review

Page 105

1      Q.    What did he do to you from the time

2   you went into the room until the time you left

3   the room?

4      A.    He put his penis in my rectum.

5      Q.    Okay.  Did he do anything else to you?

6      A.    No.

7      Q.    Did he say anything to you, other than

8   put your hands on the bed?

9            MS. POLLOCK:  Objection.  Asked and

10   answered, mischaracterizes the witness's

11   previous testimony.  Go ahead.

12      A.    He told me to pull my pants down.

13   BY MR. GAYNOR:

14      Q.    Other than telling you to pull your

15   pants down, put your hands on the bed, did he

16   say anything else to you?

17            MS. POLLOCK:  Objection.  Asked and

18   answered.

19      A.    No.

20   BY MR. GAYNOR:

21      Q.    When he was done, did he say anything

22   to you?

23      A.    He told me not to tell anyone.

24      Q.    Was that the same thing he said the

25   first time?

Confidential - Subject to Further Confidentiality Review

Page 106

1      A.    Yes.

2      Q.    Did you say anything back to him?

3      A.    I didn't say anything.

4      Q.    So the whole way from the time you

5   left the Village to the time you left his house,

6   you didn't say anything to him?

7      A.    No.

8      Q.    After he finished, what happened?

9            MS. POLLOCK:  Objection.  Vague.

10     A.    He pulled up his pants.

11   BY MR. GAYNOR:

12     Q.    Were you in physical pain?

13     A.    Yes.

14     Q.    What did you do about it?

15     A.    I didn't do anything.

16     Q.    Did you use alcohol again?

17     A.    No, not the second time.

18     Q.    Did you then leave the house?

19     A.    Yes.

20     Q.    How long were you in the house?

21     A.    I don't remember.

22     Q.    Did you get into the car?

23     A.    Yes.

24     Q.    Did he drive you back?

25     A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 107

1      Q.    How long did it take to get back?

2      A.    I don't know.

3      Q.    Did you recognize the route?

4      A.    Yes.

5      Q.    What route was it?

6            MS. POLLOCK:  Objection.  Vague.

7      A.    The route to go from Bel Air to go to

8   the Village.

9   BY MR. GAYNOR:

10     Q.    What was that route?  What are the

11  names of the streets?

12     A.    I don't remember.

13     Q.    Had you ever been on that route

14  before, other than with Mr. Perlitz in his car?

15     A.    The road to go to Bel Air?

16     Q.    Yes.

17     A.    No.

18     Q.    Those are the only two times you'd

19  ever been over those roads?

20     A.    Yes.

21     Q.    Do you remember any of the route

22  signs, the names of the roads?

23            MS. POLLOCK:  Objection.  Asked and

24  answered, and compound.

25     A.    No.

Confidential - Subject to Further Confidentiality Review

Page 108

 1    BY MR. GAYNOR:

 2        Q.    What happened when you got back to the

 3    Village?

 4        A.    I went back to the Village.  After a

 5    little while I left, I went home.

 6        Q.    Was this still during the day?

 7        A.    Yes, but it started to get dark this

 8    time.

 9        Q.    Did any of your teachers ask you where

10    you'd been?

11        A.    No.

12        Q.    Did any of your teachers ask you where

13    you'd been the first time?

14        A.    No.

15        Q.    Did any of your classmates ask you

16    where you'd been?

17        A.    No.

18        Q.    Did any of your classmates ask you

19    where you'd been the first time?

20        A.    No.

21        Q.    Did any of your classmates tell you

22    that they had seen you drive off with Doug

23    Perlitz?

24        A.    They didn't say anything to me.

25        Q.    Did you tell anybody after the second

Confidential - Subject to Further Confidentiality Review

Page 109

1    time where you'd been?

2         A.    No, I didn't tell anyone.

3         Q.    When is the next time you met up with

4    Doug Perlitz?

5         A.    I see him in the Village.

6         Q.    Did you speak to him?

7         A.    No.

8         Q.    Did he speak to you?

9         A.    The second time he spoke to me.

10        Q.    No.  After the second time that Doug

11   Perlitz raped you, according to your testimony,

12   did you ever speak to him again?

13        A.    After?

14        Q.    Yes, after.

15        A.    The next day.

16        Q.    The next day?

17        A.    The next day.

18        Q.    What did he say to you?

19        A.    He showed up and he handed me 30

20   Haitian dollars.

21        Q.    Did he say what it was for?

22        A.    No.

23        Q.    Had you asked him for money?

24        A.    No.

25        Q.    What did you do with the money?

Confidential - Subject to Further Confidentiality Review

Page 110

 1      A.    I don't remember what I did with the
 2  money.
 3      Q.    Did you buy anything?
 4      A.    Probably.
 5      Q.    Were you surprised that he gave you
 6  the money?
 7      A.    I didn't think of anything.
 8      Q.    Did he say anything else to you?
 9      A.    No.
10      Q.    Where were you when he gave you the
11  money?
12      A.    At the Village.
13      Q.    Where?
14      A.    Inside in the yard.
15      Q.    In the yard again?
16      A.    Yes.
17      Q.    What time of day was it?
18      A.    I don't remember.
19      Q.    Was it before, during, or after
20  school?
21      A.    I don't remember what time it was.
22      Q.    Did anybody see him, to your
23  knowledge, did anybody see him give you the
24  money?
25      A.    No.

Confidential - Subject to Further Confidentiality Review

Page 111

1      Q.    Had you ever heard of Doug Perlitz
2   giving any other students money?
3      A.    No.
4      Q.    Did you tell anybody that Doug Perlitz
5   gave you money?
6      A.    No.
7      Q.    Did you tell your parents Doug Perlitz
8   give you money?
9      A.    No.
10     Q.    Any of your brothers or sisters, did
11   you tell them that Doug Perlitz had given you
12   money?
13     A.    No.
14     Q.    Did you tell Johnson that Doug Perlitz
15   gave you money?
16     A.    No.
17     Q.    Did you see Doug Perlitz again after
18   he gave you the money?
19     A.    I always see him.
20     Q.    Did you have any discussion or
21   conversation with him at any time after he gave
22   you the money?
23     A.    No.
24     Q.    So that was the last time you had any
25   direct conversation with him?

Confidential - Subject to Further Confidentiality Review

Page 112

1       A.      Yes.

2       Q.      You had no medical treatment after the

3    second event, correct?

4       A.      No.

5       Q.      Did they have a nurse or a doctor at

6    the Village?

7       A.      No.

8       Q.      There was no one there to provide

9    medical care for students at the Village?

10      A.      If -- sometimes if you have a wound,

11   they would put a Band-aid, a little Band-aid on

12   it.

13      Q.      Who would do that?

14      A.      Anybody would do that.  Because one

15   day I was playing soccer and I hurt my --

16   injured myself, I had a cut, and Brittany put

17   something on it for me.

18      Q.      Who was Brittany?

19      A.      A lady.

20      Q.      Was she a teacher?

21      A.      No.

22      Q.      Well, what was her role there?

23      A.      I don't know what her role was.

24      Q.      Was she an adult?

25              THE INTERPRETER:  Excuse me.

Confidential - Subject to Further Confidentiality Review

Page 113

1    A.    She's not old, she's not young.

2    Q.    Was she a student?

3    A.    No.

4    Q.    Did she work at the Village?

5    A.    Yes.

6    Q.    Do you know what her job was?

7    A.    Somebody that was there, like -- I
8    don't know what she was doing there exactly.

9    Q.    But you don't know if they had a nurse
10   or somebody that would attend to kids that were
11   injured or ill?

12   A.    No.

13   Q.    And you never sought out any medical
14   attention as a result of Doug Perlitz?

15   A.    No.

16   Q.    To this day have you ever sought any
17   kind of medical attention, or mental health
18   counseling, or any other type of counseling, as
19   a result of what Doug Perlitz did to you?

20   A.    No.

21   Q.    How many more weeks was it until the
22   end of that year after Doug Perlitz assaulted
23   you the second time?

24         MS. POLLOCK:  Do you mean -- you can
25   tell him after the speaking.

Confidential - Subject to Further Confidentiality Review

Page 114

```
 1              Do you mean school year or calendar
 2    year?
 3              MR. GAYNOR:  School year.
 4    BY MR. GAYNOR:
 5       Q.    How many more weeks did you attend
 6    school after the second episode with
 7    Mr. Perlitz?
 8       A.    I don't remember.  I don't remember.
 9       Q.    You can't tell if it was days, weeks,
10    months?
11       A.    No.
12       Q.    Did you continue to go to class?
13       A.    Yes.
14       Q.    Did you show up every day and go to
15    class?
16       A.    Yes.
17       Q.    Did the school close down for the
18    summer?
19       A.    I don't remember that.
20       Q.    Was there a time when you would leave
21    the school on a vacation?
22       A.    No, they give us a little time off,
23    but I never went on vacation anywhere, I always
24    stayed around.
25       Q.    But at some point was the school
```

Confidential - Subject to Further Confidentiality Review

Page 115

1  closed for vacation?

2      A.    Yes.

3      Q.    Do you remember when that was?

4      A.    I remember when it closed we were on

5  vacation, and that's the way it happened.

6      Q.    Did the school reopen?

7      A.    No.

8      Q.    So you finished out that school year,

9  is that correct?

10     A.    Yes.

11     Q.    And then you left on vacation?

12     A.    Yes.

13     Q.    And then you never went back?

14     A.    They never opened again.

15     Q.    So you never went back?

16     A.    No.

17     Q.    Did you ever go back -- after you left

18 for vacation and the school closed, did you ever

19 go back to where the Village was?

20     A.    Inside, no.

21     Q.    Did you ever go around the outside at

22 any time after the school closed?

23     A.    Yes, that's where I am.

24     Q.    I'm not following.

25     A.    I live in the same area.

Confidential - Subject to Further Confidentiality Review

Page 116

```
1       Q.    So you would walk by the Village, the
2   outside of the Village from time to time because
3   you lived near there?
4       A.    Yes.
5       Q.    Did you ever try to find out why the
6   Village didn't open up again after vacation?
7       A.    Yes.
8       Q.    Who did you ask?
9       A.    I knew.
10      Q.    Well, how did you know?  Did someone
11  tell you?
12      A.    There were a lot of rumors around.
13      Q.    Okay.  When you left for vacation, did
14  you know that the school was going to close?
15      A.    No.
16      Q.    When did you learn officially that the
17  school was not going to reopen so that you
18  couldn't come back?
19            MS. POLLOCK:  Objection.  Vague.
20      A.    After the vacation.
21  BY MR. GAYNOR:
22      Q.    Who told you?
23      A.    I heard rumors on the street.
24      Q.    Okay.  Rumors on the street.  I asked
25  you if there was someone connected with the
```

Confidential - Subject to Further Confidentiality Review

Page 117

1   school that either got hold of you or your

2   parents and told you that you weren't coming

3   back because the school was closing.

4           MS. POLLOCK:  Objection.  Vague,

5   mischaracterizes the record.

6       A.    Aside from the rumors, rumors about

7   Perlitz, it was all over town, I knew the school

8   was not going to reopen.

9   BY MR. GAYNOR:

10      Q.    What rumors did you hear?

11      A.    I heard everything.  I heard that

12  Perlitz was abusing all the kids at the Village.

13      Q.    This was after you left the school on

14  vacation?

15      A.    Yes.

16      Q.    Is this the first time you heard that?

17      A.    Yes.

18      Q.    Who did you hear the rumors from?

19      A.    I don't remember the names of the

20  people exactly, but everybody knows that.

21      Q.    Can you name one person that told you

22  these rumors?

23      A.    No.

24      Q.    And what is it exactly that you heard?

25      A.    Perlitz is abusing the kids at the

Confidential - Subject to Further Confidentiality Review

Page 118

1    Village.

2        Q.    Okay.  Did you hear anything about the

3    Village -- that the Village was going to close?

4        A.    I don't understand.

5        Q.    Well, when vacation time was over, did

6    you go back to the Village expecting to go to

7    school?

8        A.    I didn't think that, because I knew it

9    wasn't going to reopen.

10       Q.    How did you know that?  You heard

11   rumors about Doug Perlitz, but how did you hear

12   that the school wasn't going to reopen?

13       A.    Because I heard that because of Doug

14   the school would not reopen.

15       Q.    But you can't tell us one person that

16   told you that?

17       A.    No.

18       Q.    Okay.  Did anybody at that -- when you

19   heard the rumors and whoever was telling you

20   about these rumors, did they tell you that they

21   had been abused?

22       A.    No.

23       Q.    And when you heard the rumors that

24   Doug Perlitz had abused kids and the school was

25   going to close, did you tell anybody about what

Confidential - Subject to Further Confidentiality Review

Page 119

1    happened to you?

2        A.    No, I didn't tell anyone, but every

3    time I walked by somebody would say "here's

4    Douglas's gays."

5        Q.    Every time you walked by where?

6        A.    Wherever I walk, because everybody

7    knew about it.

8        Q.    Everybody.  Name one person by name

9    that commented to you "here comes one of

10    Douglas's guys," or words to that effect?

11        A.    I can't remember who.

12        Q.    What did you do after you found out

13    that the school was going to close?

14        A.    What did I do?

15        Q.    Yes.

16        A.    I came to the Dominican Republic.

17        Q.    Was there any other school you could

18    have gone to?

19        A.    I didn't have any money to pay.

20        Q.    In Haiti do the children have to pay

21    for school?

22        A.    Yes.

23        Q.    Did you try to find out if there was

24    anybody at the government that would pay for

25    children to go to school?

Confidential - Subject to Further Confidentiality Review

Page 120

1      A.    No, I didn't.  I didn't know that.

2      Q.    And I think you told us what happened

3    in the Dominican Republic earlier in our

4    deposition?

5      A.    Yes, I told you what happened.

6      Q.    Okay.  When did you first hear that

7    there was some lawsuits or claims being fueled

8    by other students in connection with what Doug

9    Perlitz had done?

10          MS. POLLOCK:  I want to instruct the

11    witness the question is when did you first hear,

12    and remind you not to disclose any conversations

13    you've had with your attorneys, or conversations

14    that you've had with Cyrus or anybody else.

15          MR. GAYNOR:  I'm reserving any rights

16    here about conversations with Cyrus.  I don't

17    know why Cyrus gets some privileged

18    communication.  But we'll reserve those rights.

19          I'm asking the witness when he first

20    found out or heard about any -- whether it was

21    rumor or anything else, about lawsuits being

22    filed regarding what Doug Perlitz's activities

23    were, please, other than from your attorneys,

24    and I'm not excluding Cyrus.

25          MS. POLLOCK:  Go ahead.  Then I'll

Confidential - Subject to Further Confidentiality Review

Page 121

 1    make my objection, please.

 2              And again, I'm reminding you he's

 3    asking you when, and reminding you not to

 4    disclose any conversations that you've had with

 5    counsel or confidential conversations with

 6    Cyrus.

 7        A.    Can you repeat it for me, please?

 8    BY MR. GAYNOR:

 9        Q.    When did you first hear that there

10    were some lawsuits being filed in connection

11    with the activities of Doug Perlitz?

12        A.    When I came back from the Dominican

13    Republic.

14        Q.    And when was that, what year?

15        A.    I don't remember.

16        Q.    What month?

17        A.    I don't remember.

18        Q.    You have no idea when you came back

19    from the Dominican Republic after being

20    deported?

21        A.    No.

22        Q.    How long were you in the Dominican

23    Republic?

24        A.    Eight months.

25        Q.    Eight months?

Confidential - Subject to Further Confidentiality Review

Page 122

1      A.    Eight months.

2      Q.    Eight months.

3            And was it right after that that you

4   heard about lawsuits?

5      A.    When I went back to Haiti.

6      Q.    And who did you hear it from?

7      A.    After like I saw Cyrus, and then I

8   found out after.

9      Q.    What year was it that the school

10  closed?

11     A.    I don't remember.

12     Q.    Was it around 2009?

13     A.    The Village?

14     Q.    I'm sorry, the Village, yes.

15     A.    2008.

16     Q.    2008.

17           And then you went to the Dominican for

18  eight months, right?

19     A.    I didn't go right away.

20     Q.    How long did it take -- how long did

21  you stay in Haiti before you went to the

22  Dominican?

23     A.    Before I came here?

24     Q.    Yes.

25     A.    A few years.

Confidential - Subject to Further Confidentiality Review

Page 123

1      Q.    So you were in Haiti for several years
2   after the school closed before you went to the
3   Dominican?
4           MS. POLLOCK:  Objection.  Vague,
5   mischaracterizes the witness's testimony.
6           MR. GAYNOR:  I'm just repeating what
7   he said.
8           MS. POLLOCK:  No, you're not.
9           MR. GAYNOR:  I'm pretty sure about it.
10  BY MR. GAYNOR:
11     Q.    Go ahead.  You spent a couple of years
12  in Haiti after the school closed before you went
13  to the Dominican, is that what you're telling
14  us?
15     A.    Yes.
16     Q.    What did you do for those two years?
17          MS. POLLOCK:  Objection.
18  Mischaracterizes the witness's testimony.
19          You can answer if you can.
20          MR. GAYNOR:  I'm sorry?
21          THE INTERPRETER:  I translated what
22  counsellor said.
23     A.    Could you repeat it again, please?
24  BY MR. GAYNOR:
25     Q.    What did you do for the two years

Confidential - Subject to Further Confidentiality Review

Page 124

1    after the school closed before you went to the

2    Dominican Republic?

3              MS. POLLOCK:  Objection.

4    Mischaracterizes the witness's testimony.

5         A.    I lived.  I didn't do anything.

6    BY MR. GAYNOR:

7         Q.    Where did you live?

8         A.    With my parents.

9         Q.    What did you do for money?

10        A.    Same thing; when I found a day job, I

11   did it.

12        Q.    Did your parents have food for you at

13   home?

14        A.    When there is food, I eat.

15        Q.    And who would pay for that food?

16        A.    My mom.

17        Q.    Did your mother and father tell you to

18   leave the house at some point?

19        A.    They told me that after they heard the

20   rumors.

21        Q.    After they heard rumors.

22              When did they hear the rumors?

23        A.    They found out in 2015.

24        Q.    In 2015.

25              But you told me just a minute ago they

Confidential - Subject to Further Confidentiality Review

Page 125

1    -- strike that.  Withdrawn.

2              So you hung around in Haiti in your

3    parents' home for a couple years before you went

4    to the Dominican, right?

5        A.    Yes.

6        Q.    And you were doing odd jobs to get

7    some money?

8        A.    Yes.

9        Q.    And you weren't going to school?

10       A.    No.

11       Q.    And then you went to the Dominican?

12       A.    Yes.

13       Q.    And that was to see if you could get

14   some better work?

15       A.    Yes.

16       Q.    And when you went to the Dominican,

17   did you get better work?

18       A.    No, it was just a little bit easier.

19       Q.    Okay.  And then you got deported after

20   about eight months?

21       A.    Yes.

22       Q.    Do you remember -- and you don't

23   remember what year that was?  You don't remember

24   what year that was?

25       A.    No.

Confidential - Subject to Further Confidentiality Review

Page 126

1      Q.    And you came back.  Did you come back
2   and live with your parents again?
3      A.    Yes.
4      Q.    And at some point your parents kicked
5   you out of the house?
6      A.    Yes.
7      Q.    And that's because they heard rumors
8   about the school?
9      A.    Yes.
10     Q.    Did they ask you whether you had been
11  abused?
12     A.    They didn't ask me, but they knew.
13     Q.    They knew what?
14     A.    That I was abused.
15     Q.    Well, how did they know that if you
16  didn't tell them?
17     A.    Because of the rumors.
18     Q.    So based on rumors, they assumed that
19  anybody that went to the school was abused?
20           MS. POLLOCK:  Objection.  Calls for
21  speculation.
22     A.    I don't know if that's what they
23  understood.
24  BY MR. GAYNOR:
25     Q.    Did they ask you directly whether you

Confidential - Subject to Further Confidentiality Review

Page 127

1    had been abused?

2        A.    They didn't ask me, but they heard

3    when they were calling me gay with Douglas.

4        Q.    So they never asked you when they

5    heard these rumors whether you'd been abused?

6        A.    They never asked me.

7        Q.    Did you ever tell them?

8        A.    No.

9        Q.    Did you tell them you hadn't been

10   abused?

11       A.    No.

12       Q.    So when they were going to throw you

13   out of the house because of the rumors, did you

14   tell them "hey, it didn't happen to me"?

15       A.    Did I tell them?

16       Q.    Yeah.

17       A.    No.  Like they're sure that it

18   happened to me because some people are calling

19   me that.

20       Q.    Did you tell them that it didn't

21   happen to you?

22            MS. POLLOCK:  Objection.  Asked and

23   answered.

24       A.    No, I never said anything.

25   BY MR. GAYNOR:

Confidential - Subject to Further Confidentiality Review

Page 128

1     Q.     So you never said anything at all?

2            MS. POLLOCK:  Objection.  Asked and

3     answered.

4     A.     No.

5     BY MR. GAYNOR:

6     Q.     How about your brothers and sisters,

7     did you tell them that it didn't happen to you?

8     A.     I never told them anything.

9     Q.     Did they say that you had been abused,

10    that you had been abused?

11    A.     If other people told them that?

12    Q.     Did your brothers and sisters call you

13    names because they thought you had been abused?

14    A.     They knew.

15    Q.     They knew what?

16    A.     That I was abused.

17    Q.     How would they know that if you didn't

18    tell them?

19    A.     But everybody is calling me that in

20    front of them.

21    Q.     Did you tell them "no, it didn't

22    happen"?

23    A.     I didn't say anything.

24    Q.     So you didn't say anything?

25    A.     No.

Confidential - Subject to Further Confidentiality Review

Page 129

1    Q.    Okay.  So your parents were ready to
2    throw you out of the house, your brothers and
3    sisters were accusing you of being abused, and
4    you didn't say anything to any of them?
5            MS. POLLOCK:  Objection.
6    Mischaracterizes the witness's testimony,
7    argumentative, vague.
8    BY MR. GAYNOR:
9    Q.    You may answer when it's put to you.
10   A.    But it really happened.  I didn't say
11   anything.
12   Q.    But you didn't deny it to anyone, to
13   them?
14   A.    No, I didn't.
15   Q.    Did any of your friends call you names
16   because they thought you were abused?
17   A.    Friends, new friends or friends that I
18   had at the Village?
19   Q.    Did any acquaintances of yours call
20   you names because they thought you were abused?
21   A.    Yes.
22   Q.    Who?
23   A.    I don't remember, because everybody,
24   everybody knew that.
25   Q.    Name one person by name that you say

Confidential - Subject to Further Confidentiality Review

Page 130

1    called you names because they thought you were

2    abused.

3       A.    I don't know.  Sometimes I don't even

4    know them, but they knew I was abused.

5       Q.    And when they -- would they say that

6    to your face?

7       A.    Yes, they tell me that to my face.

8       Q.    Did you deny it?

9       A.    No, I didn't say anything.  I just

10   walked, kept on walking.

11      Q.    But you can't tell us one person by

12   name?

13      A.    No.

14      Q.    When did you start seeing some of the

15   students at the Village with a lot of money or

16   cars or something to indicate that they had come

17   into some money?

18          MS. POLLOCK:  Objection.  Vague,

19   compound.

20          You can answer.

21      A.    I don't see them easily.

22   BY MR. GAYNOR:

23      Q.    Is it your testimony here today, sir,

24   that you never noticed any of the fellow

25   students at the Village had come into money to

Confidential - Subject to Further Confidentiality Review

Page 131

1    buy cars or other objects or things?

2        A.    I may see someone in a car, but I

3    don't know.

4        Q.    Let's try my question, sir.

5            Did you ever see any of your fellow

6    students with things like cars or other objects

7    that would have cost money after the school

8    closed?

9            MS. POLLOCK:  Objection.  Vague,

10   argumentative.

11       A.    Can you tell me -- ask me more

12   clearly?

13   BY MR. GAYNOR:

14       Q.    Okay.  After the Village closed, at

15   any time did you see any of your fellow students

16   driving around in automobiles or appear to have

17   things that cost money that otherwise they

18   probably wouldn't have been able to afford?

19           MS. POLLOCK:  Objection.  Vague and

20   compound.

21           You can answer.

22       A.    Yes, I've seen them driving their

23   cars.

24   BY MR. GAYNOR:

25       Q.    When did you first start seeing some

Confidential - Subject to Further Confidentiality Review

Page 132

1    of the students driving around in cars?

2        A.    I don't remember, because I just see

3    them.

4        Q.    Did you wonder how they were getting

5    the money to do that?

6        A.    I didn't ask myself that question.

7        Q.    Did you hear any rumors that some of

8    these students had collected money as a result

9    of settlements because of claims they filed

10   against Perlitz and others?

11       A.    I heard, but I don't know.

12       Q.    When did you first hear that?

13       A.    I don't remember.

14       Q.    Was that before or after you saw Cyrus

15   for the first time?

16       A.    After, after.

17       Q.    How did you find out about Cyrus?

18       A.    The kids in the Village told me that

19   there's a gentleman that asked them questions,

20   his name is Cyrus.

21       Q.    Did they tell you that if you want to

22   see Cyrus he might connect you up with people

23   that could get you money?

24       A.    No, I didn't know who Cyrus was.

25       Q.    Did you go see Cyrus?

Confidential - Subject to Further Confidentiality Review

Page 133

1      A.    Yes.  I found him, I found him because
2  I wanted to know what he was telling the guys.
3      Q.    Okay.  Well, did they tell you that
4  there was some money to be had?
5      A.    No.
6      Q.    You had no idea about any money?
7      A.    No.
8      Q.    But you just went to Cyrus out of the
9  blue because he was asking questions?
10          MS. POLLOCK:  Objection.  Vague.
11      A.    Yes, because I heard he was talking to
12  the guys from the Village, I was at the Village,
13  so I tried to find him to find out what was
14  going on.
15  BY MR. GAYNOR:
16      Q.    What did you hear about what he was
17  talking about?
18      A.    I didn't hear anything.  What I heard,
19  I didn't hear anything.  And once I got there,
20  that's when I started to know.
21      Q.    Before you went and you heard some
22  talk about Cyrus asking questions, what were the
23  questions about?  Were they about sporting
24  events, or were they about what happened at the
25  Village with Doug Perlitz?

Confidential - Subject to Further Confidentiality Review

Page 134

```
 1      A.    They didn't tell me what the questions
 2   were about.
 3      Q.    Okay.  So you just happened to run
 4   into some students, and they told you that there
 5   was a guy named Cyrus asking questions, but you
 6   have no idea what the questions were about or
 7   what the subject matter was, is that what you're
 8   telling us, sir?
 9           MS. POLLOCK:  Objection.
10   Argumentative, asked and answered, and compound.
11      A.    Yes.
12   BY MR. GAYNOR:
13      Q.    Didn't the kids tell you to go see
14   Cyrus, you might be able to get some money?
15      A.    They didn't tell me to go see him.
16   I'm the one that went to see him.
17      Q.    Didn't they tell you that if you went
18   to see him you could get some money?
19           MS. POLLOCK:  Objection.  Asked and
20   answered, argumentative.
21      A.    No.
22   BY MR. GAYNOR:
23      Q.    Didn't they tell you that there were
24   some claims being made, and if you went to see
25   Cyrus you might be able to get money because of
```

Confidential - Subject to Further Confidentiality Review

Page 135

1    the events with Doug Perlitz?

2            MS. POLLOCK:  Objection.  Vague,

3    compound, argumentative, asked and answered.

4        A.    They didn't tell me anything.

5    BY MR. GAYNOR:

6        Q.    So you had some discussion with some

7    kids that had been at the Village about this guy

8    Cyrus, you had no idea what he was up to or what

9    he was asking about, but he was somebody you

10   were going to go out and meet, is that what

11   you're telling us here today, sir?

12           MS. POLLOCK:  Objection.

13   Argumentative, compound, assumes facts not in

14   evidence, mischaracterizes the witness's

15   testimony.

16       A.    No.

17   BY MR. GAYNOR:

18       Q.    Is that what you're telling us, what I

19   told you, is that what you're telling us here

20   today?

21           MS. POLLOCK:  Objection.  Objection.

22   Compound, vague, mischaracterizes the witness's

23   testimony, argumentative.

24       A.    What I can tell you today is that I

25   made my claim hoping to get justice.

Confidential - Subject to Further Confidentiality Review

Page 136

1    BY MR. GAYNOR:

2        Q.    I'm not asking -- we know you made

3    your claim, sir.  I'm asking you, when you heard

4    the kids talking about Cyrus, they didn't tell

5    you a thing about what the discussion was, or

6    what the subject matter was, or whether you

7    could get some money if you went to see him, is

8    that right?  Is that what you're telling us

9    today?

10           MS. POLLOCK:  Objection.

11    Argumentative, compound, vague, mischaracterizes

12    the witness's testimony.  You keep asking the

13    same question.

14           MR. GAYNOR:  I'm going to keep asking

15    until I get an answer.

16           MS. POLLOCK:  I'm talking.  He's

17    answering your question.  He's telling you he

18    doesn't know, and you just keep asking him the

19    same question again.

20           MR. GAYNOR:  You can repeat that to

21    him.

22           MS. POLLOCK:  Because you don't like

23    his answer.

24        A.    Yes, I heard them talking.

25    BY MR. GAYNOR:

Confidential - Subject to Further Confidentiality Review

Page 137

1      Q.    What did you hear them talking about?

2      A.    That there was someone asking the kids

3   from the Village questions.

4      Q.    What were they asking -- what was the

5   someone asking about?

6      A.    I didn't know.

7      Q.    So all you heard, I just want to make

8   it clear, all you heard was that there was

9   someone asking kids from the Village questions,

10   but you had no idea what the subject matter was?

11      A.    I didn't know.

12      Q.    And you didn't ask?

13      A.    No.

14      Q.    And you didn't hear the kids saying

15   "if you go see this someone who is asking

16   questions you might be able to get some money"?

17          MS. POLLOCK:  Objection.  Asked and

18   answered.

19      A.    I never heard that.

20   BY MR. GAYNOR:

21      Q.    And at that point had you seen some of

22   the kids that had been to school with you with

23   the cars or other fancy things?

24          MS. POLLOCK:  Objection.  Vague and

25   compound.

Confidential - Subject to Further Confidentiality Review

Page 138

```
 1        A.    Can you repeat it, please?
 2    BY MR. GAYNOR:
 3        Q.    And at that point had you seen some of
 4    the kids that had cars or other fancy things?
 5              MS. POLLOCK:  Objection.  Vague and
 6    compound.
 7        A.    No.
 8    BY MR. GAYNOR:
 9        Q.    Did you go see this guy, this someone
10    named Cyrus?
11        A.    If I went to see him?
12        Q.    Yes.
13        A.    Cyrus, yes.
14        Q.    How did you find him?
15        A.    I asked for explanation, and I found
16    him.
17        Q.    What explanation?  Who did you ask?
18        A.    I knew the name, and I asked around,
19    and they told me this is where he is, he is in
20    Place Carenage.
21        Q.    Why did you want to go see Cyrus?
22        A.    I wanted to know what he was saying,
23    or I wanted to hear what he had to say.
24        Q.    About what?
25        A.    Because I heard he was asking the kids
```

Confidential - Subject to Further Confidentiality Review

Page 139

1  from the Village questions.

2      Q.    About what?

3      A.    I don't know.

4      Q.    So you heard that this was -- some

5  stranger was asking kids from the Village some

6  questions, but you don't have a clue what he was

7  talking about?

8            MS. POLLOCK:  Objection.  Vague, asked

9  and answered, argumentative.

10      A.    No.

11  BY MR. GAYNOR:

12      Q.    And you had no idea that this guy,

13  that this someone who was asking questions might

14  be able to provide money to you?

15      A.    No.

16      Q.    And up to this point, you had never

17  told a soul about what happened to you, that's

18  right, isn't it?

19      A.    No.

20      Q.    You didn't tell your friends, you

21  didn't tell your parents, you didn't tell your

22  pastor, you didn't tell anybody about what had

23  happened to you?

24      A.    No.

25      Q.    What did you expect to answer to this

Confidential - Subject to Further Confidentiality Review

Page 140

1    guy that was asking the questions?

2         A.    Aside from the fact that he was asking

3    the questions from the kids that were in the

4    Village, I was in the Village, so I went also.

5         Q.    What month and year did you find and

6    meet with Cyrus?

7         A.    I don't remember.

8         Q.    Was it before or after you saw the

9    kids driving around in the cars?

10        A.    Before I saw the kids.

11        Q.    How soon before?

12        A.    A good while after.

13        Q.    What's a good while?

14        A.    A lot of time went by.

15        Q.    What's a lot of time?

16        A.    After a few months, a year.

17        Q.    A few months or a year?

18        A.    Yes.

19        Q.    So it wasn't until the few months or a

20   year after you'd met Cyrus that you saw kids

21   driving around in the cars?

22        A.    Yes.

23        Q.    When you met with Cyrus for the first

24   time, did he give you money?

25        A.    No.

Confidential - Subject to Further Confidentiality Review

Page 141

1      Q.    Did he tell you why he was asking
2    around?
3      A.    When I got -- when I saw him?
4      Q.    Yes.
5      A.    He asked me if I was part of the
6    Village.
7      Q.    Okay.  What did you tell him?
8      A.    "Yes."
9      Q.    What else did he ask you?
10      A.    He told me to register as one of the
11    victims.
12      Q.    As one of the victims?
13      A.    Yes.
14      Q.    Did you tell him you were a victim?
15      A.    I didn't tell him that right away.
16      Q.    When did you tell him you were a
17    victim?
18      A.    After we started talking, after a
19    little while.
20      Q.    That day?
21      A.    Yes.
22      Q.    Did he tell you there was money to be
23    had if you would register and tell people you
24    were a victim?
25            MS. POLLOCK:  Objection.  Vague.

Confidential - Subject to Further Confidentiality Review

Page 142

1      A.    No.

2   BY MR. GAYNOR:

3      Q.    Did he tell you there were claims that

4   others at the Village had made and had been paid

5   money?

6      A.    No, he didn't talk to me about that.

7      Q.    Did you expect that if you told him

8   you were a victim and registered on his list

9   that you would be compensated in some way at

10  some point?

11     A.    No.

12     Q.    And after you started talking that

13  day, you told him that you were a victim, is

14  that right?

15     A.    Yes.

16     Q.    And you registered on the list?

17     A.    He wrote my name down.

18     Q.    Did he tell you that you could be in

19  line for some money?

20           MS. POLLOCK:  Objection.  Vague.

21     A.    No.

22  BY MR. GAYNOR:

23     Q.    So you told this stranger that you'd

24  met for the first day that you had been abused,

25  is that right?

Confidential - Subject to Further Confidentiality Review

Page 143

1      A.    Yes.

2      Q.    And he didn't tell you anything about

3  money or compensation or anything like that, he

4  didn't give you any idea that you could be

5  entitled to money, is that right?  Is that your

6  testimony?

7          MS. POLLOCK:  Objection.  Compound,

8  vague, argumentative, and asked and answered.

9  BY MR. GAYNOR:

10     Q.    What was the answer?

11     A.    No.

12     Q.    And despite all that, you gave him

13  information about your being abused that you had

14  never told another soul?

15     A.    Yes, I told him that.

16          MR. GAYNOR:  Let's take a short break.

17          MS. POLLOCK:  Lunch is at 1:00, we

18  can -- do you just want to stop now and break

19  for lunch?

20          MR. GAYNOR:  Yes, I think so.

21          THE VIDEOGRAPHER:  Going off the

22  record.  The time is 12:43.

23          (Whereupon, a recess was taken.)

24

25

Confidential - Subject to Further Confidentiality Review

Page 144

1          AFTERNOON SESSION

2

3          THE VIDEOGRAPHER:  Back on the record.

4     The time is 2:11.

5          MR. GAYNOR:  No further questions at

6     this time.

7          MS. POLLOCK:  Counsel, before you

8     start, I don't know your plans, can you just

9     introduce yourself and who you represent again,

10    please?  Thank you.

11    BY MR. WILLIAMS:

12       Q.   Good afternoon, Mr. Bernard.  My name

13    is Paul Williams, I represent Fairfield

14    University.

15          I'm going to ask you some follow-up

16    questions.  If you don't understand any of my

17    questions, just let me know.

18          Have you ever used paint thinners?

19       A.   No.

20       Q.   Have you ever used marijuana?

21       A.   No.

22       Q.   Have you ever used any illicit drugs?

23       A.   I smoke cigarettes, and I drink white

24    rum.

25       Q.   And when did you start drinking and

Confidential - Subject to Further Confidentiality Review

Page 145

1    smoking?

2        A.    Right after this happened.

3        Q.    What happened?

4        A.    When I -- when this happened to me.

5    When this action -- when this happened to me.

6        Q.    Are you talking about the lawsuit, or

7    something else?

8        A.    I'm talking about sexual abuse.

9        Q.    Okay.  And were you still living at

10   the Village, at PPT, when you began drinking and

11   smoking?

12       A.    No.

13       Q.    Okay.  So you left the Village before

14   you started that, is that correct?

15       A.    Yes.

16       Q.    Now, you talked to us about when you

17   were living in Cap-Haïtien you were living in

18   your parents' home, is that correct?

19       A.    Yes.

20       Q.    And when you went back to Haiti after

21   being in the Dominican Republic, you returned to

22   your parents' home for some time, is that

23   correct?

24       A.    Yes.

25       Q.    Now, did you always live in the same

Confidential - Subject to Further Confidentiality Review

Page 146

1    house?

2            MS. POLLOCK:  Objection.  Vague.

3       A.    No.

4    BY MR. WILLIAMS:

5       Q.    Did your parents move over the time

6    that you were living with them?

7       A.    Yes.

8       Q.    When you were living at the Village,

9    what was the house like where you were living

10   with your parents?

11      A.    It was a house that a priest built to

12   give to people that couldn't afford houses.

13      Q.    Okay.  So your parents didn't have to

14   pay any rent to live there?

15      A.    No, they let them live there.

16      Q.    Okay.  And did you have your own room

17   in that house?

18      A.    No.

19      Q.    Did you sleep with other family

20   members in that house?

21      A.    Yes, we were all there.

22      Q.    Were there any beds in that house?

23      A.    Yes.

24      Q.    How many were there?

25      A.    One.

Confidential - Subject to Further Confidentiality Review

Page 147

```
 1      Q.    And did you all sleep together in that
 2   bed?
 3      A.    No.
 4      Q.    Who slept in that bed?
 5      A.    My father.
 6      Q.    All right.  And where did you sleep?
 7      A.    I slept on the carpet.
 8      Q.    Okay.  And your brothers and sisters
 9   also slept on the carpet on the floor?
10      A.    Those that are still living there.
11      Q.    You mentioned that you were arrested
12   in the Dominican.  Were you ever arrested in
13   Haiti?
14      A.    No.
15      Q.    Were you ever sexually abused by
16   anyone, other than the claimed abuse by
17   Mr. Perlitz?
18      A.    No.
19      Q.    Just before the break you were
20   describing when you met with Cyrus Sibert.  Do
21   you recall that?
22      A.    Yes.
23      Q.    And where did you meet with him?
24   Where was the place where you first met with
25   him?
```

Confidential - Subject to Further Confidentiality Review

Page 148

```
 1      A.    It was a park, a public park.

 2      Q.    A public park.

 3            And was anyone with you when you met

 4   him there?

 5      A.    No.

 6      Q.    Was he writing anything down when you

 7   spoke to him?

 8      A.    Yes, he was writing.

 9      Q.    What did he write down?

10      A.    I don't know.

11      Q.    Did you tell him your experience with

12   Perlitz, and did he write that down?

13      A.    I told him after.

14      Q.    Okay.  Did he write at all while you

15   were telling him that you were abused?

16      A.    I saw him writing.  I don't know if

17   that's what he was writing exactly.

18      Q.    Okay.  But during the time that you

19   were describing what happened to you, was Sibert

20   writing?

21            MS. POLLOCK:  Can I -- I'm just

22   unclear, are you asking about the first time he

23   spoke with him?

24            MR. WILLIAMS:  Yes.

25            MS. POLLOCK:  So can you, Madam
```

Confidential - Subject to Further Confidentiality Review

Page 149

```
 1    Translator, can you please make sure he knows
 2    that this is during the first conversation with
 3    Cyrus?
 4              THE INTERPRETER:  I can't, Counselor,
 5    he has to say it first.  I can't put words in
 6    his mouth.
 7              MS. POLLOCK:  Hold on.  Let me check
 8    the record.
 9              I'm going to instruct the witness not
10    to disclose any communications with Cyrus after
11    the first conversation you had with Cyrus.  The
12    lawyer is asking you about the first
13    conversation with Cyrus, which you can answer.
14              MR. WILLIAMS:  For the record, we
15    don't agree with that limitation.
16              MS. POLLOCK:  That's fine.
17    BY MR. WILLIAMS:
18       Q.    During your first meeting with Cyrus,
19    you told us that you informed him that you were
20    abused by Doug Perlitz, correct?
21       A.    Yes.
22       Q.    And during the time that you were
23    telling him you were abused by Perlitz, was he
24    writing things down?
25              MS. POLLOCK:  Objection.  Asked and
```

Confidential - Subject to Further Confidentiality Review

Page 150

1    answered.

2        A.    I saw he was writing something.    I

3    don't know what he was writing.

4    BY MR. WILLIAMS:

5        Q.    Okay.  And was anyone else there other

6    than you, Cyrus in the park?  Anyone else there?

7            MS. POLLOCK:  Objection.  Vague.

8        A.    There were other people, but they were

9    not close to us.

10    BY MR. WILLIAMS:

11        Q.    Were there any former students of PPT

12    or the Village with you the first time you met

13    Cyrus?

14        A.    No.

15        Q.    Did Cyrus give you any money?

16            MS. POLLOCK:  Objection.  Asked and

17    answered.

18        A.    No.

19    BY MR. WILLIAMS:

20        Q.    He did not?

21        A.    He didn't give me any money the first

22    time.

23        Q.    Did Cyrus ever give you any money?

24        A.    Yes, he gave me once.

25        Q.    And how much money did he give you?

Confidential - Subject to Further Confidentiality Review

Page 151

1       A.      $100.

2       Q.      And what type of -- was it Haitian

3    dollars?

4       A.      No.

5       Q.      It was American dollars?

6       A.      Yes.

7       Q.      Was it a single bill, a $100 bill?

8       A.      I don't remember.

9       Q.      Well, how many bills did you receive?

10      A.      I don't remember.

11      Q.      Had you ever seen a $100 American bill

12   before?

13      A.      No.

14      Q.      So you don't remember how many bills

15   you received from Cyrus when he gave you the

16   $100, is that correct?

17              MS. POLLOCK:  Objection.  Asked and

18   answered.

19      A.      No.

20   BY MR. WILLIAMS:

21      Q.      And what did you do with that money?

22      A.      I had needs.  I didn't have any

23   sandals or clothes, and I bought those, and I

24   bought some food to eat.

25      Q.      Did Cyrus tell you why he was giving

Confidential - Subject to Further Confidentiality Review

Page 152

 1  you the money?

 2          MS. POLLOCK:  I'm going to object and

 3  instruct the witness that you can answer yes or

 4  no only, but you cannot disclose anything that

 5  Cyrus actually did tell you.

 6          MR. O'NEILL:  On behalf of Carrier I

 7  object to that limitation, and instruct you and

 8  the witness that he may be called back if we

 9  overrule that objection.

10          MS. POLLOCK:  We respectfully

11  disagree.

12          Go ahead.  Again, I'm reminding you

13  you can answer yes or no, or ask him to repeat

14  the question if you've forgotten it.

15          MR. GAYNOR:  By the way, I think we

16  all join -- all defense join in that.

17          MS. POLLOCK:  Do you remember the

18  question?

19      A.    No.

20  BY MR. WILLIAMS:

21      Q.    Did Cyrus tell you why he gave you the

22  money?

23          MS. POLLOCK:  Again, you can answer

24  yes or no.

25      A.    No.

Confidential - Subject to Further Confidentiality Review

Page 153

1    BY MR. GAYNOR:

2        Q.    Was anyone with Cyrus when he met with

3    you and gave you the 100 American dollars?

4        A.    No.  I went to see him.

5        Q.    Where did you see him the time that he

6    gave you the 100 American dollars?

7        A.    I went to see him.

8        Q.    Where?

9        A.    In the public square.

10       Q.    The same park where you first met him?

11       A.    Yes, he told me I would find him

12   there, and I did.

13       Q.    Did you see any other former

14   PPT/Village students there with you when you

15   were given the money?

16       A.    No.

17       Q.    How did Cyrus communicate with you at

18   the time that you were given the money?

19             MS. POLLOCK:  You can answer by

20   identifying in person or by phone, or if it's

21   some other means of communication, but I'm

22   instructing you not to identify actually what

23   was communicated to you.

24       A.    I'm the one that asked him, because I

25   was in need.

Confidential - Subject to Further Confidentiality Review

Page 154

1  BY MR. WILLIAMS:

2      Q.    All right.  Did Cyrus tell you where

3  he obtained the money?

4          MS. POLLOCK:  I'm going to instruct

5  you not to answer the question.

6          MR. WILLIAMS:  Just so we don't have

7  to have constant interruptions, obviously we

8  don't agree to this line of objections.

9          MS. POLLOCK:  Understood.

10          To make the record clear, I'm

11  instructing the witness not to disclose a

12  communication between himself and Cyrus on the

13  grounds that that communication is protected by

14  the attorney/client privilege.

15          MR. ACQUARULO:  Hope Carter joins in

16  the position of codefendants on the issue.

17          MR. O'NEILL:  There's a stipulation,

18  it's one objection covers everyone, so it's

19  assumed that everyone is covered by that

20  objection by Paul.

21  BY MR. GAYNOR:

22      Q.    On the day that you got the $100 from

23  Cyrus, how had you communicated with him to set

24  up the meeting?

25          MS. POLLOCK:  You can answer the

Confidential - Subject to Further Confidentiality Review

Page 155

1    question if you communicated by phone or in

2    person, and that's it.

3        A.    I called him.

4    BY MR. WILLIAMS:

5        Q.    Okay.  Did you call him?

6        A.    Yes.

7        Q.    You had a cell phone at that time?

8        A.    Yes.

9        Q.    And when you met with him, was he

10   alone?

11       A.    Yes.

12       Q.    There were no lawyers there?

13       A.    No.

14       Q.    Cyrus introduced you to your lawyers,

15   correct?

16       A.    Yes.

17       Q.    Before you met with Cyrus, you didn't

18   retain any attorney, did you?

19            MS. POLLOCK:  Counsel, are you asking

20   about the first meeting with Cyrus, or the

21   meeting where Cyrus gave him $100?

22            MR. WILLIAMS:  I think the question

23   speaks for itself.

24            MS. POLLOCK:  Then I'm instructing him

25   not to answer it.

Confidential - Subject to Further Confidentiality Review

Page 156

1          MR. GAYNOR:  You're instructing him
2    not to answer a question --
3          MR. WILLIAMS:  What question --
4          MR. GAYNOR:  -- where it says Cyrus --
5    where it says --
6          MR. WILLIAMS:  Wait a minute.
7          MR. GAYNOR:  "Before you met with
8    Cyrus, you didn't retain an attorney, did you?"
9    You're instructing him not to answer that
10   question?
11         MS. POLLOCK:  Which meeting are we
12   talking about with Cyrus?
13         MR. GAYNOR:  It says "before you met
14   with Cyrus."
15         MS. POLLOCK:  I'm not arguing with
16   you.  It's not your question that's pending.
17         MR. GAYNOR:  You're obstructing this
18   deposition.
19         MS. POLLOCK:  If you want to specify
20   which meeting we're talking about, then we can
21   proceed.
22         MR. WILLIAMS:  Well, already we're
23   going to the judge and we're coming back
24   already, so we can just go on, you can keep
25   doing what you're doing with inappropriate

Confidential - Subject to Further Confidentiality Review

Page 157

1    objections.

2    BY MR. WILLIAMS:

3        Q.    Before you met with Cyrus the first

4    time, you didn't tell anyone that you were

5    abused by Perlitz, did you?

6        A.    No.

7        Q.    And after you met with Cyrus, you

8    retained your attorney for the first time,

9    correct?

10       A.    Yes.

11       Q.    And then you received 100 American

12   dollars from Cyrus, is that correct?

13       A.    Yes.

14       Q.    And what's been marked Exhibit 2 is

15   the Plaintiffs' provisional accounting for

16   payments on behalf of Plaintiffs.

17            (Whereupon, Bernard Exhibit Number 2,

18            Plaintiffs' Provisional Accounting of

19            Payments to or on Behalf of the

20            Plaintiffs, was marked for

21            identification.)

22   BY MR. WILLIAMS:

23       Q.    And if your counsel would like to look

24   at it.  This is represented to be the accounting

25   of Cyrus for expenses in this case?

Confidential - Subject to Further Confidentiality Review

Page 158

1    MS. POLLOCK:  For the record, Counsel

2    is showing the witness Exhibit 2 which is

3    written entirely in English, and the Plaintiff

4    has already testified he cannot read English.

5    MR. WILLIAMS:  I didn't ask him to

6    read it.  It's your representation of Cyrus's

7    accounting.

8    MS. POLLOCK:  I'm not arguing with

9    you.  Go ahead.

10    MR. WILLIAMS:  Put on the record that

11    this isn't your representation of Cyrus's

12    accounting.

13    MS. POLLOCK:  Proceed, Counsellor.

14    MR. WILLIAMS:  I will not.  Tell me

15    what this is.  Is this a valid, reliable

16    document, or is it not?

17    MS. POLLOCK:  Go ahead.

18    MR. WILLIAMS:  No, I want an answer.

19    You produced this and filed it in Federal Court.

20    Is that a reliable document?

21    MS. POLLOCK:  There's no need to yell.

22    MR. WILLIAMS:  There's a need for you

23    to not obstruct the deposition.

24    Is that a reliable exhibit, or isn't

25    it?

Confidential - Subject to Further Confidentiality Review

Page 159

 1          MS. POLLOCK:  I'm not obstructing the

 2     deposition.  I'm putting on the record you're

 3     asking the witness about a question that's --

 4     about a document that's written in English.

 5          MR. WILLIAMS:  I'm asking him about

 6     your representations to the Court.

 7          MS. POLLOCK:  The witness can't

 8     testify about my representations.

 9          MR. WILLIAMS:  I'm asking about your

10     representations.

11          MS. POLLOCK:  There's nothing to talk

12     about.

13     BY MR. WILLIAMS:

14     Q.    The document filed by your attorneys

15     in Federal Court, sworn to as accurately

16     reflecting facts and Cyrus's involvement in this

17     case, indicates that you received $100 on

18     August 22nd -- excuse me, August 13, 2013.

19          MS. POLLOCK:  Counsel, for the record,

20     what page are you referring to?

21          MR. WILLIAMS:  Page 4 -- Page 5.

22          MS. POLLOCK:  Why are you staring at

23     me?

24     BY MR. WILLIAMS:

25     Q.    Isn't there a question being

Confidential - Subject to Further Confidentiality Review

Page 160

1    translated?

2            THE INTERPRETER:  I'm going to repeat

3    the translation.

4        A.    Can you repeat it for me again?

5        Q.    Sure.

6            Exhibit 2, Plaintiffs' provisional

7    accounting of payments on behalf of Plaintiffs,

8    indicates on Page 5 that you received $100 on

9    August 22, 2013.  Do you remember receiving that

10   $100?

11       A.    I don't remember when I got it.

12       Q.    Okay.  According to this Exhibit 2,

13   $100 was not only paid to you on that same date,

14   August 3, 2013, but also paid to 25 other former

15   students at PPT.

16           MS. POLLOCK:  I was going to point out

17   there's a question pending.

18   BY MR. WILLIAMS:

19       Q.    Do you recall now other former PPT

20   students being present when you received your

21   $100?

22       A.    I don't remember.

23       Q.    Don't remember.

24           If you could look at Exhibit 2,

25   beginning with Lecenat Geffrard, do you know

Confidential - Subject to Further Confidentiality Review

Page 161

1    that person?

2              MS. POLLOCK:  Which page is it?

3              MR. WILLIAMS:  Page 4.

4       A.    Yes.

5    BY MR. WILLIAMS:

6       Q.    Was he there when you received your

7    $100?

8       A.    He wasn't close to me.  I didn't see

9    anybody there.

10      Q.    You didn't see him that day?

11      A.    No.

12      Q.    Okay.  What about Gervil St. Louis?

13      A.    I know them, but I didn't see them.

14      Q.    He wasn't there that day either?

15      A.    No.

16      Q.    Okay.  What about Eliphete Alibert?

17      A.    I already told you, I'm the one that

18   went to see him, and I got the money from him.

19      Q.    Do you know Aliphet Alibert?

20      A.    Yes.

21      Q.    He wasn't there when you received the

22   $100?

23      A.    No.

24      Q.    And what about Albert Joel?

25              MS. POLLOCK:  Objection.  Vague.

Confidential - Subject to Further Confidentiality Review

Page 162

```
 1              What's your question?
 2   BY MR. WILLIAMS:
 3        Q.    Was he there?
 4        A.    No.
 5        Q.    Do you know Joel?
 6        A.    Yes.
 7        Q.    What about Christoph Faustin, was he
 8   there?
 9        A.    No.
10        Q.    Do you know him?
11        A.    Yes.
12        Q.    What about Delphis Philome?
13        A.    Yes, I know him.
14        Q.    Was he there?
15        A.    No.
16        Q.    What about Benjamen Erlick?
17        A.    I know him.
18        Q.    Was he there?
19        A.    No.
20        Q.    Okay.  Maybe I'll take in groups of
21   five to expedite it.
22              Augustis Peterson, Lucce Calixte,
23   Joseph Ovelt, Pierre John Louis, Jean Pierre
24   Joseph.  Do you know all those people?
25        A.    No, they were not there.
```

Confidential - Subject to Further Confidentiality Review

Page 163

1      Q.    They were not there when you received

2   your $100?

3      A.    No.

4      Q.    Okay.  Lecenat Geffrard, Jameson

5   Brisma Joseph, Audate Johnson, Lubrin Milvoy,

6   Papouche Fils-Aime, do you know those people?

7      A.    Yes, I know them.

8      Q.    And were any of those people present

9   when you received your $100?

10     A.    No.

11     Q.    And you didn't see them at all?

12     A.    No.

13     Q.    Then Jean Ilguens, Derius Idlyn, Jean

14  Moise, Pierre Kobens, Pierre Emmanuel, do you

15  know those people?

16     A.    Could you --

17           THE INTERPRETER:  Can I repeat the

18  names?

19           MR. WILLIAMS:  Please.

20     A.    Yes.

21     Q.    You know all those people?

22     A.    Yes.

23     Q.    Were they there when you received your

24  $100?

25     A.    No.

Confidential - Subject to Further Confidentiality Review

Page 164

1      Q.    And lastly, a Pierre Wilnot and

2    Dieu-Dabel Bernard.  Do you know Wilnot?

3      A.    Yes.

4      Q.    And was he there when you received

5    your $100?

6      A.    No.

7      Q.    Did any of these people tell you that

8    they received money?

9      A.    No, I didn't talk about that with

10   them.

11     Q.    Nobody ever mentioned that he was

12   giving out $100 bills in the public square?

13     A.    That I don't know.

14     Q.    Don't remember.

15           Do you know what time of day it was

16   when you received the $100 bill?

17     A.    I don't remember.

18     Q.    Was it daylight, nighttime?

19     A.    It was daylight.

20     Q.    It was daylight.

21           Now, this same document, Exhibit 2,

22   indicates that an additional expense on Page 8

23   was a payment from Mathieu Napolean.

24           Do you know Mathieu Napolean?

25     A.    I know Mathieu.

Confidential - Subject to Further Confidentiality Review

Page 165

1    Q.    Who is that person?

2    A.    A guy that's there with Cyrus.

3    Q.    He works with Cyrus?

4    A.    Yes.

5    Q.    Is he always with Cyrus?

6    A.    I don't know.

7    Q.    Was he with Cyrus the first time you

8  met with Cyrus?

9    A.    No.

10    Q.    Was he with Cyrus the day that you

11  received the $100 bill?

12    A.    No.

13    Q.    Has Mathieu ever given you any money?

14    A.    No.

15    Q.    Have you ever met with Mathieu to

16  discuss your litigation?

17        MS. POLLOCK:  I'm instructing you you

18  can answer the question yes or no.

19    A.    Can you repeat the question, please?

20  BY MR. WILLIAMS:

21    Q.    Have you discussed your lawsuit with

22  Mathieu?

23        MS. POLLOCK:  Again, you can answer

24  yes or no.

25    A.    No.

Confidential - Subject to Further Confidentiality Review

Page 166

1   BY MR. WILLIAMS:

2       Q.    When was the first time you met

3   Mathieu?

4       A.    I don't remember.

5       Q.    Well, you told us the first time you

6   met Cyrus he wasn't there, correct?

7       A.    Yes.

8       Q.    And the second time when Cyrus gave

9   you money, he wasn't there?

10      A.    No.

11      Q.    But you said that he works for Cyrus,

12  is that correct?

13      A.    Yes.

14      Q.    So when was it that you saw him?

15      A.    I don't remember.

16      Q.    Did you ever have a meeting with Cyrus

17  and Mathieu?

18            MS. POLLOCK:  Again, you can instruct

19  -- I'm sorry, strike that.  You can answer the

20  question yes or no.

21      A.    Yes.

22  BY MR. WILLIAMS:

23      Q.    What was the meeting about?

24            MS. POLLOCK:  I'm instructing you not

25  to answer that question.

Confidential - Subject to Further Confidentiality Review

Page 167

```
 1              THE INTERPRETER:  I'm sorry,
 2    Counselor?
 3              MS. POLLOCK:  I'm instructing you not
 4    to answer that question, because the
 5    communications are confidential, on the ground
 6    of attorney/client privilege.
 7    BY MR. WILLIAMS:
 8         Q.   When you met with Cyrus and Mathieu,
 9    was there an attorney present?
10              MS. POLLOCK:  You can answer yes or
11    no.
12         A.   No.
13    BY MR. WILLIAMS:
14         Q.   Who else was present besides Mathieu
15    and Cyrus when you met with them?
16         A.   I don't remember.
17         Q.   Were there other people who were
18    former students of PPT?
19         A.   I remember some of them were there,
20    but I don't remember who they were.
21         Q.   You don't remember which ones were
22    there?
23         A.   No.
24         Q.   Do you remember where that meeting
25    was?
```

Confidential - Subject to Further Confidentiality Review

Page 168

1      A.    Yes.

2      Q.    Where was it?

3      A.    In a house.

4      Q.    Whose house was it?

5      A.    I don't know if that's where Mathieu

6    lives.

7      Q.    Do you know what town it is in?

8      A.    Cap-Haïtien.

9      Q.    Is it a business, or a residence?

10     A.    It's a residence.

11     Q.    And did you have this meeting before

12   you retained an attorney?

13           THE INTERPRETER:  I apologize.  The

14   interpreter apologizes for the translation.

15     A.    No.

16     Q.    Did you have an attorney when you had

17   that meeting with Mathieu and Sibert?

18     A.    Yes.

19     Q.    Exhibit 2 indicates, as we've

20   discussed, according to Mr. Sibert that you

21   received the $100 on August 3, 2013.  Your

22   complaint in this case was filed in November of

23   2013.  Do you have any present recollection of

24   the date when you retained a lawyer?

25           MS. POLLOCK:  You can answer yes or

Confidential - Subject to Further Confidentiality Review

Page 169

 1   no.

 2      A.    No, I don't remember.

 3   BY MR. WILLIAMS:

 4      Q.    Do you know if it was before or after

 5   August of 2013?

 6      A.    I don't remember.

 7      Q.    Exhibit 2 indicates that Mr. Mathieu

 8   Napolean bought you a cell phone on March 17th

 9   of 2016.  Do you remember him buying you a cell

10   phone?

11      A.    Yes.

12      Q.    Why did he buy you a cell phone?

13            MS. POLLOCK:  I'm instructing the

14   witness not to disclose any communications

15   regarding the circumstances of buying the cell

16   phone.  Strike that.  I didn't word that

17   correctly for the record.

18            I'm instructing the witness not to

19   disclose any communications that you had with

20   Mathieu or Cyrus or your attorneys about buying

21   the cell phone.

22            MR. WILLIAMS:  Just so the record is

23   clear, you're telling him not to answer why

24   Mathieu bought him a cell phone as a privileged

25   communication, is that correct?

Confidential - Subject to Further Confidentiality Review

Page 170

 1            MS. POLLOCK:  No, that's not correct.
 2    I'm instructing him he can answer the question
 3    if he can do so without disclosing the
 4    communications that he had with Mathieu or Cyrus
 5    or his attorneys about the purchase of the cell
 6    phone.
 7    BY MR. WILLIAMS:
 8        Q.    Why did Mathieu buy you a cell phone?
 9            MS. POLLOCK:  Again, I'm instructing
10    the witness not to disclose any communications
11    that you had with Mathieu or Cyrus or your
12    attorneys regarding the purchase of the cell
13    phone.  If you can answer the question without
14    disclosing any of those communications with
15    Mathieu or Cyrus or your attorney, then you can
16    answer the question.
17        A.    Can you repeat it for me, please?
18    BY MR. WILLIAMS:
19        Q.    Why did Mathieu buy you a cell phone?
20            MS. POLLOCK:  I'm instructing you that
21    you can answer the question if you can do so
22    without disclosing communications between you
23    and Cyrus or Mathieu or your attorneys.  If the
24    only way to answer that question is by
25    disclosing the communications with those people,

Confidential - Subject to Further Confidentiality Review

Page 171

```
 1   then I'm instructing you not to answer the
 2   question.
 3            MR. WILLIAMS:  I'm waiting for an
 4   answer.  I'm not sure if he's thinking or...
 5       A.    No, because my lawyer told me
 6   something.
 7            MS. POLLOCK:  Do you want to -- I'm
 8   not trying to object or interfere, we could take
 9   a break and I can go out and figure out if he
10   can answer it without disclosing the
11   communications if you want, otherwise I don't
12   know what else to do.
13            MR. WILLIAMS:  We can, I guess, do
14   that at a break.  We've already had a lot of
15   objections that we're going to claim up, so I'll
16   just continue.
17   BY MR. WILLIAMS:
18       Q.    Do you know any other former students
19   of PPT who received cell phones?
20       A.    I don't know.
21       Q.    You don't know anyone else?
22       A.    I don't know if they got any phones.
23       Q.    Okay.  Did Mathieu or Cyrus buy you
24   anything else?
25       A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 172

1       Q.      What else did they buy you?

2       A.      When I was coming here they bought me

3    some T-shirts.

4       Q.      And was that this week?

5       A.      No, a week before last.

6       Q.      Anything else that they bought you?

7       A.      Things for me to wear when I was

8    coming here, like clothes.

9       Q.      Sneakers?

10       A.      Yes.

11       Q.      Did they give you the money and allow

12    you to purchase it, or did they buy the items

13    for you?

14       A.      They went to purchase it.

15       Q.      Okay.  Did -- the cell phone that you

16    received from Mathieu, that was not your first

17    cell phone, was it?

18       A.      No, it wasn't the first one.

19       Q.      When did you have your first cell

20    phone?

21       A.      After I met with Cyrus.

22       Q.      The first meeting with Cyrus?

23       A.      After.

24       Q.      Did Cyrus have anything to do with you

25    purchasing that first cell phone?

Confidential - Subject to Further Confidentiality Review

Page 173

1              MS. POLLOCK:  I'm going to object.
2    That's vague.
3              If you give me one second, I don't
4    know if I need to object or not.  Just give me
5    one second, Counsel, to confer.
6              I'm just going to maintain my
7    objection that it's vague.
8              If you understand, you can answer.
9       A.    Can you repeat the question, please?
10   BY MR. WILLIAMS:
11      Q.    Did Cyrus assist you in any way in
12   purchasing your first cell phone?
13      A.    Yes.
14      Q.    And how?
15      A.    He purchased it for me.
16      Q.    So Mathieu and Cyrus purchased you two
17   cell phones?
18      A.    Yes.
19      Q.    And in addition, you received a $100
20   bill?
21             MS. POLLOCK:  Objection.
22   Mischaracterizes the witness's testimony.
23   BY MR. WILLIAMS:
24      Q.    You can answer.
25      A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 174

1       Q.    Is there anything else that Cyrus or

2    Mathieu has purchased or given to you that

3    you've not identified?

4       A.    Everything I received, I told you

5    about it.

6       Q.    Okay.  Thank you.

7             Now, I want to go back to your

8    description of the abuse for just a few

9    follow-up questions.

10            As I understand what you told us, you

11   were going to the Village as a day student and

12   living at home with your parents?

13      A.    Yes.

14      Q.    Okay.  And did you go to the Village

15   seven days a week, or did you go five days a

16   week?

17      A.    Every day.

18      Q.    Every day.  So even on the weekends,

19   you went to the Village?

20      A.    Only on Sundays.

21      Q.    What about on Saturdays?

22      A.    Yes, I went there on Saturdays.

23      Q.    So only on Sundays you didn't go to

24   the Village, is that what you mean?

25      A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 175

```
1        Q.    And the classes that they had at the
2   Village, were they Monday through Friday?
3        A.    Yes.
4        Q.    And on Saturday when you went to the
5   Village, was it a fun -- a sports-related
6   activity day?
7        A.    Yes.
8        Q.    And it was also the day where you
9   could continue to get your meals, correct?
10       A.    Yes.
11       Q.    Now, the day that Douglas approached
12  you to go to Bel Air the first time, do you
13  remember if it was a day when there was classes,
14  or was it Saturday, the activity day?
15       A.    It was a school day.
16       Q.    And do you recall that day whether you
17  had attended any classes or had any meals before
18  going to Bel Air the first time?
19       A.    I don't remember.
20       Q.    Now, were there more people on the
21  grounds of the Village on a school day than
22  there would be on a Saturday?
23       A.    Could you repeat it for me, please?
24       Q.    Were there more people on the grounds
25  of the Village on a school day rather than on a
```

Confidential - Subject to Further Confidentiality Review

Page 176

1   Saturday?

2       A.    During the week.

3       Q.    During the week there were more?

4       A.    Yes.

5       Q.    And did you ever see Douglas drive off

6   campus with only one student in his car?

7       A.    I don't remember.  I don't remember

8   anything about that at all.

9       Q.    Okay.  Do you remember -- well, let me

10  withdraw that.

11          As far as you know, when you were

12  approached by Douglas and taken off the Village

13  grounds in his car, was that the first time he

14  left the Village with one student in the car?

15      A.    That I don't know.

16      Q.    Okay.  You were asked many questions

17  about Bel Air.  Was it daytime when you arrived

18  there?

19          MS. POLLOCK:  Are we talking about the

20  first time?

21  BY MR. WILLIAMS:

22      Q.    I'm sorry, the first time.

23      A.    No, the first time, no.  It was still

24  daytime.

25      Q.    It was daytime.

Confidential - Subject to Further Confidentiality Review

Page 177

1              Do you remember if it was the morning

2    or the afternoon?

3        A.    I don't think it was in the morning.

4        Q.    Okay.  Do you remember if you had any

5    meals that day before going to Bel Air?

6        A.    I don't remember.

7        Q.    When you got to Bel Air, did you have

8    an opportunity to look at the house?

9        A.    No.

10        Q.    Do you know what color the house was?

11        A.    No, I don't remember.

12        Q.    Was it a clear day?

13        A.    Yes.

14        Q.    Do you have good vision?

15        A.    Yes.

16        Q.    You said the day after -- well, I

17    don't want to confuse you.

18              Mr. Bernard, now, as I understood it,

19    after the second time you were abused at Bel

20    Air, Mr. Perlitz gave you some money, is that

21    correct?

22        A.    Yes, after the second time.

23        Q.    And that was the day after you had

24    been abused the second time?

25        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 178

1       Q.     And did he tell you why he had given

2    you that money?

3       A.     No.

4       Q.     Did you ask him why he was giving you

5    that money?

6       A.     No.

7       Q.     Did he ever give you money before?

8       A.     No.

9       Q.     Did he ever give you money after that

10   one occasion?

11      A.     No.

12      Q.     During your time at the Village, did

13   anyone else ever give you money?

14             MS. POLLOCK:  Associated with the

15   Village?

16             MR. WILLIAMS:  Yes.

17      A.     Yes.

18   BY MR. WILLIAMS:

19      Q.     Who would that be?

20      A.     Robinson.

21      Q.     And who was Robinson?

22      A.     Someone that was working there.

23      Q.     And when would Robinson give you

24   money?

25      A.     I wasn't the only one.  Every Saturday

Confidential - Subject to Further Confidentiality Review

Page 179

1  they used to give us money.

2       Q.    How much money would they give you on

3  Saturday?

4       A.    50 gourdes.

5       Q.    And is that sort of spending money?

6       A.    Yes.

7       Q.    Okay.  And all the students that were

8  there on Saturday received it?

9       A.    There was a group that they give the

10  money to.

11       Q.    Did you have to do anything in order

12  to get the money?

13       A.    Yes, I used to wash the kitchen

14  utensils, and I used to clean the tables.

15       Q.    So you'd be paid for doing some

16  service or job on the grounds of the Village?

17       A.    Encourage us so we could keep it

18  clean.

19       Q.    Okay.  Now, are you making a claim

20  that your abuse by Perlitz has caused you an

21  injury?

22       A.    I'm just looking for justice.

23       Q.    But when you say "justice," are you

24  looking for money justice?

25       A.    I don't know.  Only the judge knows.

Confidential - Subject to Further Confidentiality Review

Page 180

```
 1      Q.    Do you know what the other former
 2   students received, the ones that were driving
 3   the cars?
 4      A.    No.
 5      Q.    Can you describe what going to PPT and
 6   being abused by Perlitz did to you?
 7      A.    I feel like my life is over, I feel I
 8   don't have any hope, and then I feel guilty
 9   because I felt that I went against God's laws.
10      Q.    Are you a religious person,
11   Mr. Bernard?
12      A.    That's how I was raised, that's what
13   -- that's my mother, and that's what I've always
14   seen them do.
15      Q.    Okay.  Do you attend church?
16      A.    I used to.
17      Q.    When did you stop?
18      A.    When I left my parents' house.
19      Q.    Okay.  You left your parents' house in
20   2015, I think, is that right?
21      A.    Yes.
22      Q.    Okay.  But up to that point, you were
23   attending church?
24      A.    No.
25      Q.    Okay.  When had you stopped attending
```

Confidential - Subject to Further Confidentiality Review

Page 181

1    church?

2         A.    When I left my parents' house.

3         Q.    Okay.  Are you talking about when you

4    left your parents' house at some point prior to

5    2015?

6         A.    No, after I left my parents' house I

7    didn't go to church.

8         Q.    So you haven't been going to church

9    since 2015?

10         A.    I don't go anymore.

11         Q.    Okay.  Did your parents urge you to go

12    to church when you were living with them?

13         A.    Yes.

14         Q.    Okay.  Have you sought any type of

15    counseling, or help of any kind?

16              MS. POLLOCK:  Objection.  Vague,

17    compound.

18         A.    Cigarettes in what room?

19    BY MR. WILLIAMS:

20         Q.    Have you ever sought any treatment for

21    cigarettes or rum abuse?

22         A.    No.

23         Q.    How often do you drink?

24         A.    I don't remember.

25         Q.    When did you arrive here?

Confidential - Subject to Further Confidentiality Review

Page 182

```
 1        A.    Here?

 2        Q.    Here at this resort.

 3        A.    At the hotel, or in here in this room?

 4        Q.    At the hotel.

 5        A.    Sunday.

 6        Q.    Okay.  Have you had any rum since

 7   you're here?

 8        A.    No.

 9        Q.    Do you know the last time that you had

10   rum?

11        A.    I don't remember.

12        Q.    Do you know the last time you had a

13   cigarette?

14        A.    No, I don't remember.

15        Q.    Have you had rum or cigarettes since

16   you left your parents?

17        A.    Yes.

18        Q.    But you don't know when it was, when

19   you last did?

20        A.    No.

21        Q.    Apart from rum and cigarettes, you

22   haven't sought any other type of counseling?

23        A.    No.

24        Q.    I think you answered this, sir.  I

25   apologize if I missed it.  You're not currently
```

Confidential - Subject to Further Confidentiality Review

Page 183

1    employed, are you?

2        A.    No, I'm not working now.

3        Q.    And for years you have worked an odd

4    job as a mason, is that correct?

5        A.    Yes, once in a while.

6        Q.    Once in a while.

7              But other than that, you've been

8    unemployed?

9        A.    No.

10       Q.    Now, you mentioned Fairfield

11   University.  What do you know about Fairfield

12   University?

13       A.    What I understand is that they were

14   one of the bosses that we had at the Village.

15       Q.    Okay.  And how did you have that

16   understanding?

17       A.    They always told us that.

18       Q.    Who told you that?

19       A.    Mrs. Carter used to make speeches, and

20   Douglas would translate for her.

21       Q.    Okay.

22             THE INTERPRETER:  Would interpret, I'm

23   sorry.

24       Q.    So it was Mrs. Carter who would be

25   telling you that?

Confidential - Subject to Further Confidentiality Review

Page 184

```
 1       A.    She used to tell us as soon as we're
 2  done with our studies at the Village she has the
 3  possibility and the ability to send us to
 4  Fairfield University.
 5       Q.    Did you think that Mrs. Carter was
 6  going to send you to Fairfield University?
 7       A.    Yes.
 8       Q.    Now, when you heard that, you were
 9  already at the Village, is that correct?
10       A.    Yes.
11       Q.    And before you heard Mrs. Carter, you
12  wanted to get to the Village, isn't that
13  correct?
14       A.    Can you repeat it for me, please?
15       Q.    Sure.
16             As I understood what you said earlier,
17  you were at the Carenage, and then you went to
18  the Village, is that correct?
19       A.    I went to Carenage, and then I went to
20  school at Mère Berg.
21       Q.    Right.
22             But then you also went to the Village
23  after that?
24       A.    Yes.
25       Q.    Okay.  And Madam Carter you said spoke
```

Confidential - Subject to Further Confidentiality Review

Page 185

1   to you when you were at the Village?

2       A.    She spoke to us as a group, and then

3   they would interpret for her.

4       Q.    Okay.  But that was at the Village?

5       A.    Yes.

6       Q.    So you already wanted to be at the

7   Village before that happened, correct?

8       A.    Yes.

9       Q.    Okay.  And did you ever speak to

10  anyone from Fairfield University?

11      A.    No, I never spoke to any one of them.

12          MR. WILLIAMS:  Thank you very much,

13  sir.  I don't have any other questions.

14          MR. O'NEILL:  Let's take a break.

15          MS. POLLOCK:  Sure.

16          THE VIDEOGRAPHER:  Going off the

17  record.  The time is 3:11.

18          (Whereupon, a recess was taken.)

19          THE VIDEOGRAPHER:  We're back on the

20  record.  The time is 3:30.

21          MS. POLLOCK:  Do you want me to start?

22          So before we took a break, counsel had

23  asked the witness if he knew why Cyrus had

24  purchased him a cell phone.  I instructed the

25  witness not to answer, because I thought that it

Confidential - Subject to Further Confidentiality Review

Page 186

1    was a privileged communication.  Now that I've

2    had the opportunity to understand -- ascertain

3    and understand the answer, I withdraw my

4    objection, and I will let the witness answer

5    that question.

6           MR. WILLIAMS:  Thank you.

7    BY MR. WILLIAMS:

8       Q.    Mr. Bernard, do you know why Cyrus

9    bought you your first cell phone?

10      A.    Yes.

11      Q.    And what was the reason?

12      A.    So I could communicate with my

13   lawyers.

14      Q.    And did you have a cell phone at any

15   time prior to Cyrus purchasing you that?

16      A.    Yes.

17      Q.    Okay.  And do you know if he purchased

18   other former Village students cell phones?

19      A.    I don't know.

20      Q.    Did you have Cyrus's phone number?

21      A.    Yes.

22      Q.    Did you have Mathieu's phone number?

23      A.    Yes.

24      Q.    Did you have any phone numbers of your

25   lawyers?

Confidential - Subject to Further Confidentiality Review

Page 187

1       A.    Yes.

2       Q.    Which one?

3       A.    Lawyer Mitch.

4       Q.    Why did Mr. Sibert buy you a second

5  phone through Mathieu in March of this year?

6       A.    The one I had was ruined.

7       Q.    Are you on Facebook?

8       A.    No.

9            MR. WILLIAMS:  I don't have any other

10  questions.  Thank you.

11  BY MR. O'NEILL:

12       Q.    I introduced myself earlier,

13  Mr. Bernard, I'm Timothy O'Neill, and I

14  represent Father Paul Carrier, Pere Paul I think

15  you know him as.

16       A.    Yes.

17       Q.    Now, you were -- introduced earlier

18  were your answers to interrogatories.  You

19  understand that?

20       A.    Yes.

21       Q.    I think it's Exhibit 2.

22            MS. POLLOCK:  1.

23  BY MR. O'NEILL:

24       Q.    Exhibit 1.  Are these the exhibits?

25            Okay.  So I believe you already

Confidential - Subject to Further Confidentiality Review

Page 188

1  testified, but I'll ask you again, you knew that

2  these interrogatory answers of yours were to be

3  answered under oath before God that they were

4  the truth, is that correct?

5      A.   Yes.

6      Q.   All right.  So look at Interrogatory

7  No. 12 in the Creole.

8           MS. POLLOCK:  Can you translate that

9  part for him, please?

10 BY MR. O'NEILL:

11     Q.   The question is English is "Please

12 state when you first retained counsel in this

13 matter and who referred you to counsel."

14           And your answer under oath, and I'll

15 read the English, and you have the Creole there,

16 "I do not" exactly -- "I do not know exactly

17 when.  When the Village closed I went to the

18 Dominican Republic.  I was referred to counsel

19 in and around November" 13, 2013 -- "in and

20 around November," sorry, "2013 by Cyrus Sibert."

21           Do you see that answer in Creole?

22           MS. POLLOCK:  I'm sorry, hold on,

23 Counsel.  We're on Interrogatory 13?

24           MR. O'NEILL:  No, 12.  Sorry.  Did I

25 say 13?

Confidential - Subject to Further Confidentiality Review

Page 189

1            MS. POLLOCK:  You said 2013.  So give
2     me one second, please.  You may need to repeat
3     that.  I apologize.
4     BY MR. O'NEILL:
5         Q.    Okay.  Your answer is I do not know
6     exactly when you retained counsel, but you say
7     "when the Village closed, I was referred to
8     counsel in and around November, 2013 by Cyrus
9     Sibert."
10            So having that answer in mind, you
11     stated under oath that you were referred to
12     counsel in and around November, 2013, isn't that
13     correct?
14        A.    I don't remember the date.
15        Q.    Well, you stated under oath in and
16     around November, 2013, that was your statement
17     under oath in your own interrogatories, wasn't
18     it?
19        A.    I don't remember what the date was
20     when I was referred to the lawyer.
21        Q.    You said -- these are your
22     interrogatories, aren't they, statements under
23     oath by you?
24            Do you have my question in mind?
25        A.    Yes, I remember the question.

Confidential - Subject to Further Confidentiality Review

Page 190

1      Q.    What's your answer?

2      A.    I don't remember the exact date.

3      Q.    Has something happened to your memory

4   between the time you signed these

5   interrogatories under oath stating November,

6   2013, "in and around November, 2013," has

7   something happened to your memory in the

8   intervening period of time so that you now don't

9   remember?

10          MS. POLLOCK:  Objection.  Vague, and

11   compound.

12          MR. O'NEILL:  It's not vague at all.

13   BY MR. O'NEILL:

14      Q.    But answer the question.

15      A.    Can you repeat the question, please?

16          MR. O'NEILL:  Would you read it back?

17          (Interpreter rereading question.)

18      A.    No, when something happened a long

19   time ago, it's difficult for me to remember.

20   BY MR. O'NEILL:

21      Q.    November, 2013 and when you signed

22   these interrogatories in 2014, that's not very

23   long ago, is it?

24      A.    2014, yes, time has gone by.

25      Q.    Well, doesn't it refresh your memory

Confidential - Subject to Further Confidentiality Review

Page 191

1   that you said in 2014 under oath that it was in

2   and around November, 2013 that you were referred

3   to counsel?  What's your answer?

4           MS. POLLOCK:  Hold on.  I've asked him

5   to wait.

6           I'm going to object that counsel is

7   misrepresenting what Interrogatory 12 actually

8   asks for.  You're using the word "referred to

9   counsel" when the interrogatory asks when you

10  actually retained counsel.

11          MR. O'NEILL:  I'm reading his answer.

12          MS. POLLOCK:  I'm reading the

13  question.

14          MR. O'NEILL:  I'm reading his answer.

15          MS. POLLOCK:  That's fine.

16          MR. O'NEILL:  You're again obstructing

17  the witness.

18          MS. POLLOCK:  No, I'm not.

19          MR. O'NEILL:  In a direct answer to a

20  direct question, you're interrupting, and he

21  still -- he'll lose the question again.

22  BY MR. O'NEILL:

23      Q.    Do you have the question in mind?

24      A.    No.

25      Q.    Of course not.  Let me repeat it

Confidential - Subject to Further Confidentiality Review

Page 192

1    again.

2            Doesn't it refresh your memory,

3    doesn't it call back to your mind now that in

4    2014 under oath you said it was in and around

5    November, 2013 that you were referred to

6    counsel?

7        A.    If I don't remember, I don't have to

8    choose something to say.

9        Q.    Well, you said something that you had

10    a memory in 2014.  What has happened?

11            MS. POLLOCK:  Objection.  Vague and

12    argumentative.

13    BY MR. O'NEILL:

14        Q.    What has happened to your memory?

15        A.    I may not remember.

16        Q.    Well, can we rely on memory you

17    expressed under oath in 2014 that it was in and

18    around November of 2013, not that long before

19    your statement under oath, that you were

20    referred to counsel?

21        A.    I don't remember.  I don't even

22    remember making a statement.

23        Q.    That's an answer you've given quite a

24    lot today, isn't it?

25            MS. POLLOCK:  Objection.

Confidential - Subject to Further Confidentiality Review

Page 193

 1   Argumentative.  There's no question pending.

 2   BY MR. O'NEILL:

 3       Q.    Isn't that an answer you've given to

 4   many questions today, you don't remember?

 5           MS. POLLOCK:  Objection.

 6   Argumentative.

 7       A.    Yes, I don't remember.

 8   BY MR. O'NEILL:

 9       Q.    You were arrested in the Dominican

10   Republic in 2012, weren't you?

11       A.    Yes.

12       Q.    Because you say that in your own

13   interrogatories, Interrogatory No., let's see,

14   11, No. 11.  If you'll look at the Creole for

15   No. 11 in your answers under oath to the

16   questions.

17       A.    Yes.

18       Q.    So we can rely on the answer to

19   Interrogatory No. 11 and your memory today?

20       A.    Yes.

21       Q.    And we can rely on your answer under

22   oath that you were referred to counsel in and

23   around November, 2013 because you have no memory

24   now, but you stated it under oath in 2014?

25       A.    I can remember this question, but it

Confidential - Subject to Further Confidentiality Review

Page 194

```
 1   also happens that I may not remember the other
 2   one.
 3       Q.    I know, that's why we have to rely on
 4   what you said under oath in the past.
 5             MS. POLLOCK:  There's no question
 6   pending.
 7   BY MR. O'NEILL:
 8       Q.    Isn't that correct?
 9       A.    I can't tell you I didn't because I
10   don't remember.
11       Q.    You can tell me you didn't what?
12       A.    The question that you asked, asking me
13   if I remember.
14       Q.    No.  I'm asking you since you don't
15   remember now, we can certainly rely on what your
16   statement under oath said in 2014 when you
17   answered the interrogatories?
18       A.    I don't know, because I don't
19   remember.
20       Q.    All right.  We'll leave that alone.
21             You recall that you were asked by
22   counsel just now about the record that's been
23   introduced into court in your case that Cyrus
24   Sibert gave you $100 on August 3, 2013, I
25   believe that was the date, do you recall that?
```

Confidential - Subject to Further Confidentiality Review

Page 195

1    That's correct, August 3, 2013.

2         A.    I remember he gave it to me, but I

3    told you I can't remember the exact day.

4         Q.    But Cyrus Sibert certainly remembered

5    the date because he made of record of it, didn't

6    he, August 3, 2013?

7              MS. POLLOCK:  I object that counsel is

8    asking the witness about a document that is in

9    English when he's already testified that he

10   can't --

11             MR. O'NEILL:  Well --

12             MS. POLLOCK:  I haven't finished,

13   please.  I would like to finish my objection --

14             MR. O'NEILL:  Go ahead.

15             MS. POLLOCK:  -- before you start

16   speaking.

17             MR. O'NEILL:  I know your

18   obstructionism, but go ahead.

19             MS. POLLOCK:  That's fine, Counsel.

20   Again, I am making a record that counsel is

21   asking the witness about a question that was

22   submitted by lawyers in English when the witness

23   does not read English and has not seen the

24   document before.

25             MR. O'NEILL:  Submitted by the lawyers

Confidential - Subject to Further Confidentiality Review

Page 196

1    for this witness representing that they were a

2    translation of Cyrus Sibert's notes.  So I have

3    a right to ask him.

4    BY MR. O'NEILL:

5        Q.    Can we rely on August 3rd -- since you

6    have no memory, will you accept the fact that

7    Cyrus Sibert in the document that we have said

8    he gave you the money on August 3, 2013?

9        A.    It depends on you, because I don't

10   remember.

11       Q.    Well, will you accept that there's a

12   document submitted by your own counsel that

13   represents that Cyrus Sibert said he gave you

14   the money on August 3, 2013?

15       A.    I know that he gave me -- he give it

16   to me after I hired the lawyers.

17       Q.    So that document is inaccurate, is

18   that what you're saying?  You have a memory that

19   it's inaccurate?

20           MS. POLLOCK:  Which document, Counsel?

21   BY MR. O'NEILL:

22       Q.    The document that says you got the

23   money on August 3, 2013, are you saying that

24   that document represented by your counsel as

25   coming from Cyrus Sibert is inaccurate?

Confidential - Subject to Further Confidentiality Review

Page 197

1      A.     I told you what it is.

2      Q.     You told me what?

3      A.     That I got the money after I hired the

4   lawyer.

5      Q.     After you hired the lawyers?

6      A.     Yes.

7      Q.     When did you hire the lawyers?

8      A.     I don't remember.

9      Q.     Your complaint in this case was filed

10   by your lawyers in November, 2013.  Do you

11   understand that?

12      A.     I understand.

13            MR. O'NEILL:  Sorry?

14            THE INTERPRETER:  I understand.

15      Q.     So in and around November, it makes

16   sense that that's when you hired your lawyers,

17   doesn't it?

18            MS. POLLOCK:  Objection.  Vague, and

19   compound.

20            You can answer if you can.

21      A.     I already told you I don't remember.

22            MS. POLLOCK:  Do you want to take a

23   break?

24   BY MR. O'NEILL:

25      Q.     All right.

Confidential - Subject to Further Confidentiality Review

Page 198

```
 1              MS. POLLOCK:  I'm asking if he wants
 2    to take a break.
 3       A.    Yes.
 4              MR. O'NEILL:  We just took a break.
 5              MS. POLLOCK:  The witness has said he
 6    wants to take a break.  Are you saying that he
 7    cannot take a break?
 8              MR. O'NEILL:  There's a question
 9    pending, isn't there?
10              MS. POLLOCK:  No, there's not.  He's
11    answered it.
12              MR. O'NEILL:  Why is he taking a break
13    now?  We just had a break for 20 minutes.
14              MS. POLLOCK:  We'll take a few minute
15    break.  I don't know.  I'd like to talk to him
16    and find out.
17              Are you saying we cannot take a break?
18              MR. O'NEILL:  You know --
19              MS. POLLOCK:  Yes or no, can we take a
20    break?
21              MR. O'NEILL:  -- just to remind you
22    that the objections we have to your conduct
23    here, including these recent interruptions, that
24    we will take this before the judge, and we will
25    get the judge, if he listens to us and acts upon
```

Confidential - Subject to Further Confidentiality Review

Page 199

1    the request, that the Plaintiffs pay the entire

2    expense of coming back to interrogate this

3    witness for all of the times that you have

4    interrupted with objections that are groundless,

5    and with refusal or instructions to not answer

6    questions, and it will be on your -- the

7    Plaintiff counsel's account to pay for the next

8    examination if it has to be here in the

9    Dominican Republic.

10           MS. POLLOCK:  Counsel --

11           MR. O'NEILL:  I want that on the

12   record.

13           MS. POLLOCK:  That is on the record.

14           MR. O'NEILL:  So go take your break.

15           MS. POLLOCK:  I want to respond to

16   these baseless accusations.  We're talking about

17   taking potentially a few minute break.  That

18   does not --

19           MR. O'NEILL:  I said you can take it.

20           MS. POLLOCK:  I want to finish what

21   I'm saying.

22           That does not in any way give you

23   grounds to bring him back to redepose him again.

24   Is that what you're suggesting?

25           MR. O'NEILL:  No, no.  I'm suggesting

Confidential - Subject to Further Confidentiality Review

Page 200

1    your entire conduct during the examinations

2    where you instructed the witness not to answer

3    over objections by defense counsel.

4            MS. POLLOCK:  On the basis of

5    attorney/client privilege, correct.

6            MR. O'NEILL:  Whatever the bases were.

7            MS. POLLOCK:  That was the only basis.

8            MR. O'NEILL:  The record speaks for

9    itself.  Whatever the record says, that's what

10   speaks.  And I'm telling you what also the

11   consequences will be.

12           So go ahead and take your break.

13           THE VIDEOGRAPHER:  Going off the

14   record.  The time is 3:56.

15           (Whereupon, a recess was taken.)

16           THE VIDEOGRAPHER:  Back on the record.

17   The time is 4:05.

18   BY MR. O'NEILL:

19       Q.    Mr. Bernard, do you recall when you

20   did the answers to interrogatories, the process

21   that was going on?  I don't want to know

22   anything your attorneys said, but do you

23   remember the process that led to the composition

24   of your answers to the interrogatories?

25       A.    Can you repeat it again for me,

Confidential - Subject to Further Confidentiality Review

Page 201

1    please?

2         Q.    Yes.  I'll just read it from the

3    brilliant court reporter's accurate rendition of

4    my question.  Mr. Bernard, do you recall when

5    you did the answers to interrogatories the

6    process that was going on?  I don't want to know

7    anything your attorney said, but do you remember

8    the process that led to the composition, that

9    means the creation of, the writing of, your

10   answers to interrogatories?

11        A.    You're confusing me.

12        Q.    Sorry?

13        A.    You're confusing me.

14        Q.    I don't intend to confuse you.  What

15   is it about the question that confuses you?

16        A.    I don't understand clearly.

17        Q.    Do you remember doing your answers to

18   interrogatories that are here in front of us?

19        A.    Yes.

20        Q.    Do you remember who was present when

21   you were working at getting the answers to the

22   questions?

23        A.    I don't remember.

24        Q.    You don't remember who was present?

25        A.    No.

Confidential - Subject to Further Confidentiality Review

Page 202

1      Q.    Did you compose your answers with the
2  assistance of counsel?
3            MS. POLLOCK:  You can answer yes or
4  no, but I don't want you to testify about what
5  you actually spoke about with your counsel.
6      A.    Could you repeat the again, please?
7  BY MR. O'NEILL:
8      Q.    Yes.
9            Did your answers come, to the
10  questions on the interrogatories, with the
11  assistance of counsel?  Just yes or no.
12      A.    If my lawyer helped me?
13      Q.    Yes.  Did you get help from lawyers
14  when you answered the interrogatories?  Just yes
15  or no.
16      A.    No.
17      Q.    You did it all by yourself?
18      A.    Yes.
19      Q.    And how did you do it?  Did you sit
20  down and write it all out?
21      A.    You're confusing me, because you're
22  asking me if they helped me prepare the answers
23  that I gave.
24      Q.    Yes.  I'm asking, did you do it with
25  the help and assistance of your lawyers?  Yes or

Confidential - Subject to Further Confidentiality Review

Page 203

1   no.

2         A.    They asked me questions, and I

3   answered.

4         Q.    Who asked you questions?

5         A.    The lawyers.

6         Q.    Again, I don't want to know what the

7   lawyers said, but who were the lawyers that

8   helped you?

9         A.    Help me, what do you mean?

10        Q.    You said the lawyers helped you.  Who

11  were the lawyers?  Give me their names.

12        A.    I don't remember.  Like the

13  conversations I had over the phone, I don't

14  remember who I had them with exactly.

15        Q.    Are you dodging my question?

16              MS. POLLOCK:  Objection.

17  Argumentative, and vague.

18        A.    What do you mean, "dodging"?

19  BY MR. O'NEILL:

20        Q.    Is it your testimony under oath that

21  you had assistance of lawyers when you answered

22  the questions, and you don't know who their

23  names are?

24        A.    Yes, I knew Lu.

25        Q.    Tell me.

Confidential - Subject to Further Confidentiality Review

Page 204

```
 1            MS. XIA:  He just said my name.
 2   BY MR. O'NEILL:
 3       Q.    I'm sorry.  I thought you said I know
 4   who.  You know Lu.
 5            Is this the young lady on the end
 6   here?
 7       A.    Yes.
 8       Q.    Was Mitchell Garabedian there?
 9            MS. POLLOCK:  There on the phone, or
10   there --
11   BY MR. O'NEILL:
12       Q.    Any way, either present by phone or in
13   person.  Just yes or no.
14       A.    Can you repeat it for me, please?
15       Q.    Yes.
16            Was Mitchell Garabedian one of the
17   counsel present to assist you when you were
18   answering the questions?  Just yes or no.
19   Either by telephone or in person.
20       A.    Yes.
21       Q.    Okay.  And was another lawyer by the
22   name of William Gordon also present either by
23   telephone or by person?
24       A.    I don't remember all the names.
25       Q.    Was there a lawyer by the name of Paul
```

Confidential - Subject to Further Confidentiality Review

Page 205

1   Hanky -- I mean Hanly present?

2       A.    I don't remember.  What I remembered,

3   I answered.

4       Q.    Okay.  Anyone else that you can

5   remember that was present either by phone or in

6   person when you were answering the

7   interrogatories?

8       A.    On the phone, no.

9       Q.    How about in person?

10      A.    There were people there.

11      Q.    Who else?  Was Cyrus Sibert there?

12      A.    No.  When I was at the hotel somebody

13  else was there reviewing the questions.

14      Q.    Do you know who it was?

15      A.    I don't.  I don't know who it was.

16      Q.    Had you ever seen this person -- I'm

17  sorry.

18      A.    There was an interpreter.

19      Q.    Was this person the interpreter, or

20  was there another person other than the

21  interpreter there?

22      A.    No, there was somebody else and the

23  interpreter.

24      Q.    And did this other person, if you

25  remember, represent himself as an attorney?

Confidential - Subject to Further Confidentiality Review

Page 206

1       A.    I don't remember if they told me they

2    were a lawyer.

3       Q.    All right.  Now, I'm going to read you

4    a bunch of names that were added to your

5    complaint, and I don't have copies of the

6    complaint, but I will read them from my copy of

7    your complaint that was filed in November, 2014,

8    and I'll give a list from the complaint to the

9    interpreter.

10              MS. POLLOCK:  Do you mean 2013?

11              MR. O'NEILL:  Sorry?

12              MS. POLLOCK:  2013 was when the

13   complaint was filed.

14              MR. O'NEILL:  Yes.  Sorry.  2013.

15   BY MR. O'NEILL:

16      Q.    And it's only a list of names, and all

17   I'm going to ask you is if you know the person.

18   Okay?

19      A.    Yes.

20              MR. O'NEILL:  That's my copy of

21   Mr. Bernard's complaint, and I ask you as I go

22   through the names you give it its proper

23   pronunciation.

24   BY MR. O'NEILL:

25      Q.    This is a list of names of people that

Confidential - Subject to Further Confidentiality Review

Page 207

1    were students at PPT at, I believe, the same

2    time that you were there.

3             The first name, and I will leave it to

4    the interpreter to say it properly, is Joseph

5    Jean Charles.  Do you know that person?

6        A.    There were many Josephs, I don't know

7    their last names.

8        Q.    Okay.  So you could have, but you

9    would need to -- you didn't know the Jean

10   Charles -- there were several Josephs, and you

11   don't know if one of them was Jean Charles?

12       A.    Yes.

13       Q.    Okay.  But could have been?

14       A.    What did you say?

15       Q.    It could be a person you know, but you

16   didn't know the last name?

17       A.    I don't know the last name, but I know

18   who they are.

19       Q.    Okay.  Denis Mesamour?

20       A.    Yes.

21       Q.    Okay.  Franklyn Pierre?

22       A.    Yes.

23       Q.    Benson Alcime?

24       A.    I know him.

25       Q.    Okay.  Kenson Baptiste?

Confidential - Subject to Further Confidentiality Review

Page 208

```
 1        A.    I know him.

 2        Q.    Jean Ronal Belonne?  I'm sure I blew

 3   that one.

 4        A.    I know Jean Roland.  I don't know if

 5   his last name is Belonne or not.

 6        Q.    Donald Cadet?

 7        A.    I know him.

 8        Q.    Do you know him?

 9        A.    Yes.

10        Q.    Okay.  Edier Dorsainvil?

11              He's dead?  Is that what you said?

12        A.    I know Dorsainvil.  I don't know the

13   name Edier.

14        Q.    Okay.  Emmanuel Dorvil?

15        A.    Yes.

16        Q.    Peterson Eugene?

17        A.    I know Peterson.

18        Q.    Fredelin Fils-Aime?

19        A.    I think the name is Edlin.

20        Q.    But you would know him if that's the

21   name?

22        A.    I know Fils-Aime.

23        Q.    Peterson Gedeus?

24        A.    Yes.

25        Q.    Schoubert Hedouville?
```

Confidential - Subject to Further Confidentiality Review

Page 209

1       A.    I know Schoubert.

2       Q.    Francilien Jean Charles?

3       A.    I knew Francilien.

4       Q.    Fredelin Legrand?

5       A.    Fredelin, Fredelin, I know Fredelin, I

6    don't know the last name.

7       Q.    James Mathieu?

8       A.    Yes.

9       Q.    Luckson Mesidor?

10      A.    Don't concern yourself if some of them

11   I don't remember.

12      Q.    Okay.  Robens Pierre?

13      A.    Yes.

14      Q.    Romeus Rodlyn Rosanne?

15      A.    Sometimes I give them a nickname and

16   you don't know their real name.

17      Q.    So you don't know that name in itself?

18      A.    I don't remember him.

19      Q.    Okay.  Noel Smith?

20      A.    Yes.

21      Q.    Jimmy Jesula?

22      A.    Yes.

23      Q.    Michel Mackenson?

24      A.    Yes.

25      Q.    Now, did you happen to see any of

Confidential - Subject to Further Confidentiality Review

Page 210

1   those people that we just named that you knew

2   driving through the streets of Cap-Haïtien in a

3   gleaming new car?

4        A.    Yes.

5        Q.    Which ones did you see driving new

6   cars?

7        A.    I remember seeing Peterson.

8        Q.    What kind of car did he have?

9        A.    I don't know.

10        Q.    Do you remember when you saw him

11   driving with a gleaming new car?

12        A.    I don't remember.  I just saw him in a

13   car.

14        Q.    Now, one of the people that -- on the

15   information we filed, that is filed in court

16   from ostensibly Cyrus Sibert, one of the people

17   that got 100 US dollars was Johnson Audate.

18   That's the person you live with, isn't it?

19        A.    Yes.

20        Q.    You know he received $100, too, didn't

21   you?

22        A.    He didn't tell me that.  I don't know.

23        Q.    You don't know.

24              Has Cyrus helped you with the rent,

25   you and Johnson Audate?

Confidential - Subject to Further Confidentiality Review

Page 211

```
 1      A.     No.  We don't pay rent.
 2      Q.     Oh, you don't pay rent.  Why is that?
 3   Does he own the house?
 4      A.     No.  Somebody give him the house to
 5   live in.
 6      Q.     Someone just gave him the house?
 7      A.     The person left and left him in the
 8   house to watch the house.
 9      Q.     By the way, did you know a Jessica at
10   the Village, a white woman?
11      A.     Yes.
12      Q.     From Carenage?  Did she work at
13   Carenage?
14      A.     Yes.
15             MR. O'NEILL:  That's all I have.
16   Thank you.
17   BY MR. BABBITT:
18      Q.     Good afternoon, sir.  I'm Brad
19   Babbitt, I represent the American Association of
20   the Order of Malta.
21             You were just asked about Johnson
22   Audate.  Do you also live with Jameson Audate?
23      A.     Johnson Audate, yes.
24      Q.     What about Jameson?
25      A.     Jameson, Johnson.
```

Confidential - Subject to Further Confidentiality Review

Page 212

1      Q.    Do you know a person named Jameson

2    Audate?

3      A.    No, I know Johnson.

4      Q.    Never heard that name, Jameson Audate?

5      A.    I've heard the name, but I think you

6    pronounced it wrong.  What I know is what I tell

7    you.

8      Q.    You've heard the name Jameson?

9      A.    Yes, I just heard it from you now.

10     Q.    Have you ever heard the name Jameson

11   before today?

12     A.    No.

13     Q.    Does Johnson Audate have a brother?

14     A.    He has several brothers.

15     Q.    Is one of them named Jameson?

16     A.    Yes.

17     Q.    Do you live with anyone in addition to

18   Johnson Audate?

19     A.    Besides Johnson?

20     Q.    Yes, besides Johnson, do you live with

21   anybody else in that house that you live in?

22     A.    The other brother you just mentioned.

23     Q.    The other brother I just mentioned;

24   you live with Jameson Audate?

25     A.    Yes, he lives there also.

Confidential - Subject to Further Confidentiality Review

Page 213

1      Q.    Did you attend PPT with Jameson
2   Audate?
3      A.    No.
4      Q.    Did you attend PPT with Johnson
5   Audate?
6      A.    Yes.
7      Q.    Did Jameson Audate ever attend PPT?
8      A.    No.
9      Q.    Johnson, he came and had his
10  deposition taken in January of this year, right?
11     A.    Johnson?
12     Q.    Yes, Johnson.
13     A.    Yes, I knew he came.
14     Q.    How long was he away?
15     A.    I don't remember.
16     Q.    Did you talk about the deposition when
17  he got back?
18     A.    He told me he came here.
19     Q.    What else did he say?
20     A.    He didn't say anything else.
21     Q.    He was gone for about five or
22  six days, right?
23     A.    I don't remember how many days.
24     Q.    And he didn't tell you what happened
25  while he was here?

Confidential - Subject to Further Confidentiality Review

Page 214

1      A.    No.

2      Q.    He didn't tell you about the hotel?

3      A.    Huh?

4      Q.    He didn't tell you about the hotel?

5      A.    I didn't ask him for all these

6   explanations.  He just told me that he was away.

7      Q.    He only told you that he went to a

8   deposition, that's it?  That's the only thing he

9   ever told you?

10     A.    He didn't say anything about a

11  deposition.  He said that they needed him, so he

12  was leaving to go there.

13     Q.    Did he say anything else?

14     A.    No.

15     Q.    Did he tell you how much money Cyrus

16  paid him?

17     A.    I don't know anything about that.

18     Q.    He never told you?

19     A.    No.

20     Q.    How about how much money Mathieu has

21  paid him, did he tell you that?

22     A.    No.

23     Q.    Did you ever tell him how much money

24  Cyrus paid you?

25     A.    Cyrus didn't pay me any money.

Confidential - Subject to Further Confidentiality Review

Page 215

1    Q.    How about Mathieu, did Mathieu ever
2    pay you any money?
3    A.    No.
4    Q.    So Cyrus never gave you any money, is
5    that what your testimony is?
6    A.    Yes, he gave me.
7    Q.    Okay.  So Cyrus gave you money, is
8    that right?
9    A.    Yes.
10   Q.    And did you tell Johnson how much
11   money Cyrus gave you?
12   A.    At that time we were not living in the
13   same house.
14   Q.    Did you ever tell Johnson how much
15   money Cyrus gave you?
16   A.    No.
17   Q.    Did you ever tell Cyrus -- I beg your
18   pardon.
19         Did you ever tell Johnson how much
20   money Mathieu gave you?
21   A.    Mathieu hasn't given me any money.
22   Q.    Did you ever tell Johnson that Cyrus
23   had bought you phones?
24   A.    Yes, he knew.
25   Q.    He knew because you told him?

Confidential - Subject to Further Confidentiality Review

Page 216

```
 1       A.    Yes, he saw me with the phone.
 2       Q.    Did you tell him who bought it?
 3       A.    Yes.
 4       Q.    What did you tell him?
 5       A.    He asked me where did I find the
 6  phone.  I told him I had problems, to talk to my
 7  lawyers, so Cyrus gave me the phone.
 8       Q.    What did he say to you?
 9       A.    He said "well, okay."  He didn't say
10  anything else.
11       Q.    Did Johnson ever get a phone from
12  Cyrus?
13       A.    I don't know.
14       Q.    Never seen him with a phone?
15       A.    I've seen him with a phone, but I
16  don't know where he found the phone.
17       Q.    Never asked him?
18       A.    No.
19       Q.    You attended Carenage, is that
20  correct?
21       A.    Yes.
22       Q.    Then you attended the Village?
23       A.    I went to Mère Berg first.
24       Q.    How long were you at that school?
25       A.    Mère Berg?
```

Confidential - Subject to Further Confidentiality Review

Page 217

1     Q.    Yes.

2     A.    One year.

3     Q.    Did you want to attend the Village?

4     A.    Yes.

5     Q.    Why?

6     A.    Because I thought I would be better

7  there.

8     Q.    Did you know before you attended the

9  Village that students were taught to read Creole

10  at the Village?

11     A.    At the Village?

12     Q.    Yes.

13     A.    Yes.

14     Q.    Did you want to read -- to learn to

15  read Creole?

16     A.    Yes.

17     Q.    Before you attended the Village, did

18  you know that students at the Village were

19  taught to write Creole?

20     A.    Yes.

21     Q.    Did you know before you attended the

22  Village that the students at the Village were

23  taught math?

24     A.    Yes.

25     Q.    Did you want to learn math?

Confidential - Subject to Further Confidentiality Review

Page 218

1       A.      Yes.

2       Q.      Before you attended the Village, did

3   you know that students at the Village were

4   taught science?

5       A.      Yes.

6       Q.      Did you want to learn that?

7       A.      Yes.

8       Q.      Did you know before you attended the

9   Village that student were taught other subjects

10  at the Village?

11      A.      The others I found out once I was

12  there.  The others I found out once I was there.

13      Q.      Did you go to the Village because you

14  wanted to learn to read Creole and write Creole,

15  and learn math, and learn science?

16      A.      I didn't go only for that.

17      Q.      Why else did you go?

18      A.      I went for all the other advantages

19  that I knew I would receive.

20      Q.      And what were the other advantages

21  that you knew you would receive?

22      A.      The biggest advantage to me was that I

23  knew if I finished school I would have the

24  possibility of going to university.

25      Q.      When would you finish school?  Would

Confidential - Subject to Further Confidentiality Review

Page 219

1    you be complete and able to go to university at

2    the end of the sixth grade?

3        A.    When I was totally finished with

4    school.

5        Q.    And when would you be totally finished

6    with school, at the end of the sixth grade?

7        A.    No.

8        Q.    How many grades were taught at PPT?

9    What was the top grade?

10       A.    Sixth grade.

11       Q.    So in order to go to university, you

12   would have had to go to school someplace else

13   after PPT, is that right?

14       A.    Yes.

15       Q.    Before PPT closed, did you ever hear

16   any teacher say that Doug Perlitz was forcing

17   students to have sex with him?

18       A.    I haven't heard that.

19       Q.    Before PPT closed, did you ever hear

20   any staff member at PPT say that Douglas Perlitz

21   was forcing students to have sex with him?

22       A.    No, I haven't.

23       Q.    Before PPT closed, did you ever hear

24   any person say that Doug Perlitz was forcing

25   students at PPT to have sex with him?

Confidential - Subject to Further Confidentiality Review

Page 220

1      A.    No, I haven't heard that.

2      Q.    Before you started attending the

3   Village, did you ever hear the name Haiti Fund?

4      A.    I don't understand that word.

5      Q.    Have you ever heard the name Haiti

6   Fund?

7      A.    No.

8      Q.    Now, you told us earlier today that

9   you had heard the name Malta, is that correct?

10     A.    Yes.

11     Q.    What is the Order of Malta?

12     A.    I don't know exactly what it is.  I

13   just thought they were one of the sponsors.

14     Q.    When was the first time you heard the

15   name Order of Malta?

16     A.    Inside the Village.

17     Q.    Did you hear the name Order of Malta

18   when you were attending Carenage?

19     A.    No.

20     Q.    Did you hear the name Order of Malta

21   when you were attending Mère Berg?

22     A.    No.

23     Q.    So the first time you heard the Order

24   of Malta was when you were attending the

25   Village?

Confidential - Subject to Further Confidentiality Review

Page 221

1      A.    Yes.

2      Q.    Who said the name Order of Malta to

3   you?

4      A.    I used to hear it from Robinson.

5      Q.    What did he say about it?

6      A.    Well, he used to talk about the

7   sponsors that the Village had, and I heard him

8   say that name.

9      Q.    What else did he say about the Order

10  of Malta?

11     A.    I don't remember.

12     Q.    How many times did he use that name in

13  speaking to you?

14     A.    I don't remember how many times.

15     Q.    Where were you when he said that to

16  you?

17     A.    Someplace with all the other kids.

18     Q.    Other people were present when he said

19  that to you?

20     A.    Yes.  The other kids were there.

21     Q.    Who?

22     A.    All the kids in the Village, we get

23  together, and when they're talking to us about

24  that.

25     Q.    Name who was present.

Confidential - Subject to Further Confidentiality Review

Page 222

1      A.    A lot of people.  Some of the names
2   that you just said.
3      Q.    I haven't said any names.
4            Who do you remember being there?
5      A.    Johnson, Wismond, all the other guys
6   were there.
7      Q.    Where were you when he said this to
8   you?
9      A.    In the room where we were all meeting.
10     Q.    What room?
11     A.    A room where we meet so we can talk.
12     Q.    Was this where you ate your meals, or
13   was it a classroom, or some other room?
14     A.    Sometimes they use where we eat.
15     Q.    Was that the room you were meeting in
16   when Robinson said the name Order of Malta?
17     A.    Yes.
18     Q.    What year was it when he told you what
19   he said about the Order of Malta?
20     A.    The year 2007.
21     Q.    Was Johnson Audate present when
22   Robinson used the word -- the name Order of
23   Malta?
24     A.    Yes, all the other guys were there.
25     Q.    How about Louis Saincirin, was he

Confidential - Subject to Further Confidentiality Review

Page 223

1    present?

2        A.    Louis Saincirin?

3        Q.    Yes.

4        A.    I don't remember.

5        Q.    Anybody else you remember being

6    present?

7        A.    Yes, I remember a lot of other people.

8        Q.    How about Dorat Jean?

9        A.    Jean Dorat, yes.

10       Q.    He was there?

11       A.    Yes.

12       Q.    How about Eliodor Fleuridor?

13       A.    Yes.

14       Q.    He was there?

15       A.    Yes.

16       Q.    Anybody else you remember?

17       A.    Yes.

18       Q.    Who?

19       A.    Brisma, Papouche Frisnel, Johnson

20   Bien-Aime, and others and others.

21       Q.    How about Lecenat Geffrard?

22       A.    Yes, he was there.  They were all

23   there.

24       Q.    How about Lucce Calixe?

25       A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 224

1     Q.    Gervil St. Louis?

2     A.    Yes.

3     Q.    Papouche Fils-Aime?

4     A.    Yes.

5     Q.    And you remember all of these people

6   being present when Robinson told you about the

7   Order of Malta in 2007?

8     A.    Yes.

9     Q.    What else did Robinson say?

10    A.    A lot of things.  I just don't

11   remember the rest.

12    Q.    What was he talking about?

13    A.    When we meet he tells us about things

14   that are -- that have to do with the Village.

15    Q.    Do you remember anything else about

16   what he said about the Order of Malta?

17    A.    Sometimes he talked to us about

18   Fairfield University.

19    Q.    Do you remember anything else about

20   what he said about the Order of Malta?

21    A.    I don't remember what he said.  I just

22   remember that he used to use the word, the name

23   Order of Malta.  He used to tell us about it.

24    Q.    What did he tell you?

25    A.    They were one of our sponsors.

Confidential - Subject to Further Confidentiality Review

Page 225

1      Q.    And what else did he say?
2      A.    They were one of the bosses that were
3   helping us at the Village.
4      Q.    What does that mean?
5      A.    People there are helping you in any
6   way to help you progress.
7      Q.    Anybody that helps is a boss, that's
8   your understanding?
9      A.    It depends.
10     Q.    What is your understanding of the word
11  "boss" in that answer you just gave us?
12     A.    Somebody that's helping you in any
13  way.
14     Q.    Do you know any of the members of the
15  Order of Malta?
16     A.    No.
17           MR. BABBITT:  I have nothing further.
18  Thank you.
19           MS. POLLOCK:  Do you have a sense of
20  how long you're going to go?  I'm not trying to
21  limit you at all.  Is it a natural time to take
22  a break?
23           MR. ACQUARULO:  We can take a break.
24           MS. POLLOCK:  I'm not suggesting we
25  take a break, I'm just trying to figure out

Confidential - Subject to Further Confidentiality Review

Page 226

1    about how long.

2              MR. ACQUARULO:  It's hard to know.

3              MS. POLLOCK:  Let's go for a little

4    bit.

5              MR. ACQUARULO:  Keep going?

6              MS. POLLOCK:  Yes.

7    BY MR. ACQUARULO:

8         Q.    Good afternoon, Mr. Bernard.

9         A.    Thank you.

10        Q.    My name is Adam Acquarulo, and again,

11   I represent Hope Carter.  Do you know her as

12   Madam Carter?

13        A.    Yes, I know her.

14        Q.    When did you first meet Madam Carter?

15        A.    I don't remember the exact date.

16        Q.    Was it before you went to the Village?

17        A.    No, when I was at the Village.

18        Q.    The first time you met Madam Carter

19   was when you were already a student at the

20   Village?

21        A.    Yes.

22        Q.    And you were a student at the Village

23   for only one school year?

24        A.    Yes.

25        Q.    Did you know of Madam Carter -- well,

Confidential - Subject to Further Confidentiality Review

Page 227

1    withdrawn.

2           Did you meet Madam Carter?

3    A.    No.

4    Q.    How did you learn of Madam Carter?

5    A.    I see her in the Village.

6    Q.    But you did not meet with her

7    personally, is that correct?

8    A.    No, I have never spoken to her

9    face-to-face.

10   Q.    How many times did you see her?

11   A.    I don't remember.

12   Q.    Was it more than once?

13   A.    Yes.

14   Q.    Was it more than five times?

15   A.    I don't remember.

16   Q.    Was it more than two times?

17   A.    I don't remember at all how many

18   times.

19   Q.    As you sit here today, can you

20   remember seeing Madam Carter?

21   A.    Can you repeat it again?

22   Q.    As you sit here today, can you

23   remember seeing Madam Carter?

24   A.    Yes.

25   Q.    Where was that that you saw her?

Confidential - Subject to Further Confidentiality Review

Page 228

```
 1      A.    At the Village.

 2      Q.    And where at the Village?

 3      A.    In the yard at the Village.

 4      Q.    Where was she?

 5      A.    She came to the Village.

 6      Q.    What was she doing when you saw her?

 7      A.    She was walking, visiting.

 8      Q.    For how long did you see her?

 9      A.    How many hours?

10      Q.    Yes, for how long?

11      A.    I don't remember how much.

12      Q.    Was it more than five minutes that you

13  saw her?

14      A.    Yes.

15      Q.    Was it more than 30 minutes that you

16  saw her?

17            You can recall seeing her on only one

18  occasion, is that right?

19      A.    No, I saw her more than once.

20      Q.    I asked you just a little while back

21  whether you saw her more than two -- withdrawn.

22            Did you see her twice?

23      A.    I don't remember how many times I saw

24  her, but I saw her more than once.

25      Q.    Did you see her more than two times?
```

Confidential - Subject to Further Confidentiality Review

Page 229

1      A.    I don't remember how many times.

2      Q.    Do you know if you saw her more than

3  five times?

4      A.    I don't remember.

5      Q.    So you told me now that you recall

6  seeing her at least on one occasion in the yard,

7  is that correct?

8      A.    I saw her more than once.

9      Q.    And on one occasion you saw her in the

10  yard, is that correct?

11      A.    Yes.

12      Q.    And she was walking?

13      A.    Yes.

14      Q.    Do you know where she was walking to?

15      A.    She was visiting.

16      Q.    Was she walking out the gate?  Was she

17  walking to a table?  Do you recall where she was

18  walking to?

19      A.    She's walking around inside looking.

20      Q.    Besides walking around and looking, do

21  you recall anything specifically that she was

22  doing when you saw her?

23      A.    She had a camera in her hand taking

24  pictures.

25      Q.    For how long did you see her with a

Confidential - Subject to Further Confidentiality Review

Page 230

1     camera in her hand?

2          A.     When I see her she always has a little

3     camera in her hand.

4          Q.     And as you sit here today, can you

5     tell me how many times you've seen Madam Carter?

6          A.     I don't remember how many times I saw

7     her.

8          Q.     Besides seeing her in the yard on the

9     occasion that you were describing, can you

10    describe another occasion that you saw Madam

11    Carter?

12         A.     I don't remember how many times I saw

13    her.

14         Q.     Besides the occasion that you

15    described where you saw her walking in the yard,

16    can you describe another occasion when you saw

17    Madam Carter?

18         A.     When she comes she's always walking

19    around in the yard and taking pictures with her

20    camera.

21         Q.     How many times did you see her in the

22    yard?

23         A.     More than once.

24         Q.     Okay.  Beside seeing her in the yard,

25    did you see her -- withdrawn.

Confidential - Subject to Further Confidentiality Review

Page 231

```
 1              Besides seeing her in the yard, can
 2   you recall seeing her anywhere else?
 3        A.    No.  I saw her in the yard, the
 4   Village yard.
 5        Q.    Did she ever talk to you personally?
 6        A.    No.
 7        Q.    Do you recall hearing her talk?
 8        A.    Yes, she talks.
 9        Q.    Do you recall what, if anything, she
10   said?
11        A.    No.  I don't speak English.
12        Q.    At any time that you heard her talk,
13   did anybody interpret what she was saying?
14        A.    Yes, we used to -- she used to talk to
15   us when we were all sitting together, and
16   Douglas would interpret for her.
17        Q.    In the yard?
18        A.    No, in a room where we all were having
19   a meeting.
20        Q.    So you saw her at least one time in
21   the yard, and you also saw her in a room where
22   you were meeting with other students?
23        A.    I saw her many times, but I don't
24   remember exactly how many times I saw her.
25        Q.    What I want to know, as you sit here
```

Confidential - Subject to Further Confidentiality Review

Page 232

1  today, the places and times that you can recall

2  seeing Madam Carter.  And you've testified that

3  you saw her at least one time in the yard, and

4  you saw her at least one time in a room speaking

5  to students with Doug Perlitz there.  Do you

6  recall any other times that you saw her?

7      A.    I told you, I saw her many times.  I

8  don't remember how many times I saw her.

9      Q.    But can you remember any other places

10  that you saw her than you have described

11  already?

12     A.    No, I haven't seen her anywhere else.

13     Q.    Can you recall any other places within

14  the Village besides at least one time in the

15  yard and one time in the meeting room that you

16  saw Madam Carter?

17     A.    I see her sometimes in the yard.

18     Q.    Okay.  So you've told me about the

19  yard, seeing her in the yard, and you've told me

20  about seeing her in a meeting room when Doug was

21  doing interpreting.  Are there any other places

22  within the Village that you recall seeing Madam

23  Carter?

24     A.    I'll make it simpler for you.  I saw

25  her many times.  One of the times I saw her --

Confidential - Subject to Further Confidentiality Review

Page 233

1    and I saw her in the yard.  One of the times I
2    saw her, she had a meeting with us.
3         Q.    I asked you before if you saw her more
4    than two times, and you said you can't remember,
5    but now you're using the word "many."  Do you
6    recall seeing her more than two times?
7         A.    I saw her once.  She came to the
8    Village more than once.
9         Q.    When you saw her -- withdrawn.
10              The times that you can recall seeing
11   her, were they all within a single month?
12        A.    No.
13        Q.    Do you know where she lived?
14        A.    No.
15        Q.    Do you know if she lived in Haiti?
16        A.    I think she comes to Haiti.
17        Q.    Do you know where she comes from?
18        A.    I don't know what country she comes
19   from exactly.
20        Q.    And in the meeting room on the
21   occasion that you can recall seeing her in the
22   meeting room, at that time Doug Perlitz was
23   there, and he was interpreting what she was
24   saying?
25        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 234

1      Q.    For how long did she talk on that
2  occasion?
3      A.    I don't remember.  She spent a little
4  while talking to us.
5      Q.    What did she say?
6      A.    She used to say this is who she is,
7  she's one of the people that represent
8  Fairfield.
9      Q.    Do you recall her saying anything
10  else?
11      A.    She used to tell us if we finish
12  school she has the ability to get us into
13  Fairfield.
14      Q.    Do you recall her saying anything
15  else?
16      A.    No, I don't remember.
17      Q.    Do you recall her saying those things
18  that you just told me on more than one occasion?
19      A.    I'm thinking we only met once.  I
20  don't remember if there were other times.  There
21  were other times.  I'm sorry.
22      Q.    Can you describe what Madam Carter
23  looks like?
24      A.    A little old lady.
25      Q.    Can you describe her in any more

Confidential - Subject to Further Confidentiality Review

Page 235

1    detail than that?

2        A.    She always has little glasses.  She's

3    hunchback.  And she has a little pouch in front.

4    And her pants are all the way up under her

5    heart.  And she always has a little camera in

6    her hand.

7        Q.    Have you ever spoken to anyone else

8    about Madam Carter, besides your attorneys?

9        A.    No.

10       Q.    Have you ever spoken to Doug Perlitz

11   about Madam Carter?

12       A.    No.

13       Q.    Has anyone besides Doug Perlitz ever

14   done any translation for what Hope Carter was

15   saying, as far as you know?

16       A.    No.

17       Q.    What is your understanding of Madam

18   Carter's connection to PPT?

19       A.    I know she's one of the bosses and one

20   of the sponsors that we had at PPT.

21       Q.    And by "one of the bosses," you mean

22   that she was one of the people that were

23   helping?

24       A.    Yes.

25       Q.    Besides what you've told me already --

Confidential - Subject to Further Confidentiality Review

Page 236

1    withdrawn.

2              At the Village, can you describe what

3    your daily schedule was between Monday to

4    Friday?

5        A.    I go in the morning.  I leave around

6    6:00 o'clock.

7        Q.    So you would arrive at what time in

8    the morning?

9        A.    I get there at 7:00.

10       Q.    And then what would you do?

11       A.    I go in, I eat, I go to school.

12       Q.    And would you go to school immediately

13   after eating breakfast?

14       A.    After a little while they ring the

15   bell and everybody goes to class.

16       Q.    Shortly after breakfast?

17       A.    Yes.

18       Q.    And then how long was class?

19       A.    I don't remember how long.

20       Q.    Do you have class all the way until

21   lunchtime?

22       A.    Yes.

23       Q.    And then how long was lunch?

24       A.    We were free to leave in the afternoon

25   because all -- in the end of the afternoon they

Confidential - Subject to Further Confidentiality Review

Page 237

1    gave us time to study.

2        Q.    Where would you study?

3        A.    Inside there.

4        Q.    Inside the building, or outside?

5        A.    In the yard, wherever we wanted.

6        Q.    After lunch did you have any classes?

7        A.    No.

8        Q.    After lunch were there any activities

9    that you had to attend?

10       A.    If there are activities, I

11   participate.  If not, I don't.

12       Q.    Are these activities that you're

13   expected to be at as a student of the Village?

14       A.    Can you repeat it for me, please?

15       Q.    The activities that were there for you

16   to go to after lunch, are these activities that

17   you were expected to go to as a student of the

18   Village?

19       A.    Yes.

20       Q.    What were those activities?

21       A.    Championships or tournaments,

22   basketball tournaments.

23       Q.    Anything else?

24       A.    There were other things, but I don't

25   remember what they were.

Confidential - Subject to Further Confidentiality Review

Page 238

1      Q.    Every day was there an activity to go
2   to after lunch?
3      A.    No.
4      Q.    Every day would you stay at the
5   Village until 6:00 p.m., Monday through Friday?
6      A.    And Saturday.
7      Q.    And at any other time did you ever see
8   a student drive away in a car with Douglas
9   Perlitz between Monday through Friday?
10      A.    I don't remember seeing anything like
11   that.
12      Q.    As you sit here today, do you know if
13   that ever happened?
14      A.    What are you asking me happened?
15      Q.    As you sit here today, do you know if
16   any other students were ever taken by car from
17   the Village by Douglas Perlitz?
18      A.    I don't know.
19      Q.    And you don't know how long --
20   withdrawn.
21            You cannot tell us how long the ride
22   was from the Village to Bel Air, is that
23   correct?
24      A.    No.
25      Q.    Was it more than an hour's ride?

Confidential - Subject to Further Confidentiality Review

Page 239

1        A.    I don't remember how long.

2        Q.    And on the first occasion that Douglas

3   took you by car from the Village to Bel Air,

4   that was between Monday -- that was on a day

5   between Monday and Friday, is that correct?

6        A.    Yes.

7        Q.    And when you arrived at Bel Air on the

8   first occasion, you went directly into Douglas's

9   bedroom?

10       A.    I didn't know it was his room.  He's

11   the one that took me there.

12       Q.    But you went directly into a bedroom?

13       A.    Yes.

14       Q.    And the first thing Douglas told you

15   was to pull down your pants?

16            MS. POLLOCK:  Are you talking about

17   the first time?

18       A.    No, after we went in, after a little

19   while he started touching me first.

20   BY MR. ACQUARULO:

21       Q.    How long was it before he started

22   touching you?

23       A.    Not much.  Not a long time.

24       Q.    What did you do during the time up

25   until he started to touch you?

Confidential - Subject to Further Confidentiality Review

Page 240

1          MS. POLLOCK:  Counsel, let me just get
2     on the record, are we talking about the first
3     abuse?
4          MR. ACQUARULO:  First time.
5          MS. POLLOCK:  Can you --
6          MR. ACQUARULO:  Sure.
7     BY MR. ACQUARULO:
8     Q.    On the first occasion, Mr. Bernard,
9     that Mr. Perlitz brought you to the bedroom in
10    Bel Air and before he started touching you in
11    the bedroom, what were you doing in the bedroom?
12    A.    I didn't do anything else.
13    Q.    And when he started touching you, did
14    you indicate to him that you did not like him to
15    do that?
16    A.    Yes, I told him I didn't want to.
17    Q.    And then what happened?
18    A.    He forced me.
19    Q.    After you said that you did not want
20    him to do that, what was the next thing that he
21    did?
22    A.    After I told him?
23    Q.    Right.
24    A.    Can you repeat the question?
25    Q.    Sure.

Confidential - Subject to Further Confidentiality Review

Page 241

1          You said that he started to touch you
2    while you were in the bedroom, correct?
3          A.    Yes.
4          Q.    Is that when you told him that you did
5    not like what he was doing?
6          A.    Yes, I told him I didn't agree, but he
7    forced me.
8          Q.    What were the words that you used?
9          A.    I told him no, I did not agree that he
10   touched me where he's touching me.
11         Q.    And did he say something right back to
12   you?
13         A.    Yes.
14         Q.    What did he say?
15         A.    He said if I didn't agree I wouldn't
16   be able to stay in the Village.
17         Q.    Did you say anything more to him?
18         A.    No.
19         Q.    Up until the time that he brought you
20   back to the Village that day, did you say
21   anything more to him?
22         A.    No, I didn't say anything else.
23               MS. POLLOCK:  Counsel, I don't want to
24   -- we've been going an hour, I don't know how
25   much longer you have to go.

Confidential - Subject to Further Confidentiality Review

Page 242

1            MR. ACQUARULO:  It's hard to know.

2    I'll keep going, if that's okay, or we can --

3            MS. POLLOCK:  Well, I think the

4    translator is probably tired, I know the witness

5    is tired.  Can we take like a ten minute break?

6            MR. ACQUARULO:  Absolutely.

7            MS. POLLOCK:  Thank you.

8            THE VIDEOGRAPHER:  Going off the

9    record.  The time is 5:11.

10            (Whereupon, a recess was taken.)

11            THE VIDEOGRAPHER:  Back on the record.

12    The time is 5:24.

13    BY MR. ACQUARULO:

14       Q.    Mr. Bernard, in preparation for this

15    deposition, did you review any materials?

16       A.    Yes.

17       Q.    And what did you review?

18       A.    The questions and answers that I had

19    given.

20       Q.    Is that what is in front of you marked

21    as Exhibit 1?

22       A.    I don't know.  I only read Creole --

23    or I can read Creole.

24       Q.    Is what you reviewed the questions

25    that you answered in this case and then gave

Confidential - Subject to Further Confidentiality Review

Page 243

1   this signature, showing you Exhibit 1?

2       A.    Yes, I recognize the signature.

3       Q.    Is that the document that -- that

4   document with that signature page, is that what

5   you reviewed -- is that one of the documents you

6   reviewed in preparation for this deposition?

7       A.    Yes.

8       Q.    Are there any other materials or

9   documents that you reviewed in preparation for

10  this deposition?

11      A.    I don't remember reviewing anything

12  else.

13      Q.    And as you reviewed those

14  interrogatories, those questions, do you recall

15  there being any portion to those that were no

16  longer answered correctly?

17      A.    I don't understand.

18      Q.    When you signed your signature there

19  that's at the last page of that exhibit, you

20  were indicating that your answers were true and

21  accurate, and you were swearing to God that that

22  was the case, is that true?

23      A.    Yes.

24      Q.    And when you reviewed that document in

25  preparation for this deposition, did you see any

Confidential - Subject to Further Confidentiality Review

Page 244

1    answers that were no longer correct?

2        A.    What I was reviewing?

3        Q.    Right.

4        A.    I didn't see that.

5        Q.    Mr. Bernard, bringing you back to the

6    first time Mr. Perlitz brought you to Bel Air,

7    how were you positioned when Mr. Perlitz

8    inserted his penis in your rectum?

9        A.    I was inside a room.

10        Q.    And how did you have your body?

11        A.    My hands were on the bed, and my feet

12    were on the ground.

13        Q.    Before Mr. Perlitz inserted his penis

14    in your rectum, do you know what he did in

15    preparation to do that?

16        A.    No, I don't know.

17        Q.    Was he able to stick his penis in your

18    rectum immediately?

19        A.    What do you mean?  I don't understand.

20        Q.    Was he able to put his penis in your

21    rectum on his first attempt to do so?

22        A.    No.

23        Q.    What happened?

24        A.    After several attempts, and then I was

25    bleeding.

Confidential - Subject to Further Confidentiality Review

Page 245

1      Q.    Did he ejaculate?

2      A.    I don't know.

3      Q.    Do you know how long that lasted?

4      A.    No.

5      Q.    And when he stopped doing that, you

6  left?

7      A.    Yes, after that we left.

8      Q.    Did you do anything after he did that

9  and before leaving?

10     A.    Yes, I put some alcohol.

11     Q.    That was still at Bel Air?

12     A.    Yes.

13     Q.    And you said after the second occasion

14  Mr. Perlitz had given you money, correct?

15     A.    Yes, the next day.

16     Q.    But he didn't give you any money or

17  anything at all after the first event?

18     A.    Could you repeat, please?

19     Q.    Did Mr. Perlitz give you any money

20  after the first incident with him?

21     A.    After the first time?  No.

22     Q.    At any time that Mr. Perlitz was at

23  the Village and you saw him there, did you make

24  any attempt to avoid him?

25     A.    I was always somewhere by myself away

Confidential - Subject to Further Confidentiality Review

Page 246

1   from the others.

2       Q.    But at any time that you saw him at

3   the Village, did you make any attempt to stay

4   away from him?

5       A.    There was no way I could make any

6   attempt to stay away from him.  If he needed to

7   see me, he would.

8       Q.    And on the second occasion that you

9   were in the bedroom at Bel Air with Mr. Perlitz,

10  how was your body positioned?

11            MS. POLLOCK:  Objection.  Asked and

12  answered.

13      A.    Same way.

14  BY MR. ACQUARULO:

15      Q.    And was Mr. Perlitz able to insert his

16  penis into your rectum on his first attempt?

17      A.    After a little while.

18      Q.    Do you know if he did anything or used

19  anything to help him do that?

20      A.    I don't know.

21      Q.    When you signed the list when you

22  first saw Cyrus Sibert -- do you remember doing

23  that?

24      A.    Yes, I wrote my name.

25      Q.    Do you know what it meant to put your

Confidential - Subject to Further Confidentiality Review

Page 247

1    name on that list?

2         A.    I wrote my name down so he could

3    remember and he could introduce me to the

4    lawyers.

5         Q.    And why did you want him to introduce

6    you to lawyers?

7         A.    Because I wanted to find justice for

8    this.

9         Q.    You knew that other students had found

10   a lawyer and received money before you did that,

11   is that correct?

12              MS. POLLOCK:  Objection.

13   Mischaracterizes the witness's testimony.

14              You can answer.

15        A.    Can you repeat it, please?

16   BY MR. ACQUARULO:

17        Q.    Before you put your name on that list,

18   you were aware, weren't you, that other students

19   had said that they were victims of Douglas

20   Perlitz and had received money, is that correct?

21              MS. POLLOCK:  Objection.

22   Mischaracterizes the witness's testimony.

23        A.    No, I didn't know.

24              MR. ACQUARULO:  I have no other

25   questions.  Thank you.

Confidential - Subject to Further Confidentiality Review

Page 248

1          MS. POLLOCK:  Any follow-up from any
2     lawyers?
3          There being no further questions,
4     we'll conclude the deposition.
5          THE VIDEOGRAPHER:  This concludes the
6     May 25, 2016 --
7          MR. GAYNOR:  I just want to make a
8     statement for the record.
9          The deposition is potentially
10    suspended seeking -- depending on a resolution
11    of some of the items that were withheld from
12    testimony, so that's the caveat.
13          Thank you.
14          MS. POLLOCK:  Counsel, what do you
15    mean by "some of the items"?  Are we talking
16    solely about the attorney/client privilege
17    instructions for him not to answer and disclose
18    those privileged communications?
19          MR. GAYNOR:  Yes.  And whatever other
20    items that upon reflection of the transcript
21    result in, whatever, not being able to get the
22    full answers to questions.
23          Thank you.
24          MS. POLLOCK:  Counsel, I guess I'm
25    asking you to elaborate, because we're here, are

Confidential - Subject to Further Confidentiality Review

Page 249

1    there other issues other than the
2    attorney/client privileged communications that
3    remain pending?
4              MR. GAYNOR:  I think they were made
5    clear as the deposition was progressing.
6              MS. POLLOCK:  Well, I disagree, and I
7    welcome the opportunity for you to explain what
8    you think is still pending other than the
9    attorney/client privileged --
10             MR. GAYNOR:  The --
11             MS. POLLOCK:  I'm talking.  Please
12   don't interrupt me.
13             I welcome the opportunity for you to
14   explain yourself as to other issues other than
15   the attorney/client privileged communications
16   that I instructed him not to disclose.
17             MR. GAYNOR:  The biggest one is the
18   attorney/client -- the assertion of the
19   attorney/client with regard to Mr. Sibert.
20             MS. POLLOCK:  Is there anything else?
21             MR. GAYNOR:  I don't know.  I can't
22   remember all the details of a five -- of an
23   eight hour deposition.  So whatever they were on
24   the record, they were on the record.
25             MS. POLLOCK:  All right.  Nothing

Confidential - Subject to Further Confidentiality Review

Page 250

1   further.

2           THE VIDEOGRAPHER:  This concludes the

3   May 25, 2016 deposition of Dieu-Dabel Bernard.

4   Going off the record.  The time is 5:38.

5           (Whereupon, the deposition was

6           adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 251

```
 1              C E R T I F I C A T E

 2

 3              I, MAUREEN O'CONNOR POLLARD, LSR #473,

 4    RMR, CLR, and Notary Public in and for the State

 5    of Connecticut, do hereby certify that there

 6    came before me on the 25th day of May, 2016, the

 7    person hereinbefore named, who was duly sworn to

 8    testify to the truth of their knowledge

 9    concerning the matters in this cause, and their

10    examination reduced to typewriting under my

11    direction and is a true record of the testimony.

12              I further certify that I am neither

13    attorney for or related or employed by any of

14    the parties to the action, and that I am not a

15    relative or employee of any attorney or counsel

16    employed by the parties hereto or financially

17    interested in the action.

18              In witness whereof, I have hereunto

19    set my hand and seal this 1st day of June, 2016.

20

21    _____

22    MAUREEN O'CONNOR POLLARD, License #473

23    Realtime Systems Administrator, RMR

24    Notary Commission Expires:  10/31/2017

25
```

Confidential - Subject to Further Confidentiality Review

Page 252

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the appropriate

 6    space on the errata sheet for any corrections

 7    that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  It will be attached

10    to your deposition.

11              It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt of

14    the deposition transcript by you.  If you fail

15    to do so, the deposition transcript may be

16    deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

Page 253

```
 1                    - - - - - -

                    E R R A T A

 2                    - - - - - -

 3   PAGE  LINE  CHANGE

 4   ____  ____  _____

 5       REASON: _____

 6   ____  ____  _____

 7       REASON: _____

 8   ____  ____  _____

 9       REASON: _____

10   ____  ____  _____

11       REASON: _____

12   ____  ____  _____

13       REASON: _____

14   ____  ____  _____

15       REASON: _____

16   ____  ____  _____

17       REASON: _____

18   ____  ____  _____

19       REASON: _____

20   ____  ____  _____

21       REASON: _____

22   ____  ____  _____

23       REASON: _____

24   ____  ____  _____

25
```

Confidential - Subject to Further Confidentiality Review

Page 254

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3              I, _____, do
    Hereby certify that I have read the foregoing
 4  pages, and that the same is a correct
    transcription of the answers given by me to the
 5  questions therein propounded, except for the
    corrections or changes in form or substance, if
 6  any, noted in the attached Errata Sheet.
 7
 8  _____
    DIEU-DABEL BERNARD              DATE
 9
10
11
12
13
14
15  Subscribed and sworn
    To before me this
16  _____ day of _____, 20____.
17  My commission expires: _____
18
    _____
19  Notary Public
20
21
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

Page 255

```
 1              LAWYER'S NOTES

 2   PAGE  LINE

 3   _____ _____  _____

 4   _____ _____  _____

 5   _____ _____  _____

 6   _____ _____  _____

 7   _____ _____  _____

 8   _____ _____  _____

 9   _____ _____  _____

10   _____ _____  _____

11   _____ _____  _____

12   _____ _____  _____

13   _____ _____  _____

14   _____ _____  _____

15   _____ _____  _____

16   _____ _____  _____

17   _____ _____  _____

18   _____ _____  _____

19   _____ _____  _____

20   _____ _____  _____

21   _____ _____  _____

22   _____ _____  _____

23   _____ _____  _____

24   _____ _____  _____

25
```