1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3

4    - - - - - - - - - - - - - - - x
                                   :
5    GERVIL ST. LOUIS,             :  No. 3:13CV1132(RNC)
                    Plaintiff,     :
6                                  :
               vs                  :
7                                  :
     DOUGLAS PERLITZ, ET AL,       :
8                    Defendants.   :  APRIL 19, 2017
     - - - - - - - - - - - - - - - x
9

10

11                       ORAL ARGUMENT

12

13

14       BEFORE:  HON. ROBERT N. CHATIGNY, U.S.D.J.

15

16

17

18

19                              Darlene A. Warner, RDR–CRR
                                Official Court Reporter
20

21

22

23

24

25

```
 1

 2

 3    APPEARANCES:

 4

 5         FOR GERVIL ST. LOUIS:

 6              SIMMONS HANLY CONROY, LLP
                     112 Madison Avenue; 7th Floor
 7                   New York, New York 10016
                BY:  PAUL J. HANLY, JR., ESQ.
 8                   JAYNE CONROY, ESQ.
                     ANDREA BIERSTEIN, ESQ.
 9                   ELLYN HURD, ESQ.

10              LAW OFFICES OF MITCHELL GARABEDIAN
                     100 State Street
11                   6th Floor
                     Boston, Massachusetts 02109
12              BY:  MITCHELL GARABEDIAN, ESQ.
                     WILLIAM H. GORDON, ESQ.
13                   LU XIA, ESQ.

14         FOR FAIRFIELD UNIVERSITY:

15              DAY PITNEY LLP-STMFD
                     One Canterbury Green
16                   Stamford, Connecticut 06901
                BY:  THOMAS D. GOLDBERG, ESQ.
17                   KEVIN C. BROWN, ESQ.

18         FOR HOPE E. CARTER:

19              MILANO & WANAT
                     471 East Main Street
20                   Branford, Connecticut 06405
                BY:  JEFFREY WILLIAM KENNEDY, ESQ.
21

22         FOR PAUL E. CARRIER:

23              MURPHY & KING, PC
                     One Beacon Street
24                   21st Floor
                     Boston, Massachusetts 02108
25              BY:  THEODORE J. FOLKMAN, ESQ.
                     TIMOTHY P. O'NEILL, ESQ.
```

```
 1           FOR SOVEREIGN MILITARY HOSPITALLER ORDER OF

 2               ST. JOHN OF JERUSALEM OF RHODES AND OF
                 MALTA, AMERICAN ASSOCIATION, U.S.A.:
 3
                    ROBINSON & COLE
 4                       280 Trumbull Street
                         Hartford, Connecticut 06103
 5               BY:  BRADFORD S. BABBITT, ESQ.

 6           FOR SOCIETY OF JESUS OF NEW ENGLAND:

 7                  SLOANE & WALSH, LLP
                         Three Center Plaza
 8                       Boston, Massachusetts 02108
                 BY:  MICHAEL J. KERRIGAN, ESQ.
 9                       WILLIAM J. DAILY, JR., ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              2:10 P.M.

2

3              THE COURT:  Good afternoon.  Our plan for today

4     is to address the motions submitted by Father Carrier and

5     Ms. Carter, okay?

6              MR. FOLKMAN:  Yes, Your Honor.

7              THE COURT:  Are you all set to proceed?

8              MR. FOLKMAN:  Yes, thank you, Your Honor.

9              Good afternoon, Ted Folkman for Father Carrier.

10             Thank you, Your Honor, for the amount of time

11    you've devoted to these hearings and also to allowing us

12    to brief the issues as exhaustively as we have.

13             I want to start by addressing some issues you've

14    heard a lot about and read a lot about, but that you can

15    and should put to the side when you're considering Father

16    Carrier's motion.

17             For purposes of our motion, you don't have to

18    decide whether Father Carrier used due care in all his

19    dealings with PPT or these plaintiffs.  In fact, it's okay

20    for purposes of our motion if you assume that he did not

21    use due care because the gist of the motion is that even

22    if he did -- even if he was careless, nevertheless, he's

23    not liable.

24             Similarly, you don't have to decide whether you

25    think Father Carrier is a person of good character or

```
1    whether you believe the accusations that various folks
2    have made about him.
3               There's two kinds of accusations, the first
4    kind, the most salacious kind, I think are potentially
5    relevant to some aspects of this case, and I'm referring
6    now to the claim that Father Carrier had a sexual
7    relationship with Mr. Perlitz, and I'm referring to the
8    claim Father Carrier sexually abused one of the
9    plaintiffs, Bernard Michel, who is not one of the four
10   bellwether plaintiffs.
11              I think we've demonstrated conclusively in our
12   papers that as to those two claims, there is no admissible
13   evidence that they're true.  I don't think that either
14   claim is really particularly relevant to the issues you're
15   going to have to consider on this motion.  Nevertheless,
16   we've spent a fair amount of time demonstrating that they
17   aren't supported by evidence.
18              Now, there's another kind of accusation, a kind
19   that is supported by some evidence, although we say are
20   not true, these are accusations made by people in Father
21   Carrier's past arising out of his time in Fairfield, his
22   time at Boston College, his lifetime as a member of the
23   Society of Jesus.
24              As to those sorts of allegations, they may or
25   may not be relevant to the claims against those who are
```

1    said to have a duty of some kind to supervise or to manage

2    Father Carrier.  But I trust that for obvious reasons,

3    it's understood that they're not admissible to prove that

4    Father Carrier was careless, which is the claim in this

5    case, or that he breached his fiduciary duty to these four

6    boys, which is again the claim in this case.

7            So you can set to the side the question of

8    whether Father Carrier exercised due care and you can set

9    to the side these questions in the case about his

10   character and about prior bad acts, because neither really

11   has anything to do with the motion that we're presenting.

12   We think there are four questions that you have to answer.

13   Two of them relate to the remaining statutory count, two

14   of them to the non-statutory counts.

15           On the statutory count:  Does Section 2255 show

16   Congress's unmistakable intent that the statute should

17   apply extraterritorially?  We say the answer is no.

18           Question number two:  Is there any evidence of a

19   causal link between any travel that Mr. Perlitz took from

20   the United States to Haiti that Father Carrier facilitated

21   and that is somehow causally related to the injuries these

22   plaintiffs claim to have suffered?  We say no.

23           On the non-statutory claims, the first question,

24   the big question:  Does Haitian law govern those claims?

25           Now, I understand that we're the only party that

1   has raised this issue, and each of the defendants and the

2   plaintiffs have their own reasons for the strategies

3   they've adopted.  I think you'll see in our papers and I

4   think you'll hear today that if you actually do the

5   analysis, the restatement analysis, the answer is clearly

6   and obviously yes.

7           Finally, question four:  Assuming Haitian law

8   applies, was Father Carrier the agent of the Haiti Fund?

9   We'd say yes.

10          Was he the principal of Mr. Perlitz?  We say no.

11          If you find for our favor on either of those

12  questions, the non-statutory count has to fail.

13          I'd like to start with a very small set of

14  undisputed facts.  I count four facts, and maybe a couple

15  of subsidiary facts that we think are the critical facts

16  for this motion.  Our statement of facts was maybe a

17  little longer than it should have been, partly because we

18  addressed some issues such as the claim that Father

19  Carrier somehow took money that he wasn't entitled to

20  take.  That turned out not really to be relevant to the

21  motion.  But these are the facts, I think, that if you

22  find in our favor, the motion is going to be granted.

23          On the statutory count, there is follows:

24          First, it's not really disputed that the

25  plaintiffs can only prove one date of travel that

1    Mr. Perlitz took from the United States to Haiti.  We make

2    this point at our main brief, page 10, and it's not

3    rebutted.  That date is a date in June of 2005.  It's the

4    date Mr. Perlitz testified he traveled.  I don't know that

5    that's true, but there's evidence that it happened.

6              That's fact one.

7              Fact two, none of these plaintiffs, with one

8    exception that I'll mention in a moment, can prove the

9    dates on which they say they were abused to anything

10   closer than approximately a year.  That's paragraphs 9

11   through 12 of our statement of undisputed facts.

12             The exception is Mr. Lacenat.  He claims that on

13   one of the two instances of abuse, he can localize that in

14   time to a period of a few weeks, but that period of two

15   weeks is not closely related in time to the date of

16   travel.  It's approximately a year away.

17             Those are really the only facts that we think

18   are material to the issue of causation on our statutory

19   claim.  And if you find that those facts are true, we

20   believe that there's just a failure of proof on the

21   element of causation.

22             What about the non-statutory claims?  Again it's

23   just a handful of facts.

24             The first one, we say Father Carrier was the

25   Haiti Fund's agent.  Now, when I say that, it's not just

1    me saying it.  I want to cite for you a few paragraphs of

2    the complaint.  This is the plaintiffs' case.

3         Paragraph 55, "As the chairman and the president

4    of the Haiti Fund, Father Carrier was obliged to supervise

5    and monitor the program at PPT."

6         Paragraph 93, "Father Carrier acted as the eyes

7    and ears of the Haiti Fund in Haiti."

8         Paragraph 128, "At all relevant times, the

9    responsibilities of the Haiti Fund included the hiring,

10   retention, direction and supervision of Father Carrier."

11        Paragraph 132, "At all relevant times, the

12   supervisory defendants, which includes the Haiti Fund,

13   negligently breached their duty by hiring and retaining

14   Father Carrier."

15        So it's perfectly clear from the complaint

16   itself that the plaintiffs' case is based on the notion

17   that Father Carrier was the Haiti Fund's agent.  That's

18   enough for us to prove that that's not a disputed fact.

19        Now, I would cite for you on that point the

20   Celtex case, which is as you know one of the Supreme

21   Court's leading summary judgment cases, and it makes the

22   point you're entitled to rely on the allegations of the

23   complaint in the opposing motion for summary judgment.

24        Now, Your Honor raised a point with Mr. Goldberg

25   on the first day of argument that I think is important.

1    You raised the point about what about the early period,

2    the period from 1997 to 1999?  If you recall the school

3    was founded 1997, the Haiti Fund was not incorporated

4    until 1999.  You put the question to Mr. Goldberg:  "How

5    can Fairfield look to the Haiti Fund as the responsible

6    party when it wasn't even in existence for at least some

7    period of time at the beginning?"  I think there's a lot

8    of ways to answer that, Your Honor.

9            You could just point to the gap in time.

10   There's various ways you could answer it.

11           But Father Carrier has an answer that might be a

12   little bit different than any of the defendants' answers,

13   and it's this:

14           The allegations the complaint that I just read

15   you a moment ago, they don't just talk about the Haiti

16   Fund, they talk about Fairfield too, and in some instances

17   the other institutional defendants.

18           Paragraph 55, "As director of campus ministry

19   and community service at Fairfield, Father Carrier was

20   obliged to supervise and monitor PPT."

21           Paragraph 93, "Father Carrier acted as the eyes

22   and ears of Fairfield, of the New England Jesuit Order and

23   of the Order of Malta in Haiti."

24           Paragraph 128, "At all relevant times, the

25   responsibilities of Fairfield, the Jesuits included the

1    hiring, retention, direction and supervision of Father

2    Carrier."

3              So if the issue is what about that initial

4    period of time, we would make for you exactly the same

5    case that we made with respect to the Haiti Fund.  And you

6    won't hear the plaintiffs say, oh, we dispute that, we

7    dispute that Father Carrier was the agent of Fairfield or

8    we dispute that he was the agent of Jesuits, because as

9    you've heard over two days, that's their case.  So those

10   are undisputed facts for purposes of this motion.

11             Another undisputed fact, if anybody was

12   Mr. Perlitz's employer, it was the Haiti Fund.  That's

13   paragraph 39 of our statement of facts.  And you might

14   also look at paragraphs 119 to 122 of the complaint

15   itself.

16             Now, the plaintiffs purport to dispute this

17   fact, and you can look at what they cite in their response

18   to paragraph 39.  Basically what they cite is a Form 1099

19   that the Haiti Fund itself issued to Mr. Perlitz showing

20   that in 2004 he received $3,000 in non-employee

21   compensation from the Haiti Fund, Inc..  I think what the

22   plaintiffs are trying to show is that perhaps he wasn't an

23   employee, perhaps he was an independent contractor.

24             The plaintiffs refer to meeting minutes and

25   other materials from the board of the Haiti Fund in which

1    they appear to recognize that they mischaracterized

2    Mr. Perlitz and the other American volunteers; that

3    perhaps they should have been treated as employees all

4    along instead of independent contractors.

5           But the issue is not what was the proper

6    characterization of Mr. Perlitz for U.S. tax purposes or

7    for purposes of U.S. wage law or anything like that.  The

8    question isn't was he an employee or an independent

9    contractor.  The question is whose employee or independent

10   contractor was he.

11          And if you look at the document that they

12   themselves cite, this Form 1099, it's very clear that it's

13   the Haiti Fund who's paying him the money and reporting it

14   to the IRS as a Haiti Fund expense.  Father Carrier's name

15   appears in the document in the payer's box.  What it says

16   is Haiti Fund, Inc., care of Reverend Paul Carrier and

17   then his address.  I think what that shows you is exactly

18   what we say; namely to the extent he was acting, he was

19   acting as a representative of the Haiti Fund.

20          Now, the plaintiffs also say, well, look, you

21   paid Mr. Perlitz, you took money down to Mr. Perlitz in

22   Haiti, and that's not a disputed fact.  That's true.

23          In fact, paragraph 27 of our statement of facts

24   says, "Father Carrier took money down to Mr. Perlitz in

25   Haiti."  That's not disputed.  But the question is:  Whose

1   money was it?

2           You might as well say the postman paid your

3   salary if you received a check in the mail.  Yes, Father

4   Carrier delivered money to Mr. Perlitz in Haiti as

5   Mr. Perlitz's compensation and for other PPT purposes, but

6   that doesn't mean that Father Carrier was paying him in

7   any sense that's relevant here.  Because what we're

8   interested in is:  Who was Mr. Perlitz working for?  Yes,

9   Father Carrier delivered the money, but that doesn't prove

10  anything that's relevant.

11          The plaintiffs also rely on Fairfield's

12  investigation which shows money unaccounted for or

13  insufficiently documented from the chapel accounts.

14  Again, that doesn't show that Father Carrier was

15  Mr. Perlitz's employer or that Mr. Perlitz was working for

16  Father Carrier.

17          At most, I suppose what they're going for is an

18  inference that some of that money was delivered by Father

19  Carrier to Mr. Perlitz.  But that's a fact that we've

20  already admitted.  And it's true that money was delivered

21  to Mr. Perlitz, and it wasn't Father Carrier's money, it

22  was Haiti Fund money or perhaps Fairfield money.  But the

23  point is he wasn't personally employed by Father Carrier.

24  So we say that's undisputed.

25          Another subsidiary fact you might look at when

1    thinking about who did Mr. Perlitz work for is to ask:

2    Who fired Mr. Perlitz?

3              It's not disputed that the Haiti Fund fired him.

4    If you look at paragraph 44 of the statement of facts, the

5    plaintiffs deny it, but it appears from the documents they

6    cite in denying it that what they're really getting at is

7    the Haiti Fund didn't act as promptly as it should have,

8    as immediate as it should have.  But there's no dispute

9    that the Haiti Fund fired Mr. Perlitz, which is great

10   evidence that the Haiti Fund was the one who employed

11   Mr. Perlitz.

12             And, in fact, Father Carrier, who at the time

13   still believed Mr. Perlitz was innocent, opposed the

14   firing.  So if the Haiti Fund fired him over Father

15   Carrier's opposition, what does that tell you about who he

16   was working for?

17             Lastly, the last point I want to raise when I'm

18   talking about the undisputed facts is our contention that

19   Mr. Perlitz was under the Haiti Fund's authority, and this

20   is paragraph 37 of our statement.  The plaintiffs say

21   "denied" because Father Carrier had some control over the

22   Haiti Fund.  Of course he had some control over the Haiti

23   Fund.  He was an officer and a director of the Haiti Fund.

24             But you know how corporations work.  If you're

25   an officer and a director of the corporation, the

1       employees of the corporation don't work for you, they work

2       for the corporation, and if you take them home and have

3       them cut your lawn, you're doing something wrong.  They're

4       the corporation's employee and when you exercise whatever

5       authority you're exercising, it's the corporation's

6       authority that you're exercising.

7               One last don't I think is worth mentioning, this

8       is Exhibit 20 to the Pollock affidavit.  This is the

9       meeting minutes from the Board of Counselors at Malta.

10      Someone named Marie Garibaldi, gave a report saying that

11      PPT was begun by Father Carrier and by Mr. Perlitz.

12              Now, that may or may not be relevant or

13      admissible or have anything to do about the claim against

14      the Order of Malta, but as to Father Carrier, that's

15      hearsay.  Judge Garibaldi has nothing, no knowledge about

16      the founding of PPT.  She's reporting what she learned in

17      the course of some investigation.  But as to Father

18      Carrier, that's inadmissible.  So whatever effect it may

19      or may not have with respect to Malta, it has no respect

20      to Father Carrier.

21              Let me turn to the statutory count, the one

22      remaining statutory count after we've cleared out a lot of

23      the brush that was in the case at the beginning.  I'm not

24      going to spend any time really talking about

25      extraterritoriality.  I think our brief shows that the RJR

1    case I think is dispositive.  I think that the sheer

2    complexity of the plaintiffs' theory that you have to

3    distinguish a three-level statute from a two-level

4    statute, and if we look at the legislative history, you

5    can see that this is probably what Congress meant.  Just

6    the complexity of that belies the notion that Congress has

7    clearly and unmistakably shown an intent that 2255 should

8    apply extraterritorially.  And that's all I'll say about

9    that and rely on briefs for a fuller explanation unless

10    Your Honor has questions about that.

11        The main point I want to address with respect to

12    the statute is causation.  Now, the statute has in it the

13    words "as a result of" and we say that means there has to

14    be a showing of causation, and we cite a case on that

15    point.  The plaintiffs don't deny that.  They don't say

16    no, it's not necessary to show causation.  We say in our

17    briefs, there's been no showing of causation, there's no

18    link between any travel that you can show Mr. Perlitz took

19    and any of the abuse that the plaintiffs say they

20    suffered.  Plaintiffs don't rebut that either.

21        So we say that there's a complete failure of

22    proof on this element, and that's probably the easiest

23    way, Your Honor, that you can dispose of the statutory

24    count.

25        Although I will say that I think a decision on

1    the extraterritoriality point would be helpful in future

2    cases because I think that RJR is relatively new and this

3    is an important point that should be made clear, although

4    I think it should be clear already.

5             Let me turn to the non-statutory counts and this

6    issue about Haitian law.

7             In light of Kiobel, the recent Supreme Court

8    case, I think Your Honor knows that the landscape for mass

9    tort claims brought by aliens in United States courts that

10    have to do with things that happened overseas, that

11    landscape has changed dramatically, and we're not going to

12    see claims brought asserting violations of private

13    international law for the most part anymore.  What we are

14    going to see is claims of intentional torts of one kind or

15    another.

16             So instead of saying, you know, you American

17    multi-national company have violated, you know, you have

18    violated an international convention against slavery, you

19    might see a claim for the claim of false imprisonment.  Or

20    instead of saying you violated the international law with

21    respect to torture, you're going to see a claim for

22    assault and battery.  And I think that's already started

23    to happen.

24             So all of these cases, all cases where the

25    plaintiffs are going to be bringing common law tort

1    claims, they are all going to raise this sort of conflict

2    of laws issues that we face in this case.  I think it's an

3    important issue and one that you are going to be able to

4    give guidance for in future cases because we are at the

5    cutting edge of this, I think.

6          The plaintiffs have spent a lot more time trying

7    to persuade you of the 10,000 reasons why you shouldn't

8    get to the Haitian law question and not so much time on

9    the Haitian law question, maybe for understandable

10    reasons; but let me just go through what I think are the

11    main procedural points that will allow you to get to the

12    substantive question.

13          The first is just the circularity of the

14    plaintiffs' argument.  If your read what they're saying,

15    they're saying that we have failed to adequately plead

16    foreign law under Connecticut pleadings standards and

17    therefore we can't present the claim.

18          Now, you might say:  Why do Connecticut

19    pleadings standards apply in this case?  We're in federal

20    court after all.  Their answer is the claim is governed by

21    Connecticut law and therefore Connecticut standards apply.

22    That is utterly vacuous, it has no force at all.  It's a

23    completely circular argument.

24          And it should be clear, I hope in our papers,

25    that in order to get to that result, they've really

1    miscited even the Connecticut law.  They say if you look

2    at Section 10-3 of the Practice Book, you see that foreign

3    law is an affirmative defense, but that's nonsense.

4         If you look at Section 10-3, you see that it is

5    almost exactly an analogue of federal Rule 43.1, the Rule

6    of Evidence of Foreign Law.  And that's not a pleading

7    rule, that's a notice rule.

8         There is a Connecticut rule about pleading

9    affirmative defenses, it's Section 10-50, and it lists a

10   bunch of affirmative defenses you have to plead, just like

11   Federal Rule 8 lists a bunch.  But foreign law isn't on

12   either list.

13        So I think that just from the get-go, the

14   argument that they try to cobble together about

15   Connecticut law doesn't fly.

16        I think also that if you read the Rationis case,

17   a Second Circuit case, you'll see that the notice that we

18   gave in our pleadings of the potential applicability of

19   the Haitian law is more than sufficient.  It's better than

20   the notice that the Second Circuit approved in Rationis.

21        In Rationis the party asserting the foreign law

22   didn't even identity foreign law might apply.  It said we

23   intend to raise an issue about some country's foreign law.

24   Here we specifically said Haitian law may govern, I

25   believe it's Counts Three and Five, counts on negligence

1    and the count on fiduciary duty.

2              And there can't have been any surprise about

3    this.  I mean, we've gone back and cataloged a number of

4    times over the many years we've been in front of Your

5    Honor that the issue has at least been noted, sometimes

6    by, me sometimes by you, in court as to the potential

7    applicability of Haitian law.

8              Now, there is a point that's raised in a

9    footnote of the plaintiffs' briefs about, well, we didn't

10   have a chance to depose your lawyers, the lawyers who

11   you've offered to give opinions.  The main point to make

12   about that, Your Honor, is that if you're faced with a

13   motion for summary judgment and you feel like you need

14   some more discovery, Rule 56 has a mechanism to do that.

15   It used to be 56(d).  I think it's been renumbered.  But

16   the point is they didn't do it, instead they hired a

17   Haitian law expert to say what the Haitian law is.

18             So we think that the Haitian law issues are

19   basically perfectly teed up for you to decide and we think

20   that it's quite straightforward to decide them on the

21   materials that you have before you.

22             So that's just by way of getting rid of the

23   obstacles to even considering the question.

24             It's true, as the plaintiffs say, that we also

25   have to show that there's a true conflict of laws.

1    Because if Haitian law and Connecticut law are the same,

2    then this is a fruitless exercise, a pointless exercise.

3         And I'd refer Your Honor to what we say on

4    page 23 of our main brief.  And just to paraphrase it,

5    under Haitian law, an agent is not personally liable for

6    things that he does in the course of his agency that are

7    negligent, only his principal is libel.  And you can

8    compare that with what is just the black letter law I

9    think anywhere in the United States, but certainly in

10   Connecticut, by looking the Restatement Second of

11   Agencies, Section 343, or the Scribner and Manning cases,

12   all of which say that as I know you know, if an agent is

13   negligent in the course of his agency, sure, the agent can

14   be personally liable too.

15        Now, the plaintiffs did correct something that

16   we said in our main brief which was having to do with the

17   test that you're supposed to apply in deciding which law

18   should govern.  We initially cited the O'Connor test, and

19   shortly before the briefing was due, there was a

20   Connecticut Supreme Court decision which made it clear

21   that you should look at the restatement, so in our reply

22   brief we've adopted the restatement approach.

23        The main sort of prefatory point I want to make

24   is, yes, that the approaches are different, but they're

25   not really that different.  Both approaches start off with

1      the presumption that in a tort case, in a personal injury

2      case, the law in the place the injury occurs applies and

3      that you only look to another law if there's a really good

4      reason to do so.  That's a very general way to put it.

5      But it's just a way to say that the starting point for

6      both tests is basically the same.

7              Now, you would think having noted that the

8      restatement approach is the right approach, that the

9      plaintiffs would have cited the relevant section of the

10     restatement, which is Section 146.  That section says that

11     the law is the place the injury applies unless on a

12     particular issue there's some other state with a more

13     significant relationship.  That's the default rule, that's

14     the rule that ordinarily applies in the absence of some

15     good reason to do something else.  And in all of the cases

16     that the plaintiffs cited, the plaintiff in those cases

17     had significant contacts with the law of the state that

18     was ultimately applied.

19             So the Western Dermatology case, the plaintiff

20     was a New Mexico company, New Mexico law applied.  The

21     Vasquez case, the plaintiff was a New York resident, his

22     employer was a New York employer, New York law applied.

23     Down the list you can go.

24             There's no case they've cited where the

25     plaintiffs have essentially no connection with the forum,

1    which is what the case is here with respect to these four

2    Haitian plaintiffs, and yet the Court applied a law other

3    than the law of the place of the injury.

4           But we can step back from Section 146 which

5    states the default rule, and we can step back from the

6    cases, and we can say, well, let's look sort of with new

7    eyes, with fresh eyes, at the factors in Section 145 of

8    the restatement, which after all is where the default rule

9    comes from.  What do those factors tell us about what law

10   should apply?

11          Well, where are the parties' domiciles?  There's

12   no dispute about that.  Plaintiffs are in Haiti, Father

13   Carrier, Connecticut.

14          Where did the injury occur?  That's not

15   disputed.  The injury occurred in Haiti.

16          Where was the relationship centered?  That's not

17   really disputed.  The plaintiffs say from the plaintiffs'

18   perspective it was centered in Haiti, they concede that

19   because they have to concede that.  But in fact from any

20   perspective, whatever relationship existed between Father

21   Carrier and these four plaintiffs was in Haiti.  There's

22   no showing there was ever any communication between them

23   while Father Carrier was somewhere else.  Everything that

24   ever happened in the context of that relationship happened

25   in Haiti.

1          The only factor that even potentially could

2    weigh in another direction is if you ask:  Where did the

3    tortious conduct occur?  And here I think the important

4    point, Your Honor, is to just recognize why it is that

5    Father Carrier has been sued and all the other many people

6    on the board of the Haiti Fund or at Fairfield or in the

7    Order of Malta, why is it that Father Carrier of all these

8    people who has something to do with PPT was sued.  Well,

9    it's because he was in Haiti.  He was the one who

10   allegedly was down there and failed to see red flags.  He

11   was the one who was down there.

12          And if you believe Thony Vall's interrogatory

13   answers, which of course you have to on summary judgment,

14   saw something inappropriate take place in Mr. Perlitz's

15   bedroom.  Not an instance of sexual abuse, but something

16   that should have been concerning.  He was the one that the

17   boys felt unable to approach who didn't make himself

18   available to them so that they could express their

19   concerns to him.

20          So what is it that distinguishes Father Carrier

21   from every other American who could have been sued?  I

22   mean, if you recall we've got John Does one through ten on

23   the caption.  He was the guy in Haiti and he's the link,

24   of course, between the institutional defendants and this

25   case because he was in Haiti.  He could have seen, he

1   should have seen.  That's the plaintiffs' case.

2           So on the 145 analysis, our position is, at best

3   for the plaintiffs, you have one factor that's mixed.

4   Well, two factors:  Domicile and the factor about where

5   the conduct occurred.  But the injury and the center of

6   the relationship and the overall test clearly points in

7   favor of Haiti.  But I would say that even where the

8   conduct occurred weighs strongly in favor of Haiti.  So it

9   really is a slam dunk under 145.

10          If you didn't know anything about the case and

11  you heard that there were Haitian young men who had been

12  sexually abused in Haiti and that there was someone who

13  had gone down there and failed to supervise the person

14  running the school, you would say Haiti.  And we think

15  that that's the obvious correct answer in this case.

16          You can zoom out even farther, the structure of

17  the restatement, you know, you have Section 146, which is

18  this default rule that applies to personal injury cases;

19  you have Section 145, which at a higher level of

20  generality talks about tort cases; and then you have

21  Section 6, which is at the highest level of generality and

22  it talks about what are the principles that we use to talk

23  about conflicts of law in all kinds of cases.

24          And again, if you look at these factors, you see

25  that they really weigh very heavily in favor of the

1    application Haitian law here.

2         Both parties agree that the parties'

3    expectations are unimportant in this kind of case.  It's a

4    tort case.  No one had any expectations.  It's not a

5    contract case.  No one thought, well, if I attend PPT,

6    will Connecticut law apply or will Haitian law apply.

7    It's just not relevant.

8         There's been no showing of a policy difference

9    between Haiti and the United States.  As our affidavits

10   show, I think both countries favor compensating sex abuse

11   victims.  They just allocate the liability differently.

12   So from the perspective of compensation for the victims,

13   there's no relevant difference, it's not as though Haitian

14   law says this is not a tortious act, this kind of sexual

15   abuse.  The Haitian law would treat the principal but not

16   the agent as liable if the agent is negligent of his

17   duties of supervision.  But that's just a question of

18   where the liability falls, it's not a basic policy

19   question about is this person going to be compensated or

20   not.

21        There is one factor that I think is -- it gives

22   me the greatest pause, maybe gives you the greatest pause,

23   which is the supposed uncertainty of the law.  Oh my gosh,

24   how are we going to figure out what Haitian law is.  And I

25   want to talk about Professor Curran in this context.

1    Because I think what the plaintiffs want you to believe is

2    that our submission of her materials is more or less an

3    admission that Haitian law is hopelessly unclear and

4    therefore we have to look at french law.  That's not the

5    case.  Mr. Succar explains why that's not the case.

6            In paragraphs 10 to 12 of his first statement

7    and paragraph 5 of his second statement, the reason is if

8    you're a lawyer in Haiti, what you do when you're

9    researching a legal question is you consult french

10   sources.  The French Civil Code and the Haitian Civil

11   Code, I won't say they're word for word identical across

12   the board, but it basically is the French Civil Code.

13   There's been much less amendments as I understand it to

14   the Haitian code than there has been to the French code

15   over the last couple centuries, but more or less, the

16   Haitian code is the French code.  And I tried to think of

17   examples in America that would make this more familiar to

18   us and I came up with two.

19           The first is if you imagine, you know, a time

20   earlier in our history when there was not a thriving law

21   publishing industry, how would you know what the law is if

22   you were a lawyer in America a long time ago.  You might

23   carry around your Blackstone under your arm and no one

24   would say, Blackstone, that's English.  What does that

25   have to do with anything.  If you were looking for the

1    black letter common law, of course that would be an

2    absolutely reasonable thing to do.  Of course today we

3    have gazillions of law books, so no one needs to do that

4    anymore.  But in Haiti, I think that they do have to look

5    to French sources more than they would in other places,

6    partly because they just don't have the volume of

7    materials in their own country.

8         A more modern example you might consider would

9    be an expert in the UCC.  Of course the UCC is the uniform

10   code actually explicitly thought of by the drafters as

11   sort of in the nature of a civil code, like the French

12   code, not a common law statute, and it would be crazy to

13   say I can't credit the opinion of this expert on the UCC

14   because he's an expert on the Connecticut enactment of the

15   UCC and not the Massachusetts enactment of the UCC.

16   Because it's one code.

17        It's easy for experts in one to understand the

18   other, and to the extent there are minor differences, they

19   would be only minor.  And, you know, Mr. Succar should set

20   your mind at ease on this by explaining in his statement

21   that, yes, I've reviewed Professor Curran's opinion and I

22   think it correctly states Haitian law.

23        More to the point, and I'll come back to this,

24   if you look at Mr. Joseph's declaration, the plaintiffs'

25   declaration, the gist of that is not we got the law wrong.

1    What we say about the responsibility of agents versus

2    principals, we got it wrong.  That's not the gist.  The

3    gist of his opinion is there are other ways that Father

4    Carrier might have been liable under Haitian law, and I'll

5    come back to that.

6            But the point I'm making just to bring it back

7    to the restatement, it's just not correct that Haitian law

8    in this context is particularly difficult to discern and

9    in fact I think the materials that you have lay it out

10   very clearly.

11           You know, Professor Curran, I do think she's

12   pretty uniquely qualified to help you in determining this

13   law for a couple of reasons.

14           First, she really can bridge for you and for me,

15   frankly, the common law/civil law divide.  Sometimes when

16   you read materials by civil lawyers, whether they're

17   French or Haitian or anybody, it's very difficult to

18   understand what they're saying, and I think if you read

19   her declaration, she has the vocabulary that lays it out

20   in a style that's comprehensible to common lawyers like

21   us.

22           Second, just linguistically, the plaintiffs made

23   a point in their papers quibbling about the translation.

24   No one is more qualified than Professor Curran, as you

25   could see from the CV, to give a really precise rendering

1    of the French or Haitian civil codes.

2            So I think her expertise is important in this

3    case and should give you assurance that we didn't just get

4    our Haitian lawyer and they got their Haitian lawyer and

5    the two are butting heads.  The opinion that our Haitian

6    colleague is giving is well grounded in the civil law and

7    confirmed for you by this lengthy and scholarly opinion

8    which shows that the same precise provision in France

9    means just what we say it means.

10           If you agree with me so far, you're going to get

11   to the substantive question, which is, what did Haitian

12   law say.  And we say there's two parts to that.

13           The first is that when a principal is

14   incorporated and its agent is negligent, the principal,

15   but not any of the other agents, is liable.  That's

16   paragraph 21 of Mr. Succar's first declaration.  And you

17   might also look at paragraphs 9 to 13 of Professor

18   Curran's declaration.  Both of those lawyers focused on

19   the question of, well, who's the employer, which as a

20   question of fact we've already discussed.  We really think

21   it's not disputed that Mr. Perlitz worked for the Haiti

22   Fund.

23           Mr. Succar put some meat on the bones of that

24   subject by outlining for you the factors that you use

25   under the Haitian labor code to determine when someone is

1   an employee, and I would refer you to his discussion of

2   the labor code.

3           In his first declaration he makes another

4   important point on this, which is to say that when someone

5   like Father Carrier is acting with respect to an employee

6   of the corporation, he's acting as a representative of the

7   corporation, not for himself.  That's paragraph 27 of

8   Mr. Succar's first declaration.

9           The second big point of the substantive law that

10  I want to raise for you is found primarily in paragraphs

11  21 to 26 of Professor Curran's declaration.  Which is

12  under a civil law the agent of a corporation is liable

13  only if it's a case of intentional tort of a special

14  gravity that's incompatible with the normal exercise of

15  duties.  And the way that we've put that in our papers is

16  to say the agent of a corporate employer is not liable for

17  his own negligence in the course of his employment.  Only

18  the prison is libel.  And Mr. Succar adopts this view in

19  paragraph 12 of his declaration.  That's the law, that's

20  the Haitian law.

21          Now what does Mr. Joseph say?  I think what he

22  really does is say, let's look at something else.  You

23  know, I'm not going to address what you say about agents

24  and principals.  Instead I am going to look at the

25  criminal law of Haiti and say, well, Father Carrier might

1    have been liable as an accessory in Haitian criminal law.

2            It's true in Haiti generally, unlike here, you

3    can piggyback a civil case on to a criminal case.  So if

4    there's a criminal case against Mr. Perlitz, yes, the

5    plaintiffs, the injured people, could come and bring their

6    civil claims in the criminal court.  They have a separate

7    court to deal with those kinds of matters.

8            But the problem with Mr. Joseph's view is

9    Article 56 of the Criminal Code, which we cite in

10   paragraph 4 of Mr. Succar's second declaration, which

11   makes it clear when that happens, you use the civil code

12   to determine the civil liability of the victim who is

13   coming to the criminal court.  So the criminal court in

14   that situation would be applying the civil law to say is

15   this person civilly liable or not.

16           Now, if that's not the case, if what they're

17   saying is Father Carrier was criminally liable in Haiti,

18   it's not something an American court is permitted to do or

19   can do or should do to determine the penal liability of

20   someone under another country's law.  We cite a statement

21   of the restatement on the foreign relations law to that

22   effect.  But essentially what I'm saying to you, Your

23   Honor, is that I think it's very clear from the materials

24   Mr. Succar cited, that even in that procedural situation

25   you still apply the civil law to determine substantively

1    whether the person is civilly liable.

2            Mr. Joseph also talks about the provision in

3    Article 1170 of the code which everybody agrees is the

4    relevant provision of the civil code that talks about

5    being liable for things in your custody.  I think his

6    wording might be guardian.  And both Mr. Succar and

7    Professor Curran explain why that's a misconstruing of the

8    code.

9            What that's essentially about is if I have some

10   object that injures someone, I'm liable because it's my

11   object.  Both of our experts point out that's not our

12   case.  It's not applicable to a case where what you're

13   alleging is someone's intentional tort that didn't use

14   some sort of instrumentality or object.

15           They also make a point on the very last page of

16   Mr. Joseph's declaration.  They say whether someone is a

17   subordinate and whether he's acting within the scope of

18   his functions is a question of fact, not a question of

19   law.

20           Okay, that's true in our courts.  I'm sure

21   that's true in the Haitian courts.  But of course we've

22   given you the facts and we say the facts are undisputed

23   about who's employed by whom in this case.  Once you get

24   to summary judgment, of course you can't say, well, it's a

25   question of fact.  You have the facts.  If the facts are

1       as we say they are, what we're asking you to do is apply

2       Haitian law, and we think if you do you'll find that

3       Father Carrier can't be liable.

4                Thank you very much for giving us so much time

5       and I'm happy to answer any questions.

6                THE COURT:  Thank you very much.

7                MS. BIERSTEIN:  Your Honor, would you prefer for

8       me to proceed or to take a short break?  I'll do either.

9                THE COURT:  I think we can proceed.  Thank you.

10               MS. BIERSTEIN:  Good afternoon, Your Honor.

11               THE COURT:  Good afternoon.

12               MS. BIERSTEIN:  Thank you again.  I'll echo what

13      Mr. Folkman said about thank you for your time that you've

14      accorded us on all of the issues to have everything

15      thoroughly heard.

16               I'm going to come back to this, it was a little

17      bit out of order, but I want to start really because I

18      think it's an entree point into talking about Father

19      Carrier, something that Mr. Folkman said when he said that

20      the reason that Father Carrier was sued in this case was

21      because Father Carrier was the one in Haiti.  According to

22      Mr. Folkman that's what differentiates Father Carrier from

23      all the other people who, you know, were tangentially

24      involved in this.  But I think that's really not the case.

25               And I think Your Honor is aware of the fact that

1    the reason Father Carrier was sued here is not because he

2    was the man in Haiti.  It's because -- I mean, it's not

3    only because of that.  Obviously there's some truth to

4    that.  But I think what we see of this is that Father

5    Carrier is the nexus here among everyone.  Father Carrier

6    is the heart of this case.  He is the nexus among all the

7    institutions and Perlitz.  He was the connector, the prime

8    mover, he was the person who got all of this started.

9         Now, as we know, he's connected to all of the

10   institutions here.  He was a chaplain, later magistral

11   chaplain of the Order of Malta, he was a chaplain and

12   director of campus ministry at Fairfield University.  He's

13   obviously a member of the Society of Jesus.  It was Father

14   Carrier who met Douglas Perlitz who became involved with

15   him, in whatever way we understand that involvement to be,

16   who then solicited and arranged for Fairfield with Malta

17   to collaborate with Perlitz in founding PPT by providing

18   the funds needed for the project that Perlitz proposed.

19        I think you have the evidence you've seen so

20   far, the evidence we've submitted with our papers, and

21   frankly the evidence defendants submitted shows, that the

22   relevant institutions who were claiming the credit for

23   this, who were funding it, who were involved in this all

24   understood this to be Father Carrier's mission, Father

25   Carrier's project.

1              They understood, as we discussed last time, and

2     I don't want to rehash all of that, that he was doing that

3     to some extent, and we already have, but there is no doubt

4     that Father Carrier was the man on the ground.  Father

5     Carrier is ground zero of where this got started.

6              All the institutions with which he was involved

7     knew about his work in Haiti.  All of them simply left him

8     alone in this work, failing to supervise to check what he

9     was doing on the ground.

10             Father Carrier was also, I think it's now

11    undisputed, an individual with a troubled history.  He

12    never should have been left in sole charge of the program

13    being run by Douglas Perlitz.  The society knew because of

14    the letter from Father Clooney, if not otherwise, about

15    incidents of improper touching at Boston College.  There

16    were, as this Court is aware, is similar incidents at

17    Fairfield.

18             The inappropriateness between Father Carrier and

19    Perlitz was manifest to observers and yet Father Carrier

20    was left more or less in sole charge of supervising

21    Perlitz with respect to PPT.

22             Now, Father Carrier doesn't dispute any of that,

23    and he in fact I think tries to make a point at the

24    beginning that none of that is relevant to this motion,

25    and I would agree that at least some portion of that is

1   relevant only to the other defendants.

2          So I want to make it clear, to the extent that

3   Father Carrier says material in the Clooney letter, the

4   reports of the other events at Fairfield, they're not

5   relevant to Father Carrier's motion, they're highly

6   relevant obviously to the motions of the other defendants.

7          Just as an aside, because I don't think it

8   connects up elsewhere, when Mr. Folkman referred to other

9   matters that he thought were irrelevant.  In terms of

10  whether there's admissible evidence of Michele's

11  allegations of Father Carrier abused him, again, we

12  pointed this out the last time.  The question for the

13  Court is whether there's evidence that can be made

14  admissible and I think in the case of Mr. Michel,

15  obviously that evidence can be made admissible for

16  purposes of trial.

17         But for purposes of these motions, as I said, we

18  understand that these issues about Father Carrier's

19  character pertain more to the other defendants, but I

20  think they do inform the place where we find ourselves

21  with respect to Father Carrier.

22         Father Carrier also doesn't dispute that if

23  Connecticut law applies, plaintiffs are entitled to try

24  their claim for negligent supervision and that summary

25  judgment would not be appropriate.

1              So what I want to do is to actually start with

2      the choice of law question, and then I'll come back to the

3      statutory questions at the end.  But I think the choice of

4      law question is central to Father Carrier's argument and

5      so I want to start with that.

6              On the question of the waiver of Haitian law,

7      Mr. Folkman I think mischaracterizes our argument because

8      we never actually argued the Connecticut procedural law

9      would apply.  We understand that federal pleading

10     standards apply here.

11             What we have argued is that Connecticut law

12     governs the substance.  To the extent that foreign law is

13     an affirmative defense under Connecticut law, that would

14     be part of the substantive law, and then the federal

15     pleading standards, which is what we put in our brief,

16     it's the federal pleading standards that would determine

17     how you have to plead an affirmative defense.

18             But I think to some extent the question whether

19     this is an affirmative defense under Connecticut law or

20     isn't is really beside the point, and I think it's beside

21     the point for two reasons.

22             First, our initial argument about the waiver

23     wasn't simply the lack of notes.  It's also the fact that

24     Father Carrier affirmatively sought dismissal under

25     Connecticut law of claims of three of the plaintiffs in

1    this round of cases.  I'm not even talking about in the

2    initial Jean-Charles round.  He argued Connecticut law

3    there.  Whether that would be binding or be a waiver in

4    this, you know, this separate group, is a different

5    question.

6            But we're not relying on the arguments he made

7    in Jean-Charles case because he made a separate motion

8    here early in the case and he sought dismissal under

9    Connecticut law.  Having sought dismissal under

10   Connecticut law, we say he should be precluded from later

11   arguing that Connecticut law doesn't apply.

12           And I think that's all the more true because

13   Father Carrier says that he pleaded that Haitian law may

14   apply, but that's not actually what he pleaded.  He

15   pleaded that if Haitian law applied, certain things might

16   fall.  But there was never an assertion that he thought

17   that Haitian law did apply until these motions.

18           And I think that the point that Mr. Folkman made

19   that Connecticut law procedurally is similar to federal

20   law, that is to Rule 44.1 of the Federal Rules of Civil

21   Procedure.  But that rule is not of any help to Father

22   Carrier because the very case on which he relies in his

23   discussion of Rule 44.1, which is Rationis makes clear

24   first of all that the purpose of the notice under

25   Rule 44.1 is to prevent unfair surprise.  And as set forth

1      in the Advisory Committee Notes to that rule and quoted by

2      the Second Circuit in Rationis Enterprises, the stage

3      which the case is reached at the time of the notice, the

4      reason proffered by the party for his failure to give

5      earlier notice and the importance to the case as a whole

6      of the issue of foreign law are among the factors which

7      the court should consider in deciding a question of the

8      reasonableness of a notice.

9             So if we're looking at the reasonableness of the

10     notice that Father Carrier gave that he would rely on

11     Haitian law, those are the factors that we look at.

12            Now it doesn't really help to simply say, well,

13     the notice he gave here was clearer than the notice that

14     they gave in Rationis, because that's not the point.  The

15     point is to look at the reasonableness under the

16     circumstances of the case.

17            Here Father Carrier did not assert the

18     applicability of the Haitian law until after the close of

19     discovery so that plaintiffs had no opportunity or no

20     reason to take discovery of facts that might be pertinent

21     under Haitian law but not under Connecticut law.  Nor is

22     there any good reason for the late assertion of Haitian

23     law.  It's not as if Father Carrier only belatedly

24     discovered the Haitian connection to this case.

25            In fact, there were these kind of vague

1    illusions, well, if Haitian law, if Haitian law, and then

2    nothing, then motions made addressing things under

3    Connecticut law.

4          So it's not as if there was a reason which you

5    would sometimes find in a complex commercial transaction

6    and a lot of pieces and people don't realize until later

7    that this boat was actually flagged in this country and

8    that country comes to the fore, and there may be good

9    reason that the foreign law wasn't clear.  I think you see

10   that in Rationis itself where there was an issue of so

11   many countries involved.

12         But here I think it was always clear what the

13   basic facts were.  So I think the factor of the reason

14   proffered by the party for his failure to give earlier

15   notice, I think it's -- it clearly suggests, you know,

16   that there was some reason, or maybe there was no reason

17   that it wasn't raised sooner, but it ought to have been

18   raised before the parties completed their discovery and

19   then comes a motion for summary judgment and now it relies

20   on Haitian law.

21         I think further to that point, and I think

22   Mr. Folkman misunderstands the point we made about

23   Mr. Succar and the belated proposal of him, we understand

24   the procedures under Rule 56 for asking for additional

25   evidence, but the problem is we have a scheduling order in

1    this case.  We have an order that provided deadlines for

2    disclosure of all witnesses outside the U.S..  Said if you

3    plan to rely on and to call a witness outside the U.S.,

4    here's the date by which you need to disclose that, and

5    Mr. Succar was not disclosed in that context.  Now,

6    obviously neither was our expert, Mr. Joseph.

7            I think our view is if they could put in a

8    belated notice of a late national witness, so can we.  But

9    I think it hamstrings the Court in making this decision

10   that because the issue was not raised in time, the Court

11   doesn't have the kind of developed record you might have

12   in terms of depositions of these experts if the Court has

13   to weigh the two affidavits and figure out what's going

14   on.  The fact that the issue was raised so late in the

15   case, I think is not only unfair surprise to us, but as I

16   say, hamstrings the Court in assessing the declarations it

17   has been provided.

18           The last factor given by the Court, which has to

19   do with the importance to the case of the issue of foreign

20   law, this is not, at least with respect to Father Carrier,

21   a tangential issue.  The heart of Father Carrier's defense

22   to these claims is that Connecticut law doesn't apply to

23   him.

24           So I think if you take Mr. Folkman's point that

25   it's Rule 44.1 that governs the reasonableness of his

1    notice, I think it comes back to where we start, which is

2    I think they waived the applicability of Haitian law by

3    not having raised it sooner.

4         I think if you decide that it's not waived and

5    you look at the factors under the choice of law analysis,

6    and I think we disagree obviously with some of the ways

7    that Mr. Folkman analyzes these factors, Mr. Folkman put a

8    lot of emphasis on the fact that the cases he -- the cases

9    he referred to the plaintiffs had a particular connection

10   to the forum at issue, but I would note that the factors

11   listed in the restatement don't put a special focus on the

12   plaintiffs' domicile versus the defendants'.  It talks

13   about the domicile of the parties.  And so you might have

14   a lot of cases where it was the plaintiffs' domicile that

15   ended up being the law selected.  But there's nothing in

16   the factors that would cause you to weigh that more

17   heavily than the others.

18        In terms of the other factors -- and I don't

19   want to belabor this too long because we did do this in

20   our brief, but just to note again where we disagree with

21   this -- we do agree the place of the injury was in Haiti.

22   I think there's no question.

23        In terms of the place where the conduct causing

24   the injury occurred, Mr. Folkman makes a pitch for why

25   that's really Haiti as well, and he makes that argument

1    based on the idea that our claim really turns on what

2    Father Carrier saw in Haiti and what he did in Haiti, and

3    this comes back to his point that this case is really

4    about Father Carrier being the person on the ground.  But

5    I think that's really an incomplete way to look at this

6    because it's true that Father Carrier saw things in Haiti

7    that he should have done something about.

8            But to begin with, he didn't to Haiti merely as

9    a private individual.  He went on behalf of all these

10   institutions in Connecticut.  But the real problem here is

11   what he failed to do when he was in Connecticut at the

12   outset and what he failed to do when he came back to

13   Connecticut.

14           When they first established PPT, he failed in

15   his role, whether it's at Fairfield, whether it's, you

16   know, through the Jesuits, whether it's his role at Malta

17   when it was first established, failed to adopt any sort of

18   guidelines or safeguards to protect the children who were

19   going to be there.

20           Once he was going down to Haiti and seeing

21   inappropriate conduct taking place in front of him, he

22   failed when he came back to Connecticut to report that to

23   anyone, to tell anyone about the dangerous signs he'd

24   seen.  You know, Perlitz is showing pornography to young

25   boys.  Failed to use his authority, whether through Haiti

1    Fund, Fairfield, Malta, all of the entities that might

2    have been involved, to do anything about it.  It was his

3    role in the Connecticut institutions through which he was

4    functioning and it was in his role through the Connecticut

5    institutions that he failed to take the steps that he

6    should have taken.

7         So although the injury certainly occurred in

8    Haiti, I think the place where the conduct that Father

9    Carrier engaged in that caused it, Father Carrier's

10   negligent conduct, was predominantly we believe in

11   Connecticut where he should have been carrying out -- I

12   mean, in theory, you would go to Haiti, observe conditions

13   on the ground, come back home and say here's what we need

14   to do.  He didn't do it.  But it was in Connecticut he

15   would do that, we believe.  So I think that factor really

16   comes back the other way.

17        In terms of the Section 6 factors that Mr.

18   Folkman discussed, once you do the factors under Section

19   145 of the restatement and you get to the Section 6

20   factors, we went through all of these in our brief and we

21   believe that they all favor the application of Connecticut

22   law.  But I just want to call out a couple in particular,

23   which is the relevant policies of the forum.

24        Mr. Folkman says that those don't point either

25   way because Haiti and Connecticut simply allocate

1    liability differently.  But I don't think that's really

2    accurate.  Because I think in Mr. Folkman's view of

3    Haitian law, which we disagree with, so I think it's one

4    of the problems is it's hard to assess the factors without

5    knowing what Haitian law is.  So you know, we both get to

6    the question of what is Haitian law even before we know

7    whether we need to concern ourselves with it.

8              But I think if Haitian law were as Mr. Folkman

9    says, the policy of Haitian law is to limit and cut off

10   liability, to limit who can be responsible; whereas under

11   Connecticut law, you have the full range of possible

12   people who were responsible for this conduct.

13             And I think given that both places, Connecticut

14   and Haiti, are interested in protecting children from the

15   kind of conduct that occurred here, there are very

16   different policies about how you do that, whether you, you

17   know, because Haiti, according to Mr. Folkman, balances

18   that with a policy of protecting individuals.

19             So it says we go this far to protect the

20   children, but we don't go this far because that would

21   impose liability on individuals says Mr. Folkman.  As I

22   say, we'll come to our different view of that Haitian law.

23             Whereas Connecticut, the law would be that we're

24   protecting people from this kind of negligence and it

25   doesn't matter.  We don't cut that off.  We don't balance

1    that against protecting individuals.

2            So I don't think that the policy issue is

3    neutral.  And I think that typically when courts look at

4    these policy questions, they look at how it plays out

5    here, what is it that Haiti's trying to do with its rule

6    that Connecticut is trying to do something different.  So

7    I think the policy considerations would point to

8    Connecticut law.

9            Mr. Folkman also suggests that Haitian law is

10   much easier to determine than we think it is, but I have

11   to say, listening to his argument, what I heard

12   Mr. Folkman essentially suggest to the Court is that you

13   have to look to French law because Haitian law is

14   undeveloped.  He didn't use that word but he analogized to

15   a situation a 150 years ago in the United States where

16   there wasn't much American law and you might be carrying

17   around Blackstone.

18            So I take that to be an analogy to a situation

19   where Haitian law is undeveloped and so we have to look to

20   the law of another country as Haitian lawyers themselves

21   have to do to make a decision about, well, what should

22   Haiti do here?  Let's start by looking to French law.

23            The notion that the two laws are merely the same

24   so you should look at the French law experts opinion I

25   think kind of misses the point.  That is the two laws,

1    French and Haitian.

2         If Connecticut law and New York law are the same

3    and they're both -- it's clear what they both are and

4    they're the same, you don't need to go ask a New York

5    lawyer what that common law -- the law that's common

6    between the two states is.  You can go ask the Connecticut

7    lawyer because the Connecticut lawyer will also know the

8    answer.

9         But according to Mr. Folkman, if we want to

10   understand Haitian law, which happens to be the same as

11   French law, we can't simply ask the Haitian lawyer because

12   the Haitian lawyer apparently doesn't have the same body

13   of law, or the developed body of law, to turn to, and the

14   Haitian lawyer doesn't necessarily know and then needs to

15   turn to the French lawyer.

16        I want to say, I think Mr. Folkman a little bit

17   wants to have it both ways, because on the one hand, he

18   starts off in his motion, he provides us with the

19   affidavit of Mr. Succar and also of Professor Curran,

20   because she explains French law and then Mr. Succar can

21   pick up on that and say we would look to French law.  Now

22   he wants to come back and say, now Mr. Succar looks at her

23   application and says, oh, yeah that's Haitian law.  If he

24   can say that's Haitian law, then what's she doing there at

25   all?  She's an expert on French law.

1            It's kind of an untenable position to both argue

2    that Haitian law is easily determined and also to suggest

3    that we need a complicated scholarly affidavit from a

4    French law expert because the Haitian law expert doesn't

5    have the developed body of law to call on to tell us what

6    the Haitian law is.

7            So I think there too we have an issue of the

8    ease and determination and application of the law to be

9    applied as well as the certainty, predictability and

10   uniformity of result again what we think points to

11   Connecticut.

12           THE COURT:  Would this be a convenient time for

13   us to take a break?

14           MS. BIERSTEIN:  Sure.  If that works for Your

15   Honor, that's fine.

16           THE COURT:  All right, thank you.

17           MS. BIERSTEIN:  Thank you.

18           THE COURT:  We've had a long day.  We've had

19   lengthy arguments this morning, so Darlene has been at it

20   more or less full steam ahead for most of the day.  So I

21   think this is a good time.

22           MS. BIERSTEIN:  Let's take a break and I will

23   try to be brief to spare Darlene.

24           THE COURT:  Thank you.

25                (Whereupon, a recess followed)

1              MS. BIERSTEIN:  Thank you, Your Honor.  It was

2     actually a very good stopping point, because I was just

3     about to turn from the choice of law analysis to looking

4     at the Haitian law experts in terms of what they say the

5     Haitian law.  But before turning to what they actually

6     say, I do want to say something about the methodology used

7     by the experts, because what our expert did and what

8     Father Carrier's experts did I think is quite different.

9              Father Carrier argued in his reply brief that it

10    was more appropriate for an expert on Haitian law to

11    consider Haitian law in light of what he claims are the

12    undisputed facts rather than in light of the allegations

13    in the complaint.  But I think that that's actually -- I

14    think the opposite is true.  Father Carrier gave his

15    expert a one-sided approach to the facts that is here's

16    what we say the undisputed facts are, and got a legal

17    opinion as to how that expert thought the case would come

18    out on those facts, but I think that was the wrong

19    question.

20             First of all, as the plaintiffs demonstrated,

21    and this was discussed at length I think in the earlier

22    sessions, but I think some of those issues are in dispute

23    here as well, the facts here are not undisputed.  But I

24    think, second, even if they were, the role of an expert in

25    foreign law is not to assume the role of the Court in

1      adjudicating the motion for summary judgment.  It's up to

2      the Court to apply the relevant law to the undisputed

3      facts if they actually are undisputed and decide whether

4      the case can be decided as a matter of law.

5              The role of the expert in foreign law is to

6      provide the Court with the legal framework that applies to

7      the claims to say, well, for a claim like this, here are

8      the factors under which you can be liable under one law as

9      opposed to another.

10             For this purpose, it's the complaint that

11     provides the relevant information.  What claims are

12     plaintiffs asserting and in what context?  And our expert,

13     Mr. Joseph, informs the Court what Haitian law provides

14     with respect to such claims.  You know, what are the

15     factors under what circumstances would an individual be

16     liable rather than drawing the conclusion to come up with

17     the conclusion of who's liable.

18             And plaintiffs believe that Father Carrier's

19     expert, Mr. Succar, really is usurping the role of the

20     Court by purporting to adjudicate the claim accepting

21     Father Carrier's view of the facts and opining how it

22     would come out under Haitian law rather than simply

23     providing the Court with the information about what the

24     factors are under Haitian law.

25             Now, if we turn to the two views of Haitian law,

1    Mr. Succar's view and Mr. Joseph's view, we would see that

2    the views of the two experts are quite different, and

3    under Mr. Joseph's declaration it shows we don't believe

4    that there is the same kind of conflict between

5    Connecticut law and Haitian law that Father Carrier claims

6    to discern, and that's because Father Carrier's expert

7    says that an individual within organization that's

8    incorporated cannot be liable.  But Mr. Joseph reads

9    Haitian law differently and he says that individuals may

10   be liable.

11          And I want to look at some of that language,

12   because Mr. Folkman suggests that our expert's focus is on

13   the criminal law.  Now, Mr. Joseph does discuss the

14   criminal law in Haiti in his declaration, but it's not the

15   primary focus of it and it's not the core opinion that we

16   are relying on.  It is kind of a fallback and another way

17   of looking at coming around to the same point.

18          But if you were to look at paragraphs 14 and 15

19   of Mr. Joseph's declaration, and Mr. Joseph quotes Article

20   1170 of the code to say one is responsible for the damages

21   caused by one's own acts as well as for the damages caused

22   by those who are under one's supervision or direction, and

23   then the language that Mr. Folkman referred to, or by the

24   things that are under one's control.

25          So there's the things, but there's also the

1    people.  But I think it's the next paragraph that's

2    particularly important because this is where Mr. Joseph

3    explains that the liability of supervisors is broad and

4    dependent on the facts.  A supervisor in an organization,

5    he says, may be liable when the people he or she

6    supervises have caused damage if the supervisor had the

7    ability to prevent such damage.  Individual liability does

8    not depend on the formal title of the supervisor but

9    instead depends on the practical context of the

10   supervisor's activities.  That's a very different view of

11   Haitian law than what Mr. Succar, or maybe not Mr. Succar,

12   but Professor Curran talking about French law, is

13   providing, at least within the context of Haitian law.

14   Mr. Joseph is saying that you can be responsible for

15   conduct of a person under your supervision depending on

16   the particular context and circumstances and your ability

17   to prevent that.

18         Now, I think Mr. Folkman spent a lot of time

19   talking about who employed Perlitz, but I think there's a

20   couple of points here.

21         One, I don't think it's disputed that in

22   whatever capacity and on whoever's behalf Father Carrier

23   was supervising Mr. Perlitz, but I think this question of

24   who employed Mr. Perlitz, which is very much in dispute,

25   has another significance that I think we haven't focused

1   on, which is, even under Mr. Folkman's view of Haitian

2   law, this protection that they claim the individual would

3   have arises only if the employer is incorporated.

4           But it's not clear, you know, we think under the

5   facts of who was actually employing Mr. Perlitz since he

6   was:  A, as we've already discussed, an independent

7   contractor in Haiti funds; and B, he got money directly

8   from Fairfield and, no, it wasn't just Father Carrier

9   being a mailman for the U.S. Postal Service, the money was

10  raised by campus ministry, it came from checks made out to

11  Fairfield Campus Ministry, as we discussed in the previous

12  sessions.  And so clearly some of the money that paid

13  Douglas Perlitz came not only from Father Carrier's hands

14  but came from Fairfield.

15          But here is one thing that's pretty clear, was

16  that Douglas Perlitz was working for and at PPT.  PT was

17  not an incorporated entity as far as we know, and I think

18  this came up the last time as well.  One of the confusions

19  here is that PPT had no separate legal existence and there

20  were all these organizations kind of swirling around with

21  different functions and arguing the Haiti Fund's function

22  was to raise money to help -- to provide money for PPT and

23  to funnel money through.  And Fairfield University viewed

24  PPT as a program of Fairfield University that it ran and

25  sponsored and provided money to.  And Malta viewed PPT as

1    a Malta work as a program founded and supported and

2    sponsored by people from the Order of Malta.  But PPT

3    itself is not an incorporated entity.  So lots of people

4    are providing money to Douglas Perlitz, which doesn't mean

5    that he was an employee of those entities.

6            And so to the extent that PPT itself is not

7    incorporated, and there's lots of people out there

8    funneling money through entities to pay him, it's not at

9    all clear that this notion that if the employer is

10   incorporated, there's no liability for the supervisor,

11   that is the person who also works for the employer but is

12   doing the supervision, it doesn't apply at all to the

13   extent that the real quote-unquote employer, certainly the

14   only thing in Haiti employing him is PPT, which is not

15   incorporated, and as I say, which is receiving money from

16   lots of different places.

17           So even under Mr. Succar's view, it's not at all

18   clear that Father Carrier is insulated, but certainly

19   under Mr. Joseph's explanation of Haitian law where the

20   supervisor in an entity can still be responsible if he has

21   the ability to -- I'm looking back again -- supervisor in

22   an organization, was the words in the declaration, may be

23   liable when the people he or she supervises have caused

24   damage if the supervisor had the ability to prevent it.

25           So certainly under Mr. Joseph's view, even if

1      you look at Father Carrier as a supervisor within an

2      organization and if you view Douglas Perlitz as an

3      employee within an organization which I think, as I said,

4      is very hard to do here, under Mr. Joseph's view there can

5      still be liability under Haitian law.

6              So we think that plays out two ways:  That

7      there's not a true conflict between Connecticut law and

8      Haitian law; and second, that even if the Court were to

9      apply Haitian law, Father Carrier would not be entitled to

10     summary judgment.

11             I'm going to turn now, unless the Court has

12     questions about that, I'm going to turn to the statutory

13     claims as to which there's no dispute which law applies.

14             On the extraterritorial application question,

15     Mr. Folkman says that our argument is so complex that it

16     couldn't possibly be right, that if it's that complicated

17     to say that there's an intent to apply it

18     extraterritorially, it can't be so.  But I think our

19     argument is actually very simple.

20             Our argument is that Congress specifically

21     indicated the intention to apply 2255, that is the section

22     that creates the civil remedy extraterritorially because

23     Congress selected a very small number of predicate acts

24     for which it provided a civil remedy, and those predicate

25     acts included statutes such as 2423 that by their very

1    nature involve international conduct and international

2    trafficking.  And so the selection of such a small number

3    of statutes to say for these the victims have a remedy, we

4    think shows a clear intention to provide a remedy even

5    when the victims are abroad.

6              The complicated argument is the one that tries

7    to apply this RJR Nabisco case to a totally different

8    statutory structure because RJR Nabisco deals with RICO,

9    which has a completely different structure, and that's

10   when you get into the comparison we made explaining the

11   difference between the two level and the three level.  But

12   that's just a way of saying that what's hard is to take

13   the square case of RJR Nabisco and fit it into a round

14   hole of a totally different statute that is doesn't fit

15   with.  And I can go through a little bit.

16             I think the major distinction we see is that the

17   list of predicate acts in RICO may have included some with

18   an international component, but they were compiled, that

19   list, for totally different purposes.  Congress didn't sit

20   down in RICO with a list of here's what we want the civil

21   remedy to cover, they listed predicate acts that they

22   thought would create racketeering activity then they

23   defined the criminal liability based on the racketeering

24   activity and then as of then said we're going to have

25   civil liability.

 1              That's not what 2423 and 2255 look like.  These

 2      statutes are much simpler.  So I think the intention for

 3      it to apply to all the victims, whether they're within the

 4      United States or without, is very clear.

 5              I think another place where you see that

 6      intention and really big difference between these statutes

 7      and the RICO statute is in the definition of who can sue.

 8      The RICO definition was so broad and vague because it was

 9      any person injured in his business or property by reason

10      of a violation.

11              So you have all those ripples coming out of the

12      violation and courts have struggled for decades to limit

13      that, to talk about what's the proximate cause and what's

14      RICO proximate cause and how far out do the ripples go.

15              But there aren't any ripples in 2255 because

16      Congress cut off the liability there and said only the

17      direct victim of these violations, so somebody who comes

18      in and says I am secondarily affected, that doesn't apply.

19              So in the context where Congress says here's a

20      small list of statutes and the victims of those statutes

21      can sue, if they had meant to say only some of the

22      victims, only the victims in the U.S., they would have

23      said that.

24              When you create a narrow class of people rather

25      than that broad one, and a very narrow class of statutes

1    and the narrow class of statutes all have to do with

2    trafficking and sexual abuse of one kind or another, which

3    are all offenses that Congress has specifically recognized

4    have an international component that we don't have the

5    kind of boundaries and borders that may be used to divide

6    those countries in that way, that people are traveling

7    internationally and trafficking internationally, the

8    statute specifically recognized that and 2255 is

9    specifically targeting statutes like that.

10            So I think it's actually a very simple argument

11    to see that the 2255 remedy does have extraterritorial

12    application.

13            Finally, in terms of the travel details, Father

14    Carrier says we can't show a causal link because we

15    haven't provided the specific dates of travel.

16            In our view, plaintiffs don't need to provide

17    specific dates of travel in order to prove the causal link

18    here, because what we have provided is evidence that

19    Father Carrier facilitated all of Perlitz's travel to

20    Haiti.  There would have been no PPT, there would have

21    been no funds without Father Carrier's facilitation of all

22    of the travel.  And I think the record is replete with

23    evidence that Father Carrier arranged for the funding and

24    paid for Perlitz's activity, including his travel.

25            And I think there's no dispute that he traveled

1    from the U.S. to Haiti, that the money for that was

2    facilitated by Father Carrier, and that the abuse in fact

3    could only have happened because Perlitz was in Haiti.

4              However, having said that, if the Court believes

5    that more specific dates and the kind of matching up of

6    this trip happened here -- I mean, if Perlitz arrived in

7    Haiti in October and abused somebody the following March

8    or the following June, there still a causal connection

9    because that's how he got there.  But if the Court

10   believes there's a more specific need to match up dates of

11   travel, we know that in the government filings in the

12   criminal case there's extensive evidence publicly

13   available on the public docket, we could provide the Court

14   either the documents or the docket numbers, first of all

15   of Perlitz's passport with all the entry and exit stamps

16   from Haiti, and second of all, the chart created by the

17   government showing the various details of the travel.

18             So there is lots of evidence of the specific

19   information of the travel if the Court, contrary to our

20   view, believes that's necessary.  In that circumstance, we

21   would ask for leave to supplement the record with those

22   documents which, as I said, are available on the public

23   docket in any case, in the criminal case.

24             If the Court has no questions, I would just want

25   to add one kind of tagalong point just because something

1    that Mr. Folkman said which doesn't fit neatly into this

2    structure of the various arguments I think needs to be

3    addressed.

4            There was a mention of the fact that documents

5    from the Order of Malta would be inadmissible against

6    Father Carrier because Father Carrier says because they're

7    hearsay as to him.  And I would note that that doesn't

8    mean they're inadmissible, because the documents -- and

9    I'm not necessarily speaking to particular documents,

10   although the record that he referred to I think would

11   definitely fit within this -- to the extent that they're

12   business records of the Order of Malta, then they're going

13   to come in under hearsay exception, and it's not going to

14   be limited to the Order of Malta, it's only to the extent

15   that we're relying on them as being non-hearsay statements

16   of the party that Mr. Folkman could say, well, that

17   wouldn't be admissible as to us.

18           But to the extent that there's any exception to

19   the hearsay rule, including business records, which I

20   think a number of these documents, such as the formal

21   minutes of an Order of Malta meeting would qualify as

22   records kept in the ordinary course, then I think in fact

23   there's a much broader range of evidence that's admissible

24   against Father Carrier than what he has suggested.

25           THE COURT:  Thank you.

1          MR. FOLKMAN:  Your Honor, I'm very cognizant of

2     Mr. Kennedy's time.  So I'm going to try to take perhaps

3     five minutes; is that okay?

4          With respect to the statutory claim, we're well

5     aware of what's in the record of the criminal case.  I

6     would just say that we believe that none of the passport

7     records or the other records to which Ms. Bierstein

8     referred could be presented in admissible form.  I don't

9     know why it wouldn't have been presented in the briefing,

10    but if you'd like to see that, we'd be happy to brief

11    that.

12         With respect to the bigger issue, the Haitian

13    law issue, Ms. Bierstein said something I thought was

14    remarkable, she said, if only we had known, we might have

15    done something different in the case.  But of course what

16    can't possibly be right about that is because they would

17    have had to do the opposite of what they did.

18         If we're right about Haitian law and her point

19    is if we had known that you would be arguing Haitian law,

20    then we would have said, you weren't the Haiti Fund's

21    agent and Mr. Perlitz was your employee and not the

22    employee of the Fairfield or Haiti Fund entities.  It's

23    the opposite of what their case is.

24         So there's no way that they could have presented

25    their case in a different way that would have preserved

1    the claims against Father Carrier without undercutting

2    basically the whole theme of their case with respect to

3    the other defendants, so I don't think that's really a

4    fair point.

5                With respect to the issue about where the

6    conduct took place, this is one of the 145 factors that

7    was discussed, I think Ms. Bierstein's approach to this is

8    very artificial.  She says, well, Father Carrier would

9    have had to go back to Connecticut and then adopt policies

10   that would apply to Haiti.  There's no reason that really

11   is true.  If he were in Haiti and he saw there was

12   something amiss, he should have fixed it in Haiti.

13               It's true that the claims against the

14   institutional defendants may depend to some degree about

15   what he did, who he reported to and so forth when he came

16   back to Connecticut, but the question with respect to

17   Father Carrier is, he's there, he sees things going on, he

18   doesn't put any policies into place.  That has nothing --

19   no necessary requirement of travel.

20               So I think that -- I do think that our view of

21   the strength of that factor is correct.

22               The last point I want to raise, Your Honor, is

23   with respect to the certainty or uncertainty of Haitian

24   law, and I would just push back on Ms. Bierstein's example

25   about the lawyer 150 years ago from New York who didn't

1    know what Connecticut law was.

2            It's not that there wasn't much American law or

3    not much Haitian law, is that there aren't very many

4    Haitian law books.  That's the issue.  The Haitian law

5    itself is clear.  But what sources do you cite?  What

6    books do you refer to if you're a Haitian lawyer?  As I

7    think Mr. Succar's declaration makes clear, in part of

8    this you look at French law books.  It doesn't mean the

9    law isn't clear, it just means they don't have their own

10   treatises yet.

11           Thank you.

12           THE COURT:  Thank you.

13           MR. KENNEDY:  Good afternoon, Your Honor.

14           THE COURT:  Good afternoon.

15           MR. KENNEDY:  Jeff Kennedy, I represent Hope

16   Carter, if it may please the Court.

17           Your Honor, the issue to be adjudicated is quite

18   narrow and limited as to Hope Carter.  The issue is

19   whether the plaintiffs have provided this Court with hard

20   evidence as required under the D'Amico case, which is

21   cited in our brief, to overcome the protections afforded

22   Carter under the Volunteer Protection Act and in

23   connection to the General Statutes 52-5570.

24           I submit this is an easy call for Your Honor and

25   that the evidence leads to one conclusion, Carter is

1    entitled to judgment as to the four bellwether claims

2    against her contained in Count Three, which is the

3    negligent hiring, supervision and direction, and Count

4    Five, breach of fiduciary duty.

5         In order to reach this conclusion, the Court

6    need only take judicial notice of the following.

7         First, the plaintiffs acknowledge that the

8    Volunteer Protection Act provides immunity to volunteers

9    of non-profit organizations under certain circumstances.

10        Secondly, the plaintiffs acknowledge in the Rule

11   56(a)(2) statement that Carter qualifies as a volunteer

12   for purposes of both the Volunteer Protection Act and

13   Connecticut General Statutes 5570.  In other words, the

14   plaintiffs concede that The Haiti Fund was a 501(c)(3)

15   organization and Carter did not receive a salary or any

16   other compensation.  Thus to their credit, the plaintiff

17   concedes Carter was exactly what she was, a volunteer

18        Your Honor, the four bellwether plaintiffs

19   concede they never even spoke to Carter.  They concede the

20   two claims against Carter are grounded in negligence.

21        With those undisputed facts in the backdrop,

22   Your Honor, the plaintiffs' last line of defense to

23   contest Carter's entitlement to summary judgment is to

24   argue the high burden of the exception to the VPA that she

25   acted grossly negligent or reckless.  In other words, that

1    Carter, an 81 year old mother of 12 and grandmother of 34,

2    who brought six of her own children and six of her own

3    grandchildren, including a male in the fifth and sixth

4    grade, to PPT and exposed them to Perlitz acted with the

5    commensurate state of mind that the Court could infer that

6    she acted with reckless disregard for the safety of the

7    four bellwether claims.

8              Alternatively stated, Your Honor, by the Second

9    Circuit in the American Telegraph Decision, which is cited

10   on page 6 of our reply brief, the evidence needs to show

11   conduct by Carter which smacks of intentional wrongdoing.

12             Now, deciding these threshold issues, such as

13   recklessness, is a job for the Court, Your Honor, and not

14   the jury.  In other words, Your Honor, you are the

15   gatekeeper of the nebulous claims.

16             In an effort to sustain this high burden, the

17   plaintiffs claim there are two facts that show Carter

18   acted recklessly.

19             First, while a member of the Haiti Fund Board,

20   she failed to draft, adopt and implement appropriate

21   policies to protect children from possible sexual

22   predators.

23             Your Honor, Mrs. Carter was a volunteer.  She

24   was one of 30 other members over a ten-year period.  The

25   Court has already held that the Haiti Fund was not a mere

1    instrumentality of Carter or any of the other defendants.

2    Thus the plaintiffs want to simply disregard the corporate

3    structure and pierce the corporate veil and hold Carter

4    individually liable.

5         Now, when we were mere last time, Attorney

6    Bierstein had indicated that that had not been briefed,

7    the issue of the corporate veil.  I would ask Your Honor

8    to take judicial notice of page 23, footnote 6, of our

9    brief, what we did in our original motion for summary

10   judgment where we did bring up the issue of corporate veil

11   piercing.  As to that, Your Honor -- and that's the Naples

12   decision -- and these deserve a little comment, Your

13   Honor.

14        There was no complete dominance of financing and

15   policies of the Haiti Fund Board by Hope Carter.  Your

16   Honor just need review Exhibit 5, which the plaintiffs

17   rely upon, which is the Haiti Fund Board minutes.

18        Your Honor has already spoken about them, from

19   July 9, 2003, which state the board engaged in general

20   discussion of objectives of setting policy governing

21   behavior, project employees and volunteer interaction with

22   students.  And that was Phil Lacovara, so Your Honor is

23   aware of that.

24        Your Honor, the plaintiffs are simply ignoring

25   the corporate structure.  The Haiti Fund crafted and

1    implemented their own policies, not Carter.  She's simply

2    one board member, nothing more, nothing less.

3              Now, the second fact that the plaintiffs rely

4    upon to try to prove the recklessness involves providing

5    interrogatories, responses from two non-bellwether claims.

6    That's Joel Albert on page 8 of the reply brief and Wendy

7    Derice.

8              Your Honor, these are not in admissible.  All

9    the Court needs to do is to review page 9 of our reply

10    brief, the second amended scheduling order.  These are

11    Haitian residents who are not disclosed to testify at

12    trial.

13              And we've already heard from Attorney Bierstein

14    today about unfairness and about the need to keep the

15    scheduling orders and the plaintiffs were well aware of

16    this because of the fact that one of the other individuals

17    I'll speak about in a moment, Thony Vall, was disclosed

18    and they'd rely on his interrogatory response.

19              And that leads me to the next point, Your Honor.

20              The plaintiffs also appear to claim the fact

21    that Carter allegedly saw a non-bellwether plaintiff, in

22    fact Thony Vall as a former plaintiff who has already

23    settled and is not a party to these cases, in Perlitz's

24    bedroom somehow equates to recklessness.

25              I'd ask the Court to take judicial notice of

1    Thony Vall interrogatory number 20.  And what it states,

2    Your Honor, is as to Hope Carter, "I believe Pierre Paul

3    Carrier, Madam Carter, Silvester Tan and Andy knew or

4    should have known Douglas was sexually abusing Pierre Paul

5    Carrier and Madam Carter were frequent visitors to

6    Douglas's Bellair House where boys from Project Pierre

7    Toussaint were often present.  Pierre Paul Carrier and

8    Madam Carter saw me in Douglas' bedroom at Bellair when

9    Douglas was also in the bedroom."

10           That's it as to Hope Carter.  It goes on to make

11   some salacious allegations as to Father Carrier, but

12   that's it.  That's all they have, no context, nothing.

13   This is hardly the hard evidence as mandated by the Second

14   Circuit, Your Honor.  The vagueness speaks for itself.

15   This is all the evidence the plaintiffs have to meet the

16   high burden of recklessness.  To be sure, Your Honor, a

17   genuine issue is made of certain stuff.

18           To claim this equates to the state of mind

19   showing recklessness -- I'm sorry showing reckless

20   disregard to the students and recklessly exposing them to

21   sexual abuse is frankly misguided and wrong.

22           Your Honor, the plaintiffs also allege fiduciary

23   duty as to Carter.  I know Your Honor has heard ad nauseam

24   the discussion of the fiduciary duties.  So I won't spend

25   too much time on it.  But I would like you to note on

1    page 125 of the Plaintiffs' objection, they acknowledge

2    the fiduciary duty claim is based on ordinary negligence,

3    thus the VPA and 52557N would apply.

4         Your Honor, there is no case that I could find

5    that stands for the proposition that a volunteer on a

6    charitable board based in the United States has a

7    fiduciary relationship with beneficiaries in a foreign

8    country.  To be sure this is a chilling, chilling

9    proposition.

10        Your Honor, I also note, I don't mean to

11   regurgitate my brief for you, but as concerns the

12   fiduciary duty and what this Court has previously

13   indicated qualifies, I would like you to note on page 27

14   and 30 of our summary judgment, Judge Arterton's decision

15   in Johnson v. Schmidt, which she indicated that there

16   needs to be a personal and individualized relationship.

17        Your Honor has also heard from my colleagues and

18   plaintiffs about the Bass decision where there was no

19   fiduciary relationship because there was no substantial

20   contact between a minor and one of the defendants,

21   Windsor, in that case, despite the fact, Your Honor, that

22   Windsor was the head of the school with substantial

23   authority over schools and policies and practices.

24        Lastly, Your Honor, the Martinelli decision,

25   which is noted on page 2, page 11 to 13 in our reply

1    brief, which Your Honor has heard quite a bit about it,

2    that dealt with an institution, Your Honor, which had a

3    fiduciary relationship with a minor who attended one of

4    its schools and went to a church within its diocesan.

5          Carter is an individual, Your Honor, so

6    comparing and contrasting these cases to what is in front

7    of Your Honor, Carter never spoke to the plaintiffs.

8    What's the evidence here, Your Honor?  Carter said

9    bonjour, Carter gave them soccer balls and candy, Carter

10   played games with them.  To state --

11         THE COURT:  You're referring to the plaintiffs

12   generally, not the four bellwether --

13         MR. KENNEDY:  This is evidence and it's in their

14   brief, Your Honor.  This is an example of the evidence

15   provided by the four bellwethers as to their relationship

16   with Carter.

17         She said bonjour, she gave us a soccer ball, she

18   played games with us.

19         This deserves little comment, Your Honor.

20         Moreover, Your Honor, this was a broader -- and

21   this was spoken to quite eloquently by Attorney

22   Goldberg -- there's a broader societal issue before the

23   Court today and that's the chilling effect of these type

24   of lawsuits.  In our case, it's for volunteers who give

25   their support for helping those most in need.  The

1    implication of the Court's decision on this issue cannot

2    be overstated.

3              And lastly, Your Honor, and this does not appear

4    in our brief, but the Court should be aware, and it was

5    after the briefing schedule was finished, the deposition

6    of the plaintiffs' liability expert, Edward Dragan who was

7    an educational expert, was taken, and he is apparently an

8    expert on educational practices and supervision, and he

9    indicated he has no opinion as to the individual liability

10   as to Hope Carter, Your Honor, and that you would need

11   expert testimony on that issue.

12             Thank you very much.

13             THE COURT:  Thank you.

14             MS. BIERSTEIN:  In speaking about Mrs. Carter,

15   it's interesting that nowhere in Mr. Kennedy's

16   presentation or in their reply brief do you ever hear the

17   words "The Order of Malta."  And Carter assumes the only

18   possible basis on which she could be liable is her role at

19   the Haiti Fund and sitting, as Mr. Kennedy referred to, on

20   the board of the Haiti Fund.  But that's not the only

21   place that her liability derives from.  It derives as

22   much, if not more, from her role as one of the

23   representatives of Malta, the entity that had sent Perlitz

24   to Haiti and supported and approved his move from Milieux

25   in order to found PPT, provided funding for PPT and made

1   it an official work of the American Association.

2              Even more than her connection to Malta though,

3   it's Carter's frequent trips to Haiti, her frequent trips

4   to PPT, that are really the source of our claim that she

5   can be liable here.  She's not just a board member of the

6   Haiti Fund and not just the area co-chair at various

7   points of the Connecticut arm of Malta.  She was the

8   person who was actually there in Haiti, the only person

9   for those entities other than Father Carrier, who were the

10  eyes and ears to check up on where this money was going

11  and what was actually happening down there with the

12  project.

13             Now, I think we, the plaintiffs and Mrs. Carter

14  agree, I think that if she was only ordinarily negligent,

15  we do agree that at that point the Volunteer Protection

16  Statute would apply, but we think that the evidence here

17  is sufficient for a jury to consider whether she was

18  grossly negligent or reckless, not only ordinarily

19  negligent.

20             I want to say a couple points about that.

21             First of all, the fact that we argued in our

22  brief that the fiduciary duty claim in general relies on

23  the unordinary negligence doesn't mean that Mrs. Carter is

24  entitled to summary judgment on that claim.  Because to

25  the extent -- our legal burden for that claim as applies

1        to all defendants may be ordinary negligence, but to the

2        extent the evidence with respect to her shows that she was

3        grocery negligent or reckless, then we are outside -- that

4        she's outside the scope of any immunity that she might

5        otherwise claim.

6                And I think for, you know, in the same context,

7        because we're talking about her gross negligence, her

8        recklessness, what she saw in Haiti that went beyond --

9        well, an ordinary person should have noticed something was

10       wrong but really rose to a much higher level, there isn't

11       a corporate veil issue here.  We're not trying to, you

12       know, pierce through someone else's liability and, you

13       know, hold someone vicariously liable for something an

14       entity did.  This is not a corporate veil issue.

15               This is simply she is the person who was there.

16       We are seeking to hold her responsible for her own

17       conduct, her own gross negligence and recklessness, and

18       her own responsibility, because she was the person charged

19       by these entities.  And I think this is set forth in more

20       detail in our brief with being the person on the ground to

21       see what was happening there.

22               In terms of her gross negligence or

23       recklessness, Mr. Kennedy doesn't say, but perhaps

24       implies, that if the statements of the other plaintiffs

25       are admissible, that there clearly would be a disputed

1    issue of fact as to her gross negligence or recklessness.

2    And I think if the Court takes a look at the statements

3    which are quoted in our brief, but also provided as

4    exhibits, I think it's pretty clear given what these

5    plaintiffs have to say, that given the things that she saw

6    there that she -- I think that would be sufficient for a

7    jury to have to adjudicate that issue.

8            Mr. Kennedy says that those interrogatory

9    answers are not admissible because those plaintiffs were

10   not identified as witnesses outside the United States.  I

11   think that's really a wrong and really misconstruction of

12   the Court's order here.  The evidence that we are

13   discussing was specifically identified and provided to the

14   defendants because those were interrogatory answers.  We

15   had given those to the defendants months ago.  They had

16   that information.  And the whole point of the scheduling

17   order was to prevent an unfair surprise.  If you were

18   going to call someone that we don't know what they might

19   say, we want to have a chance to take their deposition.

20           Now, Thony Vall was a plaintiff from the first

21   round, but we had interrogatory answers from plaintiffs

22   who were this round plaintiffs but not selected to be

23   bellwether plaintiffs.

24           Now, of course at the time of this deadline,

25   nobody knew who the bellwethers were going to be, but the

1    defendants were in possession of all of the interrogatory

2    answers.  The defendants had the opportunity to select

3    which plaintiffs would have their depositions taken.  That

4    was completely up to them.

5         The bellwether process was a collaborative -- we

6    picked some, they picked some -- but the depositions were

7    up to them.  They had their interrogatory answers, they

8    chose not to depose the plaintiffs who provided this

9    information even though it showed great recklessness on

10   Mrs. Carter's behalf.

11        So I don't think the idea that we were supposed

12   to identify witnesses outside the U.S. by a certain date

13   has anything to do with the use of these plaintiff

14   interrogatories.  And so for that reason, I think they are

15   completely admissible here.

16        I would also add on this point Mrs. Carter's

17   somewhat in tension with Father Carrier's position,

18   because if none of these -- in the case of the Haitian law

19   expert that's not one of the plaintiffs, it's not a

20   statement we already had, it's not information we already

21   knew.  The rule that would have barred that is far more

22   clearly applicable to Mr. Succar than it could possibly be

23   to the plaintiffs here.

24        So if the Court were to say that somehow this

25   rule did apply to plaintiffs in this round, it would also

1    have to throw out the affidavits that Father Carrier

2    submitted on Haitian law.

3           But as I said, I think the clearer reading of

4    this is that it was never intended to apply for plaintiffs

5    for whom the defendants already had the interrogatory

6    answers because they already had their statements.  It's

7    not as if we put in some affidavit with additional

8    information.  What we submitted to Your Honor is the

9    interrogatory answers that the defendants have had for

10   months.  So I don't think there should be a question of

11   admissibility with respect to that.

12          On the last point, I just want to note in terms

13   of the fiduciary relationship.

14          Mrs. Carter was frequently at PPT, she was

15   well-known to the plaintiffs.  The Order of Malta -- and

16   this was evidence we went over last time -- talked about

17   the fact that the official works of the Order of Malta

18   involved not just money, but hands-on involvement of Malta

19   members.

20          The fact that they didn't share a common

21   language and couldn't speak to each other I don't think

22   changes the situation that when you take the role that she

23   took in founding this entity -- and we talked about that

24   last time, I don't want to go back through that -- and in

25   being the one on the ground to see how it's going, when

1    you're dealing with vulnerable minors in the extremely

2    vulnerable position that they're in, I don't think it's a

3    stretch to suggest that a fiduciary duty arises.  And I

4    don't think again that it's chilling of behavior that we

5    want to encourage to say that if you're the one on the

6    ground making the inspections, coming to see how it's

7    going, coming to see where the money is going, when you

8    see the kind of behavior that the plaintiffs in their

9    interrogatory answers and in the information that we've

10   submitted, when you see that kind of behavior, if you

11   don't do anything about it, you're going to be

12   responsible.

13            I don't think that chills anyone who just sits

14   on a board, or anyone who takes a more active role.

15   Because again, what we're talking about is gross

16   negligence or recklessness.  Ordinary negligence would be

17   a different matter.

18            But given what she is alleged to have seen and

19   disregarded, not alleged, I shouldn't say, because there's

20   evidence.  What the evidence shows she saw and somehow

21   disregarded, I don't think we have to worry about what

22   else that's chilling.

23            The last point I want to make is what we heard

24   in Mrs. Carter's opening papers and the reply papers and

25   from her lawyer just now about how she brought her

1    children and her grandchildren down, as if that somehow

2    insulates her from liability.  But I would say two things

3    about that.

4             We hear she's a woman in her 80's.  She wasn't

5    that elderly 20 years ago when she was doing this.  She's

6    in her 80's now.  She was in her 60's in 1998.  It is

7    nearly 20 years ago when all of this began.

8             But more to the point, when she brought her

9    children and grandchildren there, she didn't send them

10   there to live, she didn't sort of leave them there and

11   say, you know, fine, you're under Perlitz's supervision,

12   see you in six months.  And we're not alleging that she

13   actually knew, we're alleging that she was grossly

14   negligent and that she was reckless in this.

15            And the fact that she was grossly negligent and

16   reckless in terms of ignoring signs around her, the fact

17   that she had her children and grandchildren there while

18   she was there doesn't mean she wasn't being grossly

19   negligent or reckless in what she saw.

20            And as I said, she didn't go so far as to leave

21   them there unsupervised.  So, you know, to the extent, you

22   know, that you would want to argue, well, she didn't do

23   anything for the plaintiffs that she didn't do for her

24   grandchildren, that's not true.

25            So I don't think that what I think of as the

1    grandmother defense, I don't think really has anything to

2    do with her liability.

3                MR. KENNEDY:  Your Honor, I will take a minute,

4    and when I say a minute, I mean a minute.

5                Your Honor, just for the record, in reviewing

6    the Rule 56(a)(2) statement and their response, it's

7    conceded and admitted that Carter -- that Malta is a

8    501(c) and that she never received any compensation or

9    salary from Malta.  That's the first part.

10               The second point is the scheduling order speaks

11   for itself.  You can review it at your leisure.  You know

12   what it says.  These are very talented lawyers.  They know

13   the deadlines and they know what it says.

14               And that's all I have.

15               THE COURT:  Thank you.

16               Thank you all.  Thanks for coming in today.

17                    (Proceedings adjourned at 4:27 p.m.)

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3                  In Re: ST. LOUIS vs. PERLITZ

4

5

6          I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                      /s/_____
16
                      DARLENE A. WARNER, RDR-CRR
17                      Official Court Reporter
                      450 Main Street, Room #223
18                    Hartford, Connecticut 06103
                          (860) 547-0580
19

20

21

22

23

24

25