UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GERVIL ST. LOUIS, a/k/a ST. LOUIS GERVIL, <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS PERLITZ; FATHER PAUL E. CARRIER, S.J.; HOPE E. CARTER; HAITI FUND, INC.; FAIRFIELD UNIVERSITY; THE SOCIETY OF JESUS OF NEW ENGLAND; and SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA, AMERICAN ASSOCIATION, U.S.A., a/k/a ORDER OF MALTA, AMERICAN ASSOCIATION, USA, <br><br> Defendants. | Civil Action No.: 3:13-cv-01132 (RNC) |
| This document applies to: <br> *Lecenat v. Perlitz, et al.*, 3:13-cv-01633-RNC <br> *Deriza v. Perlitz, et al.*, 3:14-cv-00668-RNC | April 29, 2019 |

CLASS COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES
PURSUANT TO FED. R. CIV. P. 23(H)

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

    Overview ............................................................................................................. 2

    Class Counsel's Work on These Cases.................................................................. 6

    Expenses of Litigation ...................................................................................... 12

ARGUMENT ................................................................................................................ 12

    I.    THE ATTORNEYS' FEES SOUGHT ARE REASONABLE UNDER THE
        CIRCUMSTANCES ........................................................................................ 12

        A.    Class Counsel Expended Considerable Time and Effort Over
            Nearly Six Years ...................................................................................... 14

        B.    The Magnitude and Complexities of This Litigation Warrant
            Awarding the Attorneys' Fees Sought................................................ 15

        C.    The Risks of Pursuing This Litigation Were Great. .......................... 16

        D.    The Parties Were Represented by Qualified Counsel...................... 18

        E.    The Attorneys' Fee Requested is in Proportion to the
            Settlement............................................................................................... 20

        F.    Public Policy Weighs in Favor of Awarding Class Counsel the
            Requested Attorneys' Fees. .................................................................. 21

    II.    THE EXPENSES INCURRED ARE REASONABLE AND SHOULD BE AWARDED. ...... 22

CONCLUSION ............................................................................................................. 25

CERTIFICATE OF SERVICE.......................................................................................... 26

i

## TABLE OF AUTHORITIES

### Cases

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013)...................................................... 20

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).................................... 13, 14, 16

*Guzman v. Joesons Auto Parts*, No. 11 Civ. 4543(ETB), 2013 WL 2898154 (E.D.N.Y.
    June 13, 2013) ......................................................................................................... 20

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226 (2d Cir. 1987)........................................ 16

*In re Colgate-Palmolive*, 36 F. Supp. 3d 344 (S.D.N.Y. 2014) .................................................. 21

*In re Elan Sec. Litig.*, 385 F. Supp. 2d 363 (S.D.N.Y. 2005) .................................................... 16

*In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010)........................... 22

*Kemp-Delisser v. Saint Francis Hosp. and Med. Ctr.*, Case No. 15-cv-1113(VAB), 2016
    WL 6542707 (D. Conn. Nov. 3, 2016)....................................................................... 14, 20, 21

*McDaniel v. City of Schenectady*, 595 F.3d 411 (2d Cir. 2010) ................................................. 13

*PLA v. Renaissance Equity Holdings, LLC,* Case No. 12 Civ. 5268(JMF), 2014 WL
    113721 (S.D.N.Y. Jan. 13, 2014) ................................................................................... 20

*Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278 (2d Cir. 1987)................... 22

*Silverstein v. AllianceBernstein LP*, No. 09 Civ. 5904(JPO), 2013 WL 6726910
    (S.D.N.Y. Dec. 20, 2013) ............................................................................................... 20

*Simmons v. New York City Transit Auth.*, 575 F.3d 170 (2d Cir. 2009) ................................... 13

*Sprague v. Ticonic*, 307 U.S. 161 (1939) ................................................................................. 22

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82 (2d Cir. 2010) .......... 13

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005).................................... 20

### Rules

FED. R. CIV. P. 23(h) .................................................................................................................. 12

Law Offices of Mitchell Garabedian ("LOMG") and Simmons Hanly Conroy ("SHC"), which together have been appointed as Class Counsel in this case, respectfully file this Class Counsel's Motion for Award of Attorneys' Fees and Expenses pursuant to FED. R. CIV. P. 23(h), and in support thereof state:

## INTRODUCTION

On February 11, 2019, this Court preliminarily approved a class action settlement entered into by plaintiffs Gesner Lecenat and Jason Maxwel Deriza (together, "Representative Plaintiffs"), on behalf of themselves and all others similarly situated, and the Defendants who have appeared in the case, Father Paul E. Carrier, S.J.; Hope E. Carter; Fairfield University; The Society of Jesus of New England; and Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes and of Malta, American Association, U.S.A., a/k/a Order of Malta, American Association, USA, (collectively, "Defendants"). Pursuant to the Settlement Agreement, Defendants placed $60 million into escrow[1] to settle the claims of the Representative Plaintiffs and the Class arising from the sexual abuse of Class Members while they were minors by Douglas Perlitz, or anyone else affiliated with Project Pierre Toussaint ("PPT"), a school for destitute and homeless boys in Haiti operated by and/or under the auspices of the Defendants.

The Settlement Agreement provides that Class Counsel may seek approval of an attorneys' fee up to one-third (33-1/3%) of the common fund as well as reimbursement of their costs actually expended to pursue this litigation. With this motion, Class

---

[1] Defendants have also placed in a separate escrow $1.2 million to cover the costs of administering the settlement. If the costs of administration are less than $1.2 million, the remainder of the funds in the administration escrow will be returned to the Defendants. There is no reversion associated with the $60 million in settlement proceeds; all of that money, less any amounts approved by the Court for attorneys' fees, expenses and administrative costs greater than $1.2 million, will be distributed to the Class.

Counsel now seek an attorneys' fee award of $18,600,000.00,[2] representing 31% of the settlement fund, and reimbursement of expenses of $2,105,629.94.   As discussed in detail below, this fee is fair and reasonable in light of the time expended, the results achieved, the risks of the litigation, and the totality of circumstances.   The costs and expenses incurred are the types of costs and expenses that are routinely reimbursed by clients and they are less than what would be considered reasonable given the nature and complexity of this case. Class Counsel's motion for a fee award of $18,600,000.00 and reimbursement of costs and expenses of $2,105,629.94 should be approved in its entirety.[3]

## STATEMENT OF FACTS

**Overview**

The Court is respectfully referred to prior filings for a full discussion of, *inter alia*, the factual background, procedural history of the Action and a discussion of the negotiations leading to this Settlement.  *See* Plaintiffs' Motion and Memorandum of Law in Support of Motion for Preliminary Approval of Class Settlement, Doc. 1063

---

[2] As explained below, this fee includes $500,000 to be paid to Lynch, Traub, Keefe & Errante, P.C. ("Lynch Traub" or "Local Counsel").  Although Lynch Traub is not acting as Class Counsel, it provided, on a contingency basis, vital local counsel services to Class Counsel during the pendency of these cases.  Class Counsel has agreed to compensate Lynch Traub out of the fees awarded to them by the Court.

[3] The Representative Plaintiffs will separately seek final approval of the settlement, including final certification of the Class, and will file papers supporting that approval in advance of the final approval hearing scheduled to take place on June 5, 2019.  In order to ensure that Class Counsel's fee petition is available to members of the Class before the time they must decide whether to submit a claim, opt out of the Class, or object to the Settlement, Class Counsel and Defendants agreed that Class Counsel would file this motion for attorneys' fees in advance of the final approval papers, and at least two weeks prior to the last day for submitting claims, opting out, or objecting to the settlement, which is May 13, 2019. Representative Plaintiffs and Class Counsel expect that both the forthcoming motion for final approval and this motion for an award of attorneys' fees and costs will be decided at the final approval hearing on June 5.

("Plaintiffs' Motion for Prelim. Approval").   The following background is a brief summary provided for the Court's convenience.

This settlement will resolve all claims arising from the sexual abuse by Douglas Perlitz, over an approximately ten-year period, of minor boys, primarily at a school in Haiti known as Project Pierre Toussaint ("PPT") with which the Defendants were affiliated.  In 2010, Perlitz was convicted of multiple violations of 18 U.S.C. § 2423(b), Travel with Intent to Engage in Illicit Sexual Conduct, arising from his conduct in Haiti.

In 2011 and 2012, 23 of Perlitz's victims brought suit against the Defendants in this Court alleging that Defendants had assisted Perlitz by providing him the means to travel to and stay in Haiti and by providing him the means to operate PPT; that they failed to provide appropriate guidelines and supervision for the operation of PPT; that they disregarded warning signs that should have alerted them to the improper nature of Perlitz's relationship with some of the boys in his care and continued to provide funds to PPT long after it was, or should have been clear, that Perlitz was abusing the trust that had been placed in him.  (The actions were consolidated in this Court and referred to as the "*Jean-Charles*" actions, after the plaintiff in the first case filed.) In April 2013, Defendants reached a settlement with the *Jean-Charles* plaintiffs (which included a 24th victim with an unfiled case).  No class was identified or certified; rather each of the 24 settling claimants settled his case with the Defendants.

Thereafter, LOMG and SHC were retained by additional victims of Douglas Perlitz.  As had been the case with the *Jean-Charles* plaintiffs, each of the new clients entered into a fee agreement which, pursuant to Connecticut law regarding fees in personal injury cases, provided for a contingency fee of 33 1/3% of the first $300,000; 25% of the next $300,000; 20% of the next $300,000; 15% of the next $300,000; and 10% of any amount which exceeds $1,200,000; and reasonable reimbursement of costs as allowed by law, to be advanced by counsel as needed during the litigation. *See* accompanying Declaration of Jo Anna Pollock dated April 29, 2019 ("Pollock Dec.") at

¶2. In each case, the client was presented the fee agreement in both English and in Haitian Creole, and the terms of the agreement, including the contingency fee, were explained. Each client executed the fee agreement. Beginning in August 2013, certain of these additional victims, including the Representative Plaintiffs, commenced actions against the Defendants alleging claims essentially identical to those asserted by the *Jean-Charles* plaintiffs.  Ultimately, more than 50 new cases (i.e., cases in addition to the first group of 24 cases that were settled in 2013) were filed. Each of these cases was filed as an individual action, and none of the cases, as originally filed, were brought in a representative capacity or sought class-wide relief of any kind.[4] As explained in Plaintiffs' Motion for Preliminary Approval, the cases filed in or after August 2013 were consolidated for pretrial purposes with the *St. Louis* case, the designated lead case. Five years of intensive litigation followed.

Because the cases were filed in this Court, where neither Class Counsel is located or admitted generally to practice, Class Counsel retained the services of local counsel Steven J. Errante and Marisa A. Bellair, who are partners in the Lynch Traub law firm,

---

[4] Because the cases were not commenced as class actions, and because the retainer agreements executed by the clients provided for a contingency fee that was not based on the number of hours worked, counsel did not maintain contemporaneous time records as they worked on the cases.  As set forth in the Pollock Dec., however, because a substantial portion of the work of the attorneys on these cases consisted of preparation for and attendance at depositions; appearances in court; drafting papers that were filed with the Court; and meeting with clients in Haiti and in the Dominican Republic, it has been possible for counsel to reconstruct the hours they expended on these cases through review of deposition transcripts (which identify participants and the elapsed time of the depositions); records and transcripts of court hearings (which similarly identify those in attendance and the amount of time of the hearing); travel records (which record all of the trips taken by counsel to meet with clients and witnesses); briefs submitted to the Court (for which counsel have estimated the amount of preparation time), and other materials. Pollock Dec. at ¶¶5-6. If anything, this reconstruction has been conservative, because time spent that did not leave a paper trail was in all likelihood missed.  Details concerning the reconstruction of counsel's time are set forth in the Pollock Declaration.

located in New Haven, Connecticut, ("Lynch Traub" or "Local Counsel") to provide guidance on local practice, handle some court filings and appear before this Court where appropriate.   Lynch Traub agreed to work on a contingency fee basis.[5]

Throughout the litigation, Defendants insisted that they bore no responsibility for Perlitz's conduct. Following the denial of motions to dismiss, the parties engaged in substantial discovery, which included the exchange of documents, depositions of multiple witnesses in the United States and depositions of multiple plaintiffs in the Dominican Republic. Defendants then filed motions for summary judgment, which were vigorously contested by the plaintiffs.

The parties began negotiating a possible settlement of this action in late 2016. Working with Hon. Robert L. Holzberg (retired) as a mediator, the parties agreed on a process pursuant to which plaintiffs' counsel identified 83 claimants of whom they were aware who had not yet filed a lawsuit against the Defendants.   Plaintiffs' counsel provided to the Defendants the names of, and agreed-upon categories of information for, each of these 83 claimants.   From this list, Judge Holzberg randomly selected 35 claimants to be interviewed by counsel for the Defendants, with counsel for the plaintiffs also present.   The interviews were conducted on four separate trips to Port-au-Prince, Haiti.   Afterwards, the parties resumed settlement negotiations with a new mediator, Warren Fitzgerald, Esq.   The parties participated in on-going discussions and attended two two-day mediations, in February and May 2018, and ultimately reached a settlement in principal in May 2018, which provided, at the Defendants' insistence but with Class Counsel's agreement, that the cases would be resolved as a class action, in order to "cut off the tail" of any future liability that Defendants might face and to

---

[5] After the execution of the Settlement Agreement, and in consideration of the hours spent by Lynch Traub, Class Counsel and Lynch Traub reached an agreement that Class Counsel would seek approval from this Court to pay Lynch Traub $500,000 for their work on these cases, to be paid from the fees awarded to Class Counsel by the Court.

ensure compensation for all of the victims of abuse at PPT.  After several more months of negotiations, the parties were able to reach final agreement on the terms of settlement, which are set forth in the Settlement Agreement.   As part of the settlement negotiations, the parties agreed to settle what had been individual claims on a class-wide basis and to submit their settlement to the Court for approval as a class action settlement. Pursuant to the Settlement Agreement, the Defendants have already paid the settlement amount, $60,000,000, into a settlement fund, being held in escrow; Defendants have separately paid $1.2 million into an administration fund being used to pay the costs of administering the settlement.  *See* Settlement Agreement, §§ III.A.1, III.C.3, Doc. 1063-10 at pp. 14, 18.

Plaintiffs moved the Court for preliminary approval of the class action settlement, which was granted on February 11, 2019. Doc. 1068.  At that time, the Representative Plaintiffs were appointed to serve as Class Representatives, and LOMG and SHC were appointed Class Counsel. Doc. 1068 at ¶5. In addition, the Court appointed KCC LLC as the Claims Administrator to supervise and administer the notice as well as the processing of claims in accordance with the terms of the Settlement Agreement. Doc. 1068 at ¶6.  Also, the Court appointed the Honorable John M. Greaney (Ret.) as the Claims Assessor with the duties and functions described in the Settlement Agreement. Doc. 1068 at ¶7.

**Class Counsel's Work on These Cases**

Class Counsel worked long and hard on these cases to produce an outstanding result for their clients.  Counsel's efforts began before claims were even filed.  As detailed in the Declaration of G. Michael Stewart ("Stewart Dec.") (Doc. 1063-15) and the Declaration of Attorney Mitchell Garabedian in Support of Motion for Preliminary Approval of Class Settlement ("Garabedian Preliminary Approval Dec.") (Doc. 1063-14), SHC and LOMG have made extensive efforts over a period of years to identify and interview possible victims of abuse by Perlitz or other persons affiliated with PPT.  *See*

6

Stewart Dec. at ¶¶ 2-9; Garabedian Preliminary Approval Dec. ¶¶ 3-8; Declaration of Mitchell Garabedian in Support of Motion to Appoint Class Co-Counsel ("Garabedian Counsel Dec."). (Doc. 1063-12) ¶¶ 8, 14.   Class Counsel conducted extensive intake interviews with each of the 133 Vetted Settlement Class Members.   Most intakes required multiple interviews which were lengthy and complex given the nature of the claims and that each such Claimant was a Haitian national requiring an interpreter to explain his claim, translate the attorneys' questions, and then translate the Claimant's responses.

In addition to the intake interviews and investigation, years of hard-fought litigation required considerable effort by plaintiffs' counsel.   This included drafting interrogatories and document requests to the Defendants, and then reviewing the interrogatory answers and the more than 150,000 pages of material produced by the Defendants.   Plaintiffs also took approximately 39 depositions of fact witnesses, including depositions of the Defendants and non-party witnesses.   Each deposition required substantial preparation time, including review of documents as well of review of publicly-available materials pertinent to what the deponent knew, should have known, or may have known.   These depositions required significant long distance travel as they were conducted in various locations across the United States, including a federal penitentiary in Texas, where Plaintiffs attempted to examine Douglas Perlitz. These extensive depositions, along with the documents Defendants produced, provided the detailed evidence on which plaintiffs would rely in responding to Defendants' motions for summary judgment.

The discovery taken by the plaintiffs was only part of the story.   Defendants, too, served extensive discovery requests and responding to that discovery required substantial time and effort by Class Counsel.   Pollock Dec. at ¶14. Defendants served interrogatories upon 35 of the plaintiffs whose claims were consolidated. *Id.* The process of providing verified responses was far more complex than discovery in a typical civil

action. *Id.* The Defendants' interrogatories to the 35 plaintiffs contained 88 questions, many with subparts. *Id.* Each of the 88 questions to each of the 35 plaintiffs had to be orally translated by an interpreter into Haitian Creole and each plaintiff's oral response in Creole had to be translated into English and conveyed to counsel, who incorporated the information into a written draft. *Id.* Thereafter, the attorney's written English-language draft of each plaintiff's answers had to be translated back into Haitian Creole, and each set of answers in Creole had to be reviewed in person by each plaintiff with at least one attorney from one of the two Class Counsel firms present to allow for revisions prior to signing and verification by each plaintiff. *Id.* Defendants also served document requests on the plaintiffs; the process of gathering the plaintiff's documents in response required frequent communication between counsel and their clients, not only by telephone, but also through numerous in-person meetings in Haiti between each plaintiff and his American attorneys to ensure that all responsive materials were collected. *Id.*

In addition to document requests served on the plaintiffs, Defendants subpoenaed the documents of Plaintiff's Counsel's agent, Cyrus Sibert, which required substantial attorney time collecting, reviewing and producing his documents and briefing on the issue of whether, or to what extent, the attorney client privilege and/or attorney work product doctrine was applicable. Ultimately, the Court appointed Special Master James T. Cowdery to review multiple privilege logs and determine on a document-by-document basis, whether a privilege protected each document from disclosure to Defendants.

In addition to the 39 defendant and witness depositions discussed above, Defendants conducted lengthy depositions of 23 of the plaintiffs—all of which took place in Puerto Plata, Dominican Republic. For each plaintiff who was deposed, counsel had to arrange transport to Puerto Plata, and meet with the client to explain the deposition process and prepare the client for what to expect. Plaintiffs' counsel

attended each deposition. Again, the unusual conditions of this case made the deposition process arduous: depositions were prolonged by the need for interpreters to translate questions and answers, and by questioning from multiple counsel representing different defendants.

Plaintiffs also retained two expert witnesses—one of whom traveled with Class Counsel to Puerto Plata, Dominican Republic to meet the bellwether Plaintiffs and both of whom traveled on separate trips to Cap Haitian, Haiti as part of their research.  Their expert reports were produced to the Defendants pursuant to Fed. R. Civ. P. 26.  Both of Plaintiffs' experts were deposed; Plaintiffs' counsel attended and defended those depositions.

In addition to the discovery demands, a multitude of motions were filed throughout the litigation such as motions to dismiss, motions for protective orders, motions pertaining to the scope of discovery, and motions for summary judgment—some of which required Class Counsel to travel to Hartford, Connecticut to appear before this Court.   Motion practice was vigorous and hotly contested, covering issues of privilege, sealing, and challenges to the propriety of counsel's conduct.  Among them, the five Defendants filed briefs in support of their summary judgment motions totaling 186 pages; those briefs were accompanied by extensive testimonial and documentary submissions amounting to 278 exhibits, in addition to multiple declarations. Responding to these summary judgment motions was a Herculean task for LOMG and SHC. In opposition to the five motions, Plaintiffs submitted a single 126-page consolidated brief accompanied by 302 exhibits.   The work of marshalling and organizing the massive amount of evidence, as well as formulating and presenting the legal analysis to respond to Defendants' arguments was all but overwhelming.  Oral argument on the five summary judgment motions was heard over three days, each of which required extensive preparation.

Notwithstanding the substantial time and resources necessary to litigate this litigation, Class Counsel also devoted considerable time and resources to negotiate a settlement. The final settlement agreement was the result of a two-year mediation process, which involved a four-month process wherein the Defendants, in Port-au-Prince, Haiti, interviewed thirty-five of 83 claimants who had not filed civil actions. Pollock Dec. at ¶17. All of the 35 interviews were formal examinations recorded by a stenographer, and almost all were four hours in length. A team of four lawyers travelled to Haiti multiple times to prepare the 35 claimants (through interpreters) for interviews and to attend the interviews themselves.

There were also unique risks in travel to Haiti involving concerns for security, health and safety. Pollock Dec. at ¶18. Given U.S. Department of State warnings, Class Counsel had to be aware of, and respond to, security concerns in Haiti. At times, Class Counsel retained armed security guards for protection. *Id.* Due to health conditions in Haiti, some of the Class Counsel attorneys who travelled to Haiti received special immunization vaccinations for diseases which are common in Haiti. *Id.* Even so, at least two of the attorneys at LOMG and SHC, immediately upon return to the United States, suffered illnesses apparently contracted in Haiti. *Id.*

After the Court granted preliminary approval of the proposed class action settlement, Class Counsel has continued to devote significant time to the settlement administration by working with the Claims Administrator to identify and contact potential class members and assist class members with submitting their claim form and supporting documentation. Pollock Dec. at ¶7. Class Counsel has regularly consulted—and will continue to do so—with the Claims Assessor and Defendants to monitor, review and assist in the proper administration of submitted claims. *Id.*

10

The chart annexed as Exhibit D to the Pollock Dec. identifies each of the attorneys who worked on this litigation, along with the reconstructed hours worked on the cases.[6]  As mentioned above, and as described in detail in the Pollock Dec., these hours were conservatively reconstructed using records of depositions, court appearances, written submissions to the Court, travel records, client meetings and phone calls, and email communications.  The total reconstructed hours for Class Counsel is 22,714.33.

Class Counsel has also obtained and provided for the Court the time spent by Lynch Traub, which is annexed as Exhibit C to the Pollock Dec.  The total hours for Lynch Traub is 455.70. *See* Pollock Dec., Exhibit C. The work done by Lynch Traub attorneys was performed at the direction and under the supervision of Class Counsel, who maintained overall responsibility for the cases, even as Lynch Traub added local expertise not available within SHC or LOMG.

Counsel, including Class Counsel and Lynch Traub, expended a total of 23,170 hours on these cases, all of which contributed to the favorable resolution of this case for the Class and/or the administration of the settlement process for the benefit of the Class.  As explained in paragraph 12 of the Pollock Dec., a blended hourly rate of $709 was assigned.   Multiplying that blended rate by 23,170 total attorney hours totals $16,427,530.  The fee sought represents a nominal multiplier of 1.13 with respect to Class Counsel's lodestar.

---

[6] Although lawyers at the two Class Counsel firms do not generally bill by the hour, hourly billing rates have been attributed to lawyers at SHC in other class action cases and in mass tort cases in which common benefit funds have been distributed.  The billing rates used here are conservative when compared to the hourly rates previously assigned to SHC in class action or mass tort cases, as well as the customary hourly rates for lawyers of similar experience handling matters of similar complexity in New York, Boston, Connecticut, and St. Louis.

**Expenses of Litigation**

These cases were also expensive to litigate.  Because the clients were all located in Haiti, Class Counsel made numerous trips to Haiti and to the Dominican Republic over the course of nearly six years, including travel for depositions of 23 of the plaintiffs and for Defendants' interviews with 35 additional claimants.  These trips involved expenses for travel, ground transportation and security.  Class Counsel also engaged the services of interpreters, to assist with the plaintiffs' telephone conversations with Class Counsel and depositions and services of translators to translate written documents, including pleadings, documents for production to Defendants and interrogatory answers.   In order to arrange for plaintiffs to travel to the Dominican Republic, and to assist in the verification of claims, Class Counsel advanced the cost of obtaining birth certificates, passports, or other documentation from the Haitian government.  As discussed above, plaintiffs took approximately 39 depositions, for which Class Counsel paid the cost of court reporting services.  Plaintiffs also retained and paid expert witnesses, who did not (and could not have) worked on a contingency arrangement, but rather were paid by the hour for their work.  Most of these depositions also required Class Counsel to travel to where deponents were located resulting in expenses for travel and hotels.  Details concerning each of the expenditures are set forth in Group Exhibit A to the Pollock Declaration. Details concerning each expenditure by Local Counsel are provided in Exhibit B to the Pollock Declaration.  As shown in these exhibits, over nearly six years, Class Counsel and Local Counsel spent $2,105,629.94 on reasonable and necessary costs of litigating these actions.

## ARGUMENT

## I.  THE ATTORNEYS' FEES SOUGHT ARE REASONABLE UNDER THE CIRCUMSTANCES

"In a certified class action, the court may award reasonable attorney's fees that are authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h). It is "well

established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund" and that "[c]lass action lawsuits are the prototypical example of instances where the common fund doctrine can apply." *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010).   The district court has "broad discretion" to determine whether attorneys' fees are reasonable. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 57 (2d Cir. 2000).

According to the Second Circuit, "either the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases." *Id.* at 45.  The trend is toward the percentage method. *McDaniel v. City of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010).  Pursuant to the percentage method, the court "sets some percentage of the recovery as a fee." *Goldberger v. Integrated Res., Inc.*, 209 F.3d at 47. That "fee award should be assessed based on scrutiny of the unique circumstances of each case, and a jealous regard to the rights of those who are interested in the fund." *Id.* at 53.

Although courts in the Second Circuit most often use the percentage method, the lodestar method may serve as a "cross check" on the reasonableness of the requested percentage.  *Id.* at 50.  The lodestar is calculated by multiplying an appropriate hourly rate by the number of hours reasonably billed to the class. *Id.* at 47.  Although the presumptive hourly rate is what is appropriate for the district, the Second Circuit recognizes that out-of-district counsel may be awarded a higher rate if a reasonable client would have selected out-of-district counsel for their expertise not readily available in this district and it was reasonable for plaintiffs to believe they would achieve a "substantially better net result" with their services.  *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009).  The district court may then "adjust the multiplier based on other factors such as the risk of the litigation or the performance of

13

the attorneys." *Kemp-Delisser v. Saint Francis Hosp. and Med. Ctr.*, Case No. 15-cv-1113(VAB), 2016 WL 6542707, *15 (D. Conn. Nov. 3, 2016).

"[W]hether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances[.]" *Goldberger*, 209 F.3d at 47. "What constitutes a reasonable fee is properly committed to the sound discretion of the district court[.]" *Id.* According to the Second Circuit, district courts must consider: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Id.* at 50.

As explained below, in this complex, hard-fought, international litigation, the fees sought by Class Counsel, who are highly qualified, are reasonable under both the percentage-of-recovery and the lodestar analysis and, therefore, should be awarded.

A. **Class Counsel Expended Considerable Time and Effort Over Nearly Six Years**

As described above, Class Counsel (including local counsel working at Class Counsel's direction) devoted more than 22,000 hours to these cases over a period of nearly six years. Because the cases did not resolve quickly, this work included client interviews, motion practice, extensive discovery, multiple court appearances, the retention of expert witnesses, travel across the United States, travel to Haiti and the Dominican Republic, and many, many hours working with the plaintiffs themselves to provide the discovery demanded by the Defendants. Beyond the work already performed, Class Counsel will continue to expend time and resources overseeing the administration of the settlement even after this a fee award is approved. *See Kemp-DeLisser*, 2016 WL 6542707 at *15 (recognizing that Class Counsel's future work administering the settlement can be considered). Total lodestar for Class Counsel, reflecting all of their time and effort, comes to $16,427,530. This fee that Class Counsel

seeks represents a modest multiplier of 1.13, which is more than justified by the factors discussed below.

   B.   **The Magnitude and Complexities of This Litigation Warrant Awarding the Attorneys' Fees Sought**

These cases were large and complex in several dimensions.  First, the number of claimants – both those with filed cases and those with unfiled cases – and the number of witnesses made the case difficult to manage, as Defendants sought discovery from an extraordinarily high percentage of the claimants.  Second, the length of time involved in litigating these cases – nearly six years - also demonstrates the substantial size and complexity of this litigation.  Third, the case presented complex issues of choice-of-law because the plaintiffs were located in Haiti, issues that were brought to the fore when one of the Defendants argued for the application of Haitian law in connection with a motion for summary judgment.  Fourth, the case presented somewhat novel legal and factual issues different from those seen in many other clergy sex-abuse cases. In this case, the perpetrator, Douglas Perlitz, was not himself a member of the clergy, but was employed by and supervised by clergy and religious institutions.  The precise role of each Defendant was hotly contested and the factual record concerning the relationships among the various parties was murky.   Who exactly was responsible for running PPT was itself in doubt.  The application of law to these facts was uncertain.  (Defendants agreed that the issues were complex, as counsel for Fairfield University noted at the Preliminary Approval Hearing.)  Fifth, the passage of time since the time of Perlitz's abuse presented special challenges.  So, too, the fact that so many of the relevant events took place in Haiti made locating and speaking to witnesses more challenging than is ordinarily the case.  The need for interpreters for every communication with plaintiffs and witnesses in Haiti further added to the complexity of the case.

The settlement of the *Jean-Charles* cases did not reduce the complexity of this case, and if, anything, increased it.  The *Jean-Charles* cases were settled without any

significant discovery, so there were few efficiencies to be gained from that prior litigation.  Moreover, the prior settlement appears to have motivated the Defendants to litigate vigorously this time, and to view the claims of the plaintiffs with a high degree of skepticism.  In short, the more than 22,000 hours expended by Class Counsel and 450 hours expended by Local Counsel were not make-work, but rather required by the size and complexity of this difficult case.

C. **The Risks of Pursuing This Litigation Were Great.**

District courts in the Second Circuit have determined that "[t]he risk of litigation is 'perhaps the foremost factor' when considering" the amount of fees to award. *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005).  The Second Circuit explained that "[r]isk falls along a spectrum, and should be accounted for accordingly." *Goldberger*, 209 F.3d at 54. That court further explained that "[a] court … in adjudging whether to award a risk multiplier, should examine closely the nature of the action in order to determine whether, as a matter of public policy, it is the type of case worthy of judicial encouragement." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987).

The risks of this litigation were high for Class Counsel and Local Counsel.  As the Court is well aware, success was far from certain bringing a substantial risk of non-payment to the attorneys. The actual perpetrator, Douglas Perlitz, never appeared in the cases, is in prison, and is surely judgment proof. The role played by each Defendant in establishing, funding, and overseeing PPT was unclear at the outset, and only somewhat less so by the end of discovery.  The liability of institutions and individuals in the posture of the Defendants under Connecticut law was uncertain.  Defendants were well-funded and represented by capable counsel. The difficulties of communicating with the plaintiffs, coupled with concerns as to whether they would ever be allowed to travel to the United States for trial, added to the litigation risk. As noted above, the prior settlement of the *Jean-Charles* cases did not materially reduce the

16

litigation risk:  rather, the prior settlement provided an incentive for the Defendants to fight to the end.  Defendants insisted that all of the true victims had been identified in the *Jean-Charles* cases and that each plaintiff's claim needed to be examined with a level of detail that was not demanded the first time around.

The cases were high-risk in another sense, as well.  Travel to Haiti was both challenging and dangerous. *See* Pollock Dec. at ¶18.  Class Counsel had to be follow State Department alerts about the dangers of travel to Haiti; during some periods of time, it was simply unsafe to travel to Haiti at all. At other times, counsel were able to travel but had to take special security precautions when there in order to avoid becoming targets of crime.  Travel to Haiti also involved the risk of exposure to diseases and indeed, two of the attorneys who travelled to Haiti apparently contracted diseases while there.  In at least one instance, attorneys from SHC and LOMG had extensive contact with a plaintiff believed to be suffering from tuberculosis.  Significantly, the depositions of the plaintiffs were held in the Dominican Republic largely because one or more of the Defendants' lawyers was not comfortable travelling to Haiti, viewing such travel as unacceptably risky.  Class Counsel did not have the luxury, however, of limiting their travel to the Dominican Republic; they needed to travel to Cap-Haitien, repeatedly, in order to meet with their clients there.  This involved unusual risks not generally encountered in complex litigation of this kind.

As to the public interest in encouraging lawyers to take on these kinds of risks -- of all cases, the representation of vulnerable sex abuse victims is the type of case worthy of judicial encouragement.  Few law firms—and certainly not the victims in Haiti—have the qualifications or resources (and the willingness to commit those resources) to assume the full risk and pursue these Defendants in protracted, complex litigation necessitating frequent international travel, interpreters and individualized experts with respect to damages.  It is most assuredly in the public interest to encourage counsel to take on the risks of representing destitute victims in impoverished circumstances, who,

17

without competent counsel handling their cases on a contingency-fee basis, would never have an opportunity for justice.

D.     **The Parties Were Represented by Qualified Counsel.**

As set forth in the Declaration of Andrea Bierstein ("Bierstein Dec."), previously submitted to the Court (Doc. 1063-9), Class Counsel were highly qualified to represent the Settlement Class.  Mitchell Garabedian, William H. Gordon (both of LOMG), Paul J. Hanly, Jr., Andrea Bierstein, Jo Anna Pollock, and Ellyn Hurd (all of SHC) were admitted to practice before this Court *pro hac vice*. SHC has significant experience in class actions and mass torts, with lawyers at the firm having served as class counsel in numerous class actions, and on executive or steering committees for numerous mass torts.  Paul J. Hanly, Jr., of SHC's New York office, currently serves as co-lead counsel in *In re: National Prescription Opiate Litigation*, MDL 2804 (N.D. Ohio), which has been described as perhaps the largest civil litigation in United States history.   Andrea Bierstein is an experienced litigator, with more than three decades of experience in analyzing complex legal issues, writing legal motions and appeals, and presenting oral argument with respect to such issues.   Bierstein Dec. ¶¶ 9, 10.  Both Mr. Hanly and Ms. Bierstein are admitted in multiple federal courts around the country and have handled complex matters over the length of their long professional careers.

As set forth the Declaration of Mitchell Garabedian in Support of Motion to Appoint Class Co-Counsel ("Garabedian Counsel Dec."), which was previously submitted (Doc. 1063-12), the Law Offices of Mitchell Garabedian brought unparalleled expertise to these cases.  Mr. Garabedian has been for decades the foremost advocate for victims of child sexual abuse by agents or representatives of religious institutions, including by priests, deacons and staff of dioceses or religious orders of the Catholic Church.   His groundbreaking work in bringing to light the complicity of the Archdiocese of Boston in decades of sex abuse by clergy under its supervision was the subject of a Pulitzer Prize winning series of articles in the *Boston Globe* and years later, a

subject of the "Best Picture" Academy Award winning for the movie "Spotlight," in which Mr. Garabedian is masterfully portrayed by the actor Stanley Tucci.

Together, the combination of SHC and LOMG (supported by the local expertise of Local Counsel) has been powerful, with LOMG supplying incomparable expertise in litigating child sex abuse claims, SHC bringing decades of experience in complex mass torts and class actions (along with significant resources to support these cases) and Local Counsel advising Class Counsel and appearing before this Court.  SHC and LOMG worked together to investigate the claims against the Defendants herein, interview potential plaintiffs, develop and file the complaints in this case and the related cases in this Court, participate in discovery, including taking and defending depositions across the United States, Dominican Republic and Haiti, and briefing all of the motions over several years of litigation.  Class Counsel also worked tirelessly with the plaintiffs to prepare them to tell their stories in proceedings entirely unfamiliar to them.

The Court can judge for itself the resulting quality of the representation this team provided.  Class Counsel notes only that plaintiffs successfully defeated Defendants' motions to dismiss, and gathered evidence to present a compelling case, at the summary judgment stage, for why these cases should proceed to trial.  The briefing and argument on the summary judgment motions, the marshalling of the evidence gathered in discovery, and the exceptional work of Class Counsel in vetting and working with plaintiffs to enable them to tell their stories, honestly and convincingly, in front of the Defendants, apparently brought Defendants to the bargaining table.  Class Counsel notes, as well, that Defendants would not have settled these cases for the amount they did had they not believed they faced significant risk of liability at trial.  Defendants had shown themselves willing to litigate for many years to defeat plaintiffs' claims; they did not settle merely to avoid litigation.  Rather, the Court can easily conclude that the

settlement in this case was driven in large part by the quality of the work of Class Counsel in litigating this matter.

       E.     **The Attorneys' Fee Requested is in Proportion to the Settlement.**

In this Circuit, courts typically approve attorney's fees that range between 30 and 33 percent. *See PLA v. Renaissance Equity Holdings, LLC,* Case No. 12 Civ. 5268(JMF), 2014 WL 113721, at *2 (S.D.N.Y. Jan. 13, 2014) citing *Guzman v. Joesons Auto Parts*, No. 11 Civ. 4543(ETB), 2013 WL 2898154, at *4 (E.D.N.Y. June 13, 2013 (collecting cases); *Silverstein v. AllianceBernstein LP*, No. 09 Civ. 5904(JPO), 2013 WL 6726910, at *9 (S.D.N.Y. Dec. 20, 2013); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013). When applying the lodestar analysis, this court may apply a multiplier. *See e.g. Kemp-DeLisser*, 2016 WL 6542707 at *17 (citing that 2.77 lodestar multiplier has been found reasonable by courts in the Second Circuit) citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005)("Here, the lodestar yields a multiplier of 3.5, which has been deemed reasonable under analogous circumstances.")

Here, whether under the percentage-of-recovery or the lodestar analysis, the attorneys' fee requested is reasonable given the circumstances of this case (as explained in detail above). Class Counsel seeks 31% of the common fund—a figure within the range of 30 and 33 percent typically approved. The lodestar analysis—especially when a nominal multiplier of 1.13—further confirms the reasonableness of the attorneys' fee.

Class Counsel note, as well, that, in this case, the percentage sought aligns with the fee to which each of the plaintiffs agreed when the parties believed that the cases would be litigated and resolved individually. As explained above, the fee agreements that plaintiffs and Class Counsel originally entered into provided for a sliding-scale percentage fee of 33 1/3% of the first $300,000; 25% of the next $300,000; 20% of the next $300,000; 15% of the next $300,000; and 10% of any amount which exceeds $1,200,000. How these percentages would have been applied had the cases resolved individually depends on the ultimate number of Class members. At a minimum, the Class includes

the 133 Vetted Class Members. If these were the only members of the Class, each Class Member would receive a gross settlement amount of $451,127.82, which, under the formula, would result in a total fee, to Class Counsel, of 30.5%.  If the Class includes 150 members, each plaintiffs' award would be reduced to $400,000, and the total fee under the formula would be 31.23%. At 160 Class members, the formula would have produced a fee of 31.64%.  The actual award Class Counsel seeks, 31%, is squarely within the range of how the fee agreements would likely have operated.  Class Counsel notes, as well, that the resolution of this case on a class-action basis has required counsel to perform additional work in connection with the approval and administration of the settlement, that was not envisioned when counsel and individual plaintiffs entered into individual fee agreements.   The similarity of the fee sought to the fee agreed to by plaintiffs on an individual basis confirms, however, that the percentage sought is reasonable and appropriate.

F.   **Public Policy Weighs in Favor of Awarding Class Counsel the Requested Attorneys' Fees.**

As this court has recognized, "Class Counsel's fees 'should reflect the important public policy goal of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Kemp-DeLisser*, 2016 WL 6542707 at *17, citing *In re Colgate-Palmolive*, 36 F. Supp. 3d 344, 352 (S.D.N.Y. 2014).  Here, Class Counsel sought to recover money damages on behalf of some of the most vulnerable persons in society, that being young men in Haiti who were sexually abused as children while attending a program created and/or overseen by the Defendants.

Given the complexity involved in prosecuting this matter, the risk of investing years of multiple attorneys' time with no guarantee of recovery, and the fact that the amount sought by Class Counsel in attorneys' fees is reasonable under both the percentage-of-recovery and lodestar analyses, the fee sought by Class Counsel should be awarded.

## II.   THE EXPENSES INCURRED ARE REASONABLE AND SHOULD BE AWARDED.

The Court should also approve reimbursement of the litigation expenses Class Counsel advanced in the prosecution of these cases.  As a leading treatise states, "[a]n attorney who creates or preserves a common fund by judgment or settlement for the benefit of a class is entitled to receive reimbursement of reasonable fees and expenses involved." Alba Conte, *1 Attorney Fee Awards* § 2:19 (3d ed.). According to the prevailing view, the reimbursement of reasonable fees and expenses is in addition to the fee percentage. *Id.   See also Sprague v. Ticonic*, 307 U.S. 161, 166-67 (1939) (recognizing a federal court's equity power to award costs from a common fund).

In the Second Circuit, expenses "that are incidental and necessary to the representation" are recoverable, provided they are reasonable. *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987).  For example, in a class action common fund case, expert fees, electronic research charges, postage and delivery expenses, discovery costs, filing fees, photocopying, expenses associated with locating and interviewing dozens of witnesses, and out-of-town travel expenses are the type of expenses "that are necessarily incurred in litigation and routinely charged to clients." *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 364 (E.D.N.Y. 2010).   Even expenses seemingly substantial are "incidental and necessary" to providing adequate representation, absent artificial inflation or bad faith, according to the Second Circuit. *Reichman*, 818 F.2d at 283.

Here, Class Counsel's expenses were incidental and necessary to providing adequate representation to a multitude of victims located in Haiti.  Class Counsel and Local Counsel brought this case without guarantee of reimbursement or recovery so they were motivated to keep costs at a reasonable level, and they did.   As detailed in Group Exhibit A of the Pollock Dec., the Law Offices of Mitchell Garabedian expended a total of $394,788.34. In addition, Simmons Hanly Conroy expended a total of

$1,682,563.54. Finally, the law firm Lynch, Traub, Keefe & Errante, P.C. incurred expenses in the amount of $28,278.06, for which it seeks reimbursement. In total, the amount of reimbursable costs sought is $2,105,629.94.

Because of the scope of this case involving discovery in three countries, Class Counsel was required to incur fees for travel and interpreters. A total of 62 depositions were taken in this litigation including various locations across Haiti, Dominic Republican and the United States. These depositions required counsel to pay court reporter/videographer fees and to travel to attend the depositions. The various court appearances over the years necessitated that the attorneys travel to Hartford, Connecticut. Travel charges were also incurred for settlement negotiations as Class Counsel who were not resident in Massachusetts were required to travel to Boston to attend multiple mediations. The total travel charges incurred was $747,389.44. *See* Pollock Dec. ¶21 and accompanying Group Exhibit A for itemized travel.

In addition to travel, because of the language barrier between Class Counsel and the plaintiffs, Class Counsel was required to use the services of interpreters to communicate with the plaintiffs and witnesses who were Haitian nationals and the services of translators to translate documents originating in Haitian Creole into English for Class Counsel's review and to translate the plaintiffs' answers to interrogatories. The total charges incurred from Interpreters/Translators was $404,016.67. *See* Pollock Dec. ¶21 and accompanying Group Exhibit A for itemization.

Because the litigation advanced to the expert stage, Class Counsel retained two expert witnesses: Dr. Chu and Dr. Dragan. Dr. Chu traveled to Puerto Plata, Dominican Republic to interview four bellwether plaintiffs and traveled to Cap Haitian, Haiti to interview them again. Dr. Dragan traveled to Cap Haitian, Haiti to conduct investigation and inquiry to support his expert opinions. Thereafter, each expert provided written reports and produced their discoverable file materials, and each was deposed by the Defendants for several hours. In total, the charges incurred for Experts

was $371,779.46. *See* Pollock Dec. ¶21 and accompanying Group Exhibit A for itemization.

In addition to the routine costs incurred to pursue litigation of this type and because of the language barrier, cultural differences, and geographic distance between the victims and Class Counsel, Class Counsel retained the services of Cyrus Sibert, who was paid for his time and expenses and reimbursed for his expenditures. Such expenditures included obtaining national identification cards for plaintiffs; phones for various plaintiffs' use so that Class Counsel could communicate with some plaintiffs; bus tickets, passports and visas for twenty-three plaintiffs to travel from Cap Haitian, Haiti to Puerto Plata, Dominican Republic for their depositions. The details regarding Mr. Sibert's services and expenditures provided for Class Counsel was previously provided to the Court both in writing and oral argument. *See* Doc. 714. The total charges for which Class Counsel seeks reimbursement is $227,282.00. *See* Pollock Dec. ¶21 and accompanying Group Exhibit A for itemization.

These costs are less than what would be expected in complex international class action against multiple defendants. An empirical study of the costs awarded in class action litigation found that the average cost award was equal to 4% of the relief obtained for the class. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: an Empirical Study*, 1 Journal of Empirical Legal Studies 27, 70 (2004). The total costs in this case thus far are $2,105,629.94, representing approximately 3.5% of the relief obtained for the class, are less than the 4% average. Because these costs and expenses are the types of costs and expenses that are routinely reimbursed by clients and they are substantially less than what would be considered reasonable given the nature and complexity of this case, Counsel's request for reimbursement of costs and expenses should be approved as fair and reasonable.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for an award of attorneys' fees in the amount of $18,600,000 and the expenses distributed across the class in the amount of $2,105,629.94 and grant such further relief as this Court deems proper.

By:    Mitchell Garabedian (phv04676)
garabedianlaw@msn.com.com
William H. Gordon (phv04677)
wgordon@garabedianlaw.com
LAW OFFICES OF MITCHELL GARABEDIAN
100 State Street, 6th Floor
Boston, MA 02109
Phone:  (617) 523-6250

 /s/ Andrea Bierstein
Andrea Bierstein (phv04678)
abierstein@simmonsfirm.com
Paul J. Hanly, Jr. (phv04680)
phanly@simmonsfirm.com
Jayne Conroy (phv04679)
jconroy@simmonsfirm.com
SIMMONS HANLY CONROY
112 Madison Ave., 7th floor
New York, New York 10016
Phone:  (212) 784-6400

Attorneys for Plaintiffs and the Putative Class

Steven J. Errante (ct04292)
SErrante@ltke.com
Marisa A. Bellair (ct23802)
Mbellair@ltke.com
LYNCH, TRAUB, KEEFE, & ERRANTE, P.C.
P.O. Box 1612
52 Trumbull Street
New Haven, CT 06510
Phone:  (203) 787-0275
Fax:  (203) 782-0278

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on April 29, 2019, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by first-class mail to all parties who are unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

/s/    Andrea Bierstein
Andrea Bierstein
